**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

WEST ALABAMA WOMEN'S CENTER, on
behalf of themselves and their staff; Yashica
Robinson, M.D., on behalf of herself, her
patients and staff; and ALABAMA
WOMEN'S CENTER, on behalf of
themselves, their patients and staff,

        Plaintiffs,

v.

STEVE MARSHALL, in his official capacity
as Alabama Attorney General, WILLIAM R.
ADAIR in his official capacity as District
Attorney for Walker County, T. KIRKE
ADAMS in his official capacity as District
Attorney for Dale and Geneva Counties,
SCOTT ANDERSON in his official capacity
as District Attorney for Morgan County,
DARYL D. BAILEY in his official capacity
as District Attorney for Montgomery County,
JEFFREY WADE BARKSDALE in his
official capacity as District Attorney for
Franklin County, STEPHEN M. BILLY in his
official capacity as District Attorney for
Escambia County, KEITH BLACKWOOD in
his official capacity as District Attorney for
Mobile County, JENNIFER BRAY in her
official capacity as District Attorney for
Marshall County, ROBERT L. BROUSSARD
in his official capacity as District Attorney for
Madison County, DANNY CARR in his
official capacity as District Attorney for
Jefferson County, Birmingham Division,
MATTHEW CASEY in his official capacity
as District Attorney for Shelby County,
PAMELA CASEY in her official capacity as
District Attorney for Blount County, RICK
CHANCEY in his official capacity as District
Attorney for Russell County, CHRIS
CONNOLLY in his official capacity as

CIVIL ACTION NO._____

District Attorney for Lauderdale County,
CHAMP CROCKER in his official capacity as
District Attorney for Cullman County,
JOSEPH D. FICQUETTE in his official
capacity as District Attorney for Clay and
Coosa Counties, STEVEN D. GIDDENS in
his official capacity as District Attorney for
Talladega County, RUSS GOODMAN in his
official capacity as District Attorney for Henry
and Houston Counties, GREGORY S.
GRIGGERS in his official capacity as District
Attorney for Greene, Marengo, and Sumter
Counties, ANDREW C. HAMLIN in his
official capacity as District Attorney for
Fayette, Lamar, and Pickens Counties, LYLE
HARMON in his official capacity as District
Attorney for St. Clair County, HAL
HUGHSTON in his official capacity as
District Attorney for Colbert County, ERREK
P. JETT in his official capacity as District
Attorney for Lawrence County, BRIAN C.T.
JONES in his official capacity as District
Attorney for Limestone County, BRIAN A.
MCVEIGH in his official capacity as District
Attorney for Calhoun and Cleburne Counties,
WALTER M. MERRELL, III in his official
capacity as District Attorney for Covington
County, JASON R. PIERCE in his official
capacity as District Attorney for Jackson
County, BEN C. REEVES, JR. in his official
capacity as District Attorney for Barbour and
Bullock Counties, CJ ROBINSON in his
official capacity as District Attorney for
Autauga, Chilton, and Elmore Counties,
MIKE SEGREST in his official capacity as
District Attorney for Chambers, Macon,
Randolph, and Tallapoosa Counties,
SUMMER MCWHORTER SUMMERFORD
in her official capacity as District Attorney for
Cherokee and Dekalb Counties, SCOTT A.
SLATTON in his official capacity as District
Attorney for Marion and Winston Counties,
JAMES H. TARBOX in his official capacity
as District Attorney for Coffee and Pike
Counties, CHARLOTTE M. TESMER in her
official capacity as District Attorney for

Butler, Crenshaw, and Lowndes Counties,
ROBERT TURNER, JR. in his official
capacity as District Attorney for Bibb, Dallas,
Hale, Perry, and Wilcox Counties, JESSICA
VENTIERE in her official capacity as District
Attorney for Lee County, LYNNEICE OLIVE
WASHINGTON in her official capacity as
District Attorney for Jefferson County,
Bessemer Division, TODD WATSON in his
official capacity as District Attorney for
Conecuh and Monroe Counties, HAYS
WEBB in his official capacity as District
Attorney for Tuscaloosa County, JOSEPH
WILLOUGHBY in his official capacity as
District Attorney for Etowah County,
ROBERT E. WILTERS in his official
capacity as District Attorney for Baldwin
County, STEPHEN K. WINTERS in his
official capacity as District Attorney for
Choctaw, Clarke, and Washington Counties,

Defendants.

## VERIFIED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, by and through their attorneys, bring this Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof state the following:

## INTRODUCTION

1. Shortly after the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228 (2022), Alabama's criminal ban on nearly all abortion care, Ala. Code § 26-23H-1 *et seq*. (the "2019 Abortion Ban" or the "Ban"), went into effect.

2. As a result, physicians can no longer legally provide abortions in Alabama, except in the extremely limited circumstances permitted by the Ban.

3.      But that was only the start. As set forth further below, while Defendant Attorney General Marshall has conceded that it is lawful for a person to leave the state to obtain an abortion elsewhere, he has nevertheless publicly threatened that his office, working on its own and alongside local law enforcement and prosecutors, could use a heretofore unused 1896 provision of Alabama's conspiracy law, Alabama Code § 13A-4-4 ("Section 13A-4-4" or "1896 Law"), as well as other general criminal laws, to prosecute those who assist individuals seeking to lawfully travel across state lines to obtain abortion care *outside* of Alabama, in states where abortion is legal and even legally protected.

4.      As a result, Plaintiffs—who provide comprehensive non-abortion reproductive health care to pregnant patients in Alabama—fear that if they provide specific information, counseling, and other forms of practical support to assist individuals who are seeking to exercise their constitutional right to cross state lines and obtain legal medical care outside of Alabama, they will be prosecuted under the 1896 Law as conspirators and/or under another one of Alabama's general criminal laws.

5.      *No* Alabama law authorizes such prosecutions. Nor could it. That would be a blatant extraterritorial overreach of state power that not only contravenes the Due Process Clause, the First Amendment, and the fundamental constitutional right to travel, but also the most foundational principles of comity upon which our federalist system rests.

6.      Accordingly, Plaintiffs seek a declaration that the 1896 Law, Ala. Code § 13A-4-4, and/or any of Alabama's other general criminal laws, including but not limited to, Ala. Code § 13A-4-1 ("Criminal Solicitation"), Ala. Code § 13A-4-3 ("Criminal Conspiracy Generally"), Ala. Code § 13A-2-23 ("Criminal liability based upon behavior of another – Complicity"), cannot be used to prosecute otherwise lawful speech or conduct because it is intended to or may be used to assist Alabamians seeking to cross state lines to obtain abortion care in a state where abortion

4

is legal, and injunctive relief preventing the Defendants, their employees, agents, and successors in office, from enforcing or threatening to enforce such laws in this manner.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. This is an action to enforce civil and constitutional rights arising under 42 U.S.C. § 1983 and the U.S. Constitution.

