# IN THE DISTRICT COURT OF THE UNITED STATES FOR THE MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| YELLOWHAMMER FUND, on behalf of itself and its clients. | ) ) ) | CASE NO. 2:23-cv-00450-MHT |
| Plaintiff, | ) ) | CIVIL ACTION |
| v. | ) ) | |
| ATTORNEY GENERAL OF ALABAMA STEVE MARSHALL, in his official capacity | ) ) ) ) | |
| Defendant. | ) ) | |
| WEST ALABAMA WOMEN'S CENTER, on behalf of themselves and their staff; et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| STEVE MARSHALL, in his official capacity as Alabama Attorney General, | ) ) ) ) | |
| Defendant. | ) ) | |

## PLAINTIFF YELLOWHAMMER FUND'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................. 3

  A.  Defendant Threatened to Prosecute Abortion Helpers for Engaging in Constitutionally Protected Activities ................................................ 3

  B.  Plaintiff Is a Reproductive Justice Organization that Communicates a Message of Solidarity and Support to Pregnant Alabamians. ........................................ 4

  C.  Plaintiff Has a Genuine Desire to Engage in Constitutionally Protected Activities. ............................................................................... 5

  D.  Plaintiff's Desired Expression About Lawful, Out-of-State Abortion Care Is Vital in Light of Alabama's Abortion Ban. ........................................ 7

STANDARD OF REVIEW .............................................................................. 8

ARGUMENT ................................................................................................... 10

  A.  Supporting A Pregnant Person's Lawful, Out-Of-State Abortion Does Not Violate Any Alabama Law. ................................................ 11

  B.  Applying the Alabama Abortion Ban to Criminalize Abortion in a State Where it Is Lawful Would Violate the Due Process Clause and Foundational Principles of Sovereignty and Comity. ................................................ 17

  C.  Defendant's Threats Violate Helpers' Rights to Free Expression and Association Under the First Amendment. ........................................ 20

  D.  Alabama Code § 13A-4-4 is Unconstitutionally Overbroad. ............................ 33

  E.  Defendant's Threats Violate Plaintiff's and Pregnant Alabamians' Right to Travel ........................................................................ 36

CONCLUSION ................................................................................................ 47

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*, 143 S. Ct. 2298 (2023)............................................ 21, 22

*Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373 (2021)............. 30, 33

*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242 (1986) ............................................ 8, 9

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002) .................................................. 21

*Attorney General of New York v. Soto-Lopez*, 476 U.S. 898 (1986)............. 37, 40, 43

*Barrows v. Jackson*, 346 U.S. 249 (1953) .................................................................. 44

*Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569

   (1987).................................................................................................. 33, 35, 36

*Bigelow v. Virginia*, 421 U.S. 809 (1975) ....................................................... 19, 20, 32

*BMW of N. America, Inc. v. Gore*, 517 U.S. 559 (1996)........................................... 18

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000)...................................................... 29

*Brady v. Carnival Corp.*, 33 F.4th 1278 (11th Cir. 2022)........................................... 8

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973)........................................................... 33

*Brown v. Hartlage*, 456 U.S. 45 (1982)...................................................................... 34

*Carey v. Pop. Servs. Int'l*, 431 U.S. 678 (1977).......................................................... 44

*Catron v. City of St. Petersburg*, 658 F.3d 1260 (11th Cir. 2011) ............................ 33

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247 (11th Cir.

   2021) .................................................................................................................... 24

*Craig v. Boren*, 429 U.S. 190 (1976).......................................................................... 44

*Crandall v. Nevada*, 73 U.S. 35 (1867) .................................................................. passim

*Cruthers v. State*, 67 N.E. 930 (Ind. 1903) ..................................................... 13, 14, 16

*Dennis v. United States*, 341 U.S. 494 (U.S. 1951) .............................................. 31, 34

*DJR Assocs. LLC v. Hammonds*, 241 F. Supp. 3d 1208 (N.D. Ala. 2017) ............... 19

*Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022) ... 3, 6, 8, 19

*Edwards v. California*, 314 U.S. 160 (1941) ......................................................... passim

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................ 29

*FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290 (11th Cir. 2017) 35, 36

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235 (11th

   Cir. 2018) ............................................................................... 22, 23, 24, 25

*Garvie v. City of Fort Walton Beach*, 366 F.3d 1186 (11th Cir. 2004) ...................... 9

*Griswold v. Connecticut*, 381 U.S. 479 (1965) ......................................................... 44

*Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936) ...................................................... 21

*Healy v. James*, 408 U.S. 169 (1972) ....................................................................... 30

*Henry v. Attorney General*, 45 F.4th 1272 (11th Cir. 2022) ..................................... 33

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ......................................... 31

*Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004) ........... 23, 25

*Jacobs v. The Florida Bar*, 50 F.3d 901 (11th Cir. 1995) ......................................... 10

*June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103 (2020) ............................ 44, 46, 47

*Kaplan v. California*, 413 U.S. 115 (1973) ............................................................... 22

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) ................................................................ 45

iv

*Matal v. Tam*, 137 S. Ct. 1744 (2017) ......................................................... 26

*McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185 (2014).................................... 24

*Myers v. United States*, 377 F.2d 412 (5th Cir. 1967)................................................. 41

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958)........................................ 29

*Nat'l Pork Producers Council v. Ross*, 143 S. Ct. 1142 (2023)................................. 18

*New York Life Ins. Co. v. Head*, 234 U.S. 149 (1914) ................................................ 18

*New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1 (1988) ................ 34

*Nielsen v. Oregon*, 212 U.S. 315 (1909) ........................................................ 17, 19, 31

*Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020) ............................ 27, 28, 32

*Planned Parenthood Greater N.W. v. Labrador*, No. 23-cv-001420, 2023 WL

    4864962 (D. Idaho July 31, 2023) .......................................................... 28

*Police Dep't of Chic. v. Mosley*, 408 U.S. 92 (1972)................................................. 21

*Powers v. Ohio*, 499 U.S. 400 (1991)........................................................................ 44

*Rape v. Poarch Band of Creek Indians*, 250 So. 3d 547 (Ala. 2017) ........................ 13

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015).............................................. 26, 27, 32

*Reflectone, Inc. v. Farrand Optical Co.*, 862 F.2d 841 (11th Cir. 1989)..................... 9

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984)................................................. 28, 29, 31

*Robinson v. Marshall*, No. 2:19-cv-365-MHT, 2022 WL 2314402 (M.D. Ala. June

    24, 2022) ..................................................................................................... 3

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ............... 26

*Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990) ............................................. 32

*Saenz v. Roe*, 526 U.S. 489 (1999) .............................................................. 36

*Shapiro v. Thompson*, 394 U.S. 618 (1969) ......................................... 36, 38

*Singleton v. Wulff*, 428 U.S. 106 (1976) .................................................... 46

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022) ............................. 26

*Spence v. State of Wash.*, 418 U.S. 405 (1974) .............................. 22, 24, 25

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ........................... 19

*Steffel v. Thompson*, 415 U.S. 452 (1972) .................................................... 9

*Stewart v. Baldwin Cnty. Bd. of Educ.*, 908 F.2d 1499 (11th Cir. 1990) .................. 23

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) .......................................... 45

*Texas v. Johnson*, 491 U.S. 397 (1989) .................................................. 22, 25

*Thompson v. State*, 17 So. 512 (Ala. 1895) .................................... 14, 15, 34

*Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994) ................................ 21

*United States v. Goodwin*, 457 U.S. 368 (1982) ....................................... 17

*United States v. Guest*, 383 U.S. 745 (1966) ...................................... passim

*United States v. Williams*, 553 U.S. 285 (2008) ........................................ 33

*Wallace v. Brownell Pontiac-GMC Co.*, 703 F.2d 525 (11th Cir. 1983) .................... 9

*Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293 (11th Cir. 2017) ........................ 27

*Young Apartments, Inc. v. Town of Jupiter, FL*, 529 F.3d 1027 (11th Cir. 2008) .... 45, 46, 47

*Zobel v. Williams*, 457 U.S. 55 (1982) ................................................. 36, 37

## Statutes

Ala. Code § 13A-1-4 ................................................................................ 12

Ala. Code § 13A-4-3 .......................................................................... 11, 14

Ala. Code § 13A-4-4 ....................................................................... passim

Ala. Code § 13A-5-11 ............................................................................... 3

Ala. Code § 13A-5-6 ................................................................................. 3

Ala. Code § 26-23H-3 ............................................................................. 12

Ala. Code § 26-23H-4 ..................................................................... 3, 7, 12

Ala. Code § 26-23H-6 ............................................................................... 3

Ala. Code §13A-2-23 ........................................................................ 11, 14

Ark. Code Ann. § 5-61-304 ...................................................................... 7

Ga. Code Ann. § 16-12-140 ...................................................................... 7

Ga. Code Ann. § 16-12-141 ...................................................................... 7

Idaho Code § 18-622 ................................................................................ 7

Ky. Rev. Stat. Ann. § 311.772 ................................................................. 7

La. Stat. Ann. § 40:1061 .......................................................................... 7

Miss. Code Ann. § 41-41-4 ....................................................................... 7

Mo. Rev. Stat. § 188.017 .......................................................................... 7

Okla. Stat. Ann. tit. 21, § 861 .................................................................. 7

S.D. Codified Laws § 22-17-5.1 ............................................................... 7

Tenn. Code Ann. § 39-15-213 .................................................................. 7

Tex. Health & Safety Code Ann. § 170A.002 ................................................. 7

W. Va. Code § 16-2R-3 ................................................................................. 7

Wis. Stat. § 940.04 ....................................................................................... 7

## Other Authorities

Commentary to Ala. Code § 13A-1-4 ......................................................... 12

Moderated by Manley F. Brown, The Honorable Marc T. Treadwell, *The United States Attorney's Office Middle District of Georgia: Gary B. Blasingame, Manley F. Brown, Joseph H. Davis, and Joseph W. Popper, Jr.*, 22 J.S. Legal Hist. 73 (2014) ......................................................................................................... 41

Peggy Cooper Davis et. al., *The Persistence of the Confederate Narrative*, 84 Tenn. L. Rev. 301 (2017) ....................................................................................... 42

S.B. 1, 122nd Leg., 1st Spec. Sess. (Ind. 2022) .......................................... 7

S.B. 2150, 68th Leg. Sess., Reg. Sess. (N.D. 2023) .................................... 7

## Rules

Fed. R. Civ. P. 56 ...................................................................................... 8, 9

## Constitutional Provisions

U.S. Const. am. 1 ................................................................................ passim

U.S. Const. am. 14 .............................................................................. passim

## INTRODUCTION

This is a summary judgment motion in a civil rights action about helpers and the active infringement of their constitutional rights in the State of Alabama. Helpers are the people who aid others in accessing their rights. When helpers extend a hand, they do more than simply provide aid; they send a message. To those who are persecuted, they send a message of solidarity. To the oppressors, helpers send a message of protest and defiance. This is true whether the aid furthers a politically popular viewpoint or one that is held by the minority. And it is especially true when a state disagrees with the message, values, or goals of the aid provided.

