**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| YELLOWHAMMER FUND, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 2:23-cv-00450-MHT-KFP |
| STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama, | ) ) ) | |
| | ) | |
| *Defendant*. | ) | |

| | | |
|---|---|---|
| WEST ALABAMA WOMEN'S CENTER, *et al.*, | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2:23-cv-00450-MHT-KFP |
| | ) | |
| STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama, | ) ) ) | |
| | ) | |
| *Defendant*. | ) | |

**MOTION TO DISMISS**

The State of Alabama prohibits most abortions. Unless an exception related to the health of the mother or child applies, it is a crime to perform an abortion in Alabama. Plaintiffs do not challenge the constitutionality of that prohibition.

Instead, they argue that because some other States allow such abortions, Plaintiffs have a right to conspire with others in Alabama to try to have abortions performed out of state. Plaintiffs are mistaken.

Alabama law clearly provides that "[a] conspiracy formed in this state to do an act beyond the state, which, if done in this state, would be a criminal offense, is indictable and punishable in this state in all respects as if such conspiracy had been to do such act in this state." ALA. CODE § 13A-4-4.[1] An elective abortion performed in Alabama would be a criminal offense; thus, a conspiracy formed in the State to have that same act performed outside the State is illegal. Plaintiffs identify no constitutional provision that would bar the State from enforcing that law.

Plaintiffs first argue, under the Due Process Clause, that § 13A-4-4 does not mean what it says and that the provision applies only if the conspiracy formed in Alabama is to commit an act outside Alabama that is also illegal where the act would occur. But nothing in the statute supports that interpretation, and, in any event, federal courts lack authority to order a State official to comply with a federal court's reading of State law.

---

[1] Ala. Code § 13A-4-4 is the focus of this Motion because that statute expressly applies to actions taken in Alabama to advance conduct outside the State. The legal issues presented by this case—except where explicitly noted otherwise, *see infra* Part III—do not change based on the particular State statute at issue.

Plaintiffs next argue that their First Amendment rights to speech, expression, and association are violated because they cannot conspire to procure out-of-state abortions. But it is well settled that speech used to conduct a crime receives no constitutional protection; the same is true for the right to associate, otherwise all criminal conspiracies would be constitutionally protected criminal "associations."

Likewise, the right to travel, to the extent that it is even implicated, does not grant Plaintiffs the right to carry out a criminal conspiracy simply because they propose to do so by purchasing bus passes or driving cars.

Plaintiffs finally argue that they have a so-called right to be free from extraterritorial application of State law, but the prohibited conduct in which they wish to engage would occur right here in Alabama. In the words of the Alabama conspiracy statute, Plaintiffs wish, while in this State, to "agree[] with one or more persons to engage in or cause the performance of the conduct" constituting an offense, followed by "one or more of the persons do[ing] an overt act to effect an objective of the agreement." ALA. CODE § 13A-4-3(a). Prosecuting someone for forming a conspiracy in Alabama is not an extraterritorial application of Alabama law simply because the planned conduct is to occur beyond State lines. Plaintiffs assert that there is some difference because the object of their conspiracy is legal where it might occur. But they don't explain why that makes any constitutional difference, and it doesn't. The conspiracy is what is being punished,

even if the final conduct never occurs. That conduct is Alabama-based and is within Alabama's power to prohibit.

For these reasons, Defendant Steve Marshall, sued in his official capacity as Attorney General of the State of Alabama, moves under rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiffs' complaints (docs. 1, 23).

## BACKGROUND

### A.    The Alabama Human Life Protection Act

In 2019, Alabama passed The Alabama Human Life Protection Act, advancing "the public policy of the state to recognize and support the sanctity of unborn life and the rights of unborn children." ALA. CODE § 26-23H-2(b). The law makes it "unlawful for any person to intentionally perform or attempt to perform an abortion except" to address certain health risks to the mother or unborn child. ALA. CODE § 26-23H-4; *see also id.* § 26-23H-3(1). The statute exempts from liability women on whom abortions are performed. *Id.* § 26-23H-5. "An abortion performed in violation of this chapter is a Class A felony," and "[a]n attempted abortion performed in violation of this chapter is a Class C felony." *Id.* § 26-23H-6.

The Court preliminarily enjoined enforcement of the Act on October 29, 2019, as likely violating substantive due process, *Robinson v. Marshall*, 415 F. Supp. 3d 1053, 1057 (M.D. Ala. 2019), but the Court later dissolved the preliminary

4

injunction after the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), *Robinson v. Marshall*, No. 2:19-cv-365-MHT, 2022 WL 2314402 (M.D. Ala. June 24, 2022).

### B.   Alabama's Interest in Prohibiting and Regulating Abortions

By prohibiting and regulating abortions, the Alabama Legislature advances a number of important governmental interests. In Alabama, "[t]he dignity and value of life, especially the lives of children, born or unborn, has been and continues to be a public policy and often sacred concern of the highest order for the people of this state." ALA. CODE § 26-23F-2(a)(4). Alabama understands that "medical science has increasingly recognized the humanity of the unborn child[,]" at all stages of development. *Id*. § 26-23H-2(e).

While protecting fetal life is a foremost concern in Alabama, the State also prioritizes protecting maternal health and safety. "The medical, emotional, and psychological consequences of an abortion are serious and can be lasting or life threatening." *Id*. § 26-23A-2(a)(3). Alabama recognizes that "abortion or reproductive health centers have often failed to meet acceptable standards of medical care[,]" *id*. § 26-23E-2(8), and often treat patients "in a manner inconsistent with a traditional physician/patient relationship[,]" *id.* (2). Indeed, "Abortion is . . . most often engaged in by stand-alone clinics without many of the safeguards found in a traditional physician/patient relationship or other medical care setting." *Id.* (6).

"Most women do not return to the [abortion] facility for post-surgical care." *Id.* § 26-23A-2(a)(2).

### C.   Alabama Conspiracy Law

Under Alabama law:

> (a) A person is guilty of criminal conspiracy if, with the intent that conduct constituting an offense be performed, he or she agrees with one or more persons to engage in or cause the performance of the conduct, and any one or more of the persons does an overt act to effect an objective of the agreement.
>
> (b) If a person knows or should know that one with whom he or she agrees has in turn agreed or will agree with another to effect the same criminal objective, he or she shall be deemed to have agreed with the other person, whether or not he or she knows the other's identity.

ALA. CODE § 13A-4-3. "A conspirator is not liable under this section if, had the criminal conduct contemplated by the conspiracy actually been performed, he or she would be immune from liability under the law defining the offense." *Id.* § 13A-4-3(e). But it is no "defense to a prosecution for criminal conspiracy" that "[t]he person, or persons, with whom defendant is alleged to have conspired has been acquitted, has not been prosecuted or convicted . . . or is immune from prosecution." *Id.* § 13A-4-3(d).

