## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| YELLOWHAMMER FUND, on behalf of itself and its clients, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 2:23-cv-450-MHT |
| ATTORNEY GENERAL OF ALABAMA STEVE MARSHALL, in his official capacity, | ) ) ) ) ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| WEST ALABAMA WOMEN'S CENTER, on behalf of themselves and their staff, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 2:23-cv-450-MHT |
| STEVE MARSHALL, in his official capacity as Alabama Attorney General, | ) ) ) | |
| Defendant. | ) | |

## WEST ALABAMA WOMEN'S CENTER, ET AL. PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................... i

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 1

I.   Since June 24, 2022, Abortion Has Been Banned in Alabama, With Only Limited
     Exceptions. ............................................................................................................... 1

II.  After the Ban Took Effect, Defendant Publicly Threatened to Prosecute Those Who
     Assist Pregnant Alabamians Seeking to Cross State Lines to Access Legal Abortion
     Care. ........................................................................................................................ 2

III. Defendant's Threat of Prosecution Has Chilled Plaintiffs' Provision of Information
     and Support to Pregnant Alabamians Seeking to Travel Across State Lines to
     Access Legal Abortion Care. ................................................................................... 3

STANDARD OF REVIEW ................................................................................................. 6

ARGUMENT ...................................................................................................................... 7

I.   Plaintiffs Have Standing to Assert Each of Their Three Claims. ........................... 9

     A.   Plaintiffs Have Standing to Assert Due Process and First Amendment
          Claims on Behalf of Themselves and Their Staff. ......................................... 10

     B.   Plaintiffs AWC and Dr. Robinson Have Standing to Assert Their Patients'
          Right to Travel. ............................................................................................... 15

II.  Application of the Alabama Criminal Laws to Plaintiffs' Speech and Conduct
     Regarding Legal Out-of-State Abortion Care Violates Due Process. ..................... 21

     A.   The Alabama Criminal Laws and Binding Alabama Supreme Court
          Precedent Provide No Fair Warning That Plaintiffs' Speech and Conduct
          Here Is a Crime. .............................................................................................. 21

     B.   Defendant's Eleventh Amendment Argument Is a Red-Herring That
          Misconstrues Plaintiffs' Due Process Claim and the Relief Requested. ......... 33

III. Application of the Alabama Criminal Laws to Plaintiffs' Protected Speech Violates
     Plaintiffs' Free Speech Rights. ................................................................................ 34

     A.   Plaintiffs' Speech About Legal Out-of-State Abortion Care Is Protected by
          the First Amendment ....................................................................................... 35

     B.   The Application of Alabama's Criminal Laws to Plaintiffs' Protected
          Speech Is Content- and Viewpoint-Discriminatory and Cannot Satisfy Strict
          Scrutiny. ......................................................................................................... 36

IV.  Application of the Alabama Criminal Laws to Plaintiffs AWC and Dr. Robinson
     Violates the Fundamental Right to Travel. .............................................................. 42

CONCLUSION ................................................................................................................... 52

i

# TABLE OF AUTHORITIES

**Cases**

*Agostini v. Felton*,
   521 U.S. 203 (1997) ........................................................................... 17

*Am. Booksellers v. Webb*,
   919 F.2d 1493 (11th Cir. 1990) ........................................................ 37

*Anderson Realty Grp., LLC v. King*,
   No. 2201014, 2022 WL 2092974 (Ala. Civ. App. June 10, 2022) ........................................... 26

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................. 6

*Att'y Gen. of N.Y. v. Soto-Lopez*,
   476 U.S. 898 (1986) ..................................................................... passim

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................. 6

*Bigelow v. Virginia*,
   421 U.S. 809 (1975) ..................................................................... passim

*Black Jack Distribs., Inc. v. Beame*,
   433 F. Supp. 1297 (S.D.N.Y. 1977) .................................................. 11

*BMW of N. Am., Inc. v. Gore*,
   517 U.S. 559 (1996) ..................................................................... 23, 51

*Bosco's Club, Inc. v. City of Okla. City*,
   598 F. Supp. 583 (W.D. Okla. 1984) ...................................... 11, 12, 13

*Bouie v. City of Columbia*,
   378 U.S. 347 (1964) ..................................................................... passim

*Brandt v. Rutledge*,
   No. 4:21-CV-00450-JM, 2023 WL 4073727 (E.D. Ark. June 20, 2023) ................................ 38

*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993) ........................................................................... 48

*Burk v. Augusta-Richmond County*,
   365 F.3d 1247 (11th Cir. 2004) ........................................................ 38

*Calderwood v. United States*,
   623 F. Supp. 3d 1260 (N.D. Ala. 2022) ............................................ 10

*Caplin & Drysdale, Chartered v. United States*,
   491 U.S. 617 (1989) ........................................................................... 17

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
   447 U.S. 557 (1980) ........................................................................... 39

*Charles v. Carey*,
   627 F.2d 772 (7th Cir. 1980) ......................................................... 19

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
   142 S. Ct. 1464 (2022) ................................................................ 38

*Conant v. Walters*,
   309 F.3d 629 (9th Cir. 2002) ................................................... 38, 40

*Council of Ins. Agents + Brokers v. Gallagher*,
   287 F. Supp. 2d 1302 (N.D. Fla. 2003) ................................... 14, 15

*Craig v. Boren*,
   429 U.S. 190 (1976) ................................................................ 16, 19

*Cramer v. Skinner*,
   931 F.2d 1020 (5th Cir. 1991) ................................................. 48, 49

*Crandall v. Nevada*,
   73 U.S. 35 (1867) ................................................................... passim

*Davidson v. Capital One Bank (USA), N.A.*,
   797 F.3d 1309 (11th Cir. 2015) ...................................................... 6

*Dennis v. United States*,
   384 U.S. 855 (1966) ..................................................................... 33

*DJR Assocs., LLC v. Hammonds*,
   241 F. Supp. 3d 1208 (N.D. Ala. 2017) ....................................... 51

*Dobbs v. Jackson Women's Health Org.*,
   141 S. Ct. 2619 (2021) ................................................................ 17

*Dobbs v. Jackson Women's Health Org.*,
   142 S. Ct. 2228 (2022) .................................................... 1, 30, 44

*Doe v. Moore*,
   410 F.3d 1337 (11th Cir. 2005) .............................................. 48, 49

*Dunn v. United States*,
   442 U.S. 100 (1979) ..................................................................... 21

*Dusek v. JPMorgan Chase & Co.*,
   832 F.3d 1243 (11th Cir. 2016) ...................................................... 6

*Edelman v. Jordan*,
   415 U.S. 651 (1974) ..................................................................... 42

*Edgehill Corp. v. Hutchens*,
   213 So. 2d 225 (Ala. 1968) ......................................................... 26

*Edwards v. California*,
   314 U.S. 160 (1941) ............................................................... passim

*Eisenstadt v. Baird*,
   405 U.S. 438 (1972) ..................................................................... 17

*Ex parte City of Florala,*
113 So. 312 (Ala. 1927) ................................................................................ 27

*Ex parte King,*
No. SC-2022-0653, 2023 WL 3557915 (Ala. May 19, 2023) ........................ 26

*Ex parte Old Republic,*
733 So. 2d 881 (Ala. 1999) ........................................................................... 23

*Ex parte Rapier,*
143 U.S. 110 (1892) ...................................................................................... 30

*Fla. Bar v. Went For It, Inc.,*
515 U.S. 618 (1995) ...................................................................................... 39

*Florida ex rel. Shevin v. Exxon Corp.,*
526 F.2d 266 (5th Cir. 1976) ........................................................................ 34

*FPL Food, LLC v. U.S. Dep't of Agric.,*
671 F. Supp. 2d 1339 (S.D. Ga. 2009) ................................................... 12, 14

*Friend v. Gasparino,*
61 F.4th 77 (2d Cir. 2023) ............................................................................ 35

*Giboney v. Empire Storage & Ice Co.,*
336 U.S. 490 (1949) ................................................................................ 35, 36

*Gilmore v. Gonzales,*
435 F.3d 1125 (9th Cir. 2006) ................................................................. 48, 49

*Griswold v. Connecticut,*
381 U.S. 479 (1965) ...................................................................................... 17

*Hang On, Inc. v. City of Arlington,*
65 F.3d 1248 (5th Cir. 1995) ........................................................................ 11

*Heath v. Alabama,*
474 U.S. 82 (1985) ........................................................................................ 23

*Hill v. White,*
321 F.3d 1334 (11th Cir. 2003) ...................................................................... 6

*Hunt v. Tucker,*
93 F.3d 735 (11th Cir. 1996) ........................................................................ 27

*Jones v. Gov. of Fla.,*
950 F.3d 795 (11th Cir. 2020) ...................................................................... 10

*Jones v. Helms,*
452 U.S. 412 (1981) ...................................................................................... 50

*June Med. Servs. LLC v. Russo,*
140 S. Ct. 2103 (2020) .................................................................................. 16

*Knight v. Jacobson,*
300 F.3d 1272 (11th Cir. 2002) .................................................................... 34

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004).................................................................. 10, 11, 16

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994)........................................................................... 21

*Lawrence v. Dunbar*,
  919 F.2d 1525 (11th Cir. 1990) ......................................................... 6, 7

*Macon Cnty. Invs., Inc. v. Warren*,
  No. 3:06-CV-224, 2007 WL 141959 (M.D. Ala. Jan. 17, 2007)................. 11

*Magwood v. Warden, Ala. Dep't of Corr.*,
  664 F.3d 1340 (11th Cir. 2011) .......................................................... 22

*Marks v. United States*,
  430 U.S. 188 (1977)........................................................................... 24

*Matsuo v. United States*,
  586 F.3d 1180 (9th Cir. 2009) ............................................................ 49

*McElmurray v. Consol. Gov't of Augusta–Richmond Cnty.*,
  501 F.3d 1244 (11th Cir. 2007) ............................................................ 6

*Metrish v. Lancaster*,
  569 U.S. 351 (2013).................................................................... 28, 29

*Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration All.*,
  304 F.3d 1076 (11th Cir. 2002) ............................................................ 9

*Mitchell v. State*,
  27 So. 2d 36 (Ala. 1946) ................................................................... 31

*N.Y. State Bar Ass'n v. Reno*,
  999 F. Supp. 710 (N.D.N.Y. 1998) ...................................................... 12

*N.Y.C.L. Union v. N.Y.C. Transit Auth.*,
  684 F.3d 286 (2d Cir. 2012)............................................................... 12

*Nat'l Ass'n of Fam. & Life Advocs. v. Becerra*,
  138 S. Ct. 2361 (2018) ................................................................ 39, 40

*Nielsen v. Oregon*,
  212 U.S. 315 (1909)........................................................................... 23

*Nw. Mem'l Hosp. v. Ashcroft*,
  362 F.3d 923 (7th Cir. 2004) ............................................................. 20

*Okpalobi v. Foster*,
  190 F.3d 337 (5th Cir. 1999) ............................................................. 19

*Otto v. City of Boca Raton*,
  981 F.3d 854 (11th Cir. 2020) ........................................................... 41

*Passenger Cases*,
  48 U.S. (7. How.) 283 (1849) ............................................................ 47

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
  280 F.3d 278 (3d Cir. 2002) ............................................................................ 15

*Planned Parenthood of Cent. N.J. v. Farmer*,
  220 F.3d 127 (3d Cir. 2000) ...................................................................... 18, 19

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
  748 F.3d 583 (5th Cir. 2014) ......................................................................... 19

*Planned Parenthood Se., Inc. v. Bentley*,
  951 F. Supp. 2d 1280 (M.D. Ala. 2013) ......................................................... 19

*Planned Parenthood Se., Inc. v. Strange*,
  33 F. Supp. 3d 1330 (M.D. Ala. 2014) .......................................................... 14

*Powers v. Ohio*,
  499 U.S. 400 (1991) ......................................................................... 13, 15, 18

*Rabe v. Washington*,
  405 U.S. 313 (1972) ....................................................................................... 22

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ................................................................................. 37, 38

*Region 8 Forest Serv. Timber Purchasers Council v. Alcock*,
  993 F.2d 800 (11th Cir. 1993) ....................................................................... 14

*Reprod. Health Servs. v. Strange*,
  204 F. Supp. 3d 1300 (M.D. Ala. 2016) .............................................. 13, 18, 20

*Robinson v. Marshall*,
  No. 2:19-CV-365-MHT, 2022 WL 2314402 (M.D. Ala. June 24, 2022) ............ 1, 2

*Roe v. Wade*,
  410 U.S. 113 (1973) ......................................................................................... 1

*Rogers v. Tennessee*,
  532 U.S. 451 (2001) ......................................................................... 21, 24, 28

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ....................................................................................... 37

*Saenz v. Roe*,
  526 U.S. 489 (1999) ................................................................... 42, 44, 46, 52

*Shapiro v. Thompson*,
  394 U.S. 618 (1969) ................................................................................. 42, 45

*Singleton v. Wulff*,
  428 U.S. 106 (1976) ................................................................................ passim

*Sorrell v. IMS Health, Inc.*,
  564 U.S. 552 (2011) ....................................................................................... 41

*Speech First, Inc. v. Cartwright*,
  32 F.4th 1110 (11th Cir. 2022) ...................................................................... 37

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) ........................................................................ 23

*Texas v. Johnson*,
  491 U.S. 397 (1989) ........................................................................ 37

*Thompson v. Nagle*,
  118 F.3d 1442 (11th Cir. 1997) ....................................................... 22

*Thompson v. State*,
  17 So. 512 (Ala. 1895) ............................................................. passim

*Twining v. New Jersey*,
  211 U.S. 78 (1908) .......................................................................... 43

*United States v. Lanier*,
  520 U.S. 259 (1997) ............................................................ 21, 22, 34

*United States v. McQueen*,
  86 F.3d 180 (11th Cir. 1996) ........................................................... 24

*United States v. Alvarez*,
  567 U.S. 709 (2012) ........................................................................ 42

*United States v. Elliott*,
  266 F. Supp. 318 (S.D.N.Y. 1967) .................................................. 32

*United States v. Guest*,
  383 U.S. 745 (1966) .................................................................. 42, 45

*United States v. Hansen*,
  143 S. Ct. 1932 (2023) .................................................................... 35

*United States v. Playboy Ent. Grp., Inc.*,
  529 U.S. 803 (2000) ........................................................................ 38

*United States v. Simington*,
  No. EP-10-CR-2275-KC, 2011 WL 145326 (W.D. Tex. 2011) ........ 48, 49

*United States v. Smith*,
  No. 08-50-1, 2008 WL 4630356 (E.D. Pa. Oct. 17, 2008) .................. 33

*United States v. Stewart*,
  590 F.3d 93 (2d Cir. 2009) .............................................................. 33

*United States v. Toler*,
  144 F.3d 1423 (11th Cir. 1998) ....................................................... 31

*United States v. Vazquez*,
  319 F.2d 381 (3d Cir. 1963) ............................................................ 33

*United States v. Williams*,
  553 U.S. 285 (2008) ........................................................................ 35

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ........................................................................ 10

*W. Ala. Women's Ctr. v. Williamson*,
    120 F. Supp. 3d 1296 (M.D. Ala. 2015) .......................................................... 14, 15

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ........................................................................................... 38

*Warth v. Seldin*,
    422 U.S. 490 (1975) ............................................................................. 10, 16, 17

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ........................................................................................... 17

*White's Place, Inc. v. Glover*,
    222 F.3d 1327 (11th Cir. 2000) ......................................................................... 11

*Whitson v. Staff Acquisition, Inc.*,
    41 F. Supp. 2d 1294 (M.D. Ala. 1999) ................................................................. 7

*Wollschlaeger v. Governor*,
    848 F.3d 1293 (11th Cir. 2017) ................................................................. passim

*Young Apartments, Inc. v. Town of Jupiter*,
    529 F.3d 1027 (11th Cir. 2008) ................................................................. 11, 13

