# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | | |
|---|---|---|
| YELLOWHAMMER FUND, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 2:23-cv-00450-MHT-KFP |
| STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama, | ) ) ) | |
| | ) | |
| *Defendant*. | ) | |

| | | |
|---|---|---|
| WEST ALABAMA WOMEN'S CENTER, *et al.*, | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2:23-cv-00450-MHT-KFP |
| | ) | |
| STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama, | ) ) ) | |
| | ) | |
| *Defendant*. | ) | |

## REPLY IN SUPPORT OF MOTION TO DISMISS

# TABLE OF CONTENTS

I.      Plaintiffs Lack Third-Party Standing. .........................................................3

   A.      Plaintiffs Yellowhammer, AWC, and Dr. Robinson Lack Third-Party
       Standing to Sue on Behalf of Their Clients. ..............................................6

   B.      The West Alabama Plaintiffs Lack Third-Party Standing to Sue on
       Behalf of Their Staff. ...............................................................................10

II.     Abortion's Legality in Other States Remains Immaterial. .........................11

III.    Yellowhammer's Extraterritorial Due Process Claim Fails.......................16

IV.     The West Alabama Plaintiffs' Fair-Notice Due Process Claim Fails........21

V.      The First Amendment Does Not Protect Criminal Conduct.....................26

VI.     Yellowhammer Has Not Sufficiently Pleaded an Overbreadth Claim, But
      It Fails on the Merits Regardless..................................................................33

VII.   Alabama Law Does Not Violate the Right to Travel.................................35

   A. Yellowhammer Does Not Have a Right to Travel.......................................36

   B.   Enforcing the Relevant Alabama Statutes Does Not Violate the Right to
      Travel.........................................................................................................38

Conclusion ...........................................................................................................45

Certificate of Service ...........................................................................................47

## REPLY IN SUPPORT OF MOTION TO DISMISS

Plaintiffs insist that Alabama's Criminal Code does not mean what it says, and that if it does, then it must somehow violate the Constitution. But the Due Process Clause does not compel the Attorney General to adopt Plaintiffs' strained interpretation of Alabama's conspiracy laws. Enforcement of those statutes' plain language is consistent with the Constitution and a sovereign's right to police conduct that occurs within its borders.

The legality of elective abortions in other jurisdictions does not affect whether Alabama law prohibits them; the Human Life Protection Act plainly does. *See* ALA. CODE § 26-23H-1, *et seq.* And the plain language of Alabama Code § 13A-4-4 criminalizes conspiring to commit "an act beyond the state" (not necessarily "a crime"), which "would be a criminal offense" "if done in [Alabama]." Nonetheless, the West Alabama Plaintiffs argue that abortion facilitators lack "fair notice" that conspiring to procure an out-of-state abortion constitutes a crime. Yellowhammer advances a different faulty due process theory—arguing that prosecuting conspiracies in Alabama *actually* constitutes extraterritorial application of State law.

Both sets of Plaintiffs then deny that forming a criminal conspiracy is a "course of conduct" that may be punished under the First Amendment. But Attorney General Marshall's interpretation of § 13A-4-4 is the best reading of the statute— and at a minimum could be anticipated by anyone reading the statute. Plaintiffs'

extraterritoriality and free speech claims thus also fail because prosecuting criminal agreements formed in one's jurisdiction does not involve extraterritorial application and criminal conspiracies are not protected speech.

Finally, Plaintiffs rely on the implicit constitutional right to travel but lack standing to sue on behalf of pregnant women who call them to inquire about abortions. Moreover, because an organization does not possess the right to travel, Yellowhammer cannot advance a right to travel claim on behalf of itself. And even assuming that the former abortion providers and so-called abortion "helpers" have third-party standing and that non-natural persons have the right to travel (which are big assumptions), their claims fail for the simple reason that the implicit right to travel does not protect one's ability to conspire *in Alabama* to do elsewhere what Alabama prohibits.

Ultimately, Plaintiffs cannot find constitutional law to establish that the permissive criminal code of one State dictates how another State may enforce its own code—because such precedent does not exist. Instead, it is Plaintiffs who seek to violate the "basic principle of federalism" "that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) Accordingly, Plaintiffs' lawsuits should be dismissed in full for failure to state a claim.

## I.   Plaintiffs Lack Third-Party Standing.[1]

The standing inquiry here does not end merely because "Defendant does not contest that Dr. Robinson has standing to assert her own speech and due process rights[,]" doc. 34 at 20.[2] Rather, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (cleaned up). Of course, Dr. Robinson's first-party standing as to two of the West Alabama Plaintiffs' three claims does nothing for the third claim or for the entirety of the non-overlapping claims and relief sought in Yellowhammer's Complaint (and vice versa for Yellowhammer's first-party standing). And any of the Plaintiffs' first-party standing does not allow Plaintiffs to obtain relief premised on third-party injuries that they aren't entitled to assert. Lastly, this standing inquiry affects the scope of relief available.

As an initial matter, much of Plaintiffs' opposition to Attorney General Marshall's third-party standing arguments relies on *June Medical Services L.L.C. v.*

---

[1] At this time, Defendant is not contesting Plaintiffs' first-party Article III standing generally. When Attorney General Marshall argued that "the organizational Plaintiffs cannot claim injury based on the notion that they are subject to enforcement of the threatened laws" because the relevant statutes here do not provide for corporate liability, doc. 28 at 11 (cleaned up), he was arguing just that. That said, there is nothing inconsistent, *contra* doc. 33 at 17–18 n.3, about saying that a corporation is not itself subject to criminal prosecution while explaining that Plaintiffs' staff (who, bar Dr. Robinson, are not parties to this lawsuit) can still be held accountable for their own criminal acts.

[2] All citations to Plaintiffs' Responses correspond to the pagination in the ECF header.

*Russo*, 140 S. Ct. 2103 (2020), and related cases, which Plaintiffs barely seem to acknowledge aren't good law after *Dobbs*. The Supreme Court in *Dobbs*—after citing *June Medical* and other abortion-related cases in the previous paragraph— articulated that "[t]he Court's abortion cases . . . . have ignored the Court's third-party standing doctrine." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2275 & n.61 (2022). *Dobbs* then cites *Warth v. Seldin*, 422 U.S. 490 (1975), and the dissents in *June Medical* as the "third-party standing doctrine" that abortion-related cases like *June Medical* ignored. *Id.* Plaintiffs thus cannot rely on the cases that *ignore* third-party standing doctrine to supply the standard for their third-party standing here. Sure, "*Dobbs* did not also rule that third-party standing cannot exist in the abortion context[,]" doc. 33 at 20 n.4, but it persuasively indicates that a warped variant of third-party standing that enabled abortion providers to assert women's right to abortion should not be *extended* to confer third-party standing on *former* abortion providers and abortion funders when the right to abortion no longer exists. *See* doc. 28 at 10 n.3.

Neither can *Craig v. Boren*, 429 U.S. 190 (1976), serve as a basis for the organizational Plaintiffs' exercising third-party standing. There, an Oklahoma statute prohibited the sale of certain beer in a way that discriminated on the basis of sex. *See generally* 429 U.S. at 191–92. Two plaintiffs sued—"Craig, a male between 18 and 21 years of age" who could not purchase the beer and "Whitener, a licensed

4

vendor of 3.2% beer." *Id.* at 192. Craig's claim became moot sometime after the Supreme Court exercised jurisdiction when he turned twenty-one, so the question became whether Whitener could rely on Craig's equal-protection objections. *Id.* at 192–93. The Court concluded that she could because "[t]he legal duties created by the statutory sections under challenge are addressed directly to vendors such as appellant."[3] But Ala. Code § 13A-4-4 is a general statute not addressed directly to Plaintiffs, and the organizational Plaintiffs cannot even be held liable because the statute does not provide for corporate liability. Thus, *Craig* and other similar cases that depend on the party asserting third-party standing being the subject of the regulation, do not help the organizational Plaintiffs either. *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) ("And in several cases, this Court has allowed standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." (cleaned up) (quoting *Warth*, 422 U.S. at 510) (citing *Craig*, 429 U.S. 190)).

---

[3] *Craig* is distinguishable for at least two other reasons. First, Oklahoma never objected to "Whitener's reliance upon the claimed unequal treatment of 19-20-year-old males as the premise of her equal protection challenge[,]" 429 U.S. at 193, whereas Attorney General Marshall contests Plaintiffs' ability to rely on third-party rights. Second, the Court based its decision in part on "the lower court already ha[ving] entertained the relevant constitutional challenge[,]" which made it inefficient to "forgo consideration of the constitutional merits in order to await the initiation of a new challenge to the statute by injured third parties[.]" *Id.* at 193–94. That consideration is not relevant here.

**A.    Plaintiffs Yellowhammer, AWC, and Dr. Robinson[4] Lack Third-Party Standing to Sue on Behalf of Their Clients.**

As Attorney General Marshall stated in his Motion, *see* doc. 28 at 11–14, Plaintiffs cannot satisfy the third-party standing requirements, *see Powers v. Ohio*, 499 U.S. 400, 411 (1991), as to their clients for three reasons. Plaintiffs' responses do not affect that conclusion.

