**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| YELLOWHAMMER FUND,<br><br>                      Plaintiff,<br><br>    v.<br><br>STEVE MARSHALL, in his Official Capacity as<br>Attorney General of Alabama,<br><br>                    Defendant. | No. 2:23-cv-00450-MHT |
| WEST ALABAMA WOMEN'S<br>CENTER, *et al.,*<br><br>                    Plaintiffs,<br><br>    v.<br><br>STEVE MARSHALL, in his Official Capacity as<br>Attorney General of Alabama,<br><br>                    Defendant. | No. 2:23-cv-00451-MHT |

**STATEMENT OF INTEREST OF THE UNITED STATES IN SUPPORT OF**
**PLAINTIFFS' RIGHT TO TRAVEL CLAIM**

## Table of Contents

INTRODUCTION ...............................................................................................................1

INTERESTS OF THE UNITED STATES .......................................................................3

BACKGROUND ...............................................................................................................4

DISCUSSION ...................................................................................................................7

I.     The Right to Travel Protects an Individual's Right to Cross State Lines and Engage in Conduct that Is Lawful in Other States, Including Obtaining a Legal Abortion. .....................8

     A.     Binding Precedent Confirms Individuals' Right to Obtain Legal Abortions in Other States. ........................................................................................................8

     B.     The Right to Travel and Engage in Conduct that Is Lawful in Other States Is Confirmed by the Constitution's Text, Structure, and Design.....................................11

II.     States May Not Prevent Third Parties from Assisting Individuals in Exercising Their Right to Travel. .......................................................................................................17

     A.     The Right to Travel Traditionally Protects Third-Party Assistance of Travel. ............17

     B.     The Alabama AG's Threatened Prosecutions Violate the Above Principles, and Conspiracy Law Cannot Be Used to Circumvent the Right to Travel. ........................22

CONCLUSION ................................................................................................................28

## Table of Authorities

**Cases**

*Att'y Gen. of N.Y. v. Soto-Lopez,*
   476 U.S. 898 (1986)...................................................................................................20

*Austin v. New Hampshire,*
   420 U.S. 656 (1975)...............................................................................................14, 15

*Bacchus Imports, Ltd. v. Dias,*
   468 U.S. 263 (1984).....................................................................................................3

*Bigelow v. Virginia,*
   421 U.S. 809 (1975)................................................................................................passim

*BMW of N. Am. v. Gore,*
   517 U.S. 559 (1996)................................................................................................passim

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.,*
   582 U.S. 255 (2017)...................................................................................................16

*City of Chicago v. Willett Co.,*
   344 U.S. 574 (1953).....................................................................................................3

*City of Detroit v. Osborne,*
   135 U.S. 492 (1890)...................................................................................................12

*Crandall v. Nevada,*
   73 U.S. (6 Wall.) 35 (1867).....................................................................................passim

*Dobbs v. Jackson Women's Health Org.,*
   142 S. Ct. 2228 (2022).........................................................................................2, 8, 10

*Doe v. Bolton,*
   410 U.S. 179 (1973)................................................................................................passim

*Edwards v. California,*
   314 U.S. 160 (1941)..........................................................................................2, 18, 22

*Franchise Tax Bd. of Cal. v. Hyatt,*
   578 U.S. 171 (2016)..............................................................................................15, 21

*Franchise Tax Bd. of Cal. v. Hyatt,*
   139 S. Ct. 1485 (2019).............................................................................................3, 15

*Gibbons v. Ogden,*
   22 U.S. (9 Wheat.) 1 (1824)..................................................................................13, 23

*Griffin v. Breckenridge,*
  403 U.S. 88 (1971)....................................................................................20

*Heath v. Alabama,*
  474 U.S. 82 (1985)....................................................................................16

*Hughes v. Oklahoma,*
  441 U.S. 322 (1979)..................................................................................13

*Huntington v. Attrill,*
  146 U.S. 657 (1892)..................................................................................10

*Jones v. Helms,*
  452 U.S. 412 (1981)..................................................................................25

*Kansas v. Colorado,*
  206 U.S. 46 (1907)....................................................................................15

*McIlvanie v. Coxe's Lessee,*
  8 U.S. (4 Cranch) 209 (1808)..................................................................15

*Mem'l Hosp. v. Maricopa Cnty.,*
  415 U.S. 250 (1974).................................................................9, 10, 22, 26

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue,*
  460 U.S. 575 (1983)..................................................................................25

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012)..................................................................................13

*Nat'l Pork Producers Council v. Ross,*
  598 U.S. 356 (2023)..............................................................................15, 21

*N.Y. Life Ins. v. Head,*
  234 U.S. 149 (1914)..................................................................................16

*Nielsen v. Oregon,*
  212 U.S. 315 (1909)........................................................................2, 16, 23

*Paul v. Virginia,*
  75 U.S. 168 (1868), *overruled in part on other grounds by*
  *United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533 (1944) ........12, 14

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984)..................................................................................25

*Saenz v. Roe,*
  526 U.S. 489 (1999)...........................................................................*passim*

*Shapiro v. Thompson,*
   394 U.S. 618 (1969)..................................................................................10, 15, 18

*Slaughter-House Cases,*
   83 U.S. 36 (1872)......................................................................................1, 11, 12

*Sup. Ct. of N.H. v. Piper,*
   470 U.S. 274 (1985)..........................................................................................14

*State Farm Mut. Auto. Ins. v. Campbell,*
   538 U.S. 408 (2003) ......................................................................................8, 16

*Toomer v. Witsell,*
   334 U.S. 385 (1948)................................................................................11, 14, 21

*Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n,*
   455 U.S. 691 (1982)..........................................................................................15

*United Bldg. & Constr. Trades Council of Camden Cnty. & Vicinity v. Mayor & Council of City of Camden,*
   465 U.S. 208 (1984)..........................................................................................14

*United States v. Guest,*
   383 U.S. 745 (1966)....................................................................................*passim*

*United States v. Texas,*
   599 U.S. 670 (2023)..........................................................................................13

*Ward v. State,*
   79 U.S. 418 (1870)............................................................................................12

*World-Wide Volkswagen Corp. v. Woodson,*
   444 U.S. 286 (1980).....................................................................................15, 16

*Zobel v. Williams,*
   457 U.S. 55 (1982).......................................................................................1, 11

## Statutes

28 U.S.C. § 517..............................................................................................1

Ala. Code § 13A-4-3.......................................................................................4

Ala. Code § 13A-4-4.......................................................................................4

Ala. Code § 13A-5-6.......................................................................................4

Ala. Code § 13A-2-23......................................................................................4

Ala. Code § 26-23H-4......................................................................................4

Ala. Code § 26-23H-6............................................................................................................4

**Constitutions**

U.S. Const. art. IV, § 2 .......................................................................................................13

**Other Authorities**

3 J. Story, Commentaries on the Constitution of the United States (1833) ...........................................11

## INTRODUCTION

The United States respectfully submits this Statement of Interest under 28 U.S.C. § 517.[1] In these two consolidated cases, the Alabama Attorney General (Alabama AG) expressly argues that he may criminally prosecute individuals within Alabama who assist others in obtaining legal, out-of-state abortions. Specifically, the Alabama AG contends that providing assistance within Alabama to someone seeking an out-of-state abortion constitutes a criminal conspiracy, regardless of whether the abortion is legal in the state where it is performed, as long as the abortion would be illegal if performed within Alabama. Plaintiffs in these cases are organizations and individuals within Alabama seeking to facilitate women's access to legal, out-of-state abortions. Plaintiffs challenge the Alabama AG's threatened conspiracy prosecutions on a variety of grounds, including as being inconsistent with the Constitution's right to travel.

