IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| YELLOWHAMMER FUND, on behalf of itself and its clients, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:23cv450-MHT |
| | ) | (WO) |
| ATTORNEY GENERAL OF ALABAMA STEVE MARSHALL, in his official capacity, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| WEST ALABAMA WOMEN'S CENTER, on behalf of themselves and their staff; et al., | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:23cv451-MHT |
| | ) | (WO) |
| STEVE MARSHALL, in his official capacity as Alabama Attorney General, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

At its core, this case is simply about whether a
State may prevent people within its borders from going

to another State, and from assisting others in going to another State, to engage in lawful conduct there.

In *Dobbs v. Jackson Women's Health Org.*, the United States Supreme Court held that the U.S. Constitution no longer protects a right to abortion, allowing States to regulate and restrict abortions before viability.  597 U.S. 215 (2022).  In Alabama, it is now a felony for anyone to perform or attempt to perform an abortion absent a medical emergency.  *See* Ala. Code § 26-23H-4.

Plaintiff Yellowhammer Fund is a nonprofit organization dedicated to reproductive justice. Plaintiffs West Alabama Women's Center, Alabama Women's Center, and Dr. Yashica Robinson are reproductive-healthcare providers.  Before *Dobbs*, the plaintiffs all either helped coordinate abortions in Alabama or provided abortions themselves.  Part of their work also consisted of arranging abortions outside Alabama.  The plaintiffs all ceased their abortion-related services in the wake of *Dobbs*.

Although the plaintiffs may no longer legally coordinate abortions in Alabama, they wish to help the people they serve access abortions in States where such abortions are lawful.  The plaintiffs have not done so because Alabama's Attorney General, defendant Steve Marshall, has threatened to prosecute anyone who helps arrange abortions in other States.  The Attorney General has publicly declared that Alabama law prohibits anyone from assisting or otherwise facilitating an out-of-state act that, if performed in Alabama, would constitute a crime, including performing or attempting to perform abortions.  The plaintiffs would all resume providing assistance to people seeking abortions if not for the Attorney General's threats.

The plaintiffs filed these two now-consolidated lawsuits seeking declaratory judgments that the Attorney General cannot constitutionally prosecute the act of facilitating lawful out-of-state abortions and injunctive relief preventing the Attorney General from

3

so prosecuting. While the claims brought by each of the four plaintiffs vary slightly, this litigation tasks the court with resolving whether the Attorney General's threats, if carried out, would violate four constitutional protections: the right to travel, the freedom of expression, the constitutional limitations on the extraterritorial application of state law, and the fair-warning requirement of due process. Jurisdiction is proper pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1334 (civil rights).

This cause is before the court on the Attorney General's motion to dismiss. He argues that the plaintiffs lack standing to assert many of their claims and that, even if the plaintiffs could establish standing, the lawfulness of abortions in other States does not render his threatened prosecutions unconstitutional. The motion has been fully briefed, and the U.S. Department of Justice has submitted a statement of interest contending that the Attorney

**4**

General's threatened enforcement would violate the right to travel.  For the reasons set forth below, the court will grant the motion in part and deny it in part.


## I.  MOTION-TO-DISMISS STANDARD

The Attorney General brings his motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction and 12(b)(6) for failure to state a claim upon which relief can be granted.  Unless a defendant disputes the factual contentions relevant to subject-matter jurisdiction, Rule 12(b)(1) affords a plaintiff "safeguards similar to those provided in opposing a Rule 12(b)(6) motion." *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).  Here, the Attorney General is not attempting to introduce competing jurisdictional facts into the record.  Because he is not mounting a factual attack on the court's subject-matter jurisdiction, any

distinction between Rule 12(b)(6) and Rule 12(b)(1) is immaterial to the instant motion.

Accordingly, the court will evaluate the Attorney General's entire motion using the standards applicable to Rule 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*


## II. BACKGROUND

The allegations in the complaint, taken in the light most favorable to the plaintiffs, establish the following facts.

6

Yellowhammer Fund is a Tuscaloosa-based nonprofit advocacy group committed to supporting families and promoting equity in reproductive healthcare. To further its mission, the Fund distributes free diapers, school supplies, pregnancy tests, contraception, hygiene products, emergency contraception, and sex-education materials. Before *Dobbs*, Yellowhammer Fund also used to operate an abortion fund, which provided financial assistance and logistical support, including help coordinating food, lodging, and childcare, to people in Alabama seeking abortions. Between 15 and 20 percent of the abortions that the Fund's clients received occurred outside of Alabama.[1] The Fund arranged for its clients' travel either by

---

1. The court uses the term 'clients' as shorthand for the class of individuals whom the plaintiffs serve and wish to serve, including West Alabama, Alabama Women's Center, and Dr. Robinson's patients; Yellowhammer Fund's would-be funding recipients; and individuals who approach the plaintiffs with requests for assistance.

having its staff members transport them to their out-of-state appointments or by helping its clients book bus and plane tickets.

West Alabama Women's Center ("West Alabama") and Alabama Women's Center are reproductive-healthcare providers that offer routine checkups, prenatal care, testing and treatment for sexually transmitted infections, and pregnancy testing, among other services. Dr. Robinson, who serves as the medical director of Alabama Women's Center, "provide[s] a broad range of reproductive and women's health care, including but not limited to general OB-GYN care; major and minor gynecological surgeries; prenatal, delivery and post-partum care; management of infertility; and primary care." West Alabama et al.'s Compl. (Doc. 23) ¶ 12.

As stated, before *Dobbs*, West Alabama, Alabama Women's Center, and Dr. Robinson used to offer abortions themselves and, where appropriate, would

arrange for out-of-state abortions. These three healthcare providers helped their clients secure funding for their abortions and, like Yellowhammer Fund, provided logistical support. For medically complex cases, Dr. Robinson would communicate directly with out-of-state physicians to relay pertinent records and coordinate pre-procedure medical testing.

That all changed when *Dobbs* cleared the way for Alabama's abortion restrictions, which this court had preliminarily enjoined as a violation of the constitutional right to an abortion, to take effect. *See Robinson v. Marshall*, 415 F. Supp. 3d 1053, 1060 (M.D. Ala. 2019) (Thompson, J.) (granting preliminary injunction); *Robinson v. Marshall*, No. 2:19-cv-365-MHT, 2022 WL 2314402, at *1 (M.D. Ala. June 24, 2022) (Thompson, J.) (vacating preliminary injunction). Under Alabama law, it is now "unlawful for any person to intentionally perform or attempt to perform an abortion except ... in the case of a medical

emergency." Ala. Code § 26-23H-4. The restrictions exempt those who receive abortions from civil and criminal liability. *See id.* § 26-23H-5. But anyone who performs or attempts to perform an abortion can be charged with a Class A felony, punishable by anywhere between 10 and 99 years in prison. *See id.* § 26-23H-6; *id.* § 13A-5-6(a)(1). The restrictions amount to a "near-total ban on abortion." *Robinson*, 415 F. Supp. 3d at 1055. After the *Dobbs* opinion was issued, the four plaintiffs stopped providing their clients with abortion-related information, counseling, and other resources.

On the day that *Dobbs* was decided, a representative in Alabama's state legislature speculated that, with the abortion restrictions in effect, "anyone can be prosecuted for conspiracy ... if they help someone either get or even plan to get an abortion in another state." West Alabama et al.'s Compl. (Doc. 23) ¶ 27. The representative cited Alabama's interjurisdictional

conspiracy statute, which was passed in 1896 and provides that "[a] conspiracy formed in this state to do an act beyond the state, which, if done in this state, would be a criminal offense, is indictable and punishable in this state in all respects as if such conspiracy had been to do such act in this state." Ala. Code § 13A-4-4. Under Alabama's general conspiracy statute, "[a] person is guilty of criminal conspiracy if, with the intent that conduct constituting an offense be performed, he or she agrees with one or more persons to engage in or cause the performance of the conduct, and any one or more of the persons does an overt act to effect an objective of the agreement." *Id.* § 13A-4-3(a).

In response to the state representative's comment, the Attorney General announced that he was "reviewing the matter." West Alabama et al.'s Compl. (Doc. 23) ¶ 28. A few weeks later, at a local Federalist Society meeting, he stated that he would prosecute anyone who

helped someone else obtain an out-of-state abortion under Alabama's conspiracy laws.

The Attorney General reiterated his commitment to prosecuting those who help coordinate out-of-state abortions during an appearance on the *Jeff Poor Show*, an online radio program.  The show's host asked him what he thought of "some of the talk from the left that you could be an accomplice somehow by transporting someone across state lines for abortion."  West Alabama et al.'s Compl. (Doc. 23) ¶ 32.  In response, the Attorney General emphasized that, in Alabama, performing an abortion "is the most significant offense we have as far as punishment goes under a criminal statute absent a death penalty case.  And so provisions relating to accessory liability, provisions relating to conspiracy, would have applicability involving this particular act."  *Id.* ¶ 33.  He elaborated:

> "[O]ne thing we will do in working with local
> law enforcement and prosecutors is making sure
> that we fully implement this law. ... [I]f any
> individual held themselves out ... as an entity

or a group that is using funds, that they are able to raise, uh, to be able to facilitate ... those visits then that, uh, is something we are going to look at closely. ... To the extent that there [are] groups, and we've seen groups out of Tuscaloosa for example, that have one point in time have talked about it, some of them are doing it now, but if they are promoting this as one of the services, we clearly will be taking a look at that."

Yellowhammer Fund's Compl. (Doc. 1) ¶ 21. A few months after his radio show appearance, the Attorney General again noted "that prosecution is also possible to those who aid and abet abortions." *Id.* ¶ 23.