8.     Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

9.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendant Marshall and a number of Defendant District Attorneys, including, *inter alia*, Defendant District Attorney for Montgomery County, who are sued in their official capacities, carry out their official duties at offices located in this District.

## PLAINTIFFS

10.     Plaintiff West Alabama Women's Center ("WAWC") provided abortion and other forms of reproductive health care in Tuscaloosa, Alabama, for nearly three decades, until the Supreme Court's *Dobbs* decision. WAWC no longer provides abortion care as a result of the Ban, but still provides a range of high-quality reproductive health services, including contraceptive counseling and care, testing and treatment for sexually transmitted infections, pregnancy testing, dating and options counseling, annual well-woman exams, prenatal care, and referrals for adoption services.

11.     Prior to *Dobbs*, WAWC staff provided those who wanted or needed to obtain out-of-state abortion care with information about and recommendations for specific, trusted providers from

whom they could obtain that care, tailored to their geographic location and particular personal and medical circumstances, as well as specific information about where they could obtain financial and practical support to access such care and for assistance with inter-state travel. Due to the threat of prosecution, WAWC no longer provides this sort of information and counseling, despite frequently receiving inquiries from people who are considering their pregnancy options and are interested in where and how to access abortion care in a state where it is legal, and where and how to obtain assistance in doing so. WAWC sues on its own behalf and on behalf of its staff.

12.    Plaintiff Yashica Robinson, M.D., is a highly experienced, board-certified OB-GYN, who has provided comprehensive reproductive health care to Alabamians for nearly twenty years. Prior to *Dobbs*, that care included abortion, but, as a result of the Ban, Dr. Robinson no longer provides abortion care. However, in her private practice and as Medical Director of Alabama Women's Center ("AWC") in Huntsville, Alabama, Dr. Robinson continues to provide a broad range of reproductive and women's health care, including but not limited to general OB-GYN care; major and minor gynecological surgeries; prenatal, delivery and post-partum care; management of infertility; and primary care.

13.    Prior to *Dobbs*, Dr. Robinson provided those who wanted or needed to obtain out-of-state abortion care with information about and recommendations for specific, trusted providers from whom they could obtain that care, tailored to their geographic location and particular personal and medical circumstances, as well as specific information about where they could obtain financial and practical support to access such care and for assistance with inter-state travel. She would also direct patients to the staff at AWC who would work with patients further to facilitate their travel. For medically complex patients, Dr. Robinson and her staff would also help coordinate the patient's transfer to an out-of-state provider by, *e.g.*, talking directly to the other provider and forwarding

medical records and other relevant information to support the patient's care. Due to the threat of prosecution, Dr. Robinson and her staff no longer provide this sort of information and support, despite frequently receiving inquiries from people who are considering their pregnancy options and are interested in where and how to access abortion care in a state where it is legal, and where and how to obtain assistance in doing so, and despite continuing to see medically complex patients who are considering abortion. Dr. Robinson sues on her own behalf and on behalf of her patients and staff.

14.     Plaintiff AWC provided abortion and other forms of reproductive health care in Huntsville, Alabama, for more than twenty years, until the Supreme Court's *Dobbs* decision. AWC no longer provides abortion care as a result of the Ban, but still provides a range of high-quality reproductive health services, including contraceptive counseling and care, testing and treatment for sexually transmitted infections, pregnancy testing, dating and options counseling, and referrals for prenatal care and adoption services.

15.     Prior to *Dobbs*, AWC staff provided those who wanted or needed to obtain out-of-state abortion care with information about and recommendations for specific, trusted providers from whom they could obtain that care, tailored to their geographic location and particular personal and medical circumstances, as well as specific information about where they could obtain financial and practical support to access such care and for assistance with inter-state travel. AWC staff also directly assisted many individuals who needed to travel out of state for abortion care by communicating with specific out-of-state providers to ensure that they could provide the care needed, making appointments for patients with out-of-state providers, coordinating funding for care and travel with local and national abortion assistance organizations, and helping to make travel arrangements. Due to the threat of prosecution, AWC no longer provides this sort of information and support, despite frequently receiving inquiries from people who are considering their pregnancy options and are interested in

where and how to access abortion care in a state where it is legal, and where and how to obtain assistance in doing so. AWC sues on its own behalf and on behalf of its patients and staff.

## DEFENDANTS

16.     Defendant Steve Marshall is the Attorney General of the State of Alabama, located at 501 Washington Avenue, Montgomery, Alabama. The Attorney General may, at "any time he [] deems proper, . . . superintend and direct the prosecution of any criminal case in any of the courts of this state," Ala. Code § 36-15-14, and may also "direct any district attorney to aid and assist in the investigation or prosecution of any case in which the state is interested," *id.* at § 36-15-15. As such, Defendant Marshall is responsible for criminal enforcement of, *inter alia*, Ala. Code § 13A-4-4, Ala. Code § 13A-4-1, Ala. Code § 13A-4-3, and Ala. Code § 13A-2-23. Defendant Marshall is sued in his official capacity.

17.     Defendants Alabama District Attorneys (the "Defendant District Attorneys") are the District Attorneys for the following Alabama counties:  Autauga County, Baldwin County, Barbour County, Bibb County, Blount County, Bullock County, Butler County, Calhoun County, Chambers County, Cherokee County, Chilton County, Choctaw County, Clarke County, Clay County, Cleburne County, Colbert County, Coffee County, Conecuh County, Coosa County, Covington County, Crenshaw County, Cullman County, Dale County, Dallas County, DeKalb County, Elmore County, Escambia County, Etowah County, Fayette County, Franklin County, Geneva County, Greene County, Hale County, Henry County, Houston County, Jackson County, Jefferson County/Bessemer Division, Jefferson County/Birmingham Division, Lamar County, Lauderdale County, Lawrence County, Lee County, Limestone County, Lowndes County, Macon County, Madison County, Marengo County, Marion County, Marshall County, Mobile County, Montgomery County, Monroe County, Morgan County, Perry County, Pickens County, Pike County, Randolph County, Russell

County, Shelby County, St. Clair County, Sumter County, Talladega County, Tallapoosa County, Tuscaloosa County, Walker County, Washington County, Wilcox County, Winston County. District attorneys have the power to "draw up all indictments and to prosecute all indictable offenses" within their jurisdiction. Ala. Code § 12-17-184(2). As such, the Defendant District Attorneys are responsible for criminal enforcement of, *inter alia*, Ala. Code § 13A-4-4, Ala. Code § 13A-4-1, Ala. Code § 13A-4-3, and Ala. Code § 13A-2-23, in their respective Alabama counties. The Defendant District Attorneys are sued in their official capacities.

## FACTUAL ALLEGATIONS

### Abortion in Alabama Post-*Dobbs*

18.     On June 24, 2022, the U.S. Supreme Court issued its opinion in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), overturning, *inter alia*, *Roe v. Wade*, 410 U.S. 113 (1973).