Yellowhammer Fund ("Plaintiff") is a non-profit helper that operated an abortion fund for approximately five years before Alabama's abortion ban took effect. Last year, the Defendant, Alabama Attorney General Steve Marshall, threatened to prosecute organizations that help pregnant people leave the state for lawful abortion care. One of Defendant's threats was recorded on a radio program and cannot be disputed. If not for Defendant's threats, Plaintiff would reopen the fund and continue helping pregnant Alabamians seek lawful out-of-state abortion care.

Each of Plaintiff's claims can be decided in its favor on legal grounds and on the face of Defendant's threats, and there are no disputed facts that bar resolution. As a matter of law, Alabama's abortion ban reaches only as far as its borders. Yellowhammer Fund would not violate any law if it helped pregnant Alabamians

PLAINTIFF YELLOWHAMMER FUND'S MSJ

access lawful abortion care in other states, and Defendant's assertion that he can criminalize people who support such care offends the values of sovereignty and comity that are foundational to our constitutional structure.

Further, there can be no dispute that Defendant's threats blatantly burden speech and expressive conduct on the basis of its content and viewpoint, infringe on the right to associate with others in pursuit of shared goals, and inhibit a wide range of expression about lawful out-of-state conduct. Defendant has no interest, much less a compelling one, in silencing Plaintiff's support for out-of-state abortion and infringing on Alabamians' right to seek and support lawful medical care. Even if Defendant's mere disagreement with Plaintiff's messages was sufficiently compelling, Defendant's broad threats are not narrowly tailored for such an egregious violation of constitutional rights. And because it is clear from Defendant's threats that his primary objective is to prevent Plaintiff and pregnant Alabamians from aiding and engaging in interstate travel, Defendant's threats violate the constitutional right to travel.

The facts of this case are not in dispute, and Defendant's threats against Plaintiff and other abortion helpers are well documented. Accordingly, Plaintiff respectfully moves this Court to enter summary judgment on its claims and prohibit Defendant from further infringing on the constitutional rights of abortion helpers and those they serve.

## STATEMENT OF FACTS

### A. Defendant Threatened to Prosecute Abortion Helpers for Engaging in Constitutionally Protected Activities.

Alabama's near-total abortion ban—Alabama Code § 26-23H-4 ("Abortion Ban")—took effect on June 24, 2022, the day the United States Supreme Court released its opinion in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). *See Robinson v. Marshall*, No. 2:19-cv-365-MHT, 2022 WL 2314402, at *1 (M.D. Ala. June 24, 2022). Violations of the Abortion Ban are punishable by up to life in prison and a fine of up to $60,000. Ala. Code §§ 13A-5-6, 13A-5-11, 26-23H-6(a).

On August 11, 2022, Defendant appeared on the Jeff Poor Show, a local talk radio program, and threatened to criminally prosecute abortion helpers in Alabama. Among other things, Defendant stated, "if someone was promoting themselves . . . as a funder of abortion out of state . . . that is potentially criminally actionable for us," and that he would "look . . . closely" at anyone who uses funds to "facilitate" out-of-state abortion care.[1] Suelzle Decl. ¶¶ 3–7. In his remarks, Defendant specifically mentioned "groups out of Tuscaloosa" that provide support for out-of-state abortion.[2] Suelzle Decl. ¶ 6.

---

[1] The Suelzle Declaration contains a transcription of Alabama Attorney General Steve Marshall, Jeff Poor Show FM Talk 1065, August 11, 2022 at 4:29:09 p.m., 8:00 min – 10:01, available at https://fmtalk1065.com/podcast/alabama-attorney-general-steve-marshall-jeff-poor-show-thursday-8-11-22 (last visited July 3, 2023).

[2] *Id.*

PLAINTIFF YELLOWHAMMER FUND'S MSJ

Members of Plaintiff's staff learned about Defendant's statements after his appearance on the Jeff Poor Show. Fountain Decl. ¶ 22; McLain Decl. ¶ 23. Yellowhammer Fund believed that Defendant's threats specifically targeted them. *See* McLain Decl. ¶ 23; Fountain Decl. ¶¶ 6, 22–23. In the months since his radio appearance, Defendant has repeatedly reaffirmed his belief that he can target abortion helpers when they assist with lawful, out-of-state abortion care.[3] *See* Fountain Decl. ¶¶ 24–27, 29–30; McLain Decl. ¶¶ 24–25, 33.

### B. Plaintiff Is a Reproductive Justice Organization that Communicates a Message of Solidarity and Support to Pregnant Alabamians.

Yellowhammer Fund is a reproductive justice organization founded in 2017. Fountain Decl. ¶¶ 6–7; McLain Decl. ¶ 17. Reproductive justice organizations are typically Black-led organizations that believe all people have the right to decide whether to have children, when to have children, and how to parent the children they have in safe and healthy environments. Fountain Decl. ¶ 6; McLain Decl. ¶ 17. Yellowhammer Fund believes that every person should be free to make decisions about their bodies, families, and futures without shame or governmental interference.

---

[3] *See, e.g.*, Ashley Bowerman, *Alabama AG clarifies prosecution rules under abortion law*, WSFA 12 News (Jan. 11, 2023), https://www.wsfa.com/2023/01/12/alabama-ag-clarifies-prosecution-rules-under-abortion-law/; Nathaniel Weixel, *Abortion advocates sue Alabama AG over prosecution threats for out-of-state travel*, The Hill (July 31, 2023), https://thehill.com/policy/healthcare/4128993-abortion-advocates-sue-alabama-ag-over-prosecution-threats-for-out-of-state-travel/ (explaining that the attorney general responded to the filing of this lawsuit by stating that he "will continue to vigorously enforce Alabama laws protecting unborn life which include the Human Life Protection Act. That includes abortion providers conspiring to violate the Act").

Fountain Decl. ¶¶ 1, 6–7, 9–13, 16–19; McLain Decl. ¶¶ 17, 32. Plaintiff provides support to pregnant Alabamians and their families to help eliminate barriers to abortion care, with a specific focus on addressing racial inequity in reproductive healthcare. *See, e.g.*, Fountain Decl. ¶¶ 8–16, 19–20; McLain Decl. ¶¶ 6–8, 14–16. Like all helpers, Plaintiff communicates a message of solidarity and support to people in need. *See* Fountain Decl. ¶¶ 10–13, 18–20; McLain Decl. ¶¶ 11–14; 29–30, 32.

### C. Plaintiff Has a Genuine Desire to Engage in Constitutionally Protected Activities.

From 2017 to June 24, 2022, Yellowhammer Fund operated an abortion fund that provided financial and logistical support to pregnant people seeking abortion care. Fountain Decl. ¶¶ 7, 14–18; McLain Decl. ¶¶ 6–13. The fund provided support to pregnant Alabamians and residents of other states who needed help accessing abortions within and outside of Alabama. McLain Decl. ¶¶ 3, 6, 18; Fountain Decl. ¶ 7. In addition to paying for the cost of abortion care, the fund helped callers with transportation, childcare, and lodging, and provided guidance, moral support, and information about reproductive healthcare. McLain Decl. ¶¶ 6-13; Fountain Decl. ¶¶ 7, 18. Members of Plaintiff's staff also drove patients to abortion appointments both within and outside of Alabama. Fountain Decl. ¶ 16.

Plaintiff's abortion fund was a core part of the organization's mission. *See* Fountain Decl. ¶¶ 10, 14–19. The fund met a critical gap for pregnant Alabamians, with a particular focus on helping people of color and people with low incomes.

PLAINTIFF YELLOWHAMMER FUND'S MSJ

McLain Decl. ¶¶ 11–16; Fountain Decl. ¶¶ 19–20. Well before *Dobbs*, Plaintiff began to plan for a future in which abortion care would be banned in Alabama. McLain Decl. ¶¶ 18–21. Plaintiff anticipated that the abortion fund would play a critical role helping pregnant Alabamians travel to states where abortion care remained legal, and it began developing plans to expand the fund to meet community needs. *Id.*

After *Dobbs*, Plaintiff paused the operation of the abortion fund. McLain Decl. ¶ 22; Fountain Decl. ¶ 21. Plaintiff has not resumed providing support to pregnant Alabamians seeking abortion care because it fears criminal prosecution as a result of Defendant's threats. McLain Decl. ¶¶ 23–25; Fountain Decl. ¶¶ 24–26, 29–30. Plaintiff has also stopped collaborating with pregnant Alabamians, abortion funds, advocacy groups, and out-of-state clinics out of fear that its associations will be criminalized. Fountain Decl. ¶¶ 17, 25; McLain Decl. ¶¶ 7, 27.

Since *Dobbs*, pregnant Alabamians continue to contact Yellowhammer Fund seeking support for accessing abortion care in states where abortion is legal. McLain Decl. ¶ 26. Plaintiff's help line receives between five and ten calls per week from people seeking support from the fund. *Id.* Because Plaintiff no longer operates the fund, it notifies callers that it cannot provide them with help. *Id.* at ¶ 27. Plaintiff would resume providing support to callers and advertising the services of the fund if it could be assured that it would not face criminal prosecution for doing so. *Id.* at ¶¶ 32–33;

Fountain Decl. ¶¶ 28–30. Plaintiff also would resume providing information to callers about out-of-state abortion care. McLain Decl. at ¶¶ 32–33; Fountain Decl. ¶¶ 28–30

### D. Plaintiff's Desired Expression About Lawful, Out-of-State Abortion Care Is Vital in Light of Alabama's Abortion Ban.