Furthermore, "[a] conspiracy formed in this state to do an act beyond the state, which, if done in this state, would be a criminal offense, is indictable and punishable in this state in all respects as if such conspiracy had been to do such act in this state." *Id.* § 13A-4-4. This statute is consistent with Alabama's longstanding common-law

rule that "[t]he place at which it is intended to commit the felony is not material. It is the law of the place where the conspiracy is formed which is broken." *Thompson v. State*, 17 So. 512, 516 (Ala. 1895).

### D. Proceedings.

On July 31, 2023, West Alabama Women's Center, Yashica Robinson, and Alabama Women's Center ("West Alabama Plaintiffs") and Yellowhammer Fund filed lawsuits in the Middle District of Alabama alleging that their constitutional rights to free speech, expression, association, travel, due process, and to be free from extraterritorial application of State law would be violated by the application of general Alabama criminal laws (namely Ala. Code §§ 13A-2-23, 13A-4-1, 13A-4-3, and 13A-4-4) to punish Plaintiffs for helping others obtain out-of-state abortions. *See* doc. 1, doc. 23.

## LEGAL STANDARD

"Without jurisdiction the court cannot proceed at all in any cause." *Ex parte McCardle*, 74 U.S. 506, 514 (1868). A plaintiff seeking to invoke a federal court's jurisdiction must establish Article III standing. *See Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1273 (11th Cir. 2001). "It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Warth v. Seldin*, 422 U.S. 490, 518 (1975).

"When evaluating a motion to dismiss under Rule 12(b)(6), the question is whether the complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Worthy v. City of Phenix City*, 930 F.3d 1206, 1217 (11th Cir. 2019) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Facial challenges to the legal sufficiency of a claim or defense, such as a motion to dismiss based on failure to state a claim for relief, should . . . be resolved before discovery begins." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367 (11th Cir. 1997) (footnote omitted). Such a dispute "always presents a purely legal question; there are not issues of fact because the allegations contained in the pleading are presumed to be true." *Id.* (citing *Mitchell v. Duval Cnty. Sch. Bd.*, 107 F.3d 837, 838 n.1 (11th Cir. 1997) (per curiam)).

## ARGUMENT

### I. This Court lacks subject-matter jurisdiction to consider some of Plaintiffs' claims.

First, this Court lacks jurisdiction over Plaintiffs' claims on behalf of their staff and clients because Plaintiffs cannot satisfy the third-party standing requirements. Second, the Eleventh Amendment bars Plaintiffs' claims that depend on Defendant Marshall complying with *their* interpretation of State law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

## A.      Plaintiffs Lack Third-Party Standing.

Both sets of Plaintiffs bring claims on behalf of their clients for violation of their clients' right to travel. *See* doc. 23 ¶¶ 13, 131 ("Dr. Robinson sues on her behalf and on behalf of her patients and staff."); doc. 1 ¶¶ 67, 91 ("Plaintiff further has standing to sue on its clients' behalf[.]"). Further, Plaintiffs seek to sue on behalf of their staff.[2] *See generally* doc. 23; doc. 1. But none of the Plaintiffs have third-party standing to bring such claims.

As an initial matter, third-party standing rules do not relax in abortion-related cases. In *Dobbs*, the Supreme Court explained that its previous abortion cases "led to the distortion of many important but unrelated legal doctrines." 142 S. Ct. at 2275. That distortion included "ignore[ing] the Court's third-party standing doctrine" in *June Medical Services L.L.C. v. Russo*, 140 S. Ct. 2103 (2020). *Dobbs*, 142 S. Ct. at 2275. Indeed, the *Dobbs* Court specifically named *June Medical* as a case that misapplied third-party standing doctrine, pointing instead to the dissents in *June Medical* as the proper application. *Id*. at 2275 n.61. Those majority opinions are thus no longer good law; instead, the prior caselaw governs, and the opinions and dissents identified in *Dobbs* contour third-party standing in the context of abortion-related

---

[2] To the extent Plaintiffs intended to bring additional claims on behalf of their clients or their staff, Defendant Marshall's argument that Plaintiffs lack third-party standing applies with equal force.

cases.[3] Whatever the Supreme Court's third-party standing jurisprudence might have been in pre-*Dobbs* abortion-related cases, the normal articulation and application of third-party standing principles now controls. *See SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*, 40 F.4th 1320, 1328 (11th Cir. 2022) (declining to treat abortion differently in the void-for-vagueness context because there is no longer a constitutional right to abortion).

Generally, "a litigant may only assert his own constitutional rights or immunities." *United States v. Raines*, 362 U.S. 17, 22 (1960). That's because "[t]he Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally." *Warth*, 422 U.S. at 499. However, the Court has crafted a narrow exception to the rule against third-party standing where (1) the litigant has "suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the

---

[3] *See Dobbs*, 142 S. Ct. at 2275 n.61 (citing *Warth*, 422 U.S. at 499; *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15, 17–18, (2004), *abrogated on others grounds by Lexmark Inter., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *June Med.*, 140 S. Ct., at 2167–68 (Alito, J., dissenting); *June Med.*, 140 S. Ct., at 2173–74 (Gorsuch, J., dissenting) (collecting cases); *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 632 n.1 (2016) (Thomas, J., dissenting)); *see also All. for Hippocratic Med. v. FDA*, No. 23-10362, 2023 WL 2913725, at *4 (5th Cir. Apr. 12, 2023) (per curiam) ("We are cognizant of the fact that the Supreme Court has disavowed the theories of third-party standing that previously allowed doctors to raise patients' claims in abortion cases."); *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 664 S.W.3d 633, 652 (Ky. 2023) (determining that *Dobbs*'s "denouncement of permitting abortion providers third-party standing in [abortion-related] cases" was "proper" and examining the dissents in *June Medical* and *Whole Women's Health* to hold that abortion providers did not have standing to sue on behalf of their patients).

outcome of the issue in dispute"[4]; (2) the litigant has a "close relation to the third party"; and (3) there is "some hindrance to the third party's ability to protect his or her interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991). "[T]hird-party standing is not appropriate where there is a potential conflict of interest between the plaintiff and third party." *June Med.,* 140 S. Ct. at 2167 (Alito, J., dissenting) (citing *Elk Grove*, 542 U.S. 1). And it is the burden of the "party who seeks the exercise of jurisdiction in his favor, clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (cleaned up).

### 1. Plaintiffs Lack Third-Party Standing to Sue on Behalf of Their Clients.

*First*, Plaintiffs cannot satisfy third-party standing because they have a potential conflict of interest with the women whose interests they claim to represent. *See June Medical*, 140 S. Ct. at 2153 (Alito, J., dissenting) (rejecting "the idea that a regulated party can invoke the right of a third party for the purpose of attacking legislation enacted to protect the third party"). *Dobbs* makes clear that a State may regulate abortion due to its interest in the "protection of maternal health and safety." 142 S. Ct. at 2284. Alabama law vindicates this interest by prohibiting or otherwise

---

[4] The organizational Plaintiffs cannot claim injury based on the notion that they are "subject to enforcement of the threatened laws[.]" doc. 1 ¶ 69. Alabama law does not provide for corporate criminal liability unless the Legislature "has specifically provided for corporate liability." *State v. St. Paul Fire & Marine Ins. Co.*, 835 So. 2d 230, 233 (Ala. Crim. App. 2000). None of the relevant statutes here provide for corporate liability.

regulating in-state abortion providers, *see infra* at 5–6, but because the State cannot police the safety of out-of-state abortions, its conspiracy statute serves as a backstop to protect maternal health and safety. By promoting out-of-state abortions, in-state abortion providers necessarily advance their own financial and reputational interests irrespective of any costs (or even benefits) it may have on the women consulting them. Thus, Plaintiffs and pregnant women have a potential conflict of interest, barring third-party standing.