**Statutes**

18 U.S.C. § 241 ........................................................................................................ 45

18 U.S.C. § 371 ........................................................................................................ 32

42 U.S.C. § 1985(3) ................................................................................................. 48

Ala. Code § 13A-2-23 ......................................................................................... 5, 23

Ala. Code § 13A-4-3(g) ............................................................................................ 31

Ala. Code § 13A-4-1 ........................................................................................... 5, 23

Ala. Code § 13A-4-1(f) ............................................................................................ 31

Ala. Code § 13A-4-1(f)(2) .......................................................................................... 5

Ala. Code § 13A-4-3 ......................................................................................... 5, 31

Ala. Code § 13A-4-3(a) ............................................................................................ 23

Ala. Code § 13A-4-3(g)(2) .......................................................................................... 5

Ala. Code § 13A-4-4 ...................................................................................... passim

Ala. Code § 13A-5-6(a)(1) ......................................................................................... 2

Ala. Code § 13A-5-6(a)(2) ......................................................................................... 5

Ala. Code § 13A-5-6(a)(3) ......................................................................................... 2

Ala. Code § 26-23H-3 ............................................................................................... 2

Ala. Code § 26-23H-4 ........................................................................................... 1, 2

Ala. Code § 26-23H-5 ............................................................................................... 2

Ala. Code § 26-23H-6(a) ........................................................................................ 2

Ala. Code § 26-23H-6(b) ........................................................................................ 2

Cal. Fish & Game Code § 2070 ............................................................................ 52

Cal. Fish & Game Code § 2080 ............................................................................ 52

Wyo. Stat. Ann. § 23-1-101(a)(xii)(A) ................................................................ 52

Wyo. Stat. Ann. § 23-1-302(a)(ii) ....................................................................... 52

**Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................................. 1, 6, 7

Fed. R. Civ. P. 12(b)(1) ..................................................................................... 1, 6

**Other Authorities**

1 Wharton's Criminal Law § 1.6 (16th ed. 2021) ............................................... 30

1 Wharton's Criminal Law § 8.2 (16th ed. 2021) ............................................... 31

13A Charles Alan Wright & Arthur R. Miller,
    Federal Practice and Procedure § 3531.4 (3d ed. 2008) ............................. 12

15A C.J.S. Conspiracy § 118 ............................................................................... 31

16 Am. Jur. 2d Conspiracy § 1 ............................................................................ 31

16 Am. Jur. 2d Conspiracy § 2 ............................................................................ 31

Ashley Bowerman, *Alabama AG Clarifies Prosecution Rules Under Abortion Law*,
    WSFA 12 News (Jan. 11, 2023) .....................................................................2

Cal. Dep't Fish & Wildlife, *Mountain Lions in California* ................................ 52

Laurence H. Tribe, Saenz *Sans Prophecy: Does the Privileges or Immunities Revival
    Portend the Future—or Reveal the Structure of the Present?*, 113 Harv. L. Rev. 110
    (1999) ...........................................................................................................43

*Malum in se*, Black's Law Dictionary (11th ed. 2019) ..................................... 30

Petition for a Writ of Certiorari, *Dobbs v. Jackson Women's Health Org.*,
    142 S. Ct. 2228 (No. 19-1392) ..................................................................... 17

Seth F. Kreimer, *Lines in the Sand: The Importance of Borders in American Federalism*,
    150 U. Pa. L. Rev. 973 (2002) ...................................................................... 43

**INTRODUCTION**[1]

Defendant's Motion to Dismiss, ECF No. 28 ("Motion" or "MTD"), only confirms the credibility of Plaintiffs' fear of prosecution and reinforces Defendant's aim of gagging speech about lawful conduct and depriving pregnant Alabamians—particularly those who have fewer resources—of the assistance they depend on to access legal, out-of-state abortion care. This he cannot do without violating the federal Constitution, and his arguments to the contrary fail on the merits and, therefore, certainly fail to warrant dismissal of this action. As detailed below, it is clear (and Defendant does not appear to contest) that Plaintiffs have Article III standing, and well-established and undisturbed Supreme Court precedent confirms Plaintiffs' satisfaction of any prudential (not jurisdictional) standing considerations for asserting their staff's rights to free speech and due process and their patients' right to travel. Plaintiffs have also far exceeded the liberal pleading requirements necessary to survive a Rule 12(b)(6) motion for each of their claims, and the Eleventh Amendment presents no bar under Rule 12(b)(1) to this Court's jurisdiction or ability to issue the requested relief. Accordingly, Defendant's Motion must be denied.

**STATEMENT OF FACTS**

Plaintiffs' extensive, well-supported factual allegations, which, for purposes of a motion to dismiss, must be taken as true, establish the following:

**I.    Since June 24, 2022, Abortion Has Been Banned in Alabama, With Only Limited Exceptions.**

On June 24, 2022, the same day that the U.S. Supreme Court issued its opinion in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), overturning, *inter alia*, *Roe v. Wade*, 410 U.S. 113 (1973), Alabama's near-total abortion ban ("the 2019 Ban" or "the Ban"), Ala. Code § 26-23H-4, took effect. *Robinson v. Marshall*, No. 2:19-CV-365-MHT, 2022 WL

---

[1] Unless otherwise noted, all emphasis is added and all internal quotation marks and citations are omitted.

2314402, at *1 (M.D. Ala. June 24, 2022).

The Ban makes it a crime "for any person to intentionally perform or attempt to perform an abortion" in Alabama at any stage in pregnancy, in nearly all cases. Ala. Code § 26-23H-4; *id.* § 26-23H-3. Performing an abortion in violation of the Ban constitutes a Class A felony, punishable by imprisonment for 10–99 years. *Id.* §§ 26-23H-6(a); 13A-5-6(a)(1). Attempting an abortion that violates the Ban constitutes a Class C felony, punishable by imprisonment for 1–10 years. *Id.* §§ 26-23H-6(b); 13A-5-6(a)(3). These penalties run to those providing abortion care; the Ban explicitly exempts the person having the abortion from any criminal or civil liability. *Id.* § 26-23H-5.[2] As a result of the Ban, Alabama physicians no longer provide abortion care in the state, except potentially where one of the Ban's limited exceptions or exclusions applies. Verified Compl. Declaratory & Injunctive Relief ("Compl.") ¶ 26, ECF No. 23.

## II. After the Ban Took Effect, Defendant Publicly Threatened to Prosecute Those Who Assist Pregnant Alabamians Seeking to Cross State Lines to Access Legal Abortion Care.

On the day *Dobbs* was decided and the Ban took effect, Representative Chris England tweeted about an 1896 provision of Alabama's conspiracy law ("Section 13A-4-4" or "1896 Law"), *see* Ala. Code § 13A-4-4, asserting that, "anyone can be prosecuted for conspiracy [under that provision] if they help someone either get or even plan to get an abortion in another state." Compl. ¶ 27.[3] In response, a spokesman for Attorney General Marshall said, "We are reviewing the matter

---

[2] *See also* Compl. ¶ 25 n.1 (citing Ashley Bowerman, *Alabama AG Clarifies Prosecution Rules Under Abortion Law*, WSFA 12 News (Jan. 11, 2023), https://www.wsfa.com/2023/01/12/alabama-ag-clarifies-prosecution-rules-under-abortion-law/ (Defendant Marshall stating "[t]here is a very specific provision in [the 2019 Ban] that specifically exempts the woman from criminal prosecution")).

[3] The 1896 Law states that "[a] conspiracy formed in this state to do an act beyond the state, which, if done in this state, would be a criminal offense, is indictable and punishable in this state in all respects as if such conspiracy had been to do such act in this state." Ala. Code § 13A-4-4. As discussed below, *see infra* Argument, Section II.A, the 1896 Law codifies the common law principle "that it is an indictable common-law misdemeanor to enter into a conspiracy in this state to commit a *known common-law felony, malum in*

and have no comment at this time." *Id.* ¶ 28. On July 13, 2022, Defendant Marshall stated in a speech that his office would exercise its authority to prosecute violations of the Ban, and that the 1896 Law could apply to attempts to procure an abortion out of state. *Id.* ¶¶ 29–30.

On August 11, 2022, Defendant addressed the issue again, as a guest on the Jeff Poor Show, an internet radio show broadcast in Alabama and available online. *Id.* ¶ 31. Mr. Poor asked Defendant what he thought of "some of the talk from the left that [someone] could be an accomplice somehow by transporting someone across state lines for abortion?" *Id.* ¶ 32. Defendant Marshall responded as follows:

> There's no doubt that [the Ban] is a criminal law, and general principles that apply to a criminal law would apply to this, because this is a classic felony, that is the most significant offense we have as far as punishment goes under a criminal statute absent a death penalty case. And so provisions relating to accessory liability, provisions relating to conspiracy, would have applicability involving this particular act that was passed by the Legislature. So, for example, if someone was promoting themselves out as a funder of abortion out of state, then that is potentially criminally actionable for us. And so, one thing that we will do in working with local law enforcement and prosecutors is making sure that we fully implement this law. You know, and there's nothing about that law that restricts any individual from driving across state lines and seeking an abortion in another place. However, I would say that if an individual held themselves out as an entity or a group that is using funds that they are able to raise to be able to facilitate those visits, then that's something that we're going to look at closely.

*Id.* ¶ 33.

Alabama media reported Defendant Marshall's threats to the wider public. *Id.* ¶ 34.

### III. Defendant's Threat of Prosecution Has Chilled Plaintiffs' Provision of Information and Support to Pregnant Alabamians Seeking to Travel Across State Lines to Access Legal Abortion Care.

Plaintiffs are providers of comprehensive reproductive health services in Alabama, including contraceptive counseling and care, pregnancy testing and dating, and pregnancy-options

---

*se*, in a sister state," which was recognized and applied to Alabama by the Alabama Supreme Court in *Thompson v. State*, 106 Ala. 67, 79, 17 So. 512 (Ala. 1895).

counseling. *Id.* ¶¶ 10, 12, 14. Prior to the Supreme Court's decision in *Dobbs*, Plaintiffs also provided abortion care in Alabama. *Id.* In their capacity as reproductive health care providers, Plaintiffs receive inquiries from pregnant Alabamians about their medical care options, including those that are lawful and available outside of Alabama, such as abortion. *Id.* ¶¶ 11, 13, 15, 64, 77–78, 102. Prior to *Dobbs*, Plaintiffs provided these individuals with information about and recommendations for specific, trusted abortion providers in other states, as well as information about where and how they could obtain financial assistance and/or other practical support relating to inter-state travel for abortion care. *Id.* ¶¶ 11, 13, 15, 67–68. Prior to *Dobbs*, Plaintiff AWC also provided direct assistance to people seeking to travel out of state for abortion care, by, *inter alia*, communicating and making appointments for patients with out-of-state providers, coordinating funding for care and travel with local and national abortion assistance organizations, and helping to make travel arrangements. *Id.* ¶¶ 15, 69. In addition, Plaintiff Dr. Robinson and her staff helped directly coordinate out-of-state care for medically complex patients who could not receive care in-state by, *inter alia*, talking to providers in other states who could provide such care and forwarding medical records and other relevant information to support the patient's care. *Id.* ¶¶ 13, 70.

But for the threat of prosecution, Plaintiffs would continue providing this information and support. *Id.* ¶¶ 65, 117–18. Indeed, Plaintiffs and their staff feel ethically obligated to provide their patients, and all other pregnant Alabamians who seek assistance, with the best medical information they can—including information about where and how to safely access the abortion care that Plaintiffs can no longer provide—and are deeply distressed by being forced to withhold this information and support. *Id.* ¶¶ 79–81, 91. However, if, as Defendant has threatened, and reiterated in his filings in this case, Alabama construes this provision of information and support as constituting

4

a conspiracy, solicitation, or another form of complicity under the Alabama Criminal Laws,[4] Plaintiffs and their staff face prosecution and serious criminal penalties.[5] *Id.* ¶¶ 72–73. Because of this risk, Plaintiffs have ceased providing such information and support. *Id.* ¶¶ 71, 82–91.

Many pregnant Alabamians who request information and support from Plaintiffs in navigating access to legal out-of-state abortion care, but who are unable to receive it from Plaintiffs and must therefore find it another way, will be delayed in accessing abortion. *See Id.* ¶¶ 80, 102–08. While abortion is very safe, and far safer than childbirth, the risks associated with it increase as pregnancy progresses, as do its costs. *Id.* ¶ 109. Therefore, the longer it takes someone to find an appropriate out-of-state provider, and make the necessary arrangements to attend an appointment, the greater the cost, and the greater the risk to their health and safety from prolonged pregnancy and the abortion itself. *Id.* ¶ 113. Moreover, to the extent any pregnant Alabamians are entirely unable to access a desired out-of-state abortion without Plaintiffs' assistance and (as a result) are forced to remain pregnant and carry to term, they face giving birth in a state that, according to the Alabama Department of Public Health, has the third highest maternal mortality rate in the country (36.4 deaths per 100,000 live births in 2020). *Id.* ¶ 116.

On July 31, 2023, Plaintiffs filed this action, alleging that prosecuting them and their staff under the Alabama Criminal Laws as threatened violates their federal constitutional rights to free

---

[4] "Alabama Criminal Laws" or "Laws," as used herein, include the 1896 Law and any of Alabama's other general criminal laws, *see, e.g.*, Ala. Code § 13A-2-23 ("Criminal liability based on behavior of another— Complicity"); *id.* § 13A-4-1 ("Criminal solicitation"); *id.* § 13A-4-3 ("Criminal conspiracy generally").

[5] For example, criminal conspiracy is a Class B felony if an object of the conspiracy is a Class A felony; it is punishable by imprisonment for 2–20 years. *See* Ala. Code §§ 13A-4-3(g)(2); 13A-5-6(a)(2). The same is true for solicitation. *Id.* §§ 13A-4-1(f)(2); 13A-5-6(a)(2). And if an individual is successfully prosecuted as an accomplice or aider and abetter, he is subject to the same steep penalties as the person who committed the offense, whose behavior he is legally accountable for. *See, e.g., id.* § 13A-2-23(2).

speech and due process, and their patients' fundamental right to travel,[6] and requesting that this Court declare as much and enjoin Defendant from enforcing the Laws as threatened.

**STANDARD OF REVIEW**

Defendant has moved under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss Plaintiffs' Verified Complaint. *See* MTD at 4. When evaluating a Rule 12(b)(6) motion, this Court must "accept as true all well-pleaded factual allegations in the complaint," *Davidson v. Capital One Bank (USA), N.A.*, 797 F.3d 1309, 1312 (11th Cir. 2015), and these facts must be construed "in the light most favorable to the plaintiff." *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). A Rule 12 (b)(6) motion should be granted "only when the movant demonstrates that the complaint has failed to include 'enough facts to state a claim to relief that is plausible on its face.'" *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016) (quoting *Twombly*, 550 U.S. at 570).

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction asserts either a facial or factual challenge to the complaint. *McElmurray v. Consol. Gov't of Augusta–Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007); *accord Lawrence v. Dunbar*, 919 F.2d 1525, 1528–

---

[6] Unlike Plaintiff Yellowhammer, Plaintiffs here have not brought a claim that the threatened prosecutions violate their "right to be free from extraterritorial application of state law," *see* MTD at 36 (quoting Compl. Declaratory & Injunctive Relief ("Yellowhammer Compl."), ECF No. 1). They therefore largely do not respond to arguments made in this section of the MTD. Plaintiffs also have not brought an overbreadth claim, and do not claim that any restriction that the threatened prosecution imposes on the provision of "financial . . . support resources for assistance with inter-state travel," MTD at 24, violates their speech rights—their First Amendment claim is based solely on the chilling effect that the threat has had on their provision of *information* and *counseling* to pregnant Alabamians. Compl. ¶¶ 123–27. They therefore do not respond to notes 12 and 13 of the MTD.