*First*, Plaintiffs (including Yellowhammer) have a potential conflict of interest with their clients. "[T]hird-party standing is not appropriate where there is a potential conflict of interest between the plaintiff and third party." *June Med.*, 140 S. Ct. at 2167 (Alito, J., dissenting); *id.* at 2174 (Gorsuch, J., dissenting). Plaintiffs fail to engage with Justice Alito's point "that a regulated party [should not be able to] invoke the right of a third party for the purpose of attacking legislation enacted to protect the third party[,]" *id.* at 2153, which the State's abortion laws do here, *see* doc. 28 at 5–6. Plaintiffs instead appeal to *ipse dixit* that their interests are necessarily perfectly aligned with those of every client merely because such clients may ask about obtaining an abortion. *See* doc. 33 at 22. And regardless of whether Plaintiffs actually receive direct benefits from facilitating out-of-state abortions, their existence as organizations is at least in part based on soliciting donations as abortion

---

[4] West Alabama Women's Center does not assert any claims on behalf of its clients. Doc. 34 at 25 n.11.

facilitators. *See, e.g.*, https://action.yellowhammerfund.org/onlineactions/ VJwyf79UF0yW0qhFnyakGw2 (last visited Oct. 12, 2023) (asking for donations "to support reproductive justice in Alabama" and explaining that "Yellowhammer Fund is an *abortion advocacy* and reproductive justice organization providing services in the Deep South." (emphasis added)).

*Next*, Plaintiffs lack a close relationship with women seeking abortions. Yellowhammer argues that "[i]t is difficult to imagine a situation in which the interests between the litigant and the third party could be more aligned" while distancing itself from such a situation: Justice Gorsuch's point in his dissent in *June Medical* that the types of implicated relationships are like those between parents and children. *See* doc. 33 at 21. The relationship Yellowhammer alleges is nothing close to that of a parent and child: it "receives approximately five to ten calls a week from people who need abortion funding" and then informs them that it cannot provide financial support or refer them, doc. 1 ¶ 47 (cited by doc. 33 at 23, 24); *id.* ¶ 68. That abstract series of one-off telephone connections, absent allegations of any pre- or post-existing relationship with these women, does not demonstrate that Yellowhammer's interests "are so aligned with those of a [woman calling about abortion access] that the litigation will proceed in much the same way as if [the woman] herself were present[,]" *June Medical*, 140 S. Ct. at 2174 (Gorsuch, J., dissenting).

The West Alabama Plaintiffs[5] appeal to the supposed closeness of the doctor–patient relationship, doc. 34 at 27, but "a woman who obtains an abortion typically does not develop a close relationship with the doctor who performs the procedure[,]" *June Medical*, 140 S. Ct. at 2168 (Alito, J., dissenting); *see* ALA. CODE §§ 26-23A-2, 26-23E-2. The West Alabama Plaintiffs cite numerous paragraphs in their complaint in support of their argument that the relationship is close because the patients "rely on them to provide counseling and information[,]" doc. 34 at 27–28, but to the extent that these "patients" are just the "75-85 individuals per week" whom "Plaintiffs collectively receive calls or inquiries about out-of-state abortion options[,]" doc. 24 ¶ 102, these relationships are not any different than the one-off interactions that Yellowhammer alleges. Thus, no Plaintiffs have established the requisite close relationship.[6]

---

[5] Paradoxically, "only Plaintiffs AWC and Dr. Robinson"—*not* WAWC—bring a right-to-travel claim on behalf of their patients. Doc. 34 at 25 n.11. The West Alabama Plaintiffs provide no explanation as to why one materially similar former abortion provider in Alabama asserts third-party standing while the other does not. *See, e.g.*, doc. 23 ¶ 77 (referring to the "approximately 30 individuals per week" who call WAWC about out-of-state abortion options).

[6] Attorney General Marshall does not dispute that the Supreme Court's "third-party standing cases have gone far astray[,]" leading to "granting third-party standing in a number of cases to litigants whose relationships with the directly affected individuals were at best remote." *Kowalski*, 543 U.S. at 134–135 (Thomas, J., concurring) (citing *Craig*, 429 U.S. 190 (1976); *Powers v. Ohio*, 499 U.S. 400 (1976); *Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977); *Eisenstadt v. Baird*, 405 U.S. 438 (1972); *Barrows v. Jackson*, 346 U.S. 249 (1953)); *see also* doc. 33 at 21 (relying on those same cases). While those cases have not been overruled, Attorney General Marshall argues that they are inconsistent with the reasoning in *Kowalski* and other more recent articulations of the third-party standing doctrine and thus should be overruled to the extent that those cases permit third-party standing here.

*Lastly*, Plaintiffs' clients can vindicate their own rights. As to abortion,[7]

Plaintiffs primarily rely on the Supreme Court's plurality opinion in *Singleton v.

Wulff*, 428 U.S. 106 (1976), which "identified two purported obstacles to suits by

women wishing to obtain abortions—the women's desire to protect their privacy and

the prospect of mootness[,]" *June Medical*, 140 S. Ct. at 2168 (Alito, J., dissenting).

"But whatever the supposition of a 1976 plurality, in the years since interested

women have challenged abortion regulations on their own behalf in case after case."

*Id.* at 2174 (Gorsuch, J., dissenting) (collecting cases). And these alleged obstacles

are "chimerical" anyway. *Singleton*, 428 U.S. at 126 (Powell, J., concurring in part

---

[7] Yellowhammer heavily relies on *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1042–44 (11th Cir. 2008), which employs an equal-protection-specific rule from a New York federal district court case: that "non-minority plaintiffs have standing . . . when these non-minority plaintiffs are uniquely positioned to assert the rights of absent third party minorities[,]" *Doe v. Village of Mamaroneck*, 462 F. Supp. 2d 520, 547 (S.D.N.Y. 2006). *Doe* cites (with a "*see*" cite and no pincite) *Barrows* for the rule, but *Barrows* describes this "unique situation" as one "in which it would be difficult if not impossible for the persons whose rights are asserted to present their grievance before any court[,]" 346 U.S. at 257 (quoted by *Young Apartments*, 529 F.3d at 1043). *Young Apartments* spends half of its limited hindrance discussion talking about how Young Apartments "has strong incentives to pursue this lawsuit[,]" 529 F.3d at 1044, which is irrelevant to the standard hindrance inquiry. The Court then assumed the truth of allegations in the complaint that Hispanic tenants experienced race hostility from Jupiter residents and then went beyond the complaint to make its own presumptions. *See id.* But *Young Apartments* "did not require the immigrant residents to proceed under pseudonyms[,]" doc. 33 at 26 n.8, because it never engaged with the argument that pseudonyms could be used to avoid privacy concerns. And *Young Apartments* does not assess whether similar third parties have advanced claims in the past, *see Kowalski*, 543 U.S. at 132, which Attorney General Marshall presses here. *Young Apartments* also rested on the fact that "denying Young Apartments standing to raise these claims would unfairly limit its ability to vindicate its own right to be free from official misconduct." 529 F.3d at 1044. That is not relevant here as shown by Plaintiffs' bringing a host of claims based on their first-party rights. For all these reasons, *Young Apartments*—which appears inconsistent with more recent and/or applicable Supreme Court third-party standing jurisprudence (*Kowalski* and the dissents in *June Medical*)—is inapplicable here.

and dissenting in part). Plaintiffs have not suggested how "this suit differs from those cases [where women seeking abortions attempted to vindicate their own rights] in any meaningful way." *June Medical*, 140 S. Ct. at 2174 (Gorsuch, J., dissenting).

**B.    The West Alabama Plaintiffs[8] Lack Third-Party Standing to Sue on Behalf of Their Staff.**

As an initial matter, the West Alabama Plaintiffs do not contest Attorney General Marshall's argument that "they have not even alleged either a close relationship for purposes of third-party standing with their staff or that their staff is hindered from bringing suits[,]" doc. 28 at 15. Indeed, they cite no allegations in support of there being any hindrance to their staff vindicating their own rights in their response. *See* doc. 24 at 24–25. Nor can they amend their complaint through briefing. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 at 799 n.2 (11th Cir. 2022) (en banc) (citations omitted). Thus, there are no allegations to assume as true that the West Alabama Plaintiffs' staff—who are already publicly associated with a former abortion provider—face any additional "violence, harassment, and societal stigma surrounding abortion provision and support for abortion access in Alabama[,]" doc. 34 at 23 (citations omitted), from vindicating their own rights. And again, proceeding under a pseudonym and engaging in

---

[8] "Yellowhammer Fund is not asserting third-party standing on behalf of its staff." Doc. 33 at 21 n.11.

protective-order practice would alleviate these issues. Lastly, it strains credulity to suggest—without offering any reason why—that the WAWC Plaintiff's staff are materially different than Dr. Robinson or that her presence as a Plaintiff doesn't undermine the West Alabama Plaintiffs' hindrance argument. The West Alabama Plaintiffs thus lack third-party standing to sue on behalf of their staff.