"[T]he constitutional right to travel from one State to another is firmly embedded in" both the Supreme Court's jurisprudence and the Constitution. *Saenz v. Roe*, 526 U.S. 489, 498 (1999). Indeed, the right to travel pre-dates the Constitution: it was expressly codified in the Articles of Confederation, and then was carried forward by the Privileges and Immunities Clause of Article IV of the Constitution. *See Zobel v. Williams*, 457 U.S. 55, 79-80 (1982) (O'Connor, J., concurring); *Slaughter-House Cases*, 83 U.S. 36, 75 (1872). The right to travel is so fundamental that it is one of the rights of national citizenship also protected by the Fourteenth Amendment's Privileges or Immunities Clause. *Slaughter-House Cases*, 83 U.S. at 79-80; *see also United States v. Guest*, 383 U.S. 745, 764-67 (1966) (Harlan, J., concurring).

It is therefore unsurprising that the Supreme Court has recognized that individuals have the

---

[1] Under 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

right to cross state lines and engage in legal conduct in other states, including to obtain a legal abortion in another state. *See, e.g.*, *Doe v. Bolton*, 410 U.S. 179, 200 (1973) (holding that the Privileges and Immunities Clause "protect[s] persons who enter Georgia seeking the medical services that are available there," including abortion); *Bigelow v. Virginia*, 421 U.S. 809, 824 (1975) (cautioning that Virginia could not "prevent its residents from traveling to New York to obtain" abortion services legally available in that state, nor could Virginia "prosecute [its residents] for going there"). And over a century ago, the Supreme Court similarly confirmed that Oregon cannot "punish a man for doing within the territorial limits of Washington an act which that state had specially authorized him to do[.]" *Nielsen v. Oregon*, 212 U.S. 315, 321 (1909). These precedents are supported by the Constitution's text, structure, and original design, all of which confirm that the right to travel includes the right to engage in lawful conduct in other states. As Justice Kavanaugh has explained, the question of whether a State may "bar a resident of that State from traveling to another State to obtain an abortion" is "not especially difficult"—"the answer is no based on the constitutional right to interstate travel." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2309 (2022) (Kavanaugh, J., concurring).

Moreover, the Supreme Court has also held that states may not prevent third parties from *assisting* others in exercising their right to travel. This principle flows squarely from *Edwards v. California*, 314 U.S. 160 (1941), in which the Supreme Court overturned the criminal conviction of an individual who assisted his brother-in-law in traveling to California. *Id.* at 171. Any contrary approach—whereby individuals are theoretically free to travel on their own, but states are permitted to prohibit third-party assistance for that travel—would severely undercut the right to travel itself. Just as a state cannot prohibit travel to other states to engage in conduct that is lawful in those other states, the state likewise cannot prohibit third-party assistance for such travel.

These precedents foreclose the Alabama AG's threatened prosecutions here. Specifically, the Alabama AG's conspiracy prosecutions would criminalize third-party assistance for interstate travel,

and their sole purpose is to impede individuals' exercise of their right to leave Alabama and obtain medical services legally available elsewhere. The Alabama AG's primary defense of his position—that conspiracy doctrine allows him to punish in-state agreements to travel—does nothing to remove the fundamental constitutional defect of the threatened prosecutions. Just as the Alabama AG cannot directly prohibit an individual from crossing state lines to obtain a legal abortion, neither can he seek to achieve the same result by threatening to prosecute anyone who assists that individual in their travel. Thus, for the reasons explained more fully below, the United States files this Statement of Interest in support of Plaintiffs' right to travel claims.

## INTERESTS OF THE UNITED STATES

The United States has a sovereign interest in preserving the proper functioning of the federal system, including by ensuring that one state does not improperly intrude into the affairs of other states, thereby protecting the integrity of the Union itself. *See, e.g.*, *Franchise Tax Bd. of Cal. v. Hyatt* (*Hyatt III*), 139 S. Ct. 1485, 1498 (2019) ("Each State's equal dignity and sovereignty under the Constitution implies certain constitutional 'limitation[s] on the sovereignty of all of its sister States.'") (citation omitted). The Supreme Court has similarly recognized "strong federal interests in preventing economic Balkanization," *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 276 (1984), and a "national interest in the unrestricted flow of interstate commerce," *City of Chicago v. Willett Co.*, 344 U.S. 574, 577 (1953). Moreover, the United States and its federal agencies have their own interests in states not criminalizing travel, or the assistance of travel, across state lines to access healthcare.

As discussed further below, the Alabama AG's threatened prosecutions undermine these national interests by obstructing individuals' exercise of their right to travel—one of the rights of national citizenship—and also by interfering with the legitimate policy judgments of other states. *See, e.g.*, *Guest*, 383 U.S. at 767 (Harlan, J., concurring) ("[T]he right to unimpeded interstate travel, regarded as a privilege and immunity of national citizenship, was historically seen as a method of breaking

down state provincialism, and facilitating the creation of a true federal union."). Thus, the United States files this Statement of Interest to prevent a breakdown in the federal system, preserve the Constitution's original structure, and eliminate burdens on the efforts of individuals within Alabama seeking to travel to other states to engage in lawful conduct.

## BACKGROUND

Following the Supreme Court's decision in *Dobbs*, Alabama now prohibits most abortions within the state. *See* Ala. Code § 26-23H-4. Separately, Alabama law also prohibits criminal conspiracies: "A person is guilty of criminal conspiracy if, with the intent that conduct constituting an offense be performed, he or she agrees with one or more persons to engage in or cause the performance of the conduct, and any one or more of the persons does an overt act to effect an objective of the agreement." *Id.* § 13A-4-3(a). Additionally, Alabama law provides that "[a] conspiracy formed in this state to do an act beyond the state, which, if done in this state, would be a criminal offense, is indictable and punishable in this state in all respects as if such conspiracy had been to do such act in this state." *Id.* § 13A-4-4; *see also id.* § 13A-2-23 (aiding and abetting statute). Under Alabama law, a person found guilty of conspiring to commit an unlawful abortion could face a term of imprisonment between two and twenty years. *See id.* § 13A-4-3(g)(2); *id.* § 13A-5-6(a)(2); *id.* § 26-23H-6(a).

Plaintiffs filed these two consolidated cases on July 31, 2023, and both sets of Plaintiffs seek declaratory and injunctive relief preventing the Alabama AG from prosecuting them for assisting Alabamians in obtaining legal abortions in other states. The following facts are assumed to be true as alleged in the complaints. Plaintiff Yellowhammer Fund describes itself as a "reproductive justice organization" based in Tuscaloosa, Alabama, that previously provided abortion funding and other practical support, including transportation, to individuals seeking abortions. *See Yellowhammer* Compl., ECF No. 1, ¶¶ 7, 35-42. Yellowhammer intended, after *Dobbs*, to continue "support[ing] patients who

needed to travel out of Alabama to access abortion care." *Id.* ¶ 42. Shortly after the Supreme Court decided *Dobbs*, however, the Alabama AG appeared on a radio program and, although he acknowledged that Alabama's abortion ban applies only within Alabama, he also suggested that groups facilitating out-of-state abortions could be prosecuted under Alabama's criminal conspiracy laws. *See id.* ¶¶ 17-27. After the Alabama AG's statements, Yellowhammer "stopped sharing information about lawful out-of-state abortion and stopped providing funds and logistical support to abortion seekers," *id.* ¶ 44, even though it wishes to continue doing so. *Id.* ¶¶ 44-48.