The Attorney General's comments about liability as an accessory or for aiding and abetting an offense seemingly refer to Alabama's criminal complicity statute, under which anyone who induces, aids and abets, or fails to prevent a crime is criminally liable. *See* Ala. Code § 13A-2-23. Prosecutions for complicity are generally pursued when the substantive offense is completed, but where an offense never reaches fruition, "it is contemplated that solicitation

charges will be brought." *Id.* § 13A-2-23 cmt.   Under Alabama's solicitation statute, "[a] person is guilty of criminal solicitation if, with the intent that another person engage in conduct constituting a crime, he or she solicits, requests, commands or importunes another person to engage in such conduct." *Id.* § 13A-4-1(a)(1).

The Attorney General's threats to prosecute people for facilitating out-of-state abortions were reported widely in the media, which is how the plaintiffs learned of them.   The four plaintiffs all wish to continue serving people in Alabama who seek lawful out-of-state abortions and would do so if not for the Attorney General's threats.   Collectively, they still receive as many as 95 weekly inquiries from clients about the availability of out-of-state abortions. Yellowhammer Fund no longer operates its abortion fund and has eliminated a position on its staff dedicated to overseeing the organization's efforts to reduce

**14**

obstacles to abortions.  The Fund also used to work with other advocacy groups and abortion funds but no longer does so for fear of prosecution.  The three healthcare providers no longer respond to questions from clients and physicians about medical procedures available in other States.

The plaintiffs do not concede that Alabama law or the U.S. Constitution authorizes the Attorney General to prosecute someone for assisting others in obtaining abortions that are lawful in other States. Nonetheless, even an unsuccessful prosecution would impose financial, emotional, and reputational costs that the plaintiffs and their staff cannot bear.

Yellowhammer Fund and the three healthcare providers filed their respective complaints on the same day.  The Fund contends that the Attorney General's threatened prosecutions would violate its right to travel, as well as its clients' right to travel; the First Amendment; and its right to be free from the

15

extraterritorial application of Alabama law.  Two of
the healthcare providers (Alabama Women's Center and
Dr. Robinson) claim that the Attorney General cannot
act on his threats without violating their clients'
right to travel.  And all three of the healthcare
providers bring a claim on their own behalf and on
behalf of their staff members that the Attorney
General's enforcement campaign would violate the First
Amendment and due process.  The court consolidated the
two cases at the Attorney General's request.

The Attorney General has reiterated throughout this
litigation that he stands by his interpretation of
Alabama law--and that he can prosecute those who help
people in Alabama engage in conduct in another State
that, though lawful there, would be a crime if done in
Alabama.

16

### III.DISCUSSION

As stated, the court must determine whether the Attorney General's intended enforcement of Alabama law would violate four constitutional guarantees: the right to travel, the First Amendment, the limits on the extraterritorial application of state law, and the right to due process.  Not every plaintiff makes each of these constitutional claims, and the plaintiffs bring some claims on behalf of their clients and staff. Before discussing the parties' arguments, the court briefly outlines which of the plaintiffs asserts which of these four claims, and on whose behalf.

First, Yellowhammer Fund and two of the healthcare providers, West Alabama and Dr. Robinson, assert a right-to-travel claim on behalf of their clients.  The Fund also brings a right-to-travel claim on its own behalf.  The third medical provider, Alabama Women's Center, does not bring a right-to-travel claim at all.

17

Second, all four of the plaintiffs assert First Amendment claims on their own behalf. The three healthcare providers also bring a First Amendment claim on behalf of their staff.

Third, only Yellowhammer Fund contends that the Attorney General's reading of Alabama's criminal statutes would amount to an unconstitutional extraterritorial application of state law. The Fund asserts its extraterritoriality claim on its own behalf only.

Fourth and finally, the three healthcare providers argue that the Attorney General's intended enforcement of Alabama law would violate the Due Process Clause by failing to provide fair warning of what it prohibits. The healthcare providers bring their due process claim on behalf of themselves and their staff.

### *A. The Right to Travel*

Yellowhammer Fund, Alabama Women's Center, and Dr. Robinson argue that the right to travel forbids the Attorney General from using Alabama law to prosecute someone for facilitating out-of-state abortions in States where they are lawful. The Attorney General responds that these three plaintiffs lack standing to bring a right-to-travel claim on their clients' behalf, and that, even if these plaintiffs did have standing, Alabama can prohibit their abortion-related assistance without violating their clients' constitutional rights. Regarding the Fund's claim on its own behalf, the Attorney General contends that only natural persons, and not organizations, enjoy a right to travel at all, and that even if an organizational right to travel existed, it would not protect travel that furthers criminal conduct.

The court concludes that the plaintiffs all have standing and that the plaintiffs' factual contentions,

if proven, amount to a violation of their clients'
right to travel.  The court will reserve judgment as to
whether Yellowhammer Fund enjoys a right to travel and
thus also whether the Attorney General violated that
right.

    1.  Standing

The court will first address the threshold issue of
standing.    In  general,  to  establish  standing,  a
plaintiff must have "'alleged such a personal stake in
the  outcome  of  the  controversy'  as  to  warrant  his
invocation of federal-court jurisdiction and to justify
exercise of the court's remedial powers on his behalf."
*Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (quoting
*Baker  v.  Carr*,  369  U.S.  186,  204  (1962)).    "'[A]
plaintiff must demonstrate standing for each claim he
seeks to press' and 'for each form of relief' that is
sought."  *Davis v. Fed. Election Comm'n*, 554 U.S. 724,

734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

The "irreducible constitutional minimum of standing" has three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). If a plaintiff cannot meet these requirements, the court does not have jurisdiction over the case. *See Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008).

The court finds, and the Attorney General does not dispute, that all of the plaintiffs have satisfied the constitutional requirements for standing and thus have what is often referred to as 'Article III standing' to bring each claim. Therefore, the court has a

"virtually unflagging" obligation to hear and decide the issues. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013)).

Nonetheless, the Attorney General insists that, though the court has jurisdiction, the court should decline to adjudicate the plaintiffs' claim asserting their clients' right to travel. Generally, a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). This principle reflects the assumption that "the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation." *Id.* However, unlike Article III standing, which is a constitutional and jurisdictional requirement, the limitations on

22

asserting the rights of third parties are prudential, meaning they are "flexible and not jurisdictional in nature." *United States v. Blake*, 868 F.3d 960, 970 (11th Cir. 2017). Prudential requirements are "self-imposed constraints [that] are intended to ensure the proper role of the courts." *Harris v. Evans*, 20 F.3d 1118, 1121 (11th Cir. 1994).

The principle limiting claims that assert third-party rights is hardly absolute. On the contrary, the Supreme Court has consistently recognized a "class of cases where [it] 'allowed standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights.'" *Kowalski*, 543 U.S. at 131 (emphasis added) (quoting *Warth*, 422 U.S. at 510).[2] One such

---

2. *See also, e.g.*, *U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720 (1990) (permitting an attorney disciplined for accepting a fee prohibited by the Black (continued...)

case, *Craig v. Boren*, is particularly illustrative. 429 U.S. 190 (1976). In *Craig*, a beer vendor sought to prevent the enforcement of a statute that prohibited the sale of beer to men under the age of 21 and to women under the age of 18. The vendor argued that the statute unconstitutionally discriminated against men between the ages of 18 and 20. The Supreme Court held that the vendor, because she had Article III standing, was "*entitled* to assert those concomitant rights of third parties that would be 'diluted or adversely affected' should her constitutional challenge fail and

---

Lung Benefits Act of 1972 to invoke claimants' due process rights to challenge the fee restriction that resulted in his punishment); *Doe v. Bolton*, 410 U.S. 179, 188 (1973), *abrogated in part on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) (permitting criminally liable physicians to raise the rights of patients seeking abortions); *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965) (permitting a criminally liable physician to assert the rights of a married couple seeking contraception); *Barrows v. Jackson*, 346 U.S. 249, 257-59 (1953) (permitting a white tenant sued for conveying property to African-American individuals to raise the rights of prospective African-American purchasers).

the statutes remain in force." *Id.* at 195 (emphasis added) (quoting *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965)).  The Court further explained that because the statute prohibited vendors from distributing beer to young men rather than directly prohibiting young men from drinking beer, the vendor was the "obvious claimant" and "least awkward challenger." *Craig*, 429 U.S. at 197.

The same reasoning holds true here.  Just as the statute in *Craig* was directed at the vendor, the Attorney General has addressed his threats of enforcement to the plaintiffs and their staff.  He has declared his intent to prosecute any "entity" or "group" that facilitates out-of-state abortions. Yellowhammer Fund's Compl. (Doc. 1) ¶ 21.  He specifically mentioned "groups out of Tuscaloosa" as organizations of interest, apparently referring to Yellowhammer Fund.  *Id.*  The plaintiffs contend that targeting them for helping their clients leave Alabama

25

and obtain medical services that are lawful in other States infringes on their clients' right to travel. As in *Craig*, the plaintiffs, by virtue of being the target of the Attorney General's enforcement, are the "obvious claimants" and "least awkward challengers." *Craig*, 429 U.S. at 197. Indeed, consistent with the logic of *Craig*, the Supreme Court has long allowed parties facing the prospect of enforcement to bring right-to-travel claims on behalf of third parties whose travel they wish to facilitate. *See, e.g.*, *Crandall v. Nevada*, 73 U.S. 35, 39 (1867) (upholding a stage-company agent's challenge to a tax on crossing the state border on the passengers' behalf); *Edwards v. California*, 314 U.S. 160, 170-71 (1941) (permitting a man who helped his brother-in-law enter California to challenge a statute forbidding individuals from helping indigent persons enter the State).