19.     Later that same day, in response to a motion filed by Defendant Marshall, this district court dissolved the preliminary injunction that had previously blocked enforcement of the 2019 Abortion Ban, thereby permitting the Ban to take immediate effect. *Robinson v. Marshall*, No. 2:19CV365-MHT, 2022 WL 2314402, at *1 (M.D. Ala. June 24, 2022).

20.     The 2019 Abortion Ban makes it a crime "for any person to intentionally perform or attempt to perform an abortion" at any stage in pregnancy, except to avert death or "serious health risk." Ala. Code § 26-23H-4.

21.     The Ban's exception for "serious health risk[s]" is limited to "a condition that so complicates [the patient's] medical condition that it necessitates the termination of her pregnancy to avert her death or to avert serious risk of substantial physical impairment of a major bodily function." *Id.* at § 26-23H-3. The exception requires sign-off from a second, and in some cases even third,

physician, *see id.* at § 26-23H-3(6); *id.* at § 26-23H-4(b), and it requires certain abortions be performed in a hospital, *see id.* at § 26-23H-3(6).

22.     In addition to the foregoing narrow exception, the Ban excludes from the definition of abortion, *inter alia*, a procedure to terminate the pregnancy in cases where the fetus "would die after birth or shortly thereafter or be stillborn." *Id.* at § 26-23H-3(1), (3).

23.     Performance of an abortion in violation of the Ban constitutes a Class A felony, which is punishable by imprisonment for 10-99 years. *Id.* at § 26-23H-6(a); *id.* at § 13A-5-6(a)(1).

24.     Attempted performance of an abortion in violation of the Ban constitutes a Class C felony, which is punishable by imprisonment for 1-10 years. *Id.* at § 26-23H-6(b); *id.* at § 13A-5-6(a)(3).

25.     The 2019 Ban explicitly exempts the person having the abortion from any criminal or civil liability. *Id.* at § 26-23H-5.[1]

26.     Upon information and belief, Alabama physicians are no longer providing abortion care, except potentially where one of the Ban's limited exceptions or exclusions applies.

**Defendant Marshall's Statements Following *Dobbs***

27.      On June 24, 2022, the day that *Dobbs* was decided and the Ban took effect, Alabama State Representative Chris England tweeted about the 1896 Law, asserting that, "anyone can be prosecuted for conspiracy [under that provision] if they help someone either get or even plan to get an abortion in another state."[2]

---

[1] *See also* Ashley Bowerman, *Alabama AG clarifies prosecution rules under abortion law*, WSFA 12 News, (Jan. 11, 2023, 9:31 PM), https://www.wsfa.com/2023/01/12/alabama-ag-clarifies-prosecution-rules-under-abortion-law/ (Defendant Marshall explaining that someone receiving an abortion in Alabama cannot be prosecuted, stating "[t]here is a very specific provision in [the 2019 Ban] that specifically exempts the woman from criminal prosecution.").

28.     In response, a spokesman for Defendant Marshall said, "We are reviewing the matter and have no comment at this time."[3]

29.     By July 13, 2022, Defendant Marshall appeared to agree with Representative England.

30.     As reported by Matt Clark, President of the Alabama Center for Law and Liberty, Defendant Marshall gave a speech at a local Federalist Society meeting on that date, stating that his office would exercise its authority to prosecute violations of the 2019 Ban and that the 1896 Law could apply to attempts to procure an abortion out of state.[4]

31.     Defendant Marshall addressed the issue again on August 11, 2022, as a guest on The Jeff Poor Show, an internet radio show broadcast in Alabama and available online.

32.     On air, Mr. Poor asked Defendant Marshall: "What do you think of some of the talk from the left that you could be an accomplice somehow by transporting someone across state lines for abortion? That these are things that are some of the unintended consequences of the Human Life Protection Act, that that is something your office, if it or any other prosecutor saw fit, that they could go after . . . [A] lot of these Democrats are making noise as some of these left-wing storefronts, these non-profits, that they're . . . that you can't even give somebody a ride to another state if they wanted to get an abortion, or there's all these aspects of the Human Life Protection

---

[2] Chris England (@RepEngland70), Twitter (June 24, 2022, 5:01 PM), https://twitter.com/RepEngland70/status/1540440008657608704; Chris England (@RepEngland70), Twitter (June 24, 2022, 7:49 PM), https://twitter.com/RepEngland70/status/1540482376014462977.

[3] Howard Koplowitz, *Is It Illegal to Help an Alabamian Travel to Get an Abortion? AG's office 'Reviewing the Matter,'* AL.com (June 29, 2022, 3:38 PM), https://www.al.com/news/2022/06/is-it-illegal-to-help-an-alabamian-travel-to-get-an-abortion-ags-office-reviewing-the-mater.html.

[4] Matt Clark, *The Good News Is, AG Marshall Will Enforce Abortion Ban*, 1819 News, (July 15, 2022), https://1819news.com/news/item/matt-clark-the-good-news-is-ag-marshall-will-enforce-abortion-ban.

Act that are going to come . . . . And I mean, is that really something that is on your radar that needs to be cleaned up or is it really part of the law?"[5]

33.     Defendant Marshall responded, as follows: "There's no doubt that [the Ban] is a criminal law, and general principles that apply to a criminal law would apply to this, because this is a classic felony, that is the most significant offense we have as far as punishment goes under a criminal statute absent a death penalty case. And so provisions relating to accessory liability, provisions relating to conspiracy, would have applicability involving this particular act that was passed by the Legislature. So, for example, if someone was promoting themselves out as a funder of abortion out of state, then that is potentially criminally actionable for us. And so, one thing that we will do in working with local law enforcement and prosecutors is making sure that we fully implement this law. You know, and there's nothing about that law that restricts any individual from driving across state lines and seeking an abortion in another place. However, I would say that if an individual held themselves out as an entity or a group that is using funds that they are able to raise to be able to facilitate those visits, then that's something that we're going to look at closely."[6]

34.     These comments were further reported on in Alabama media.[7]

#### The 1896 Law & Other Criminal Statutes

35.     Neither the 1896 Law nor any of Alabama's other general criminal laws were intended

---

[5] Jeff Poor Show FM Talk 1065, *Attorney General Steve Marshall*, Audioboom, at 00:05:30-00:07:07 (Aug. 11, 2022, 12:29 PM), https://audioboom.com/posts/8137219-attorney-general-steve-marshall-jeff-poor-show-august-11-2022.

[6] *Id.* at 00:08:00-00:09:30 (cleaned up).

[7] *See, e.g.*, Josh Moon, *Alabama AG: State May Prosecute Those Who Assist in Out-of-State Abortions*, Ala. Pol. Rep., (Sept. 15, 2022, 6:30 AM), https://www.alreporter.com/2022/09/15/alabama-ag-state-may-prosecute-those-who-assist-in-out-of-state-abortions/.

to be used to criminalize speech and conduct relating to out-of-state activities that are legal in the state where they occur.