Today, sixteen states, including Alabama, ban or severely restrict abortion.[4] Of the four states that border Alabama, Mississippi and Tennessee currently have near-total bans on abortion; Georgia has a 6-week ban; and Florida has a 15-week ban. Miss. Code Ann. § 41-41-45; Tenn. Code Ann. § 39-15-213; Ga. Code Ann. §§ 16-12-140, 16-12-141; Fla. Stat. Ann. § 390.0111. Pregnant Alabamians who seek abortion care must travel long distances to access care in states where abortion is legal. *See* White Decl. ¶ 21; McLain Decl. ¶¶ 28, 31.

People who are unable to obtain an abortion face significant medical, social, and economic consequences. White Decl. ¶¶ 22, 27.  The United States has a higher rate of maternal mortality than any other developed nation, and that rate has increased in recent years. *Id.* at ¶ 34. Alabama has the third highest maternal mortality rate in the country, at 36.4 deaths per 100,000 live births. *Id.* Carrying a pregnancy to term is

---

[4] Ala. Code § 26-23H-4; Ark. Code Ann. § 5-61-304; Ga. Code Ann. §§ 16-12-140, 16-12-141; Idaho Code § 18-622; S.B. 1, 122nd Leg., 1st Spec. Sess. (Ind. 2022); Ky. Rev. Stat. Ann. § 311.772; La. Stat. Ann. § 40:1061; Miss. Code Ann. § 41-41-45; Mo. Rev. Stat. § 188.017; S.B. 2150, 68th Leg. Sess., Reg. Sess. (N.D. 2023); Okla. Stat. Ann. tit. 21, § 861; S.D. Codified Laws § 22-17-5.1; Tenn. Code Ann. § 39-15-213; Tex. Health & Safety Code Ann. § 170A.002; W. Va. Code § 16-2R-3; Wis. Stat. § 940.04.

especially dangerous for certain populations. Pregnancy-related deaths disparately impact communities of color. *Id.* at ¶ 35. According to a 2021 report, the maternal mortality rate for Black women is 2.6 times higher than the rate for non-Hispanic white women. *Id.* Specifically, the maternal mortality rate for non-Hispanic white women in 2021 was 26.6 deaths per 100,000 live births, while the maternal mortality rate for Black women was 69.9 deaths per 100,000 live births. *Id.* at ¶ 36.

Those who seek abortion care in Alabama are disproportionately people of color and low-income people. *Id.* at ¶ 23. Along with Kentucky, Alabama is the sixth-poorest state in the country. *Id.* at ¶ 24. Since *Dobbs*, abortion has become increasingly inaccessible for pregnant Alabamians. *Id.* at ¶¶ 16, 26. Without financial and logistical support from abortion funds and practical support organizations, many Alabamians struggle to access abortion care today. *Id.* at ¶¶ 24–25.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). "[A] 'genuine' dispute exists if 'a jury applying [the applicable] evidentiary standard could reasonably find for either the plaintiff or the defendant' as to the material fact." *Brady v. Carnival Corp.*, 33 F.4th 1278, 1281 (11th Cir. 2022) (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986)). However, "the mere existence of *some* alleged

factual dispute between the parties" will not defeat a summary judgment motion unless the dispute is genuine and the fact is material to the outcome of the case. *Anderson*, 477 U.S. at 247–48.

Rule 56 permits a party to move for summary judgment at any time. *See Reflectone, Inc. v. Farrand Optical Co.*, 862 F.2d 841, 843 (11th Cir. 1989) (per curiam) (explaining that there is no "blanket prohibition on the granting of summary judgment motions before discovery"); *Wallace v. Brownell Pontiac-GMC Co.*, 703 F.2d 525, 527 (11th Cir. 1983). A court can delay consideration of a motion for summary judgment to allow the nonmoving party "time to obtain affidavits or declarations or to take discovery," Fed. R. Civ. P. 56(d)(2), but only if the non-moving party identifies with specificity how delaying the ruling "will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact." *Wallace*, 703 F.2d at 527 (citation omitted). Summary judgment is appropriate if "the pertinent facts are obvious and indisputable from the record," and "the only remaining truly debatable matters are legal questions that a court is competent to address." *Garvie v. City of Fort Walton Beach*, 366 F.3d 1186, 1190 (11th Cir. 2004).

An actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law when an individual is subject to a threat of prosecution. *See Steffel v. Thompson*, 415 U.S. 452, 458–59 (1972). A plaintiff may establish standing by showing that they were threatened with prosecution, prosecution is likely, or there

PLAINTIFF YELLOWHAMMER FUND'S MSJ

is a credible threat of prosecution. *Jacobs v. The Florida Bar*, 50 F.3d 901, 904 (11th Cir. 1995).

## ARGUMENT

Plaintiff is entitled to summary judgment because there are no factual disputes that preclude resolution of its claims. As a matter of law, Alabama's Abortion Ban reaches only as far as its borders, and the Due Process Clause strictly forbids Defendant from applying Alabama laws outside of the state's borders. Even if the conspiracy and accessory liability statutes could be read to criminalize out-of-state activities, Defendant cannot constitutionally prosecute, nor threaten to prosecute, out-of-state lawful conduct.

Additionally, as a helper providing aid to people in need of support, Plaintiff necessarily engages in speech, expressive conduct, and expressive association in pursuit of its goals. Defendant's threats to prosecute Plaintiff and other helpers for speaking about lawful, out-of-state activities violate the First Amendment because they restrict speech on the basis of its content and viewpoint. Further, because Defendant's primary objective is to burden the right to travel, Defendant's threats also blatantly infringe on Plaintiff's and pregnant Alabamians' right to travel by penalizing those who would assist people seeking to travel across state lines for lawful abortion care. As a result, Plaintiff is entitled to summary judgment on its claims that Defendant's threats violate the constitutional rights of Plaintiff and pregnant Alabamians who seek lawful abortion care in other states.

PLAINTIFF YELLOWHAMMER FUND'S MSJ

## A. Supporting A Pregnant Person's Lawful, Out-Of-State Abortion Does Not Violate Any Alabama Law.

The conduct that Yellowhammer Fund wishes to engage in clearly does not violate Alabama law. This is because the Abortion Ban only applies to abortions performed in Alabama. Defendant's threats invoking the conspiracy and accessory liability statutes assume that the underlying conduct of those offenses violates Alabama's Abortion Ban. However, if an abortion is lawful in the state where it occurs, there is no such offense.

Alabama's general conspiracy statute provides that "[a] person is guilty of criminal conspiracy if, with the intent that conduct *constituting an offense* be performed, he or she agrees with one or more persons to engage in or cause the performance of the conduct, and any one or more of the persons does an overt act to effect an objective of the agreement." *See* Ala. Code § 13A-4-3(a) (emphasis added). Alabama's accessory liability statute provides that "[a] person is legally accountable for the behavior of another *constituting a criminal offense* if, with the intent to promote or assist the commission of the offense . . . He aids or abets such other person in committing the offense." Ala. Code §13A-2-23(2) (emphasis added). If an out-of-state abortion is not a violation of the Abortion Ban—which it is not—there can be no conspiracy or aiding and abetting liability for assisting with an out-of-state abortion.

### 1. The Alabama Abortion Ban Does Not Criminalize Abortion in A State Where Abortion Is Legal.

By its plain terms, the Abortion Ban does not apply outside of Alabama. Only those acts defined as a crime under Alabama law are considered crimes. Ala. Code § 13A-1-4 ("No act or omission is a crime unless made so by" Alabama "statute or lawful ordinance."). Further, it is a bedrock principle in Alabama law that "persons accused of crime—and also the prosecuting officials, the courts and all others concerned with the administration of justice—are entitled to know in plain explicit language what constitutes the offense charged." Commentary to Ala. Code § 13A-1-4. The Abortion Ban states: "It shall be unlawful for any person to intentionally perform or attempt to perform an abortion" except under extremely limited circumstances. Ala. Code § 26-23H-4(a). The Abortion Ban clearly does not criminalize out-of-state abortions.[5]

Interpreting the Abortion Ban to apply only to abortions in Alabama is consistent with references to "Alabama" in the statute and its definitions.[6] Reading the statute to only apply within Alabama's borders is also consistent with traditional notions of state sovereignty, as expressed by Alabama courts. *See Rape v. Poarch Band of Creek*

---

[5] Even if the statute's language sought to establish that the Abortion Ban applies to abortions occurring outside of the state, which it does not, such a provision would be unconstitutional as discussed in Section B, *see infra* at 17.

[6] *See, e.g.*, Ala. Code § 26-23H-4(b) ("[A]n attending physician licensed in Alabama" can use his or her judgment regarding exceptions); Ala. Code § 26-23H-3(5) (defining "physician" as "[a] person licensed to practice medicine and surgery or osteopathic medicine and surgery in Alabama."); Ala. Code § 26-23H-3(6) ("[T]ermination may be performed and shall be only performed by a physician licensed in Alabama in a hospital as defined in the Alabama Administrative Code and to which he or she has admitting privileges.").

*Indians*, 250 So. 3d 547, 553 (Ala. 2017) ("As to a matter over which a government has no regulatory authority, it is not sovereign. Black's Law Dictionary 1631 (10th ed. 2014) defines 'state sovereignty' as '[t]he right . . . to self-government; the supreme authority exercised by each state.'").