*Second*, Plaintiffs do not have sufficiently close relationships with "pregnant Alabamians seeking to travel out of state" for abortions. *See* doc. 1 ¶¶ 67–68. A close relationship for third-party standing purposes is one in which "the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter." *Harris v. Evans*, 20 F.3d 1118, 1123 (11th Cir. 1994) (quoting *Singleton v. Wulff*, 428 U.S. 106, 115 (1976) (plurality opinion)). An "existing" relationship is more likely to be a "close relationship," distinct from "hypothetical" relationships between third parties and litigants. *Kowalski v. Tesmer*, 543 U.S. 125, 131 (2004).

Plaintiffs' allegations do not establish this requisite close relationship. Yellowhammer alleges that its "crucial role in enabling its client to travel" suffices to show a close relationship. Doc. 1 ¶ 68. According to Yellowhammer, "[t]here are people presently in need" of its services, and it "regularly receives requests" from

12

pregnant women who would financially struggle to travel out of state to procure an abortion. *Id*. WAWC and Dr. Robinson previously performed abortions and provided clients with "information, counseling, and support[.]" Doc. 23 ¶ 65.[5] Close relationships for third-party standing purposes exist between, for example, "parents and children, guardians and wards." *June Medical*, 140 S. Ct. at 2174 (Gorsuch, J., dissenting). In other words, there must be a continuous and standing relationship between the plaintiffs and third parties—not a one-off "incidental congruity of interest." *Warth*, 422 U.S. at 510 (1975). This continuity is not present between Plaintiffs and their clients.

*Third*, Plaintiffs' clients are not hindered in asserting their rights. In considering whether a third-party is hindered from bringing its own case, courts inquire into the "likelihood and ability of the third parties . . . to assert their own rights." *Powers*, 499 U.S. at 414. Courts may analyze whether similar third parties have advanced claims in the past. *See Kowalski*, 543 U.S. at 132.

Plaintiffs' clients are not hindered from bringing a right to travel claim in court. Yellowhammer alleges that women seeking out-of-state abortions are "likely to face hostility from the community" if they bring right to travel claims themselves.

---

[5] As to WAWC, the relationship between an abortion provider and a woman who obtains an abortion is "generally brief and very limited" and does not require any meaningful follow-up with the abortion provider or an abortion clinic. *June Medical*, 140 S. Ct. at 2168 (Alito, J., dissenting); *see also* ALA. CODE § 26-23E-2(8) (explaining that abortion providers often treat patients "in a manner inconsistent with a traditional physician/patient relationship").

Doc. 1 ¶ 69. But those women can sue under a pseudonym. *See, e.g.*, *Singleton*, 428 U.S. at 117 (Powell, J., concurring in part and dissenting in part) ("Our docket regularly contains cases in which women, using pseudonyms, challenge statutes that allegedly infringe their right to exercise the abortion decision."). Plaintiffs have not alleged that any client or potential client has been denied a request to litigate under a pseudonym, and these women face no threat of criminal prosecution in Alabama for having out-of-state abortions.

Neither is mootness an issue. Yellowhammer also alleges that a woman "seeking to travel [to obtain an abortion] also faces the imminent mootness of their claim." Doc. 1 ¶ 69. But "if a woman seeking an abortion brings suit, her claim will survive the end of her pregnancy under the capable-of-repetition-yet-evading-review exception to mootness." *June Med.*, 140 S. Ct. at 2169 (Alito, J. dissenting); *see also Roe v. Wade*, 410 U.S. 113, 125 (1973) ("Pregnancy provides a classic justification for a conclusion of nonmootness."). And, of course, a woman seeking an abortion could pursue temporary or preliminary relief or bring a class action, which (once a class is certified) prevents mootness even where the named plaintiff's individual claims become moot, *see Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74–75 (2013). Neither of Plaintiffs' explanations for why their clients are unable to vindicate their own rights hold up under scrutiny. Because Plaintiffs have a potential conflict of interest with pregnant women and they cannot satisfy the relationship and

hindrance elements, they lack third-party standing to assert right to travel (or any other) claims.

2. *Plaintiffs Lack Third-Party Standing to Sue on Behalf of Their Staff.*

Plaintiffs also bring claims on behalf of their staff, but they have not even alleged either a close relationship for purposes of third-party standing with their staff or that their staff is hindered from bringing suits. As a matter of law, "the relationship between the party asserting the right and the third party has been characterized by a strong identity of interests which is absent in an employer/employee relationship." *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 810 (11th Cir. 1993) (collecting cases). And nothing hinders Plaintiffs' staff from bringing their own suit or joining this one. Dr. Robinson's participation as a Plaintiff in this case proves the point. By providing (and wanting to provide in the future) assistance and information to potential clients seeking abortions, she is similarly situated to Plaintiffs' other staff, and Dr. Robinson was able to bring suit. *See* doc. 23 at 6. Thus, Plaintiffs all fail to meet their burden in alleging third-party standing of the rest of their staff.

**B. The Eleventh Amendment bars Plaintiffs' claims that depend on Defendant Marshall's complying with their interpretation of State law.**

Throughout Plaintiffs' complaints runs the implicit (and occasionally explicit) notion that prosecuting them would run afoul of *State* law. To the extent Plaintiffs

are claiming that this Court should command State officials to follow State law, such an order would violate the long-established rule that "the Eleventh Amendment prohibit[s] the District Court from ordering state officials to conform their conduct to state law." *Pennhurst*, 465 U.S. at 97. "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Id.* at 106. Regardless of how Plaintiffs style their claims, courts must look to the "gravamen" of a plaintiff's claims to determine whether they truly seek adjudication of state or federal issues. *DeKalb Cnty. Sch. Dist. v. Schrenko*, 109 F.3d 680, 688 (11th Cir. 1997); *see also, e.g.*, *Waldman v. Conway*, 871 F.3d 1283, 1290 (11th Cir. 2017) (holding that a purported federal challenge based on state prison officials' failure to follow their classification manual "is not a procedural due process challenge—it is a claim that state officials violated state law in carrying out their official responsibilities[,]" which *Pennhurst* bars). Thus, Plaintiffs cannot ask this Court to declare or require that Defendant Marshall, or any other State official, adopt their preferred interpretation of State law. *Pennhurst*, 465 U.S. at 97, 106.