29 (11th Cir. 1990). "A facial attack"—like the one here—"questions the sufficiency of the pleading and the plaintiff enjoys similar safeguards to those provided when opposing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Whitson v. Staff Acquisition, Inc.*, 41 F. Supp. 2d 1294, 1296 (M.D. Ala. 1999); *see also Dunbar*, 919 F.2d at 1529. That is, "[t]he court accepts the plaintiff's allegations as true, construes them most favorably to the plaintiff, and will not look beyond the face of the complaint." *Whitson*, 41 F. Supp. 2d at 1296.

## ARGUMENT

Defendant's Motion must be denied. To begin, Defendant's assertion that this Court lacks subject matter jurisdiction is completely baseless. Third-party standing is prudential, not jurisdictional, and regardless, in addition to Article III standing, Plaintiffs have more than adequately alleged standing to assert both their employees' First Amendment and due process rights and their patients' right to travel. Nor does the Eleventh Amendment present a jurisdictional bar; Defendant's *Pennhurst* argument is a strawman, premised on a distortion of Plaintiffs' due process claim. Plaintiffs do not seek *any* interpretation of *state* law—"preferred" or otherwise. Instead, their argument is based on the scope of the common law principle that was first applied to Alabama by the Alabama Supreme Court in *Thompson v. State*, 106 Ala. 67, 17 So. 512 (Ala. 1895), and then codified by the Legislature *as* the 1896 Law, as well as on Defendant's violation of *federal* law—specifically, the Due Process Clause of the *federal* Constitution—by enforcing the Alabama Criminal Laws in a manner far beyond their plain language and well-defined scopes.

Defendant's 12(b)(6) arguments fare no better, as Plaintiffs have more than sufficiently stated plausible claims for relief. At the threshold, Defendant effectively concedes that the speech and conduct in which Plaintiffs seek to engage would expose them to the risk of criminal prosecution; Plaintiffs thus clearly face a credible threat, and Defendant has not attempted to suggest otherwise. With respect to Plaintiffs' due process claim, the Complaint more than

adequately alleges: (1) Alabama's general criminal laws on, *e.g.*, conspiracy, solicitation, and aiding and abetting, on their face only proscribe speech or conduct undertaken with the intent to engage in or result in an actual *crime* or *offense*; (2) the Alabama Supreme Court's authoritative definition of the common law principle that was codified as the 1896 Law establishes that the Law does not criminalize "conspiracies" formed in Alabama to engage in *lawful* out-of-state conduct; and (3) Alabama has not made (and could not constitutionally make) providing, leaving the state to seek, or actually obtaining a legal abortion in another state a *crime* or *offense*, or otherwise *unlawful*. In other words, nothing in Alabama law provides fair notice that a person in Alabama could be subject to prosecution under the Alabama Criminal Laws for helping another to engage in *legal* out-of-state conduct, like obtaining a legal abortion. Defendant's arguments to the contrary hinge largely on the baseless contention that the legality of abortion outside of Alabama is irrelevant because Alabama can prosecute people for criminal conspiracy (and other inchoate crimes) so long as the object of the conspiracy is a crime in Alabama, regardless of whether that object is also a crime where it occurs. This argument fails in the face of statutory text, basic tenets of conspiracy law, and the authoritative Alabama Supreme Court precedent that binds this Court and that Defendant discounts and misconstrues. Thus, Plaintiffs have adequately stated this claim.

As for Plaintiffs' First Amendment claim, Supreme Court precedent dictates that the speech-integral-to-criminal-conduct exception Defendant invokes is inapplicable here, where the speech at issue relates only to *legal* conduct that does not violate any valid criminal statute. Plaintiffs have thus also adequately stated a claim that their speech is protected by the First Amendment, that Defendant's threat of prosecution has chilled Plaintiffs and their staff from engaging in their protected speech, and that a prohibition on such protected speech based on its specific content or viewpoint, like the one here, cannot withstand scrutiny.

Lastly, Plaintiffs have adequately stated a claim that the threatened prosecution violates Plaintiffs AWC's and Dr. Robinson's patients' fundamental right to travel. Defendant's argument to the contrary relies on cases concerning travel-adjacent laws that were found to have only "incidental" or "negligible" impacts on travel, ancillary to the non-travel-related purposes they were designed to serve. These cases are inapposite here, where Defendant threatens to impose direct criminal penalties for assisting another in leaving the state for abortion, and where Defendant's clear purpose in doing so is to impede or prevent pregnant Alabamians from traveling across state lines for care. As detailed below, that resolves this claim in Plaintiffs' favor, as, absent limited inapplicable exceptions, a state cannot (purposely or otherwise) penalize interstate travel in this way. Because Defendant's jurisdictional arguments are meritless, and Plaintiffs have clearly stated claims upon which relief can be granted, Defendant's Motion must be denied.

## I.   Plaintiffs Have Standing to Assert Each of Their Three Claims.

Defendant does not question Plaintiffs' Article III standing[7] but instead contends that Plaintiffs lack third-party standing to pursue claims on behalf of their "staff and clients" and that this Court therefore lacks subject matter jurisdiction to hear such claims. MTD at 8, 10–15. This attack is deeply misguided. As a threshold matter, this argument does not implicate the Court's subject matter jurisdiction at all, as third-party standing is an exception to the prudential—not

---

[7] Defendant does suggest in passing that the clinic Plaintiffs cannot claim injury based on fear that they will be prosecuted, *see* MTD at n.4, but, as discussed below, and as Defendant does not seem to contest, the existence of corporate criminal liability is not the only way to establish Article III injury, *see infra* 12. And the clinic Plaintiffs have more than met the standard for establishing Article III standing at the pleading stage by adequately alleging injury to themselves—among other things, the inability to fulfill their mission and ethical obligations as health care providers, *see id.*; Compl. ¶¶ 75–91—that has been caused directly by Defendant's threatened prosecutions and is capable of redress by this Court through a declaration that Defendant's threatened enforcement violates the Constitution and an injunction preventing such enforcement. *See Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration All.*, 304 F.3d 1076, 1080–81 (11th Cir. 2002) ("At the pleading stage," where "on a motion to dismiss [courts] presume that general allegations embrace those specific facts that are necessary to support the claim," to establish Article III standing a plaintiff is only required to "generally allege a redressable injury caused by the actions of [the defendant] about which it complains.").

jurisdictional—rule that a plaintiff "must assert his own rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *see also Kowalski v. Tesmer*, 543 U.S. 125, 128–29 (2004); *Calderwood v. United States*, 623 F. Supp. 3d 1260, 1280 (N.D. Ala. 2022). Regardless, as to Plaintiffs' due process and First Amendment claims, a third-party standing analysis is unnecessary— Dr. Robinson is an individual physician named in the complaint who has standing to assert her *own* speech and due process rights, and, as many courts have held, when at least one party has standing, there is no need to address the question of whether the other parties have standing. In any event, as detailed below, Plaintiffs' well-pled allegations readily demonstrate that they have standing to assert the constitutional rights of their staff. Finally, Plaintiffs AWC and Dr. Robinson have amply alleged facts that, under longstanding and undisturbed Supreme Court precedent, demonstrate their ability to assert their patients' right to travel—the only claim Plaintiffs AWC and Dr. Robinson pursue on their patients' behalf.

### A. Plaintiffs Have Standing to Assert Due Process and First Amendment Claims on Behalf of Themselves and Their Staff.

As noted above, Defendant does not contest Plaintiffs' Article III standing to bring their due process and First Amendment claims. Instead, he seems to contend that each individual staff member at Plaintiffs' clinics must pursue these claims on their own because the staff are not sufficiently "close" to Plaintiffs and are not hindered from bringing their own suits. MTD at 15. He is wrong for multiple reasons. To start, as noted above, Defendant does not contest that Dr. Robinson has standing to assert her own speech and due process rights, and so long as one party has standing, there is no need to address whether other parties also have standing. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263–64 & n.9 (1977) (declining to consider standing of additional parties where one plaintiff had standing); *Jones v. Gov. of Fla.*, 950 F.3d 795, 805–06 (11th Cir. 2020) (same). This alone ends the inquiry.

Nevertheless, Plaintiffs have standing to assert the rights of their staff. To begin, courts commonly permit employers to assert the rights of their employees where, as here, the challenged action or enforcement of a law against employees "infringes the constitutional rights of the employees *as they work*" and the employer suffers injury as a result. *Bosco's Club, Inc. v. City of Okla. City*, 598 F. Supp. 583, 588–89 (W.D. Okla. 1984); *see also Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1252 (5th Cir. 1995) ("Ordinarily, a business like Hang On may properly assert its employees' or customers' First Amendment rights where the violation of those rights adversely affects the financial interests or patronage of the business."); *White's Place, Inc. v. Glover*, 222 F.3d 1327, 1330 (11th Cir. 2000) ("We agree with the reasoning of the Fifth Circuit that a business may assert the First Amendment rights of its employees where violation of those rights adversely affects the financial interests or patronage of the business"); *Black Jack Distribs., Inc. v. Beame*, 433 F. Supp. 1297, 1302–03 (S.D.N.Y. 1977) (holding that organizational plaintiffs had standing to defend First Amendment rights of employees where their business was disrupted due to defendants' allegedly unconstitutional actions); *cf. Macon Cnty. Invs., Inc. v. Warren*, No. 3:06-CV-224, 2007 WL 141959, at *4 n.5 (M.D. Ala. Jan. 17, 2007) ("Where the individual seeking standing is part of the third party's constitutionally protected activity, third party standing is permissible.").

Plaintiffs have alleged sufficient facts showing that Defendant's threatened prosecutions infringe the First Amendment and due process rights of their staff while they work at the clinics to provide health care support and guidance to patients, *see, e.g.*, Compl. ¶¶ 75–91; *infra* Sections II & III, and that Plaintiffs themselves are suffering the requisite "injury" as a result.[8] Indeed,

---

[8] This is so for both Article III and prudential standing purposes, as the "injury-in-fact" requirements are one and the same. *See Kowalski*, 543 U.S. at 130 (explaining that third-party standing requires the "two additional showings" of "close relationship" and "hindrance" on top of Article III standing requirements); *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1041–42 (11th Cir. 2008) (referring back to

Plaintiffs' well-pled allegations make clear that Plaintiffs have suffered immeasurable harm to their professional commitment, mission, and ethical obligations as health care providers to provide comprehensive reproductive health care to pregnant Alabamians, which includes helping them obtain quality, out-of-state care that they themselves are not able to provide. *See, e.g.*, Compl. ¶¶ 4, 10–15, 64–72, 74–84, 91, 115, 117–18; *cf. N.Y. State Bar Ass'n v. Reno*, 999 F. Supp. 710, 716 (N.D.N.Y. 1998) (finding irreparable harm where threat of sanction compelled attorneys to "self-censor[]" certain counsel and assistance to clients in violation of their ethical obligations). Defendant's reference to the absence of corporate *criminal* liability under the Alabama Criminal Laws, MTD at n.4, is of no moment: a cognizable injury can be shown in any number of ways,[9] and is readily established here, where Plaintiffs demonstrate disruption to their ability to carry out their professional responsibilities and inability to fulfill their mission and purpose because of the challenged government action. *See, e.g.*, *N.Y.C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 295 (2d Cir. 2012) (concluding that plaintiff had shown that it (through its agents) had suffered a concrete injury where its ability to carry out responsibilities to its clients was frustrated by challenged policy); *cf. Bosco's Club, Inc.*, 598 F. Supp. at 588–89 ("[A] corporation[] can act only by and through its employees. Thus, if [a law] infringes the constitutional rights of the employees as they work, it is obvious that the Plaintiff has suffered the harm as well.").

---

Article III injury discussion in noting that the plaintiff "has sufficiently alleged that that it has a concrete interest in the outcome of this dispute" before moving on to the close relation and hindrance prongs); *FPL Food, LLC v. U.S. Dep't of Agric.*, 671 F. Supp. 2d 1339, 1361 (S.D. Ga. 2009) ("The injury-in-fact showing required to overcome the third-party prudential limitation is essentially the same as the injury-in-fact showing required for Article III standing.").

[9] *See* 13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.4 (3d ed. 2008) (noting that Article III injury "can be supported by a very slender reed of injury," citing varied examples of cognizable injuries, including "spiritual injury," "procedural-opportunity injury," and "stigmatic injury," as well as a number of "abstract interests").

Moreover, Plaintiffs have pled facts that easily satisfy the other traditional factors for third-party standing: in addition to an "injury in fact," Plaintiffs "have a close relation to" their staff who seek to provide information and support to patients, and "there . . . exist[s] some hindrance to [their staff's] ability to protect [their] own interests." *Powers v. Ohio*, 499 U.S. 400, 410–11 (1991). As to the close relationship, the Supreme Court and Eleventh Circuit have made clear that the question for closeness is whether the relationship makes the litigant an effective proponent of the third party's rights. *Id.* at 413; *see also Young Apartments, Inc.*, 529 F.3d at 1042–43 (holding that landlord had a sufficiently close relationship with tenants where their interests were "sufficiently aligned to ensure that [the landlord] will properly frame the issues" and "will be a zealous advocate of the legal rights at issue"); *Reprod. Health Servs. v. Strange*, 204 F. Supp. 3d 1300, 1324 (M.D. Ala. 2016) ("[T]o satisfy the 'close relationship' requirement, the litigant's interest in redressing her own injury must be aligned with the third party right she seeks to assert, such that the litigant is fully, or very nearly, as effective a proponent of the right."). Here, Plaintiffs' interest in remedying the injury to their mission of helping pregnant Alabamians access the full range of reproductive health care options, including those that are legal in other states, aligns perfectly with their staff's interest in being able to provide the on-the-job information and support that they feel ethically obligated to provide to patients, without risking loss of their personal freedom, and potentially physical and financial security for their families. Compl. ¶¶ 10–15, 79–80, 82–84, 91. Thus, a congruence of interests is clearly satisfied. *See Bosco's Club, Inc.*, 598 F. Supp. at 588–89 (corporation "may assert the rights of its employees, as it stands in an even closer relationship to them than it does to its patrons" where the challenged ordinance infringed the constitutional rights of employees as they work).

Defendant's reliance on *Region 8 Forest Service Timber Purchasers Council v. Alcock*, 993 F.2d 800, 810 (11th Cir. 1993) to claim that the "identity of interest" required for third-party standing can *never* be present in an employer/employee relationship "[a]s a matter of law" is off-base. MTD at 15. *Region 8* itself limits its ruling to the facts of that case,[10] and rightly so, as the employers there—who separately lacked an injury-in-fact—were attempting to gain standing by asserting their employees' generalized interest in "the outdoors," which was not only unrelated to the employees' work but also was not necessarily congruent with the employer's primary asserted economic interest and was not something the employees were shown to be hindered from asserting themselves. 993 F.2d at 809–10. Indeed, courts in the Eleventh Circuit have declined to read *Region 8* to preclude third-party standing in the employer-employee context, and this Court should too. *See, e.g.*, *FPL Food, LLC*, 671 F. Supp. 2d at 1361–62 (rejecting contention that *Region 8* created a rule "that an employer-employee relationship is never close enough to confer third-party standing," noting that "[o]ther circuits have . . . upheld third-party standing in the employer-employee context, and [the 11th Circuit] . . . upheld standing in the landlord-tenant context, which arguably is not as close as the employer-employee relationship."); *Council of Ins. Agents + Brokers v. Gallagher*, 287 F. Supp. 2d 1302, 1309–10 (N.D. Fla. 2003) (applying *Region 8* test and finding employers had third-party standing to assert their employees' rights).

Finally, Plaintiffs' staff face genuine obstacles to suing on their own, including, *inter alia*, the violence, harassment, and societal stigma surrounding abortion provision and support for abortion access in Alabama. *See Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1333–34 (M.D. Ala. 2014) (describing a "history of violence [against] abortion providers and women seeking abortions in Alabama."); *W. Ala. Women's Ctr. v. Williamson*, 120 F. Supp. 3d

---

[10] *Id.* (holding that "*in this case*, the employee/employer relationship is not such that the employer would be nearly as effective a proponent as the employees.").