## II. Abortion's Legality in Other States Remains Immaterial.

Much of Plaintiffs' argument rests on the incorrect assumption that Alabama is powerless to act against a conspiracy formed in Alabama if the ultimate aim of the conspiracy is conduct that is legal where it would be performed. Before addressing Plaintiffs' individual claims below, Attorney General Marshall will here explain why Plaintiffs are incorrect. Alabama seeks to punish an unlawful conspiracy formed in this State—not potentially lawful conduct in another State.

Plaintiffs suggest, without citing specific authority, that the object of a criminal conspiracy must be "unlawful in every state" for a State to criminalize an agreement intended to further that objective. *E.g.*, doc. 33 at 40. But whether the object of a criminal conspiracy must itself be illegal "depends on the statute." *Drew v. Thaw*, 235 U.S. 432, 438 (1914); *see also United States v. Elliott*, 266 F. Supp. 318, 324 n.3 (S.D.N.Y. 1967) (cleaned up) (explaining that a conspiracy was punishable "despite there being no criminal liability attached to the objective of the conspiracy"). Contrary to Plaintiffs' position, Alabama may prohibit persons

inside the State from helping women obtain abortions, even if abortion is legal elsewhere and even though women may independently obtain them without exposing themselves to criminal liability.

"It is perfectly possible and may even be rational to enact that a conspiracy to accomplish what an individual is free to do shall be a crime." *Drew*, 235 U.S. 432, 438 (1914) (emphasis added). Indeed, "it is well settled that Congress may make it a crime to conspire with others *to do* what an individual *may lawfully do on his own*." *Dennis v. United States*, 341 U.S. 494, 573 (1951) (Jackson, J., concurring) (emphasis added). For example, in the antitrust context, the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce[.]" 15 U.S.C. § 1. One company's refusal to work with a distributor is generally permissible, but group refusals to deal are generally illegal, *e.g.*, *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 293 (1985). Likewise, that a woman in Alabama is free to travel to a neighboring state to receive an abortion does not resolve whether any other person is free to coordinate with her in Alabama to procure that abortion. So-called "helpers" who "fill[] gaps for the [Alabama] community[,]" doc. 1 ¶ 37, by facilitating abortions that are illegal in Alabama "obstruct the due administration" of the Human Life Protection Act. *Drew*, 235 U.S. at 438. Section 13A-4-4 "makes the

conspiracy" to procure an out-of-state abortion "criminal whether the acts themselves are so or not." *Id.*

*Thompson v. State*, 17 So. 512 (Ala. 1895), does not change this conclusion. Plaintiffs are incorrect to assert that Attorney General Marshall needs *Thompson* to be a "panacea," doc. 33 at 38, for this Court to grant his Motion. His interpretation does not "hinge[] almost entirely," doc. 34 at 40, on any one line in *Thompson*. To the contrary, and as Attorney General Marshall clearly stated in his Motion, "*Thompson* does not undermine, much less override, § 13A-4-4's plain language." Doc. 28 at 20. Instead, it is Plaintiffs whose claims depend on *Thompson* meaning what they say it does and modifying § 13A-4-4 the way they argue it does. Attorney General Marshall will not fully retread his Motion's discussion explaining why Plaintiffs' appeals to the common-law rule announced in *Thompson*, § 13A-4-4's legislative history, and caselaw about other statutes (namely § 13A-4-3) do not alter the plain text of § 13A-4-4, which was enacted *after Thompson* and uses different language than either the common-law rule or those other statutes.

Plaintiffs do not directly engage with Attorney General Marshall's quotation of two successive sentences establishing that the place at which the substantive crime is to be committed "is not material" because "[i]t is the law of the place where the conspiracy is formed which is broken[,]" doc. 28 at 21. They instead emphasize *Thompson*'s language that, "if the combination is formed, and the agreement entered

into, to commit a *known felony, malum in se*, the offense is complete." *Thompson*, 17 So. at 516 (emphasis added) (cited by doc. 34 at 40; doc. 33 at 38). Known felony where? In "the place where the conspiracy is formed." Plaintiffs do not explain why that reading of *Thompson*—which agrees with a plain-text reading of § 13A-4-4— should be rejected.[9] And Plaintiffs have no evidence that the Legislature—despite acknowledging *Thompson*—intended to limit § 13A-4-4's plain text to disallow Attorney General Marshall's interpretation.

Indeed, Plaintiffs' attempts to impose a cribbed reading of § 13A-4-4 by means of a cribbed reading of *Thompson* proves too much. Plaintiffs, for example, appear to elevate *Thompson*'s "malum in se" language into an element of Alabama's conspiracy law, but doing so would create troubling results. Several courts, for example, have concluded that drug trafficking is merely malum prohibitum, not malum in se. *See, e.g.*, *Commonwealth v. Ludwig*, 55 Pa. D. & C.4th 449, 454–55 (Pa. Ct. Com. Pl. 2002) ("As pervasive and devastating as drug trafficking is in modern culture it still falls within that [mala prohibita] class of crimes."); *Du Vall v. Bd. of Med. Examiners of Ariz.*, 66 P.2d 1026, 1030 (Ariz. 1937) ("[T]he sale or

---

[9] *Thompson* also refers to "a well-known felony or misdemeanor *at common law*[.]" 17 So. at 515 (emphasis added). So while Americans *today* may have sharply conflicting views about abortion, *see* doc. 34 at 40 n.16 (citing *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2240 (2022)), "an unbroken tradition of prohibiting abortion on pain of criminal punishment persisted from the earliest days of the common law until 1973[,]" *Dobbs*, 142 S. Ct. at 2253–54. Attorney General Marshall raised this point in his Motion, *see* doc. 28 at 20 n.8, to which Plaintiffs did not respond.

dispensing . . . of narcotic drugs, except for medicinal use and under strict surveillance, does involve, as we think, moral turpitude, although malum prohibitum only."); *but see United States v. Pohlable*, No. SA CR07-0033 DOC, 2008 WL 11355441, at *4 (C.D. Cal. Apr. 28, 2008) (deeming drug trafficking malum in se). Thus, under Plaintiffs' reading of *Thompson* and § 13A-4-4, Alabama might be powerless to stop a drug ring from conspiring to sell drugs and even taking actions in Alabama to carry out their scheme, so long as the final transfer was to occur across State lines. That makes no sense and shows that Plaintiffs' reading of the *Thompson* proves too much.

On the other hand, a plain reading of § 13A-4-4 does not lead to the parade of horribles that the West Alabama Plaintiffs trot out. They claim that "people could be criminally prosecuted for 'conspiring' to engage in myriad *legal* behaviors, should those tasked with enforcement of the criminal laws disfavor or dislike such conduct[,]" doc. 34 at 32. No, § 13A-4-4 allows prosecution only of conspiracies to engage in behavior that would be illegal under Alabama law—that the elected representatives of this State have designated as punishable conduct. There is no avenue for prosecution of behavior that Attorney General Marshall or a district attorney merely "disfavor[s] or dislike[s]."

Attorney General Marshall obviously recognizes the distinction between acts such as abortion, which are not universally illegal among the States, and acts such

15

as selling heroin, which (at least in the United States) are, but Plaintiffs ignore the breadth of their own theory. As Attorney General Marshall noted in his Motion regarding an Alabama conspiracy to sell heroin in Georgia, Plaintiffs do not contest that "Alabama would lose its authority to punish this Alabama-based conduct if Georgia repealed its law or if the Alabama-based conspirators simply set their sights on another jurisdiction with lax laws"—i.e., those that would treat selling heroin as a misdemeanor or merely impose a civil fine. *See* doc. 28 at 17.

## III.   Yellowhammer's[10] Extraterritorial Due Process Claim Fails.

Yellowhammer's claim hinges on its insistence that "the law plainly allows" it, *within Alabama's borders*, to *facilitate* elective abortions for Alabama's citizenry. *See Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). On the contrary, Alabama law plainly *prohibits* such conduct. Ala. Code § 26-23H-4 makes it generally "unlawful for any person to intentionally perform or attempt to perform an abortion[,]" and § 13A-4-4 prohibits persons from conspiring in Alabama "to do an act beyond [Alabama], which, if done in [Alabama], would be a criminal offense."

---

[10] Despite a lengthy footnote addressing the relevant cases, *see* doc. 34 at 33 n.14, "[u]nlike Plaintiff Yellowhammer," the West Alabama Plaintiffs "have not brought a claim that the threatened prosecutions violate their right to be free from extraterritorial application of state law." Doc. 34 at 16 n.6. Nonetheless, Attorney General Marshall's argument adequately responds to the West Alabama Plaintiffs' footnote.

Yellowhammer thus fails to state a claim that Defendant's threatened application of these statutes violates the Due Process Clause.[11]

The central pillar to this claim is Yellowhammer's argument that Attorney General Marshall is "applying Alabama's Abortion Ban extraterritorially to out-of-state, lawful conduct." Doc. 33 at 33; *accord* at 36 (Plaintiffs are "not guilty of any crime unless Alabama unconstitutionally purports to apply its Abortion Ban outside its borders."). Yellowhammer provides no citation for the proposition that § 13A-4-4's liability mechanism—using out-of-state conduct (which Alabama is not prosecuting and which may not even come to fruition) as a predicate to punish conspiracies occurring *in Alabama* if that conduct would be illegal in Alabama— requires extraterritorial application. Alabama's conspiracy laws do not criminalize any out-of-state conduct, so there is no extraterritorial application. So even if there is "[a]n unbroken line of Supreme Court[12] precedent" prohibiting the extraterritorial

---

[11] Yellowhammer's claim here falls apart if it is incorrect about § 13A-4-3's impact on § 13A-4-4, which is why it spends four pages engaging in a wholly State-law-based argument before reaching its federal extraterritorial-based Due Process argument. The same is not true for Attorney General Marshall's argument as to this claim. Even if he has incorrectly interpreted § 13A-4-4, criminalizing Alabama-based conspiracies still has no extraterritorial effect.