Similarly, the second suit was filed by three plaintiffs—the West Alabama Women's Center; Dr. Yashica Robinson, M.D.; and the Alabama Women's Center—all of whom previously provided abortions within Alabama, but stopped doing so after the Supreme Court's *Dobbs* decision. *See W. Ala. Women's Ctr.* Compl., ECF No. 23, ¶¶ 10-15. In addition to performing abortions, these plaintiffs also provided individuals "with information, counseling, and support in order to assist those individuals interested in accessing out-of-state abortion care in doing so." *Id.* ¶ 65; *see also id.* ¶¶ 69-70. Based on the Alabama AG's threats of prosecution, these plaintiffs "ceased providing this sort of information and support," *id.* ¶ 71, even though they wish to continue doing so, *id.* ¶¶ 65, 75-82.

Both complaints name as a defendant the Alabama AG in his official capacity.[2] In their complaints, Plaintiffs assert a variety of claims, but both allege that the Alabama AG's threatened conspiracy prosecutions violate the constitutional right to travel. *See, e.g.*, *Yellowhammer* Compl. ¶ 92 ("Defendant's threats to . . . prosecute abortion funds deprive Yellowhammer Fund and the people it serves of their constitutional right to travel."); *W. Ala. Women's Ctr.* Compl. ¶ 131 (allowing prosecutions for "the provision of . . . support and assistance to those seeking to . . . obtain abortion

---

[2] The *West Alabama Women's Center* complaint initially also named as defendants District Attorneys representing each of Alabama's counties. The District Attorney defendants were dismissed pursuant to a stipulation by both parties on August 3, 2023, under which the District Attorney defendants agreed to be bound by any relief that may be ordered against the Alabama AG. *See* Consent Order, ECF No. 25.

care that is legal and available in other states" would "unconstitutionally violate the fundamental right to travel"). Accordingly, both Plaintiffs request declaratory and injunctive relief prohibiting such prosecutions. *See Yellowhammer* Compl. at 36-37; *W. Ala. Women's Ctr.* Compl. at 32-33.

On August 28, 2023, the Alabama AG filed a motion to dismiss both Plaintiffs' complaints in their entirety, including the right to travel claim. *See* AG Mot. to Dismiss, ECF No. 28 ("MTD"). In his motion, the Alabama AG expands on the position he took in his publicly reported comments. Specifically, he contends that individuals can be prosecuted if they form an agreement within Alabama to assist in obtaining an abortion in another state, regardless of whether the abortion is legal in that other state, if that abortion would be illegal if performed within Alabama. *See, e.g.*, MTD at 2 ("An elective abortion performed in Alabama would be a criminal offense; thus, a conspiracy formed in the State to have that same act performed outside the State is illegal."); *id.* at 17 ("The criminal conduct is the agreement (the conspiracy) itself, which is conduct that occurs *in Alabama* that Alabama has every right to prosecute. Thus, the legality of abortion in other States is irrelevant to whether Alabama can prosecute a conspiracy formed in Alabama.").

Both Plaintiffs have opposed the motion to dismiss including with respect to their right to travel claim, *see Yellowhammer* Opp'n, ECF No. 33; *W. Ala. Women's Ctr.* Opp'n, ECF No. 34, and the Alabama AG has filed a reply in support, *see* Reply in Supp. of Mot. to Dismiss, ECF No. 36 ("Reply"). In advance of any hearing, the United States submits this Statement of Interest in support of Plaintiffs' opposition to Defendant's motion to dismiss regarding Plaintiffs' right to travel claims.[3]

---

[3] This Statement of Interest takes no position on any other issues or claims in these cases. In particular, the United States does not understand the Alabama AG to contend that individuals are prohibited from informing or counseling each other about lawful reproductive care that is available in other states. *See* Reply at 28 n.22 (stating that the Alabama AG has not "threatened to prosecute . . . the mere discussion of options with a patient"); *cf. Bigelow*, 421 U.S. at 829. Thus, the United States has not addressed that question in this filing.

**DISCUSSION**

"The constitutional right to travel from one State to another . . . occupies a position fundamental to the concept of our Federal Union." *Guest*, 383 U.S. at 757. The right to travel embraces more than just physical movement; it also protects an individual's right to engage in conduct that is lawful in other states while in those states, regardless of their home state's laws. That right to engage in lawful conduct includes the right to obtain a legal abortion in another state, as binding precedent and fundamental constitutional principles both confirm. Moreover, not only do states lack authority to directly prohibit travel across state lines, but states also cannot prevent third parties from providing assistance to individuals who are seeking to exercise their right to travel. And laws that have the purpose of impeding, deterring, or chilling interstate travel are likewise unconstitutional.

Here, the Alabama AG's threatened conspiracy prosecutions plainly violate these principles. Individuals within Alabama have a constitutional right to leave the state and obtain a legal abortion in another state. The Alabama AG does not directly prohibit such travel, and instead seeks to impede that travel by criminally prosecuting anyone who provides assistance to the traveling individual. But the Supreme Court has long confirmed that states may not prevent third parties from assisting in the exercise of the constitutional right to travel, and nothing about conspiracy doctrine changes that result. The Alabama AG cannot undermine the right to travel by making each traveling individual an island unto themselves, prohibited from receiving assistance from anyone else within the state. As discussed more fully below, therefore, the Alabama AG's threatened prosecutions are contrary to the right to travel and therefore unconstitutional.[4]

---

[4] The Alabama AG also contends that Yellowhammer Fund, as a non-natural person, does not possess any right to travel. *See* MTD at 31-33; Reply at 36-38. But assuming that Yellowhammer has sufficiently established its standing—a question on which the United States takes no position—the United States sees no impediment to the Court addressing Yellowhammer's right to travel claim based on Yellowhammer's staff and volunteers who are natural persons. *See Yellowhammer* MTD Opp'n, ECF No. 33, at 46-47 (invoking rights of "members of Plaintiff's board, staff, and volunteers");

I.     **The Right to Travel Protects an Individual's Right to Cross State Lines and Engage in Conduct that Is Lawful in Other States, Including Obtaining a Legal Abortion.**

At its most basic level, the right to travel includes "the right to go from one place to another, including the right to cross state borders while en route[.]" *Saenz*, 526 U.S. at 500. But the right to travel is not limited only to physical movement; it also protects the right to engage in lawful conduct once an individual arrives in another state. Binding Supreme Court precedent confirms that the right to travel encompasses a right to engage in conduct that is lawful in other states while in those states— including obtaining a lawful abortion in another state. This right to engage in conduct that is lawful in other states is further supported by the Constitution's design, as reflected in Article IV's Privileges and Immunities Clause and the overall federal structure.

A.     **Binding Precedent Confirms Individuals' Right to Obtain Legal Abortions in Other States.**

Under the Supreme Court's decisions, a State may not, consistent with the constitutional right to interstate travel, prevent its citizens from traveling to another State to obtain an abortion that is lawful where obtained. As Justice Kavanaugh—one of the five members of the *Dobbs* majority— wrote in his concurring opinion in that case, the question of whether "a State [may] bar a resident of that State from traveling to another State to obtain an abortion" is "not especially difficult as a constitutional matter"—"the answer is no based on the constitutional right to interstate travel." *Dobbs*, 142 S. Ct. at 2309 (Kavanaugh, J., concurring). That conclusion follows from Supreme Court precedent making clear that, based on the constitutional right to travel, a state cannot prosecute or prevent individuals from crossing state lines to obtain a lawful abortion.

In *Doe v. Bolton*, 410 U.S. 179 (1973), the Court held that Article IV's Privileges and Immunities

---

*Yellowhammer* Compl. ¶ 41 ("As needed, Yellowhammer Fund's staff and volunteers directly transported callers to abortion appointments."). And the Supreme Court has relied on principles of interstate federalism to protect the rights of entities in addition to natural persons. *See, e.g., State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 421 (2003); *BMW of N. Am. v. Gore*, 517 U.S. 559, 571-72 (1996); Part I.B.2, *infra*.