The Attorney General attempts to distinguish *Craig* on various fronts,[3] but he forgets that *Craig* is just one example of the broader principle that litigants threatened with enforcement are well positioned, if not entitled, to assert the rights of third parties that are intertwined with the conduct the litigants seek to pursue. The Attorney General also attacks that principle's applicability to the organizational plaintiffs by arguing that they cannot technically be

---

3. The Attorney General observes that, unlike the statute in *Craig*, which was directed at vendors, Alabama's criminal laws are not explicitly addressed to the plaintiffs or their staff. But the Supreme Court in *Craig* highlighted the vendor's statutory duties only to explain that she had Article III standing, which the Attorney General does not dispute that the plaintiffs have adequately pleaded. The Attorney General also notes that, in *Craig*, the State had not objected in the lower courts to the vendor's assertion of the rights of third parties, leaving the Court reluctant to "await the initiation of a new challenge to the statute by injured third parties" before reaching the constitutional claims. 429 U.S. at 194. But the Court in *Craig* emphasized that, regardless of these circumstances, the vendor "ha[d] established independently her claim to assert jus tertii standing." *Id.*

prosecuted because the Alabama statutes do not provide for corporate liability.  However, taking the allegations in the complaint as true, he has threatened to prosecute the plaintiff organizations' staff with the express purpose of frustrating the work of the "entit[ies]" and "group[s]" for whom they work. Yellowhammer Fund's Compl. (Doc. 1)  ¶ 21.  The organizational plaintiffs, of course, cannot function without their staff members.  As far as the *Craig* rationale is concerned, enforcement against the plaintiffs' staff is the functional equivalent of enforcement against the organizations themselves, considering that the Attorney General's stated objective is to target the organizations.[4]

_____

4. The Attorney General does not seem to challenge the *Craig* rationale's applicability to Dr. Robinson's assertion of her clients' right to travel.  Because Dr. Robinson has standing to bring claims asserting third-party rights under *Craig*, the court's standing analysis could, theoretically, stop there.  When multiple plaintiffs assert common claims for the same (continued...)

Moreover, regardless of the *Craig* rationale's applicability, the plaintiffs each satisfy the standard prudential requirements to assert their clients' right to travel. Courts use a two-factor test to determine whether plaintiffs have standing to assert third-party rights: first, whether the plaintiffs have a 'close relationship' to the third parties; and, second, whether the third parties are 'hindered' from asserting

---

relief, only one of them must establish standing. *See, e.g.*, *Fla. ex rel. Atty. Gen. v. U.S. Dep't of Health & Hum. Servs.*, 648 F.3d 1235, 1243 (11th Cir. 2011), *aff'd in part, rev'd in part sub nom. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ("The law is abundantly clear that so long as at least one plaintiff has standing to raise each claim--as is the case here--we need not address whether the remaining plaintiffs have standing.") (collecting cases). Dr. Robinson's standing under *Craig* moots the Attorney General's objections to the other plaintiffs' standing to assert third-party rights insofar as the parties all seek the same relief.

their own rights.   *See Powers v. Ohio*, 499 U.S. 400, 411 (1991).[5]

Turning to the first of those two factors, plaintiffs must ordinarily establish that their relationship with the third party whose rights they wish to assert is sufficiently close such that the plaintiffs are "fully, or very nearly, as effective a proponent of the right" as the third party would be. *Singleton v. Wulff*, 428 U.S. 106, 115 (1976) (plurality opinion).  To determine if a close relationship exists,

---

5. The court takes up the parties' arguments about these prudential factors as an alternative ground for its ruling on standing.  However, it bears emphasis that the *Craig* rationale is sufficient to establish standing to assert third-party rights.  When that rationale applies, courts need not also consider whether a plaintiff has sufficiently alleged a close relationship with the third parties and a hindrance in the third parties' ability to assert their rights. *See, e.g.*, *Craig*, 429 U.S. at 195; *June Med. Servs. L.L.C. v. Russo*, 591 U.S. 299, 318-19 (2020), *abrogated on other grounds by Dobbs*, 597 U.S. 215; *Triplett*, 494 U.S. at 720; *Carey v. Population Servs., Int'l*, 431 U.S. 678, 683 (1977).

a court asks whether the plaintiffs and the third parties have "a strong identity of interests." *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 810 (11th Cir. 1993); *see also Powers*, 499 U.S. 400 at 413 (emphasizing that defendants could assert the third-party rights of jurors because of their "common interest in eliminating racial discrimination from the courtroom").[6]      The

---

6. The Attorney General counters that a close relationship is not defined by an identity of interests.   In his telling, only such intimate relationships as those between parents and children, and guardians and wards, are sufficiently 'close' to satisfy the prudential factor.   However, the Attorney General's argument is controverted by the many cases in which the Supreme Court recognized a litigant's standing to assert third-party rights despite the relationship between the litigant and the third party being quite unlike a parent-child relationship. *See, e.g.*, *Powers*, 499 U.S. at 413.   Indeed, the Supreme Court has even refused to let a parent assert a child's rights where "[i]n marked contrast to our case law on *jus tertii*, the interests of this parent and this child are not parallel and, indeed, are potentially in conflict." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 (2004) (internal citation omitted), *abrogated on other grounds by Lexmark*, 572 U.S. 118. (continued...)

close-relationship standard is generally satisfied if the third parties' rights are "inextricably bound up with the activity the litigant[s] wish[] to pursue." *Singleton*, 428 U.S. at 114.

Here, the clients' right to travel is inextricably bound up with the plaintiffs' desire to assist them in that travel. The plaintiffs' and their clients' interests are essentially identical, as the plaintiffs wish to provide services that their clients seek. And, because the plaintiffs face the threat of enforcement should they resume facilitating out-of-state abortions, they have every incentive to litigate their claim vigorously.

The Attorney General insists that the plaintiffs cannot establish a close relationship with their

---

Furthermore, the Attorney General bases his theory of standing on dissenting Supreme Court opinions, which are not binding authority and are at odds with the precedent that *stare decisis* obligates this court to apply. *See, e.g.*, AG's Mot. Dismiss (Doc. 28) at 13 (drawing on a dissenting opinion in *June Medical*).

clients due to a conflict of interest.[7]   His theory is
that a conflict of interest will exist whenever a
"regulated party ... invoke[s] the right of a third
party for the purpose of attacking legislation enacted
to protect the third party."  AG's Reply (Doc. 36) at 8
(quoting *June Med. Servs. L.L.C. v. Russo*, 591 U.S.
299, 378 (2020), *abrogated on other grounds by Dobbs v.
Jackson Women's Health Org.*, 597 U.S. 215 (2022)
(Alito, J., dissenting)).  The Attorney General derives
this argument from a dissenting opinion in *June
Medical*, where the statute at issue regulated the
credentials that physicians needed to perform

---

7. The Attorney General suggests that the existence
of a conflict of interest is a separate prudential
limitation, distinct from the closeness and hindrance
factors.    This    is    incorrect.    Because    the
close-relationship criterion is concerned with whether
the interests of the litigant and the third party are
sufficiently aligned, courts should necessarily already
weigh potential conflicts of interests as part of this
inquiry.    *See, e.g.*, *Harris*, 20 F.3d at 1123
(explaining that the "relationship between a prison
inmate and the prison employees" was not sufficiently
close because of its "adversarial nature").

33

abortions.   The dissent reasoned that any entity faced with a burdensome regulation has a financial interest in avoiding compliance at the expense of delivering quality services to its clients, creating a potential conflict.   Even if the court were bound by the *June Medical* dissent's conception of a conflict of interest, it would not fit the facts of this case.   Alabama's laws do not purport to make abortions safer or impose any compliance measures on the plaintiffs' abortion-related assistance that they might be incentivized to avoid.   Rather, Alabama has completely banned almost all abortions within its borders, and the Attorney General intends to prevent people from facilitating any out-of-state abortions whatsoever. There is no conflict of interest between those who want to get abortions outside Alabama and those who help them do precisely that.[8]   Accordingly, the plaintiffs

---

8. The Attorney General also argues that a conflict
(continued...)

have sufficiently pleaded a close relationship with their clients.

The plaintiffs also satisfy the second of the two factors for standing to assert third-party rights: that the third parties be hindered in their ability to assert their own rights.  When third parties do not assert their own rights, it might suggest that their "right[s] [are] not truly at stake, or truly important to [them]."  *Singleton*, 428 U.S. at 116.  However, if "some genuine obstacle" hinders the third parties from asserting their rights, "the party who is in court becomes by default the right's best available proponent."  *Id.*

of interest exists insofar as the plaintiffs' assistance is a source of reputational and monetary gain, including as a means for the plaintiffs to solicit donations.  But the Attorney General's contentions about the plaintiffs' ulterior motives are at odds with the factual allegations in the complaints, which cast the plaintiffs as purely mission-driven. The court must assume the truth of those allegations.

35

The plaintiffs' clients face multiple obstacles to asserting their rights.   Most significantly, even a meritorious lawsuit is unlikely to reach a merits determination until after the window to obtain an abortion has passed.   The end of pregnancy may not technically moot the clients' claim, but the sheer unlikelihood of obtaining personal relief before the end of pregnancy will inevitably deter clients from filing their own suits.   Clients who are unlikely to succeed in obtaining an abortion through litigation have "little incentive to set in motion the arduous process needed to vindicate [their] own rights." *Powers*, 499 U.S. at 415.

Other obstacles abound.   For one, the plaintiffs' clients may be deterred from bringing their own suits by a desire to protect their privacy.   Although the Attorney General emphasizes that litigants who wish to maintain their anonymity can sue under a pseudonym, such an argument was considered in *Singleton* and was

36

made in the *June Medical* dissents, but it has yet to carry the day.  Additionally, the plaintiffs serve many low-income clients who lack the means to travel outside Alabama without the plaintiffs' assistance.  The time and expense of litigation may be too much for these clients to bear.  *See Powers*, 499 U.S. at 414.

The Attorney General argues that the plaintiffs' clients cannot be hindered from filing suit because other pregnant plaintiffs in other actions have been willing to assert similar rights regardless of these obstacles.  That may be so, but the existence of a hindrance turns on whether "some genuine obstacle" to the third-parties' assertion of their own rights exists, not whether that obstacle can theoretically be or has been overcome.  *Singleton*, 428 U.S. at 116.  A few individuals may be willing to brave the risks, costs, and inconveniences of litigation, but that does not negate the magnitude of those risks, costs, and inconveniences or the likelihood that they will

significantly deter others.    In light of the time-sensitive nature of pregnancy, as well as the clients' privacy concerns and financial vulnerability, the plaintiffs have sufficiently alleged a hindrance in their clients' ability to assert their own rights.