*1896 Law*

36.     The 1896 Law, currently codified at <u>Alabama Code § 13A-4-4</u>, states that "[a] conspiracy formed in this state to do an act beyond the state, which, if done in this state, would be a criminal offense, is indictable and punishable in this state in all respects as if such conspiracy had been to do such act in this state."

37.     The 1896 Law codified the common law principle "that it is an indictable common-law misdemeanor to enter into a conspiracy in this state to commit a *known common-law felony, malum in se*, in a sister state," which the Alabama Supreme Court recognized applied in Alabama in *Thompson v. State*, <u>106 Ala. 67, 79</u>, <u>17 So. 512, 516</u> (Ala. 1895) (emphasis added).

38.     *Thompson* concerned an appeal brought by two criminal defendants who were jointly indicted for a conspiracy formed in Alabama to commit a robbery in Georgia and convicted. *Id.* at 512–13.

39.     The Alabama Supreme Court acknowledged that, at the time it was deciding the *Thompson* case, Alabama was "without a statute declaring a conspiracy formed in this state to commit a felony or a misdemeanor in a sister state an indictable offense." *Id.* at 515.

40.     Thus, the Court noted that under the existing Alabama criminal code, a punishable offense of conspiracy to commit a felony or misdemeanor seemingly "refer[red] exclusively to a conspiracy in [Alabama] to commit *within the state* a felony or misdemeanor, as the Code defines these offenses." *Id.* (emphasis added).

41.     Nevertheless, the Court noted that it "has long been established, in civil and criminal cases, that the common law, so far as adapted to [Alabama's] condition, consistent with [its]

institutions, and unaffected by legislation, prevails." *Id.* at 515–16.

42.     Accordingly, looking to the common law, the Court determined that it had "no hesitancy in declaring that it is an indictable common-law misdemeanor to enter into a conspiracy in this state to commit a *known common-law felony, malum in se*, in a sister state." *Id.* at 516 (emphasis added).

43.     The same year that *Thompson* was decided (1895), the Governor of Alabama appointed William L. Martin as Commissioner, pursuant to a legislative act,  "to revise, digest and codify all of the statutes of this State of a general and public nature, both civil and criminal." Report of William L. Martin, Code Commissioner of Alabama (1896), p. 3.[8]

44.     The act under which Commissioner Martin was charged provided, *inter alia*, that the Commissioner "shall prepare and submit to the Governor . . . such bills as he may deem necessary or proper for perfecting, harmonizing, or improving the system of laws of Alabama which he cannot embrace in the Code as hereinbefore provided," with such proposed laws to then be reported by the Governor to the Legislature. *Id.* at 4, Ex. 1.

45.     The Report submitted by Commissioner Martin in October 1896 contained a number of new proposed sections, including the following:

CHAPTER 138.—CONSPIRACY.

4428. New section. Makes a conspiracy formed in this State to do an act in another State which, if done in this State, would be a criminal offense, indictable and punishable here in all respects as if the conspiracy had been to do the act in this State.

(Suggested by Thompson v. State, 17 So. 512.)

*Id.* at 91, Ex. 1.

---

[8] The relevant excerpts from the Report are attached hereto as Exhibit 1. The full version is publicly available via the Harvard Law School Library at https://babel.hathitrust.org/cgi/pt?id=hvd.hl5119&view=1up&seq=1.

46.     On February 16, 1897, the Alabama Legislature approved the code proposed by Commissioner Martin, subject to any revisions adopted by a joint committee by both legislative chambers. *See* Act 480, "An Act To Adopt a Code of Laws for the State of Alabama."[9]

47.     No revisions were made to the conspiracy provision derived from *Thompson* set forth above, and it was adopted verbatim as part of the Alabama Code on that date:

> 4430. Conspiracy formed in this state to commit crime elsewhere indictable here.
>
> A conspiracy formed in this state to do an act beyond the state which, if done in this state, would be a criminal offense, is indictable and punishable in this state in all respects as if such conspiracy had been to do such act in this state.
>
> Thompson's case, <u>106 Ala. 67</u>.

1897 Code, 199.[10]

48.     The only identified source for the provision was *Thompson*, not an originating act passed by the Legislature. *Id.*

49.     Nor has any originating act ever been identified in subsequent versions of the Alabama Code. Rather, the provision was subsequently re-adopted verbatim (with only the section number changed) in the 1907, 1923, and 1940 Codes, each time citing only *Thompson* as its source.[11]

---

[9] Act 480 is attached hereto as <u>Exhibit 2</u>. The full version of the Alabama Legislative Acts, 1896-97 is publicly available via the Alabama Legislature's archives at https://archive.org/details/alabama-acts-1896-1897/Acts_1896_1897/.

[10] The relevant excerpts from the 1897 Code are attached hereto as <u>Exhibit 3</u>. The full version is publicly available via the Harvard Law School Library at https://babel.hathitrust.org/cgi/pt?id=hvd.hl3g45&view=1up&seq=215.

[11] Code of Alabama 1907, Vol. III—Criminal, Ch. 189 § 6472; Code of Alabama 1923, Vol. II—Criminal, Ch. 104 § 3573; Code of Alabama 1940, Vol. IV, Tit. 14. Crimes and Offenses, Ch. 29 § 102. The relevant excerpts from the 1907, 1923, and 1940 Codes are attached hereto as Exhibits 4, 5, and 6, respectively. The full version of the 1907 Code is publicly available at https://babel.hathitrust.org/cgi/pt?id=nyp.33433009075874, and the full version of the 1923 Code is publicly available at https://babel.hathitrust.org/cgi/pt?id=mdp.35112105421830&seq=177.

50.    In the 1940 version of the Code, the cite to *Thompson* was also accompanied by a recitation of the common law principle set forth by the Court in that case: that "[t]he common-law offense of conspiracy to commit a felony, malum in se, in a sister state, is indictable and punishable in this state." *See* Ex. 6, 1940 Code Excerpts, at 77.

51.    The current version of the provision was codified (again verbatim) in 1977 at Section 13A-4-4, where it remains today.

52.    Upon information and belief, no prosecution has ever been brought under the 1896 Law at all, let alone with respect to the formation of an alleged conspiracy to engage in conduct that is lawful where it occurs.

53.    In view of the Alabama Supreme Court's authoritative construction of the 1896 Law, as set forth in *Thompson* and re-adopted and re-codified in the Alabama Code multiple times for more than 100 years, and the fact that the law has never been used to prosecute an alleged conspiracy to engage in out-of-state conduct that is legal in the state where it occurs, to use the 1896 Law to prosecute speech or conduct that assists those seeking to obtain an out-of-state abortion that is legal in the state where it is provided would violate fundamental Due Process principles of notice, foreseeability, and the right to fair warning.