Few cases have had to address issues such as this, because states generally criminalize the same conduct. However, in *Cruthers v. State*, 67 N.E. 930 (Ind. 1903), the Indiana Supreme Court addressed a similar situation in which Indiana tried to punish conduct that was illegal in Indiana but lawful in Illinois where it occurred. The court found the crime could not be charged in Indiana, even though most participants were Indiana residents. In that case, the defendant, Mr. Cruthers, told the victim that Mr. Cruthers would be running a foot race, and enticed the victim to travel to Illinois and bet on Mr. Cruthers. *Id.* at 931. Mr. Cruthers threw the race, and Indiana prosecutors tried to charge him with bunko steering—a somewhat obscure offense about enticing others into participating in fraudulent gambling. *Id.* 930–32. The Indiana Supreme Court said the defendant could not have been guilty of the underlying offense of bunko steering because "[t]hat section has no extraterritorial force or operation, and the offense thereby defined cannot be committed partly within the state of Indiana and partly without." *Id.* at 932. He could not have committed the crime because all he did in Indiana was make representations to entice the person to Illinois, where all of the acts of the "crime" occurred. *Id.* at 933. However, because bunko steering was not a crime in Illinois, the court held that the conviction could not stand.

PLAINTIFF YELLOWHAMMER FUND'S MSJ

*Id.* Just as Indiana could not punish lawful conduct occurring in Illinois, Alabama cannot punish abortion occurring in states where it is legal.

### 2. The Conspiracy and Aiding and Abetting Laws Do Not Criminalize Helpers Who Help Pregnant People Obtain Lawful Abortions.

It then necessarily follows that a violation of Alabama's conspiracy or accessory liability laws in connection with the Abortion Ban can pertain only to abortions performed in Alabama. Conspiracy requires intent to violate an Alabama criminal offense. Ala. Code § 13A-4-3(a). Accessory liability involves holding a person accountable for an Alabama criminal offense, if that person assists in the commission of that offense. Ala. Code § 13A-2-23. As a result, Ala. Code §§ 13A-4-3 and 13A-2-23 do not apply to Plaintiff's desired activities because Plaintiff seeks to assist Alabamians in obtaining lawful, out-of-state abortion care, which Alabama's Abortion Ban does not reach. *See supra* at 11.

Defendant has threatened to prosecute such conduct as conspiracy using Alabama Code § 13A-4-4. That statute provides that "[a] conspiracy formed in this state to do an act beyond the state, which, if done in this state, would be a criminal offense, is indictable and punishable in this state in all respects as if such conspiracy had been to do such act in this state." *Id.* Alabama Code § 13A-4-4 was only intended to codify *Thompson v. State*, 17 So. 512 (Ala. 1895), and this Court should interpret it in line with that case.

In *Thompson*, the Alabama Supreme Court determined that a prosecutor could indict on a conspiracy to "unlawfully take one thousand dollars . . . from [the victim's] person, and against his will, by violence." *Id.* at 513. The victim of the robbery lived in Georgia at the time of the offense. *Id.* There was no question in *Thompson* that the act of robbery would have been a crime in the state where it was planned to occur. *Id.* In fact, the indictment explicitly acknowledged the illegality of the act where it occurred. *Id.* at 513, 516. While the court in *Thompson* agreed there was no statute that explicitly criminalized conspiracies to commit unlawful acts in other states, the court explained that the clearly unlawful nature of the act in both states was sufficient to justify the indictment. *Id.* at 515–16.

Alabama Code § 13A-4-4—which merely codified the decision in *Thompson*—should not be interpreted to apply under these circumstances. Here, the threats of prosecution relate to activities that would be legal in the state where they occur. Alabama Code § 13A-4-4 can only conceivably reach conspiracies to engage in conduct that is illegal where it occurs. Upon information and belief, Alabama Code § 13A-4-4 has never been used to prosecute an extraterritorial conspiracy, and it certainly has not been used to prosecute someone who formed an alleged conspiracy to engage in legal conduct. Since it is impossible for Plaintiff to "conspire" to support lawful, out-of-state abortions, its desired activities are not prohibited by Alabama Code § 13A-4-4.

15

This was also true in *Cruthers*, which evaluated a statute like Alabama Code §

13A-4-4. That Indiana statute stated:

> Aiding Felony in Another State. Every person who shall, while in this state, *aid in and abet the perpetration or attempt to perpetrate an offense in another state which by the laws of this state is a felony*, shall be deemed guilty of a felony, and upon conviction thereof shall be punished in the same manner and to the same extent as accessories before the fact to the commission of such a felony are prosecuted and punished by the criminal laws of the state; and it shall not be essential to the conviction of such person of said felony that the principal be prosecuted for the crime charged.

*See Cruthers*, 67 N.E. at 931 (emphasis added).[7] The court held that the defendant

could not be guilty of aiding and abetting bunko steering because bunko steering was

not a crime in Illinois, where it occurred:

> There is an entire absence in the information of any averment or facts to show that the acts done and perpetrated . . . in the state of Illinois . . . constituted an offense under the laws of [that] state. For this reason alone, regardless of any other infirmity which may be imputed to the information, it is fatally defective in charging appellant with the crime defined and created by [the aiding and abetting statute]."

*Id.* at 933. Thus, Alabama law cannot reach Plaintiff's proposed support for abortions

that are lawful in the states where they occur. There is no conspiracy or aiding and

abetting liability because there is no criminal offense—a necessary element of those

two crimes.

---

[7] This statute is not in effect today.

PLAINTIFF YELLOWHAMMER FUND'S MSJ

**B. Applying the Alabama Abortion Ban to Criminalize Abortion in a State Where it Is Lawful Would Violate the Due Process Clause and Foundational Principles of Sovereignty and Comity.**

If this Court determines that Alabama's Abortion Ban prohibits out-of-state lawful abortion care, then Alabama's Abortion Ban is unconstitutional under the Due Process Clause and foundational principles of sovereignty and comity. "To punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.'" *United States v. Goodwin*, 457 U.S. 368, 372 (1982) (internal citation omitted). Courts have long upheld the rule that a state cannot prosecute a person "for doing within the territorial limits of [another state] an act which that state had specially authorized him to do." *Nielsen v. Oregon*, 212 U.S. 315, 321 (1909). Acts that are "done within the territorial limits of [one state], under authority and license from that state . . . cannot be prosecuted and punished by [a different state]." *Id.*

There are no facts that must be resolved to decide whether Alabama can apply its Abortion Ban extraterritorially—this is a purely legal inquiry. Here, Defendant can only punish helpers for aiding or abetting or conspiring to commit *a violation of Alabama's Abortion Ban*. If the Alabama Abortion Ban criminalizes out-of-state abortions, the Abortion Ban would constitute an extraterritorial application of Alabama's laws. Alabama would be prosecuting something another state plainly allows: obtaining lawful abortion care. Alabama cannot punish lawful conduct, nor can it impose penalties "in order to deter conduct that is lawful in other jurisdictions."

17

*BMW of N. America, Inc. v. Gore*, 517 U.S. 559, 573 (1996) (holding that lawful out-of-state conduct could not be considered by the court when awarding punitive damages in a state that prohibited that same conduct).

Additionally, applying the Alabama Abortion Ban to abortions in other states where abortion is legal violates the "original and historical understandings of the Constitution's structure and the principles of 'sovereignty and comity' it embraces." *Nat'l Pork Producers Council v. Ross*, 143 S. Ct. 1142, 1156 (2023) (citing *BMW of North America, Inc.*, 517 U.S. at 572). In *National Pork Producers Council v. Ross*, the Court found that a state can require those who sell pork within California to follow certain production requirements. *Id.* at 1150. In its holding, the Court reinforced the principles of "sovereignty and comity" within the Constitution. *Id.* at 1156–57. Furthermore,

> [I]t would be impossible to permit the statutes of [a State] to operate beyond the jurisdiction of that State . . . without throwing down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends.

*New York Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914). It is an essential feature of American federalism that people can travel among the states and avail themselves of the laws of the state they are visiting. This is what makes the country a cohesive nation of states while respecting the sovereignty of each state.

18

Another "basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003). The majority in *Dobbs* reinforced this principle when returning the issue of the abortion to the states: "[T]he people of the various States may evaluate those interests differently." *Dobbs*, 142 S. Ct. at 2257.

Thus, Alabama may not impose its policy preferences on other states that have chosen to allow abortion within their borders. "Alabama does not have the right to insist that its view of" abortion be enforced "with respect to conduct occurring entirely in another state, particularly where Alabama's policy choices conflict with those of the other state." *DJR Assocs. LLC v. Hammonds*, 241 F. Supp. 3d 1208, 1233 (N.D. Ala. 2017); *see also Nielsen*, 212 U.S. at 321 ("[O]ne state cannot enforce its opinion against that of the other; at least, as to an act done within the limits of that other state.").

It is axiomatic that each state's right to set policy preferences and exercise its police powers extends only as far as its own jurisdiction. In *Bigelow v. Virginia*, for example, the Supreme Court overturned a conviction of a newspaper editor under a Virginia statute that forbid the advertisement of abortion. The Virginia newspaper editor had published information about how to obtain a legal abortion in New York. In determining that this conviction could not stand, the Court emphasized that a "State does not acquire power or supervision over the internal affairs of another State

because the welfare and health of its own citizens may be affected when they travel to that State." *Bigelow v. Virginia*, 421 U.S. 809, 824 (1975). A state cannot bar the dissemination of information about an activity that is legal in another state, even "under the guise of exercising internal police powers." *Id.* at 824–25. The same is true here: Plaintiff is seeking to support abortions taking place in another state, which are obviously "activities that [Alabama's] police powers do not reach." *Id.* at 828.

Because a conviction of conspiracy under Alabama Code §§ 13A-4-3 and 13A-4-4 or aiding and abetting under Alabama Code §13A-2-23 requires efforts to support a *criminal* offense, if the underlying criminal offense is unconstitutional, it follows that a conviction of conspiracy to commit or aiding and abetting an unconstitutional offense would also be unconstitutional. In sum, if the statutes are interpreted to cover Plaintiff's activities, the extraterritorial application of Alabama's laws would violate the Due Process Clause and principles of state sovereignty and comity.