## II.   Abortion's legality in other States is immaterial.

Plaintiffs exhaustively emphasize that abortion, though generally illegal in Alabama, is legal in other states. *See, e.g.*, doc. 1 ¶ 4; doc. 23 ¶ 23. As an initial matter, Plaintiffs don't appreciate that though abortion may be legal elsewhere, it is

16

plainly illegal pursuant to Ala. Code § 13A-4-4 for Plaintiffs to conspire with others to procure abortions that would be illegal in Alabama. The criminal conduct is the agreement (the conspiracy) itself, which is conduct that occurs *in Alabama* that Alabama has every right to prosecute. Thus, the legality of abortion in other States is irrelevant to whether Alabama can prosecute a conspiracy formed in Alabama.

Plaintiffs do not contest that Alabama, for example, can criminalize conspiracy to sell heroin in Georgia. Nor, under their theory, would it appear to make a difference if Georgia penalized that conduct less harshly than Alabama does, for example, by treating the Alabama felony as a Georgia misdemeanor (or maybe even a civil fine). But in Plaintiffs' view, Alabama would lose its authority to punish this Alabama-based conduct if Georgia repealed its law or if the Alabama-based conspirators simply set their sights on another jurisdiction with lax laws.

Plaintiffs' theory ignores basic tenets of conspiracy liability. When a State punishes conspiracy, "[i]t is the law of the place where the conspiracy is formed which is broken." *Thompson*, 17 So. at 516. Moreover, "even if the objects are not themselves criminal, the conspiracy is punishable where the objectives present prejudice to the general welfare." *United States v. Elliott*, 266 F. Supp. 318, 324 (S.D.N.Y. 1967) (cleaned up). For example, federal courts at all levels have "allow[ed] punishment under 18 U.S.C. § 371 for conspiracy to defraud the United States despite the[re] being no criminal liability attached to the objective of the

conspiracy." *Id.* at 324 n.3; *see, e.g.*, *Dennis v. United States*, 384 U.S. 855, 866–67 (1966) (when a defendant "conspir[es] . . . to circumvent the law[,]" "the claimed invalidity of [that law] would be no defense to the crime of conspiracy").[6]

So too here. Alabama law recognizes abortions as illegal without regard to place or jurisdiction. ALA. CODE § 26-23H-1, *et seq.* The Legislature has categorized abortion as *malum in se*, comparing it to murder, *see* ALA. CODE § 26-23H-2 (citing "the sanctity of unborn life"). And it is up to Alabama "to determine what are within and what without the" category of *malum in se* crimes. *Ex parte Rapier*, 143 U.S. 110, 134 (1892). Alabama can criminalize Alabama-based conspiracies to commit abortions elsewhere, even if the State lacked jurisdiction to prosecute out-of-state crimes. *See Thompson*, 17 So. at 516 ("The place at which it is intended to commit the felony is not material.").

## III.  Alabama Law Does Not Violate the Due Process Clause.

Plaintiffs' due process claims rest upon the novel idea that Alabama law means something other than what its plain language says. In Count III of their complaint, the West Alabama Plaintiffs assert that "no Alabama statute or case law

---

[6] *See also United States v. Vazquez*, 319 F.2d 381, 384 (3d Cir. 1963) ("The . . . conspiracy is itself the substantive offense, and a count of an indictment drawn under it need refer to no other statute than [the conspiracy statute]."); *United States v. Terranova*, 7 F. Supp. 989, 990 (N.D. Cal. 1934) ("To constitute an offense by conspiracy to defraud the United States under section 37 of the Criminal Code, it is not necessary that the conspiracy should have been to commit an act in violation of a criminal statute." (citing *Falter v. United States*, 23 F.2d 420 (2d Cir. 1928); *United States v. Stone*, 135 F. 392 (D.N.J. 1905)).

provides any notice, foreseeability, or fair warning" that "speech or conduct" facilitating procurement of an abortion in another state is unlawful. Doc. 23 ¶ 122.[7] This argument ignores the clear contours of Alabama law and fails to appreciate the high bar required to state such a due process claim: that the interpretation of the statute at issue is "unexpected and indefensible," *see, e.g.*, *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964). Moreover, its inherent focus on State officials' compliance with State law runs afoul of basic federalism principles including sovereign immunity pursuant to *Pennhurst* and the nature of § 1983.

As an initial matter, Plaintiffs' argument fails because it relies on a clear misinterpretation of Alabama law. Alabama law criminalizes any "conspiracy formed in this state to do an act beyond the state, which, *if done in this state*, would be a criminal offense." ALA. CODE 13A-4-4 (emphasis added). Plaintiffs make no serious effort to dispute that the statute's plain language encompasses the situation complained of here, nor could they. Instead, Plaintiffs contend that an 1895 Alabama Supreme Court decision recognizing then-operative common-law conspiracy rules

---

[7] Yellowhammer's complaint does not include a count asserting a similar due process claim. Even to the extent that its passing reference (within its count asserting a "right to be free from extraterritorial application of state law") that "to punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort" could be construed as a separate claim, doc. 1 at 34–35, ¶ 101, it fails as a matter of law and should be dismissed for the same reasons discussed in this section as to the West Alabama Plaintiffs' expressly asserted claim.

somehow prevents this later-enacted statute's plain language from being given effect. *See* doc. 23 ¶¶ 36–55 (citing *Thompson*, 17 So. at 516).

*Thompson* does not undermine, much less override, § 13A-4-4's plain language. To begin, the case was decided when Alabama was "without a statute declaring a conspiracy formed in this state to commit a felony or a misdemeanor in a sister state an indictable offense." *Thompson*, 17 So. at 515. Alabama now has such a statute, which contains no carve out for conduct that is illegal in Alabama but permitted elsewhere. Thus, even if conspiracy rules at common law would have left Plaintiffs free to conspire in Alabama, those rules no longer govern. *See Thompson*, 17 So. at 516 (recognizing legislative preservation of common law "except in so far as it is superseded by express or repugnant legislation"); ALA. CODE § 1-3-1 (adopting common law "so far as it is not inconsistent with the Constitution, *laws* and institutions of this state" and "except as from time to time it may be *altered or repealed* by the Legislature" (emphasis added)); *id.* § 13A-1-6 ("All provisions of [the Criminal Code] shall be construed according to the fair import of their terms[.]"). The plain language of Alabama's statutes controls today and provides more-than-fair notice that Plaintiffs' proposed conduct is criminal.[8]

---

[8] Of course, Plaintiffs would fare little better under the common law. "[A]n unbroken tradition of prohibiting abortion on pain of criminal punishment persisted from the earliest days of the common law until 1973." *Dobbs*, 142 S. Ct. at 2253–54.

Next, *Thompson* recognizes that at common law the place at which the substantive crime is to be committed "is not material"; rather, "[i]t is the law of the place where the conspiracy is formed which is broken." 17 So. at 516. These principles accord with the text and structure of Ala. Code § 13A-4-4. *Thompson* thus confirms that a violation of Alabama's inchoate criminal prohibitions accrues without reference to whether Plaintiffs ultimate object would be legal elsewhere.