1296, 1308, 1321–22 (M.D. Ala. 2015) (same); *see also Gallagher*, 287 F. Supp. 2d at 1309 (employer had standing to assert employees' rights where there existed "some obstacle," including fear of reprisal); *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 290 (3d Cir. 2002) (recognizing that "fear of stigmatization . . . operates as a powerful deterrent to bringing suit"). And contrary to Defendant's claims, MTD at 15, the fact that one individual (Dr. Robinson) is a plaintiff does not undermine this—third-party standing does not require that there be *no* hypothetical circumstance where a staff member could vindicate their own interests, only that there be "some hindrance," *Powers*, 499 U.S. at 411, or "a genuine obstacle" to staff doing so, *Singleton v. Wulff*, 428 U.S. 106, 116 (1976), as there is here. Plaintiffs have thus adequately alleged standing to assert their First Amendment and due process claims.

## B.   Plaintiffs AWC and Dr. Robinson Have Standing to Assert Their Patients' Right to Travel.

Defendant's effort to thwart Plaintiffs standing to bring their right-to-travel claim also fails.[11] To start, Supreme Court precedent has long recognized that travel and the facilitation of travel are inextricably linked, and makes clear that those who assist or seek to assist others in traveling across state lines may suffer an equally cognizable injury due to government restrictions on such travel as the travelers themselves, and therefore are appropriate parties to assert the underlying right to interstate travel in challenging those restrictions. *See, e.g.*, *Crandall v. Nevada*, 73 U.S. 35 (1867) (permitting stage company agent carrying passengers through Nevada to assert passengers' right to interstate travel in challenging tax imposed on travel); *Edwards v. California*, 314 U.S. 160 (1941) (permitting defendant who drove brother-in-law into California to assert

---

[11] The term "Plaintiffs" is used here as shorthand, but only Plaintiffs AWC and Dr. Robinson assert the right to travel claim on behalf of their patients.

brother-in-law's right to interstate travel in challenging law criminalizing bringing or assisting in bringing into California any indigent person). This alone is controlling.

In any event, Plaintiffs also have standing to bring this claim on behalf of their patients under traditional third-party standing rules. *See Kowalski*, 543 U.S. at 129–30 (third-party standing has been allowed where "enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." (quoting *Warth*, 422 U.S. at 510) (emphasis in original)). Contrary to what Defendant suggests, the decades-long application of this doctrine in the context of abortion providers and patients, *see generally June Med. Servs. LLC v. Russo*, 140 S. Ct. 2103, 2118–19 (2020), derived not from the heightened federal constitutional protection for abortion recognized in *Roe*, but from general prudential principles. *See Craig v. Boren*, 429 U.S. 190, 196–97 (1976) (third-party standing of beer sellers on behalf of customers because "the obvious claimant" and "least awkward challenger" is the party upon whom the challenged statute imposes "legal duties and disabilities"); *Singleton*, 428 U.S. at 114–18 ("[I]t generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision" as abortion access "is inextricably bound up with the activity the litigant wishes to pursue."). Indeed, the fact that the Supreme Court applied the same prudential standing principles, and found them to be satisfied, in the context of near-beer sellers and their adolescent customers only proves that whether abortion has heightened federal constitutional protection is irrelevant to the third-party standing analysis. *Boren*, 429 U.S. at 196–97.

Defendant nonetheless contends that by overruling *Roe* and *Casey*, *Dobbs* overruled *sub silentio* all prior abortion cases where third-party standing was recognized, and that the dissents in those cases now "contour third-party standing in the context of abortion-related cases." MTD at

9–10. This is wrong. To start, it improperly conflates the merits with justiciability. "[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal," *Warth*, 422 U.S. at 500; it is therefore not the case that every time the Supreme Court overturns a prior decision on the *merits*, it also implicitly concludes that the plaintiffs lacked standing. That is especially true here, as the Supreme Court expressly refused to grant certiorari on the question of the plaintiffs' third-party standing in *Dobbs*.[12] Thus, Defendant's request that this Court deem decades of prior, independent, third-party standing precedent overruled based on *dicta* in *Dobbs*, *see* MTD at 9, must be rejected. *See Agostini v. Felton*, 521 U.S. 203, 207, 237 (1997) ("[L]ower courts should follow the case which directly controls" and the Supreme Court holds "the prerogative of overruling its own decisions").

Regardless, Plaintiffs well-pled allegations easily satisfy the test for third-party standing. As detailed above, Plaintiffs have the requisite "injury." *See supra* 11–12. As to the second factor, the doctor-patient relationship is demonstrably a close one "of special consequence." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989) (discussing *Eisenstadt v. Baird*, 405 U.S. 438, 443–46 (1972)); *see also Washington v. Glucksberg*, 521 U.S. 702, 707–08 (1997) (permitting physicians to raise claims on behalf of terminally ill patients even after patients had passed away); *Griswold v. Connecticut*, 381 U.S. 479, 480–81 (1965) (medical director of clinic dispensing advice about contraception had "standing to raise the constitutional rights of the married people with whom [he] had a professional relationship"). Plaintiffs here enjoy this closeness with their patients, who rely on them to provide counseling and information about all risks and benefits of, and alternatives to, medical care, as well as information about how they can

---

[12] *See* Petition for a Writ of Certiorari, *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (No. 19-1392); *Dobbs v. Jackson Women's Health Org.*, 141 S. Ct. 2619, 2620 (2021) (granting certiorari only on first question presented.).

access the care they need in and out of state and support in doing so. Compl. ¶¶ 80–81, 93, 95, 103–08. Indeed, this relationship is particularly close here, where the ability of Plaintiffs' patients to obtain an out-of-state abortion, and to do so in a timely fashion, is, for many, dependent on Plaintiffs' ability to guide them and facilitate their access to trusted, safe providers in other states. *Id*. ¶¶ 102–116. Plaintiffs' interest in supporting their patients in accessing the full range of reproductive health care is thus "inextricably bound up with" their patients' interest in obtaining the care they need, including legal out-of-state abortion. *Singleton*, 428 U.S. at 114–18; *cf., e.g.*, *Powers*, 499 U.S. at 413–14 (close relation between defendant and excluded jurors where they "have a common interest in eliminating racial discrimination from the courtroom" and there is "no doubt that [defendant] will be a motivated, effective advocate for the excluded venirepersons' rights").

Unable to counter this powerful precedent, Defendant instead attempts to downplay the uniquely close doctor-patient relationship, suggesting that the "one-off" nature or short duration of contact between Plaintiffs and their patients deprives them of a meaningful relationship. MTD at 12–13 & n.5. But the strength of a physician-patient relationship does not turn on the duration of contact between the provider and patient, nor does any binding legal authority support such a notion. Rather, numerous courts have effectively rejected Defendant's contention that a continuous, long-standing relationship is necessary in concluding that abortion providers have a sufficiently close relationship with their patients to assert their constitutional rights. *See, e.g.*, *Singleton*, 428 U.S. at 117 ("The closeness of the relationship [between an abortion provider and her patients] is patent" given that "[a] woman cannot safely secure an abortion without the aid of a physician."); *Reprod. Health Servs.*, 204 F. Supp. 3d at 1322–24 (abortion providers had a close relationship with their patients for third-party standing purposes); *Planned Parenthood of Cent.*

18

*N.J. v. Farmer*, 220 F.3d 127, 147 (3d Cir. 2000) (same); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 589 (5th Cir. 2014) (same).

Defendant also seeks, without basis, to question the alignment of interests between providers and their patients, contending that by fighting to protect their ability to assist patients in accessing legal out-of-state abortion, Plaintiffs are seeking to promote their own financial and reputational interests at the expense of patients' safety. MTD at 11–12. To start, Defendant's argument makes no sense; it is fundamentally irrational for Defendant to claim that his threatened prosecution of Plaintiffs serves "as a backstop to protect maternal health and safety" out of state, *id.* at 12, when he has admitted that pregnant Alabamians are not prohibited from traveling out of state for abortions on their own and his threat is only depriving them of information about and recommendations for the safest, highest quality care. More fundamentally, however, this argument is premised on (1) baseless speculation that Plaintiffs receive monetary or reputational remuneration for assisting patients in accessing legal, out-of-state abortion care, which they do not; and (2) baseless speculation that, if they did, Plaintiffs would prioritize personal profit above their professional and ethical obligations to their patients. While Defendant provides no support for either claim, the former is not legally relevant, *see, e.g.*, *Boren*, 429 U.S. at 196–97 (vendor seeking to increase beer sales had third-party standing to challenge restriction on behalf of potential customers), and the latter has been correctly rejected by other courts, as the Court should do here. *See, e.g.*, *Planned Parenthood Se., Inc. v. Bentley*, 951 F. Supp. 2d 1280, 1285 n.3 (M.D. Ala. 2013) (rejecting that the "economic and liberty interests of the plaintiffs conflict with [] patients' interests"); *Okpalobi v. Foster*, 190 F.3d 337, 352 (5th Cir. 1999) (same), *reversed on reh'g en banc on other grounds*, 244 F.3d 405 (5th Cir. 2001); *Charles v. Carey*, 627 F.2d 772, 779 n.10 (7th Cir. 1980) (same).

Finally, as to the third element of third-party standing, courts have long recognized that "genuine obstacle[s]" hinder patients' ability to assert their own rights in the abortion context. *Singleton*, 428 U.S. at 116–17. In many cases, patients "desire to protect the very privacy of [their] decision[s] [to terminate pregnancies] from the publicity of a court suit" due to stigma around abortion, and the intimate nature of reproductive decision-making will prevent them from suing on their own behalf. *Id.* at 117; *see also supra* 14–15 (citing cases recognizing stigma and violence associated with abortion provision and access in Alabama). Such circumstances present a "hindrance sufficient to support an exception to the prudential limitation on third party standing." *Reprod. Health Servs.*, 204 F. Supp. 3d at 1325–26.

The ability to sue under a pseudonym, MTD at 14, is not a panacea. That generally does not protect one's identity from their litigation counterparties, nor does it prevent family, friends, and/or others in their community from deducing their identity from facts revealed through litigation. *Cf. Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 929 (7th Cir. 2004) (when de-identified patient records "are made a part of the trial record . . . persons of their acquaintance, or skillful 'Googlers,' sifting the information contained in the medical records concerning each patient's medical and sex history, will put two and two together, 'out' [abortion patients], and thereby expose them to threats, humiliation, and obloquy"). Additionally, as the Supreme Court has recognized, the inherently time-limited nature of pregnancy and time-sensitive nature of abortion necessarily present potential mootness issues. *Singleton*, 428 U.S. at 117–18. And even if a mootness exception applied as a legal matter, or if some patient *might* be able to pursue a class action or request emergency relief, MTD at 14, a pregnant litigant is by no means guaranteed to obtain relief in time to *personally* benefit from a favorable decision, making the prospect of litigation, and its unavoidable financial and emotional costs, even more daunting. Regardless, as

noted above, a prospective proponent of a third party's rights need not show that there are *no* circumstances under which the third party could assert their rights on their own; they simply must show that a genuine obstacle to doing so exists. *See supra* 15. Such genuine obstacles exist here. Accordingly, Plaintiffs have adequately alleged facts showing third-party standing to assert their patients' right to travel out of state to obtain lawful abortion care.

## II. Application of the Alabama Criminal Laws to Plaintiffs' Speech and Conduct Regarding Legal Out-of-State Abortion Care Violates Due Process.

The "touchstone" of Plaintiffs' due process claim is whether "the statute[s]" at issue, "either standing alone or as construed, ma[ke] it reasonably clear" that assisting someone seeking to travel to obtain a lawful abortion in another state is a crime in Alabama. *United States v. Lanier*, 520 U.S. 259, 267 (1997). They do not. Moreover, as detailed below, Defendant's attempt to get rid of this claim (and this case) by resorting to the cover of *Pennhurst* and the Eleventh Amendment is unavailing, as Plaintiffs have not pled state law claims and are seeking relief from a violation of *federal* (not state) law.

### A. The Alabama Criminal Laws and Binding Alabama Supreme Court Precedent Provide No Fair Warning That Plaintiffs' Speech and Conduct Here Is a Crime.

It is well settled that "a criminal statute must give fair warning of the conduct that it makes a crime." *Bouie v. City of Columbia*, 378 U.S. 347, 350 (1964); *see also Rogers v. Tennessee*, 532 U.S. 451, 457 (2001); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly."); *Dunn v. United States*, 442 U.S. 100, 112 (1979) ("[F]undamental principles of due process . . . mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited.") (collecting cases). Deprivation of the right to fair warning can result not only from vague statutory language but also

21

"from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 U.S. at 266; *see also Thompson v. Nagle*, 118 F.3d 1442, 1449 (11th Cir. 1997) ("criminal prosecution of a defendant for an act which was not a criminal offense at the time the act took place" prohibited).

For example, in *Bouie*, the Supreme Court reversed the defendants' conviction for trespass after refusing to leave a restaurant during a sit-in because the criminal statute under which they were convicted "[b]y its terms . . . prohibited only entry upon the lands of another after notice from the owner prohibiting such entry" and "[t]here was nothing in the statute [or prior interpretation] to indicate that it also prohibited the different act of remaining on the premises after being asked to leave." 378 U.S. at 355. As the Court recognized, "[t]he interpretation given the statute by the South Carolina Supreme Court" to affirm the convictions was at odds with 95 years of state court precedent that "uniformly emphasized the notice-before-entry requirement, and gave not the slightest indication that that requirement could be satisfied by proof of the different act of remaining on the land after being told to leave." *Id.* at 356–57. As such, the Court held that retroactive construction of a statute "to impose criminal penalties for conduct committed at a time when it was not fairly stated to be criminal" violated the Due Process Clause. *Id.* at 362; *see also Rabe v. Washington*, 405 U.S. 313, 315 (1972) (overturning conviction for knowing display of obscene motion pictures where "[t]he statute under which petitioner was prosecuted . . . made no mention that the 'context' or location of the exhibition was an element of the offense somehow modifying the word 'obscene.' *Petitioner's conviction was thus affirmed under a statute with a meaning quite different from the one he was charged with violating*."); *Magwood v. Warden, Ala. Dep't of Corr.*, 664 F.3d 1340, 1349 (11th Cir. 2011) (applying *Bouie* to find due process violation

where defendant "did not have fair warning that a court, when faced with an unambiguous statute, would reject the literal interpretation [of that statute].").

Here, as in *Bouie*, no Alabama statute or legal precedent provides notice or fair warning that the speech and conduct at issue—about legal abortions *outside* Alabama—could constitute a criminal offense *in* Alabama. As Defendant concedes, it is "obvious" that leaving the state to obtain a legal abortion is not a crime or offense under Alabama law. MTD at 30. Nor does any Alabama law—including the Abortion Ban, which, on its face, only applies to abortions provided in Alabama[13]— make providing or obtaining a legal abortion in another state a crime or offense. Nor *could* a law do so, without violating other constitutional rights. *See, e.g.*, *infra* Section IV (discussion of right to travel).[14] Thus, because the Alabama Criminal Laws speak only of "conduct constituting an offense," Ala. Code § 13A-4-3(a), "conduct constituting a crime," *id.* § 13A-4-1, and conduct "constituting a criminal offense," *id.* § 13A-2-23, and because the conduct here—

_____

[13] Indeed, Defendant concedes that "in order to have extraterritorial effect, a statute must explicitly provide for that effect," MTD at 37 (quoting *Ex parte Old Republic*, 733 So. 2d 881, 884 (Ala. 1999)), yet he points to no explicit provision in the Ban purporting to provide for such effect.