[12] *Cruthers v. State*, 67 N.E. 930 (Ind. 1903), lends no support to Yellowhammer's position either because the Indiana statute that it concerns is materially different from § 13A-4-4. "Section 1645 . . . reads as follows: 'Aiding Felony in Another State. Every person who shall, while in this state, aid in and abet the perpetration or attempt to perpetrate an *offense in another state by which the laws of this state is a felony* . . . .'" *Cruthers*, 67 N.E. at 931 (emphasis added). The Indiana statute explicitly required that the conduct be an offense in the other State; Yellowhammer can point to no such language in Ala. Code § 13A-4-4. *Cruthers* thus does not "involv[e] a similar situation" as here, and Yellowhammer has pointed to no additional case involving a statute like § 13A-4-4—

---

application of State law, *see* doc. 33 at 34–37 (discussing *Nielsen*, *State Farm*, and *Bigelow*, which Attorney General Marshall addressed in his Motion, *see* doc. 28 at 37–38), that precedent is not implicated here.

Yellowhammer makes much of its contention that Attorney General Marshall "does not—and cannot—cite a single case in which the state or federal government was found to have constitutionally convicted a person for conspiring to engage in *lawful*, out-of-state conduct." *See* doc. 33 at 38. *One*, Attorney General Marshall does not have to prove in this pre-enforcement suit that his threatened prosecution has already been found constitutional. It is Plaintiffs who have not cited cases supporting their remarkable contention that the Due Process Clause requires the permissive criminal code of one State to dictate what is indictable as a criminal conspiracy *in other States*. And *two*, that framing narrows the issue in a way that would ignore Supreme Court precedent supporting Alabama's ability to "make its own reasoned judgment about what conduct is permitted or proscribed within its borders." *State Farm*, 538 U.S. at 422.

Supreme Court precedent supporting States' rights to regulate extraterritorial conduct further supports Alabama's right here to regulate *intra*territorial conduct. Though this case does not involve extraterritorial application of State law, the

---

as Attorney General Marshall interprets it. *Contra* doc. 33 at 37 (characterizing Cruthers as a case that "address[es] circumstances like this").

Constitution permits a State to punish a non-citizen for "[a]cts done outside [its] jurisdiction" if they are intended to produce and produce "detrimental" effects within it. *Strassheim v. Daily*, 221 U.S. 280, 285 (1911) (collecting cases); *cf. BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572, 573 (1996) ("Alabama does not have the power . . . to punish [a defendant] for conduct that was lawful where it occurred *and that had no impact on Alabama or its residents*." (emphasis added)).

Relatedly, the Constitution does not categorically prohibit a State from regulating the extraterritorial conduct of its own citizens. *See Skiriotes v. Florida*, 313 U.S. 69, 77 (holding that Florida possessed authority to prosecute its citizen for sponge fishing beyond its territorial waters "on the high seas," despite Congress possessing the authority to define and punish felonies on the high seas but not making sponge fishing a crime). If it's true that State laws in some circumstances can reach extraterritorial conduct by non-citizens and citizens alike, then *a fortiori*, Alabama can certainly prosecute *intra*territorial conduct that is criminal under Alabama law.

Lastly, Plaintiffs invoke the principles of "comity and sovereignty"[13] espoused in *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023), but ignore how the Court applied those principles. In upholding California's pork-

---

[13] Yellowhammer "does not allege a Dormant Commerce Clause violation[.]" Doc. 33 at 41.

processing regulation that burdened out-of-state pork producers, the Court refused to recognize a per se rule restricting "the ability of a State to project its power extraterritorially." *Nat'l Pork Prods. Council*, 598 U.S. at 376. As the Court acknowledged, many laws (if not most laws) have some "practical effect" of influencing out-of-state behavior. *Id.* at 374–75 (noting States' "[e]nvironmental laws," "income tax laws," "libel laws, securities requirements, charitable registration requirements, franchise laws, tort laws," "inspection laws, quarantine laws, and health laws of every description" have a "considerable influence on commerce outside their borders" (internal quotation marks omitted)).

The Court reiterated "the usual 'legislative power of a State to act upon persons and property within the limits of its own territory[.]'" *Id.* at 375 (quoting *Hoyt v. Sprague*, 103 U.S. 613, 630 (1881)). Rather than suggest that Alabama must permit persons within its borders to arrange out-of-state abortions for its citizens, principles of federalism vindicate the constitutionality of the Human Life Protection Act and its application in conjunction with Alabama's conspiracy laws. *See id.* ("A feature of our constitutional order that allows different communities to live with different local standards." (cleaned up)). Yellowhammer's claim that Attorney General Marshall has violated the Due Process Clause by threatening to extraterritorially apply Alabama law thus fails to state a claim for which relief can be granted.

## IV.    The West Alabama Plaintiffs'[14] Fair-Notice Due Process Claim Fails.

The West Alabama Plaintiffs' Response failure to engage with the text of the challenged laws proves fatal to their fair-notice due process claim. To succeed on this claim, they must show that the challenged interpretation is "unexpected and indefensible." *Bouie v. City of Columbia*, 378 U.S. 347, 350 (1964). But Plaintiffs still do not—again, because they cannot—dispute that § 13A-4-4's *text* prohibits the conduct they wish to engage in. Section 13A-4-4 provides that: "A conspiracy formed in this state to do an act beyond the state, which, if done in this state, would be a criminal offense, is indictable and punishable in this state in all respects as if such conspiracy had been to do such act in this state."

If Plaintiffs conspired to procure an abortion in Alabama, that would be plainly illegal; thus, § 13A-4-4 prohibits conspiring to procure an abortion elsewhere. The analysis need proceed no further, as the West Alabama Plaintiffs cannot assert that "there is nothing in [§ 13A-4-4] to indicate it also prohibit[s] the different act" of conspiring to procure on abortion *beyond the state*. *Bouie*, 378 U.S. at 355. As Attorney General Marshall raised in his Motion (but Plaintiffs have declined to address), interpreting a statute to match its own text can never be "unexpected and indefensible." *See* doc. 28 at 22. And appealing to Alabama

---

[14] Despite a lengthy footnote addressing the relevant cases, "Yellowhammer Fund does not make [a fair-notice due process] argument[.]" Doc. 33 at 41 n.19. Nonetheless, Attorney General Marshall's argument adequately responds to Yellowhammer's footnote.

caselaw interpreting a different statute (§ 13A-4-3)—which, like Plaintiffs, doesn't engage with § 13A-4-4's text—cannot render Attorney General Marshall's interpretation a departure or indefensible break from existing caselaw. *Contra* doc. 34 at 34.[15]

"[A] routine exercise of common law decisionmaking in which [a] court [brings] the law into conformity with reason and common sense" does not impinge upon the fair-notice protections of the Due Process Clause. *Rogers v. Tennessee*, 532 U.S. 451, 461–62, 467 (2001); *accord Magwood v. Warden, Ala. Dep't of Corr.*, 664 F.3d 1340, 1347 (11th Cir. 2011). The West Alabama Plaintiffs' Response attempts to undercut this holding by implying (assisted by some selective quotation) that it applies only when "laying to rest an archaic and outdated rule." *See* doc. 34 at 38–39.[16] *But see Rogers*, 532 U.S. at 467; *but see also id.* at 461–62 (concluding that

---

[15] The West Alabama Plaintiffs assert that certifying the question of interpretation to the Supreme Court of Alabama is improper because their approximately eight-page interpretation of a one-sentence statute is so obviously correct (and Attorney General Marshall's adherence to the statute's actual text so obviously wrong) as to be beyond question. *See* doc. 34 at 44 n.19 (addressing certification); *id.* at 33–37, 39–42 & n.17 (interpreting Ala. Code § 13A-4-4); *see also* doc. 33 at 34 n.14 (Yellowhammer asserting the same argument). This unyielding stance proves too much. At any rate, there is "a high likelihood that the Supreme Court of Alabama's interpretation of the [challenged statutes] will resolve this matter; therefore, the state courts should have the opportunity to address this issue in the first instance." *Ala. Educ. Ass'n v. State Superintendent of Educ.*, 665 F.3d 1234, 1237–38 (11th Cir. 2011) (certifying a question to the Supreme Court of Alabama); *see also Ala. Educ. Ass'n v. State Superintendent of Educ.*, 746 F.3d 1135, 1138–40 (11th Cir. 2014) (applying the Supreme Court of Alabama's interpretation to reverse the district court's injunction).