Clause guaranteed an individual's right to enter another state for the purpose of obtaining a lawful abortion. *See id.* at 200 ("Just as the Privileges and Immunities Clause protects persons who enter other States to ply their trade, so must it protect persons who enter Georgia seeking the medical services that are available there. A contrary holding would mean that a State could limit to its own residents the general medical care available within its borders. This we could not approve."). Similarly, in *Bigelow v. Virginia*, the Court reiterated that because abortion services were legal in New York, Virginia could not "prevent its residents from traveling to New York to obtain those services" nor could it "prosecute them for going there." 421 U.S. at 824. The Court invoked state autonomy and limits on territoriality, cautioning that "[a] State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State." *Id.* at 824; *see also id.* at 827-28 (stating that Virginia is effectively "advancing an interest in shielding its citizens from information about activities outside Virginia's borders, activities that Virginia's police powers do not reach").

This conclusion in the abortion context follows directly from the Court's cases outside the abortion context. For example, in *Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974), the Court held that the right to travel includes the right to obtain medical care in other states. Arizona had imposed a durational residence requirement for eligibility for nonemergency free medical care, a law that "effectively penalized" individuals for their "interstate migration." *Id.* at 256. The Court recognized that "[t]he right of interstate travel" is "a basic constitutional freedom," *id.* at 254, and struck down the law because it "served to penalize the exercise of the right to travel" by blocking access to medical care without any compelling justification, *id.* at 257. The Court reasoned that "the right of interstate travel must be seen as insuring new residents the same right to vital government benefits and privileges in the States to which they migrate as are enjoyed by other residents," and Arizona's statutory impediment to "medical care penalizes indigents for exercising their right to

migrate to and settle in that State." *Id.* at 261-62; *see also Shapiro v. Thompson*, 394 U.S. 618, 630-31 (1969) (striking down durational residence requirements for welfare assistance because the laws' "purpose of deterring the in-migration of indigents," contrary to their "constitutional right to travel from one State to another," "is constitutionally impermissible").

The Alabama AG disregards Justice Kavanaugh's concurring opinion and fails to address *Doe v. Bolton*. Aside from challenging the First Amendment analysis in *Bigelow*, he largely contends that the decision "rested on abortion's then-constitutionally protected status." MTD at 38 n.15; Reply at 30. But the relevant portion of *Bigelow* was not based on the First Amendment or on an individual having a constitutional right to an abortion; it was grounded in the constitutional right to travel and broader restrictions on states' territorial jurisdiction—principles that long pre-dated *Roe v. Wade,* were not affected by *Dobbs*, and remain good law today. *See Bigelow*, 421 U.S. at 824. In particular, the relevant passage in *Bigelow* cited three cases about the right to travel (*Guest*, 383 U.S. at 757-59; *Shapiro*, 394 U.S. at 629-31; and *Bolton*, 410 U.S. at 200), and one case about states' limited territorial authority (*Huntington v. Attrill*, 146 U.S. 657, 669 (1892)). Nothing in the *Dobbs* opinion (overturning *Roe v. Wade*) calls into question any of these principles or the relevant teachings of *Bigelow* or *Bolton*.[5] Indeed, Justice Kavanaugh's concurring opinion embraces the relevant rule from *Bigelow* and *Bolton*. *See* 142 S. Ct. at 2309 (Kavanaugh, J., concurring). It is thus clear, based on binding Supreme Court precedent, that individuals' right to travel includes the right to engage in conduct that is lawful in another state, including obtaining abortions that are lawful in the other state.

---

[5] The *Dobbs* majority opinion criticized *Bolton* because some courts had interpreted a separate part of that opinion as "protect[ing] a broad right to obtain an abortion at any stage of pregnancy provided that a physician is willing to certify that it is needed due to a woman's 'emotional' needs or 'familial' concerns." *Dobbs*, 142 S. Ct. at 2255 n.40. But that portion of *Bolton*, 410 U.S. at 192, is entirely separate from the opinion's discussion of the right to travel, *see id.* at 200, and nothing in *Dobbs* purports to question *Bolton* on that aspect of the case. This aspect of *Bolton* is also consistent with other cases outside the abortion context, unaffected by *Dobbs*. *See Mem'l Hosp.*, 415 U.S. at 269.

**B.    The Right to Travel and Engage in Conduct that Is Lawful in Other States Is Confirmed by the Constitution's Text, Structure, and Design.**

The above precedents flow from fundamental constitutional principles that make clear that the right to travel includes the right to engage in conduct that is lawful in other states while in those states. In particular, the Privileges and Immunities Clause and principles of equal state sovereignty confirm as much.

**1.** The right to travel is "firmly embedded" in both the Supreme Court's jurisprudence and the Constitution, *Saenz*, 526 U.S. at 498, and is so fundamental that it is one of the rights of national citizenship. *Slaughter-House Cases*, 83 U.S. at 79-80. This constitutional right to travel includes "at least three" different components, including the right "to enter and to leave" a state, "the right to be treated as a welcome visitor" in the destination state, and the right of new permanent residents "to be treated like other citizens" of the destination state. *Saenz*, 526 U.S. at 500. As relevant here, the "right to go from one place to another" was "expressly mentioned in the text of the Articles of Confederation" and "may simply have been 'conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created.'" *Id.* at 501; *see also Zobel*, 457 U.S. at 80 (O'Connor, J., concurring). Moreover, the right to be treated as a welcome visitor is "expressly protected by the text of the Constitution," *id.*, namely the Privileges and Immunities Clause of Article IV which provides: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

"The primary purpose" of the Privileges and Immunities Clause, "like the clauses between which it is located—those relating to full faith and credit and to interstate extradition of fugitives from justice—was to help fuse into one Nation a collection of independent, sovereign States. It was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy." *Toomer v. Witsell*, 334 U.S. 385, 395 (1948); *see also* 3 J. Story, *Commentaries on the Constitution of the United States*, 3:674-75, § 1800 (1833) ("The intention of this clause was to confer

on them, if one may so say, a general citizenship; and to communicate all the privileges and immunities, which the citizens of the same state would be entitled to under the like circumstances."). Thus, "[t]he clause plainly and unmistakably secures and protects the right of a citizen of one State to pass into any other State of the Union for the purpose of engaging in lawful commerce, trade, or business without molestation." *Ward v. State*, 79 U.S. 418, 430 (1870); *see also Slaughter-House Cases*, 83 U.S. at 75.

Under the Privileges and Immunities Clause, once a resident of Alabama passes into another state (say, Florida), the Alabama resident is equally free to engage in conduct that is lawful within Florida on the same basis as Florida residents. *See City of Detroit v. Osborne*, 135 U.S. 492, 498 (1890) ("A citizen of another state going into Michigan may be entitled under the federal constitution to all the privileges and immunities of citizens of that state; but, under that constitution, he can claim no more. He walks the streets and high ways in that state *entitled to the same rights and protection as*, but none other than, those accorded by its laws to its own citizens." (emphasis added)). Because the purpose of the Clause is to "place the citizens of each State upon the same footing with citizens of other States," when individuals travel into another state they lose both "the peculiar privileges conferred by their [home state's] laws" as well as "the disabilities of alienage" while they are in the other state. *Paul v. Virginia*, 75 U.S. 168, 180-81 (1868), *overruled in part on other grounds by United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533 (1944). Regardless of the benefits or burdens that a home state places on its residents, therefore, when an individual travels to a new state, they are placed "upon the same footing" and enjoy "the same freedom[s]" as the residents of that state; any other approach would give "an extra-territorial operation . . . to local legislation utterly destructive of the independence and the harmony of the States." *Paul*, 75 U.S. at 180-81.