The Attorney General offers one final objection to the plaintiffs' standing to assert their clients' rights that warrants discussion.  He observes that, in *Dobbs*, the Supreme Court lamented that "abortion cases ... have ignored the Court's third-party standing doctrine."  597 U.S. at 286-87 & n.61.  From this stray remark, as well as the Court's citation in a footnote to a series of cases about asserting third-party rights, the Attorney General proclaims that "[t]hose majority opinions are thus no longer good law ... and the opinions and dissents identified in *Dobbs* contour third-party standing in the context of abortion-related cases."  AG's Mot. Dismiss (Doc. 28) at 9-10.

38

The Attorney General misreads *Dobbs* insofar as he suggests that the Supreme Court, in eight words, upended the law of standing.  *Dobbs* was not a case about standing, and it did not overrule any precedent except where the Court explicitly said so.  While the Attorney General may wish that a great bulk of the Court's cases governing standing to assert third-party rights were overruled and that dissenting opinions were instead binding authority, this court must abide by precedent.[9]  Accordingly, the court has applied the traditional prudential standards governing when litigants may assert third-party rights, as *stare*

---

9.  In addition to suggesting that the cases governing standing to assert third-party rights of people seeking abortions are bad law, the Attorney General also argues that other cases, unrelated to abortion, which support standing here, should be overruled as well.  *See* AG's Reply (Doc. 36) at 10 n.6 (citing *Craig*, 429 U.S. 190 (1976); *Powers*, 499 U.S. 400; *Eisenstadt v. Baird*, 405 U.S. 438 (1972); and *Barrows*, 346 U.S. 249).

*decisis* requires, and it has determined that the plaintiffs have met those standards.

In sum, the Attorney General does not contest Yellowhammer Fund's standing to assert the right to travel on its own behalf, and the court finds that the plaintiffs also have standing to bring a right-to-travel claim on their clients' behalf.


### 2. The Clients' Right to Travel

Because the plaintiffs all have standing to assert a right-to-travel claim on behalf of their clients, the court now turns to whether the claim should be dismissed on the merits. The claim will not be dismissed because (a) the right to travel includes the right both to move physically between States and to do what is lawful in those States, and (b) prosecuting those who facilitate lawful out-of-state abortions, as the Attorney General threatens to do, would violate that right.

**40**

a.   The Scope of the Right to Travel

The central disagreement between the plaintiffs and the Attorney General concerns the scope of the right to travel.   As the Attorney General explains, the plaintiffs contend that "the constitutional right to travel encompasses the right to travel *and* to do whatever is legal in other states," while the Attorney General insists that "the right to interstate travel is not that broad" and "only prevents States from erecting 'actual barriers' to interstate movement."   AG's Motion to Dismiss (Doc. 28) at 34-35.   The history and jurisprudence of the right to travel overwhelmingly support the plaintiffs.

The right to interstate travel is one of our most fundamental constitutional rights.   It cultivates national citizenship and curbs state provincialism, and thus was key to fusing a league of States into a true federal union.   *See United States v. Guest*, 383 U.S. 745, 757-58 (1966); *id.* at 767 (Harlan, J.,

**41**

concurring).  Indeed, while the right to travel is not enumerated in the Constitution, it is so essential to the structure and character of our nation that the Supreme Court has found the right manifested in several constitutional provisions.  *See id.* at 757-59 (1966) (noting that the Court has identified several sources of the right).[10]

The right to travel has deep historical roots, and it has long encompassed more than the mere movement of persons across borders.  Indeed, as the court will explain, travel has consistently been protected precisely so that people would be free to engage in lawful conduct while traveling.  The right can be

_____

10. The Supreme Court has derived the right to travel from the Privileges and Immunities Clause of Article IV, the Commerce Clause, the Privileges or Immunities Clause of the Fourteenth Amendment, and the Due Process Clauses of the Fifth and Fourteenth Amendments.  *See Shapiro v. Thompson*, 394 U.S. 618, 666 (1969) (Harlan, J., dissenting), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974); *Guest*, 383 U.S. at 763-70 (Harlan, J., concurring).

traced back at least as far as the Magna Carta, which ensured that merchants could travel for the purpose of engaging in commerce. *See* Magna Carta (1215) cl. 41; *see also Kent v. Dulles*, 357 U.S. 116, 125-26 (1958). In the United States, the right was explicitly included in Article IV of the Articles of Confederation, and it similarly guaranteed that citizens "shall have free ingress and regress to and from any other State, and shall enjoy therein all the privileges of trade and commerce, subject to the same duties, impositions and restrictions as the inhabitants thereof." Articles of Confederation of 1781, art. IV, para. 1. Thus, in addition to protecting travel for the purpose of commerce, it provided that those traveling would not be subject to restrictions in other States beyond those which are imposed on those States' residents.

While Article IV of the Constitution omitted the express reference to "free ingress and regress," "Charles Pinckney, who drafted the current version of

Art. IV, told the Convention that this Article was 'formed exactly upon the principles of the 4th article of the present Confederation.'" *Zobel v. Williams*, 457 U.S. 55, 79 (1982) (O'Connor J., concurring) (quoting 3 M. Farrand, Records of the Federal Convention of 1787, p. 112 (1934)). Considering Pinckney's statement and that Art. IV of the Constitution incorporated its predecessor's broad guaranty that "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states," U.S. Const. art. IV, § 2, cl. 1, "[c]ommentators ... have assumed that the Framers omitted the express guaranty [of the right to travel] merely because it was redundant." *Zobel*, 457 U.S. at 79-80. Indeed, the Supreme Court has repeatedly observed that the Constitution did not include the right-to-travel language because the right was "so elementary [that it] was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution

created." *Shapiro v. Thompson*, 394 U.S. 618, 631 (1969), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974).

Considering the right to travel in the context of Article IV's Privileges and Immunities Clause confirms that the right includes both the right to move physically between the States and to do what is legal in the destination State. The Clause was meant to create a "general citizenship," 3 J. Story, *Commentaries on the Constitution of the United States*, 3:674-75, § 1800 (1833), and "place the citizens of each State upon the same footing with citizens of other States." *Paul v. Virginia*, 75 U.S. 168, 180 (1868), *overruled in part on other grounds by United States v. Se. Underwriters Ass'n*, 322 U.S. 533 (1944). When individuals do travel into another State, the Clause ensures that they lose both "the peculiar privileges conferred by their [home State's] laws" as well as "the disabilities of alienage." *Id.* The Clause "insures to

[citizens] in other States the same freedom possessed by the citizens of those States in the acquisition and enjoyment of property and in the pursuit of happiness." *Id*. at 180-81. These goals are incompatible with a right to travel that would allow one's home State to inhibit a traveler's liberty to enjoy the opportunities lawfully available in another State.

Accordingly, one of the first notable judicial recognitions of the right to travel included in its list of privileges and immunities the "right of a citizen of one state to pass through, or to reside in any other state, for *purposes of trade, agriculture, professional pursuits, or otherwise*." *Corfield v. Coryell*, 6 F. Cas. 546, 552 (C.C.E.D. Pa. 1823) (Washington, J., on circuit) (emphasis added). Similarly, the Supreme Court has explained that the Privileges and Immunities Clause "plainly and unmistakably secures and protects the right of a citizen of one State to pass into any other State of

the Union for the purpose of engaging in lawful commerce, trade, or business without molestation." *Ward v. State*, 79 U.S. 418, 430 (1870); *accord Toomer v. Witsell*, 334 U.S. 385 (1948).

Based on this understanding of the Privileges and Immunities Clause, the Supreme Court has recognized that the right to travel "protect[s] persons who enter Georgia seeking the medical services that are available there," including abortion. *Doe v. Bolton*, 410 U.S. 179, 200 (1973), *abrogated in part on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022);[11] *accord Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974) (holding that a durational residency requirement for state-funded medical care

---

11. Because this holding did not depend on the constitutionally protected status of abortion, the *Dobbs* decision did not undermine it.

47

generally violated the right to travel).[12]   Consistent

with this holding, though not necessarily rooted in the

Privileges and Immunities Clause, the Court in *Bigelow*

*v. Virginia* emphasized that "[t]he Virginia Legislature

could not have ... prevent[ed] its residents from

_____

12. The Attorney General suggests that these cases
are inapposite because they concerned States treating
visitors differently from residents, not burdens on
travel imposed by the States of origin.  While it is
true that previous right-to-travel cases have generally
concerned States that discriminated against visitors
from other States, this merely reflects the
unprecedented nature of the Attorney General's actions
in seeking to prevent residents of his own State from
engaging in lawful conduct in other States.  Neither
the text nor purpose of the Privileges and Immunities
Clause suggests that its protections depend upon
whether the State imposing travel restrictions is the
State of one's origin or destination.  The Clause
provides broadly that "[t]he Citizens of each State
shall be entitled to all Privileges and Immunities of
Citizens in the several States."  U.S. Const. art. IV,
§ 2, cl. 1, and it serves to ensure that residents may
travel to other States "on the same footing with
citizens of [those] States" and without facing "the
disabilities of alienage."  *Paul*, 75 U.S. at 180.  It
follows that the Privileges and Immunities Clause and
the right to travel are implicated when *any* State
prohibits residents of one State from enjoying the
benefits lawfully available in another State.

48

traveling to New York to obtain [abortion] services or ... prosecute them for going there." 421 U.S. 809, 822-24 (1975).[13]  And, most recently, Justice Kavanaugh explained in his *Dobbs* concurrence that the question whether a State may "bar a resident of that State from traveling to another State to obtain an abortion" was "not especially difficult as a constitutional matter" because "the constitutional right to interstate travel" would prohibit such state action.  *Dobbs*, 597 U.S. at 346.