54.    If Defendant Marshall or any of the Defendant District Attorneys were permitted to use the 1896 Law, contrary to the Alabama Supreme Court's holding in *Thompson*, to prosecute the formation of an alleged conspiracy in Alabama to obtain an abortion in a state where abortion is legal, then there would be nothing to stop them from selectively prosecuting individuals for speech and conduct relating to any number of other lawful out-of-state activities, particularly where those activities may be deemed controversial or politically unpopular.

55.    Even if the 1896 Law had been intended to be used to prosecute certain individuals

for the formation of an alleged conspiracy in Alabama to engage in conduct that is lawful where it occurs, *i.e.*, obtaining abortion care, doing so would violate any number of federal constitutional guarantees, including the First Amendment and the fundamental right to travel, a right that lies at the heart of our federalist system.

***Other Laws Concerning Conspiracy, Solicitation, and Criminal Liability***

56.     None of Alabama's other general conspiracy, solicitation, or criminal liability statutes even reference extraterritorial conduct at all, let alone lawful extraterritorial conduct. *See, e.g.*, Ala. Code § 13-A-4-3 (Criminal conspiracy generally); *id.* at § 13A-4-1 (Criminal solicitation); *id.* at § 13A-2-23 (Criminal liability based on behavior of another – Complicity).

57.     For example, the general conspiracy statute states "[a] person is guilty of criminal conspiracy if, *with the intent that conduct constituting an offense be performed*, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one or more of such persons does an overt act to effect an objective of the agreement." *Id.* at § 13A-4-3(a) (emphasis added).

58.     The criminal solicitation statute states that "[a] person is guilty of criminal solicitation if, *with the intent that another person engage in conduct constituting a crime*, he solicits, requests, commands or importunes such other person to engage in *such conduct*." *Id.* at § 13A-4-1 (emphasis added).

59.     The general complicity statute states that "[a] person is legally accountable for the behavior of another *constituting a criminal offense* if, with the *intent to promote or assist the commission of the offense*," that person "procures, induces or causes such other person to *commit the offense*" or "aids or abets such other person in *committing the offense*." *Id.* at § 13A-2-23 (emphasis added).

60.     There is no Alabama law that purports to make providing or obtaining abortion care in a state where abortion is legal a crime or offense within Alabama.

61.     Therefore, there is nothing on the face of any of Alabama's general conspiracy, solicitation, or criminal liability statutes that would provide any Alabamian with notice, foreseeability, or fair warning that assisting someone to lawfully travel across state lines to obtain an abortion in another state where abortion is legal could constitute a crime or offense for purposes of those statutes.

62.     If Defendant Marshall or any of the Defendant District Attorneys were permitted to use Alabama's general conspiracy, solicitation, or criminal liability statutes to prosecute otherwise lawful speech and conduct that is intended to or may be used to assist someone in Alabama seeking to obtain an abortion in a state where it is legal—even though those statutes are, on their face, limited to crimes and offenses—then there would be nothing to stop them from selectively prosecuting individuals for speech and conduct relating to any number of other lawful out-of-state activities, particularly where those activities may be deemed controversial or politically unpopular.

63.     Even if any of these laws had been intended to be used to prosecute certain individuals for the formation of an alleged conspiracy, solicitation, and/or complicity to engage in conduct that is lawful where it occurs, *i.e.*, obtaining abortion care, doing so would violate any number of federal constitutional guarantees, including the First Amendment and the fundamental right to travel, a right that lies at the heart of our federalist system.

**The Impact of the Defendant Marshall's Threat on Plaintiffs and Alabamians Seeking Out-of-State Abortion Care**

64.     As noted above, Plaintiffs WAWC, AWC, and Dr. Robinson provide Alabamians with comprehensive, high-quality reproductive health services, including pregnancy testing and dating, and options counseling, and frequently receive questions from pregnant individuals about available treatment and medical care options, including those options that are lawful and available

18

outside of Alabama, such as abortion. Dr. Robinson also occasionally receives inquiries from physician colleagues in Alabama seeking information for their patients about available treatment and medical care options, including options for abortion care that is lawful and available outside of Alabama.

65.     Prior to *Dobbs*, Plaintiffs provided these individuals with information, counseling, and support in order to assist those individuals interested in accessing out-of-state abortion care in doing so. And, but for Defendant Marshall's unjustified threat, they would do the same today.

66.     However, as set forth below, Defendant Marshall's threat to exercise his authority to "superintend and direct the prosecution," Ala. Code § 36-15-14, or "direct any district attorney to aid and assist in the investigation or prosecution," *id.* at § 36-15-15, of individuals in Alabama who assist those seeking to engage in lawful travel to obtain abortion care in another state where abortion is legal is having a significant chilling effect on Plaintiffs' provision of this information, counseling, and support, and on the constitutional rights of Plaintiffs and their patients.

***Pre-Dobbs, Plaintiffs Provided Information and Support to Alabamians Seeking Out-of-State Abortion Care***

67.     Before *Dobbs*, Plaintiffs would provide individuals seeking abortion care outside of Alabama with information about and recommendations for specific, trusted abortion providers in other states, based on the individual's personal and medical circumstances. For example, Plaintiffs would provide information about or recommend specific providers they knew to provide safe, high-quality care based on proximity to the person's home, their pregnancy duration, and/or any other specific medical needs, to attempt to ensure that they could obtain the care they needed in a timely fashion.

68.     Before *Dobbs*, Plaintiffs would also provide specific information to individuals about where and how they could obtain financial assistance and/or other practical support relating to inter-

state travel.

69.     In addition, Plaintiff AWC's staff would often directly assist people seeking out-of-state abortion care by communicating with out-of-state providers to ensure that they could provide the care needed, making appointments with the out-of-state providers, coordinating funding for care and travel with local and national abortion assistance organizations, and helping to make travel arrangements.

70.     Moreover, for patients with medically complex circumstances who needed to travel to obtain out-of-state care, Plaintiff Dr. Robinson would also speak directly with the physician to whom she was referring the patients, relay pertinent medical and surgical history, coordinate and complete pre-procedural testing, and, as needed, coordinate with the patient's primary care physician about the patient's medical circumstances. Dr. Robinson and her staff would also compile the necessary information and transmit the medical records, including referral, to seek to ensure that the receiving physician had a complete copy of the patients' relevant records and could provide timely care.

***Defendant Marshall's Threat Has Chilled Plaintiffs' Provision of Information and Support to Alabamians Seeking Out-of-State Abortion Care***

71.     Given Defendant Marshall's statements, and the unjustified threat of prosecution of individuals in Alabama who assist those seeking to engage in lawful travel to obtain lawful medical care in another state, Plaintiffs ceased providing this sort of information and support.

72.     While Plaintiffs do not concede that their prior speech or conduct meets the definition of a conspiracy, solicitation, or other forms of complicity under Alabama law, given Defendant Marshall's statements, Plaintiffs are afraid that Defendant Marshall or a Defendant District Attorney would nevertheless try to use the sort of information and/or support they previously provided as direct or circumstantial evidence of a conspiracy, solicitation, or some other form of complicity, like aiding

or abetting.