### C. Defendant's Threats Violate Helpers' Rights to Free Expression and Association Under the First Amendment.

As explained above, Plaintiff's support for out-of-state lawful abortion care does not violate Alabama law. *See supra* at 12–14. Even if this Court disagrees, Defendant may not prosecute Plaintiff because doing so would violate the First Amendment rights of Plaintiff and other Alabamians. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its

subject matter, or its content." *Police Dep't of Chic. v. Mosley*, 408 U.S. 92, 95 (1972).[8] On their face, Defendant's threats blatantly target expression and association because of the messages they convey and the perspectives they embrace. As further explained below, Plaintiff is entitled to summary judgment on its First Amendment claims because Defendant's threats impermissibly seek to criminalize speech, conduct, and association on the basis of their content and viewpoint, and Defendant's asserted interests cannot satisfy strict scrutiny.

1. **Defendant's Threats are Presumptively Unconstitutional Because They Are Content- and Viewpoint-Based Restrictions on Speech.**

The First Amendment "bars the government from dictating what we see or read or speak or hear." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002). It protects the right of all people to make their own decisions about "the ideas and beliefs deserving of expression, consideration, and adherence," *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994), even when those ideas and beliefs are unpopular. *See, e.g.*, *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2308 (2023).

a. **Like all Helpers, Plaintiff Engages in Both Speech and Expressive Conduct to Support People in Need.**

Although the First Amendment uses the term "speech," constitutional protection "does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404

---

[8] The Due Process Clause of the Fourteenth Amendment incorporates the rights protected by the First Amendment and prohibits state governments from violating them. *See Grosjean v. Am. Press Co.*, 297 U.S. 233, 243–44 (1936).

(1989). In addition to speech, the First Amendment also protects conduct that is "sufficiently expressive." *See id.*; *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (hereinafter "*FLFNB*").

As a matter of law, Defendant's threats are infringing on Plaintiff's right to engage in pure speech related to lawful out-of-state abortion care. There can be no genuine dispute that Plaintiff's abortion fund wishes to provide information to pregnant Alabamians about lawful out-of-state abortion care, including referrals, guidance, and moral support. *See, e.g.*, Fountain Decl. ¶¶ 15; McLain Decl. ¶¶ 7, 29. This type of communication clearly constitutes "pure speech" that indisputably qualifies for First Amendment protection. *See 303 Creative LLC*, 143 S. Ct. at 2312 ("All manner of speech—from 'pictures, films, paintings, drawings, and engravings,' to 'oral utterance and the printed word'—qualify for the First Amendment's protections." (quoting *Kaplan v. California*, 413 U.S. 115, 119–20 (1973))).

Defendant's threats prevent Plaintiff from engaging in expressive conduct. The Supreme Court has announced a two-part test to determine whether conduct is protected by the First Amendment:  (1) whether the speaker has "[a]n intent to convey a particularized message," and (2) whether "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Spence v. State of Wash.*, 418 U.S. 405, 410–11 (1974). "[I]n determining whether conduct is expressive, we ask whether the reasonable person would interpret it as *some*

22

sort of message, not whether an observer would necessarily infer a *specific* message." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (emphasis in original); *see also Stewart v. Baldwin Cnty. Bd. of Educ.*, 908 F.2d 1499, 1501, 1505 (11th Cir. 1990) (a school employee's "quiet and non-disruptive" early departure from a mandatory meeting was expressive).

As a helper that provides support to people seeking healthcare, Plaintiff is necessarily engaged in expressive conduct. *See, e.g.*, *FLFNB*, 901 F.3d at 1240–41 (explaining that providing access to a necessary human right is a form of expressive conduct). Plaintiff intends to convey a message of solidarity, love, and support when it helps pregnant Alabamians access lawful out-of-state abortion care. *See, e.g.*, Fountain Decl. ¶¶ 10–13, 18–20; McLain Decl. ¶¶ 11–14, 29–30, 32. Plaintiff is a mission-driven organization that envisions a world where all people can access reproductive healthcare, regardless of their income level or place of residence. *See* Fountain Decl. ¶ 6. There can be no dispute that Plaintiff's abortion fund seeks to advance the organization's mission and message by helping community members afford abortion care and reducing barriers that limit access to care. *See* Fountain Decl. ¶ 11–12. Further, as a previous funder of abortion, Plaintiff seeks to contribute financially to pregnant Alabamians' out-of-state abortions and provide logistical support for travel, childcare, lodging, and other related needs. *See* McLain Decl. ¶¶ 32–33. Courts have repeatedly recognized that donating money to a political, charitable, or social cause qualifies as expressive conduct. *See, e.g.*, *McCutcheon v.*

*Fed. Election Comm'n*, 572 U.S. 185, 191–92 (2014) ("[T]he right to participate in democracy through political contributions is protected by the First Amendment."); *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1254 (11th Cir. 2021) (holding that it would violate the First Amendment to compel online retailer to provide charitable funds to Christian ministry and media corporation).

In addition to funding abortions, Plaintiff engages in other expressive conduct that unquestionably communicates a message about abortion access. The context and circumstances surrounding abortion care in Alabama demonstrate that Plaintiff's desired activities constitute expressive conduct. *See, e.g.*, White Decl. ¶¶ 16–20. *FLFNB* is particularly instructive. In that case, the Eleventh Circuit held that an organization that hosted food-sharing events in a public space was engaged in expressive conduct. 901 F.3d at 1240–41. The court's decision emphasized that "the context in which a symbol is used for purposes of expression is important, for the context may give meaning to the symbol." *Id*. at 1241 (citing *Spence*, 418 U.S. at 410). By distributing food in a public park, sharing information and literature, and hosting public events, FLFNB intentionally communicated a message "that all persons are equal, regardless of socio-economic status, and that everyone should have access to food as a human right." *Id.* at 1240–41. The court observed that "the treatment of the City's homeless population is an issue of concern in the community," *id.* at 1242, which added essential context for a reasonable observer to understand that "FLFNB's food sharing sought to convey some message." *Id.* at 1243.

PLAINTIFF YELLOWHAMMER FUND'S MSJ

Like FLFNB, Plaintiff's abortion fund helps members of the community access a critical human need: healthcare. Just as food and lodging for the homeless population was an issue of public concern in *FLFNB*, access to reproductive healthcare in Alabama is unquestionably a topic of rapid change and significance to the community. *See, e.g.*, White Decl. ¶¶ 16, 20, 25, 26, 27. The context illustrates that abortion care is inaccessible for many pregnant Alabamians due to financial limitations, political restrictions, and geography. *See* White Decl. ¶¶ 20–27.

Against this backdrop, Plaintiff necessarily communicates an important message about the injustice of barriers to reproductive healthcare. *See, e.g.*, Fountain Decl. ¶ 18. Plaintiff seeks to provide funding and logistical support for lawful out-of-state abortions during a critical moment in the struggle for reproductive justice. *See, e.g.*, *Johnson*, 491 U.S. at 406 (holding that timing of flag burning, which "coincided with the convening of the Republican Party," contributed to conclusion that it was expressive conduct); *Spence*, 418 U.S. at 410 (concluding that conduct was expressive when it was "roughly simultaneous with and concededly triggered by the Cambodian incursion and the Kent State tragedy, also issues of great public moment"); White Decl. ¶¶ 16, 20–24. The expressive nature of Plaintiff's conduct does not depend on the resolution of facts—it is self-evident from the context surrounding abortion access in Alabama and the historical role of helpers in the struggle for civil rights. *See, e.g.*, White Decl. ¶¶ 16, 20–24; *see also FLFNB*, 901 F.3d at 1240–42; *Holloman*, 370 F.3d

at 1270 (explaining that conduct is expressive if an objective, reasonable observer would interpret it as "*some* sort of message").

For these reasons, Plaintiff's activities are expressive, representing pure speech and expressive conduct, and are therefore protected by the First Amendment.

> ### b. Defendant's Threats Are Content- and Viewpoint-Based Because They Exclusively Target Speech and Expressive Conduct About Lawful, Out-of-State Abortion Care.

By threatening to prosecute Plaintiff for supporting lawful abortion care, Defendant targets Plaintiff's speech on the basis of its content and viewpoint. Content-based laws "target speech based on its communicative content," while viewpoint-based laws prohibit speech based on the "particular views taken by speakers on a subject." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1125–26 (11th Cir. 2022). Laws that target speech based on its communicative content "are presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

"Viewpoint discrimination is . . . an egregious form of content discrimination." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). "The Supreme Court has reiterated time and again—and increasingly of late—the 'bedrock First Amendment principle' that '[s]peech may not be banned on the ground that it expresses ideas that offend." *Speech First, Inc.*, 32 F.4th at 1126 (citing *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017)).

Here, there can be no dispute that Defendant's threats prohibit speech based on the message it communicates and the goals it advances. Defendant's threats specifically target abortion helpers that "promot[e] themselves" as funders of out-of-state abortions and use funds to "facilitate" out-of-state abortions. *See* Suelzle Decl. ¶ 6. To determine if a speaker violated these restrictions, Defendant would have to examine the content of Plaintiff's message to pregnant Alabamians, abortion supporters, volunteers, and members of the public to decide whether it was promoting and facilitating out-of-state abortions. *See Reed*, 576 U.S. at 164 (explaining that a restriction is content-based if its enforcement depends "entirely on the communicative content" of the speech); *see also Otto v. City of Boca Raton*, 981 F.3d 854, 859 (11th Cir. 2020) (holding that a ban on conversion therapy was content-based because it prohibited certain therapy based on "the content of the words used in that therapy"); *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1307–08 (11th Cir. 2017) (holding that law was content-based because it restricted doctors from asking patients about firearm ownership but did not apply to other types of doctor-patient communications).

Defendant's threats also prohibit speech based on the viewpoint it advances. By threatening to prosecute people who support and fund lawful out-of-state abortions, Defendant targets speech that expresses the view that abortion care should be accessible. Like the restriction on conversion therapy in *Otto*, Defendant's threats seek to "codify a particular viewpoint"—that abortion care should be inaccessible to pregnant Alabamians—and punish abortion helpers like Plaintiff for "advancing any

other perspective." 981 F.3d at 864 (holding that restriction on conversion therapy was both content- and viewpoint-based). Further, Defendant's threats silence Plaintiff and other abortion helpers *only* when they speak in support of lawful out-of-state abortion. *See Planned Parenthood Greater N.W. v. Labrador*, No. 23-cv-001420, 2023 WL 4864962, at *22 (D. Idaho July 31, 2023) (holding that threats to prosecute healthcare providers for referring people for out-of-state abortion care were content- and viewpoint-based restrictions because they silence healthcare providers "on a single topic—abortion," while permitting them to "provide information and referrals about out-of-state resources like anti-abortion counseling centers or prenatal care").