At any rate, this Court need not decide what may be the best or even currently operative reading to dismiss Plaintiffs' due process claim. The Supreme Court has "long recognized that 'a mere error of state law is not a denial of due process.'" *Swarthout v. Cooke*, 562 U.S. 216, 222 (2011). Rather, Plaintiffs' "fair notice" due process claim—premised on the notion that applying § 13A-4-4's plain language would somehow work a retroactive change—requires showing that the challenged reading is "unexpected and indefensible." *Bouie*, 378 U.S. at 354. As relevant here, a claim of this kind occurs only "from an unforeseeable and retroactive judicial expansion of statutory language that appears narrow and precise on its face." *Rogers*, 532 U.S. 451, 457 (2001).[9] Plaintiffs cannot meet this demanding standard.

---

[9] While this principle bears some resemblance to the *Ex Post Facto* Clause's limitations on legislative action, it has been "long settled . . . that the *Ex Post Facto* Clause does not apply to judicial decisionmaking." *Rogers*, 532 U.S. at 462. Nor does *ex post facto* case law have any bearing on a "fair notice" claim. To the contrary, injecting *ex post facto* case law "into due process limitations on judicial decisionmaking would place an unworkable and unacceptable restraint on normal judicial processes and would be incompatible with the resolution of uncertainty that marks any evolving legal system." *Rogers*, 532 U.S. at 461.

For example, in *Rogers*, the Supreme Court found that a Tennessee decision abolishing the common law "year-and-a-day rule"[10] and retroactively applying it to a criminal defendant was not "an exercise of the sort of unfair and arbitrary judicial action against which the Due Process Clause aims to protect." 532 U.S. at 467. Rather, "the court's decision was a routine exercise of common law decisionmaking in which the court brought the law into conformity with reason and common sense." *Id.* And in *Metrish v. Lancaster*, the Supreme Court recognized that it had "never found a due process violation in circumstances remotely resembling [that] case— *i.e.*, where a state supreme court, squarely addressing a particular issue for the first time, rejected a consistent line of lower decisions based on the supreme court's reasonable interpretation of the language of a controlling statute." 569 U.S. 351, 367–68 (2013). Thus, albeit on habeas review, *Metrish* rejected a criminal defendant's argument that the due process clause prohibited retroactive curtailment of his diminished-capacity defense. *Id.*

Plaintiffs' allegations fail to clear this high bar. Regardless of whether their roundabout reading of Ala. Code § 13A-4-4 is the most correct, giving force to a statute's plain language can never be "unexpected and indefensible." Indeed, there is no "unforeseeable and retroactive judicial expansion of statutory language."

---

[10] "At common law, the year and a day rule provided that no defendant could be convicted of murder unless his victim had died by the defendant's act within a year and a day of the act." *Rogers*, 532 U.S. at 453.

*Rogers*, 532 U.S. at 457. Plaintiffs' allegations are a far cry from those in cases like *Bouie* where "[p]etitioners did not violate the statute as it was written[,]" 378 U.S. 347, 350–55 (1964); here, Plaintiffs undeniably would violate the statute as written. Moreover, applying the other inchoate criminal statutes that Plaintiffs challenge would not be "unexpected and indefensible." Although these statutes do not specify where the ultimate conduct constituting a crime must either occur or by reference to which jurisdiction's laws, *Thompson* (on which Plaintiffs heavily rely) makes clear that, for inchoate crimes, the place at which the ultimate crime is intended to be committed "is not material" because it is the "law of the place where the" inchoate crime takes shape "which is broken." 17 So. at 516. Plaintiffs cannot lack fair notice of century-old legal principles.

Unable to clear *Bouie*'s high bar, Plaintiffs' due process claim asks no less of this Court than to federalize Alabama's interpretation of its own laws.[11] But "[t]here is no federal right not to be arrested in violation of state law." *Knight v. Jacobson*, 300 F.3d 1272, 1276 (11th Cir. 2002); *see also Swarthout*, 562 U.S. at 222 ("[A] mere error of state law is not a denial of due process."). An order requiring

---

[11] Even to the extent that resolving Plaintiffs' claims required definitive interpretation of any of the statutes at issue (or any other issue of Alabama law), such questions should be certified to the Supreme Court of Alabama. *See WM Mobile Bay Env't Ctr. v. City of Mobile Solid Waste Auth.*, 972 F.3d 1240, 1251 & n.3 (11th Cir. 2020) ("[A]s a matter of federalism and comity, dispositive issues of Alabama law should be first presented to the Alabama Supreme Court to decide."); *see also LaFrere v. Quezada*, 582 F.3d 1260, 1262 (11th Cir. 2009) ("[W]hen [federal courts] write to a state law issue, [they] write in faint and disappearing ink.").

implementation of Plaintiffs' preferred readings of Alabama law would not vindicate federal notions of fair notice; it would instead mandate State officials to follow Plaintiffs' preferred reading of State law in spite of the Eleventh Amendment's jurisdictional bar. *See supra* Part I.B.; *Pennhurst*, 465 U.S. at 97, 106. Separately, on the merits, "[w]hile the violation of state law may (or may not) give rise to a state tort claim, it is not enough by itself to support a claim under section 1983." *Knight*, 300 F.3d at 1276. Whether for lack of jurisdiction or for failure to state a claim, Plaintiffs' due process claim is due to be dismissed.

## IV. The First Amendment Does Not Protect Criminal Conduct.

Plaintiffs' First Amendment claims fail because the First Amendment does not protect criminal activity. Nonetheless, the *West Alabama* Plaintiffs complain that Alabama law prohibits "Plaintiffs' speech about abortion care that is legal and available in other states, including, but not limited to, their provision of counseling about out-of-state options and information about and recommendations for specific, trusted out-of-state abortion providers and financial and practical support resources for assistance with inter-state travel." Doc. 23 ¶ 125. And the *Yellowhammer* Plaintiffs complain about restrictions on their speech and expression as abortion

funders,[12] doc. 1 ¶ 75, and their right to associate with their clients, staff, and other abortion groups, *id.* ¶ 85.