[14] Additionally, for Alabama law to purport to make providing or obtaining a legal abortion in another state a crime or offense would violate due process for yet another reason. As the Supreme Court has repeatedly held, the Fourteenth Amendment's Due Process Clause prohibits a jurisdiction from punishing a defendant for engaging in out-of-jurisdiction activity that is permitted where it transpires. *See Nielsen v. Oregon*, 212 U.S. 315, 321 (1909) ("[F]or an act done within the territorial limits of [one state] . . . , under authority and license from that state, one cannot be prosecuted and punished by . . . [a different] state"); *Bigelow v. Virginia*, 421 U.S. 809, 824 (1975) (Virginia could not criminalize the publication of an advertisement concerning the availability of abortion services in New York, which were, at the time of publication and prosecution, legal in New York); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572–73 (1996) (while Alabama could punish BMW for engaging in unlawful behavior in Alabama, it would violate due process to punish BMW for engaging in out-of-state conduct that was lawful where it transpired); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003) (a punitive damages award against a defendant that accounted for the defendant's out-of-state behavior violated due process, because "[a] State cannot punish a defendant for conduct that may have been lawful where it occurred"). Defendant's claim that *Nielsen* has limited relevance after *Heath v. Alabama*, 474 U.S. 82, 91 (1985), MTD at n.14, is a dramatic overstatement; indeed, the language he quotes from *Heath* is from the Court's discussion of *Nielsen*'s *dicta* that "where States have concurrent jurisdiction over a criminal offense, the first State to prosecute thereby bars prosecution by any other State," *Heath*, 474 U.S. at 91—not *Nielsen*'s *holding*, quoted above, which remains good law. Defendant's critiques of *Bigelow*, MTD at n.15, are discussed *infra* at note 21.

namely, providing, obtaining, or leaving the state to obtain a legal out-of-state abortion—is *not* a crime or offense, there can be no criminal conspiracy, solicitation, or accomplice liability under Alabama law. Therefore, just as the statute in *Bouie* plainly did not make what defendants were charged with a crime, none of the Alabama Criminal Laws provides any "notice, foreseeability, and, in particular, . . . fair warning as those concepts bear on the constitutionality of attaching criminal penalties" to the otherwise "innocent conduct" at issue here. *Rogers*, 532 U.S. at 451.

Faced with this, Defendant bases his argument almost entirely on the 1896 Law. *See* MTD at n.1 & *generally*. But this argument fails under *Bouie* too, as to construe the 1896 Law to create a crime of conspiracy with respect to *lawful* out-of-state conduct, as Defendant seeks to do, would not only mark "a significant *departure* from prior case law," but would represent an "'unexpected and indefensible' *break* from the existing case law," in violation of the Due Process Clause. *United States v. McQueen*, 86 F.3d 180, 183–84 (11th Cir. 1996) (quoting *Bouie*, 378 U.S. at 354; citing *Marks v. United States*, 430 U.S. 188, 194–96 (1977)).

In 1895, the Alabama Supreme Court considered an appeal by two criminal defendants who were indicted and convicted for a conspiracy formed in Alabama to commit a robbery in Georgia. *Thompson*, 17 So. at 515. The Court acknowledged that, at that time, Alabama was "without a statute declaring a conspiracy formed in this state to commit a felony or a misdemeanor in a sister state an indictable offense." *Id.* Thus, it noted that under the existing criminal code, a punishable offense of conspiracy to commit a felony or misdemeanor seemingly "refer[red] exclusively to a conspiracy in [Alabama] to commit *within the state* a felony or misdemeanor, as the Code defines these offenses." *Id.* However, looking to the common law, the Court determined that it had "no hesitancy in declaring that it is an indictable common-law misdemeanor to enter

into a conspiracy in this state to commit a *known common-law felony, malum in se*, in a sister state." *Id.* at 516.

The same year that *Thompson* was decided (1895), the Governor of Alabama appointed William L. Martin to "revise, digest and codify all of the statutes of this State of a general and public nature, both civil and criminal." Compl. ¶ 43, Ex. 1 (ECF No. 23-1), Excerpts of Report of William L. Martin, Code Commissioner of Alabama (1896), p. 3. Commissioner Martin was charged with proposing any new laws that were not already "embrace[d] in the Code as hereinbefore provided," but that "he may deem necessary or proper for perfecting, harmonizing, or improving the system of laws of Alabama." Compl. ¶ 44, Ex. 1 at 4. Pursuant to this authority, in the Report submitted to the Governor in October 1896, Commissioner Martin proposed the following new section:

> CHAPTER 138.—CONSPIRACY.
>
> 4428. New section. Makes a conspiracy formed in this State to do an act in another State which, if done in this State, would be a criminal offense, indictable and punishable here in all respects as if the conspiracy had been to do the act in this State.
>
> (Suggested by Thompson v. State, 17 So. 512.)

Compl. ¶ 45, Ex. 1 at 91.

On February 16, 1897, the Alabama Legislature adopted the code proposed by Commissioner Martin, *see* Compl. ¶ 46, Ex. 2 (ECF No. 23-2), Act 480, "An Act To Adopt a Code of Laws for the State of Alabama," and the above provision appeared in the 1897 Code without any substantive revisions:

> 4430. Conspiracy formed in this state to commit crime elsewhere indictable here.
>
> A conspiracy formed in this state to do an act beyond the state which, if done in this state, would be a criminal offense, is indictable and punishable

in this state in all respects as if such conspiracy had been to do such act in this state.

Thompson's case, 106 Ala. 67.

Compl. ¶ 46, Ex. 3 (ECF No. 23-3), Excerpts of 1897 Code, 199. As indicated, the statute codified the common-law principle set forth in *Thompson*. *Id.* The 1896 Law was subsequently re-adopted verbatim (with only the section number changed) in the 1907, 1923, and 1940 Codes, each time explicitly identifying *Thompson* as the basis for the law. *See* Compl. ¶ 49, Exs. 4, 5, and 6 (ECF Nos. 23-4, -5, -6). Tellingly, in 1940, the Legislature even included a direct quote from the *Thompson* Court's articulation of the common law principle that the statute codifies: that "[t]he common-law offense of conspiracy to commit a felony, *malum in se*, in a sister state, is indictable and punishable in this state." Compl. ¶ 50, Ex. 6. And in 1977, the provision was codified (again verbatim) at Section 13A-4-4, where it remains today. Compl. ¶ 51. Unsurprisingly, Plaintiffs are not aware of *any* recorded prosecution under the 1896 Law for the alleged formation of a conspiracy to engage in *lawful* conduct in another state. *Id.* ¶ 52.

Defendant attempts to minimize the import of *Thompson*, characterizing the case as simply reflecting "then-operative common-law conspiracy laws," and therefore unrelated to the 1896 Law. MTD at 19–20. But this argument ignores that where a statute adopts a common-law principle, as construed by the state Supreme Court, and is recodified repeatedly without change, it is presumed that the legislature adopted that construction, and that "prior decisions" of the state Supreme Court regarding the now-codified common-law principle "permeate the statute." *Edgehill Corp. v. Hutchens*, 213 So. 2d 225, 227–28 (Ala. 1968); *Anderson Realty Grp., LLC v. King*, No. 2201014, 2022 WL 2092974, *5 (Ala. Civ. App. June 10, 2022) ("It is . . . a rule of statutory construction that statutes should be construed in reference to principles of the common law") (collecting cases), *aff'd sub nom. Ex parte King*, No. SC-2022-0653, 2023 WL 3557915 (Ala. May

26

19, 2023); *id.* ("If a statute of the legislature adopt[s] phrases of the common law, we must look to the common law to ascertain their true signification. This is a rule of reason."); *Ex parte City of Florala*, 113 So. 312, 312–13 (Ala. 1927) ("We note the statute here involved has been recodified without change since the [case construing it] was decided. The rule of presumed legislative adoption of the existing construction applies.").

That is precisely what has happened here. As shown above, it is the Alabama Supreme Court's holding in *Thompson* that "it is an indictable common-law misdemeanor to enter into a conspiracy in [Alabama] to commit a *known common-law felony, malum in se*, in a sister state," that the Legislature codified as Section 13A-4-4. Indeed, *Thompson* was explicitly cited as the source of the provision when it was first introduced and codified, and then cited—and even quoted—each time the Alabama Legislature readopted and re-affirmed the provision. Compl. ¶¶ 49–50. Thus, Defendant's claim that *Thompson* was decided when Alabama was "without a statute declaring a conspiracy formed in this state to commit a felony or a misdemeanor in a sister state an indictable offense," *see* MTD at 20 (quoting *Thompson*, 17 So. at 515), is irrelevant, because it was *Thompson* that *produced* such a statute by declaring it a crime to conspire in Alabama "to commit a known common-law felony, malum in se, in a sister state," *Thompson*, 17 So. at 516—a declaration that was codified *as* the 1896 Law. This Court is bound by that declaration, which defines the scope of the 1896 Law to foreclose Defendant's position here. *See Hunt v. Tucker*, 93 F.3d 735, 737 (11th Cir. 1996) ("[F]ederal courts must follow the interpretation of Alabama law made by the highest court of that State absent a constitutional violation.").

Because the *Thompson* Court's definition of the common-law criminal conspiracy offense that was codified as the 1896 Law is controlling here, the Attorney General's threatened use of the 1896 Law to prosecute Plaintiffs for facilitating others' attempts to obtain entirely *legal* out-of-

state medical care is "unexpected and indefensible" under *Bouie*. 378 U.S. at 354. Neither *Rogers*, 532 U.S. at 457, nor *Metrish v. Lancaster*, 569 U.S. 351, 367–68 (2013), *see* MTD at 21–22, compels a different conclusion. Unlike *Bouie* (and this case), *Rogers* did not concern a statutory enactment—let alone one whose scope had already been clearly defined by a state Supreme Court. Instead, *Rogers* involved "an act of common law judging," where "there often arises a need to clarify or even to reevaluate prior opinions as new circumstances and fact patterns present themselves." 532 U.S. at 461. This alone would be sufficient to distinguish the case, but there is more.

To start, the *Rogers* Court affirmed that "judicial alteration of a common law doctrine of criminal law violates the principle of fair warning . . . where it is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'" 532 U.S. at 462 (quoting *Bouie*, 378 U.S. at 354). It then applied this standard and concluded that there was nothing unexpected or indefensible *in that case* upon finding, *inter alia*, that the rule at issue was "widely viewed as an outdated relic of the common law," *id.*, that, "at the time of petitioner's crime," the rule "had only the most tenuous foothold" in Tennessee criminal law, that the rule "did not exist as part of Tennessee's statutory criminal code," and that it "had never once served as a ground of decision in any prosecution" in the state, *id.* at 464. Accordingly, the Court concluded that "[f]ar from a marked and unpredictable departure from prior precedent, the court's decision was a routine exercise of common law decisionmaking in which the court brought the law into conformity with reason and common sense" by "laying to rest an archaic and outdated rule." *Id.* at 467.[15] This

---

[15] Moreover, unlike *Rogers*, Plaintiffs here do not argue that the threatened application of the Alabama Criminal Laws violates the *Ex Post Facto* Clause. *See* MTD at n.9; *Rogers*, 532 U.S. at 458 ("To the extent petitioner argues that the Due Process Clause incorporates the specific prohibitions of the *Ex Post Facto* Clause as identified in *Calder,* petitioner misreads *Bouie.*"). Plaintiffs' claim is one of due process, and— just like *Bouie*—"rest[s] on core due process concepts of notice, foreseeability, and, in particular, the right

reasoning, and application to the facts of that case, are inapplicable here; the common-law principle identified and applied in *Thompson* cannot possibly be characterized as an outdated relic given that the 1896 Law has been recodified unchanged multiple times, citing to *Thompson*, and the Defendant has not identified a single recorded prosecution under the 1896 Law for a conspiracy to engage in *lawful* out-of-state conduct since its inception.

Defendant fares no better with *Metrish*, a federal habeas case in which the U.S. Supreme Court concluded, under the "demanding" standard required for habeas relief, that retroactive application of a Michigan Supreme Court decision "squarely addressing" for the first time whether a "controlling" statute permitted a diminished capacity defense did not violate the petitioner's due process rights. 569 U.S. at 365, 367–68. The Court recognized that the case there "present[ed] the inverse of the situation this Court confronted in *Bouie*. Rather than broadening a statute that was narrow on its face, [the Michigan Supreme Court] disapproved lower court precedent recognizing a defense Michigan's high court found, on close inspection, to lack statutory grounding." *Id.* at 366. This situation is therefore vastly different from the case at hand, where the "controlling statute" codifies a common law principle, the scope of which was clearly defined by the Alabama Supreme Court and has not been altered, undermined or changed in the intervening 120+ years, and the Attorney General is now, for the first time, seeking to "broaden" the statute's application.

Unable to wriggle out from under *Thompson*, Defendant contends that case instead confirms that the Alabama Criminal Laws apply regardless of "whether Plaintiffs['] ultimate object would be legal elsewhere." MTD at 21. Not so. This argument—as well as Defendant's more universal contention that it is immaterial whether the conduct one is charged with conspiring

---

to fair warning as those concepts bear on the constitutionality of attaching criminal penalties to what previously had been innocent conduct." *Id.* at 458–59 (citing *Bouie*, 378 U.S. at 351, 352, 354–55).

to commit is legal where it occurs, so long as the agreement to commit that conduct is formed in Alabama, MTD at 16–18, 23—hinges almost entirely on his selective quoting of *Thompson*'s general statement that "[i]t is the law of the place where the conspiracy is formed which is broken." *See id.* at 21 (quoting *Thompson*, 17 So. at 516); *see also id.* at 7, 17, 23, 34, 37 (same). But this ignores *Thompson*'s statement just four sentences prior: that "[t]he criminating element and constituent of an indictable conspiracy is the vicious, unlawful combination, the corrupt and corrupting agreement; and wherever the common law prevails, if the combination is formed, and the agreement entered into, *to commit a known felony*, *malum in se*, the offense is complete." 17 So. at 516. In other words, while it is correct that the conspiracy (or agreement) itself is the "crime," and it is therefore "law of the place where the conspiracy is formed [that] is broken," the Alabama Supreme Court made clear that for a conspiracy offense to be "complete," the agreement in question must be formed "to commit a known felony, malum in se"—in other words, to do something that is actually *illegal*. *Id.*[16]

---

[16] Defendant's claim that abortion is a "*malum in se* crime" because Alabama has implicitly designated it as such through the legislative findings in its 2019 Abortion Ban, *see* MTD at 18, is simply wrong. At the threshold, to the extent Defendant is actually arguing that Alabama has the power to render abortion "illegal without regard to place or jurisdiction" by virtue of its Ban, *id.*, such an argument is squarely foreclosed by both (1) the fact that the law does not explicitly provide for extraterritorial effect, *see id.* at 37, and (regardless) (2) the decades of precedent referenced above, making clear that a state cannot effectively project its laws outside its borders by imposing criminal penalties on someone for engaging in out-of-state conduct that is lawful in the jurisdiction where it transpires. *See supra* note 14. Setting that aside, that a particular state has chosen to criminalize certain conduct does not automatically render that conduct *malum in se*. A crime that is *malum in se* is "a crime or an act that is inherently immoral, such as murder, arson, or rape," and thus one that, by definition, is not the subject of sharply conflicting views but rather tends to be plainly prohibited across jurisdictions. *Malum in se*, Black's Law Dictionary (11th ed. 2019). Unlike such crimes, "[a]bortion presents a profound moral issue on which Americans hold sharply conflicting views." *Dobbs*, 142 S. Ct. at 2240. And, whereas "*every* legal system has a prohibition on murder," 1 Wharton's Criminal Law § 1.6 (16th ed. 2021), abortion remains legal—and even constitutionally protected (as a matter of state law)—in many states. Defendant does not explain how conduct that enjoys such widespread legal protection or engenders "conflicting views" could also be sufficiently wicked or depraved to qualify as *malum in se*. Indeed, the sole case Defendant cites—*Ex parte Rapier*, 143 U.S. 110, 134 (1892)—is inapposite as it concerned *Congress's* power to forbid the use of the federal mails in promotion of certain conduct that, were *Congress* to pass a *federal* law forbidding, *would* be plainly prohibited across the U.S.