[16] Yellowhammer—although, again, disavowing even bringing this sort of challenge—similarly misses the mark with *Rogers*. Yellowhammer asserts: "A statutory interpretation is unexpected if it is out of sync with the 'vast majority' of jurisdictions." Doc. 33 at 41 n.19 (citing *Rogers*, 532

22

the "unexpected and indefensible" rule "accords common law courts the substantial leeway they must enjoy as they engage in the daily task of formulating and passing upon criminal defenses and interpreting such doctrines as causation and intent, reevaluating and refining them as may be necessary to bring the common law into conformity with logic and common sense"). Ultimately, *Rogers* stands for the straightforward proposition that courts are not locked into a single interpretation of a statute forever; rather, that interpretation can change even retroactively as long as it is not unexpected and indefensible.

The West Alabama Plaintiffs' arguments do not squarely engage with the rules of *Bouie* or *Rogers*. Instead, they conflate the fair-notice requirements of the Due Process Clause into a rule requiring only the *best* interpretation of a statute.[17]

---

U.S. at 463–64). But that's the opposite of what *Rogers* says: "[t]his case, however, involves not the precise meaning of the words of a particular statute, but rather the continuing viability of a common law rule[,]" and "[c]ommon law courts frequently look to the decisions of other jurisdictions in determining whether to alter or modify a common law rule[.]" *Id.*; *see also id.* at 463–64. So while other jurisdictions' rules may matter when abolishing a common-law defense, they do not when a jurisdiction is interpreting the precise words of its own particular statutes.

[17] While not necessary for this analysis, Plaintiffs' overcomplicated interpretations of Ala. Code § 13A-4-4 are not only *worse*, but not even plausible. Their interpretation rests upon the baseline premise that the common law restricts the scope of a *later*-enacted statute employing *broader* language to only the common law's narrower rule, which Alabama law squarely rejects. *See* doc. 28 at 20 (collecting statutes and sources). Moreover, Plaintiffs' attempts to import § 13A-4-3's rendition of conspiracy would eviscerate the distinction between "an act beyond the state which if done in this state, would be a criminal offense" and "conduct constituting an offense." Because these statutes can be read in a way that does not alter § 13A-4-4's plain meaning, they must be because "[i]f possible, every word and every provision is to be given effect" and "[n]one should needlessly be given an interpretation that causes it to duplicate a provision or to have no consequence." *In re Appling*, 848 F.3d 953, 959 (11th Cir. 2017) (quoting ANTONIN SCALIA & BRYAN A. GARNER, *Reading Law: The Interpretation of Legal Texts* 174 (2012)). And reinforcing

To be clear, Attorney General Marshall's "completely []textual," doc. 33 at 41 n.19, reading is the best reading. But even if it was objectively worse, it's undeniably plausible and thus § 13A-4-4's proper interpretation is a matter of state criminal law—not one of federal constitutional concern. "[A] defendant charged with conspiracy under either law must have the ability to challenge whether that underlying act is in fact criminal[,]" doc. 33 at 30, and he does: in his state-court criminal proceeding just as the defendants do in the plethora of Alabama cases that Plaintiffs cite in their responses.

Lastly, Plaintiffs' attempts to overhaul the Due Process Clause would federalize every run-of-the-mill interpretation of State criminal statutes and procedure. While Plaintiffs' arguments as to § 13A-4-4's proper interpretation might be properly asserted in a motion to dismiss their charges in State court, they do not belong in a federal pre-enforcement challenge. And contrary to Plaintiffs' formalistic protestations that they "have not pled any state law claims," *see* doc. 34 at 43, it is the "gravamen" of their claims that determines whether the Eleventh Amendment (under *Pennhurst*) bars such claims. *DeKalb Cnty. Sch. Dist. v.*

---

this conclusion, a similar distinction existed at the time of § 13A-4-4's enactment. *Compare* ALA. CODE § 4428 (1897) ("Any two or more persons, conspiring together to commit a *felony*" (emphasis added)), *and* ALA. CODE § 4429 (1897) ("Any two or more persons, conspiring together to commit a *misdemeanor*"(emphasis added)), *with* ALA. CODE § 4430 (1897) ("A conspiracy . . . to do an *act* beyond the state" (emphasis added)).

*Schrenko*, 109 F.3d 680, 688 (11th Cir. 1997).[18] And expanding the Due Process Clause in the way they seek here would run afoul of the Eleventh Amendment's bar. If the WAWC Plaintiffs maintain such an expansive claim, it is due to be dismissed for lack of subject-matter jurisdiction.

Accordingly, applying the proper rules announced by *Bouie* and *Rogers*, the West Alabama Plaintiffs' fair-notice claim plainly fails. Section 13A-4-4's text plainly prohibits the conduct at issue here and thus cannot be said to be "unexpected and indefensible."[19] Unlike any of the cases the West Alabama Plaintiffs cite for support (including *Bouie*), which found due process problems where a statute was *expanded beyond* its text,[20] they here seek to use due process to restrict the fair application of the text itself. And even if their overcomplicated interpretation of § 13A-4-4 were the currently operative interpretation, *Rogers* makes clear that the Supreme Court of Alabama could return that statute's interpretation to its text

---

[18] The West Alabama Plaintiffs' Response declines to engage with this principle, which Attorney General Marshall's Motion squarely raised. *Compare* doc. 34 at 43–44, *with* doc. 28 at 16 ("Regardless of how Plaintiffs style their claims, courts must look to the 'gravamen' of a plaintiff's claims to determine whether they truly seek adjudication of state or federal issues." (citing *Schrenko*, 109 F.3d at 688; *Waldman v. Conway*, 871 F.3d 1283, 1290 (11th Cir. 2017))).

[19] It's also unclear how Plaintiffs could say such an interpretation is "unexpected" when they're bringing a pre-enforcement challenge premised on Attorney General Marshall's announcement that he intends to enforce the statute in the way they've challenged.

[20] *See, e.g.*, *Magwood*, 664 F.3d at 1349 ("Magwood did not have fair warning that a court, when faced with an unambiguous statute, would reject the literal interpretation.").

without running afoul of due process.[21] Accordingly, the West Alabama Plaintiffs' fair-notice due process claim is due to be dismissed.

## V.    The First Amendment Does Not Protect Criminal Conduct.

Plaintiffs' argument that Alabama law "cannot restrict [any] speech related to lawful, out-of-state abortion care[,]" doc. 33 at 43; *see* doc. 34 at 45, rests on their refusal to acknowledge that elective abortions and "agreements" to procure them have been "deemed injurious to society[,]" *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949), by the Alabama Legislature. While an elective abortion may be "an entirely legal act" in some States, doc. 33 at 43, it is illegal in Alabama. Reading the Human Life Protection Act in conjunction with Alabama's conspiracy laws, an agreement to "help pregnant Alabamians travel to obtain lawful, out-of-state abortions[,]" *id.* (emphasis omitted), "constitute[s] a single and integrated course of conduct . . . in violation of [Alabama]'s valid law." *Giboney*, 336 U.S. at 498. Thus, any "speech integral" to that "criminal conduct" is unprotected. *United States v. Fleury*, 20 F.4th 1353, 1365 (11th Cir. 2021).

---

[21] More fundamentally, the West Alabama Plaintiffs' due process claim is directed at the wrong party and likely unripe. *Bouie* and *Rogers* impose restrictions on *State courts'* interpretations of statutes, not on prosecutors' attempts to enforce those statutes or to argue for particular interpretations. If the West Alabama Plaintiffs are correct that their interpretation of § 13A-4-4 is the currently operative interpretation, then they would not even suffer an injury (under their own theory) unless and until the Supreme Court of Alabama rejected their interpretation. This limitation on this species of due process claim is best evidenced by the fact that Plaintiffs' supporting cases involve direct appeals from criminal prosecutions or collateral attacks on such prosecutions like habeas proceedings.

In circular fashion, Yellowhammer asserts that—unlike speech incidental to the procurement of abortions—speech to facilitate the distribution or receipt of child pornography may be restricted because there exists a "*valid* federal criminal statute, and the federal government *clearly ha[s] jurisdiction* over the defendant's activities." Doc. 33 at 44 (emphasis added). But Alabama's Human Life Protection Act and general conspiracy laws are valid criminal statutes, *see Dobbs*, 142 S. Ct. at 2257 (noting Mississippi's valid belief "that abortion destroys an 'unborn human being'"), and a State clearly has jurisdiction over the activities of persons operating within its borders, *see Hoyt*, 103 U.S. at 630. The First Amendment does not entitle persons in Alabama to conspire to procure elective abortions simply because they would do so "by means of language, either spoken, written, or printed." *Giboney*, 336 U.S. at 502.