Contrary to the Alabama AG's assertion, *see* MTD at 28, this component of the right to travel is not limited only to prohibiting discrimination against out-of-state residents. Although most applications of the Privileges and Immunities Clause involve a state discriminating against out-of-state

residents, *cf. Saenz*, 526 U.S. at 501-02 (collecting recent cases), that is simply because cases have most often involved instances in which states sought to benefit their own residents at the expense of out-of-state residents. *Cf. Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979) (acknowledging "tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation"). But the governing principle under the Constitution is the same regardless of which state's laws are at issue: *no* state may prohibit residents of one state from enjoying the benefits legally available in another state. The historical rarity of what the Alabama AG is attempting here—*i.e.*, to impede Alabama's own residents from pursuing in another state conduct that is lawful there—only serves to highlight the constitutional defects. *Cf. United States v. Texas*, 599 U.S. 670, 677 (2023) ("A telling indication of the severe constitutional problem with the States' assertion of standing to bring this lawsuit is the lack of historical precedent supporting it."); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549 (2012) ("Sometimes the most telling indication of a severe constitutional problem is the lack of historical precedent." (cleaned up)).

Moreover, the Privileges and Immunities Clause provides an entitlement to individuals and, importantly, nothing in the text of that Clause makes that entitlement contingent on the identity of the state that is discriminating. Instead, the Clause provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1; *cf. Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 188 (1824) ("[T]he enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said."). From the perspective of the individual whose rights are at issue, it makes no difference whether she is prohibited from engaging in conduct that is lawful in Florida by the laws of Florida or Alabama; in both scenarios she is not on equal footing with Florida residents, contrary to the Privileges and Immunities Clause's purpose of ensuring that individuals enjoy "the same freedom" and do not suffer "the disabilities of alienage" in other

states. *Paul*, 75 U.S. at 180. And structurally, none of the other constitutional provisions within Article IV—which were likewise designed to support interstate harmony, *see Toomer*, 334 U.S. at 395—are limited to preventing discrimination against out-of-state residents.

Finally, limiting the Privileges and Immunities Clause only to discrimination against nonresidents would open the door for the very economic balkanization that the Clause was intended to prevent. *See, e.g.*, *Sup. Ct. of N.H. v. Piper*, 470 U.S. 274, 285 n.18 (1985). Although economic balkanization generally results from discrimination against nonresidents, it does not inherently require such discrimination; isolationism can similarly be achieved through discrimination against states' own residents. For example, *Toomer* involved a "shrimp fishery extending from North Carolina to Florida" that, because of each state's protectionist measures, had become "effectively partitioned at the state lines." 334 U.S. at 388. The Supreme Court invalidated South Carolina's attempt to exclude nonresident commercial fishers from South Carolina's waters. *Id.* at 396-97. If the Privileges and Immunities Clause applied only to discrimination against nonresidents, the states could have achieved the same protectionist, partitioned result simply by enacting laws prohibiting their residents from fishing outside the state boundaries, and making the law contingent on every other state from North Carolina to Florida enacting the same law. Or to take another scenario, each state could enact a similar law prohibiting its residents from applying for out-of-state contracting opportunities, with the resulting partitioning of the relevant market. *Cf. United Bldg. & Constr. Trades Council of Camden Cnty. & Vicinity v. Mayor & Council of City of Camden*, 465 U.S. 208 (1984) (invalidating an attempt to reserve contracting jobs only for certain residents). Permitting such laws would thus enable the very type of economic isolationism and balkanization that the Privileges and Immunities Clause was intended to prevent, which highlights why the Clause's grant of individual rights extends beyond the narrow context of discrimination against out-of-state residents; the Clause also ensures that State A cannot prevent its residents from engaging in lawful conduct in State B on the same terms as State B residents. *Cf. Austin*

*v. New Hampshire*, 420 U.S. 656, 667 (1975) ("A state may not barter away the right, conferred upon its citizens by the Constitution of the United States, to enjoy the privileges and immunities of citizens when they go into other states.").

**2.** In addition to the Privileges and Immunities Clause, the right to travel to another state *and* engage in conduct that is lawful in that state flows from principles of horizontal federalism inherent in the Constitution's design. *See Shapiro*, 394 U.S. at 629 (grounding the right to travel in "the nature of our Federal Union"); *Guest*, 383 U.S. at 767 (Harlan, J., concurring) (right to travel was "historically seen as a method of breaking down state provincialism, and facilitating the creation of a true federal union"); *see also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 (2023) ("To resolve disputes about the reach of one State's power, this Court has long consulted original and historical understandings of the Constitution's structure and the principles of 'sovereignty and comity' it embraces.") (quoting *Gore*, 517 U.S. at 572.

Inherent in our Constitution and "the structure of our Nation as a union of States," *Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n*, 455 U.S. 691, 704 (1982), is "the Constitution's vision of 50 individual and equally dignified States." *Franchise Tax Bd. of Cal. v. Hyatt (Hyatt II)*, 578 U.S. 171, 179 (2016); *see also Kansas v. Colorado*, 206 U.S. 46, 97 (1907). Prior to ratification, "the States considered themselves fully sovereign nations," each with "all the rights and powers of sovereign states." *Hyatt III*, 139 S. Ct. at 1493 (quoting *McIlvanie v. Coxe's Lessee*, 8 U.S. (4 Cranch) 209, 212 (1808)). Once ratified, however, "the Constitution affirmatively altered the relationships between the States, so that they no longer relate to each other solely as foreign sovereigns." *Id.* at 1497. Instead, "[e]ach State's equal dignity and sovereignty under the Constitution implies certain constitutional 'limitation[s] on the sovereignty of all of its sister States.'" *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980)). Thus, each State's authority to regulate conduct "must be assessed in the context of our federal system of government" and must

"remain faithful to the principles of interstate federalism embodied in the Constitution." *Woodson*, 444 U.S. at 293; *see also Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 263 (2017) (even when a state "has a strong interest in applying its law," the Constitution, "acting as an instrument of interstate federalism, may sometimes act to divest the State of its power").

Pursuant to these principles, the Supreme Court has repeatedly confirmed across many factual contexts that no State can "impose its own policy choice on neighboring States." *Gore*, 517 U.S. at 571-72 (holding that "principles of state sovereignty and comity" prohibit a state from "impos[ing] economic sanctions . . . with the intent of changing the tortfeasors' lawful conduct in other States"). In particular, a state cannot impose criminal penalties on a person for engaging in conduct in another state that was lawfully authorized by that state:

> The plaintiff in error was within the limits of the state of Washington, doing an act which that state in terms authorized and gave him a license to do. Can the state of Oregon, by virtue of its concurrent jurisdiction, disregard that authority, practically override the legislation of Washington, and punish a man for doing within the territorial limits of Washington an act which that state had specially authorized him to do? We are of opinion that it cannot.

*Nielsen*, 212 U.S. at 321; *see also State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 421 (2003) ("A State cannot punish a defendant for conduct that may have been lawful where it occurred."); *N.Y. Life Ins. v. Head*, 234 U.S. 149, 161 (1914) ("[I]t would be impossible to permit the statutes of Missouri to operate beyond the jurisdiction of that State . . . without throwing down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends.").[6]

---

[6] The Alabama AG contends in a footnote that *Nielsen* has been limited to its facts. MTD at 38 n.14 (citing *Heath v. Alabama*, 474 U.S. 82, 91 (1985)). But *Heath* was a double jeopardy case, not a case about federal constitutional limitations on state authority to prosecute conduct authorized by another state. And *Heath* acknowledged that *Nielsen* has relevance on that type of question—*i.e.*, "questions of jurisdiction between two entities deriving their concurrent jurisdiction from a single source of authority." 474 U.S. at 91. Moreover, the relevant rule from *Nielsen* is also embraced in later cases such as *State Farm*, 538 U.S. at 421.