_____

13. The plaintiffs invoke other language from the *Bigelow* opinion in their complaints and in their briefs in opposition.  According to the Attorney General, that language is dicta and may not be good law insofar as it assumed the constitutionally protected status of abortions.  The court does not address the Attorney General's concerns because it concludes that the plaintiffs have adequately pleaded right-to-travel and free-speech claims regardless of *Bigelow*'s applicability.  In their future filings, the parties are advised not to dwell on *Bigelow*'s viability, which, as the court has demonstrated, is not dispositive of whether the plaintiffs may prevail on their claims.

As the discussion above demonstrates, the Constitution protects the right to cross state lines and engage in lawful conduct in other States, including receiving an abortion. The Attorney General's characterization of the right to travel as merely a right to move physically between the States contravenes history, precedent, and common sense. Travel is valuable precisely because it allows us to pursue opportunities available elsewhere. "If our bodies can move among states, but our freedom of action is tied to our place of origin, then the 'right to travel' becomes a hollow shell." Seth F. Kreimer, *Lines in the Sand: The Importance of Borders in American Federalism*, 150 U. Pa. L. Rev. 973, 1007 (2002). Indeed, the Attorney General's theory of the right to travel, which would allow each State to force its residents to carry its laws on their backs as they travel, "amount[s] to nothing more than the right to have the physical environment of the states of one's choosing pass before

50

one's eyes." Laurence H. Tribe, Saenz *Sans Prophecy: Does the Privileges or Immunities Revival Portend the Future—or Reveal the Structure of the Present?*, 113 Harv. L. Rev. 110, 152 (1999). Such a constrained conception of the right to travel would erode the privileges of national citizenship and is inconsistent with Constitution.

### b. The Plaintiffs' Right-to-Travel Challenge

Having established that the right to travel protects both entering other States *and* engaging in conduct that is lawful there, the question whether the Attorney General's threatened prosecutions would violate that right is easily resolved. Of course, if a State cannot outright prohibit the plaintiffs' clients from traveling to receive lawful out-of-state abortions, it cannot accomplish the same end indirectly by prosecuting those who assist them. The threatened prosecutions offend two tenets of right-to-travel jurisprudence: first, that States may not act with the

purpose of impeding lawful travel; and, second, that States may not outlaw assistance for otherwise lawful travel. Here, the threatened prosecutions would do both. The court addresses each of these principles in turn.

First, the Attorney General's threatened prosecutions are intended to deter and prevent people from traveling out-of-state to receive a lawful abortion. Government action that has "impeding travel [as its] primary objective" violates the right to travel. *Att'y Gen. of New York v. Soto-Lopez*, 476 U.S. 898, 903 (1986); *see also Saenz v. Roe*, 526 U.S. 489, 499 n.11 (1999) ("If a law has no other purpose ... than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it is patently unconstitutional." (internal quotation marks omitted)); *Edwards v. California*, 314 U.S. 160, 174 (1941) (striking down a law which had the "express purpose" of prohibiting

indigents from entering California).  As the court has already explained, the right to travel necessarily protects the right to cross state lines and engage in lawful conduct in the destination State.  Therefore, state restrictions with the primary objective of preventing specific lawful out-of-state conduct are just as constitutionally impermissible as restrictions aimed at preventing travel generally.

The Attorney General insists that the intent behind his prosecutorial threats is to prevent the plaintiffs from facilitating their clients' "visits" to "more permissive jurisdictions" for abortions.  Yellowhammer Fund's Compl. (Doc. 1) ¶ 21; AG's Reply (Doc. 36) at 46.  In doing so, he thus concedes that his primary purpose in enforcing the law is to chill and penalize the plaintiffs' clients' assertion of their right to travel.

Second, in addition to relying on an impermissible purpose, the Attorney General's threatened enforcement

53

would actually have an unconstitutional effect on travel. Supreme Court precedent demonstrates that, when a State creates barriers to travel itself, "the constitutional right of interstate travel is virtually unqualified," *Haig v. Agee*, 453 U.S. 280, 307 (1981), and even the slightest burdens on travel are generally not tolerated. For this reason, travel restrictions directed toward those who facilitate travel for others can offend the Constitution. Exemplifying both points is *Crandall v. Nevada*, which produced the Supreme Court's first majority opinion on the right to travel. 73 U.S. 35 (1867). At issue was a Nevada statute that imposed a one-dollar tax per passenger on common carriers leaving the State. The Court held that the tax was an unconstitutional burden on the passengers' right to travel, even though the tax was merely one dollar and even though it applied only when someone relied on a common carrier for transportation.

Likewise, in *Edwards v. California*, the Supreme Court struck down a California law that made it a crime to bring or assist in bringing into the State any indigent person who was not a California resident. 314 U.S. 160 (1941). Thus, the California law subjected only those who *assisted* others in travel to criminal liability. The Court nonetheless determined that the law violated indigent people's right to travel. It did so even despite recognizing that the State had passed the law to address "grave and perplexing social and economic" issues. *Id.* at 173. The Court held that regardless of "'the wisdom, need, or appropriateness' of the legislative efforts of the States to solve such difficulties," the Constitution prohibited such a burden on facilitating travel. *Id.* (quoting *Olsen v. Nebraska ex rel. W. Reference & Bond Ass'n*, 313 U.S. 236, 246 (1941)).

Here, a straightforward application of *Crandall* and *Edwards* resolves the right-to-travel claim brought on

behalf of the plaintiffs' clients. Denying--through criminal prosecution--assistance to the plaintiffs' clients, many of whom are financially vulnerable, is a greater burden on travel than the one-dollar tax per passenger in *Crandall*, and it is precisely what was held unconstitutional in *Edwards*. The Attorney General argues that *Crandall* and *Edwards* are distinguishable because the travel restrictions at issue in those cases operated categorically, regardless of the reasons for which people were traveling. Again, however, the right to travel includes the right to do what is lawful in another State while traveling, so restrictions that prohibit travel for specific out-of-state conduct are unconstitutional just as those that impede travel generally are. There is no end-run around the right to travel that would allow States to burden travel selectively and in a patchwork fashion based on whether they approve or disapprove of lawful conduct that their residents wish to engage in outside their borders.

56

The Attorney General's attempt to distinguish *Edwards* and *Crandall* is even less persuasive when considering the cases that he believes should govern the court's analysis. He relies mostly on out-of-circuit cases that bear little resemblance to the facts of this case to argue that using Alabama criminal law to prevent people seeking out-of-state abortions from receiving assistance is a "mere inconvenience" that does not warrant serious constitutional scrutiny. AG's Reply (Doc. 36) at 45. These cases concerned challenges to notification and registration requirements for sex offenders, *see Doe v. Moore*, 410 F.3d 1337, 1348-49 (11th Cir. 2005); *United States v. Simington*, No. EP-10-cr-2275-KC, 2011 WL 145326, at *9-10 (W.D. Tex. 2011) (Cardone, *J.*) (unpublished opinion); a requirement to present identification at an airport or be subjected to a more extensive search, *Gilmore v. Gonzales*, 435 F.3d 1125, 1136-37 (9th Cir. 2006); and federal restrictions placed

on an airport that required that those seeking to fly to certain other States either use a connecting flight or use another airport twelve miles away for direct flights, *Cramer v. Skinner*, 931 F.2d 1020, 1031-33 (5th Cir. 1991).

These cases are quite unlike the one before the court. They generally involved travel regulations for individuals who had previously committed a crime or regulations meant to facilitate travel that were deemed to result in minor delays or inconveniences. In contrast, the Attorney General is attempting to prohibit, in practice, all abortion-related travel that would require assistance from others. This is no 'mere inconvenience,' especially considering that many of the plaintiffs' clients lack the financial resources to travel on their own. Furthermore, considering the complexity associated with finding, evaluating, and arranging for medical care in another State, it would be difficult for anyone to do so without assistance.

In sum, the plaintiffs have sufficiently alleged that the Attorney General's threatened enforcement would violate their clients' right to travel. The motion to dismiss the right-to-travel claim asserted on the plaintiffs' clients' behalf will be denied.

### 3.   Yellowhammer Fund's Right to Travel

Finally, Yellowhammer Fund brings a right-to-travel claim on its own behalf. In its complaint, the Fund represents that it "previously traveled, and desires to once again travel, between states with passengers in its vehicles who need transportation to other states to obtain lawful abortion care." Yellowhammer Fund's Compl. (Doc. 1) ¶ 89. The Attorney General argues that the right to travel belongs only to "a flesh and blood, physical citizen," and not to organizations such as the Fund. AG's Mot. Dismiss (Doc. 28) at 32. The Fund, of course, disagrees.

The Supreme Court has provided very limited guidance as to when, in general, a constitutional right can be enjoyed by a corporation or is instead purely personal in nature. Indeed, the "only analytical framework that exists" comes from a footnote in *First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978).[14]  Darrell A. H. Miller, *Guns, Inc.:* Citizens United*, McDonald*, and the Future of Corporate Constitutional Rights*, 86 N.Y.U. L. Rev. 887, 908 (2011). However, this footnote does not provide a clear and standardized test for determining such

---

14. The footnote reads in relevant part: "Certain 'purely personal' guarantees, such as the privilege against compulsory self-incrimination, are unavailable to corporations and other organizations because the 'historic function' of the particular guarantee has been limited to the protection of individuals. Whether or not a particular guarantee is 'purely personal' or is unavailable to corporations for some other reason depends on the nature, history, and purpose of the particular constitutional provision." *Bellotti*, 435 U.S. at 778 n.14 (internal citation omitted).

significant legal questions, and courts have only rarely used it to do so. *See id.* at 909-14.