73.     To be convicted under any of these statutes would result in serious criminal penalties. Violation of the 2019 Ban is a Class A Felony. Ala. Code § 26-23H-6(a). Under Alabama law, a criminal conspiracy is a Class B felony if an object of the conspiracy is a Class A felony; it is punishable by imprisonment for 2-20 years. *Id.* at § 13A-4-3(g)(2), *id.* at § 13A-5-6. The same is true for solicitation. *Id.* at § 13A-4-1(f)(2), *id.* at § 13A-5-6. Violation of the 2019 Ban based on the behavior of another, *e.g.*, *id.* at § 13A-2-23, is a Class A Felony punishable by 10-99 years imprisonment, *id.* at § 26-23H-6(a); *id.* at § 13A-5-6(a)(1).

***Defendant Marshall's Threat Is Inflicting Ongoing, Irreparable Harm on Plaintiffs and Alabamians Seeking Out-of-State Abortion Care***

74.     The chill on Plaintiffs' speech and conduct caused by Defendant Marshall's unjustified threat is inflicting serious ongoing, irreparable harm on Plaintiffs and their constitutional rights, and also on those who rely on them for information and advice about safe medical options and to exercise their constitutional right to cross state lines to obtain abortion care in states where abortion is legal.

### A.   *Irreparable Harm to Plaintiffs and Their Staff*

75.     Consistent with their medical ethical obligations, it is common for medical providers to counsel their patients about individualized and specialized medical treatments available out of state, and to provide individuals with information about and recommendations for out-of-state medical providers that are tailored to the individual's specific personal and medical circumstances.

76.     The threat of prosecution for providing information and assistance of the kind offered in every other aspect of medical care is severely harmful and disruptive to Plaintiffs and to the physician-patient relationship.

77.     WAWC estimates they receive calls or inquiries about out-of-state abortion options from approximately 30 individuals per week.

78.     Similarly, Dr. Robinson estimates she receives approximately 5 inquiries about out-of-state abortion options each week at her private practice, and AWC estimates that it receives approximately 40-50 such inquiries per week.

79.     Plaintiffs and their staff are trained and feel ethically obligated to present pregnant patients with all of their treatment options, respond to patient questions, and provide them with the best medical information they can, including information about where and how to safely access care that Plaintiffs themselves cannot provide.

80.     Plaintiffs and their staff know that patients expect to be able to trust their health care providers to give them counseling and information about all risks, benefits and alternatives, as well as information about how they can access the care they need. It is devastating for Plaintiffs to have to withhold vital information and support, putting their patients' health and safety at risk, exacerbating the confusion and distress their patients are already experiencing, and contributing to potentially dangerous delays in accessing health care.

81.     For example, Dr. Robinson's patients regularly come to her with requests for information about their medical circumstances and treatment options, but the risk of prosecution means that she cannot give those who may be considering abortion the specific information and counseling about their options that she believes they deserve and need. Patients also sometimes inquire about what would happen if something went wrong with a wanted pregnancy and they needed to terminate it, but, again, because of Defendant Marshall's threat, Dr. Robinson cannot provide specific information or counseling about what their options would be in such a scenario. Depriving patients of this information and assistance is agonizing for Dr. Robinson and goes

against all of her training and commitment to patient-centered care. Every one of these conversations causes her great distress.

82.     However, as much as Plaintiffs wish to provide information and support to pregnant Alabamians, Plaintiffs and their staff simply cannot afford to do so in the face of the severe criminal penalties outlined above.

83.     The majority of Plaintiffs WAWC's and AWC's staff members are the sole source of income for their households. If they were to be arrested and prosecuted for their provision of information or support to patients, they face not only the loss of their personal freedom, but the loss of physical and financial security for their entire families.

84.     Moreover, even if a prosecution were ultimately unsuccessful, to be arrested and to have to defend against such a prosecution can cause significant and irreparable harm. A felony charge and prosecution would take an enormous toll on Plaintiffs and their staff—financial, emotional, and reputational. The cost of defending such a prosecution could be financially devastating, and a licensed health care provider could face career-ending consequences.

85.     Dr. Robinson has direct personal experience with the enormous toll that defending against an unjustified and ultimately unsuccessful prosecution can take on a person's life and family.

86.     In 2014, Dr. Robinson was criminally indicted on federal fraud charges, as a result of unknowingly purchasing misbranded intra-uterine devices (a form of long-acting, reversible contraception).

87.     Dr. Robinson's attorneys moved to dismiss the indictment on the grounds that she had been subject to selective prosecution because of her connection with abortion services. Def. Y. Robinson White M.D.'s Mem. of Law in Supp. Mot. to Dismiss, *United States v. Robinson*

*White*, No. 3:14-CR-00126-MHT, (M.D. Ala. Jan. 20, 2015), ECF No. 30. Indeed, as of January 2015, when the motion to dismiss was filed, Dr. Robinson was the only person—in Alabama or the nation—to have been prosecuted for any federal offense related to these devices, despite the fact that *hundreds* of other health care providers—including multiple providers in Alabama alone—had also purchased misbranded devices in the same manner. *Id.* at 7–8.

88.     After the motion was filed, the federal government also moved to dismiss, and the court granted that motion, dismissing the indictment with prejudice. Judgment, *United States v. Robinson White*, No. 3:14-CR-00126-MHT (M.D. Ala. Mar. 4, 2015), ECF No. 46.

89.     Despite the dismissal, the process inflicted significant harm on Dr. Robinson's professional and personal life. Her indictment was used in unrelated legal proceedings to malign the safety and competence not only of the care Dr. Robinson provided, but also of the care of other physicians who provided abortions in Alabama. Dr. Robinson even had to obtain a letter from her lawyer to submit to the hospital where she works to retain her admitting privileges.

90.     Further, the legal fees for her ultimately successful defense were financially devastating, and the entire experience also took a deeply personal toll on Dr. Robinson. Before the indictment was dismissed, she was often unable to sleep and often reduced to uncontrollable tears, fearful that in addition to her family's financial well-being, her freedom was being threatened at every turn. She struggled to explain to her children what was happening and to protect them from being asked about it at school.

91.     Plaintiffs and their staff are thus caught between a rock and a hard place—they are deeply distressed by being unable to provide their patients with the lawful information and support they feel ethically obligated to provide, but cannot afford to risk providing this information and support given the immense personal, professional, and financial harm they would incur if

prosecuted (even unsuccessfully) and/or convicted under the 1896 Law, or any of the other general criminal laws that Defendant Marshall has threatened to use against those who assist pregnant Alabamians in accessing legal out-of-state abortion care.

### B.   Irreparable Harm to Pregnant Alabamians, Including Plaintiffs' Patients

92.     In addition to harming Plaintiffs and their staff, Defendant Marshall's threats are seriously and irreparably harming pregnant Alabamians, including Plaintiffs' patients.

93.     As noted above, patients routinely seek out the expertise, insight, and recommendations of their medical providers regarding individualized and specialized medical treatments that are available out of state.