On their face, Defendant's threats prevent Plaintiff and other abortion helpers from speaking about a specific issue—lawful abortion care in other states—without disturbing their ability to speak about a host of other issues and viewpoints. As a result, Defendant's threats are both viewpoint- and content-based.

### 2. Defendant's Threats Violate Plaintiff's Right to Associate with Like-Minded Abortion Funds, Supporters, and Pregnant Alabamians.

Defendant's threats of prosecution also violate Plaintiff's First Amendment right to expressive association. The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Indeed, "[t]he Constitution guarantees freedom of association of this kind as

an indispensable means of preserving other individual liberties." *Id.* at 618. Restrictions on the right to associate can be sustained only if they satisfy strict scrutiny. *Id.* at 626 (explaining that laws infringing expressive association must "further[] compelling state interests" and be "the least restrictive means of achieving" those interests); *see also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

Laws unconstitutionally restrict the right to associate when they punish individuals based on the company they keep and the goals and values they share. In *Elrod v. Burns*, the Supreme Court held that it was unconstitutional for a sheriff's office to deny or grant public benefits, including public employment, on the basis of an individual's affiliation with a political party. 427 U.S. 347, 357–59 (1976). The Court explained that threatening dismissal for an individual's failure to support a specific political party "unquestionably inhibits protected belief and association," penalizing people for choosing to associate with a different political party or support another party's goals. *Id.* at 359. In striking down the political patronage system in *Elrod*, the Court recognized that the right to associate forbids the government from forcing people to associate *and* requires the government to permit individuals to choose their own associations and advance favored goals together. *Id.* at 357; *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958) ("Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association.").

On their face, Defendant's threats prevent Plaintiff and other abortion helpers from associating with pregnant Alabamians for the purpose of helping them travel to other states for lawful abortion care. *See* Suelzle Decl. ¶ 6. Like all helpers, Plaintiff associates with others in order to help them access their rights. *See, e.g.*, McLain Decl. ¶¶ 7, 24, 29; Fountain Decl. ¶¶ 18, 26. By threatening to prosecute helpers like Plaintiff for holding themselves out as funders of out-of-state abortion, Defendant's threats impede Plaintiff's ability to advance its goals in collaboration with others—including pregnant Alabamians, other abortion funds, and abortion advocacy groups. *See, e.g.*, *Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373, 2387, 2388 (2021) (holding that a regulation requiring tax-exempt charities to disclose the names and addresses of their major donors unconstitutionally infringed on expressive association because it "indiscriminately sweep[s] up the information of *every* major donor with reason to remain anonymous"); *see also Healy v. James*, 408 U.S. 169, 181 (1972) (holding that a college's refusal to officially recognize a student political organization created an "impediment to free association" that limited "the organization's ability to participate in the intellectual give and take of campus debate").

There can be no dispute that Defendant's threats chill expressive association by forbidding collaboration and support in favor of lawful out-of-state abortion care. Thus, Defendant's threats violate Plaintiff's right to associate under the First Amendment.

### 3. Defendant's Threats Cannot Survive Strict Scrutiny.

Because Defendant's threats restrict Plaintiff's speech, expressive conduct, and association based on their message and viewpoint, they can be justified only by "compelling state interests, unrelated to the suppression of ideas." *Roberts*, 468 U.S. at 623; *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 27–28 (2010) (holding that state action targeting expressive conduct on the basis of its message is subject to strict scrutiny).[9] There is no justification for Defendant's threats that can meet this demanding standard.

First, as a matter of law, the State has no interest—much less a compelling one—in punishing a person for supporting or associating to advance *lawful* out-of-state conduct. *See, e.g.*, *Nielsen*, 212 U.S. at 321 (holding that a state cannot prosecute someone "for doing within the territorial limits of [another state] an act which that [separate] state had specifically authorized him to do"); *see also supra* at 12–14. Although courts have acknowledged that the crime of conspiracy inherently targets speech, the justifications for the constitutional exception permitting states to prosecute conspiracy evaporate when the speech does not further conduct that is criminal. *See Dennis v. United States*, 341 U.S. 494, 575 (U.S. 1951) (Jackson, J., concurring)

---

[9] In *Otto*, the Eleventh Circuit suggested, but did not conclusively determine, that viewpoint-based speech restrictions are per se unconstitutional. 981 F.3d at 864; *see also Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) ("[R]estrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited.").

PLAINTIFF YELLOWHAMMER FUND'S MSJ

(explaining that a state may not "punish conspiracy to advocate something, the doing of which it may not punish").

Second, Defendant has no "interest in regulating" what its residents "may hear or read about" lawful, out-of-state abortion. *See Bigelow*, 421 U.S. at 827. Alabama has no interest in "shielding its citizens from information about activities outside [its] borders." *Id.* at 827–28. The First Amendment does not permit the government to "calibrate the propriety and utility of speech on certain topics." *Otto*, 981 F.3d at 868. Moreover, even if Defendant identifies a compelling interest, he must prove that his threats "further[]" that compelling interest and are "narrowly tailored to that end." *Reed*, 576 U.S. at 171. Defendant's disagreement with other state's abortion laws does not justify his threats to prosecute all speech and association related to funding and supporting out-of-state abortions. Even if these were compelling interests, Defendant's threats go far beyond expressing disagreement with Plaintiff's activities: instead, they attempt to "shield[]" Alabamians "from information about activities outside [Alabama's] borders, activities that [Alabama's] police powers do not reach." *Bigelow*, 421 U.S. at 827–28; *see also Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 (1990) (explaining that the First Amendment prohibits the government from forcing people to "conform their beliefs and associations to some state-selected orthodoxy").

For these reasons, Defendant's threats cannot survive strict scrutiny, and Plaintiff is entitled to summary judgment on its free expression and association claims.

PLAINTIFF YELLOWHAMMER FUND'S MSJ

### D. Alabama Code § 13A-4-4 is Unconstitutionally Overbroad.

Defendant's threats invoked Alabama's extraterritorial conspiracy statute, Alabama Code § 13A-4-4. If construed to permit the prosecution of lawful, out-of-state conduct, that statute criminalizes a substantial number of constitutional acts "judged in relation to the statute's plainly legitimate sweep." *Bonta*, 141 S. Ct. at 2387. Thus, it is unconstitutionally overbroad under the First Amendment.

"[A] party [may] challenge an ordinance under the overbreadth doctrine in cases where every application creates an impermissible risk of suppression of ideas . . . ." *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1269 (11th Cir. 2011). "The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). The second step in the overbreadth analysis is to determine "whether the statute, as we have construed it, criminalizes a substantial amount of protected expressive activity." *Henry v. Attorney General*, 45 F.4th 1272, 1290 (11th Cir. 2022) (citing *Williams*, 553 U.S. at 297). Plaintiffs may pursue an overbreadth claim even if their own speech can be constitutionally prohibited. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987). To succeed on an overbreadth claim, a plaintiff "must demonstrate from the text" of the statute "and from actual fact that a substantial number of instances exist in

which the [statute] cannot be applied constitutionally." *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988).

If construed contrary to *Thompson*, *see supra* at 14–15, Alabama Code § 13A-4-4 would extend to any agreement to commit an act that would be criminal in Alabama, regardless of whether the agreed-upon act is a crime in the state where it is committed. As a result, the statute on its face criminalizes agreements without regard to the legality of the underlying action—a blatant violation of the First Amendment.

Under this construction, Alabama Code § 13A-4-4 criminalizes a substantial amount of protected expressive activity because it brings within its sweep expression about lawful activity. It is well-established that conspiracy prosecutions necessarily target speech and association. *See Dennis*, 341 U.S. at 575 (Jackson, J., concurring). Although courts have announced an exception to the First Amendment when parties agree to engage in illegal conduct, *see Brown v. Hartlage*, 456 U.S. 45, 55 (1982), the justification for that exception dissolves if the agreed-upon act is *not* illegal. *See Dennis*, 341 U.S. at 575 (Jackson, J., concurring) (explaining that the state may not "punish conspiracy to advocate something, the doing of which it may not punish"). Simply put, one cannot be guilty of "conspiring" to commit a lawful act.

Here, if construed contrary to *Thompson*, there is nothing in the statute prohibiting Alabama from prosecuting agreements to commit acts that are *lawful* in the state where they are committed. The amount of constitutionally protected expression

34

that the statute would bring within its sweep is striking: virtually any agreement to engage in lawful out-of-state conduct, coupled with an overt act, could be criminalized. Alabama could punish any expression or association that furthers legal out-of-state conduct, just because it disagrees with the message or object of the agreement.

Courts have held that a statute is overbroad when, by its plain terms, it contains no limiting principle to narrow the conduct that is prohibited. In *Board of Airport Commissioners of City of Los Angeles*, for example, the Supreme Court struck down a law that banned all "First Amendment activities" in a specific part of Los Angeles International Airport. 482 U.S. at 574–75. The Court held that "the words of the resolution simply leave no room for a narrowing construction," and expressly applied to protected speech. *Id.* at 575. In that case, "it [was] difficult to imagine that the [law] could be limited by anything less than a series of adjudications, and the chilling effect of the resolution on protected speech in the meantime would make such a case-by-case adjudication intolerable." *Id.* at 575–76. Similarly, in *FF Cosmetics FL, Inc. v. City of Miami Beach*, the Eleventh Circuit held that an ordinance restricting stores from distributing "any handbill that conveys any information about any good or service provided by a business" was unconstitutionally overbroad. 866 F.3d 1290, 1304 (11th Cir. 2017). The court held that the ordinance "burdens substantially more speech than necessary to further the City's interests," because it applies to non-commercial handbilling and the distribution of fliers and information about public issues. *Id.*

35

Alabama Code § 13A-4-4 suffers from the same defects as the handbilling ordinance in *FF Cosmetics* and the airport speech prohibition in *Board of Airport Commissioners of City of Los Angeles*. Even if Alabama has a compelling interest in prosecuting out-of-state *unlawful* activities, Alabama Code § 13A-4-4 unconstitutionally sweeps in protected expression and association about *lawful* out-of-state activities, allowing Alabama to punish any speech, agreement, or association with which it disagrees. Because the extraterritorial conspiracy statute has an "impermissible chilling effect on protected speech," *id.* at 1302, Plaintiff is entitled to summary judgment on its claim that Alabama Code § 13A-4-4 is unconstitutionally overbroad.