But the only criminalized activity is that which conspires to commit a *crime*. Such activity has no First Amendment protection. "Many long established criminal proscriptions—such as laws against conspiracy, incitement, and solicitation—criminalize speech (commercial or not) that is intended to induce or commence illegal activities." *United States v. Williams*, 553 U.S. 285, 298 (2008). "[S]peech integral to criminal conduct" is one of the "long recognized," "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *United States v. Fleury*, 20 F.4th 1353, 1365 (11th Cir. 2021). "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either

---

[12] To the extent Plaintiffs argue that the restriction Alabama law imposes on "financial . . . support resources for assistance with inter-state travel" violates their free speech right, such a theory misunderstands the First Amendment. *See* doc. 23 at 31. The First Amendment protects speech and funding for speech, not funding for conduct. Speakers "use money amassed from the economic marketplace to fund their speech. The First Amendment protects *the resulting speech*, even if it was enabled by economic transactions with persons or entities who disagree with the speaker's ideas." *Citizens United v. FEC*, 558 U.S. 310, 351 (2010) (emphasis added). Only where Alabama "singles out money used to fund speech as its legislative object, [is it] acting against speech as such, no less than if it had targeted the paper on which a book was printed or the trucks that deliver it to the bookstore." *McConnell v. FEC*, 540 U.S. 93, 252 (2003) (Scalia, J., concurring in part and dissenting in part), *overruled by Citizens United*, 558 U.S. 310. But Alabama law only regulates the use of money as it is spent on *conduct*, i.e., paying for a client's travel to obtain an out-of-state abortion just like it regulates paying someone to travel to obtain out-of-state illegal drugs, *see* ALA. CODE §§ 13A-12-201, *et seq.*

spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) (citations omitted).

Here, the only speech incidentally criminalized is speech that conspires—as defined by Alabama law—to perform an illegal act. To say this law "discriminate[s] on the basis of content and viewpoint[,]" doc. 23 ¶ 127, underscores the point: "It is precisely because" "the content of [the] speech" causes a crime that the speech is unprotected. *Fleury*, 20 F.4th at 1364. "Content-based restrictions are permitted when they are confined to [this] categor[y] of speech." *Id.* at 1365; *see Virginia v. Black*, 538 U.S. 343, 361–62 (2003) ("When the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists." (cleaned up)). Holding otherwise would be "an expansive interpretation of the constitutional guaranties of speech . . . [, which] would make it practically impossible ever to enforce laws against agreements . . . and conspiracies deemed injurious to society." *Giboney*, 336 U.S. at 691. One cannot seriously doubt that the State can prevent a mobster from asking a hitman to kill a rival because the agreement occurred through spoken word. So too here for conspiracies to obtain an elective abortion.

Finally, State authority to regulate professional speech—even speech that is not criminal conduct—is well established. "The First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on

speech, and professionals are no exception to this rule." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2373 (2018) (cleaned up). Here, Plaintiffs are engaged in professional speech, referring to "patients" and "clients" in the captions of their cases. Thus, even if their speech were legal, the State would still have the authority to regulate professional speech between staff and clients. Ala. Code § 13A-4-4 is a "law[] directed at conduct sweeping up incidental speech[,]" *Otto v. City of Boca Raton*, 981 F.3d 854, 865 (11th Cir. 2020), which poses no First Amendment issue.[13]

## V.   Alabama Law Does Not Violate The Right to Travel.

Plaintiffs claim that Alabama law would violate their, their staff's, and their clients' fundamental right to interstate travel. *See* doc. 1 ¶¶ 87–97; doc. 23

---

[13] Yellowhammer's passing use of the word "overbroad" in Counts I and II of its complaint—titled "*Yellowhammer Fund's* Constitutional Rights to Expression" and "Association," doc. 1 at 29–31 (emphasis added)—is facially insufficient to state a facial overbreadth claim distinct from its individual as-applied First Amendment claims. Moreover, its complaint lacks any factual allegations as to overbreadth, woefully failing to "bear[] the burden of demonstrating, from the text of the law *and from actual fact*, that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (cleaned up) (emphasis added). And because "invalidation for overbreadth is strong medicine that is not to be casually employed[,]" courts "vigorously enforce[] the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *United States v. Williams*, 553 U.S. 285, 292–93 (2008). The laws at issue have a plainly legitimate sweep well beyond the challenged applications because they also criminalize inchoate crimes where the underlying conduct is unlawful in both states. As just one of myriad examples, there's no disputing that Alabama can legitimately criminalize conspiring *in Alabama* to commit murder *in Georgia*. So even if the challenged laws implicated protected speech (and they do not, as explained above), Yellowhammer Fund's overbreadth challenge must fail. Yellowhammer Fund cannot bring a *facial* overbreadth challenge to only a subset of a statute's applications that it disfavors. A law is either overbroad as a whole, or not at all. The challenged Alabama laws are not.

¶¶ 128–31. But relevant Alabama law does not violate the right to travel for any of them.

The right to interstate travel protects three components: (1) "the right of a citizen of one State to enter and to leave another State," (2) "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State," and, (3) "for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz v. Roe,* 526 U.S. 489, 500 (1999). The second and third components are irrelevant here because they are only implicated when a state treats out-of-state residents differently than it does its own residents. *See id.* at 501–03.

The right of a citizen to enter and to leave another state concerns "the right of 'free ingress and regress to and from' neighboring states.'" *Id*. (quoting *United States v. Guest*, 383 U.S. 745, 758 (1966)). In other words, the constitutional right to interstate travel protects travelers from "the erection of actual barriers to interstate movement." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 277 (1993). "[M]ere burdens on a person's ability to travel from state to state are not necessarily a violation of their right to travel." *Doe v. Moore*, 410 F.3d 1337, 1348 (11th Cir. 2005); *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991) ("Minor restrictions on travel simply do not amount to the denial of a fundamental right that can be upheld only if the Government has a compelling justification." (citation omitted)).

28

Indeed, States *can* burden interstate travel when that burden is reasonable in light of the State's interest in the burden. In *Doe v. Moore*, the Eleventh Circuit rejected an argument from sex offenders that the Florida Sex Offender Act "unreasonably burdened" their right to travel by requiring them to notify Florida law enforcement in person when they change permanent or temporary residences. 410 F.3d at 1348–49. Despite recognizing that the requirement burdened the right to travel, the Eleventh Circuit did not find that burden unreasonable given the State's legitimate, "strong interest in preventing future sexual offenses[.]" *Id.*; *Saenz*, 526 U.S. at 499 (noting that a State statute cannot "unreasonably burden" the right to travel); *see also United States v. Simington*, No. EP-10-CR-2275-KC, 2011 WL 145326, at \*9 (W.D. Tex. 2011) ("[W]here a statute imposes a reasonable burden or mere inconvenience on a person's right to travel, the statute does not violate any constitutional right." (emphasis omitted) (citing *Doe*, 410 F.3d at 1349)).

Here, whether considering the right to travel of either Plaintiffs' clients or of Plaintiffs and their staff, Alabama law does not infringe upon it.

## A.   Alabama Law Does Not Violate the Right to Travel of Plaintiffs' Clients.

As discussed above, Plaintiffs do not have standing to invoke their clients' or potential clients' right to travel in this case. *See infra* Part I.A. But even if they did, their complaints do not state a claim because either (1) the right to travel is not

implicated by the minor restrictions alleged here or (2) to the extent that those minor restrictions are cognizable, they are supported by legitimate State interests.