Such a holding is far from novel—indeed, the maxim that the object of the agreement in a conspiracy must be something illegal (or something illegally achieved) is elemental and well-supported. *See, e.g.*, *Mitchell v. State*, 248 Ala. 169, 172, 27 So. 2d 36, 38–39 (1946) (noting that "the word 'conspire' does not within itself necessarily connote an evil intention," and holding that in an indictment for criminal conspiracy, "the fact that the conspiracy is characterized as unlawful is not enough," and the government must allege that the "supposed offense that was the object of the conspiracy" is unlawful); *United States v. Toler*, 144 F.3d 1423, 1426 (11th Cir. 1998) (noting that the "essential element of a conspiracy [is] that the object of the agreement must be *illegal*."); 15A C.J.S. Conspiracy § 118 ("To constitute a criminal conspiracy, either the object of the conspiracy or the means of accomplishing it must be illegal. . . . No one can be held criminally liable for conspiracy to do acts that are perfectly lawful and to which there is no criminal objective."); 16 Am. Jur. 2d Conspiracy § 1 ("The crime of conspiracy can only be defined in conjunction with a second crime, that is, the substantive crime involved in the conspiracy."); 16 Am. Jur. 2d Conspiracy § 2 ("In any case, a conspiracy in a legal sense does not exist where both the object of the agreement and the means contemplated for its achievement are lawful."); 1 Wharton's Criminal Law § 8.2 (16th ed. 2021) ("Conspiracy is the result of an agreement between two or more persons to commit an *unlawful* act or to commit a lawful act by *unlawful* means.").

Indeed, contrary to Defendant's claims, MTD at 23, this basic tenet is only reinforced by Alabama's other statutes on inchoate crimes and accomplice liability, which—as discussed above—all clearly require that the conduct that is the object of the conspiracy (or solicitation or provision of aid) be an actual "offense" or "crime" and define the severity of the offense based upon that object. *See supra* 23–24; *see also* Ala. Code §§ 13A-4-3(g); 13A-4-1(f) (looking to the

31

*object* of the conspiracy and solicitation to delineate the severity of the offense).[17] Here, unless Defendant is claiming that Alabama has the power to project its Ban into other states where abortion is legal (which, as discussed above, *supra* note 14, would be unconstitutional), there *is no underlying crime or offense* that Plaintiffs could be conspiring to commit (or soliciting, or aiding) when they assist a pregnant Alabamian seeking to access *legal*, out-of-state abortion care.

To be sure, that the intended object of a conspiracy (or solicitation, or provision of aid) must be a *crime* is not only supported by law, but by logic: if Defendant's position were true, people could be criminally prosecuted for "conspiring" to engage in myriad *legal* behaviors, should those tasked with enforcement of the criminal laws disfavor or dislike such conduct. Such arbitrary and unexpected enforcement of criminal law would fly in the face of due process, and the inapposite cases Defendant cites concerning two *federal* conspiracy statutes do not counsel otherwise. *See* MTD at 17–18 & n.6. In *United States v. Elliott*, 266 F. Supp. 318, 322 (S.D.N.Y. 1967), the district court's rejection of the plaintiff's due process challenge to a federal statute criminalizing the formation of a conspiracy in the U.S. to "damage or destroy" property in a foreign country belonging to a foreign government was premised on, *inter alia*, the *federal* government's power over foreign affairs, the vital importance of preserving delicate American foreign relations, and the court's recognition that the "objective" of the conspiracy—the destruction of a bridge— was "malum in se in any sense of that term," and "if consummated would have escaped the criminal law of [the United States]." *Id.* at 324; *see also id.* at 323 n.2 (noting that "in cases immediately affecting *national* interests, *nations* may punish acts done within another recognized jurisdiction"

---

[17] Indeed, because the 1896 Law itself does not define "conspiracy" or its elements, it must be read and applied with reference to the general conspiracy statute that immediately precedes it in the Code, *see* Ala. Code § 13A-4-3 ("Criminal conspiracy generally"), which—as noted above—requires that a prosecutor prove as an element of the crime an "intent that conduct constituting an *offense* be performed." Again, there is no offense here, where the conduct that is the object of any agreement is entirely legal.

(cleaned up)). The same weighty national and foreign interests and *malum in se* crime are not present here. The remainder of the cases Defendant cites are similarly inapposite, as they all concern the "defraud" clause of 18 U.S.C. § 371, *see* MTD at 18 n.6, which "already itself refers to the substantive offense of fraud." *See United States v. Smith*, No. 08-50-1, 2008 WL 4630356, at *2 (E.D. Pa. Oct. 17, 2008); *see also United States v. Vazquez*, 319 F.2d 381, 384 (3d Cir. 1963) (noting that the conspiracy to defraud is itself the substantive offense).[18] In sum, Defendant cites nothing that could enable him to escape the inevitable conclusion here: that Plaintiffs have adequately stated a claim that it is a due process violation to prosecute them under the Alabama Criminal Laws for helping someone in engage in *legal* conduct.

### B. Defendant's Eleventh Amendment Argument Is a Red-Herring That Misconstrues Plaintiffs' Due Process Claim and the Relief Requested.

Finally, Defendant's attempt to invoke the Eleventh Amendment, *see* MTD at 23–24, fundamentally misconstrues Plaintiffs' arguments, and, indeed, would effectively eviscerate *Bouie* and its progeny—including every Eleventh Circuit decision to apply that holding. Unlike the plaintiffs in *Pennhurst* and the other cases Defendant cites, *id.* at 15–16, Plaintiffs here have not pled any state law claims, nor do they seek a holding that Defendant is in violation of state law, or any relief under state law. Plaintiffs' claim here, as in *Bouie*, is that Defendant runs afoul of the Due Process Clause of the federal Constitution by "applying a novel construction of a criminal

---

[18] Equally misguided is Defendant's implication that *Dennis v. United States* stands for some sort of bright-line rule that conspiracy defendants are never permitted to defend themselves by arguing that the law they are accused of conspiring to violate is invalid, *see* MTD at 18 (quoting *Dennis v. United States*, 384 U.S. 855, 866–67 (1966)). *Dennis* stands only for the principle that there are "appropriate and inappropriate ways to challenge acts of government thought to be unconstitutional," 384 U.S. at 867, and that there is "no reason for [federal courts] to consider the constitutionality of a statute at the behest of petitioners who have been indicted for conspiracy *by means of falsehood and deceit* to circumvent the law which they now seek to challenge," *id.* at 866. As other courts have recognized, this conclusion is not applicable where the indictment is *not* based on a "voluntary, deliberate and calculated course of fraud and deceit," and the constitutionality of the law is instead "challenged by those who of necessity violate its provisions and seek relief in the courts," or where the governmental action was taken with no "colorable authority," *United States v. Stewart*, 590 F.3d 93, 111 (2d Cir. 2009), as is the case here.

statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 U.S. at 266. And while there may be "no federal right not to be arrested in violation of state law," MTD at 23 (quoting *Knight v. Jacobson*, 300 F.3d 1272, 1276 (11th Cir. 2002)), there *is* a federal right to due process, and Section 1983 *does* "create a remedy" for "wrong[s] committed under the color of state law . . . that deprive a plaintiff of a federal right." *Knight*, 300 F.3d at 1276. Thus, this Court need not (and should not) "declare or require that Defendant . . . adopt [Plaintiffs'] *preferred* interpretation of State law," MTD at 16; it simply must look to the Alabama Criminal Laws in question, and any authoritative Alabama Supreme Court case law defining the scope of those laws, and determine whether Defendant's threatened enforcement amounts to an "unexpected and indefensible" departure from that scope, in violation of the federal Due Process Clause. *Bouie*, 378 U.S. at 354. As detailed above, Plaintiffs have adequately pled facts showing that that question must be answered in the affirmative.[19] This Court must therefore deny Defendant's request to dismiss Plaintiffs' due process claim.

## III.   Application of the Alabama Criminal Laws to Plaintiffs' Protected Speech Violates Plaintiffs' Free Speech Rights.

As the Eleventh Circuit has recognized, "[i]n the fields of medicine and public health . . . [d]octors must . . . be able to speak frankly and openly to patients." *Wollschlaeger v. Governor*, 848 F.3d 1293, 1313 (11th Cir. 2017). Here, but for the threat of prosecution, Plaintiffs would do just that—they would provide their patients and other pregnant Alabamians with information and counseling relating to abortion care *outside* of Alabama, in states where it is legal.

---

[19] Contrary to Defendant's off-hand claim, MTD at n.11, state court certification would be inappropriate here, where there exists no "significant doubt" on a dispositive state law issue. *See Florida ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 273 (5th Cir. 1976). Given the clear controlling precedent of the Alabama Supreme Court in *Thompson*, this Court is fully capable of making a "principled rather than conjectural conclusion" based on the available statutes and law, *see id.* at 275, and the "practical limitations" associated with certification would prejudice Plaintiffs by delaying resolution of their claims, *id.* at 275–76, unduly prolonging the ongoing and irreparable harm that they and their patients are suffering. *See supra* 4–5.

*See supra* 3–5. Contrary to Defendant's claims, MTD at 24–27, this speech about *lawful* activity falls well within the protections of the First Amendment, and application of the Alabama Criminal Laws to this speech based on its content and viewpoint cannot survive exacting scrutiny.

### A.      Plaintiffs' Speech About Legal Out-of-State Abortion Care Is Protected by the First Amendment.

While there are discrete categories of speech that the Supreme Court has exempted from First Amendment protection, speech about abortion is not one of them. *See, e.g.*, *United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (listing obscenity, defamation, fraud, incitement, and speech integral to criminal conduct as the categories of unprotected expression). To be sure, as Defendant notes, MTD at 25, the "constitutional freedom for speech" does not "extend[] its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949). However, the *sine qua non* of the "speech integral to criminal conduct" exception is that the speech must be "intended to bring about a particular *unlawful act*." *United States v. Hansen*, 143 S. Ct. 1932, 1947 (2023); *see also United States v. Williams*, 553 U.S. 285, 298 (2008) (recognizing speech "intended to induce or commence *illegal activities*" is not protected by First Amendment); *id.* at 298–99 (emphasizing narrowness of exception in noting "the distinction between a proposal to engage in illegal activity and the abstract advocacy of illegality," the latter of which is protected). Here, because the speech at issue concerns legal abortions, there is no unlawful act, and the First Amendment applies. *See, e.g.*, *Friend v. Gasparino*, 61 F.4th 77, 90 (2d Cir. 2023) (where "there is no predicate crime" to which the relevant speech was "integral," it cannot be shown that the speech is "unprotected for being integral to criminal conduct").

Despite this unambiguous precedent, Defendant contends that there is no set of facts under which Plaintiffs could prove their First Amendment claim. Defendant's argument essentially boils

down to the following: Speech about lawful conduct in another state can nevertheless be criminalized in Alabama because if, *hypothetically*, someone were to engage in that conduct in Alabama, it might violate Alabama law. To state the argument is to refute it. To be clear, even Defendant does not allege that anyone is actually seeking or intending to provide—let alone *talking* about actually seeking or intending to provide—an abortion in Alabama in violation of the Ban. But, according to Defendant, that is irrelevant, because the First Amendment categorically exempts from its protection any speech about a lawful act, so long as it is conceivable that, under different circumstances that no one is contemplating, that act might be unlawful. Such a reading would render the First Amendment meaningless, and no case supports it. That Defendant seeks to use laws concerning inchoate crimes, like conspiracy, makes no difference. *See* MTD at 26. There is still no underlying "illegal act," *id.*, and, as explained above, an "agreement" formed in Alabama to do something that is entirely legal is not a conspiracy (or any other crime, for that matter) under Alabama law.

In sum, the speech integral to criminal conduct exception to the First Amendment applies to speech that is, as the very name indicates, "an integral part of conduct in violation of a valid criminal statute." *Giboney*, 336 U.S. at 498. Because the speech here—speech about legal abortion care in states outside Alabama—is not an integral part of *any* such conduct, the narrow exception to the First Amendment that Defendant seeks to invoke has no bearing. *Id.*

**B.      The Application of Alabama's Criminal Laws to Plaintiffs' Protected Speech Is Content- and Viewpoint-Discriminatory and Cannot Satisfy Strict Scrutiny.**

Because Plaintiffs' speech does not fall into the "speech integral to criminal conduct" exception, traditional First Amendment principles apply, and application of the Alabama Criminal Laws to punish Plaintiffs' speech constitutes content- and viewpoint-based discrimination, which cannot survive exacting First Amendment scrutiny.

The Supreme Court has made clear that restrictions "that target speech based on its communicative content" are presumptively unconstitutional and subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *see also Texas v. Johnson*, 491 U.S. 397, 412 (1989) (subjecting content-discriminatory application of law to "the most exacting scrutiny"); *Am. Booksellers v. Webb*, 919 F.2d 1493, 1500 (11th Cir. 1990) ("[C]ontent-based restrictions on speech survive constitutional scrutiny only under extraordinary circumstances."). Where the government targets particular views taken by speakers on a subject (rather than targeting all views on a given subject), the restriction is even more egregious. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."); *see also Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1126 (11th Cir. 2022) ("[R]estrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited, seemingly as a *per se* matter.").

Here, Plaintiffs' extensive and well-pled allegations plainly demonstrate that applying the Alabama Criminal Laws to Plaintiffs' speech about legal out-of-state abortion care targets a single topic—abortion—and is, therefore, content-based. *See Wollschlaeger*, 848 F.3d at 1307 (restriction on physician speech about firearm ownership was content-based). Indeed, Defendant acknowledges as much in attempting to justify his infringement. *See* MTD at 26 (arguing that "[c]ontent-based restrictions are permitted" when the speech at issue "causes a crime"). It is, moreover, viewpoint-discriminatory, because it singles out and condemns expression of a particular viewpoint—one supportive of individuals who wish to terminate their pregnancies—by restricting Plaintiffs from providing information and counseling related to out-of-state abortion care, while leaving Plaintiffs free to provide the same kind of information and counseling (*i.e.*,

recommendations for trusted providers, specialist care, and financial resources), *so long as* it concerns care for a continuing pregnancy. *See, e.g.*, *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002) ("[T]he policy does not merely prohibit the discussion of marijuana; it condemns expression of a particular viewpoint, i.e., that medical marijuana would likely help a specific patient. Such condemnation of particular views is especially troubling in the First Amendment context."); *Brandt v. Rutledge*, No. 4:21-CV-00450-JM, 2023 WL 4073727, at *37 (E.D. Ark. June 20, 2023) (holding that prohibition on referrals for gender-affirming health care is a "content and viewpoint-based regulation of speech because it restricts healthcare professionals from making referrals for 'gender transition procedures' *only*, not for other purposes"). In particular, while Plaintiffs and other Alabamians face the risk of prosecution for supporting people seeking legal abortion in other states, they remain free to "support" people *not* to have an abortion, including by directing them to anti-abortion counseling centers, without fear of becoming the subject of a criminal investigation. Thus, strict scrutiny applies; Defendant must prove a compelling interest in prohibiting the speech at issue, and that the means chosen are the "least restrictive." *Burk v. Augusta-Richmond County*, 365 F.3d 1247, 1251 (11th Cir. 2004) (citing *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000)); *see also Reed*, 576 U.S. at 171.[20]

Defendant cannot do so. Alabama has no legitimate, let alone compelling, interest in preventing Plaintiffs from providing information to or counseling their patients and pregnant Alabamians about abortion care that is legal and available in other states because—as the Supreme

---

[20] Even if application of the Alabama Criminal Laws to Plaintiffs' speech were viewed as content-neutral, it would fail intermediate scrutiny because, as set forth below, Alabama does not have *any* legitimate, significant, *or* compelling interest in silencing medical providers from speaking to their patients and others about medical care that is available and legal in other states. *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1475–76 (2022) ("[T]o survive intermediate scrutiny, a restriction on speech or expression must be 'narrowly tailored to serve a significant governmental interest.' (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989))).