For their part, the West Alabama Plaintiffs argue that because some States categorize elective abortion as a lawful act, *an agreement* formed *in Alabama* to procure an elective abortion in one of those States is necessarily lawful and protected by the First Amendment. Doc. 34 at 35–36. But they ignore that forming an agreement may constitute an act or "conduct in violation of a valid criminal statute[,]" *Giboney*, 336 U.S. at 498. "In a criminal context, the purpose of conspiracy charges is to punish *the act of agreement* itself." *Beck v. Prupis*, 162 F.3d 1090, 1011 n.18 (11th Cir. 1998) (emphasis added) (citing WAYNE R. LAFAVE &

AUSTIN W. SCOTT, JR., CRIMINAL LAW § 6.4(d) (2d ed. 1986)). To this end, a "[c]onspiracy is a 'distinct, substantive offense and is complete when the unlawful combination is entered into.'" Doc. 1 ¶ 31 (quoting *Connelly v. State*, 1 So. 2d 606, 607 (Ala. Ct. App. 1990)). Conspiracy laws necessarily restrict written or spoken communication because mere "[a]greements to engage in criminal activity are considered dangerous to society in and of themselves." *Beck*, 162 F.3d at 1011 n.18. Here, abortion is generally illegal under Alabama law, and the Legislature has prohibited Alabama-based conspiracies (agreements) to perform them because such agreements are inherently dangerous.[22]

Plaintiffs argue that the injuriousness to Alabama of agreements to engage in certain conduct—"namely, providing, obtaining, or leaving the state to obtain a[n] . . . abortion[,]" doc. 34 at 34—materially depends on whether the target State of the Alabama-based conspiracy is California—thus, "a legal out-of-state abortion[,]" *id.*—or Mississippi. By the same token, Plaintiffs' argument leads to the odd result

---

[22] The West Alabama Plaintiffs' appeal to *Wollschlaeger v. Governor of Florida*, 848 F.3d 1293 (11th Cir. 2017)—for the importance of information sharing and open communication in the medical field—is unpersuasive here. Attorney General Marshall does not dispute these principles generally, but the conduct he has threatened to prosecute is not the mere discussion of options with a patient. He seeks to prohibit agreements where both the patient and physician have the intent to circumvent Alabama's general ban on abortion. *Wollschlaeger*'s statement that "information can save lives[,]" 848 F.3d at 1313 (citation omitted), is clearly not relevant here when (1) the Human Life Protection Act allows for abortions when the mother's life is at risk and (2) Alabama considers these agreements to be ending lives. No physician is being prevented from "knowing all that a patient can articulate" in a way that "would impair diagnosis or treatment[.]" *Trammel v. United States*, 445 U.S. 40, 51 (1980) (quoted by *Wollschlaeger*, 848 F.3d at 1313).

that identical underlying speech or conduct would be constitutionally protected if aimed at California but not if aimed at Mississippi. These are the same agreements to engage in the same conduct. The language in Justice Jackson's concurrence in *Dennis*, 341 U.S. at 575 ("I do not suggest that Congress could punish conspiracy to advocate something, the doing of which it may not punish") (cited by doc. 33 at 43), might apply when the predicate activity is constitutionally protected, but Alabama certainly can and does prohibit "the doing" of elective abortion.

Alabama's interests in protecting unborn life and maternal health do not "evaporate[]," doc. 33 at 43, merely because Plaintiffs target a State where abortion is legal. Instead, Alabama "has decided to apply its law without exception to all persons who combine to" facilitate abortions that violate the Human Life Protection Act. *Giboney*, 336 U.S. at 497. Plaintiffs' attempt to argue for "special constitutional protection denied all other people[,]" *id.* at 496, for those who target a State where abortion is legal should be denied. *Id.* at 497 (Courts "are without constitutional authority to modify or upset [Alabama]'s determination that it is in the public interest to make combinations of [those who facilitate abortion] subject to laws designed to [prevent those combinations from occurring].")

"To be sure, there remains an important distinction between a proposal to engage in illegal activity and the abstract advocacy of illegality." *United States v. Williams*, 553 U.S. 285, 298–99 (2008) (citations omitted). But like the United States

29

in *Williams*, Defendant has not construed § 13A-4-4 to prohibit "abstract advocacy" for abortion in Alabama or anywhere else. *See id.* (explaining that the statute did not criminalize statements such as "'I believe that child pornography should be legal' or even 'I encourage you to obtain child pornography'"). So the West Alabama Plaintiffs are incorrect to claim that Attorney General Marshall seeks to criminalize mere "[s]peech about lawful conduct in another state[,]" doc. 34 at 46. Under § 13A-4-4, abortion advocates may vigorously advocate for abortion.[23] Still, in Alabama, the formation of an agreement between particular persons with the intent of aborting a particular unborn child—followed by an act to further that objective— is unprotected criminal activity, not permissible abstract advocacy of illegality.

Plaintiffs heavily rely on *Bigelow v. Virginia*, insisting it should inform— maybe control—this Court's Extraterritorial Due Process and First Amendment analyses.[24] *E.g.* doc. 33 at 44–45; doc. 34 at 48–49. To be clear, *Bigelow* is a *Roe*-era decision that held that Virginia's restrictions on abortion-advertising to be

---

[23] Indeed, Yellowhammer did not seem concerned about hosting a "Reproductive Justice Bus Tour across the state of Alabama" this summer, doc. 27-1 ¶ 10, which was kicked off with a rally called "F*** Your Abortion Ban[,]" *We're cruising across Bama in our new BUS*, Yellowhammer Fund, https://www.yellowhammerfund.org/bus-tour-2023/ (last visited Oct. 9, 2023).

[24] Yellowhammer emphasizes *Bigelow* as "a First Amendment case," doc. 33 at 36 n.16, but simultaneously characterizes the Court's observations about extraterritorial police power *as a holding* that supports its Due Process claim, *see* doc. 33 at 36; *see also* doc. 34 at 33 n.14. The West Alabama Plaintiffs summon this versatile "holding" to argue that, when applying heightened scrutiny under the First Amendment, this Court should discount Alabama's interest in preventing elective abortions. *See* doc. 34 at 49.

unconstitutional under the then-operative balancing test.[25] *See, e.g.*, 421 U.S. at 827. The Court reasoned that "the activity advertised" (abortion) "pertained to constitutional interests." *Bigelow v. Virginia*, 421 U.S. 809, 822 (1975) (citing *Roe v. Wade*, 410 U.S. 113 (1973); *Doe v. Bolton*, 410 U.S. 179 (1973)). The *Bigelow* majority continued, the "First Amendment interests [of the abortion advertiser] coincided with the constitutional interests of the general public." *Bigelow*, 421 U.S. at 822. Nonetheless, the West Alabama Plaintiffs baldly assert that *Bigelow*'s holding "*did not at all* rest on the fact that the advertisement concerned abortion specifically." doc. 34 at 49 n.21 (emphasis added).

That Court also did not address the "extent to which the First Amendment permits regulation of advertising that is related to activities the State *may legitimately regulate or even prohibit*." *Id*. at 825 (emphasis added). Moreover, *Bigelow*'s suggestion that a State has no interest in restricting speech incidental to conduct permitted elsewhere is no longer good law. *See United States v. Edge Broad. Co.*, 509 U.S. 418 (1993) (holding that States that prohibit gambling have a legitimate interest in shielding their citizens from lottery advertisements). Plaintiffs' appeals to *Bigelow* are only important insofar as they highlight their reliance on an

---

[25] To assess restrictions on commercial speech, the Supreme Court replaced the balancing framework employed in *Bigelow* with a defined four-part test. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980).

outdated legal landscape to support their purported constitutional right to facilitate a now-unprotected criminal activity.

Plaintiffs' discussion of heightened scrutiny for Alabama's conspiracy laws underscores why the First Amendment does not protect conspiracies formed in Alabama to procure elective abortions. True, viewpoint discrimination is almost per se disallowed under the First Amendment. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1126 (11th Cir. 2022). But this is because "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829 (1995). By contrast, § 13A-4-4 restricts the formation of agreements (necessarily involving speech) to perform elective abortions so as to prevent elective abortions (conduct) from being performed. In Alabama, Plaintiffs may express their pro-abortion ideology, perspective, and opinions to anyone—including patients, but entering into an agreement to procure an abortion for a woman is criminal activity. Put simply, § 13A-4-4 restricts unlawful conduct, not the marketplace of ideas, and does not curtail speech that the First Amendment protects.[26]

---

[26] Attorney General Marshall argued that Yellowhammer's right-to-association claim rises and falls with the other First Amendment claims in this case because if speech forming a criminal conspiracy is unprotected, then a person's association in that conspiracy is likewise unprotected. *See* doc. 28 at 3 ("[T]he same is true for the right to associate, otherwise all criminal conspiracies would be constitutionally protected criminal 'associations.'"). And Yellowhammer recognizes this connection. *See* doc. 33 at 49 (citing *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984), for the proposition that the right to associate is "implicit" in other First Amendment rights); doc. 28 (citing

## VI.   Yellowhammer[27] Has Not Sufficiently Pleaded an Overbreadth Claim, But It Fails on the Merits Regardless.

Although Yellowhammer faults Attorney General Marshall's discussion of its purported overbreadth claim as "brief and passing," doc. 33 at 52, it fails to even address that discussion in full—betraying the weakness of its position. As an initial matter, Yellowhammer's Complaint does not contain a "short *and plain* statement of the claim[,]" FED. R. CIV. P. 8(a)(2) (emphasis added). Yellowhammer's Complaint literally contains no statement of an overbreadth claim at all. Its only arguable hook is its use of the word "overbroad" twice (buried within two Counts asserting only its own constitutional rights and not anyone else's, as in an overbreadth claim[28]), which is not sufficient to provide Attorney General Marshall fair notice that Yellowhammer even intended to assert such a claim.[29]

Regardless, Yellowhammer's failure to address Attorney General Marshall's discussion in full dooms its (purported) overbreadth claim on the merits.