Thus, the constitutional right to travel is informed by background principles of interstate federalism and limits on state authority, embedded within the Constitution's structure and design. And those principles establish that, if an individual engages in conduct that is lawful in another state, the individual cannot be prosecuted based on their home state's disagreement with the other state's policy judgments. *Cf. Gore*, 517 U.S. at 570-71 (particularly when "a patchwork of rules representing the diverse policy judgments of lawmakers in 50 States" has emerged around an issue, a state's ability to impose its policies is "constrained by the need to respect the interests of other States").

II.    **States May Not Prevent Third Parties from Assisting Individuals in Exercising Their Right to Travel.**

The settled principles described above establish that individuals have a fundamental constitutional right to cross state lines and engage in conduct that is lawful in another state, including obtaining legal abortions. Of course, this case involves third-party organizations and individuals seeking to *assist* individuals engaging in that interstate travel for the purpose of obtaining legal abortions. The Supreme Court has made clear that this conduct is equally protected; a state violates the right to travel when it forecloses third-party assistance for travel or acts with the purpose of impeding lawful travel. Here, the Alabama AG's threatened conspiracy prosecutions would prohibit third-party assistance for travel, and would do so precisely for the purpose of impeding such travel. These prosecutions are therefore unconstitutional for each of those independent reasons.

A.    **The Right to Travel Traditionally Protects Third-Party Assistance of Travel.**

The Alabama AG's central argument is that his threatened prosecutions "do not implicate the right to travel because they present no burden to it," and instead "merely regulate[] certain assistance for interstate travelling." MTD at 30; *see also* Reply at 11-12 ("Alabama may prohibit persons inside the State from helping women obtain abortions, even if abortion is legal elsewhere and even though women may independently obtain them without exposing themselves to criminal liability."). But this argument ignores the well-settled principle that a state cannot interfere with the right to travel by

punishing those who assist with the travel.

The leading case is *Edwards v. California*, in which the Supreme Court addressed a criminal conviction of an individual who helped his indigent brother-in-law come to California, in violation of a California law penalizing anyone who "brings or assists in bringing into the State any indigent person who is not a resident of the State." 314 U.S. at 171. That law did not directly prohibit the interstate travel of indigent persons, and instead penalized only those who assisted in the indigent persons' travel into California.[7] Nonetheless, the Supreme Court overturned the conviction and invalidated the law, precisely because its "express purpose and inevitable effect is to prohibit the transportation of indigent persons across the California border." *Id.* at 174. It did not matter that indigent persons retained the ability to travel independently into California; the "prohibition . . . against the 'bringing' or transportation of indigent persons into California" was nonetheless unconstitutional. *Id.* at 173. Nor did it matter that California's law was intended to address "problems of health, morals, and especially finance, the proportions of which are staggering." *Id.* The State could not seek to advance those interests in an unconstitutional manner by interfering with interstate travel. *Id.* at 173-74.[8]

Similarly, in *Crandall v. Nevada*, 73 U.S. (6 Wall.) 35 (1867), the Supreme Court invalidated a Nevada law imposing a "tax of one dollar upon every person leaving the State by any railroad, stage coach, or other vehicle engaged or employed in the business of transporting passengers for hire[.]" *Id.* at 36. The tax did not apply if individuals left the state independently; it applied only if individuals

---

[7] The Alabama AG incorrectly asserts that the law in *Edwards* "categorically blocked 'in-migration' of indigent nonresidents." Reply at 41. The law did not prohibit the travel of indigent nonresidents at all; it criminalized only the actions of those who brought, or assisted in bringing, indigent nonresidents into the state. *See Edwards*, 314 U.S. at 171.

[8] The Alabama AG also contends that *Edwards* did not contemporaneously style itself as a constitutional right to travel case. *See* Reply at 41 n.34. But that argument ignores that the Supreme Court subsequently classified *Edwards* as a right to travel case, describing it as vindicating the "right to go from one place to another, including the right to cross state borders while en route." *Saenz*, 526 U.S. at 500; *see also Shapiro*, 394 U.S. at 630 & n.8 (explaining that in *Edwards*, "a Commerce Clause approach was employed" as the "source of this right to travel interstate").

relied on the assistance of a common carrier to leave the state "by the ordinary mode of passenger travel." *Id.* at 40. Nevertheless, the Court overturned the conviction of a stage coach agent who refused to collect the tax. *Id.* at 43-49. The Court reasoned that even a tax ostensibly on the operator of a vessel is effectively "a tax upon the passenger" and thus unconstitutional. *Id.* at 40. Thus, in a case involving a stage coach agent (not a passenger), involving a law that imposed only a small tax on the use of third-party companies to travel out of state, the Supreme Court held that the law violated individuals' underlying right to travel.

These cases demonstrate that, just as a state cannot prohibit the underlying travel, a state also cannot restrict third-party assistance of that travel. Any contrary approach—allowing states to restrict third-party assistance for travel—would threaten to gut the right to travel itself. Even at the time of *Crandall* over 150 years ago, "the common and usual modes" of interstate travel involved assistance from third-party entities, 73 U.S. (6 Wall.) at 39, which is equally (if not more) common today. And the Alabama AG fails to articulate any limiting principle for his theory that a state is free to prohibit third-party assistance intended to support an individual's travel. A state could effectively make each traveler an island unto themselves—technically free to cross state lines on their own, but unable to rely on any third parties to assist in that endeavor. Given the breadth of services needed to engage in interstate travel, a ban on third-party assistance would allow states to significantly limit (if not functionally prevent) the travel itself.

The analysis is no different if a state's restrictions on third-party assistance are limited to assistance that furthers specific conduct disapproved of by the state. *Cf.* Reply at 41 (attempting to distinguish *Edwards* because "Alabama's conspiracy statutes criminalize travel aid only to the extent that it furthers a specific, unlawful agreement to procure an elective abortion"). Even apart from the right to travel cases involving third-party assistance, the Supreme Court has made clear that a state law violates the right to travel when the law's purpose is to deter such travel. *See, e.g., Saenz*, 526 U.S. at 499

n.11 ("If a law has no other purpose than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it is patently unconstitutional." (modifications omitted)); *Guest*, 383 U.S. at 760 (the right to travel is implicated by state action where the "predominant purpose . . . is to impede or prevent the exercise of the right of interstate travel, or to oppress a person because of his exercise of that right"); *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986) (plurality op.). As discussed in Part I, *supra*, the right to travel encompasses the right to engage in conduct that is lawful in other states, including to obtain a lawful abortion. Thus, a state's restrictions on third-party assistance are unlawful regardless of whether the purpose of the restrictions is to deter the travel itself or to deter the lawful conduct occurring in another state—both purposes are constitutionally impermissible.

More fundamentally, the right to travel exists as a right of *national* citizenship. *See Griffin v. Breckenridge*, 403 U.S. 88, 106 (1971); *Saenz*, 526 U.S. at 501. "For all the great purposes for which the Federal government was formed we are one people, with one common country. We are all citizens of the United States, and as members of the same community must have the right to pass and repass through every part of it without interruption, as freely as in our own States." *Crandall*, 73 U.S. (6 Wall.) at 48-49. Allowing a single state to penalize anyone who facilitates individuals' exercise of their national rights, simply because that state disagrees with how another state has chosen to exercise its own legislative authority, would fundamentally undermine this right to national citizenship no less than a direct tax or regulation on the travel itself. *Cf. id.* at 49 ("[A] tax imposed by a State, for entering its territories or harbors, is inconsistent with the rights which belong to citizens of other States as members of the Union, and with the objects which that Union was intended to attain. Such a power in the States could produce nothing but discord and mutual irritation, and they very clearly do not possess it."). The rights of national citizenship may not be undermined by state-versus-state policy disagreements.