Because determining whether, and to what extent, the right to travel protects an organization carries potentially weighty implications, and because the court would have very limited legal authority to guide its analysis, the court will reserve judgment on the issue. There are multiple other claims which may resolve this case such that the court need not ever reach this novel question.

### B. The Freedom of Speech

In addition to the right-to-travel claim, the plaintiffs contend that enforcing the Attorney General's reading of Alabama's criminal laws, including those punishing inchoate offenses and codifying accomplice liability, would violate the freedom of

speech under the First and Fourteenth Amendments.[15]  The plaintiffs all raise an as-applied challenge, contending that the Attorney General cannot constitutionally prosecute people for providing information, counseling, and material support to their clients.[16]  Yellowhammer Fund also asserts that Alabama's interjurisdictional conspiracy statute is

---

15.  Yellowhammer Fund makes two other First Amendment arguments: first, that its abortion-related services involve constitutionally protected expressive conduct; and, second, that the Attorney General's threatened enforcement would also violate the freedom of association.  The Attorney General does not address these arguments directly.  Instead, he observes that they are moot if the plaintiffs' free-speech challenge fails, as he insists it should.  Because the court rejects the Attorney General's argument that the free-speech claim should be dismissed, the court will reserve consideration of the Fund's other First Amendment arguments.

16. This is an as-applied challenge because with it, the plaintiffs do not ask the court to declare the various general criminal statutes that the Attorney General seeks to enforce to be unconstitutional in whole.  Rather, the plaintiffs argue that the statutes are unconstitutional only insofar as they would prohibit people from providing assistance to others seeking abortions in a State where abortion is lawful.

overbroad and therefore facially invalid insofar as it authorizes the Attorney General to act on his threats. The Fund brings its First Amendment challenge on its own behalf, while the plaintiff healthcare providers--West Alabama, Alabama Women's Center, and Dr. Robinson--bring their claim on behalf of themselves and their staff.

The Attorney General makes three arguments in support of his motion to dismiss the First Amendment challenge: first, that the plaintiff healthcare providers lack standing to assert the rights of their staff; second, that the plaintiffs' speech can be constitutionally regulated because it furthers conduct that Alabama has deemed criminal; and third, that Yellowhammer Fund has not pleaded any factual contentions to support its overbreadth claim. The court concludes that the plaintiffs all have standing and that the factual contentions underlying the as-applied challenge, if proven, amount to a violation

of the freedom of speech.  The Fund's overbreadth claim
will be dismissed.


### 1.  Standing

The court first takes up the Attorney General's
argument that West Alabama, Alabama Women's Center, and
Dr. Robinson do not satisfy the prudential requirements
to bring a First Amendment claim on behalf of their
staff.  The Attorney General does not dispute that
Yellowhammer Fund and the healthcare providers each
have Article III standing to assert their own First
Amendment rights.  Only the healthcare providers'
standing to assert the rights of their staff is at
issue.

As a threshold matter, it is immaterial whether
Alabama Women's Center has standing to bring a First
Amendment claim on behalf of its staff because Dr.
Robinson is a member of its staff with "standing to
assert these rights as [her] own." *Vill. of Arlington*

*Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977). In *Arlington Heights*, the Supreme Court explained that it did not need to determine whether a real-estate company could bring claims on behalf of its prospective tenants because one of those tenants was a party to the suit with Article III standing. 429 U.S. at 263-64. That tenant wished to assert the same rights that the real-estate company sought to vindicate on the third-party tenants' behalf, making any inquiry into whether the real-estate company had standing to bring claims asserting third-party rights unnecessary. The same logic applies here. Alabama Women's Center seeks to assert the rights of its staff, and one of those staff members, Dr. Robinson, is a party to the suit who has Article III standing and who is asserting those same rights herself. Under *Arlington Heights*, Dr. Robinson's presence in this suit relieves the court from having to determine whether Alabama Women's Center has standing to assert its staff members' rights.

65

In any event, the plaintiff healthcare providers each readily satisfy the prudential requirements for standing: they have demonstrated a close relationship with their staff and a hindrance in their staff's ability to assert their own free-speech rights. *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004).

As to closeness, "[e]mployers have been allowed to assert the rights of employees in circumstances that at least suggest a congruence rather than a conflict of interests." 13A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531.9.3 (3d ed. 2023 update). The complaint reflects an alignment of interests between the plaintiff healthcare providers and their staff sufficient to establish a close relationship. The staff members wish to carry out their employers' mission to provide information, counseling, and support to individuals seeking out-of-state abortions. The staff members "are trained and feel ethically obligated" to help their clients

access out-of-state abortions but, like their employers, cannot do so for fear of prosecution. West Alabama et al.'s Compl. (Doc. 23) ¶¶ 79-80. The interests here are plenty aligned to constitute a close relationship.

The Attorney General responds by suggesting that the Eleventh Circuit has declined to recognize employers' standing to raise their employees' rights "[a]s a matter of law." AG's Mot. Dismiss (Doc. 28) at 15. He invokes language from *Region 8 Forest Service Timber Purchasers Council v. Alcock* that "a strong identity of interests ... is absent in an employer/employee relationship." 993 F.2d 800, 810 (11th Cir. 1993). However, *Region 8* did not lay down a categorical rule that employers could never assert their employees' rights. The Eleventh Circuit qualified its language in *Region 8* and limited its holding to the facts of that case. *See id.* (holding only that "*in this case* the employee/employer

relationship is not such that the employer would be nearly as effective a proponent as the employees" (emphasis added)).

West Alabama, Alabama Women's Center, and Dr. Robinson allege a much more compelling congruity of interests with their staff than the Eleventh Circuit considered in *Region 8*.   There, timber companies challenging a regulation protecting woodpeckers claimed they satisfied the prudential requirements for standing because their employees had an "interest in the outdoors." *Id.* at 809.   The Eleventh Circuit concluded that the employees' purported recreational interests did not make their employer "as effective a proponent" of their rights as they would be.   *Id.*   By contrast, the staff members here could face prosecution for the very work they were hired to do and still wish to do. Unlike in *Region 8*, the plaintiff healthcare providers and their staff have materially identical interests that the threatened prosecutions would equally imperil.

*Region 8* poses no bar to asserting third-party rights in this case, and in contrast to the plaintiffs there, West Alabama, Alabama Women's Center, and Dr. Robinson have adequately pleaded a close relationship with their staff.

The factual contentions in the complaint also demonstrate that the staff members face a hindrance to asserting their own First Amendment rights. Dr. Robinson contends that she was previously subject to retaliatory prosecution for providing abortion-related services, which left her in a state of financial and professional instability, as well as emotional disarray. According to the complaint, many of the plaintiff healthcare providers' staff members are the sole earners for their households and cannot afford the financial expense, reputational harm, and emotional turmoil that a criminal prosecution would entail. The staff members could justifiably see what happened to Dr. Robinson, their colleague, as a cautionary tale

that declaring their commitment to abortion services in a lawsuit could subject them to the "violence, harassment, and hostility" that have long plagued abortion providers in Alabama. *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1333–34 (M.D. Ala. 2014) (Thompson, *J.*).

The Attorney General responds with two arguments: first, that Dr. Robinson's participation in this lawsuit undermines the plaintiff healthcare providers' representation that their staff members face a hindrance to asserting their own First Amendment rights; and, second, that any staff members concerned about retaliation can sue under pseudonyms. Neither point succeeds. Prudential standing doctrine requires only that there be "some genuine obstacle" to a third party's bringing suit, not that doing so would be borderline impossible. *Singleton v. Wulff*, 428 U.S. 106, 116-18 (1976) (plurality opinion). Dr. Robinson's involvement in this litigation does not detract from

the risks of retaliation that her staff and colleagues may not be willing to brave.   Nor, for the reasons discussed previously, does the availability of pseudonyms call the existence of a hindrance into question.

In sum, the factual contentions in the plaintiff healthcare providers' complaint would, if proven, satisfy the prudential requirements to assert their staff's First Amendment rights.   The court now turns to the merits of the plaintiffs' free-speech claim, beginning with the as-applied challenge before taking up Yellowhammer Fund's facial challenge under the overbreadth doctrine.

### 2.   The Free-Speech Challenge

Relying on the First Amendment, the plaintiffs contend that the Attorney General cannot prosecute or threaten to prosecute those who help others obtain lawful out-of-state abortions for inchoate crimes, such

71

as conspiracy and solicitation, as accomplices, or otherwise.[17] They submit that Alabama's criminal laws cannot authorize the Attorney General to act on his threats without creating an unconstitutional content-based restriction on speech,[18] at least as applied to the speech they and their staff wish to engage in:[19] informing their clients about the laws of

---

17. The Attorney General's briefs focus almost exclusively on conspiracy law. He notes that "[t]he legal issues presented by this case ... do not change based on the particular State statute at issue." AG's Mot. Dismiss (Doc. 28) at 2 n.1.

18. The plaintiffs also argue that the Attorney General's threatened enforcement of Alabama law would unconstitutionally discriminate against speech based on the speaker's viewpoint. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (defining viewpoint discrimination). Because, as discussed below, the Attorney General concedes that the statutes at issue discriminate against speech based on content, the court does not address whether they also discriminate based on viewpoint.

19. The court refers to 'the plaintiffs and their staff' for readability, but the reader is reminded that only the three healthcare providers--West Alabama, Alabama Women's Center, and Dr. Robinson--assert a (continued...)

other States, offering counseling services about treatment options outside Alabama, and providing material support to clients seeking abortions in States where they are lawful.

"[A]s a general matter, 'the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002) (alteration in original) (quoting *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 65 (1983)). Content-based restrictions on speech are ordinarily subject to strict scrutiny. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015). A law is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 163.

---

First Amendment claim on their staff's behalf. Yellowhammer Fund brings its First Amendment challenge on its own behalf only.