94.     Indeed, consultation with a medical provider in Alabama regarding the availability of out-of-state options for medical care is often the first step in providing Alabamians access to these critical treatments. For example, there are cancer clinics that draw their patients from across the country because of clinical trials or treatments only available in those locations. Alabama patients might only learn of the opportunity to obtain care at such a facility because of the knowledge and expertise of their local oncologist.

95.     Many patients also rely on their home-state medical providers to guide and assist them in figuring out payment for out-of-state care, and (particularly for medically complex patients) to communicate directly with any out-of-state specialist they are being referred to about their medical condition and history.

96.     Pregnant Alabamians, just like people seeking other types of medical treatment, have the right to seek and obtain information, counsel, and medical advice about all medical options, including those options—such as abortion—that are legal outside of Alabama.

97.     A pregnant person may choose to have an abortion for a myriad of complex and

often interrelated reasons that are intimately related to the individual's health status and reproductive history, values and beliefs, culture and religion, familial situation, and resources and economic stability.

98.     In addition, some people who have suffered trauma, such as sexual assault or domestic violence, may be concerned that pregnancy, childbirth, and/or an additional child may exacerbate already extremely difficult and dangerous situations for them and put them at greater risk of sexual or physical violence, or worse.

99.     Continuing a pregnancy can also pose a risk to the person's physical, mental, and emotional health, and even their life, as well as to the stability and well-being of their family, including existing children.

100.    Even for someone who is otherwise healthy and has an uncomplicated pregnancy, carrying that pregnancy to term and giving birth poses serious medical risk and can have long-term medical or physical consequences. For someone with a medical condition caused or exacerbated by pregnancy, these risks are increased.

101.    Whether to take on the risks associated with pregnancy and/or the responsibilities of parenting, or whether to have an abortion, is an extremely personal and individualized decision.

102.    As noted above, Plaintiffs collectively receive calls or inquiries about out-of-state abortion options from approximately 75-85 individuals per week.

103.    Many of those who seek information and resources from Plaintiffs do not have reliable internet access and/or are not tech savvy, which can make navigating the internet to find reliable information and resources relating to out-of-state abortion providers on their own very difficult, if not impossible.

104.    Others have limited English language proficiency, which may make navigating the

26

internet to find reliable information and resources relating to out-of-state abortion providers on their own particularly daunting, given that so few online resources are available in other languages, including Spanish.

105.    But even those who do not face technical or basic language obstacles may lack the expertise or experience coordinating care, travel, and funding for medical care to ensure that they can find high-quality care, tailored to their needs in another state, and/or the resources they need to avail themselves of such care.

106.    Without Plaintiffs' expertise to guide them to an appropriate, trusted provider, some people unknowingly seek information and assistance via websites that are set up to impede access to abortion care, rather than to provide information and resources to help facilitate such care, and may be delayed in obtaining care as a result. Others are so overwhelmed by the prospect of navigating out-of-state abortion access on their own that they may give up obtaining a desired abortion entirely.

107.    Further, the majority of Plaintiffs' patients are low income, and without Plaintiffs' assistance in securing funds, transportation, or logistical support that will enable them to travel out of state, these patients will face still greater delays as they try to either navigate finding financial assistance or to raise the necessary funds on their own.

108.    The fluctuating availability of abortion in states surrounding and close to Alabama only makes it more challenging for pregnant Alabamians to find safe options for care in a timely manner without the expertise and advice of their health care providers. For example, due to ongoing litigation and legislation, clinics have opened and closed, and gestational limits for abortion have changed or threatened to change multiple times over the past year in Georgia, Florida, North Carolina, and South Carolina, to name just a few states.

109.    While abortion is very safe, and far safer than childbirth, the risks associated with it do increase as pregnancy progresses, as do the costs of the procedure.

110.    As noted above, pregnancy also places stresses on the body, and can give rise to or exacerbate existing health risks.

111.    The physical stresses of pregnancy can also make it difficult if not impossible for some people to continue to go to work or school or care and provide for existing children.

112.    For those experiencing intimate partner violence, forced pregnancy may also exacerbate the risk of new or increased violence and may further—often permanently—tether the victim and the victim's family to their abuser.

113.    Therefore, the longer it takes for someone to find an appropriate out-of-state provider, and make the necessary arrangements to attend an appointment, the greater the cost, especially if they are required to make multiple trips and/or engage in extensive inter-state travel, and the greater the risk to their health and safety from prolonged pregnancy and the abortion procedure itself.

114.    For some of Plaintiffs' patients, receiving assistance in finding a clinic, arranging funding, and handling the logistics may be what makes the difference between them being able to obtain a safe abortion outside Alabama or being forced to continue a pregnancy and give birth against their will.

115.    Indeed, Dr. Robinson has provided ongoing prenatal care to patients who initially asked for information about access to abortion care—information that Dr. Robinson was unable to provide as a result of Defendant Marshall's threat—and who then continued, throughout their pregnancies, to express ambivalence and distress about remaining pregnant and carrying to term and giving birth.

116.    Particularly for Black women—comprising the majority of Plaintiffs' patients—the ability to travel out of state for care may be what makes the difference between obtaining a safe abortion and dying as a result of pregnancy or childbirth. Alabama has the third highest maternal mortality rate in the country, reporting 36.4 deaths per 100,000 live births in 2020,[12] and Black women make a disproportionate share of these deaths: In Alabama, Black women make up 36% of maternal deaths, but only 30% of all births.[13]

* * *

117.    But for the fear of prosecution set forth above, Plaintiffs would resume providing information about and recommendations for specific, trusted abortion providers in other states, based on an individual's personal and medical circumstances, as well as information about where and how patients traveling out of state could obtain financial assistance and/or other practical support relating to inter-state travel.

118.    But for the fear of prosecution set forth above, Plaintiff Dr. Robinson would resume coordinating the transfer of patient care to out-of-state providers for medically complex patients by, for example, talking directly to other out-of-state providers and forwarding medical records and other relevant information to support the patient's care. Likewise, Plaintiff AWC would resume directly assisting with practical and logistical needs by, for example, helping patients with phone calls and scheduling appointments, helping patients make travel arrangements, coordinating travel, lodging, and financial assistance with organizations that provide financial and practical

---

[12] Bur. of Family Health Servs., Ala. Dep't of Pub. Health, 2020 Maternal Mortality Review 6 (2022), https://www.alabamapublichealth.gov/perinatal/assets/2020_final_annual_mmr.pdf.

[13] 2020 Maternal Mortality Review, *supra* at n.12 (Black patients make up 36% of maternal deaths in Alabama but only 30% of all births).

support, and related needs.

119.    Plaintiffs have no adequate remedy at law.

## CLAIMS FOR RELIEF

### Count I

### (VIOLATION OF DUE PROCESS)

120.    Plaintiffs incorporate by reference all of the allegations set forth in preceding paragraphs 1 through 119.

121.    No Alabama law purports to make it a crime in Alabama to provide an abortion in another state where abortion is legal, to obtain or seek to obtain an abortion in another state where abortion is legal, or cross or seek to cross state lines to obtain an abortion in another state where abortion is legal.