### E. Defendant's Threats Violate Plaintiff's and Pregnant Alabamians' Right to Travel

Whether or not Alabama's laws can be read to prohibit support for lawful out-of-state abortion care, *see supra* at 12–14, prosecuting Plaintiff for violating Alabama law would impermissibly violate Plaintiff and pregnant Alabamians' constitutional right to travel. The U.S. Supreme Court has firmly established and repeatedly recognized a right to travel. *Zobel v. Williams*, 457 U.S. 55, 67 (1982) (Brennan, J., concurring); *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969), overruled on other grounds by *Edelman v. Jordan*, 415 U.S. 651 (1974). It is a right that ensures people can enter and leave any state. *Saenz v. Roe*, 526 U.S. 489, 500 (1999). The right to travel is "so elementary" that it inherently accompanies the Union that the Constitution established. *United States v. Guest*, 383 U.S. 745, 757–58 (1966). How else could a

loose confederation of states be transformed into one nation? *See Zobel*, 457 U.S. at 67 (Brennan, J., concurring); *Attorney General of New York v. Soto-Lopez*, 476 U.S. 898, 902 (1986) (noting "the important role [the right to travel] has played in transforming many States into a single Nation"); *Crandall v. Nevada*, 73 U.S. 35, 43 (1867) ("[T]he people of these United States constitute one nation.").

Defendant's threats convey to Plaintiff, and the pregnant people in Alabama that it serves, that if Plaintiff helps pregnant people travel to a state where abortion is legal, Plaintiff and its employees and volunteers could be prosecuted and face up to a life sentence in prison. When California made it illegal for helpers to bring indigent people into the state, the U.S. Supreme Court invalidated the law. *Edwards v. California*, 314 U.S. 160, 166 (1941). When a Nevada law taxed people leaving the state, the U.S. Supreme Court overturned it. *Crandall*, 73 U.S. at 49. And when the Ku Klux Klan inflicted violence in Georgia meant to stop Black people from using highways to travel between states, the U.S. Supreme Court declared this violence a violation of the right to travel. *Guest*, 383 U.S. at 760. Plaintiff's right to travel claim can be resolved by applying well-established constitutional principles. There are no issues of fact that prevent this Court from entering summary judgment in Plaintiff's favor.

1. **The Predominant Purpose of Defendant's Threats of Prosecution Is to Prevent the Exercise of the Right to Interstate Travel and to Oppress Those Who Exercise That Right.**

A state action implicates the right to travel when impeding travel is its primary objective. *Soto-Lopez*, 476 U.S. at 903; *see also Guest*, 383 U.S. at 760. When the

PLAINTIFF YELLOWHAMMER FUND'S MSJ

government infringes upon the right to travel, the government's actions will be unlawful. *Shapiro*, 394 U.S. at 634. Three cases—*Edwards, Crandall,* and *Guest*—make abundantly clear that the right to travel is implicated here.

*Edwards* shows why Plaintiff—a helper seeking to assist in the exercise of the right to travel—has suffered a constitutional violation. Fred Edwards took a trip in late December 1939 from Texas to California to help his brother-in-law start a new life. *Edwards*, 314 U.S. at 171. His brother-in-law had $20 to his name and, because of his indigency, he believed California could offer him and his family new opportunities. *Id.* At the time, California law criminalized helpers like Mr. Edwards, specifically making it unlawful to transport indigent people into the state. *Id.* The trial court sentenced Mr. Edwards to six months in the county jail for coming to the aid of his brother-in-law. *Id.* The U.S. Supreme Court ultimately found that no single state could "isolate itself" by prohibiting indigent people from entering and held that fundamental constitutional rights were at play—rights we now call "the right to travel." *Id.* at 173. The Court was not unsympathetic to the "grave and perplexing social and economic dislocation" that led California to seek to use its police power to restrict travel. *Id.* However, the state's interests in exercising its police power could not overcome the countervailing importance of preserving the free movement of people across state lines, and the Court ultimately found the restriction impermissible. *Id.* at 173.

The similarities between *Edwards* and this case are striking. Like Mr. Edwards, Plaintiff is a helper seeking to transport people who do not have the funds to travel to another state. *See, e.g.*, Fountain Decl. ¶ 20. Like Mr. Edwards, Plaintiff is facing potential criminal liability if it aids in another's travel. *See, e.g.*, Fountain Decl. ¶ 24; McLain Decl. ¶¶ 23-24. And like Mr. Edwards, Yellowhammer Fund is being deprived of the fundamental right to move freely between states while being faced with a state's efforts to isolate itself and its residents from other states in the Union. *See* Fountain Decl. ¶¶ 16, 26.

Similarly, *Crandall* also establishes that Plaintiff is a proper party and that Defendant's threats violate the constitutional right to travel. In 1865, Nevada enacted a law that levied a tax of one dollar upon any person leaving the state by railroad, stagecoach, or other vehicle for hire. *Crandall*, 73 U.S. at 35–39. Nevada argued that this tax was "not a tax upon the passenger, but upon the business of the carrier who transports him"—an argument rejected by the U.S. Supreme Court. *Id.* at 39. The Court found Nevada's actions in conflict with the Constitution, discussing the havoc that would befall the nation if the government could place burdens on the right to leave a state. "The people of these United States constitute one nation. They have a government in which all of them are deeply interested." *Id.* at 43. The Court explained that it is against the principles of our nation to erect barriers to leaving a state, as such a precedent would interfere with the activities of national citizenship. *Id.* at 43–44.

"[N]o power can exist in a State to obstruct this right that would not enable it to defeat the purposes for which the government was established." *Id.* at 44.

*Crandall* guides this case for two additional reasons. First, Mr. Crandall was not a passenger but the agent for a stagecoach. *Id.* at 36. Like Mr. Edwards, he was able to get judicial relief even though the right to travel violated by the law belonged to the stagecoach passengers traveling out of Nevada. *Crandall* also is instructive because the infringement on the right was merely a one-dollar fee, where in the present case, the criminal penalty is one of the most extreme available under Alabama law. Here, Defendant is threatening a sentence up to life in prison for aiding in travel. *See* Suelzle Decl. ¶ 6.

Finally, *Guest* demonstrates that the right to travel is infringed if the predominant purpose of the challenged act is to "impede or prevent the exercise of the right of interstate travel, or to oppress a person because of his exercise of that right."[10] *Guest*, 383 U.S. at 760. *Guest* arises from the Ku Klux Klan shooting of Lt. Col. Lemuel Penn in Athens, Georgia, on a highway while he was driving back to

---

[10] Plaintiff moves for summary judgment here on a theory that the primary objective of the Defendant's threats is to impede or prevent the right to interstate travel or to oppress a person because of his exercise of that right. *Soto-Lopez* also allows Plaintiff to establish a violation through additional theories. 476 U.S. at 903. Plaintiff recognizes that proceeding on those alternative theories may require reliance upon issues of fact, and therefore, this summary judgment motion only proceeds on "primary objective grounds." By doing so, Plaintiff does not waive its right to present evidence in support of the additional theories if summary judgment is not granted.

Washington after completion of reserve military duty at Fort Benning, Georgia, and the rash of racial motivated terror inflicted on Athens around the time of the shooting. *Id.*; *see also Myers v. United States*, 377 F.2d 412, 416 (5th Cir. 1967) (describing facts of the murder that were the basis of *Guest*).[11] After a local jury failed to convict the suspects of murder, the federal government sought to prosecute the men for conspiring to deprive Black people of their constitutional rights, including the right to travel. *Guest*, 383 U.S. 747 n.1. Initially the district court dismissed the indictment. *Id*. at 748.

On appeal, the U.S. Supreme Court had to determine whether the Department of Justice could indict under 18 U.S.C. § 241. *Id.* at 746–47. *Guest*, one of the first cases argued by Thurgood Marshall as Solicitor General, is primarily about the Court's decision to extend the protection of the Fourteenth Amendment to citizens who suffer

_____

[11] During the Spring and Summer of 1964, Athens, Georgia, had been plagued with violence arising from a group of Ku Klux Klansmen and the complicity of law enforcement in their violence. *Myers*, 377 F.2d at 414–16 (discussing law enforcement's frequent presence when the Ku Klux Klan acted). In the backdrop, young Black residents were picketing The Varsity drive-in restaurant in Athens because the business refused to serve Black residents. *Id*. at 414–15. A group of Klansmen, often with the same few actors, traversed the town with weapons, beat Black men, shot into homes in Black residential neighborhoods costing a man his eye and a 13-year-old girl her lip, and sought to scare Black people with out-of-state license plates off the interstate highways through a rash of violence. *Id*. at 414–16. Around 5 a.m. on July 11, 1964, Lt. Col. Lemuel Penn and two other Black army officers were driving to Washington D.C. from Fort Benning, Georgia, after completing summer training duties. *Id*. at 416. They stopped in Athens, Georgia, where Lt. Col. Penn took the wheel. About 20 miles outside of town, a light-colored car approached the three men's vehicle. *Id*. Two shotgun blasts were fired, one of these going through a rear window and missing the occupants. *Id*. The other blast smashed a hole in the window near Lt. Col. Penn—a decorated veteran of World War II, an assistant superintendent of schools in Washinton D.C., a husband and a father of three—striking his head and killing him instantly. *Id*.; *see also* Moderated by Manley F. Brown, The Honorable Marc T. Treadwell, *The United States Attorney's Office Middle District of Georgia: Gary B. Blasingame, Manley F. Brown, Joseph H. Davis, and Joseph W. Popper, Jr.*, 22 J.S. Legal Hist. 73, 127 n. 46 (2014). None of these facts are described in the text of *Guest* but provide the context of the case.

a deprivation of their Constitutional rights at the hands of private actors. [12] But the case is rooted in the constitutional right to travel. *Id.* at 757. The Supreme Court stated that "[t]he constitutional right to travel from one State to another, and necessarily to use the highways and other instrumentalities of interstate commerce in doing so, occupies a position fundamental to the concept of our Federal Union." *Id.* It continued:

> Although the Articles of Confederation provided that 'the people of each State shall have free ingress and regress to and from any other State,' that right finds no explicit mention in the Constitution. The reason, it has been suggested, is that a right so elementary was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created. In any event, freedom to travel throughout the United States has long been recognized as a basic right under the Constitution. . . . Although there have been recurring differences in emphasis within the Court as to the source of the constitutional right of interstate travel, there is no need here to canvass those differences further. All have agreed that the right exists.