At the onset, it is important to state the obvious: Ala. Code § 13A-4-4 does not forbid a woman from leaving the state to obtain an abortion, which Plaintiffs recognize in their complaints, *see* doc. 1 ¶ 18; doc. 23 ¶ 5. Plaintiffs' theory is instead that without their "information, counseling, and support" in finding available out-of-state abortions, a pregnant woman's right to travel would be unconstitutionally burdened. *E.g.*, doc. 23 ¶ 66.

The relevant statutes do not implicate the right to travel because they present no burden to it. The supposed "burden" that Ala. Code § 13A-4-4 places on the ability of women seeking an abortion to travel is not the kind of policy that implicates the fundamental right to travel. It merely regulates certain assistance for interstate travelling. A regulation on, for example, travel agents or hotels does not implicate the right to travel. *See, e.g*., *Matsuo v. United States*, 586 F.3d 1180, 1183 (9th Cir. 2009) ("[N]ot everything that deters travel burdens the fundamental right to travel. States and the federal government would otherwise find it quite hard to tax airports, hotels, moving companies or anything else involved in interstate movement"); *Cramer*, 931 F.2d at 1030 ("If every infringement on interstate travel violates the traveler's fundamental constitutional rights, any governmental act that limits the ability to travel interstate, such as placing a traffic light before an interstate bridge,

would raise a constitutional issue." (footnote omitted)). Nor does a regulation on how one may travel implicate the right. *See, e.g.*, *Gilmore v. Gonzales*, 435 F.3d 1125, 1137 (9th Cir. 2006) (Appellant had no "fundamental right to travel by airplane even though it is the most convenient mode of travel to him[.]").

Even if those alleged minor restrictions were cognizable, they are constitutional nonetheless. The test, as applied in *Doe v. Moore*, for burdens on interstate travel is reasonableness. *See* 410 F.3d at 1348–49. The law easily clears that hurdle because, as applied to the Plaintiffs, it is supported by strong, legitimate interests including preserving unborn life, maternal health (especially considering that Alabama cannot police the medical standards of out-of-state abortion providers), and "the preservation of the integrity of the medical profession[,]" *Dobbs*, 142 S. Ct. at 2228, 2284. The "burdens" Plaintiffs allege as to the interstate travel of their clients, if burdens at all, are reasonable and thus constitutional.

**B.    Alabama Law Does Not Violate the Right to Travel of Plaintiffs or Their Staff.**

While Plaintiffs argue that their clients suffer an indirect burden on the right to travel, Plaintiffs' own first-party burden and their staff's third-party burden also fail to state a claim.

*1.  The Organizational Plaintiffs Do Not Have a Right to Travel.*

Undoubtedly, non-natural persons or business entities enjoy some of the same constitutional rights as natural persons do. *See, e.g.*, *Santa Clara County v. S. Pac.*

31

*R.R. Co.*, 118 U.S. 394 (1886) (equal protection); *Minneapolis & St. L. Ry. Co. v. Beckwith*, 129 U.S. 26 (1889) (due process); *Citizens United*, 558 U.S. at 331 (free speech). But non-natural persons do not enjoy "purely personal" constitutional guarantees "because the 'historic function' of the [purely personal guarantees] has been limited to the protection of individuals." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 778 n.14 (1978) (plurality opinion). Whether a right is purely personal depends chiefly "on the nature, history, and purpose of the particular constitutional provision." *Id*.

The nature, history, and purpose of the right to travel demonstrate that the right to travel does not exist for non-natural persons. Article IV of the Articles of Confederation provided that "the people of each State shall have free ingress and regress to and from any other State." From the earliest days of the Republic, the right was described as the "right of a citizen of one state to pass through, or to reside in any other state"—that is, a flesh and blood, physical citizen. *Corfield v. Coryell*, 6 F. Cas. 546, 552 (C.C.E.D. Pa. 1823) (Washington, J., on circuit); *see Saenz*, 526 U.S. at 500 (same). The right encompasses the "protection of *individuals* from violations of civil rights that impinge on their free movement[.]" *United States v. Guest*, 383 U.S. 745, 759 (1966) (emphasis added). And tellingly, corporations often challenge States' regulations on out-of-state businesses under the Dormant Commerce Clause, not as a right to travel violation. *See, e.g.*, *Norwegian Cruise Line*

*Holdings Ltd v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1141–54 (11th Cir. 2022).

Plaintiffs' complaints illustrate the point. The West Alabama Plaintiffs allege that "[t]he United States Constitution protects the fundamental right *of individuals* to 'travel freely' among the states." Doc. 23 ¶ 129 (emphasis added) (citation omitted); *see also id.* ¶ 131 ("restrict[ing] *Alabamians'* inter-state movement (emphasis added)). Meanwhile, Yellowhammer alleges that it "previously traveled, and desires to once again travel, between states with passengers in its vehicles who need transportation to other states" to facilitate abortions. Doc. 1 ¶ 89. Corporate personhood might be a legal fiction, but legal fictions don't transmute the intangible to the tangible. For example, one might say that Apple issued a press release about a new iPhone, but Apple cannot stand up in front of an audience, hold the new iPhone, and demonstrate its features. Steve Jobs did that. Similarly, Yellowhammer could "provide[] financial and practical support" to their clients, (presumably through the use of funds and words), *see* doc. 1 at 16; but it did not and could not get into a car, turn the key, and drive a client to another state. In other words, non-natural persons cannot do tangible acts, like driving a car, which are inherent to the concept of travel. Its staff might have done that, but its staff (bar Dr. Robinson for Alabama Women's Center) are not parties to this suit.

## 2. *Criminalizing Conspiracy Does Not Implicate Plaintiffs' and Their Staff's Right To Travel Regardless.*

Nevertheless, even if the organizational Plaintiffs had a right to travel, Alabama law does not implicate their or Dr. Robinson's right. And even if Plaintiffs had standing to sue on behalf of their staff's right to travel, those claims would fail.

As previously stated, Yellowhammer alleges that it "previously traveled, and desires to once again travel, between states with passengers in its vehicles who need transportation to other states" to facilitate abortions. Doc. 1 ¶ 89. Because it no longer can do so, so the argument goes, their right to travel has been violated.

The theory ignores what Alabama law actually prohibits. For example, § 13A-4-4 criminalizes a "conspiracy formed in this state." That the statute may reach or even prohibit out-of-state conduct for purposes of the Alabama-formed conspiracy is irrelevant. *See Thompson*, 17 So. at 516 ("The place at which it is intended to commit the felony is not material. It is the law of the place where the conspiracy is formed which is broken."). A right-to-travel challenge against Alabama conspiracy law as applied to kidnapping, say, on the grounds that it would reach conspiracies where part of the assistance was crossing state lines would clearly fail. Plaintiffs may try to distinguish that challenge based on the fact that most states criminalize kidnapping. At bottom then, Plaintiffs' theory must provide that the constitutional right to travel encompasses the right to travel *and* to do whatever is legal in other states. But the right to interstate travel is not that broad, and Plaintiffs

34

have so far not offered binding authority saying otherwise. In this context, the right to travel only prevents States from erecting "actual barriers" to interstate movement. *Bray*, 506 U.S. at 277.