Court has long recognized—any asserted state interest "in shielding its citizens from information about activities outside [its] borders, activities that [its] police powers do not reach" is "entitled to little, if any, weight." *Bigelow*, 421 U.S. at 827–28; *id.* at 824–25 (holding that a state "may not, under the guise of exercising internal police powers, bar" Plaintiffs "from disseminating information about an activity that is *legal*" in another state); *id.* at 824 (a state "does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State.").[21]

Indeed, this court should view attempts to restrict the type of speech Plaintiffs wish to engage in, particularly in such a content- and viewpoint discriminatory manner, with extreme suspicion. *See, e.g.*, *Wollschlaeger*, 848 F.3d at 1313–14. The Supreme Court has firmly rejected that professional speech, including that between health care providers and patients, receives any lesser First Amendment protection. *See Nat'l Ass'n of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018) ("*NIFLA*") (holding that the "Court has not recognized 'professional speech' as a separate category of speech" and that its precedents do not support exempting professional speech "from the normal prohibition on content-based restrictions"). To the contrary,

---

[21] Defendant's assertion that this language from *Bigelow* is "dictum," MTD at n.15, is belied by the decision itself, which, fairly read, considered whether Virginia had "an interest in regulating what Virginians may hear or read about . . . New York services," and rejected the proposition that the state's police powers extend to "shielding its citizens from information about activities outside Virginia's borders." *Bigelow*, 421 U.S. at 827–28. Nor is this holding "outdated." MTD at n.15. Assuming Defendant means to argue that the decision was issued prior to *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), which established a four-part test to determine the constitutionality of restrictions on commercial speech, that assertion is completely irrelevant as commercial speech is not at issue here. Regardless, while Defendant is correct that today a state "'may freely regulate commercial speech that concerns unlawful activity[,]' including abortion in Alabama," MTD at n.15 (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623–24 (1995)), as already discussed above, the speech here is not about any "*unlawful*" activity because it does not concern the performance of illegal abortions in Alabama; it concerns legal abortion outside of Alabama. Finally, the *Dobbs* decision has done nothing to undermine *Bigelow*'s holding, which did not at all rest on the fact that the advertisement concerned abortion specifically; indeed, the *Bigelow* Court emphasized that the case was "a First Amendment case and not an abortion case," 421 U.S. at 815 n.5.

the Court has held that "when the government polices the content of professional speech, it can fail to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail," and has specifically pointed to the example of medical providers who "might have a host of good-faith disagreements, both with each other and with the government," including on, for example, "the ethics of assisted suicide or the benefits of medical marijuana." *Id.* at 2374–75.

The Eleventh Circuit has likewise recognized that protecting physician-patient speech from government interference and manipulation, and particularly with the heavy hand of the criminal laws, is at the heart of the First Amendment. *See Wollschlaeger*, 848 F.3d at 1313–14 ("Florida may generally believe that doctors and medical professionals should not ask about, nor express views hostile to, firearm ownership, but it may not burden the speech of others in order to tilt public debate in a preferred direction."); *id.* at 1310 (citing approvingly to *Conant*, 309 F.3d 629, "which struck down, on First Amendment grounds, a federal policy which threatened doctors with revocation of their DEA prescription authority if they recommended the medicinal use of marijuana to their patients" and "rejected the government's paternalistic assertion that the policy was valid because patients might otherwise make bad decisions"). As Judge Pryor explained in his concurrence in *Wollschlaeger*, citing historical examples where "governments have overtly politicized the practice of medicine . . . directly manipulating the content of the doctor-patient discourse," the "need to prevent the government from picking ideological winners and losers is as important in medicine as it is in any other context." 848 F.3d at 1328.

Plaintiffs here—as health care providers, who know that their patients trust, value, and rely on information obtained in "the doctor-patient discourse"—feel ethically obligated to speak "frankly and openly" with their patients about all their pregnancy options, including those (like abortion) that are legal and available in other jurisdictions. *Id.* at 1313–14, 1328; Compl. ¶¶ 75–

76, 79–80, 91; *cf. Otto v. City of Boca Raton*, 981 F.3d 854, 863 (11th Cir. 2020) ("To be sure, [doctors] remain free to describe [a treatment] to the public or recommend that a client receive [a treatment] in another jurisdiction."). However, faced with the threat of prosecution, Plaintiffs are unable to engage in this protected speech and are instead forced to withhold vital information and counseling from those seeking their knowledge and expertise relating to accessing safe abortion in another state. *See* Compl. ¶¶ 82–91; *see generally Wollschlaeger*, 848 F.3d at 1313 ("In 'the fields of medicine and public health . . . information can save lives.'" (alteration in original) (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011))).[22] Threatened criminal prosecution for speaking about legal out-of-state abortion options is not an "incidental burden" on Plaintiffs' professional speech, *see* MTD at 26–27, but rather a direct restriction on Plaintiffs', and other medical professionals', ability to provide constitutionally protected medical information, counseling, and recommendations to their patients. *Wollschlaeger*, 848 F.3d at 1308 (rejecting state's argument that the First Amendment "is not implicated because any effect on speech is merely incidental to the regulation of professional conduct," noting that "[s]aying that restrictions on speaking and writing are merely incidental to speech is like saying that limitations on walking and running are merely incidental to ambulation"). Accordingly, because the speech here is fully protected by the First Amendment, and because criminalizing such speech does not further any legitimate, let alone compelling, state interest, Plaintiffs have more than adequately stated a claim that the application of the Alabama Criminal Laws in this context is unconstitutional.[23]

---

[22] Indeed, Defendant's own rationale reinforces importance of providing patients with such information here; if Defendant is genuinely concerned with protecting maternal health outside Alabama, *see, e.g.*, MTD at 5, 12, 31, then one would think that he would want to ensure that the pregnant Alabamians he concedes are free to leave the state for abortion receive guidance from trusted medical experts and health professionals about the safest, highest-quality places to obtain such care. It is telling that he does not.

[23] Even if Defendant could demonstrate a compelling interest, he cannot prove that prohibiting protected speech is the least restrictive means of furthering *any* purported interest, when other less restrictive means,

**IV.    Application of the Alabama Criminal Laws to Plaintiffs AWC and Dr. Robinson Violates the Fundamental Right to Travel.**

Plaintiffs' extensive allegations undoubtedly state a claim that application of the Alabama Criminal Laws to individuals, including Plaintiffs AWC and Dr. Robinson, for providing assistance to pregnant Alabamians to facilitate their travel across state lines to obtain legal abortion care violates Plaintiffs' patients' fundamental right to travel.[24] "[T]he nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." *Saenz v. Roe*, 526 U.S. 489, 499 (1999) (quoting *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969), *overruled in part on other grounds in Edelman v. Jordan*, 415 U.S. 651 (1974)). The Constitution therefore protects the fundamental right of individuals to "travel freely" among the states. *Id.* at 500–01.

This right to travel, which has been "firmly established" and "repeatedly recognized" in Supreme Court jurisprudence, is so "fundamental" and "elementary" that it "was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created." *United States v. Guest*, 383 U.S. 745, 757–58 (1966); *see also Shapiro*, 394 U.S. at 638.[25] Free

---

including counterspeech, are readily available. *See Bigelow*, 421 U.S. at 824 (noting that a state may "seek to disseminate information so as to enable its citizens to make better informed decisions when they leave"); *United States v. Alvarez*, 567 U.S. 709, 726 (2012) ("The Government has not shown, and cannot show, why counterspeech would not suffice to achieve its interest.").

[24] Plaintiffs do not claim that the threatened prosecution infringes their own or their staff's right to travel— only their patients', which, as discussed above, they have standing to assert. Accordingly, Plaintiffs do not respond directly to Defendant's argument that they have failed to state a claim that their own or their staff's right to travel has been violated. *See* MTD at 31–36.

[25] The Supreme Court has not identified any one, specific constitutional provision from which the right to travel emanates, *see Saenz*, 526 U.S. at 501; *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 902–03 (1986) (plurality opinion), and this court need not do so here. Whatever its source, there has been an "unquestioned historical acceptance of the principle of free interstate migration," *Soto-Lopez*, 476 U.S. at 902, the existence and fundamental nature of which is "firmly embedded in [federal] jurisprudence," *Saenz*, 526 U.S. at 498. The right to interstate travel is consistent with the sort of fundamental rights of national

interstate movement is central to our system of federalism, and to "national citizenship" and "national unity," *Edwards*, 314 U.S. at 181 (Douglas, J., concurring), because it plays an essential role in binding the citizens of the several states together and preserving the core principle that "[t]he people of these United States constitute one nation." *Crandall*, 73 U.S. at 43. The fundamental freedom of interstate movement also plays the important role of ensuring that individuals can "seek[] new horizons in other states" and experience what other jurisdictions have to offer. *Edwards*, 314 U.S. at 181 (Douglas, J., concurring); *see also Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 902 (1986) (plurality opinion) (noting "the important role [the right to travel] has played in transforming many States into a single Nation"). Indeed, the Supreme Court's discussion of the right in *Crandall* makes clear that it protects more than just mere physical movement across state lines—it protects this movement in part *because* it is undertaken in order to *do certain things* in the destination state. *See* 73 U.S. at 44 (noting that a citizen's right to, *inter alia*, assert claims upon and transact business with government, to access seaports, sub-treasuries, land and revenue offices, and courts of justices, cannot be made to depend on "the will of any State over whose soil he must pass in the exercise of it.").[26] State action that inhibits or restricts the free

---

citizenship recognized and protected by the Privileges or Immunities Clause of the Fourteenth Amendment, *see, e.g.*, *Twining v. New Jersey*, 211 U.S. 78, 97 (1908) (Clause protects rights that "arise out of the nature and essential character of the national government," including "the right to pass freely from state to state"), *overruled in part on other grounds by Malloy v. Hogan*, 378 U.S. 97 (1964); *Edwards*, 314 U.S. at 181 (Douglas, J., concurring) ("The conclusion that the right of free movement is a right of national citizenship stands on firm historical ground."); *Crandall*, 73 U.S. at 48–49 (as "citizens of the United States," individuals "must have the right to pass and repass through every part of it without interruption"). It has also at times been attributed to the Privileges and Immunities Clause of Article IV, the Commerce Clause, and "the federal structure of government adopted by our Constitution," *Soto-Lopez*, 476 U.S. at 902.

[26] *See also* Seth F. Kreimer, *Lines in the Sand: The Importance of Borders in American Federalism*, 150 U. Pa. L. Rev. 973, 1007 (2002) ("If our bodies can move among states, but our freedom of action is tied to our place of origin, then the 'right to travel' becomes a hollow shell."); Laurence H. Tribe, *Saenz Sans Prophecy: Does the Privileges or Immunities Revival Portend the Future—or Reveal the Structure of the Present?*, 113 Harv. L. Rev. 110, 152 (1999) ("If each state could decide for itself . . . how much of its legal system its citizens would carry around on their backs while seeking to take advantage of the legal environments of other states, then the right to choose which state to enter for any purpose lawful in that

interstate movement of their citizens interferes with this national project, "enabl[ing] [States] to defeat the purposes for which the [national] government was established," a power states "very clearly do not possess." *Id.* at 44, 49. As such, it is unconstitutional for a state to attempt to "isolate itself" from the rest of Union "by restraining the transportation of persons and property across its borders." *Edwards*, 314 U.S. at 173; *Saenz*, 526 U.S. at 499 (stating that states may not "unreasonably burden . . . [interstate] movement").

The Alabama Criminal Laws, if applied to criminalize speech and conduct intended to assist Alabamians in traveling out of state for legal medical care, as Defendant has threatened, contravene foundational principles of federalism and violate the Constitution. Defendant acknowledges that Alabama does not prohibit pregnant people from leaving the state for abortion care, MTD at 30, nor could it, constitutionally. *See supra* note 14; *see also Dobbs*, 142 S. Ct. at 2309 (Kavanaugh, J., concurring) ("[B]ased on the constitutional right to interstate travel," a state may not "bar a resident of that State from traveling to another State to obtain an abortion."). However, by recognizing the right of pregnant Alabamians to travel for lawful abortions, but wielding the Alabama Criminal Laws against anyone who would assist that pregnant person in traveling, Defendant's attempt to do indirectly what Alabama may not do directly runs equally afoul of the Constitution and Supreme Court precedent. This is so for two reasons.

First, it is clear from the face of his threat that Defendant's predominant purpose is to chill pregnant Alabamians' exercise of their right to travel by depriving them of the assistance they may need to travel out of state to obtain lawful abortion care. Such a purpose is "patently unconstitutional." *See Saenz*, 526 U.S. at 499 n.11 ("If a law has no other purpose . . . than to chill

---

state would amount to nothing more than the right to have the physical environment of the states of one's choosing pass before one's eyes . . . . Surely, however, more than that is involved in the right of interstate mobility that follows from the basic structure of our federal Union.").

the assertion of constitutional rights by penalizing those who choose to exercise them, then it [is] patently unconstitutional." (alterations in original)); *Shapiro*, 394 U.S. at 631 (same); *Soto-Lopez*, 476 U.S. at 903 (laws that have "impeding travel [as a] primary objective" violate the right to travel); *Edwards*, 314 U.S. at 174 (looking to "express purpose" of prohibiting travel); *cf. Guest*, 383 U.S. at 760 (finding potential conspiracy against federal rights under 18 U.S.C. § 241 where "*predominant purpose* of the conspiracy is to impede or prevent the exercise of the right of interstate travel, or to oppress a person because of his exercise of that right").

Any attempt to distract from this by arguing that the use of criminal laws to inhibit travel is intended instead to further state interests in protecting fetal life or maternal health, *see* MTD at 31, 36, is unavailing. Alabama has already "advance[d]" those alleged interests within its own borders by banning abortion in the state. *See id.* at 5. As such, the only remaining way to further achieve those goals is to inhibit the ability of state residents to *leave* Alabama to access abortion care where it is legal as well—directly penalizing travel. It thus follows that the *immediate* and *primary* purpose of Defendant's threat can only be to "impede or prevent the exercise of the right of interstate travel." *Guest*, 383 U.S. at 760; *see also Edwards*, 314 U.S. at 174 (concluding that the "express purpose" of California law criminalizing bringing an indigent person into California was "to prohibit the transportation of indigent persons across the California border," even where the State claimed the law combatted problems of health, morals, and finance). As Plaintiffs' well-pled allegations and Defendant's own Motion illustrate, Defendant has not been shy about admitting that this is his objective. Compl. ¶¶ 32–33; *see also generally* MTD.