---

*Roberts*'s description of the right to associate as a "corresponding right"). Thus, Attorney General Marshall did not need to directly engage with this derivative claim to show that it fails. The same goes for Yellowhammer's expressive-conduct claim. If *speech* integral to a criminal conspiracy is unprotected, then so is expressive *conduct*.

[27] The West Alabama Plaintiffs "have not brought an overbreadth claim[.]" doc. 34 at 16 n.6.

[28] Overbreadth claims are inherently and solely facial in nature. *See United States v. Hansen*, 599 U.S. 762, 785 (2023) ("This is not the stuff of overbreadth—as-applied challenges can take it from here.").

[29] Indeed, the first notice Attorney General Marshall received that Yellowhammer intended to assert an overbreadth claim was when it filed its motion for summary judgment (prior before he

Overbreadth claimants "bear[] the burden of demonstrating, from the text of the law and from actual fact, that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (cleaned up). "That is not easy to do." *Doe v. Valencia Coll.*, 903 F.3d 1220, 1232 (11th Cir. 2018). Because "invalidation for overbreadth is strong medicine that is not to be casually employed[,]" courts "vigorously enforce[] the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292–93 (cleaned up) (citations omitted). And this potent medicine "should be administered only as a last resort." *Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011) (quotation marks and citation omitted).

Yellowhammer failed to clear this high bar when it failed to address the "plainly legitimate sweep" of the laws it challenges. In his Motion, Attorney General Marshall pointed out the numerous "plainly legitimate" applications of the challenged laws—i.e., prohibiting conspiracies to engage in conduct that is uniformly criminalized. *See* doc. 28 at 27 n.13. Accordingly, "the ratio of unlawful-

---

moved to dismiss). But, of course, "facts contained in a motion or brief cannot substitute for missing allegations in the complaint." *Dorman v. Aronofsky*, 36 F.4th 1306, 1317 (11th Cir. 2022) (internal quotations omitted) (quoting *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1030 n.5 (11th Cir. 2016)); *accord Adams*, 57 F.4th at 799 n.2 (rejecting plaintiff's attempt to reframe suit to raise a new claim not previously asserted because a plaintiff "cannot amend the complaint by arguments made in an appellate brief"); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

to-lawful applications is not lopsided enough to justify the 'strong medicine' of facial invalidation for overbreadth." *Hansen*, 599 U.S. at 784. So even if Yellowhammer experiences a significant chilling effect from the challenged laws, that does not "justify prohibiting all enforcement of [those] law[s]" because they "reflect[] 'legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.'" *Hicks*, 539 U.S. at 119 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).

Indeed, declaring the challenged statutes here to be overbroad (and thus facially invalid) would threaten to leave Alabama without clear prohibitions on (for example) conspiring in Alabama to commit murder, creating "substantial social costs" that "swallow" the supposed "social benefits" Yellowhammer seeks. *Id.* "In other words, [Plaintiffs] ask[] [this Court] to throw out too much of the good based on a speculative shot at the bad." *Hansen*, 599 U.S. at 785. Having failed to carry their burden to justify overbreadth's "strong medicine," Yellowhammer's purported overbreadth claim fails and is due to be dismissed.

## VII.    Alabama Law Does Not Violate the Right to Travel.

As an initial matter, this Court need not address to what extent the relevant statutes burden the right to travel of persons seeking abortion access in other States.

Yellowhammer is the only Plaintiff asserting its own right to travel,[30] and non-natural persons have never been found to possess (nor could they exercise) the right to travel. *See infra* Part VII.A. That leaves only third-party claims on behalf of Plaintiffs' clients, which they lack third-party standing to bring, *see supra* Part I.A. Setting this aside, Plaintiffs nonetheless fail to establish that the relevant statutes as applied to conspiracies to procure an abortion would violate their or their clients' right to travel. Unlike the cases in which the Supreme Court found State laws to violate the right to travel, the primary objective and purpose of the prospective enforcement of the relevant Alabama statutes is to prevent elective abortions and conspiracies to procure them.

Plaintiffs respond by observing that elective abortion is illegal in Alabama but not uniformly throughout the States and contending that the Constitution must confer an implicit right for Plaintiffs to provide assistance to pregnant women so that they can obtain elective abortions in other States. This concocted right is not grounded in precedent, our constitutional order, or common sense.

### A.   Yellowhammer Does Not Have a Right to Travel.

Unlike a natural person, Yellowhammer is not a citizen capable of traveling and does not possess a right to travel. *See United States v. Guest*, 383 U.S. 745, 759

---

[30] Plaintiffs AWC and Dr. Robinson "assert the right to travel claim on behalf of their patients[,]" doc. 34 at 25 n.11, but "do not claim that the threatened prosecution infringes their own or their staff's right to travel—only their patients'," *id.* at 52 n.24.

(1966) (explaining that the right to travel protects "individuals" from restrictions on "free movement"). Yellowhammer emphasizes the fundamental nature of the individual right to travel but fails to cite a single case showing that this right extends to non-natural persons. *See* doc. 33 at 56–57. Instead, the "nature, history, and purpose of" the right to travel demonstrate that it is a "purely personal" guarantee of flesh and blood citizens to freely move between states. *See* doc. 28 at 31–33 (citing *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 778 n.14 (1978) (plurality opinion)); *see also Shapiro v. Thompson*, 394 U.S. 618, 629 (1969) (noting that "the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel"), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974). Despite citing *Bellotti*, Yellowhammer does not engage with this test.

Yellowhammer's response that if non-natural persons have a right to free speech, then they also have a right to travel is unpersuasive, *see* doc. 33 at 56–57. That's because "[f]reedom of speech and other freedoms encompassed by the First Amendment always have been viewed as fundamental components of the liberty safeguarded by the Due Process Clause[,]" *Bellotti*, 435 U.S. at 780 (citations omitted), and "corporations are persons within the meaning of the Fourteenth Amendment[,]" *id.* at 780 n.15 (citations omitted) (quoted by doc. 33 at 57). Yellowhammer has not attempted to ground the right to travel in the Fourteenth

Amendment, which is unsurprising given—as the West Alabama Plaintiffs note—that "[t]he Supreme Court has not identified any one, specific constitutional provision from which the right to travel emanates[,]" doc. 34 at 52 n.25 (citation omitted).

What's more, the activity that the First Amendment protects is inherently different from the activity that the right to travel covers. While First Amendment "speech" does not require physical mouth movement, the right to travel is inseparable from physical movement—ingress or regress from State to State. Doc. 28 at 32. Non-natural persons cannot do the physical, tangible acts that constitute "travel." Precedent and basic commonsense thus dictate that Yellowhammer, as a non-natural person, does not have a right to travel.

### B. Enforcing the Relevant Alabama Statutes Does Not Violate the[31] Right to Travel.

Both Plaintiffs argue that the "primary objective" or the "predominant purpose" of Defendant's "threat" to enforce state law is "to impede travel." Doc. 33

---

[31] Plaintiffs' right-to-travel arguments largely overlap—relying on many of the same cases in the same way. While Alabama Women's Center purports to assert the right of patients to *receive* assistance in traveling out of state to obtain an elective abortion, doc. 34 at 52, Yellowhammer asserts a right to "*provide*[] transportation assistance" to "pregnant people in Alabama" for the express purpose of obtaining elective abortions. Doc. 1 ¶¶ 89, 91. Thus, both Plaintiffs contend that the constitutional right to travel encompasses the right to cross state lines and do whatever may be legal in another jurisdiction.

at 64; doc. 34 at 54.[32] These assertions ignore that the relevant laws are general criminal statutes targeting conduct *other* than interstate travel—elective abortions and agreements to procure them.

The Human Life Protection Act recognizes and protects "[t]he dignity and value of life, especially the lives of children, born and unborn[.]" ALA. CODE § 26-23F-2(a)(4). Its primary objective is thus to advance Alabama's "legitimate interests" in respecting and preserving "prenatal life at all stages of development." *Dobbs*, 142 S. Ct. at 2284. Enforcing Alabama law also shields women from "[t]he medical, emotional, and psychological consequences of an abortion." ALA. CODE § 26-23A-2(a)(3). By the same token, Alabama's conspiracy laws aim to prohibit the "unlawful combination, the corrupt and corrupting agreement[,]" 17 So. at 516, formed by those who would help procure an elective abortion. These laws were not "enacted for the impermissible purpose of inhibiting migration[,]" *Saenz v. Roe*, 526 U.S. 489, 499 (1999), any more than other criminal laws of general applicability are. Likewise, the primary purpose of *enforcing* the relevant statutes is to prevent elective abortions and corrupt agreements to procure them.[33]

---

[32] West Alabama argues that a "reasonableness" test (if this Court finds the relevant statutes burden the right to travel) is inappropriate because the relevant statutes are "primarily aimed at impeding travel itself." Doc. 34 at 59. Yellowhammer similarly suggests that the reasonableness standard is applicable only if "the purpose of the law was not to prevent travel[.]" Doc. 33 at 61.