Finally, even if state restrictions on third-party assistance could be limited to those situations where a state objected to the traveler's ultimate conduct, that still would open the door to any number of problematic state laws. A state that criminalized gambling could go further and prevent its residents from assisting with travel to casinos in Mississippi or Nevada, based solely on its policy disagreement with those states on that issue. Or, a state that was concerned about the health effects of flavored tobacco could not only ban those products in-state, but also prohibit individuals from assisting with travel to another state to purchase those products. Or a state that was concerned with animal welfare could prohibit third-party involvement in an individual's travel to another state to consume food that was produced in an objectionable manner.

All of these examples are inconsistent with the right to travel, including its foundation in horizontal federalism and territorial limits on each state's authority. *See, e.g.*, *Hyatt II*, 578 U.S. at 178-79 ("A constitutional rule that would permit this kind of discriminatory hostility is likely to cause chaotic interference by some States into the internal, legislative affairs of others. . . . It is difficult to reconcile such a system of special and discriminatory rules with the Constitution's vision of 50 individual and equally dignified States."); *cf. also Nat'l Pork Producers Council*, 598 U.S. at 375; *id.* at 407 (Kavanaugh, J., concurring in part). Yet all of these hypothetical laws would be fully legal if, as the Alabama AG asserts, states can prohibit third-party assistance for individuals exercising their right to travel simply because a state objects to the conduct occurring in those other states. Such an approach of inviting division among states, with each state overtly interfering with conduct that other states have made legal, would be contrary to the goal of "fus[ing] into one Nation a collection of independent, sovereign States," *Toomer*, 334 U.S. at 395, as well as each state's obligation to "respect the interests of other States," particularly on issues where there are "diverse policy judgments of lawmakers in 50 States." *Gore*, 517 U.S. at 570-71.

**B.      The Alabama AG's Threatened Prosecutions Violate the Above Principles, and Conspiracy Law Cannot Be Used to Circumvent the Right to Travel.**

The Alabama AG's threatened conspiracy prosecutions—criminalizing third-party assistance intended to facilitate individuals' efforts to leave the state and pursue conduct in another state that is lawful there—violate the right to travel for all the reasons laid out above. And the AG's reliance on conspiracy doctrine does nothing to change that result.

**1.** The Alabama AG's threatened prosecutions are founded on legal theories that the Supreme Court has already rejected. The California law at issue in *Edwards* did not directly prohibit interstate travel and instead penalized only those who assisted in the indigent persons' travel into California. 314 U.S. at 171. But just as California could not resist the travel of indigent people by penalizing those who helped them, neither can the Alabama AG penalize those who assist individuals to exercise their right to obtain a legal, out-of-state abortion. Nor is the theoretical possibility that "women may independently obtain" abortions, Reply at 12, sufficient to avoid this constitutional defect. The Supreme Court has found a violation of the right to travel regardless of whether the challenged law "actually deterred travel," so long as the law "serves to penalize the exercise of that right." *Mem'l Hosp.*, 415 U.S. at 257-58; *see Crandall*, 73 U.S. (6 Wall.) at 46 (invalidating "a tax of one dollar for passing through the State of Nevada, by stage coach or by railroad," regardless of the alternate modes of travel available or minimal nature of the tax).

Moreover, the Alabama AG has repeatedly conceded that these prosecutions are for the purpose of making interstate travel more difficult, thereby deterring women from crossing state lines to engage in lawful conduct in other states:

- "[B]ecause the State cannot police the safety of out-of-state abortions, its conspiracy statute serves as a backstop to protect maternal health and safety." MTD at 12.

- "[A]s applied to the Plaintiffs, [the conspiracy statute] is supported by strong, legitimate interests including preserving unborn life, maternal health (especially considering that Alabama cannot police the medical standards of out-of-state abortion

providers), and the preservation of the integrity of the medical profession[.]" *Id.* at 31.

- "[T]he primary objective and purpose of the prospective enforcement of the relevant Alabama statutes is to prevent elective abortions and conspiracies to procure them." Reply at 36.

- "[T]he primary purpose of *enforcing* the relevant statutes is to prevent elective abortions and corrupt agreements to procure them." *Id.* at 39.

- "The state has a strong interest in" preserving unborn human life and maternal health, and it is reasonable to not allow abortion providers to legally subvert the purpose of the statute by directing their conspiracies toward more permissive jurisdictions." *Id.* at 44.

Thus, in addition to unconstitutionally prohibiting third-party assistance for interstate travel, the threatened conspiracy prosecutions independently have an unconstitutional purpose: to prevent people from exercising their right to travel to engage in lawful out-of-state conduct. *See Saenz*, 526 U.S. at 499 n.11 ("If a law has no other purpose than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it is patently unconstitutional." (quotation marks omitted)).[9] Indeed, the Alabama AG's claimed interests in preventing legal, out-of-state abortions are the very same ones that the Supreme Court rejected in *Bigelow*. *See* 421 U.S. at 824 (Virginia could not "prevent its residents from traveling to New York to obtain" the abortion services legally available there, because "[a] State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State").

The Alabama AG's threatened prosecutions also undermine the federal structure and the

---

[9] It is irrelevant that Alabama's conspiracy law is a "criminal law[] of general applicability" and has applications outside the abortion or travel contexts. Reply at 39. The right to travel and principles of interstate federalism can be violated even apart from laws that facially burden the right. *See, e.g.*, *Guest*, 383 U.S. at 747 n.1 (private conspiracy); *Gore*, 517 U.S. at 572 (damages award); *Nielsen*, 212 U.S. at 315 (statute that did not facially discriminate). And with respect to the criminal prosecutions at issue in these cases, the Alabama AG has conceded that the purpose is to chill exercise of the right to travel to obtain a legal, out-of-state abortion. Thus, the admitted purpose of the threatened prosecutions at issue here is unconstitutional, regardless of whether the law has valid applications in other contexts.

appropriate balance of relations between the states. In effect, the Alabama AG seeks to deprive Alabama residents of the benefits of the Privileges and Immunities Clause, by making it more difficult (if not impossible) for individuals within Alabama to leave the state and enjoy the legal privileges offered by other states. "Just as the Privileges and Immunities Clause protects persons who enter other States to ply their trade, so must it protect persons who enter Georgia seeking the medical services that are available there." *Bolton*, 410 U.S. at 200 (citations omitted). The Alabama AG cannot counteract that holding by prosecuting anyone who assists a person entering another state for the purpose of pursuing medical services available there, as that person is constitutionally entitled to do. If such an approach is allowed—whereby states can criminally prosecute those who assist others engaging in lawful conduct in other states—it is difficult to see how the right to travel could ever succeed in its goal of "breaking down state provincialism, and facilitating the creation of a true federal union." *Guest*, 383 U.S. at 767 (Harlan, J., concurring). That is particularly true given that the Alabama AG's threatened prosecutions are rooted in nothing more than a disagreement with other states' legitimate policy judgments to protect abortion, *see* MTD at 12, which if accepted would open the door for any number of problematic (and potentially retaliatory) state laws, contrary to foundational principles of interstate federalism.