There are a few "narrowly limited classes of speech" that the government may regulate without having to satisfy strict scrutiny. *United States v. Stevens*, 559 U.S. 460, 468-69 (2010) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)). These categories include obscenity, defamation, fraud, incitement, and, most relevant here, speech integral to unlawful conduct. *See Stevens*, 315 U.S. at 469. The Supreme Court has described these categories as "historic and traditional" because regulations of the speech they encompass "have never been thought to raise any Constitutional problem." *Id.* at 468-49 (quoting *Chaplinsky*, 559 U.S. at 571-72).

The Attorney General contends that insofar as the Alabama statutes at issue regulate speech, they reach only speech integral to unlawful conduct and need not satisfy strict scrutiny. He concedes that Alabama's criminal laws impose a content-based restriction on speech. "[T]he content of [the] speech," he explains,

is what "causes a crime."  AG's Mot. Dismiss (Doc. 28) at 26 (alteration in original) (quoting *United States v. Fleury*, 20 F.4th 1353, 1364-65 (11th Cir. 2021)). He does not dispute that providing abortion-related services would require the plaintiffs and their staff to engage in speech, either in the form of pure speech or expressive conduct, or that his threats have chilled that speech.  Nonetheless, in his view, the Alabama statutes are exempt from strict scrutiny "because the First Amendment does not protect criminal activity." AG's Mot. Dismiss (Doc. 28) at 24.

The exception to strict scrutiny for speech integral to unlawful conduct comes from *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949).  There, the Supreme Court observed "that the constitutional freedom for speech ... [does not] extend[] its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute."  *Id.* at 498.  The Attorney General casts his motion to

75

dismiss as a straightforward application of *Giboney*: Alabama law prohibits most abortions within its borders, and so any agreement, encouragement, or assistance to do what Alabama has outlawed is criminally actionable, even if the agreement, encouragement, or assistance occurs through speech.

Simple as this argument seems, it ignores the issue at the heart of this case: that the plaintiffs and their staff wish to help their clients access abortions in States where abortions are *lawful*. The Attorney General has not identified any instance of *Giboney* being held to authorize a prosecution for steps taken inside one State toward an act that would be permitted, or even legally protected, in another. The question the court must confront is whether *Giboney*'s exception to strict scrutiny for content-based restrictions on speech can accommodate these novel circumstances.

It bears repeating that *Giboney* represents a "narrowly limited" exception to the general rule that

content-based restrictions on speech must satisfy strict scrutiny. *Stevens*, 559 U.S. at 468-69 (quoting *Chaplinsky*, 315 U.S. at 571-72); *see also United States v. Alvarez*, 567 U.S. 709, 717-18 (2012); *United States v. Williams*, 553 U.S. 285, 288 (2008). The categories of regulation exempt from strict scrutiny are narrow largely because even speech related to unlawful conduct can have constitutional value, including the potential to inform, critique, entertain, and otherwise enrich the "interchange of ideas." *Dennis v. United States*, 341 U.S. 494, 549 (1951) (Frankfurter, J., concurring in the judgment); *see also* Eugene Volokh, *Crime-Facilitating Speech*, 57 Stan. L. Rev. 1095, 1111 (2005).

Against this backdrop, the Attorney General urges the court to extend *Giboney*'s immunity into new terrain: efforts to perform acts that would be unlawful in the State where they are planned but lawful (and potentially even constitutionally protected) in the

State where they would occur.  The court cannot accept the Attorney General's expansive interpretation of *Giboney*, which would have dangerous consequences for the freedom of expression.

The Attorney General's reading of *Giboney* would enable him to regulate conduct that he lacks the authority to prosecute directly by burdening speech. Alabama's criminal jurisdiction does not reach beyond its borders, and it cannot pass a statute explicitly punishing what its residents do in another State: "[A]n act done within the territorial limits of [one state], under authority and license from that state, ... cannot be prosecuted and punished by [another state]." *Nielsen v. Oregon*, 212 U.S. 315, 321 (1909).  Unable to proscribe out-of-state abortions, the Attorney General interprets state law as punishing the speech necessary to obtain them.  *Giboney*, however, is intended only to recognize a narrow and well-established class of speech that governments have historically regulated, not as a

tool to reach regulatory ends that the Constitution otherwise prohibits governments from realizing. *See Stevens*, 559 U.S. at 468-69.

For the *Giboney* exception to have tractable limits, the speech at issue must bear some relation to an independently unlawful course of conduct. *Giboney* "can't justify treating speech as 'integral to illegal conduct' simply because the speech is illegal under the law that is being challenged." Eugene Volokh, *The "Speech Integral to Criminal Conduct" Exception*, 101 Cornell L. Rev. 981, 987-88 (2016). In other words, the speech being proscribed must be "causally linked to a particular crime, a crime that does not itself consist of otherwise protected speech." *Id.* at 1000. Were the doctrine otherwise, any criminally prohibited speech would be integral to unlawful conduct, and any statute punishing that speech would be immune from strict scrutiny. Indeed, that is the very logic the Attorney General advances here. He contends that the

Alabama statutes can withstand the plaintiffs'
as-applied challenge because the speech they and their
staff wish to engage in would be integral to unlawful
conduct, but their speech would be integral to unlawful
conduct only because the Alabama statutes, as
interpreted by the Attorney General, make their speech
unlawful. Such circular reasoning quickly spins out of
control.

Put another way, the Attorney General's reading of
*Giboney* would render meaningless the requirement that
the speech being regulated be integral to unlawful
conduct. Without a separate course of unlawful conduct
that the plaintiffs' and their staff's speech would
further, the only 'conduct' that could be the basis of
the Attorney General's threatened prosecutions would be
speech that Alabama regards as politically unpopular
and morally disfavored. The First Amendment does not
tolerate that result, as the freedom of speech is meant
to prevent the government from "suppress[ing] unpopular

ideas or information." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994). *Giboney* therefore cannot exempt the Attorney General's threatened enforcement of the Alabama statutes from strict scrutiny.

The Attorney General protests that at least two federal statutes punish conspiracies to commit acts that are not unlawful insofar as they are not separately codified as crimes, and courts have long assumed that both statutes fall within the *Giboney* exception to strict scrutiny. According to the Attorney General, if those statutes are constitutional, he can likewise prosecute speech integral to conduct that is not independently illegal. The first statute the Attorney General invokes is Section 1 of the Sherman Act, which bars any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Under Section 1, acts undertaken by one market participant

may be perfectly legal, but an agreement to perform the
same acts by a conglomerate of market participants can
be a punishable offense.    Courts have not subjected
this provision to strict scrutiny.   The second statute
cited by the Attorney General is the federal conspiracy
statute, which outlaws conspiracies to "defraud the
United    States."      18    U.S.C.    § 371.      The
constitutionality of the federal conspiracy statute has
not been seriously questioned, even though no law
separately makes defrauding the United States an
unlawful object.

The Attorney General's reliance on the Sherman Act
and the federal conspiracy statute misses a critical
point: neither law contemplates agreements to perform
acts that some States deem worthy of affirmative legal
protections.    Conspiring to restrain trade and
conspiring to defraud the United States may not be
explicitly prohibited in the U.S. Code, but the
Attorney General would be hard-pressed to argue that

either act involves 'lawful' conduct in any meaningful sense of the term.  The lawfulness of abortion, on the other hand, varies by State and gestational age.  Some States regard the freedom to terminate a pregnancy as so sacred that the liberty interest is protected in their constitutions.  *See, e.g.*, *Hodes & Nauser, MDs, P.A. v. Schmidt*, 440 P.3d 461, 486 (2019); *Valley Hosp. Ass'n v. Mat-Su Coal. for Choice*, 948 P.2d 963, 969 (Alaska 1997); Mich. Const. art I, § 28.  Defrauding the United States and restraining trade, which *no* State affirmatively permits, are fundamentally unlike abortions and the patchwork of legal protections nationwide surrounding them.

Another noteworthy distinction is that Congress has the constitutional authority to criminalize the acts of restraining trade and defrauding the United States.  In fact, Section 2 of the Sherman Act punishes unilateral restraints on trade, making it a felony for anyone "to monopolize any part of the trade or commerce among the

several States."   15 U.S.C. § 2.   Similarly, courts have interpreted the federal conspiracy statute to reach agreements to bribe government officials, steal money or property from the government, and make false statements to the government, all of which Congress can and has separately prohibited.   *See* Abraham S. Goldstein, *Conspiracy to Defraud the United States*, 68 Yale L.J. 405, 436-41 (1959).   By contrast, the Constitution forbids Alabama from prosecuting people for engaging in lawful out-of-state conduct.   *See Nielsen*, 212 U.S. at 321.   Neither the Sherman Act nor the federal conspiracy statute represents an attempt by Congress to accomplish indirectly what it cannot do through direct legislation, as the plaintiffs allege the Attorney General is attempting to do here.

The Attorney General also insists that Alabama has the authority to regulate professional speech under lesser constitutional scrutiny, including speech about medical practices such as abortions.   But the Supreme

**84**

Court "has not recognized 'professional speech' as a separate category of speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 767 (2018). Perhaps for this reason, the Attorney General abandons this argument in his reply brief.

Having established that the Attorney General's attempt to invoke *Giboney* is unavailing, the court turns to whether the plaintiffs have stated a viable First Amendment claim, taking the factual allegations in their complaints as true. The plaintiffs submit that the State plans to initiate a prosecution under Alabama's statutes punishing conspiracy, complicity, solicitation, and other crimes based on the content of the speech they and their staff wish to engage in about out-of-state abortions. "[C]ontent-based speech regulations face 'strict scrutiny,' the requirement that the government use the least restrictive means of advancing a compelling government interest." *Burk v. Augusta-Richmond Cnty.*, 365 F.3d 1247, 1251 (11th Cir.

2004).

The Attorney General does not argue that his threatened prosecutions can satisfy strict scrutiny. He has presented no other reason to dismiss the plaintiffs' First Amendment claim besides his attempt to invoke the *Giboney* exception, which, as stated, does not extend to speech in furtherance of lawful out-of-state conduct. His motion to dismiss the as-applied First Amendment challenge will therefore be denied.