122.    Therefore, prosecuting Plaintiffs for otherwise lawful speech and conduct under the 1896 Law, Ala. Code § 13A-4-4, and/or any of Alabama's other general criminal laws, *e.g.*, Ala. Code §§ 13A-4-1, 13A-4-3, 13A-2-23, because that speech or conduct may assist Alabamians crossing state lines, or seeking to cross state lines, to obtain abortion in another state where abortion is legal violates the Due Process Clause because no Alabama statute or case law provides any notice, foreseeability, or fair warning that such speech or conduct could constitute a criminal offense. *See, e.g.*, *Bouie v. City of Columbia*, 378 U.S. 347, 350–55 (1964).

### Count II

### (VIOLATION OF THE FIRST AMENDMENT)

123.    Plaintiffs incorporate by reference all of the allegations set forth in preceding paragraphs 1 through 122.

124.    The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." The First Amendment applies to state and local governments under the Fourteenth Amendment to the United States Constitution.

125.    Plaintiffs' speech about abortion care that is legal and available in other states, including, but not limited to, their provision of counseling about out-of-state options and information about and recommendations for specific, trusted out-of-state abortion providers and financial and practical support resources for assistance with inter-state travel, is protected by the First Amendment.

126.    As applied to the provision of counseling, information, and/or recommendations to patients about their options for abortion care that is legal and available in other states, and resources for obtaining that care, the 1896 Law, Ala. Code § 13A-4-4, and/or any of Alabama's other general criminal laws, *e.g.*, Ala. Code §§ 13A-4-1, 13A-4-3, 13A-2-23, unconstitutionally restrict Plaintiffs' right to free speech.

127.    As applied to the provision of counseling, information, and/or recommendations to patients about their options for abortion care that is legal and available in other states, and resources for obtaining that care, the 1896 Law, Ala. Code § 13A-4-4, and/or any of Alabama's other general criminal laws, *e.g.*, Ala. Code §§ 13A-4-1, 13A-4-3, 13A-2-23, unconstitutionally discriminate on the basis of content and viewpoint.

## Count III

### (VIOLATION OF THE FUNDAMENTAL RIGHT TO TRAVEL)

128.    Plaintiffs incorporate by reference all of the allegations set forth in preceding paragraphs 1 through 127.

129.     The U.S. Constitution protects the fundamental right of individuals to "travel freely" among the states. *Saenz v. Roe*, 526 U.S. 489, 500–501 (1999) (quoting *United States v. Guest*, 383 U.S. 745, 757 (1966)).

130.     The right to travel has been "firmly established" and "repeatedly recognized" in Supreme Court jurisprudence, and is so "fundamental" and "elementary" that it "was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created." *Guest*, 383 U.S. at 757–58; *see also Shapiro v. Thompson*, 394 U.S. 618, 638 (1969), *overruled in part on other grounds in Edelman v. Jordan*, 415 U.S. 651 (1974).

131.     As applied to the provision of information or other speech described above, as well as to the provision of other forms of support and assistance to those seeking to exercise their constitutional right to travel to obtain abortion care that is legal and available in other states, the 1896 Law, Ala. Code § 13A-4-4, and/or any of Alabama's other general criminal laws, *e.g.*, Ala. Code §§ 13A-4-1, 13A-4-3, 13A-2-23, unconstitutionally violate the fundamental right to travel by "burden[ing] or restrict[ing]" Alabamians' inter-state movement, *Saenz*, 526 U.S. at 498; *cf. also Dobbs*, 142 S. Ct. at 2309 (Kavanaugh, J., concurring) (even if a state may criminalize abortion within its borders, it may not criminalize "traveling to another State to obtain an abortion").

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court:

A.     Enter a judgment declaring that, if applied to prosecute individuals for otherwise lawful speech or conduct because it is intended to or may be used to assist Alabamians seeking to cross state lines to obtain abortion care in a state where abortion is legal, the 1896 Law, Ala. Code § 13A-4-4, and/or any other provision of Alabama's criminal code, *e.g.*, Ala. Code §§ 13A-4-1,

13A-4-3, 13A-2-23, violate the Due Process Clause, the First Amendment, and the fundamental right to travel, as guaranteed by the U.S. Constitution; and enter an injunction restraining Defendants, their employees, agents, and successors in office from enforcing or threatening to enforce those laws in that manner;

      B.    To award Plaintiffs their costs and expenses, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

      C.    To grant any additional relief as may be just and proper.


Respectfully submitted this July 31st, 2023.

Alison Mollman
Alabama State Bar No. 8397-A33C
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(510) 909-8908
amollman@aclualabama.org

Meagan Burrows*
New York State Bar No. 5341904
Alexa Kolbi-Molinas*
New York State Bar No. 4477519
Lindsey Kaley*
New York State Bar No. 5324983
Scarlet Kim*
New York State Bar No. 5025952
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
mburrows@aclu.org
akolbi-molinas@aclu.org
lkaley@aclu.org
scarletk@aclu.org

33

Lorie Chaiten*
Illinois State Bar No. 6191424
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
1640 North Sedgwick
Chicago, IL 60614
(212) 549-2633
lchaiten@aclu.org

*Attorneys for Plaintiffs*

*\*Pro hac vice motions forthcoming*

## VERIFICATION OF COMPLAINT

I, Robin Marty, am Operations Director of West Alabama Women's Center (WAWC), and I am authorized to give this verification on behalf of WAWC. I further declare under penalty of perjury under the laws of the United States that I have reviewed the Verified Complaint and that the statements contained in paragraphs 4, 10, 11, 26, 64, 65, 66, 67, 68, 71, 72, 74, 75, 76, 77, 79, 80, 82, 83, 84, 91, 92, 93, 94, 95, 96, 97, 98, 99, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 116, 117, related to WAWC are true and accurate to the best of my knowledge and belief based on the information currently available to me.

Robin Marty
Operations Director
West Alabama Women's Center

Executed on: _7/27/23_

## VERIFICATION OF COMPLAINT

I, Yashica Robinson, M.D., am Medical Director of Alabama Women's Center (AWC) and provide medical care to Alabamians in my own private practice. I am authorized to give this verification on behalf of AWC, in my capacity as Medical Director, and on behalf of myself. I further declare under penalty of perjury under the laws of the United States that I have reviewed the Verified Complaint and that the statements contained in paragraphs 4, 12, 13, 14, 15, 26, 64, 65, 66, 67, 68, 69, 70, 71, 72, 74, 75, 76, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, and 118, related to myself and to AWC are true and accurate to the best of my knowledge and belief based on the information currently available to me.

Yashica Robinson, M.D.
Medical Director
Alabama Women's Center

Executed on: 07/27/23