*Id.* at 758–59 (internal citations and footnotes omitted). The Court allowed the indictment, explaining:

> [I]f the predominant purpose of the conspiracy is to impede or prevent the exercise of the right to interstate travel, or to oppress a person because of his exercise of that right, then, whether or not motivated by racial discrimination, the conspiracy becomes a proper object of the federal law under which the indictment in this case was brought.

---

[12] Peggy Cooper Davis et. al., *The Persistence of the Confederate Narrative*, 84 Tenn. L. Rev. 301, 342 (2017).

PLAINTIFF YELLOWHAMMER FUND'S MSJ

*Guest*, 383 U.S. at 760. Since then, the "predominant purpose" or "primary objective" test, has been one way a party can show infringement of the right to travel. *See Soto-Lopez*, 476 U.S. at 903.

Here, the predominant purpose of the Defendant's threats of prosecution are to "impede or prevent the exercise of the right to interstate travel" and to "oppress a person because of his exercise of that right." One need only look to the Defendant's statements for proof of their purpose. He specifically acknowledged his inability to prosecute the pregnant person for exercising the right. Suelzle Decl. ¶ 6 ("You know there is nothing about that law that restricts any individual from driving across state lines and, uh, seeking an abortion, uh, in another place . . ."). But he went on to explain how he would stop that travel by prosecuting abortion funds. *Id.* ("[H]owever, I would say that if any individual held themselves out, uh, as a, as an entity or a group that is using funds, that they are able to raise, uh, to be able to facilitate those [sic] those visits then that, uh, is something we are going to look at closely."). Defendant is threatening enforcement specifically to prevent organizations and individuals like Plaintiff from transporting people to other states, just as in *Edwards* and *Crandall*. And, like in *Guest*, his purpose in making this threat is to impede travel. Further, *Guest* makes clear that "actions" (i.e., the unspeakable violence Black Georgians' faced), not just laws, can violate the right to travel. Here, like the actions in *Guest*, Defendant's threats are life-destroying, as Defendant is threatening a sentence of life in prison without the possibility of parole.

PLAINTIFF YELLOWHAMMER FUND'S MSJ

### 2. Plaintiff Has Third-Party Standing to Vindicate the Right to Travel for Those it Serves.

*Edwards* and *Crandall* make clear that Plaintiff can bring this claim on its own behalf. However, Plaintiff also has third-party standing to vindicate the right to travel on behalf of those it serves. Third-party standing is a prudential doctrine, not a constitutional requirement, and the rule disfavoring it "is hardly absolute." *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2117–18 (2020) (plurality opinion); *accord id.* at 2139 n.4 (Roberts, C.J., concurring). The Supreme Court has, for example, permitted third-party standing in cases where a litigant has Article III standing to challenge the constitutionality of a law, policy, or action, and the "rights of third parties . . . would be 'diluted or adversely affected' should [its] constitutional challenge fail." *Carey v. Pop. Servs. Int'l*, 431 U.S. 678, 684 (1977) (quoting *Craig v. Boren*, 429 U.S. 190, 195 (1976)). Such cases have entailed a variety of fact patterns and interests. *See, e.g.*, *Powers v. Ohio*, 499 U.S. 400, 415 (1991) (holding that a criminal defendant had third-party standing to assert the rights of potential jurors excluded from jury service); *Carey,* 431 U.S. at 683–84 (holding that a company selling non-medical contraceptives had third-party standing to assert the rights of potential customers, including minors); *Craig*, 429 U.S. at 194 (holding that a beer vendor had third-party standing to assert the rights of potential customers); *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965) (holding that healthcare providers had third-party standing to assert the rights of patients seeking to use contraception); *Barrows v. Jackson*, 346 U.S. 249, 258 (1953)

(holding that white property owners had third-party standing to assert the rights of potential Black purchasers).

Here, Plaintiff satisfies the requirements for third-party standing because it has suffered an injury-in-fact, there is a sufficiently close relationship between Plaintiff and the pregnant people it supports, and there is a hindrance to the ability of pregnant Alabamians to protect their own rights. *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004).

First, Plaintiff is suffering injury-in-fact that is caused by Defendant's threatened prosecution, and Plaintiff's injury would be redressed by a judgment declaring that Defendant's threatened prosecution infringes upon its right to travel. *Cf. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–67 (2014) (explaining that, when a plaintiff seeks to engage in conduct that is proscribed by statute, a credible threat of enforcement gives rise to injury-in-fact).

Second, Plaintiff has a close relationship with pregnant Alabamians currently seeking to travel out of state for lawful abortion care. Plaintiff plays a crucial role in enabling its clients to travel. McLain Decl. ¶ 18. There are people presently in need of Plaintiff's services, and it regularly receives requests from pregnant people who cannot travel without Plaintiff's financial and logistical assistance. *Id.*, ¶¶ 26, 29. Additionally, Plaintiff's and pregnant people's interests are aligned. *See Young Apartments, Inc. v. Town of Jupiter, FL*, 529 F.3d 1027, 1042 (11th Cir. 2008) (holding that a landlord had

third-party standing to assert the equal protection rights of its tenants). In fact, their interests are one and the same: Plaintiff's mission is to provide abortion funding and travel support to those who wish to obtain a lawful abortion, which gives Plaintiff a direct interest in protecting pregnant people's right to travel. Fountain Decl. ¶ 30. Plus, Defendant is effectively targeting pregnant people by threatening criminal prosecution against helpers such that it would be "difficult (if not impossible)" for Plaintiff to vindicate its own rights without implicating the right to travel of pregnant people in need of support. *Id.* at 1043; *see also June Med. Servs. L.L.C.*, 140 S. Ct. at 2119 ("[T]he 'threatened imposition of governmental sanctions' . . . eliminates any risk that [Plaintiff's] claims are abstract or hypothetical.").

Third, pregnant people in Alabama face significant hindrances to asserting the right to travel on their own behalf. Pregnant people seeking lawful abortion are likely to face hostility from the community if they draw attention to their desire to obtain an abortion and are "reluctant to raise such claims for fear of provoking additional policing measures" or other legal risks. *Young Apartments, Inc.*, 529 F.3d at 1044. Plaintiff also has observed its clients' fear of being wrongfully criminalized for obtaining an abortion out of state and their desire for privacy. *See* McLain Decl. ¶ 24. A pregnant person may be chilled from asserting their own right to travel by the publicity of a court suit, *Singleton v. Wulff*, 428 U.S. 106, 117 (1976), and someone seeking to travel also faces the imminent mootness of their claim. *Id.* ("Only a few months, at the most, after the maturing of the decision . . . her right thereto will have

been irrevocably lost."). In contrast, Plaintiff is "uniquely positioned" to assert claims on behalf of its clients. *See Young Apartments, Inc.*, 529 F.3d at 1044. As a funder of out-of-state abortions, Plaintiff is the subject of Defendant's threatened prosecution and has suffered significant injury to its organizational mission such that "it has strong incentives to pursue" the right to travel claim on its clients' behalf. *Id.* As a result, Plaintiff is the "obvious claimant" because it is the party upon which the threatened statutes would impose "legal duties and disabilities." *June Med. Servs. L.L.C.*, 140 S. Ct. at 2119; *id.* at 2139 n.4 (Roberts, C.J., concurring).

Accordingly, Plaintiff may assert pregnant Alabamians' constitutional right to travel.

## CONCLUSION

For the reasons set forth above, this Court should grant Plaintiff's motion for summary judgment in its entirety.

Dated: August 28, 2023

Respectfully submitted,

*/s/ Jamila Johnson*
Jamila Johnson*
Allison Zimmer*
THE LAWYERING PROJECT
3157 Gentilly Blvd. #2231
New Orleans, LA 70122
(347) 706-4981 (JJ)
(347) 515-6074 (AZ)
jjohnson@lawyeringproject.org
azimmer@lawyeringproject.org

47

Paige Suelzle*
THE LAWYERING PROJECT
2501 SW Trenton Street #1097
Seattle, WA 98106
(347) 515-6073
psuelzle@lawyeringproject.org

Ashley Light, ASB 1059-F69L
SOUTHERN POVERTY LAW
CENTER
400 Washington Ave
Montgomery, AL 36104
(334) 746-1530
ashley.light@splcenter.org

Krista Dolan*
SOUTHERN POVERTY LAW
CENTER
106 East College Avenue, #M
Tallahassee, FL 32301
(850) 521-3000
Krista.dolan@splcenter.org

*Admitted *pro hac vice*

# IN THE DISTRICT COURT OF THE UNITED STATES FOR THE MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

## <u>CERTIFICATE OF SERVICE</u>

I, Jamila Johnson, do hereby Certify that a true and correct copy of the foregoing has been furnished by ECF electronic service, on this 28th day of August 2023, to counsel of record for Defendant Steve Marshall.

Date: <u>August 28, 2023</u>                    <u>*/s/ Jamila Johnson*</u>
                                                                    Jamila Johnson