*Jones v. Helms* stands as another bar to Plaintiffs' theory. 452 U.S. 412 (1981). There, a prisoner challenged a Georgia law that charged parents with willful and voluntary abandonment of a dependent child generally as a misdemeanor but enhanced the crime to a felony if the parent left the state after abandonment. *See generally id.* The Court held that the statute did not violate the right to travel for two reasons relevant here.

One, nothing in the Constitution suggested "that a person who has committed an offense punishable by imprisonment has an unqualified federal right to leave the jurisdiction prior to arrest or conviction." *Id* at 420. Here, Alabama's law criminalizes only "conspirac[ies] formed in this state," ALA. CODE § 13A-4-4, so once a person or group conspires in Alabama to procure an out-of-state abortion, they have committed the criminal conduct. *See also Thompson*, 17 So. at 516. In *Jones*, prisoner's "criminal conduct within the State . . . necessarily qualified his right to thereafter freely to travel interstate." 452 U.S. at 421. Likewise, by facilitating an out-of-state abortion, Plaintiffs have qualified their right to freely travel interstate by engaging in criminal conduct (a conspiracy) within Alabama.

Two, a "restriction [on the right to travel] that is rationally related to the offense itself is within the State's power." *Id*. at 422. Alabama's conspiracy law does not enhance a sentence of a conspirator if he crosses state lines; but it could under *Jones* because such an enhancement would be rationally related to the offense of conspiring to procure an abortion. For one, an enhancement would go to the "imposition of a proper punishment." *Id*. That is, a former abortion provider in Alabama who physically drove a client across state lines to take her to an out-of-state abortion provider could be punished greater than one who referred the client for an out-of-state abortion. *A fortiori* then, Alabama's conspiracy law, which does not hinge on a conspirator's interstate travel, does not violate the Plaintiffs' right to travel.

\*   \*   \*

Alabama's conspiracy law violates no one's right to travel. Their clients' right to travel is not implicated here; and even if it was, Alabama law does not present an unconstitutional burden on it given the State's strong interests in protecting unborn life and maternal health. And Alabama law only criminalizes conspiracies *formed in Alabama*, thus also not affecting Plaintiffs' or their staff's own right to travel at all.

## VI.   Alabama Law Does Not Violate Any So-Called "Right to Be Free From Exterritorial Application of State Law."

Yellowhammer alleges that Alabama's conspiracy law, as applied to them, violates their "right to be from extraterritorial application of state law." Doc. 1 at 34.

Assuming *arguendo* that such a right exists, Alabama's conspiracy law does not implicate it because it does not apply extraterritorially. As a general matter, Alabama "follow[s] the general rule of statutory construction that, in order to have extraterritorial effect, a statute must explicitly provide for that effect." *Ex parte Old Republic*, 733 So. 2d 881, 884 (Ala. 1999). Moreover, the law at issue only criminalizes a "conspiracy formed *in this state*." ALA. CODE § 13A-4-4 (emphasis added); *see also Thompson*, 17 So. at 516 ("It is the law of the place where the conspiracy is formed which is broken."). The law plainly does not "criminalize out-of-state activity which is lawful where it occurs[.]" Doc. 1 ¶ 98. So, while Plaintiffs' clients may be allowed under Alabama law to obtain abortions outside Alabama, Plaintiffs are "plainly [not] allow[ed]" under Ala. Code § 13A-4-4 to conspire *in Alabama* to help procure abortions. *See id.* ¶ 101.

Yellowhammer points to a few cases, *see* doc. 1 ¶¶ 12–15 (citations omitted), that allegedly demonstrate a right to be free from laws with extraterritorial application; each of them, however, further prove that this alleged right is not implicated here. First, *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 422 (2003), does not apply because Alabama's conspiracy law punishes only "conspiracies formed in this state,"—that is, activity undertaken "within its borders" by "defendant[s] who act[] within its jurisdiction." And *Nielsen v. Oregon*, 212 U.S. 315 (1909), doesn't help because Alabama's conspiracy law

does not prohibit "doing within the territorial limits of [another state] an act which that state had specially authorized him to do"—it prohibits forming conspiracies in Alabama.[14] Lastly, *Bigelow v. Virginia*, 421 U.S. 809 (1975),[15] an abortion-related case, doesn't move the needle either because Alabama enforcing its conspiracy law as to conduct occurring wholly in Alabama does not "acquire power or supervision over the internal affairs of another State."[16] Thus, Alabama's conspiracy statute does not violate the so-called right to be free from extraterritorial application of State law.

## CONCLUSION

Plaintiffs' complaints should be dismissed.

---

[14] Additionally, the Supreme Court in *Heath v. Alabama* stated that *Nielsen* was "limited to its unusual facts and has continuing relevance, if it all, only to questions of jurisdiction between two entities deriving their concurrent jurisdiction from a single source of authority." 474 U.S. 82, 91 (1985).

[15] The *Bigelow* statement that Plaintiffs rely on, *see* doc. 1 ¶ 13, is dictum. The quoted statement was not essential in the Court's holding that the statute was unconstitutional under an outdated First Amendment balance-of-interests test, *Bigelow*, 421 U.S. at 812. And that holding is no longer good law because it rested on abortion's then-constitutionally protected status, *id.* at 822; *see also id.* at 830 (Rehnquist, CJ., dissenting). The State "may freely regulate commercial speech that concerns unlawful activity[,]" including abortion in Alabama. *Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 623–24 (1995).

[16] Plaintiffs rely on *National Pork Producers Council v. Ross*, 143 S. Ct. 1142 (2023), a recent Dormant Commerce Clause case, for the proposition that "courts have long consulted . . . the [constitutional] principles of 'sovereignty and comity.'" *See* doc. 1 ¶ 99. Because their Complaint at no point invokes the Dormant Commerce Clause and indeed grounds its supposed "Right to Be Free From Extraterritorial Application of State Law" in the Fourteenth Amendment, *id.* at 34 ¶ 98, the State does not take Yellowhammer to be raising a Dormant Commerce Clause claim. Nonetheless, such claim would fail for three reasons. First, there is no extraterritoriality principle within the Dormant Commerce Clause that "almost per se forbid[s] enforcement of state laws that have the practical effect of controlling" out-of-state commerce. *Nat'l Pork Producers*, 143 S. Ct. at 1153–54. Second, Alabama's conspiracy law does not discriminate against out-of-state commerce. *See id.* at 1153. And third, Plaintiffs have not alleged a substantial burden to trigger *Pike* balancing, and even if they did, Alabama law would easily satisfy it. *See id.* at 1161. *See generally Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).

Respectfully submitted,

Steve Marshall
  *Attorney General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

/s/ Benjamin M. Seiss
Benjamin M. Seiss (ASB-2110-O00W)
  *Assistant Attorney General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov

## CERTIFICATE OF SERVICE

I certify that I electronically filed this document using the Court's CM/ECF

system on August 28, 2023, which will serve all counsel of record.

/s/ Benjamin M. Seiss