Second, the Supreme Court has made clear that, outside of certain inapplicable exceptions, *see, e.g.*, *infra*, states cannot constitutionally do what Defendant is attempting to do here—namely, penalize the exercise of the constitutional right to travel by imposing sanctions upon those who

45

assist another person in their attempt to enter or leave another state. *See Edwards*, 314 U.S. at 167; *Crandall*, 73 U.S. at 48–49; *see also Soto-Lopez*, 476 U.S. at 903 (laws that "penalize the exercise of that right" impermissibly burden right to travel). Indeed, the Supreme Court's decision in *Edwards v. California* is directly on point. In *Edwards*, the Supreme Court unanimously struck down as unconstitutional a California law that—exactly like Defendant has threatened to do here—imposed criminal liability on those who would facilitate another person's interstate travel.[27] In that case, the defendant brought his brother-in-law from Texas to California and was charged with violating a California law that made it a misdemeanor for anyone to "bring[] or assist[] in bringing into the State any indigent person who is not a resident." 314 U.S. at 171. Although the Court recognized California's interest in addressing "grave" and "staggering" concerns involving health, morals, and finance caused by migration into the state, the Court nonetheless held that the State's chosen mechanism—burdening interstate travel—exceeded the "boundaries [of] permissible . . . State legislative activity." *Id.* at 173. The Court explained that, among the limitations on state authority imposed by the Constitution, "none is more certain than the prohibition against attempts on the part of any single State to isolate itself" and its residents from the rest of the Union "by restraining the transportation of persons and property across its borders." *Id.*

Yet that is exactly the situation here. Just like California in *Edwards*, Defendant is attempting to impose criminal liability on those who would "assist[] in bringing" a pregnant person across state lines for abortion care. *Id.* at 171. Defendant's acknowledgment that Alabama law does not restrict individuals *themselves* from driving across state lines and seeking an abortion in

---

[27] The majority in *Edwards* relied on the Commerce Clause as the basis of its holding. As noted, *supra* n. 25, the Commerce Clause is one of the textual sources that the Court has on occasion identified as a basis for the fundamental right to travel, *see, e.g.*, *Soto-Lopez*, 476 U.S. at 902, and, as the Supreme Court later confirmed in *Saenz*, the *Edwards* decision "vindicated" the constitutional right to travel, *Saenz*, 526 U.S. at 500.

another place, MTD at 30, and the concomitant fact that some pregnant people may therefore theoretically be able do so without Plaintiffs' assistance, is irrelevant. The same was true in *Edwards*, but the fact that an indigent person could have theoretically entered California without assistance was of no moment in the Court's constitutional analysis; the Court still found that by criminalizing anyone who would *assist* in that travel, as well as the traveler themselves, California's statute unconstitutionally penalized interstate movement. So too here.

Indeed, even less severe, non-criminal penalties on interstate travel have been held unconstitutional when they penalize cross-state travel, regardless of whether they create an insurmountable barrier. For example, in *Crandall*, the Supreme Court struck down a Nevada law that imposed a $1 tax on railroad and stagecoach companies for every passenger carried out of the state. 73 U.S. 35. The Court first rejected Nevada's argument that this was "not a tax upon the passenger, but upon the business of the carrier who transports him," *id.* at 39, concluding that the "burden evidently falls upon the passenger," and that the law was therefore in effect imposing a "tax upon the passenger for the privilege of leaving the State, or passing through it by the ordinary mode of passenger travel," *id.* at 40. The Court emphasized that such a tax—irrespective of whether it actually prevented individuals from traveling—exceeded constitutional limitations on state power because it interfered with the rights of national citizens as "members of the same community . . . to pass and repass through every part of [the United States] without interruption . . . freely." *Id.* at 48–49 (quoting *Passenger Cases*, 48 U.S. (7. How.) 283, 492 (1849) (Taney, C.J., dissenting)). If the small monetary tax in *Crandall* violates the Constitution, so too must Defendant's threats to impose *criminal liability* on Plaintiffs here. *See Edwards*, 314 U.S. at

181 (Douglas, J., concurring) ("If a state tax on that movement, as in the *Crandall* case, is invalid, a fortiori a state statute which obstructs or in substance prevents that movement must fall.").[28]

Defendant ignores this controlling precedent. Instead, he posits that this matter is governed by cases under which often minor, incidental burdens on one's ability to travel are subject only to rationality review because they do not meaningfully implicate the right to travel. MTD at 30–31. These cases include challenges to, *e.g.*, notification and registration requirements for sex offenders, like those at issue in *Doe v. Moore*, 410 F.3d 1337, 1348 (11th Cir. 2005), and *United States v. Simington*, No. EP-10-CR-2275-KC, 2011 WL 145326, at *9 (W.D. Tex. 2011), *see* MTD at 28–29, 31; laws that impose security screening requirements at airports, *see, e.g.*, *id.* at 31 (citing *Gilmore v. Gonzales*, 435 F.3d 1125, 1136 (9th Cir. 2006)); restrictions placed on the use of certain airports that have the effect of making a preferred method of airline travel "less convenient" for certain passengers, *id.* at 28, 30 (citing *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991)); and conventional traffic regulations like traffic lights, speed limits, license and registration requirements, and toll roads that affect travel by car, *see id.* at 30–31 (quoting *Cramer*, 931 F.2d at 1030). Central to the courts' reasoning in these cases was the determination that any impact on travel amounted to no more than routine delays and inconveniences or affected only a single mode

---

[28] Defendant cites *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 277 (1993) in claiming that the right to travel only prevents states from imposing "actual barriers" on travel. *See* MTD at 28, 35. To the extent Defendant means to suggest that Plaintiffs must show that their patients are prevented from traveling to prevail on their claim, this is belied by *Crandall*, *Edwards*, and a multitude of other Supreme Court cases confirming that Plaintiffs may prove a violation of the right to travel claim without showing actual deterrence, let alone outright prevention. *See, e.g.*, *Soto-Lopez*, 476 U.S. at 903 (state action can violate the right to travel in multiple ways, including "when impeding travel is its primary objective."). Moreover, *Bray* is inapposite because (1) it concerned private (not state) conspiracies to interfere with the right to travel, premised on application of 42 U.S.C. § 1985(3), *Bray*, 506 U.S. at 275; (2) the court determined that § 1985(3) did not apply because, *inter alia*, petitioners did not have the requisite intention or purpose of impeding travel under the statute, *id.* at 275–76, and (3) (perhaps most importantly) the petitioners' proposed demonstrations did not even implicate the right to travel because any incidental restriction was only on *intra*state travel, not *inter*state travel. In any event, Plaintiffs have adequately alleged the existence of "actual barriers" here, as—unlike the protests in *Bray*—Defendant's threats are actually depriving patients of assistance needed to cross state lines in order to access time-sensitive care. Compl. ¶¶ 102–116.

or preferred method of travel, leaving alternative routes open. This is a far cry from the draconian criminal penalties Plaintiffs are threatened with here for assisting with *any* and *all* forms of interstate travel for abortion. *See Edwards*, 314 U.S. at 173 (criminal penalties on travel-related assistance impermissibly "restrain[]" right to travel).[29]

In addition, Defendant's cases do not apply because, unlike the threatened prosecutions here, the impact on travel was ancillary to the non-travel-related purposes that the policies at issue were designed to serve. Laws like sex offender security protocols and rules regarding air travel *regulate* travel but are not primarily aimed at impeding travel itself.[30] By contrast, Defendant here has threatened to impose criminal penalties on anyone who would assist residents in travelling across state lines precisely *because* they have assisted in that travel, for the *purpose* of inhibiting that travel, just like the law at issue in *Edwards*. And the Supreme Court in *Edwards* certainly did not impose a test of "reasonableness." MTD at 31. Rather, the *Edwards* Court looked at whether the law in question utilized the impermissible mechanism of penalizing interstate travel, and found that, because it did, it violated the fundamental right, regardless of whether the law also accomplished otherwise-legitimate objectives. 314 U.S. at 173 (restraining cross-border

---

[29] *Matsuo v. United States*, 586 F.3d 1180, 1183 (9th Cir. 2009), MTD at 30, is even further afield, as it did not even involve a *state* restriction on interstate travel. The Ninth Circuit's decision there was not, as Defendant implies, premised on a conclusion that the law imposed no burden on the right to travel, but rather on the basis that "states [weren't] involved," and that the Supreme Court's precedent on right to travel invoked by the plaintiffs—namely, *Saenz*—does not provide any right to "be[] provided with the same *federal* benefits after moving." *Matsuo*, 586 F.3d at 1184. Moreover, any incidental burden on travel that flows from the loss of a financial employment benefit obtained by virtue of residing in certain states, as was at issue in *Matsuo*, is a far cry from the direct criminal penalties at issue here.

[30] *See, e.g.*, *Doe*, 410 F.3d at 1348 (primary purpose to prevent sex offenders from legally subverting the purpose of the Sex Offender Act by temporarily traveling to other jurisdictions for long periods, where they might commit sex offenses, without having to notify law enforcement); *Simington*, 2011 WL 145326, at *10 (purpose of law to "prevent[] future sex crimes"); *Cramer*, 931 F.2d at 1031 ("[T]he statute's history shows that its purpose was not to impede travel but to carry out an agreement thought necessary to benefit the region's travelers by consolidating service."); *Gilmore*, 435 F.3d at 1131 n.4 (airline passenger identification requirement intended to "protect transportation security").

transportation exceeded the "boundaries [of] permissible . . . State legislative activity," despite other interests served).[31]

To be sure, the right to travel is not absolute, and the Supreme Court has carved out certain exceptions wherein penalties on travel are permitted. For example, as Defendant notes, in *Jones v. Helms*, MTD at 35, the Supreme Court held that there was no right-to-travel violation in a Georgia law that imposed an aggravated penalty on "a felony if a resident offender leaves the State after committing the offense." 452 U.S. 412, 422 (1981). The Court concluded that if a resident commits a crime and then flees the jurisdiction, the state may criminalize "the entire sequence of events, from the initial offense to departure." *Id.* at 422–23. *Jones*, however, merely stands for the unremarkable proposition that a state can prevent an individual who has committed a crime within its jurisdiction from fleeing, or punish them for doing so, without violating the right to travel.[32] This "fleeing felon" exception, and other narrow exceptions under which courts have permitted penalties on travel, have no bearing here[33]; indeed, Plaintiffs are aware of no case in which a court

---

[31] It is of no moment that Alabama asserts other interests, like protecting fetal life, that might be served by prohibiting Alabama residents from traveling out of state for abortion. If California's exceedingly reasonable (if not compelling) interests in preventing "grave and perplexing" problems of health, morals and finance allegedly created by an influx of migrants into the state during the Depression could not save the statue in *Edwards*, 314 U.S. at 173, Alabama's interests cannot save the near-identical threat here.

[32] Moreover, *Jones* did not create a rational basis test for all violations of the right to travel premised on preventing those merely *alleged* to have committed a crime from leaving the state. MTD at 36. Rather, *Jones* simply held that when it comes to the state's interest in preventing *convicted* criminals (whose right to travel is qualified by the fact that they have committed offenses punishable by imprisonment) from departing the state, where the departure would aggravate the consequences of the criminal conduct already punishable, "a restriction [on travel] that is rationally related to the [criminal] offense itself—either to the procedure for ascertaining guilt or innocence, or to the imposition of a proper punishment or remedy—must be within the State's power. *Jones*, 452 U.S. at 421–22.

[33] Defendant invokes the "fleeing felon" exception only in responding to Yellowhammer's claimed violation of *its* right to travel (not to Plaintiffs' claimed violation of their *patients'* right, which—as noted above—is the only claim they bring), *see* MTD at 35–36. Nevertheless, it bears repeating that (1) because the Alabama Criminal Laws require that any conspiracy (or solicitation or aiding and abetting) have as its object something that is actually a *crime or offense*, and (2) because abortion (the intended "object" of the alleged conspiracy here) is legal where it occurs and is not and cannot be criminalized by Alabama, there

has endorsed a state's attempt to criminalize travel to engage in conduct that is expressly lawful where it occurs. *See, e.g.*, *BMW of N. Am.*, 517 U.S. at 573 (states lack authority to "impose sanctions . . . in order to deter conduct that is *lawful* in other jurisdictions").

*    *    *

In sum, Plaintiffs well-pled allegations are more than sufficient to state a claim that, by threatening to apply the Alabama Criminal Laws against anyone who would assist Alabamians in traveling to and accessing lawful abortion services in a sister state, Defendant seeks to effectively nullify the existence of those alternative legal environments within the United States for residents of Alabama, and, in so doing, violates the right to travel. Interfering with interstate travel in this way threatens to upend and disrupt the interstate comity, national unity, and respect for co-equal sovereignty on which our system of federalism depends. *Cf., e.g.*, *Bigelow*, 421 U.S. at 824 (states do "not acquire power or supervision over the internal affairs of another State merely because the welfare and health of [their] own citizens may be affected when they travel to that State"); *DJR Assocs., LLC v. Hammonds*, 241 F. Supp. 3d 1208, 1233 (N.D. Ala. 2017) ("[I]n a federal system, Alabama does not have the right to insist that its view of proper . . . policy be enforced . . . with respect to conduct occurring entirely in another state, particularly where Alabama's policy choices conflict with those of another state.").

If Defendant is permitted to use the Alabama Criminal Laws to prosecute Plaintiffs and

---

is simply no crime of conspiracy (or solicitation or aiding or abetting) that *anyone* could have committed in Alabama (and thus could be said to be fleeing from by crossing state lines). As to other exceptions, courts have, in limited cases, upheld *federal* statutes that target interstate travel or use of interstate facilities for unlawful purposes, but because these cases were predicated on *Congress*'s exclusive, plenary power to regulate interstate commerce, they provide no support for Defendant's threatened application of *state* criminal laws in the unconstitutional manner contemplated here. Courts have also found laws that prohibit interstate travel for purposes that are criminalized *both* in *and* out of state to be permissible in certain circumstances; indeed, that would be the case with Defendant's example of conspiracy to commit kidnapping, *id.* at 34, which—as Defendant acknowledges—"most states criminalize." But that is not how Defendant purports to apply the Alabama Criminal Laws here, *see supra* Section II.

others for facilitating Alabamians' ability to access lawful abortion care out of state, there is nothing to prevent other states from following suit to try to inhibit travel for reasons that one state's policy disfavors and another state's policy protects. For example, a state could criminalize the travel agent that arranges a car service to take residents out of state to gamble at a casino, or the uncle who invites his nephew for a visit to lawfully hunt animals that the nephew's home state (but not the uncle's state) defines as a protected species.[34] Such a patchwork of state restrictions on disfavored travel would dangerously undermine the central principle that "[t]he people of these United States constitute one nation," *Crandall*, 73 U.S. at 43, and must "be free to travel throughout the length and breadth of our land uninhibited," *Saenz*, 526 U.S. at 499; *see also Soto-Lopez*, 476 U.S. at 902; *Edwards*, 314 U.S. at 181 (Douglas, J., concurring). The ability of a state to "isolate" itself and its residents from the rest of the nation in this manner, *Edwards*, 314 U.S. at 173, and to thereby "defeat the purposes for which the [national] government" and national citizenship were established, is a power that individual states "very clearly do not possess," *Crandall*, 73 U.S. at 44, 49. Because Plaintiffs have more than adequately stated a right to travel claim, Defendant's request to dismiss this claim must be denied.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendant's Motion to Dismiss in its entirety.

Dated: September 28, 2023

---

[34] *Compare, e.g.*, California Protected Wildlife Act, Cal. Fish & Game Code §§ 2070 (establishing endangered species); 2080 (prohibiting importation, exportation, taking, possession, purchase, or sale of endangered or threatened species), *and* Cal. Dep't Fish & Wildlife, *Mountain Lions in California*, https://wildlife.ca.gov/Conservation/Mammals/Mountain-Lion#562331244-can-mountain-lions-be-hunted-in-california, *with* Wyo. Stat. Ann. §§ 23-1-101(a)(xii)(A) (defining mountain lions as "trophy game animal"); 23-1-302(a)(ii) (permitting hunting of trophy animals in state-established zones), https://mountainlion.org/us/wyoming/.

Respectfully submitted,

Meagan Burrows*
New York State Bar No. 5341904
Alexa Kolbi-Molinas*
New York State Bar No. 4477519
Lindsey Kaley*
New York State Bar No. 5324983
Scarlet Kim*
New York State Bar No. 5025952
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
mburrows@aclu.org
akolbi-molinas@aclu.org
lkaley@aclu.org
scarletk@aclu.org

Lorie Chaiten*
Illinois State Bar No. 6191424
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
1640 North Sedgwick
Chicago, IL 60614
(212) 549-2633
lchaiten@aclu.org

Alison Mollman
Alabama State Bar No. 8397-A33C
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(334) 265-1747
(334) 265-2754
amollman@aclualabama.org

*Attorneys for Plaintiffs*

*Admitted pro hac vice*

53

## <u>CERTIFICATE OF SERVICE</u>

I, Meagan Burrows, do hereby certify that a true and correct copy of the foregoing document was filed using the Court's CM/ECF system on this 28th day of September 2023, which will serve all counsel of record.

_____
Meagan Burrows