[33] The text of the generally applicable laws that Attorney General Marshall has a duty to enforce are the crux of this dispute. Attorney General Marshall's "threats" to enforce Alabama's

Plaintiffs' real argument is that the right to travel bars every State from imposing sanctions upon those who form unlawful agreements to commit a proscribed act if the act is permitted in another jurisdiction. *See, e.g.*, doc. 34 at 62 (arguing that an anti-gambling State must allow those operating within its borders to arrange travel for out-of-state gambling); *see also* doc. 28 at 34 ("At bottom then, Plaintiffs' theory must provide that the constitutional right to travel encompasses the right to travel *and* to do whatever is legal in other states."). Plaintiffs offer no authority to establish that the right to travel is so broad. Instead, they rely on traditional right-to-travel cases where the invalid law proscribed travel with a class of persons (the indigent) or categorically penalized travel for any purpose (taxing means of travel).

---

conspiracy laws against abortion facilitators were not a "custom or usage" that violated constitutional rights through "a systematic maladministration of" the conspiracy laws. *Contra* doc. 33 at 62 n.23 (quoting *Adickes v. SH Kress & Co.*, 398 U.S. 144, 167 (1970)). For starters, Attorney General Marshall did not establish any "settled practices" through his brief remarks. *See Adickes*, 398 U.S. at 168 (explaining that "longstanding practice of state officials" may *differ* from the text of a statute). And his remarks were not a purposeful departure from a statute intended to impede interstate travel; rather, he explicitly stated that "nothing about that law restricts any individual from driving across state lines and seeking an abortion in another place[,]" doc. 34 at 13. His remarks signaled that he would enforce "provisions relating to conspiracy" when faced with efforts "to facilitate" elective abortions. *Id.*; doc. 23 at 11 n.4 (citing an article titled, "*The Good News Is, AG Marshall Will Enforce Abortion Ban*"). Plaintiffs' qualms lie with Alabama's abortion and conspiracy laws, not Attorney General Marshall's implementation of them.

*Edwards v. California* is distinguishable in almost every material aspect. 314 U.S. 160 (1941).[34] While the law at issue in *Edwards* categorically blocked "in-migration" of indigent non-residents, *id.* at 166, it should go without saying that no Alabama law forbids the transportation of pregnant women across State lines. More to the point, Alabama's conspiracy statutes criminalize travel aid only to the extent that it furthers a specific, unlawful agreement to procure an elective abortion. The law in *Edwards* criminalized crossing State lines with an entire class of persons (indigents) no matter the purpose. Here, participating in a specific, unlawful scheme to procure an elective abortion— regardless of movement across State lines— triggers criminal liability. And whereas the interstate transportation of indigent persons "if regulated at all . . . must be prescribed by a single authority[,]" *id.* at 176, "[t]he Constitution does not prohibit the citizens of each State from . . . prohibiting abortion[,]" *Dobbs*, 142 S. Ct. at 2284.

*Crandall* similarly does not support Plaintiffs' position. In *Crandall v. Nevada*, the Supreme Court held unconstitutional a Nevada statute that levied a one-dollar tax upon each person leaving the State of Nevada by any railroad, stage coach, or other vehicle. 73 U.S. at 39. The *Crandall* court reasoned that directly taxing

---

[34] *Edwards* was decided pursuant to the Commerce Clause and not "the right of persons to move freely from State to State[,]" which "the Court expresse[d] no view on." 314 U.S. at 169 (Douglas, J., concurring).

interstate travel allowed a State to potentially prevent "*all* transportation of passengers from one part of the country to the other." *Id*. at 46 (emphasis added). Unlike the policy at issue in *Crandall*, Alabama law does not impose any tax, much less a direct tax on movement across state lines. Section 13A-4-4 instead prohibits travel assistance only insofar as it is intended to further a criminal conspiracy— whether to procure an elective abortion, to traffic illicit drugs, or to engage in any other criminal activity.

*Crandall* found Nevada's tax problematic because it obstructed the "correlative rights" of American citizenship, including "free access to its sea-ports, . . . to the sub-treasuries, the land offices, the revenue offices, and the courts of justice in the several States." *Id*. at 44. In other words, a State may not impede on a citizen's rights to engage in *protected* activity—"the activities of national citizenship[,]" doc. 33 at 60. Of course, access to an elective abortion is not a right implicit in national citizenship or one that the Constitution specifically protects, so Alabama does not trample "correlative rights" by prohibiting conspiracies to procure abortions. Again, Plaintiffs' reliance on *Crandall* highlights their failure to adapt to a legal landscape in which abortion is not constitutionally protected and laws burdening access to it are not subject to heightened scrutiny.

Any "impact on travel" from enforcement of Alabama law is transparently "ancillary to the non-travel-related purposes that the policies at issue were designed

to serve" (natal life and maternal health). *Contra* doc. 34 at 59. Plaintiffs can only contend that the "immediate and primary purpose" of enforcing § 13A-4-4 is to impede the right to travel by arbitrarily declaring that the Human Life Protection Act "has already 'advance[d] those alleged interests" enough. *See* doc. 34 at 55. Plaintiffs don't get to make that decision. And the State has already decided: conspiracies to procure an elective abortion are inconsistent with the State's interests just like performing one is. *See* ALA. CODE § 13A-4-4.

That the crime in this case (as with kidnapping) may involve travel does not mean that the law penalizes travel-*qua*-travel, which is the essence of a right-to-travel claim. Like everyone else, pregnant women and abortion advocates are free to cross State lines whenever and with whomever they like. But the implicit right to travel does not include an unqualified right to receive or provide assistance in furtherance of a criminal conspiracy just because that assistance is related to interstate travel. Alabama's enforcement of its criminal code simply does not burden the right to travel.

Because the ancillary burden on travel here is materially different from the burdens discussed in the Supreme Court cases Plaintiffs rely on, that burden is more closely related to the "mere inconvenience" cases that Attorney General Marshall

discussed in his Motion, *see* doc. 28 at 30–31.[35] Indeed, "mere burdens on a person's ability to travel from state to state are not necessarily a violation of their right to travel." *Doe v. Moore*, 410 F.3d 1337, 1348 (11th Cir. 2005) (citing *Saenz v. Roe*, 526 U.S. 489, 499 (1999)). And even if enforcement of the relevant statutes imposed a cognizable burden on the right to travel, it is more than "[]reasonable by constitutional standards, especially in light of the reasoning behind such" prohibitions. *Id.* The State's legitimate objectives of prohibiting elective abortions and conspiracies to procure them cannot be achieved if conspirators may arrange abortions so long as they target out-of-state destinations. "The state has a strong interest in" preserving unborn human life and maternal health, and it is reasonable to not allow abortion providers to "legally subvert the purpose of the statute" by directing their conspiracies toward more permissive jurisdictions. *Id*.

Lastly, the Supreme Court's decision in *Jones v. Helms* demonstrates[36] that persons who commit a crime in a State do not have "an unqualified federal right to leave the jurisdiction prior to arrest or conviction." 452 U.S. 412, 420 (1981). "Prior to arrest" makes clear that Plaintiffs are incorrect that *Jones*'s reasoning hinged on

---

[35] Because Yellowhammer—the only Plaintiff asserting its own right to travel—nor women seeking abortions are subject to criminal prosecution, Plaintiffs cannot claim that criminal prosecution is the relevant burden on travel to assess.

[36] Despite Yellowhammer's assertion otherwise, Attorney General Marshall never suggested that *Jones v. Helms* prescribed a "rational basis" standard for assessing all laws that burden the right to travel. *Contra* doc. 33 at 63–65.

the fleeing having occurred after the parent was convicted. *See id.* ("Therefore, although [the parent] was not convicted upon abandonment until after his first trip to Alabama, [the parent's] own misconduct had qualified his right to travel interstate before he sought to exercise that right."). Because the departure across State lines to obtain an abortion would further an illegal conspiracy, "the State may treat the entire sequence of events, . . . as more serious than its separate components." *Id.* at 422–23. Plaintiffs' remaining opposition to *Jones* is just a rehash of their argument that Attorney General Marshall cannot criminalize these conspiracies under § 13A-4-4. *See* doc. 34 at 60 n.33. But because conspiring in Alabama to procure an elective abortion is a crime, *Jones* stands for the proposition that restricting travel as part of that crime does not violate the right to travel. Plaintiffs thus fail to state a claim that the enforcement of Alabama's criminal laws in conjunction the Human Life Protection Act violates anyone's right to travel.

## CONCLUSION

The Court should grant Attorney General Marshall's motion to dismiss in full.

Respectfully submitted,

Steve Marshall
 *Attorney General*

James W. Davis (ASB-4063-I58J)
 *Deputy Attorney General*

/s/ Benjamin M. Seiss

45

Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
*Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Jim.Davis@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov

46

**CERTIFICATE OF SERVICE**

I certify that I electronically filed this document using the Court's CM/ECF

system on October 12, 2023, which will serve all counsel of record.

/s/ Benjamin M. Seiss