The harms to interstate federalism are compounded by the vagueness inherent in the Alabama AG's threatened prosecutions. Although the Alabama AG purports to limit his prosecutions to those involving "an unlawful conspiracy formed in this State—not potentially lawful conduct in another State," Reply at 11, the Alabama AG does not explain what this limitation means in the context of interstate travel for medical care. For example, if a pregnant person in Alabama makes a telephone call to an abortion provider in New York, conveys that they are in Alabama seeking to travel to New York for an abortion, and the New York provider agrees to perform that abortion, does that constitute an "unlawful conspiracy formed in this State" because one person was physically present in Alabama

at the time the agreement was formed? If so, the Alabama AG's approach would presumably subject the New York provider to conspiracy liability in Alabama, despite the provider never having stepped foot in Alabama, and despite the provider's conduct being entirely legal in the state where it occurred—a result plainly at odds with *Bolton* and *Bigelow*, as well as the principles of interstate federalism pursuant to which one state may not seek to control lawful conduct in other states. The Alabama AG offers no principled reason why, under his expansive legal theories, this conduct could not be prosecuted in Alabama as an unlawful conspiracy, despite being entirely lawful in New York.[10]

**2.** The Alabama AG's primary response to these points is to invoke conspiracy doctrine, arguing that "Alabama can criminalize Alabama-based conspiracies to commit abortions elsewhere," even if those abortions are legal where they occur. MTD at 18. But conspiracy doctrine does not change any of the above analysis.

Fundamentally, a state cannot achieve through conspiracy liability what it is prohibited from accomplishing through direct criminal laws. Just as a state cannot enact a criminal law prohibiting individuals from attending a church, a state also cannot use conspiracy law to prohibit individuals from agreeing to attend the church or assisting those who wish to attend the church by transporting them. *Cf. Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Similarly, just as a state cannot directly prohibit publication of a newspaper, a state also cannot rely on conspiracy law to prohibit agreements to provide the newspaper with paper or ink. *Cf. Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983). And lacking the power to exclude nonresidents from its hospital emergency rooms, a state could not accomplish the same result by banning agreements to transport nonresidents

---

[10] The Alabama AG recognizes that there is a fundamental difference between his proposed conspiracy prosecutions—penalizing assistance even for acts that are legal where they occur—and the typical example of interstate conspiracies involving acts that are "universally illegal among the States[.]" Reply at 15-16. This same distinction explains why *Jones v. Helms*, 452 U.S. 412 (1981), is inapposite, *see* MTD at 35, because that case likewise did not involve a prosecution akin to the Alabama AG's threatened prosecutions here—*i.e.*, where the sole criminal conduct is assisting someone engage in conduct in another state that is lawfully authorized by that state.

to those emergency rooms. *Cf. Mem'l Hosp.*, 415 U.S. at 269.

The same is equally true here: just as Alabama cannot directly prohibit individuals from leaving the State to obtain legal abortions elsewhere, Alabama also cannot use its conspiracy law to prohibit individuals from agreeing to do so. Nor can Alabama use its conspiracy law to target third parties and prohibit their provision of assistance to individuals seeking to leave the state to obtain legal abortions. Conspiracy law does not provide a loophole through which states can undercut the constitutional right to travel, or the exercise of other constitutional rights, simply by prohibiting agreements or third-party assistance in support of the exercise of those rights.

Indeed, the Alabama AG appears to concede this point, acknowledging that a state cannot use conspiracy law to "impede on a citizen's rights to engage in *protected* activity." Reply at 42. The AG contends that because "access to an elective abortion is not a right implicit in national citizenship . . . Alabama does not trample 'correlative rights' by prohibiting conspiracies to procure abortions." *Id.* As discussed above, however, even if abortion itself is not a constitutionally protected right, individuals *do* have a constitutional right to travel to another state and seek medical services available in that state, including abortion, on the same terms as residents of that state. *See* Part I, *supra*. This aspect of the constitutional right to travel has been applied across a number of contexts, "whether to obtain employment, to procure medical services, or even to engage in commercial shrimp fishing." *Saenz*, 526 U.S. at 502 (citations omitted). Nobody would contend that a person has a constitutional right to engage in shrimp fishing, but the Constitution's protections to travel to another state and engage in shrimp fishing do not depend on shrimp fishing itself being constitutionally protected. Similarly here, even if abortion is not constitutionally protected, the constitutional right to travel *does* protect the right to obtain a legal abortion in another state on the same terms as that state's residents. By the Alabama AG's own admission, therefore, his conspiracy prosecutions interfere with this component of the right to travel and are thus impermissible.

-26-

The Alabama AG does not gain any greater authority to interfere with individuals' travel simply because the alleged conspiracy to travel is formed within Alabama. *Cf.* MTD at 37. The Supreme Court's decision in *Bigelow* equally involved in-state conduct, where a Virginia-based newspaper, circulated within Virginia, published an advertisement that conflicted with Virginia law. 421 U.S. at 811-12. The Supreme Court nonetheless cautioned that, notwithstanding those actions within the state, Virginia had no authority to impair its residents' travel to another state to obtain services legally available there. *See id.* at 822-24 ("Neither could Virginia prevent its residents from traveling to New York to obtain those services or . . . prosecute them for going there."). And as noted above, the very interests that the Alabama AG invokes here are the same ones the Court rejected in *Bigelow*. The Alabama AG simply has no cognizable interest in interfering with individuals' ability to obtain services legally available in other states, regardless of whether the individuals (or third parties assisting those individuals) are physically present in Alabama at any point.

Finally, the Alabama AG cannot defend his threatened prosecutions as only a minor or incidental restriction on travel, akin to taxing hotels or regulating travel agents. *See* MTD at 30; Reply at 43-44. Criminalizing third-party assistance for interstate travel to obtain an abortion results in a far greater infringement on the right to travel than, for example, regulations on lodging or accommodations, or "placing a traffic light before an interstate bridge." MTD at 30. Under the Alabama AG's approach, conspiracy liability can be avoided only if a pregnant patient leaves the state, by themselves and using only their own resources, without talking to anyone about their plans or even making any firm plans with anyone else. That is far more than an "ancillary burden on travel," Reply at 43—particularly given the complexities of evaluating, deciding to pursue, and then arranging for medical care in another state. And the magnitude of these burdens, taken together with the Alabama AG's own statements, confirms that the Alabama AG's "predominant purpose . . . is to impede or prevent the exercise of the right of interstate travel" by women seeking an abortion. *Guest*, 383 U.S.

at 760. At a minimum, Plaintiffs here have plausibly alleged that these burdens are sufficiently significant to overcome a motion to dismiss. *See Yellowhammer* Compl. ¶¶ 51-58; *W. Ala. Women's Ctr.* Compl. ¶¶ 74-81, 102-114.

In short, the Alabama AG claims authority to prosecute third-party assistance provided to any person exercising their constitutional right to travel and seek medical services lawfully available elsewhere. That is contrary to the constitutional right to travel—as highlighted by the Privileges and Immunities Clause and principles of interstate federalism—and nothing about conspiracy doctrine allows the Alabama AG to impede interstate travel in such a manner. States may have important and conflicting interests that undergird their laws regarding abortion. But a state cannot bypass constitutional limits on its jurisdictional power by the simple expedient of using its conspiracy laws to purposefully interfere with conduct that other states have chosen to legalize.

## CONCLUSION

The United States respectfully submits that, on the merits, Plaintiffs have stated a valid claim for relief with respect to their right to travel claims. At this time, the United States takes no position on any other issues or claims in these cases. The United States appreciates the Court's consideration of its views.

Dated: November 9, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

DANIEL SCHWEI
Special Counsel

JULIE STRAUS HARRIS
Assistant Branch Director

*/s/ Alexander N. Ely*
ALEXANDER N. ELY (DC Bar # 230008)

ANNA DEFFEBACH
LISA NEWMAN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 993-5177
alexander.n.ely@usdoj.gov
anna.l.deffebach@usdoj.gov
lisa.n.newman@usdoj.gov

*Counsel for the United States*

**CERTIFICATE OF SERVICE**

I certify that I electronically filed this document using the Court's CM/ECF system on November 9, 2023, which will serve all counsel of record.

*/s/ Alexander N. Ely*
ALEXANDER N. ELY

*Counsel for the United States*