### 3.  Yellowhammer Fund's Overbreadth Challenge

Finally, apart from the as-applied challenge, Yellowhammer Fund claims that the Attorney General's reading of Alabama's interjurisdictional conspiracy statute is unconstitutionally overbroad. The overbreadth doctrine allows courts to declare laws that have some legitimate applications facially invalid because they infringe on the freedom of expression. A

86

law is overbroad if it sweeps in so much protected conduct that no "narrowing construction" can save it. *Osborne v. Ohio*, 495 U.S. 103, 119 (1990). Generally, overbreadth claims are asserted by parties when their conduct is not constitutionally protected; they can nonetheless assert that the law regulating their conduct "punishes so much protected speech that it cannot be applied *to anyone*," including them. *United States v. Hansen*, 599 U.S. 762, 769 (2023) (emphasis in original). Because facial invalidation is "strong medicine," courts invoke the overbreadth doctrine "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). "To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." *Hansen*, 599 U.S. at 770 (2023).

Yellowhammer Fund alludes to the overbreadth doctrine in two counts of its complaint. The Fund

87

alleges that the Attorney General's reading of Alabama's interjurisdictional conspiracy statute "is overbroad and imposes a content- and viewpoint-based restriction" on speech and association. Yellowhammer Fund's Compl. (Doc. 1) ¶¶ 73, 80.

Yellowhammer Fund does not support the overbreadth claim with any factual contentions or legal arguments aside from the allegations and arguments underlying the as-applied challenge. The complaint does not identify any other act that Alabama either has prohibited or could prohibit that would be lawful in other States and that the Attorney General's interpretation of conspiracy law would authorize him to prosecute. Nor does the complaint present any allegations or other reason to suggest that the Fund's constitutional concerns cannot be addressed through its as-applied challenge.

Although Yellowhammer Fund's brief in opposition offers some clarification about its overbreadth theory,

the complaint remains devoid of sufficient allegations to state a plausible claim for relief.  The court will therefore grant the Attorney General's motion to dismiss the Fund's overbreadth challenge.


### C. Extraterritoriality, Sovereignty, and Comity

Yellowhammer Fund next argues that the Attorney General's threatened prosecutions would amount to an extraterritorial application of Alabama's abortion restrictions in violation of the Due Process Clause and the constitutional principles of sovereignty and comity.  The parties agree that the Attorney General does not intend to prosecute conduct occurring in another State; instead, he has threatened those who facilitate out-of-state conduct.  Left unresolved is whether and to what extent the constitutional limitations on the extraterritorial application of state law are implicated when a state seeks to use its

criminal law to deter or prevent specific out-of-state conduct.

After carefully considering Yellowhammer Fund's and the Attorney General's arguments, the court concludes that the parties each require more time to address this novel question. The court therefore will reserve judgment on the extraterritoriality claim.

### D. Due Process – Fair Warning

West Alabama, Alabama Women's Center, and Dr. Robinson contend that the Attorney General cannot act on his threats of prosecution without violating the fair-warning requirement of the Fourteenth Amendment's Due Process Clause because, contrary to the Attorney General's assertion, Alabama law does not actually make facilitating lawful out-of-state abortions a crime.[20]

---

20. The Attorney General also contests the plaintiff healthcare provider's third-party standing to bring their fair-warning claim on behalf of their (continued...)

Although the healthcare providers offer a compelling argument that neither the 1896 conspiracy statute nor any other Alabama law makes their assistance a crime, their competing reading of state law is insufficient to state a fair-warning claim.[21]

_____

staff, and he does so by relying on the same argument he made regarding these plaintiffs' First Amendment claim. For the same reasons provided in the court's discussion of the First Amendment claim, the plaintiffs also have third-party standing to bring their fair-warning claim.

21. The healthcare providers explain that the interjurisdictional conspiracy statute codified the Alabama Supreme Court's holding in *Thompson v. State* "that it is an indictable common-law misdemeanor to enter into a conspiracy in [Alabama] to commit a known common-law felony, *malum in se*, in a sister state." 17 So. 512, 516 (Ala. 1895). The proposal to add an interjurisdictional conspiracy statute to Alabama's criminal code described the intended change as "[s]uggested by *Thompson v. State*." West Alabama et al.'s Compl. (Doc. 23) ¶ 45 (quoting Report of William L. Martin, Code Commissioner of Alabama (1896), p. 91, Ex. 1). Because abortion is not *malum in se*, the interjurisdictional conspiracy statute would not apply to any agreements to have one performed. Furthermore, the plaintiffs argue that none of Alabama's general criminal statutes operate interjurisdictionally either, (continued...)

The Due Process Clause requires that the law provide fair warning of what it prohibits. This principle has "long been part of our tradition," *United States v. Bass,* 404 U.S. 336, 348 (1971), and is recognized as "fundamental to our concept of constitutional liberty," *Marks v. United States,* 430 U.S. 188, 191 (1977). The United States Supreme Court has recognized two ways that the right to fair warning might be violated: first, when statutory language is so vague that ordinary people cannot understand what conduct is prohibited or that it encourages arbitrary and discriminatory enforcement, *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); and, second, when courts retroactively apply "a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope," *United States v. Lanier*, 520 U.S.

as the text of those statutes does not allow for such an application.

92

259, 266 (1997).  The healthcare providers argue that the Attorney General's threatened prosecutions would violate the right to fair warning in the latter sense, as he intends to prosecute based on a reading of Alabama law that the plaintiffs insist is unprecedented and unfounded.

Fair-warning claims based on novel interpretations of state law are governed by the standard articulated in *Bouie v. City of Columbia*, 378 U.S. 347 (1964).  In *Bouie*, the Supreme Court considered whether defendants who had participated in a sit-in to oppose a restaurant's racial segregation could constitutionally be convicted for violating South Carolina's trespass statute.  *Id.* at 348-49.  The text of the trespass statute prohibited only the "entry" onto property against the owner's or tenant's will, but in affirming the defendants' convictions, the South Carolina Supreme Court construed the statute as also covering the act of *remaining* on another's property after being told to

leave.  *Id.* at 349-50.  The United States Supreme Court held that this "unforeseeable and retroactive judicial expansion of narrow and precise statutory language" was unconstitutional.  *Id.* at 352.  Just as the Constitution's Ex Post Facto Clause bars a state legislature from passing a law that "makes an action done before the passing of the law, and which was innocent when done, criminal," the Due Process Clause bars a state court "from achieving precisely the same result by judicial construction."  *Id.* at 353-54. Thus, the rule that emerged from *Bouie* is that, under the Due Process Clause, "a judicial construction of a criminal statute [that] is 'unexpected and indefensible' by reference to the law which had been expressed prior to the conduct in issue' ... must not be given retroactive effect."  *Id.* at 354.

The *Bouie* rule is inapplicable here, where no court has construed Alabama law consistent with the Attorney General's interpretation nor applied such a

construction retroactively to a defendant's conduct. The "judicial construction" and "retroactive" elements are essential to finding a fair-warning violation under *Bouie*. Due process is denied due to a lack of fair warning only when a court's novel interpretation of law results in retroactive punishment of conduct that was legal when it occurred. By contrast, as a general matter, a prosecution based on an untested legal theory does not necessarily offend the fair-warning requirement. While facing prosecution is undoubtedly burdensome, defendants may seek to dismiss the charges against them in a state-court proceeding on the ground that their conduct was not actually a crime. If the court agrees and dismisses the charge, it would be difficult to argue that the defendant was denied due process. It is only if the court adopts the prosecution's unexpected and indefensible interpretation of the law, and the defendant is convicted does a fair-warning issue arise. The act of

prosecution or, in this case, the threat of prosecution, does not generally violate the fair-warning requirement under *Bouie*, even if such prosecution relies on an "unexpected and indefensible" theory of the law. West Alabama, Alabama Women's Center, and Dr. Robinson's fair-warning claim will be dismissed.[22]

## IV. CONCLUSION

This case is simply about how a State may not prevent people within its borders from going to another State, and from assisting others in going to another State, to engage in lawful conduct there. Alabama can no more restrict people from going to, say, California

---

22. The Attorney General also contends that the Eleventh Amendment prohibits the court from resolving the plaintiffs' fair-warning claim. Because the court will dismiss the fair-warning claim for failing to allege a plausible claim under *Bouie*, the court need not address the Attorney General's argument to dismiss the fair-warning claim on Eleventh Amendment grounds.

to engage in what is lawful there than California can restrict people from coming to Alabama to do what is lawful here.   In this sense, the case is not an "especially difficult call." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 346 (2022) (Kavanaugh, J., concurring).

Therefore, the plaintiffs here correctly contend that the Attorney General cannot constitutionally prosecute people for acts taken within the State meant to facilitate lawful out of state conduct, including obtaining an abortion.  Although the court will dismiss the fair notice and overbreadth claims, the plaintiffs have sufficiently alleged that the Attorney General's threats, if carried out, would violate the right to travel and the freedom of speech.  The court also reserves judgment on four of Yellowhammer Fund's claims regarding the Fund's own right to travel, freedom of association, expressive conduct, and extraterritorial application of state law.  The Attorney General's

97

motion to dismiss will therefore be granted in part and denied in part.

***

For the reasons stated above, it is ORDERED as follows:

(1) The defendant's motion to dismiss (Doc. 28) is granted as to the overbreadth claim and fair-notice due process claim, which are dismissed.

(2) The defendant's motion to dismiss is denied as to the following claims: the right-to-travel claim, the freedom-of-speech claim (including the argument that facilitating abortions constitutes expressive conduct), the freedom-of-association claim, and the extraterritoriality claim.

DONE, this the 6th day of May, 2024.

/s/ Myron H. Thompson
**UNITED STATES DISTRICT JUDGE**