# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | | |
|---|---|---|
| YELLOWHAMMER FUND, on behalf of itself and its clients, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 2:23-cv-450-MHT |
| ATTORNEY GENERAL OF ALABAMA STEVE MARSHALL, in his official capacity, | ) ) ) ) ) | |
| Defendant. | ) ) | |
| WEST ALABAMA WOMEN'S CENTER, on behalf of themselves and their staff, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 2:23-cv-451-MHT |
| STEVE MARSHALL, in his official capacity as Alabama Attorney General, | ) ) ) ) | |
| Defendant. | ) ) | |

**WEST ALABAMA WOMEN'S CENTER ET AL. PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT, DECLARATORY RELIEF, AND PERMANENT INJUNCTION**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION .............................................................................................................. 1

STATEMENT OF UNDISPUTED MATERIAL FACTS .......................................... 2

   I.  Since June 24, 2022, Abortion Has Been Banned in Alabama, with Only Limited
      Exceptions. ......................................................................................................... 2

   II.  Defendant Publicly Threatened to Prosecute Those Who Assist Pregnant Alabamians
       Seeking to Cross State Lines to Access Legal Abortion Care. ........................... 3

   III. Defendant's Threat of Prosecution Has Chilled Plaintiffs' Provision of Information
       and Support to Pregnant Alabamians Seeking to Travel Across State Lines to Access
       Legal Abortion Care. .......................................................................................... 4

STANDARD OF REVIEW ............................................................................................... 7

ARGUMENT ..................................................................................................................... 8

   I.  The Attorney General's Threats Violate the First Amendment as a Matter of Law. ......... 10

      A.  Plaintiffs Have Standing to Assert Their First Amendment Claim. ........................... 11

      B.  Plaintiffs' and Plaintiffs' Staffs' Speech About Legal Out-of-State Abortion Care
         Is Protected by the First Amendment. ......................................................... 15

      C.  The Attorney General's Threats Are Content- and Viewpoint- Discriminatory
         and Cannot Survive Strict Scrutiny. ........................................................... 20

   II.  The Attorney General's Threats Violate the Fundamental Right to Travel as a Matter
       of Law. ................................................................................................................. 27

      A.  Plaintiffs AWC and Dr. Robinson Have Standing to Assert the Right to Travel
         Claim. ........................................................................................................... 28

      B.  The Right to Travel Is Fundamental to the Structure and Character of the Nation
         and Protects Both the Ability to Physically Move Across State Lines and to
         Engage in Activities That Are Legal in the Destination State. .................... 32

      C.  The Attorney General's Threats Violate the Fundamental Right to Travel. ................ 37

   III. Plaintiffs Satisfy the Remaining Factors for Permanent Injunctive Relief. ...................... 42

CONCLUSION ................................................................................................................. 43

# TABLE OF AUTHORITIES

**Cases**

*Alabama v. U.S. Army Corps of Eng'rs,*
  424 F.3d 1117 (11th Cir. 2005). ..................................................... 42

*Am. Booksellers v. Webb,*
  919 F.2d 1493 (11th Cir. 1990) ..................................................... 21

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)................................................................. 7, 8

*Ashcroft v. A.C.L.U.,*
  535 U.S. 564 (2002)................................................................. 15

*Att'y Gen. of N.Y. v. Soto-Lopez,*
  476 U.S. 898 (1986)............................................................ *passim*

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979)................................................................. 8

*Barrett v. Walker Cnty. Sch. Dist.,*
  872 F.3d 1209 (11th Cir. 2017) .................................................... 43

*Barrows v. Jackson,*
  346 U.S. 249 (1953)................................................................ 29

*Bigelow v. Virginia,*
  421 U.S. 809 (1975)........................................................ 23, 26, 36

*BMW of N. Am., Inc. v. Gore,*
  517 U.S. 559 (1996)................................................................ 20

*Bolger v. Youngs Drug Prods. Corp.,*
  463 U.S. 60 (1983)................................................................. 15

*Bosco's Club, Inc. v. City of Oklahoma City,*
  598 F. Supp. 583 (W.D. Okla. 1984) ........................................... 12, 13

*Burk v. Augusta-Richmond County,*
  365 F.3d 1247 (11th Cir. 2004) ................................................... 9, 22

*Clark Constr. Co. v. Pena,*
  930 F. Supp. 1470 (M.D. Ala. 1996) ............................................ 42, 43

*Corfield v. Coryell,*
  6 F. Cas. 546 (C.C.E.D. Pa. 1823)............................................... 35, 36

*Colon v. Bureau of Alcohol*,
    No. 8:23-CV-223-MSS-UAM, 2024 WL 309975 (M.D. Fla. Jan. 26, 2024)........................ 32

*Conant v. Walters*,
    309 F.3d 629 (9th Cir. 2002) ................................................................ 22, 24

*Council of Ins. Agents + Brokers v. Gallagher*,
    287 F. Supp. 2d 1302 (N.D. Fla. 2003).......................................................... 15

*Craig v. Boren*,
    429 U.S. 190 (1976)......................................................................... 29, 30

*Crandall v. Nevada*,
    73 U.S. (6 Wall.) 35 (1867) ............................................................. *passim*

*Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*,
    975 F.3d 300 (3d Cir. 2020)................................................................... 43

*Dennis v. United States*,
    341 U.S. 494 (1951)........................................................................... 16

*DJR Assocs., LLC v. Hammonds*,
    241 F. Supp. 3d 1208 (N.D. Ala. 2017)........................................................ 20

*Dobbs v. Jackson Women's Health Org.*,
    597 U.S. 215 (2022)..................................................................... 2, 19, 36

*Doe v. Bolton*,
    410 U.S. 179 (1973)....................................................................... 29, 36

*Edelman v. Jordan*,
    415 U.S. 651 (1974)........................................................................... 27

*Edwards v. California*,
    314 U.S. 160 (1941)................................................................... *passim*

*Ellis v. England*,
    432 F.3d 1321 (11th Cir. 2005) ................................................................ 8

*Elrod v. Burns*,
    427 U.S. 347 (1976)........................................................................... 42

*FPL Food, LLC v. U.S. Dep't of Agric.*,
    671 F. Supp. 2d 1339 (S.D. Ga. 2009)........................................................ 12

*Garcia v. Stillman*,
    No. 22-cv-24156, 2023 WL 5095540 (S.D. Fla. Aug. 9, 2023) ............................... 43

*Garvie v. City of Ft. Walton Beach,*
   366 F.3d 1186 (11th Cir. 2004) ........................................................ 8

*Giboney v. Empire Storage & Ice Co.,*
   336 U.S. 490 (1949) ........................................................ 16, 17, 20

*Griswold v. Connecticut,*
   381 U.S. 479 (1965) ........................................................ 29

*Hang On, Inc. v. City of Arlington,*
   65 F.3d 1248 (5th Cir. 1995) ........................................................ 12

*Harrell v. Fla. Bar,*
   608 F.3d 1241 (11th Cir. 2010) ........................................................ 8

*Harris v. Bd. of Supervisors,*
   366 F.3d 754 (9th Cir. 2004) ........................................................ 42

*Jones v. Gov. of Fla.,*
   950 F.3d 795 (11th Cir. 2020) ........................................................ 11

*Katt v. Dykhouse,*
   983 F.2d 690 (6th Cir. 1992) ........................................................ 18, 23

*Kent v. Dulles,*
   357 U.S. 116 (1958) ........................................................ 33

*Kerry v. Din,*
   576 U.S. 86 (2015) ........................................................ 33

*Kilgore v. City of Rainsville,*
   No. 1:07-cv-02213, 2008 WL 11391369 (N.D. Ala. June 11, 2008) ........................................................ 43

*Kowalski v. Tesmer,*
   543 U.S. 125 (2004) ........................................................ 12, 29

*Lamar v. Micou,*
   114 U.S. 218 (1885) ........................................................ 19

*Macon Cnty. Invs., Inc. v. Warren,*
   No. 3:06-CV-224, 2007 WL 141959 (M.D. Ala. Jan. 17, 2007) ........................................................ 12

*Mem'l Hosp. v. Maricopa County,*
   415 U.S. 250 (1974) ........................................................ 36

*Mitchell v. State,*
   27 So. 2d 36 (Ala. 1946) ........................................................ 18

*Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*,
   643 F. Supp. 1217 (D.N.J. 1986) ........................................................ 43

*N.Y. State Bar Ass'n v. Reno*,
   999 F. Supp. 710 (N.D.N.Y. 1998) ...................................................... 13

*N.Y.C.L. Union v. N.Y.C. Transit Auth.*,
   684 F.3d 286 (2d Cir. 2012) ................................................................. 13

*NAACP v. Button*,
   371 U.S. 415 (1963) ............................................................................. 23

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   585 U.S. 755 (2018) ....................................................................... 24, 26

*Nat'l People's Action v. Village of Wilmette*,
   914 F.2d 1008 (7th Cir. 1990) ............................................................. 43

*Nat'l Rifle Ass'n of Am. v. Vullo*,
   No. 22-842, 2024 WL 2751216 (U.S. May 30, 2024) ......................... 21

*Nielsen v. Oregon*,
   212 U.S. 315 (1909) ............................................................................. 19

*Nobles v. Wal-Mart Stores Inc.*,
   No. 1:21-CV-1347-CLM, 2023 WL 7553917 (N.D. Ala. Nov. 14, 2023) ................................ 8

*Otto v. City of Boca Raton*,
   981 F.3d 854 (11th Cir. 2020) ............................................................. 26

*Paul v. Virginia*,
   75 U.S. (8 Wall.) 168 (1868) ............................................................... 34

*Patel v. U.S. Att'y Gen.*,
   971 F.3d 1258 (11th Cir. 2020) ........................................................... 19

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
   280 F.3d 278 (3d Cir. 2002) ................................................................. 15

*Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky., Inc. v. Comm'r,
Ind. State Dep't of Health*,
   No. 1:17-CV-01636-SEB-MG, 2024 WL 1908110
   (S.D. Ind. May 1, 2024) ........................................................ 16, 21, 23, 26

*Planned Parenthood Se., Inc. v. Bentley*,
   951 F. Supp. 2d 1280 (M.D. Ala. 2013) .............................................. 42

*Planned Parenthood Se., Inc. v. Strange*,
   33 F. Supp. 3d 1330 (M.D. Ala. 2014) ................................................................ 14

*Powers v. Ohio*,
   499 U.S. 400 (1991) .......................................................................................... *passim*

*Rec. Revolution No. 6, Inc. v. City of Parma*,
   638 F.2d 916 (6th Cir. 1980) .............................................................................. 23

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ..................................................................................... 21, 23

*Region 8 Forest Serv. Timber Purchasers Council v. Alcock*,
   993 F.2d 800 (11th Cir. 1993) ........................................................................... 31

*Reprod. Health Servs. v. Strange*,
   204 F. Supp. 3d 1300 (M.D. Ala. 2016) ...................................................... 14, 32

*Reprod. Health Servs. v. Strange*,
   3 F.4th 1240 (11th Cir. 2021) ............................................................................. 7

*Robinson v. Marshall*,
   415 F. Supp. 3d 1053 (M.D. Ala. 2019) ............................................................ 4

*Robinson v. Marshall*,
   No. 2:19CV365-MHT, 2022 WL 2314402 (M.D. Ala. June 24, 2022) .................. 2

*Roe v. Wade*,
   410 U.S. 113 (1973) .......................................................................................... 2

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) ......................................................................................... 22

*Saenz v. Roe*,
   526 U.S. 489 (1999) ........................................................................................ *passim*

*Shapiro v. Thompson*,
   394 U.S. 618 (1969) ................................................................................ 27, 32, 33

*Singleton v. Wulff*,
   428 U.S. 106 (1976) ................................................................................ 15, 31, 32

*Sorrell v. IMS Health, Inc.*,
   564 U.S. 552 (2011) ..................................................................................... 23, 25

*Speech First, Inc. v. Cartwright*,
   32 F.4th 1110 (11th Cir. 2022) .................................................................... 22, 42

*Texas v. Johnson*,
  491 U.S. 397 (1989) ............................................................. 21

*The Passenger Cases*,
  48 U.S. (7 How.) 283 (1849) ............................................. 39

*Thomas v. Collins*,
  323 U.S. 516 (1945) ...................................................... 25, 27

*Twining v. New Jersey*,
  211 U.S. 78 (1908) ............................................................. 33

*U.S. Dep't of Lab. v. Triplett*,
  494 U.S. 715 (1990) ........................................................... 29

*United States v. Alvarez*,
  567 U.S. 709 (2012) ........................................................... 26

*United States v. Fleury*,
  20 F.4th 1353 (11th Cir. 2021) ...................................... 21

*United States v. Guest*,
  383 U.S. 745 (1966) .................................................. *passim*

*United States v. Hansen*,
  599 U.S. 762 (2023) ...................................................... 16, 18

*United States v. Playboy Ent. Grp.*,
  529 U.S. 803 (2000) ........................................................... 23

*United States v. Stevens*,
  559 U.S. 460 (2010) ...................................................... 16, 20

*United States v. Williams*,
  553 U.S. 285 (2008) ...................................................... 16, 18

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ........................................................... 11

*Ward v. State*,
  79 U.S. (12 Wall.) 418 (1870) ........................................ 35

*W. Ala. Women's Ctr. v. Miller*,
  217 F. Supp. 3d 1313 (M.D. Ala. 2016) ...................... 42

*W. Ala. Women's Ctr. v. Williamson*,
  120 F. Supp. 3d, 1296 (M.D. Ala. 2015) ..................... 14

*Walker v. Darby,*
   911 F.2d 1573 (11th Cir. 1990) ................................................................ 8

*Warth v. Seldin,*
   422 U.S. 490 (1975) ...................................................................... 29, 30

*White's Place, Inc. v. Glover,*
   222 F.3d 1327 (11th Cir. 2000) .............................................................. 12

*Wollschlaeger v. Governor,*
   848 F.3d 1293 (11th Cir. 2017) ...................................................... *passim*

*Young Apartments, Inc. v. Town of Jupiter,*
   529 F.3d 1027 (11th Cir. 2008) ........................................................ 12, 14

*Zobel v. Williams,*
   457 U.S. 55 (1982) ........................................................................ 34

**Statutes**

Ala. Code § 13A-2-23 ........................................................................... 1

Ala. Code § 13A-2-23(2) ....................................................................... 5

Ala. Code § 13A-4-1 ........................................................................... 1

Ala. Code § 13A-4-1(f)(2) ..................................................................... 5

Ala. Code § 13A-4-3 ........................................................................... 1

Ala. Code § 13A-4-3(g)(2). .................................................................... 5

Ala. Code § 13A-4-4 ..................................................................... 1, 3, 17

Ala. Code § 13A-5-6(a)(1) ..................................................................... 2

Ala. Code § 13A-5-6(a)(2) ..................................................................... 5

Ala. Code § 13A-5-6(a)(3) ..................................................................... 2

Ala. Code § 26-23H-2(i) ...................................................................... 14

Ala. Code § 26-23H-3 .......................................................................... 2

Ala. Code § 26-23H-4 .......................................................................... 2

Ala. Code § 26-23H-5 .......................................................................... 2

Ala. Code § 26-23H-6(a) ....................................................................... 2

Ala. Code § 26-23H-6(b) ............................................................................... 2

**Rules**

Fed. R. Civ. P. 56(a) ..................................................................................... 7

Fed. R. Civ. P. 56(c)(1) ............................................................................ 1, 2

Fed. R. Evid. 201(b)(2) ................................................................................. 7

**Treatises**

13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.4
  (3d ed. June 2024 update) ......................................................................... 11

13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.9.3
  (3d ed. June 2024 update) ......................................................................... 13

13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.9.5
  (3d ed. June 2024 update) ......................................................................... 11

15A C.J.S. *Conspiracy* § 118 ........................................................................ 19

16 Am. Jur. 2d *Conspiracy* § 1 ..................................................................... 19

**Other Authorities**

Bur. of Fam. Health Servs., Ala. Dep't of Pub. Health, 2020 Maternal Mortality Review 6
  (2022), https://www.alabamapublichealth.gov/perinatal/assets/2020_annual_mmr.pdf........... 7

Guttmacher Inst., *Abortion Policy in the Absence of Roe* (Apr. 24, 2023),
  https://www.guttmacher.org/state-policy/explore/abortion-policy-absence-roe ..................... 19

Guttmacher Inst., *Interactive Map: U.S. Abortion Policies and Access After Roe*,
  https://states.guttmacher.org/policies/ .................................................................. 19

Seth F. Kreimer, *Lines in the Sand: The Importance of Borders in American Federalism*,
  150 U. Pa. L. Rev. 973 (2002) ........................................................................ 36

Laurence H. Tribe, Saenz *Sans Prophecy: Does the Privileges or Immunities Revival
  Portend the Future—Or Reveal the Structure of the Present?*,
  113 Harv. L. Rev. 110 (1999) ........................................................................ 36

Magna Carta 1215 ¶ 41 ................................................................................ 33

Eugene Volokh, *Crime-Facilitating Speech*, 57 Stan. L. Rev. 1095 (2005) ............... 16

Eugene Volokh, *The "Speech Integral to Criminal Conduct" Exception*,
  101 Cornell L. Rev. 981 (2016) ....................................................................... 18

# INTRODUCTION[1]

In effect, the material facts in this case boil down to the following: (1) Defendant Marshall threatened to prosecute those who help pregnant Alabamians travel across state lines to access legal abortion care; and (2) but for the threat of prosecution, Plaintiffs, who are reproductive health care providers, would provide information and support to pregnant Alabamians seeking to travel out-of-state for legal abortion care.[2] Attorney General Marshall readily admits the former, and the latter is not "genuinely disputed." Fed. R. Civ. P. 56(c)(1).

The law supporting Plaintiffs' First Amendment and right to travel claims is similarly straightforward: A content- and viewpoint-based restriction on protected speech, like the one at issue here, is subject to strict scrutiny—an exacting standard that Attorney General Marshall cannot satisfy. And a state law or action that has the purpose or effect of penalizing interstate travel, like the Attorney General's threats of prosecution here, is unconstitutional as a matter of law. Accordingly, and as set forth further below, this Court should grant Plaintiffs' motion for summary judgment, declare that the use of the Alabama Criminal Laws[3] to prosecute the provision of information and support to pregnant Alabamians seeking to cross state lines for legal abortion violates the First Amendment and the constitutionally protected right to travel, and permanently

---

[1] Unless otherwise noted, all emphasis is added and all internal quotation marks and citations are omitted.

[2] The West Alabama Women's Center et al. Plaintiffs originally brought three claims in this case: a fair-notice due process claim on behalf of themselves and their staff, a freedom-of-speech First Amendment claim on behalf of themselves and their staff, and a right to travel claim on behalf of their patients and other pregnant Alabamians who seek their assistance. West Alabama Women's Center et al. Verified Compl. Declaratory & Inj. Relief ("WAWC Compl.") ¶¶ 120–31, Doc. 23. This Court granted Defendant's motion to dismiss the due process claim. Mot. Dismiss Op. & Order ("MTD Order") 90–96, Doc. 48. Plaintiffs move for summary judgment only on their two remaining claims, their First Amendment and right to travel claims. *See* WAWC Compl. ¶¶ 123–31.

[3] "Alabama Criminal Laws" or "Laws," as used herein, include the 1896 conspiracy law discussed below, *see* Ala. Code § 13A-4-4, and any of Alabama's other criminal laws outlined in the Code of Alabama, *see, e.g., id.* § 13A-2-23 ("Criminal liability based upon behavior of another—Complicity"); *id.* § 13A-4-1 ("Criminal solicitation"); *id.* § 13A-4-3 ("Criminal conspiracy generally").

enjoin Defendant Marshall, and his employees, agents, and successors in office, from enforcing or threatening to enforce those laws in that manner.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The following facts are not "genuinely disputed." Fed. R. Civ. P. 56(c)(1).

**I.    Since June 24, 2022, Abortion Has Been Banned in Alabama, with Only Limited Exceptions.**

On June 24, 2022, the same day that the U.S. Supreme Court issued its opinion in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), overturning, *inter alia*, *Roe v. Wade*, 410 U.S. 113 (1973), Alabama's near-total ban on abortion (the "2019 Abortion Ban" or the "Ban"), Ala. Code § 26-23H-4, took effect. *Robinson v. Marshall*, No. 2:19CV365-MHT, 2022 WL 2314402, at *1 (M.D. Ala. June 24, 2022); Answer ("Answer") ¶ 7, Doc. 57.

The 2019 Abortion Ban makes it a crime "for any person to intentionally perform or attempt to perform an abortion" in Alabama at any stage in pregnancy, in nearly all cases. Ala. Code §§ 26-23H-4, -3. Performing an abortion in violation of the Ban constitutes a Class A felony, punishable by imprisonment for ten to ninety-nine years. *Id.* §§ 26-23H-6(a), 13A-5-6(a)(1). Attempting an abortion that violates the Ban constitutes a Class C felony, punishable by imprisonment for one to ten years. *Id.* §§ 26-23H-6(b), 13A-5-6(a)(3). These penalties apply to those providing abortion care; the Ban explicitly exempts the person having the abortion from any criminal or civil liability. *Id.* § 26-23H-5; *see also* Mot. Dismiss ("MTD") 4, Doc. 28. As a result of the Ban, Alabama physicians no longer provide abortion care in the state, except potentially where one of the Ban's limited exceptions or exclusions apply. Aff. Robin Marty Supp. WAWC et al. Pls.' Mot. Summ. J. ("Marty Aff.") ¶ 7, attached hereto as Ex. A; Aff. Yashica Robinson, M.D., Supp. WAWC et al. Pls.' Mot. Summ. J. ("Robinson Aff.") ¶ 1, attached hereto as Ex. B.

## II.    Defendant Publicly Threatened to Prosecute Those Who Assist Pregnant Alabamians Seeking to Cross State Lines to Access Legal Abortion Care.

On the day *Dobbs* was decided and the Ban took effect, Alabama Representative Chris England tweeted about an 1896 provision of Alabama's conspiracy law (the "1896 Law"), *see* Ala. Code § 13A-4-4, asserting that, "anyone can be prosecuted for conspiracy [under that provision] if they help someone either get or even plan to get an abortion in another state." WAWC Compl. ¶ 27; Answer ¶ 27.[4] In response, a spokesman for Defendant Attorney General Marshall said, "We are reviewing the matter and have no comment at this time." WAWC Compl. ¶ 28; Answer ¶ 28. On July 13, 2022, it was reported that Defendant Marshall stated in a speech that his office would exercise its authority to prosecute violations of the Ban, and that the 1896 Law could apply to attempts to procure an abortion out of state. WAWC Compl. ¶ 30; Answer ¶ 30.

On August 11, 2022, Defendant Marshall addressed the issue again as a guest on the Jeff Poor Show, an internet radio show broadcast in Alabama and available online. WAWC Compl. ¶ 31; Answer ¶ 31. Mr. Poor asked Defendant Marshall what he thought of "some of the talk from the left that [someone] could be an accomplice somehow by transporting someone across state lines for abortion?" WAWC Compl. ¶ 32; Answer ¶ 32. Defendant Marshall responded as follows:

> There's no doubt that [the Ban] is a criminal law, and general principles that apply to a criminal law would apply to this, because this is a classic felony, that is the most significant offense we have as far as punishment goes under a criminal statute absent a death penalty case. And so provisions relating to accessory liability, provisions relating to conspiracy, would have applicability involving this particular act that was passed by the Legislature. So, for example, if someone was promoting themselves out as a funder of abortion out of state, then that is potentially criminally actionable for us. And so, one thing that we will do in working with local law enforcement and prosecutors is making sure that we fully implement this law. You know, and there's nothing about that law that restricts any individual from driving across state lines and seeking an abortion in another place. However, I would say that if an individual held themselves out as an entity or a group that is using funds

---

[4] The 1896 Law states that "[a] conspiracy formed in this state to do an act beyond the state, which, if done in this state, would be a criminal offense, is indictable and punishable in this state in all respects as if such conspiracy had been to do such act in this state." Ala. Code § 13A-4-4.

that they are able to raise to be able to facilitate those visits, then that's something that we're going to look at closely.

WAWC Compl. ¶ 33; Answer ¶ 33.

Alabama media reported Defendant Marshall's threats to the wider public. WAWC Compl. ¶ 34; Answer ¶ 34.

### III.    Defendant's Threat of Prosecution Has Chilled Plaintiffs' Provision of Information and Support to Pregnant Alabamians Seeking to Travel Across State Lines to Access Legal Abortion Care.

Plaintiffs are providers of comprehensive reproductive health services in Alabama, including contraceptive counseling and care, pregnancy testing and dating, and pregnancy-options counseling. Marty Aff. ¶¶ 1, 6; Robinson Aff. ¶¶ 1, 3. Prior to the Supreme Court's decision in *Dobbs*, Plaintiffs also provided abortion care in Alabama. Marty Aff. ¶ 6; Robinson Aff. ¶¶ 1, 3; *see also, e.g.*, *Robinson v. Marshall*, 415 F. Supp. 3d 1053, 1055 (M.D. Ala. 2019). In their capacity as reproductive health care providers, Plaintiffs receive inquiries from pregnant Alabamians about their medical care options, including those that are lawful and available outside of Alabama, such as abortion. Marty Aff. ¶¶ 8, 12–13; Robinson Aff. ¶¶ 6, 10–11. Prior to *Dobbs* and the events leading up to this lawsuit, Plaintiffs and their staff provided these individuals with information about and recommendations for specific, trusted abortion providers in other states, as well as specific information about where and how they could obtain financial assistance and/or other practical support relating to inter-state travel for abortion care. Marty Aff. ¶¶ 9–10, 12; Robinson Aff. ¶ 7. Plaintiff Alabama Women's Center for Reproductive Alternatives, LLC, d/b/a Alabama Women's Center (AWC) and AWC's staff also provided direct assistance to people seeking to travel out of state for abortion care, by, among other things, communicating and making appointments for pregnant Alabamians with out-of-state providers, coordinating funding for care and travel with local and national abortion assistance organizations, and helping to make travel arrangements. Robinson

4

Aff. ¶ 8. In addition, Plaintiff Dr. Robinson and her staff helped directly coordinate out-of-state care for medically complex patients who could not receive in-state care by, among other things, talking to providers in other states who could provide such care and forwarding medical records and other relevant information to support the patient's care. *Id.*

But for the threat of prosecution, Plaintiffs would provide pregnant Alabamians with the type of information about and support in accessing out-of-state abortion care that they provided pre-*Dobbs* and the events leading up to this lawsuit. Marty Aff. ¶¶ 14, 32; Robinson Aff. ¶¶ 14, 17, 46. Plaintiffs and their staff are trained and feel ethically obligated to provide their patients, and all other pregnant Alabamians who seek assistance, with the best medical information they can— including information about where and how to safely access the abortion care that Plaintiffs can no longer provide—and are deeply distressed and devastated by being forced to withhold this information and support. Marty Aff. ¶¶ 14–15; Robinson Aff. ¶¶ 14–16. Providing such support is also integral to Plaintiffs' missions and ability to sustain the relationships of trust they have worked hard to build with their patients and the communities they serve. Marty Aff. ¶¶ 5, 16–17; Robinson Aff. ¶¶ 3, 14–16. However, because of Defendant Marshall's threats and the risk of prosecution for violation of the Alabama Criminal Laws, and attendant serious criminal penalties,[5] Plaintiffs and their staff have ceased providing such information and support. Marty Aff. ¶¶ 11–12, 18; Robinson Aff. ¶¶ 9–13, 17; *see also, e.g.*, MTD 2, 18, 35; Reply Supp. Mot. Dismiss ("MTD Reply") 26, Doc. 36. Plaintiffs' and their staffs' fear of prosecution and its consequences is well-founded; indeed, as the staff at her private practice and at AWC are aware, Plaintiff Dr. Robinson has personal experience

---

[5] For example, criminal conspiracy is a Class B felony if an object of the conspiracy is a Class A felony (as is a violation of the 2019 Abortion Ban); it is punishable by imprisonment for two to twenty years. *See* Ala. Code §§ 13A-4-3(g)(2), -5-6(a)(2). The same is true for solicitation. *Id.* §§ 13A-4-1(f)(2), -5-6(a)(2). And if an individual is successfully prosecuted as an accomplice or aider and abettor, they are subject to the same steep penalties as the person who committed the offense, whose behavior they are legally accountable for. *See, e.g., id.* § 13A-2-23(2).

being targeted for prosecution because of her connection with abortion services in Alabama, which left her personally, professionally, and financially devastated, even though the indictment was ultimately dismissed with prejudice. Robinson Aff. ¶¶ 20–25. Moreover, Plaintiffs WAWC and AWC's staff members have families they support, and the majority of Plaintiff WAWC's staff members are the sole sources of income for their households; if they were to be arrested and prosecuted for their provision of information and support to pregnant Alabamians, as threatened by Attorney General Marshall, they face not only loss of their personal freedom, but also loss of physical and financial security for their entire families. Marty Aff. ¶¶ 19–20; Robinson Aff. ¶¶ 18–19; *see* MTD Order 69–70.

Many pregnant Alabamians who request information and support from Plaintiffs in navigating access to legal out-of-state abortion care, but are now unable to receive it from Plaintiffs, will be delayed in accessing abortion. Marty Aff. ¶¶ 21–26, 31; Robinson Aff. ¶¶ 30–36. Further, many of Plaintiffs' patients are low income and, with Plaintiffs' assistance, face particular difficulty navigating how to afford out-of-state travel and abortion care and arranging the necessary funds. Marty Aff. ¶ 30; Robinson Aff. ¶ 36. While abortion is always safe, and far safer than childbirth, the risks associated with it increase as pregnancy progresses, as do its costs. Robinson Aff. ¶ 41. Pregnancy also places stress on the body and can give rise to or exacerbate existing health risks, which can also make it difficult, if not impossible, for some people to continue to go to work or school or care for existing children. Robinson Aff. ¶ 41; WAWC Compl. ¶¶ 110–11; Answer ¶¶ 110–11. Therefore, the longer it takes someone to find an appropriate out-of-state abortion provider, and make the necessary arrangements to attend an appointment, the greater the potential cost and risk to their health and safety from prolonged pregnancy and the abortion itself. Marty Aff. ¶¶ 27–29, 31; Robinson Aff. ¶ 42; Answer ¶¶ 110–11 (admitting that pregnancy imposes physical stresses and health risks and

may make it difficult, if not impossible, to go to work or school or care for existing children). Moreover, for those experiencing intimate partner violence, continuing the pregnancy and/or giving birth may also exacerbate the risk of violence. Marty Aff. ¶ 29; Robinson Aff. ¶ 41; WAWC Compl. ¶ 112; Answer ¶ 112.

Finally, to the extent any pregnant Alabamians are entirely unable to access a desired out-of-state abortion without Plaintiffs' assistance and are (as a result) forced to remain pregnant and carry to term, they face giving birth in a state that, according to the Alabama Department of Public Health, had the third highest maternal mortality rate in the country as of 2020 (36.4 deaths per 100,000 live births), with Black women comprising a disproportionate share of these deaths. *See* Bur. of Fam. Health Servs., Ala. Dep't of Pub. Health, 2020 Maternal Mortality Review 6, 17 (2022);[6] Marty Aff. ¶ 31; Robinson Aff. ¶ 45; *see also* Fed. R. Evid. 201(b)(2) (court may judicially notice a fact not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Reprod. Health Servs. v. Strange*, 3 F.4th 1240, 1268 n.11 (11th Cir. 2021) (taking judicial notice of Alabama Department of Public Health abortion statistics under Federal Rule of Evidence 201(b)(2)), *reh'g en banc granted, vacated on other grounds*, 22 F.4th 1346 (11th Cir. 2022).

## STANDARD OF REVIEW

Summary judgment is appropriate where, as here, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party makes such a showing, the burden shifts to the opposing party, who must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "The mere existence of *some* alleged

---

[6] Available at https://www.alabamapublichealth.gov/perinatal/assets/2020_annual_mmr.pdf.

factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in original); *see also Walker v. Darby*, 911 F.2d 1573, 1576–77 (11th Cir. 1990). To this end, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005); *see also Nobles v. Wal-Mart Stores Inc.*, No. 1:21-CV-1347-CLM, 2023 WL 7553917, at *2 (N.D. Ala. Nov. 14, 2023) ("[I]f the non-movant responds to the motion for summary judgment with just conclusory allegations, the court must enter summary judgment for the movant.").

Here, "the pertinent facts are obvious and indisputable from the record; the only remaining truly debatable matters are legal questions that a court is competent to address." *Garvie v. City of Ft. Walton Beach*, 366 F.3d 1186, 1190 (11th Cir. 2004). Accordingly, summary judgment is appropriate, and because, as detailed below, those legal questions must be decided in Plaintiffs' favor, Plaintiffs' motion should be granted.

## ARGUMENT

Because there are no genuine disputes of material fact that could alter Plaintiffs' success on the merits, Plaintiffs are entitled to summary judgment as a matter of law on both of their remaining claims. At the threshold, Plaintiffs satisfy the requirements of Article III, and also easily satisfy any prudential requirements for asserting their staffs' First Amendment rights and pregnant Alabamians' right to travel.[7] As to the merits, on the First Amendment, the Attorney General has

---

[7] Plaintiffs' pre-enforcement challenge is likewise justiciable. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (where "the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."); *Harrell v. Fla. Bar*, 608 F.3d 1241, 1260 (11th Cir. 2010) (plaintiffs in a pre-enforcement challenge required to show only that (1) they intend to engage in conduct

already conceded that his threatened prosecution of Plaintiffs amounts to a content-based restriction on speech, *see* MTD Order 74–75 (citing MTD 26), and it is viewpoint discriminatory as well. Because neither the "speech-integral-to-criminal-conduct" exception nor any other exception to First Amendment protection exempts the Attorney General's threats to prosecute speech about *legal* out-of-state abortion from strict scrutiny, the Attorney General must prove that prosecuting Plaintiffs for this speech is "the least restrictive means of advancing a compelling government interest." *Burk v. Augusta-Richmond County*, 365 F.3d 1247, 1251 (11th Cir. 2004). He cannot do so here. Accordingly, Plaintiffs are entitled to summary judgment on their First Amendment claim.

So too, the right to travel claim is "easily resolved," MTD Order 51, as the Attorney General's threats violate two fundamental tenets of right-to-travel jurisprudence. First, the Attorney General's concession that his purpose here is to impede or prevent pregnant Alabamians from traveling to "more permissive jurisdictions" to obtain legal abortion care, *see* MTD Order 53 (citing MTD Reply 46), settles this claim, as such a purpose is "unequivocally impermissible" as a matter of law. *Saenz v. Roe*, 526 U.S. 489, 506 (1999). Second, controlling Supreme Court precedent directs that state laws or actions that penalize those who facilitate travel for others unconstitutionally impinge upon the right to travel. *See, e.g.*, *Crandall v. Nevada*, 73 U.S. (6 Wall.) 35, 43–44 (1867); *Edwards v. California*, 314 U.S. 160, 173 (1941). Here, where it is undisputed that the Attorney General has threatened to criminally prosecute Plaintiffs for facilitating pregnant Alabamians' travel across state lines for legal abortion care, this precedent dictates the outcome

---

that is "at least arguably forbidden by the pertinent law," and (2) there is "at least *some minimal probability* that the challenged rules will be enforced if violated").

and provides a second, independent basis for awarding Plaintiffs judgment as a matter of law on their right to travel claim.

I.    <u>**The Attorney General's Threats Violate the First Amendment as a Matter of Law.**</u>

As the Eleventh Circuit has recognized, "[i]n the fields of medicine and public health . . . [d]octors, therefore, must be able to speak frankly and openly to patients." *Wollschlaeger v. Governor*, 848 F.3d 1293, 1313 (11th Cir. 2017). Here, it is undisputed that, but for the chilling effect created by the Attorney General's threats of prosecution, Plaintiffs and their staffs would do just that—they would provide their patients and other pregnant Alabamians with specific, individualized information and counseling about legal abortion care *outside* of Alabama, including recommendations for trusted providers and for organizations that offer funding and other support to individuals traveling out of state for such care. *See* Marty Aff. ¶ 32; Robinson Aff. ¶¶ 14, 46; MTD Order 75 ("[The Attorney General] does not dispute that providing abortion-related services would require the plaintiffs and their staff to engage in speech . . . or that his threats have chilled that speech."). This speech about *lawful* activity falls well within the protections of the First Amendment, and it is undisputed that application of the Alabama Criminal Laws to Plaintiffs' protected speech discriminates on the basis of its content, and it is similarly discriminatory on the basis of viewpoint. Such discrimination cannot survive the exacting scrutiny that applies. It is therefore unconstitutional, and Plaintiffs are entitled to summary judgment on their First Amendment claim.[8]

---

[8] The WAWC Plaintiffs' First Amendment claim is based on the chilling effect that the threat has had on their protected speech—namely, the provision of *information* and *counseling* to pregnant Alabamians. WAWC Compl. ¶¶ 123–27.

### A.  Plaintiffs Have Standing to Assert Their First Amendment Claim.

At the threshold, Defendant Marshall does not dispute that the Plaintiffs in this suit satisfy the constitutional requirements of Article III. *See, e.g.*, MTD Order 21 ("The court finds, and the Attorney General does not dispute, that all of the plaintiffs have satisfied the constitutional requirements for standing and thus have what is often referred to as 'Article III standing' to bring each claim."); *id.* at 64 ("The Attorney General does not dispute that . . . the healthcare providers each have Article III standing to assert their own First Amendment rights."). Dr. Robinson is plainly suffering an injury-in-fact to her own free speech rights, and the clinic Plaintiffs have clearly demonstrated injury to themselves—among other things, the inability to fulfill their mission and ethical obligations as health care providers, Marty Aff. ¶¶ 5, 14–17; Robinson Aff. ¶¶ 3, 14–16; *infra* pp. 12–13; *see also generally* 13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §§ 3531.4, 3531.9.5 (3d ed. June 2024 update)—that have been caused directly by Defendant's threats of prosecution and are capable of redress by this Court through a declaration that Defendant's threatened enforcement of the Alabama Criminal Laws against them violates the U.S. Constitution and an injunction preventing such enforcement. Moreover, Dr. Robinson is an individual plaintiff in this case and indisputably has first-party standing to assert her own First Amendment rights. *See* MTD Order 64–65 (discussing Dr. Robinson's standing to bring her own First Amendment claim). Accordingly, this Court need look no further. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977) (holding that where "at least one individual plaintiff . . . has demonstrated standing . . . we need not consider whether the other . . . plaintiffs have standing to maintain the suit"); *Jones v. Gov. of Fla.*, 950 F.3d 795, 805–06 (11th Cir. 2020) (same); *see also, e.g.*, MTD Order 64–65.

Nevertheless, the Plaintiffs in this suit also have third-party standing to assert the First Amendment rights of their staff. To start, courts commonly permit employers to assert the rights

of their employees where, as here, the challenged action or enforcement of a law against employees "infringes the constitutional rights of the employees *as they work*" and the employer suffers injury as a result. *Bosco's Club, Inc. v. City of Oklahoma City*, 598 F. Supp. 583, 588–89 (W.D. Okla. 1984); *see also Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1252 (5th Cir. 1995) ("Ordinarily, a business like Hang On may properly assert its employees' or customers' First Amendment rights where the violation of those rights adversely affects the financial interests or patronage of the business."); *White's Place, Inc. v. Glover*, 222 F.3d 1327, 1330 (11th Cir. 2000) ("We agree with the reasoning of the Fifth Circuit that a business may assert the First Amendment rights of its employees where violation of those rights adversely affects the financial interests or patronage of the business."); *cf. Macon Cnty. Invs., Inc. v. Warren*, No. 3:06-CV-224, 2007 WL 141959, at *4 n.5 (M.D. Ala. Jan. 17, 2007) ("Where the individual seeking standing is part of the third party's constitutionally protected activity, third party standing is permissible.").

Here, Plaintiffs have shown that, by chilling the ability of their staff to communicate with pregnant Alabamians, Defendant's threatened prosecutions infringe the First Amendment rights of their staff, and that, as their employers, Plaintiffs themselves are suffering the requisite "injury" as a result.[9] *See, e.g.*, Marty Aff. ¶¶ 11–18, 32; Robinson Aff. ¶¶ 9–12, 14–15, 17, 25, 46. It is indisputable that Plaintiffs have suffered immeasurable harm to their mission and ethical obligations as health care providers to provide comprehensive reproductive health care to pregnant

---

[9] The "injury-in-fact" requirements for Article III and prudential standing are one and the same. *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (explaining that third-party standing requires the "two additional showings" of "close relationship" and "hindrance" on top of Article III injury requirements); *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1041–42 (11th Cir. 2008) (referring back to Article III injury discussion in noting that the plaintiff "has sufficiently alleged that it has a concrete interest in the outcome of this dispute" before moving on to the close relation and hindrance prongs); *FPL Food, LLC v. U.S. Dep't of Agric.*, 671 F. Supp. 2d 1339, 1361 (S.D. Ga. 2009) ("The injury-in-fact showing required to overcome the third-party prudential limitation is essentially the same as the injury-in-fact showing required for Article III standing.").

Alabamians, which includes helping them obtain quality, out-of-state care that they themselves are not able to provide. *See, e.g.*, Marty Aff. ¶¶ 5, 14–17; Robinson Aff. ¶¶ 3, 14–17; *N.Y.C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 295 (2d Cir. 2012) (concluding that plaintiff had shown that it (through its agents) had suffered a concrete injury where its ability to carry out responsibilities to its clients was frustrated by challenged policy); *cf. Bosco's Club, Inc.*, 598 F. Supp. at 588–89 ("[A] corporation[] can act only by and through its employees. Thus, if [a law] infringes the constitutional rights of the employees as they work, it is obvious that the Plaintiff has suffered the harm as well."); *cf. N.Y. State Bar Ass'n v. Reno*, 999 F. Supp. 710, 716 (N.D.N.Y. 1998) (finding irreparable harm where threat of sanction compelled attorneys to "self-censor[]" certain counsel and assistance to clients in violation of their ethical obligations).

Next, as employers, Plaintiffs easily satisfy the traditional prudential requirements for asserting the First Amendment rights of their current and future staff: in addition to the "injury in fact" already discussed above, the Plaintiffs "have a close relation to" their staff who seek to provide information and support to pregnant Alabamians, and "there . . . exist[s] some hindrance to [their staff's] ability to protect [their] own interests." *Powers v. Ohio*, 499 U.S. 400, 410–11 (1991); *see also* MTD Order 66–71.

With respect to closeness, "[e]mployers have been allowed to assert the rights of employees in circumstances that at least suggest a congruence rather than a conflict of interests." 13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.9.3 (3d ed. June 2024 update); *cf. Bosco's Club, Inc.*, 598 F. Supp. at 588–89. It is undisputed that Plaintiffs have a mission of providing information, counseling, and support to pregnant Alabamians to help them access the full range of reproductive health care options, including options that are legal in other states. Marty Aff. ¶¶ 5, 9–10, 17; Robinson Aff. ¶¶ 3, 14–16, 27–29. It similarly is undisputed that

Plaintiffs' staff members are trained and feel ethically obligated to help fulfill that mission by providing on-the-job information and support to pregnant Alabamians. Marty Aff. ¶¶ 14–15; Robinson Aff. ¶¶ 14–15. Thus, the interests of Plaintiffs and their staff, who are imperiled by the threatened prosecutions challenged here, are substantively identical, which is clearly sufficient to create a close relationship. *See, e.g.*, *Powers*, 499 U.S. at 413 (permitting defendants to assert the third-party rights of jurors because of their "common interest in eliminating racial discrimination from the courtroom"); *Young Apartments Inc.*, 529 F.3d at 1042–43 (reasoning that a landlord had a sufficiently close relationship with tenants where their interests were "sufficiently aligned to ensure that [the landlord] will properly frame the issues" and "will be a zealous advocate of the legal rights at issue"); *Reprod. Health Servs. v. Strange*, 204 F. Supp. 3d 1300, 1324 (M.D. Ala. 2016) ("[T]o satisfy the 'close relationship' requirement, the litigant's interest in redressing her own injury must be aligned with the third party right she seeks to assert, such that the litigant is fully, or very nearly, as effective a proponent of the right.").

As to hindrance, the climate of stigma, harassment, and even violence relating to abortion in Alabama is well-established. *See Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1333–34 (M.D. Ala. 2014) (describing a "history of violence [against] abortion providers and women seeking abortions in Alabama."); *W. Ala. Women's Ctr. v. Williamson*, 120 F. Supp. 3d, 1296, 1308, 1321–22 (M.D. Ala. 2015) (same). This climate endures today. For example, "[o]n a day-to-day basis, a provider . . . sees this hostility when she opens the newspaper" to read about the Attorney General's threats or "learns that another piece of legislation concerning abortion has been enacted." *Strange*, 33 F. Supp. 3d at 1334; *see, e.g.*, Ala. Code § 26-23H-2(i) ("Legislative Findings" related to the 2019 Abortion Ban, including: "By comparison, more than 50 million babies have been aborted in the United States since the Roe decision in 1973, more than three

times the number who were killed in German death camps, Chinese purges, Stalin's gulags, Cambodian killing fields, and the Rwandan genocide combined"). And, as noted above, Dr. Robinson personally faced retaliatory prosecution because of her identity as an abortion provider, leaving her in a state of personal, financial, and professional instability, Robinson Aff. ¶¶ 20–25; her staff at her private practice and at AWC are well aware of this fact, and have expressed fear of something similar happening to them. Robinson Aff. ¶¶ 20, 25. Given these indisputable facts, Plaintiffs have more than established that their staff members may rightly fear that bringing their own lawsuit to protect their rights could risk exposing their identities and support for abortion in a manner that could subject them and/or their families to violence, harassment, and societal stigma, thereby jeopardizing their financial, social, and physical security, and ability to provide for the families that many of them support. *See* Marty Aff. ¶ 19; Robinson Aff. ¶ 18. This presents a "genuine obstacle" to Plaintiffs' staff suing on their own that is sufficient as a matter of law to satisfy the prudential requirements of third party standing. *See Singleton v. Wulff*, 428 U.S. 106, 116 (1976); *see also Council of Ins. Agents + Brokers v. Gallagher*, 287 F. Supp. 2d 1302, 1309 (N.D. Fla. 2003) (employer had standing to assert employees' rights where there existed "some obstacle," including fear of reprisal); *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 290 (3d Cir. 2002) (recognizing that "fear of stigmatization . . . operates as a powerful deterrent to bringing suit").

### B. Plaintiffs' and Plaintiffs' Staffs' Speech About Legal Out-of-State Abortion Care Is Protected by the First Amendment.

"[A]s a general matter, 'the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Ashcroft v. A.C.L.U.*, 535 U.S. 564, 573 (2002) (alteration in original) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983)). The few categories of speech the Supreme Court has exempted

from this general rule are "well-defined and narrowly limited," and speech about abortion is not one of them. *United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (listing obscenity, defamation, fraud, incitement, and speech integral to criminal conduct as the categories of unprotected expression). To be sure, as the Supreme Court explained in *Giboney v. Empire Storage & Ice Co.*, the "constitutional freedom for speech" does not "extend[] its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." 336 U.S. 490, 498 (1949). However, the *sine qua non* of the "speech integral to criminal conduct" exception is that the speech must be "intended to bring about a particular *unlawful act*." *United States v. Hansen*, 599 U.S. 762, 783 (2023); *see also United States v. Williams*, 553 U.S. 285, 298 (2008) (recognizing speech "intended to induce or commence *illegal activities*" is not protected by First Amendment).[10]

This narrow exception to the First Amendment is inapposite in this case, where the speech at issue—speech about options and resources for accessing *legal* out-of-state abortion—has no relationship to *any* criminal acts. Simply put, there is no separate or independent *illegal* conduct to which this speech could be "integral." *See, e.g.*, *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, No. 1:17-CV-01636-SEB-MG, 2024 WL 1908110, at *5 (S.D. Ind. May 1, 2024) ("*PPGNHAIK*") (providing pregnant minors "truthful information regarding out-of-state options for legally obtaining an abortion and providing medical referrals and/or contacting out-of-state providers on behalf of such minors seeking to obtain abortion services that are legal in those states is . . . *not* inducing criminal activity" (emphasis in original)). Defendant cannot manufacture *Giboney*'s requisite underlying "criminal conduct" by

---

[10] The narrowness of this exception is reinforced by the fact that even speech *related* to unlawful conduct has been deemed to have constitutional value. *See Williams*, 553 U.S. at 298–99 (noting the distinction between a proposal to engage in illegal activity and the abstract advocacy of illegality," the latter of which is protected); *see also Dennis v. United States*, 341 U.S. 494, 549 (1951) (Frankfurter, J., concurring); Eugene Volokh, *Crime-Facilitating Speech*, 57 Stan. L. Rev. 1095, 1111 (2005).

appealing to Alabama's abortion ban—which necessarily only criminalizes abortions provided *within* Alabama's borders—when Plaintiffs' speech concerns abortion care that is *legal or even legally protected* where it occurs. Indeed, to sanction such a view would sever *Giboney*'s necessary connection between unprotected speech and a particular crime, rendering the "speech-integral-to-criminal-conduct" exception virtually boundless, with dangerous consequences.

To start, such an expansive construction of *Giboney*'s narrow exception would effectively give a state the power to exempt *all* speech about *any* activity it disfavors from First Amendment protection, even where the speech has absolutely no connection to conduct that is actually "in violation of a valid criminal statute." *Giboney*, 336 U.S. at 498. For instance, following this twisted logic, a state (State A) that has chosen to restrict or limit certain activities it disfavors within its borders (e.g., recreational gambling or certain hunting practices) could claim that simply because those activities are unlawful in State A, *any* speech related to engaging in those activities *in State B* (*another state* where those same activities are *legal*)—such as recommendations for casinos or hunting locations—may be criminalized. The constitutional problem that arises, of course, is the same as the one presented here—there is simply no independently illegal course of conduct that the speech in question is "integral" to since the underlying conduct (i.e., gambling or hunting *in State B*) is not criminal.

Any attempt by Alabama to get around this fact by alternatively asserting that *Giboney*'s "unlawful act" requirement is satisfied because the speech in question is integral to the "crime" of agreeing to engage in an activity in another state that (though illegal in Alabama) is legal where it is planned to occur must also be rejected.[11] Accepting such an argument would enable states to

---

[11] As already noted, the 1896 Law states that "[a] conspiracy formed in this state to do an act beyond the state, which, if done in this state, would be a criminal offense, is indictable and punishable in this state in all respects as if such conspiracy had been to do such act in this state." Ala. Code § 13A-4-4. The WAWC

constitutionally criminalize large swathes of protected speech by simply passing laws making it a "crime of conspiracy" to agree to do something that is otherwise legal, and then claiming that the speech employed to form that agreement is unprotected by virtue of being "integral" to a "criminal conspiracy." Such circular reasoning would render First Amendment protections meaningless and is clearly belied by both First Amendment doctrine and well-established, elemental principles of conspiracy liability. *See, e.g.*, *Hansen*, 599 U.S. at 783 (emphasizing that for speech to fall into *Giboney*'s exception, and be unprotected, it must be "intended to bring about a particular *unlawful act*"); *Williams*, 553 U.S. at 297–98 (same); Eugene Volokh, *The "Speech Integral to Criminal Conduct" Exception*, 101 Cornell L. Rev. 981, 987–88 (2016) ("[T]he *Giboney* doctrine can't justify treating speech as 'integral to illegal conduct' simply because the speech is illegal under the law that is being challenged."); *id.* at 1000 (explaining that the speech being proscribed must be "causally linked to a particular crime, a crime that does not itself consist of otherwise protected speech"); *Katt v. Dykhouse*, 983 F.2d 690, 695 (6th Cir. 1992) ("We must decide, then, whether the First Amendment protects speech that proposes a transaction lawful in the place where the transaction is to occur when both the underlying transaction and the offer are unlawful in the place where the offer is made. We conclude that the First Amendment does provide such protection."); *see also Mitchell v. State*, 27 So. 2d 36, 38–39 (Ala. 1946) (noting "the word 'conspire' does not within itself necessarily connote an evil intention," and holding that in an indictment for criminal

---

et al. Plaintiffs do not challenge the constitutionality of the 1896 law on its face; their challenge is only to the application of the 1896 law (and any other Alabama law) to criminalize their speech about "act[s] beyond the state" like legal, out-of-state abortion that are *legal* (and even statutorily or constitutionally protected) in the jurisdictions where they are planned to occur, notwithstanding the fact that those same acts, if hypothetically occurring instead within Alabama's borders, may be unlawful. As is evident from the cases cited above, the law is abundantly clear on this point: a state does not have free reign to restrict otherwise protected speech about engaging in an activity in another jurisdiction that is legal in that jurisdiction (and thus not violative of *any* valid criminal statute) merely because that same activity *would* be prohibited if *instead* engaged in within the state's own borders.

conspiracy, "the fact that the conspiracy is characterized as unlawful is not enough," and the government must allege that the "supposed offense that was the object of the conspiracy" is unlawful); 15A C.J.S. *Conspiracy* § 118 ("To constitute a criminal conspiracy, either the object of the conspiracy or the means of accomplishing it must be illegal. . . . No one can be held criminally liable for conspiracy to do acts that are perfectly lawful and to which there is no criminal objective."); 16 Am. Jur. 2d *Conspiracy* § 1 ("The crime of conspiracy can only be defined in conjunction with a second crime, that is, the substantive crime involved in the conspiracy.").

Further, as this case itself illustrates, such an expansive construction would have destabilizing ripple effects on the limits imposed on state power and criminal jurisdiction by principles of territoriality and comity. *Dobbs* did not "prevent the numerous States that readily allow abortion from continuing to readily allow abortion," 597 U.S. at 339 (Kavanaugh, J., concurring), and the provision of abortion care is legal, at least through the first trimester, in over thirty states; in at least eighteen of those states, and the District of Columbia, abortion is not just legal, but statutorily and/or constitutionally protected.[12] And, while Alabama has chosen to restrict abortion within its borders, Alabama has not passed any law—nor could it—purporting to proscribe individuals from providing or obtaining a lawful abortion *outside* its borders. *See* Answer ¶¶ 60, 121; WAWC Compl. ¶ 60; *see also Nielsen v. Oregon*, 212 U.S. 315, 321 (1909) ("[F]or an act done within the territorial limits of [one state], under authority and license from that state, one

---

[12] *See* Guttmacher Inst., *Interactive Map: U.S. Abortion Policies and Access After Roe*, https://states.guttmacher.org/policies/ (last updated June 7, 2024) (reporting that abortion is legal—at least through the first trimester—in over 30 states); Guttmacher Inst., *Abortion Policy in the Absence of Roe* (Apr. 24, 2023), https://www.guttmacher.org/state-policy/explore/abortion-policy-absence-roe (Eighteen states and D.C. have laws that protect the right to abortion); *see also Patel v. U.S. Att'y Gen.*, 971 F.3d 1258, 1264 n.3 (11th Cir. 2020) ("Federal courts, however, must take judicial notice of state law."), *aff'd sub nom. Patel v. Garland*, 596 U.S. 328 (2022); *Lamar v. Micou*, 114 U.S. 218, 223 (1885) ("The law of any state of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice, without plea or proof.").

cannot be prosecuted and punished by . . . [a different] state."); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572–73 (1996) (while Alabama could punish BMW for engaging in unlawful behavior in Alabama, it would violate due process to punish BMW for engaging in out-of-state conduct that was lawful where it transpired); *DJR Assocs., LLC v. Hammonds*, 241 F. Supp. 3d 1208, 1233 (N.D. Ala. 2017) ("[I]n a federal system, Alabama does not have the right to insist that its view of proper . . . policy be enforced . . . with respect to conduct occurring entirely in another state, particularly where Alabama's policy choices conflict with those of the other state."). As such, to allow Alabama to punish speech about legal, out-of-state abortion care under the guise of the "speech integral to criminal conduct" exception—merely because Alabama has opted to ban abortion within *its* borders—would be to permit an effective end-run around the territorial limits imposed on Alabama's criminal jurisdiction. The Attorney General cannot expand a "historic and traditional" narrow category of unprotected speech in a bid to sanction state action that the Constitution otherwise forbids. *Cf. Stevens*, 559 U.S. at 468–69.

In sum, the speech integral to criminal conduct exception to the First Amendment applies to speech that is, as the very name indicates, "an integral part of conduct in violation of a valid criminal statute." *Giboney*, 336 U.S. at 498. Because the speech here—speech about legal abortion care *outside* Alabama—is not an integral part of *any* criminal conduct, this narrow exception to the First Amendment is inapplicable, and Plaintiffs' speech is subject to First Amendment protection.

### C.  The Attorney General's Threats Are Content- and Viewpoint- Discriminatory and Cannot Survive Strict Scrutiny.

Because Plaintiffs' speech does not fall into the "speech integral to criminal conduct" exception (or any other exception) to the First Amendment, traditional First Amendment principles apply. The Supreme Court has made clear time and again that content-based restrictions on

speech—i.e., restrictions that "appl[y] to particular speech because of the topic discussed or the idea or message expressed"—are presumptively unconstitutional and subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *see also Texas v. Johnson*, 491 U.S. 397, 412 (1989) (subjecting content-discriminatory application of law to "the most exacting scrutiny"); *Am. Booksellers v. Webb*, 919 F.2d 1493, 1500 (11th Cir. 1990) ("[C]ontent-based restrictions on speech survive constitutional scrutiny only under extraordinary circumstances."). Here, the Attorney General's threats to apply the Alabama Criminal Laws to Plaintiffs' speech about legal out-of-state abortion care plainly target a single topic—abortion—and are, therefore, content-based. *See Wollschlaeger*, 848 F.3d at 1307 (finding that a restriction on physician speech about firearm ownership was content based); *PPGNHAIK*, 2024 WL 1908110, at *5 (finding that a statute prohibiting only speech related to abortion options for minors seeking legal out-of-state abortion services was a "content-based restriction"). The Attorney General has already conceded as much. *See* MTD Order 74–75; MTD 26 ("'[T]he content of [the] speech' causes a crime[.]" (quoting *United States v. Fleury*, 20 F.4th 1353, 1364–65 (11th Cir. 2021))).

While the content-based nature of the Attorney General's threats is sufficient to trigger a presumption of unconstitutionality and strict scrutiny review, the application of the Alabama Criminal Laws to Plaintiffs' protected speech also offends the First Amendment because it is viewpoint based. *See Nat'l Rifle Ass'n of Am. v. Vullo*, No. 22-842, 2024 WL 2751216, at *7 (U.S. May 30, 2024) ("A government official can share her views freely and criticize particular beliefs, and she can do so forcefully in the hopes of persuading others to follow her lead. . . . What she cannot do, however, is use the power of the State to punish or suppress disfavored expression."); *see also id.* at *6 ("At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society."). By

restricting Plaintiffs from providing information and counseling related to out-of-state abortion care, while leaving Plaintiffs free to provide the same kind of information and counseling (i.e., recommendations for trusted providers, specialist care, and financial resources), *so long as* it concerns care for a continuing pregnancy, the policy "does not merely prohibit the discussion of [abortion]; it condemns expression of a particular viewpoint"—namely, the expression of a viewpoint supportive of individuals who wish to terminate their pregnancies. *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002); *see id.* ("[T]he policy does not merely prohibit the discussion of marijuana; it condemns expression of a particular viewpoint, i.e., that medical marijuana would likely help a specific patient. Such condemnation of particular views is especially troubling in the First Amendment context."). In other words, while Plaintiffs and other Alabamians face the risk of prosecution for supporting people seeking legal abortion in other states, they remain free to "support" people *not* to have an abortion, including by directing them to anti-abortion counseling centers, without fear of becoming the subject of a criminal investigation. Such a restriction based on viewpoint is unconstitutional, "seemingly as a *per se* matter." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1126 (11th Cir. 2022); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.").

Even if it were not per se unconstitutional, it could not survive strict scrutiny review, which requires the Attorney General to prove that there is a compelling state interest in prohibiting the protected speech at issue, and that the means chosen to advance that interest are the "least restrictive." *Burk*, 365 F.3d at 1251 (11th Cir. 2004) (citing *United States v. Playboy Ent. Grp.*,

529 U.S. 803, 813 (2000)); *see also Reed*, 576 U.S. at 171; *PPGNHAIK*, 2024 WL 1908110, at *5. He cannot do so here.

*First*, there is no legitimate, let alone compelling, state interest in gagging physicians from providing pregnant Alabamians with truthful information about lawful medical care—including care available outside Alabama's borders, which is beyond the State's power to regulate. *See, e.g.*, *NAACP v. Button*, 371 U.S. 415, 438 (1963) ("The decisions of this Court have consistently held that only a compelling state interest in the regulation of a subject *within the State's constitutional power to regulate* can justify limiting First Amendment freedoms."); *Bigelow v. Virginia*, 421 U.S. 809, 827–28 (1975) (the state interest "in shielding its citizens from information about activities outside [its] borders, activities that [its] police powers do not reach" is "entitled to little, if any, weight"); *id.* at 824–25 (state "may not, under the guise of exercising internal police powers," bar the dissemination of information about an activity that is legal in another state); *Rec. Revolution No. 6, Inc. v. City of Parma*, 638 F.2d 916, 937 (6th Cir. 1980) ("The cities' interest in regulation of advertising is limited to preventing the sale of drug paraphernalia inside their municipal boundaries. Their legitimate interest does not include regulating the information heard or read by their citizens about the availability of legal 'drug paraphernalia' in other locales."), *vacated and remanded on other grounds*, 456 U.S. 968 (1982); *Dykhouse*, 983 F.2d at 695–96, n.5 (citing approvingly *Record Revolution*'s holding regarding lack of legitimate government interest in regulating information about availability of legal items or services outside jurisdictional boundaries); *cf. Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 577 (2011) (the state cannot "seek[] to achieve its policy objectives" of promoting public health "through the indirect means of restraining certain speech by certain speakers").

Indeed, the Court should view attempts to restrict the type of speech Plaintiffs wish to engage in—information and counseling about lawful medical care—particularly in such a content and viewpoint discriminatory manner, with extreme suspicion. *See, e.g.*, *Wollschlaeger*, 848 F.3d at 1313–14. The Supreme Court has firmly rejected the claim that professional speech, including that between health care providers and patients, categorically receives any lesser First Amendment protection, holding that the "Court has not recognized 'professional speech' as a separate category of speech" and that its precedents do not support exempting professional speech "from the normal prohibition on content-based restrictions." *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 767 (2018) ("*NIFLA*"). To the contrary, the Court has held that "when the government polices the content of professional speech, it can fail to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail," and has specifically pointed to the example of medical providers who "might have a host of good-faith disagreements, both with each other and with the government," including on, for example, "the ethics of assisted suicide or the benefits of medical marijuana." *Id*. at 772.

The Eleventh Circuit has likewise recognized that protecting physician-patient speech from government interference and manipulation, particularly with the heavy hand of the criminal laws, is at the heart of the First Amendment. *See Wollschlaeger*, 848 F.3d at 1313–14 ("Florida may generally believe that doctors and medical professionals should not ask about, nor express views hostile to, firearm ownership, but it may not burden the speech of others in order to tilt public debate in a preferred direction."); *id.* at 1310 (citing approvingly to *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), "which struck down, on First Amendment grounds, a federal policy which threatened doctors with revocation of their DEA prescription authority if they recommended the medicinal use of marijuana to their patients" and "rejected the government's paternalistic assertion

that the policy was valid because patients might otherwise make bad decisions"). As Judge Pryor explained in his concurring opinion in *Wollschlaeger*, citing numerous historical examples where "governments have overtly politicized the practice of medicine . . . directly manipulating the content of doctor-patient discourse," the "need to prevent the government from picking ideological winners and losers is as important in medicine as it is in any other context." 848 F.3d at 1328.

Plaintiffs here are a physician and health care providers who feel ethically obligated to speak "frankly and openly" with their patients and other pregnant Alabamians seeking their assistance about all pregnancy options, including those (like abortion) that are legal and available in other jurisdictions. *Id.* at 1313–14, 1328; Marty Aff. ¶¶ 5–6, 14–17; Robinson Aff. ¶¶ 1–3, 14–16. However, faced with the threat of prosecution, Plaintiffs are compelled to withhold vital information and counseling from those seeking their knowledge and expertise relating to accessing safe abortion in another state. Marty Aff. ¶¶ 12, 14, 18, 32; Robinson Aff. ¶¶ 12–14, 46; *see generally Wollschlaeger*, 848 F.3d at 1313 ("In 'the fields of medicine and public health . . . information can save lives.'" (quoting *Sorrell*, 564 U.S. at 566)). Put simply, even if Attorney General Marshall does not agree with or like that abortion care remains legal and available in other jurisdictions, the fact remains that it is so, and Defendant has no legitimate, let alone compelling, interest in paternalistically preventing Alabamians from receiving truthful, and potentially health- and life-saving information about medical services that are legally available outside the state. *See, e.g.*, *Wollschlaeger*, 848 F.3d at 1325 (Wilson, J., Martin, J., concurring) ("Florida, perhaps guided by a paternalistic notion that it needs to protect its citizens from viewpoints they do not like, prohibits doctors from discussing an entire topic and advocating a position with which it does not agree. This it cannot do."); *Thomas v. Collins*, 323 U.S. 516, 544 (1945) (Jackson, J., concurring) ("I do not think [the state] could make it a crime publicly or

privately to speak urging persons to follow or reject any school of medical thought."); *cf. Otto v. City of Boca Raton*, 981 F.3d 854, 863 (11th Cir. 2020) ("To be sure, [doctors] remain free to describe [a treatment] to the public or recommend that a client receive [a treatment] in another jurisdiction.").

**Second**, even if Defendant could demonstrate a compelling interest, he cannot prove that criminalizing otherwise protected speech about legal, out-of-state abortion is the least restrictive means of furthering *any* such interest when other less restrictive means, including counterspeech, are readily available. *See United States v. Alvarez*, 567 U.S. 709, 726 (2012) (holding that the Stolen Valor Act—a law making it a crime to falsely claim receipt of military decorations or medals—was a content-based restriction on speech that could not satisfy strict scrutiny, notwithstanding the government's compelling interest in protecting the integrity of the Medal of Honor, because, *inter alia*, "the Government has not shown, and cannot show, why counterspeech would not suffice to achieve its interest."); *NIFLA*, 585 U.S. at 775 (holding that California law not sufficiently drawn to achieve the state's asserted interest of providing information to low-income women about state-sponsored services because California could engage in a public information campaign or other counterspeech); *Bigelow*, 421 U.S. at 824 (noting that a state may "seek to disseminate information so as to enable its citizens to make better informed decisions when they leave"); *Wollschlaeger*, 848 F.3d at 1329 (Pryor, J., concurring) ("The Florida Legislature overstepped the boundaries of the First Amendment when it determined that the proper remedy for speech it considered 'evil' was 'enforced silence,' as opposed to 'more speech.'"); *cf. PPGNHAIK*, 2024 WL 1908110, at *6 ("Even assuming that [Indiana's asserted interests] are . . . all compelling interests, the State has failed to present any evidence demonstrating that they are furthered by prohibiting private individuals from disseminating to unemancipated

pregnant minors truthful information about lawful abortion practices and abortion care providers in states other than Indiana and contacting or providing referrals . . . , or that the statute is narrowly tailored to further such interests.").

In sum, "it cannot be the duty, because it is not the right, of [Alabama] to protect the public" from speech about legal, out-of-state abortion care, as "[t]he very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind." *Thomas*, 323 U.S. at 545 (Jackson, J., concurring). Because the speech at issue in this case is fully protected by the First Amendment, and because criminalizing such speech does not further any legitimate, let alone compelling, state interest, and cannot otherwise satisfy the demanding requirements of strict scrutiny, Plaintiffs are entitled to judgment as a matter of law on their First Amendment claim.

## II.    The Attorney General's Threats Violate the Fundamental Right to Travel as a Matter of Law.

"[T]he nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." *Saenz*, 526 U.S. at 499 (quoting *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974)). The Constitution therefore protects the fundamental right of individuals to "travel freely" among the states. *Id.* at 500–01 (quoting *United States v. Guest*, 383 U.S. 745, 757 (1966)). Defendant Marshall seeks to deprive pregnant Alabamians of this essential right by threatening to prosecute Plaintiffs and others for providing the assistance that many rely on to travel across state lines to obtain legal abortion care. Such a direct and stark infringement of one of our most fundamental freedoms cannot pass constitutional muster.

27

As detailed below, Plaintiffs AWC and Dr. Robinson[13] have standing to bring a right-to-travel claim on their patients' and other pregnant Alabamians' behalf, and the Attorney General's unjustified threats violate the fundamental right to travel in at least two ways. First, it is evident from the face of these threats—and the Attorney General has readily admitted in briefing in this case—that the threats were issued with the unconstitutional *purpose* of penalizing free interstate "movement." *Saenz*, 526 U.S. at 498–99. Second, regardless of the Attorney General's purpose, his statements on their face clearly penalize pregnant Alabamians' fundamental right to travel by threatening the imposition of criminal penalties on those who would assist pregnant Alabamians in exercising this right. The law is clear: a state cannot (purposely or otherwise) penalize interstate travel in this way. Accordingly, Plaintiffs are entitled to judgment as a matter of law on their claim that the threatened application of the Alabama Criminal Laws to prosecute otherwise lawful speech and conduct aimed at facilitating Alabamians' travel across state lines to obtain legal abortion care violates the fundamental right to travel.

### A. Plaintiffs AWC and Dr. Robinson Have Standing to Assert the Right to Travel Claim.

As already discussed, Plaintiffs AWC and Dr. Robinson have demonstrated—and the State does not dispute—that they satisfy the requirements of Article III, including suffering cognizable injuries-in-fact. *See supra* pp. 11–13; Robinson Aff. ¶¶ 9–17; MTD Order 21. Under longstanding and undisturbed Supreme Court precedent, they also satisfy the remaining prudential standing requirements to bring the right to travel claim. Indeed, this case fits squarely into the class of cases where the Supreme Court has "allowed standing to litigate the rights of third parties" because "enforcement of the challenged restriction *against the litigant* would result indirectly in the

---

[13] The term "Plaintiffs" is used in the discussion that follows as a shorthand, but only Plaintiffs AWC and Dr. Robinson assert the right to travel claim on behalf of their patients and other pregnant Alabamians who seek their assistance.

violation of third parties' rights.'" *Kowalski*, 543 U.S. at 131 (emphasis in original) (quoting *Warth v. Seldin*, 422 U.S. 490, 510 (1975)).[14] In one such seminal case, *Craig v. Boren*, the Supreme Court held that a beer vendor had third-party standing to assert her prospective male patrons' equal protection rights in a challenge to a statutory scheme prohibiting the sale of "near-beer" only to males (and not females) between the ages of eighteen and twenty-one. 429 U.S. 190, 194–97 (1976). Having first determined that the beer vendor plaintiff otherwise satisfied the requirements of Article III, the Court concluded that she was entitled to assert the equal protection rights of her prospective male patrons, even though she was not alleging that her own constitutional rights were violated by the statutory scheme. *Id.* at 195 (citing *Griswold*, 381 U.S. at 481). The Court explained that, as the person "subject to [the statutory] proscription," she was "the least awkward challenger" and "the obvious claimant." *Id.* at 197.

The same rationale applies here. It is undisputed that the Attorney General publicly announced an intention to prosecute anyone who facilitates Alabamians access to out-of-state abortions. WAWC Compl. ¶¶ 31–34; Answer ¶¶ 31–34. Thus, just as in *Craig*, where the vendor was the subject of the challenged statutory scheme, Plaintiffs—as providers of reproductive health care who wish to facilitate their patients' and other pregnant Alabamians' access to out-of-state abortion care, *see* Marty Aff. ¶¶ 12–17, 32; Robinson Aff. ¶¶ 10–17, 46—are the subject of the

---

[14] *See also, e.g.*, *U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720 (1990) (permitting attorney disciplined for accepting a fee prohibited by the Black Lung Benefits Act of 1972 to invoke claimants' constitutional rights to challenge the fee restriction); *Doe v. Bolton*, 410 U.S. 179, 188 (1973) (permitting physicians subject to criminal penalties to raise the constitutional rights of patients seeking abortions), *abrogated in part on other grounds by Dobbs*, 597 U.S. 215 ; *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965) (permitting physician subject to criminal penalties to assert the constitutional rights of a married couple seeking contraception); *Barrows v. Jackson*, 346 U.S. 249, 257–59 (1953) (permitting white tenant sued for conveying property to African-Americans to raise constitutional rights of prospective African-American purchasers); *see also* MTD Order 23–26, 38–40.

Attorney General's challenged threats of enforcement.[15] And, just as in *Craig*, "enforcement . . . against the [Plaintiffs] would result indirectly in the violation of third parties' rights" to travel across state lines for legal abortion. *Id.* at 195 (quoting *Warth*, 422 U.S. at 510); *infra* Section II.C. Accordingly, Plaintiffs—like the vendor in *Craig*—have standing to assert the third parties' right to travel. *See* MTD Order 23–28.

Moreover, recognizing third party standing in this context would also be consistent with the Supreme Court's right to travel jurisprudence. These cases have long permitted individuals facing penalties for facilitating travel specifically to assert the right to travel of the persons they desire to assist. *See generally Crandall*, 73 U.S. 35 (permitting stagecoach company agent *carrying passengers* through Nevada to assert passengers' right to interstate travel in challenging $1 tax imposed on company for each passenger); *Edwards*, 314 U.S. 160 (permitting defendant who drove brother-in-law into California to assert brother-in-law's right to interstate travel in challenging law criminalizing bringing or assisting in bringing into California any indigent person).

However, even setting this controlling precedent aside, Plaintiffs would still have third party standing here, as they easily satisfy the Supreme Court's traditional prudential requirements for third-party standing. *See Powers*, 499 U.S. at 410–11; MTD Order 29–40. To begin, as already discussed, they have the requisite injury, as the statutes at issue are directly enforceable against Dr. Robinson herself and AWC's staff, by and through whom AWC operates. *Supra* pp. 11–13;

---

[15] As this Court has already explained, the fact that the Plaintiff clinics do not face corporate criminal liability under the Alabama Criminal Laws does not defeat *Craig*'s applicability. MTD Order 27–28. The Plaintiff clinics can operate only by and through their staff, *supra* pp. 11–13, and thus "[a]s far as the *Craig* rationale is concerned, enforcement against the plaintiffs' staff is the functional equivalent of enforcement against the organizations themselves." *Id.* at 28. Moreover, regardless as to *Craig*'s applicability to the clinics, it is indisputably applicable to Plaintiff Dr. Robinson, and—as already explained, *supra* p. 11— when multiple parties assert common claims for the same relief, only one of them need have standing. *See also id.* at 28 n.4.

MTD Order 25–28. As to the "close relationship" requirement, courts look to whether the plaintiffs and the third parties have "a strong identity of interests," *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 810 (11th Cir. 1993), and find the requirement to be generally satisfied where the third parties' rights are "inextricably bound up with the activity the litigant[s] wish[] to pursue." *Singleton*, 428 U.S. at 114–18. That factor is clearly satisfied here, where it is not disputed that pregnant Alabamians seek Plaintiffs' support in navigating cross-state travel for legal abortion care, Robinson Aff. ¶¶ 10–11, 13, or that Plaintiffs desire to provide such support, *id.* ¶¶ 14–17. Thus, Plaintiffs' interest in assisting pregnant Alabamians in accessing desired legal out-of-state abortion care is identical to, and therefore necessarily "inextricably bound up with," those persons' interests in obtaining the health care they desire. *Singleton*, 428 U.S. at 114–18; *cf., e.g.*, *Powers*, 499 U.S. at 413–14.

As to the final element of third-party standing, courts have long recognized that "genuine obstacle[s]" hinder pregnant Alabamians' ability to assert their own rights in the abortion context. *Singleton*, 428 U.S. at 116–17. As the Supreme Court has observed, the inherently time-limited nature of pregnancy and abortion necessarily presents potential mootness issues. *Id.* at 117–18. And even if a mootness exception applied as a legal matter, or if some pregnant person *might* be able to pursue a class action or request emergency relief, the limited window during which abortion care is available means that a pregnant litigant is by no means guaranteed to obtain relief in time to *personally* benefit from a favorable decision. This makes the prospect of litigation, and its unavoidable financial and emotional costs, particularly daunting, and provides abortion patients with "little incentive to set in motion the arduous process needed to vindicate [their] own rights." *Powers*, 499 U.S. at 415.

On top of this are other obstacles that prevent abortion patients from suing on their own behalf, including patients' "desire to protect the very privacy of [their] decision[s] [to terminate pregnancies] from the publicity of a court suit" due to stigma around abortion, and the intimate nature of reproductive decision-making generally. *Singleton*, 428 U.S. at 117; *see also supra* p. 14 (citing cases recognizing stigma and violence associated with abortion provision and access in Alabama); *Colon v. Bureau of Alcohol*, No. 8:23-CV-223-MSS-UAM, 2024 WL 309975, at *10 (M.D. Fla. Jan. 26, 2024) (holding that gun vendor's customers' privacy concerns surrounding their individual status as firearms owners was a sufficient hindrance, and noting that "[c]ourts have regularly found privacy to be a legitimate hindrance sufficient to confer *jus tertii* standing in cases involving citizenship concerns, medical procedures, and contraceptives"), *appeal docketed*, No. 24-10897 (11th Cir. Mar. 26, 2024). Many of Plaintiffs' patients are also poor or low-income, making the time and expense of litigation too onerous to undertake. Robinson Aff. ¶ 36; *see Powers*, 499 U.S. at 415 (discussing practical barriers to suit, including "the economic burdens of litigation"). Such circumstances present a "hindrance sufficient to support an exception to the prudential limitation on third party standing." *Reprod. Health Servs.*, 204 F. Supp. 3d at 1325–26. Accordingly, Plaintiffs have third-party standing to assert the right to travel claim.

> **B. The Right to Travel Is Fundamental to the Structure and Character of the Nation and Protects Both the Ability to Physically Move Across State Lines and to Engage in Activities That Are Legal in the Destination State.**

The right to travel, which has been "firmly established" and "repeatedly recognized" in Supreme Court jurisprudence, is so "fundamental" and "elementary" that it "was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created." *Guest*, 383 U.S. at 757–58; *see also id.* at 767 (Harlan, J., concurring); *Shapiro*, 394 U.S. at 630–

31.[16] Free interstate movement is central to our system of federalism, and to "national unity," because it plays an essential role in binding the residents of the several states together and preserving the core principle that "[t]he people of these United States constitute one nation." *Crandall*, 73 U.S. at 43.

In pursuit of this end, the fundamental right to travel does not merely protect the ability to physically move freely across state lines; it also ensures that individuals can "seek[] new horizons in other states" and experience what other jurisdictions have to offer. *Edwards*, 314 U.S. at 181 (Douglas, J., concurring); *see also Soto-Lopez*, 476 U.S. at 902 (noting "the important role [the right to travel] has played in transforming many States into a single Nation"). In fact, as this Court has recognized, the very legal foundations on which this country and its Constitution were predicated afforded protection to travel specifically so that people would be able to engage in lawful conduct while traveling. *See* MTD Order 42–46; *see also* Magna Carta 1215 ¶ 41 (protecting merchants in their travels for the purposes of "buying and selling[,] . . . from all evil tolls."); *Kent v. Dulles*, 357 U.S. 116, 125–26 (1958) (noting that the right to free movement was

---

[16] The Supreme Court has not identified any one, specific constitutional provision from which the right to travel emanates, *see Saenz*, 562 U.S. at 501; *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 902–03 (1986) (plurality), and this court need not do so here. Whatever its source, there has been an "unquestioned historic acceptance of the principle of free interstate migration," *Soto-Lopez*, 476 U.S. at 902, the existence and fundamental nature of which is "firmly embedded in [federal] jurisprudence," *Saenz*, 526 U.S. at 498. The Supreme Court has viewed the right to interstate travel as consistent with the sort of fundamental rights associated with "the federal structure of government adopted by our Constitution," *Soto-Lopez*, 476 U.S. at 902, as well as the concept of national citizenship recognized and protected by the Privileges or Immunities Clause of the Fourteenth Amendment. *See, e.g.*, *Twining v. New Jersey*, 211 U.S. 78, 97 (1908) (explaining that the Clause protects rights that "arise out of the nature and essential character of the national government," including "the right to pass freely from state to state"), *overruled in part on other grounds by Malloy v. Hogan*, 378 U.S. 97 (1964); *Edwards*, 314 U.S. at 181 (Douglas, J., concurring, joined by Black & Murphy, JJ.) ("The conclusion that the right of free movement is a right of national citizenship stands on firm historical ground."); *Crandall*, 73 U.S. at 48–49 (as "citizens of the United States," individuals "must have the right to pass and repass through every part of it without interruption"); *see also Guest*, 383 U.S. at 764–70 (Harlan, J., concurring); *Shapiro*, 394 U.S. at 666 (Harlan, J., dissenting). It has also at times been attributed to the Privileges and Immunities Clause of Article IV, the Commerce Clause, and the Due Process Clauses of the Fifth and Fourteenth Amendments.

emerging in Anglo-Saxon law at least as early as the Magna Carta); *Kerry v. Din*, 576 U.S. 86, 92 (2015) (plurality opinion, Scalia, J.) (referencing Blackstone's recognition that the "personal liberty of individuals" protected under the Magna Carta "consist[ed] in the power of locomotion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint" (alteration in original)). For example, this concept was directly incorporated in the Articles of Confederation, with Article IV explicitly protecting the ability of "the people of each State [to] free[ly] ingress and regress to and from any other State" *for purposes* of engaging in trade and commerce, and making clear that, in so doing, the travelers must not be subject to "duties, impositions, and restrictions" beyond those imposed on "the inhabitants" of the destination State. Articles of Confederation of 1781, art. IV, para. 1; *see also* MTD Order 43.

When the U.S. Constitution was written and ratified in the late 18th century, a similar scope of protection for the right to travel was carried over and embedded within it. And the Supreme Court's precedents make abundantly clear that the constitutional protections for the right to interstate travel encompass both physical movement across state borders and the ability to engage in legal conduct and activities in destination states. For example, as this Court noted, when Article IV of the Constitution was adopted, "Charles Pinckney, who drafted the current version of Art. IV, told the Convention that this Article was 'formed exactly upon the principles of the 4th article of the present Confederation.'" MTD Order 43–44 (quoting *Zobel v. Williams*, 457 U.S. 55, 79–80 (1982) (O'Connor J., concurring)). Accordingly, as the Supreme Court has recognized, the Privileges and Immunities Clause protects "the right of free ingress into other States, and egress from them" and "insures to them in other States the same freedom possessed by the citizens of those States in the acquisition and enjoyment of property and in the pursuit of happiness" by both

"reliev[ing] them from the disabilities of alienage in other States" and from "the peculiar privileges conferred by their [origin State's] laws." *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 180–81 (1868), *overruled in part on other grounds by United States v. Se. Underwriters Ass'n*, 322 U.S. 533 (1944). In other words, the right to travel guarantees that when residents of State A travel to State B, they are able to fully enjoy the offerings and pursuits of State B, just as State B's own residents would, and ensures their ability to do so is not constrained by their home State's laws.

Other notable early Supreme Court decisions recognizing the right to travel reinforce this underlying principle and make clear that the right protects travel into a sister state for the purpose of engaging in lawful activities in that state. *See Corfield v. Coryell*, 6 F. Cas. 546, 552 (C.C.E.D. Pa. 1823) (Washington, J., on circuit) (explaining that "privileges and immunities" includes "[t]he right of a citizen of one state to pass through, or to reside in any other state, *for purposes of* trade, agriculture, professional pursuits, or otherwise"); *Ward v. State*, 79 U.S. (12 Wall.) 418 (1870) ("[T]he [Privileges and Immunities] clause plainly and unmistakably secures and protects the right of a citizen of one State to pass into any other State of the Union *for the purpose of* engaging in lawful commerce, trade, or business without molestation."); *Crandall*, 73 U.S. at 36 (concluding that the federal structure of the nation as a whole protects the right to travel for purposes of "approach[ing] the great departments of the government, the ports of entry through which commerce is conducted, and the various Federal offices in the States"); *Edwards*, 314 U.S. at 177 (holding that law criminalizing those who bring or assist in bringing indigents into California, presumably for the purposes of making a better life for themselves, violates right to travel under the Commerce Clause); *see also Edwards*, 314 U.S. at 181 (Douglas, J., concurring) (right to travel protects indigents "seeking new horizons" in other states); *Guest*, 383 U.S. at 772 (Harlan, J., concurring) (surveying the various constitutional bases for the right to travel, including the

Commerce Clause, Privileges and Immunities Clause, and the Due Process Clause, and explaining that "[a] basic reason for the formation of this Nation was to facilitate commercial intercourse; intellectual, cultural, scientific, social, and political interests are likewise served by free movement. . . . If the State obstructs free intercourse of goods, people, or ideas, the bonds of the union are threatened . . . ."). Notably, these and other of the Court's precedents make clear that interstate travel is protected for myriad purposes, *see, e.g.*, *Coryell*, 6 F. Cas. at 552 ("or otherwise"), including, as is relevant here, for purposes of accessing "the medical services that are available [in the destination State]." *Doe*, 410 U.S. at 200 (holding that interstate travel to seek and obtain legal abortion is protected); *see also Mem'l Hosp. v. Maricopa County*, 415 U.S. 250, 269 (1974) (holding that one-year durational residency requirement for receipt of state-funded nonemergency hospitalization or medical care creates an invidious classification that impinges on the right to interstate travel); *Dobbs*, 597 U.S. at 345 (Kavanaugh, J., concurring) ("[B]ased on the constitutional right to interstate travel," a state may not "bar a resident of that State from traveling to another State to obtain an abortion[.]"); *cf. Bigelow*, 421 U.S. at 822–24 ("The Virginia Legislature could not have . . . prevent[ed] its residents from traveling to New York to obtain [legal abortion] services, or . . . prosecute[d] them for going there.") (collecting "right to travel" cases).

This is for good reason. Were this not the case—e.g., if the right was so circumscribed as to protect merely the movement of one's physical body across borders—then the "right to travel" that our forefathers deemed so "fundamental to the concept of our Federal Union," *Guest*, 383 U.S. at 757, would become "a hollow shell." Seth F. Kreimer, *Lines in the Sand: The Importance of Borders in American Federalism*, 150 U. Pa. L. Rev. 973, 1007 (2002) ("If our bodies can move among states, but our freedom of action is tied to our place of origin, then the 'right to travel' becomes a hollow shell."); Laurence H. Tribe, Saenz *Sans Prophecy: Does the Privileges or*

*Immunities Revival Portend the Future—Or Reveal the Structure of the Present?*, 113 Harv. L. Rev. 110, 152 (1999) ("If each state could decide for itself . . . how much of its legal system its citizens would have to carry around on their backs while seeking to take advantage of the legal environments of other states, then the right to choose which state to enter for any purpose lawful in that state would amount to nothing more than the right to have the physical environment of the states of one's choosing pass before one's eyes . . . ."). Neither history, precedent, nor logic permit such a result. Accordingly, the Constitution clearly affords robust protections for the right to travel across state lines to engage in lawful conduct in the destination state.

### C. The Attorney General's Threats Violate the Fundamental Right to Travel.

Given the robust protections afforded the fundamental right to travel, Defendant Marshall's attempt to do indirectly what Alabama may not do directly—prohibit a pregnant person from leaving the state to access lawful abortion care elsewhere—runs equally afoul of the Constitution. Indeed, the threatened prosecution of anyone who would assist a pregnant person traveling out of Alabama for a legal abortion violates two fundamental canons of right-to-travel jurisprudence. First, the Supreme Court's precedents make clear that a state law or action that has "impeding travel [as] its primary objective" necessarily violates the right to travel. *Soto-Lopez*, 476 U.S. at 903; *Saenz*, 526 U.S. at 499 n.11 ("If a law has no other purpose . . . than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it [is] patently unconstitutional." (alteration in original)); *Shapiro*, 394 U.S. at 631 (same); *Edwards*, 314 U.S. at 174 (striking down California law that had the "express purpose" of prohibiting indigent people from entering the state); *cf. Guest*, 383 U.S. at 760 (finding potential conspiracy against federal rights under 18 U.S.C. § 241 where the "*predominant purpose* of the conspiracy is to impede or prevent the exercise of the right of interstate travel, or to oppress a person because of his exercise

of that right"). As already explained, the right to travel protects not only the right to cross state lines for the sake of it, but the right to do so to engage in lawful conduct in the destination state. *Supra* Section II.B. Here, Attorney General Marshall concedes his primary purpose in threatening Plaintiffs with prosecution is to prevent them from facilitating their clients' "visits" to "more permissive jurisdictions" for the purpose of obtaining lawful abortion care, *see* MTD Order 53 (quoting MTD Reply 46)—in other words, to "imped[e]" pregnant Alabamians' travel across state lines for legal abortions by depriving them of the assistance that they may need to do so. *See* Robinson Aff. ¶¶ 26–45. Such a purpose is "patently unconstitutional" as a matter of law and must be declared as such. *See, e.g.*, *Saenz*, 526 U.S. at 499 n.11; *Soto-Lopez*, 476 U.S. at 903; *Edwards*, 314 U.S. at 174.

Second, even setting Defendant Marshall's purpose aside would not change the result because the Attorney General's threats offend yet another of the Supreme Court's "right-to-travel" precepts: that a state law or action that penalizes those who assist others in traveling across state lines has an unconstitutional *effect* on interstate travel, regardless of whether it imposes an insurmountable barrier to that travel. Indeed, the Supreme Court's decisions in *Crandall v. Nevada* and *Edwards v. California* are controlling here and equally condemn the Attorney General's threatened application of the Alabama Criminal Laws as a matter of law. *See Crandall*, 73 U.S. at 48–49; *Edwards*, 314 U.S. at 167.

In *Crandall*, the Supreme Court struck down a Nevada state law that imposed a one-dollar tax on railroad and stagecoach companies for every passenger those companies transported out of the state, but not for intra-state travel. 73 U.S. at 46–49. The Court first rejected Nevada's argument that such a tax was "not a tax upon the passenger, but upon the business of the carrier who transports him," *id.* at 39, concluding that the "burden evidently falls upon the passenger," and that

the law was therefore in effect imposing a "tax upon the passenger for the privilege of leaving the State, or passing through it by the ordinary mode of passenger travel," *id.* at 40. The Court emphasized that such a tax—irrespective of whether it actually prevented individuals from traveling—exceeded constitutional limitations on state power because it interfered with the rights of the passengers as "members of the same community . . . to pass and repass through every part of [the United States] without interruption, . . . freely." *Id.* at 49 (quoting *The Passenger Cases*, 48 U.S. (7 How.) 283, 492 (1849) (Taney, C.J., dissenting)). In short, the Court viewed the tax as an unconstitutional burden on the fundamental right to move freely across state lines, even though it (1) was merely one-dollar, which—as the Court observed—"cannot sensibly affect any function of government, or deprive a citizen of any valuable right," *id.* at 46; (2) was imposed upon the common carriers *assisting* passengers in making their interstate journey, not the passengers (travelers) themselves, *id.* at 39; and (3) applied only when someone relied on a common carrier to leave the state (as opposed to using a personal or private mode of transportation), *see, e.g.*, *id.* at 46.

Similarly, in *Edwards*, the Supreme Court unanimously struck down as unconstitutional a California law that—exactly like Defendant Marshall has threatened to do here—imposed criminal liability on those who would facilitate another person's interstate travel. 314 U.S. at 173.[17] In that case, the defendant was convicted for bringing his brother-in-law from Texas to California under a law that made it a misdemeanor for anyone to "bring[] or assist[] in bringing into the State any indigent person who is not a [California] resident." *Id.* at 171. Although California asserted—and

---

[17] The majority in *Edwards* relied on the Commerce Clause as the basis of its holding. As noted *supra* note 16, the Commerce Clause is one of the textual sources that the Court has on occasion identified as a basis for the fundamental right to travel, *see, e.g.*, *Soto-Lopez*, 476 U.S. at 902, and, as the Supreme Court later confirmed in *Saenz*, the *Edwards* decision "vindicated" the constitutional right to travel, *Saenz*, 526 U.S. at 500.

the Court recognized—the state's weighty interest in addressing "grave" and "staggering" concerns involving "health, morals, and . . . finance" related to interstate migration during the Great Depression, the Court nonetheless held that the State's chosen mechanism—penalizing interstate travel—exceeded the "boundaries [of] . . . permissible . . . State legislative activity." *Id.* at 173. The Court explained that, among the limitations on State authority imposed by the Constitution, "none is more certain than the prohibition against attempts on the part of any single State to isolate itself" and its residents from the rest of the Union "by restraining the transportation of persons and property across its borders." *Id*.

Yet that is exactly what Defendant Marshall is doing here. Just like Nevada in *Crandall* and California in *Edwards*, Defendant Marshall is attempting to impose a penalty (in this case, criminal liability with felony consequences) on those who would "assist[] in bringing" a pregnant person across state lines for lawful abortion care through the provision of necessary information or logistical or financial support. *Edwards*, 314 U.S. at 171; *Crandall*, 73 U.S. at 48–49. Defendant Marshall's acknowledgment that Alabama law does not directly restrict an individual from *themselves* driving across state lines and seeking an abortion in another place—and the concomitant fact that some pregnant people may therefore leave Alabama and cross state lines to obtain abortion care without the assistance of Plaintiffs—is irrelevant. The same was true in *Crandall*, where the tax did not apply to passengers able to leave Nevada on their own (i.e., without reliance on a common carrier), and in *Edwards*, where the challenged provision similarly did not criminalize the indigent person traveling to California themselves. But the fact that a traveler in *Crandall* or an indigent person in *Edwards* could have theoretically left Nevada or entered California, respectively, without the assistance of anyone else was of no moment to the Court's

constitutional analysis; the Court still found that by penalizing those who would *assist* in that travel, the challenged laws had an unconstitutional effect on interstate movement.

So too here. If the small monetary tax at issue in *Crandall* and the criminal law at issue in *Edwards* both violate the fundamental right to travel and are constitutionally impermissible, Defendant Marshall's attempt to "isolate" Alabamians by criminalizing those who would assist them in exercising their right to cross state lines must also fail. *Edwards*, 314 U.S. at 173; *see also Guest*, 383 U.S. at 760 (actions "to impede or prevent the exercise of the right of interstate travel, or to oppress a person because of his exercise of that right," violate federal law); *Soto-Lopez*, 476 U.S. at 903 (laws that "penalize the exercise of that right" impermissibly burden the right to travel); *Edwards*, 314 U.S. at 181 (Douglas, J., concurring) ("If a state tax on that movement, as in the *Crandall* case, is invalid, a fortiori a state statute which obstructs or in substance prevents that movement must fall."). Put another way, the Supreme Court's precedents foreclose any legal conclusion other than that the Attorney General's threat to impose criminal penalties on those who assist pregnant Alabamians in crossing state lines for legal abortion care is unconstitutional, and must be condemned to suffer the same fate as California's law in *Edwards* and Nevada's law in *Crandall*.

* * *

In sum, the only fact material to the resolution of Plaintiffs' right to travel claim is whether the Attorney General threatened to criminally prosecute those who assist pregnant Alabamians seeking to cross state lines to access abortion care where it is legal. That he did so is undisputed. Under the Supreme Court's precedents, a state may not apply its laws for the purpose of impeding the exercise of the right to travel in this manner, nor may it so penalize interstate travel by imposing sanctions on those who assist another attempting to enter or leave a state. Plaintiffs are therefore

41

entitled to judgment as a matter of law on their right to travel claim.

### III.    Plaintiffs Satisfy the Remaining Factors for Permanent Injunctive Relief.

"[T]o obtain a permanent injunction, a party must show: (1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; and (3) irreparable harm will result if the court does not order injunctive relief." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005). "[T]he doctrine that the legal remedy must be inadequate before equity will act is inextricably intertwined with the irreparable injury element." *Clark Constr. Co. v. Pena*, 930 F. Supp. 1470, 1490 (M.D. Ala. 1996). In fact, "the principal and overriding element of this prerequisite is irreparable harm resulting from the absence of an adequate remedy at law." *Id.* Having established *supra* that the Attorney General's threatened prosecutions violate Plaintiffs' and their staffs' constitutional rights, as well as the constitutional rights of the pregnant Alabamians who seek Plaintiffs' help, Plaintiffs handily meet the remaining permanent injunction factors.

As both the Supreme Court and the Eleventh Circuit have recognized, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Speech First, Inc.*, 32 F.4th at 1128 ("[A]n ongoing violation of the First Amendment constitutes an irreparable injury."). Further, the pregnant Alabamians who seek Plaintiffs' assistance are suffering irreparable harms associated with being forced to remain pregnant against their will and delayed and/or denied access to legal abortion care out of state. Marty Aff. ¶¶ 21–31; Robinson Aff. ¶¶ 26–45; *see also W. Ala. Women's Ctr. v. Miller*, 217 F. Supp. 3d 1313, 1334–35 (M.D. Ala. 2016) (holding that delays in obtaining abortion care, and accompanying increased risk of medical complications, constituted irreparable harm); *Planned Parenthood Se., Inc. v. Bentley*, 951 F. Supp. 2d 1280, 1289 (M.D. Ala. 2013)

(same); *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) (finding that harms to physical health and medical complications due to delayed medical treatment constitute irreparable harm).

No adequate remedy at law exists for these violations. To start, Plaintiffs are barred from seeking retroactive damages from Defendant because of Eleventh Amendment immunity. *Clark Constr. Co.*, 930 F. Supp. at 1478–80. But even if that were not the case, the law is clear that "the chilling of speech cannot be undone through monetary remedies." *Garcia v. Stillman*, No. 22-cv-24156, 2023 WL 5095540, at *20 (S.D. Fla. Aug. 9, 2023), *appeal docketed*, No. 23-12992 (11th Cir. Sept. 12 2023); *see also Kilgore v. City of Rainsville*, No. 1:07-cv-02213, 2008 WL 11391369, at *4 (N.D. Ala. June 11, 2008) ("First Amendment violations constitute irreparable harm for which there is no legal remedy."); *Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*, 975 F.3d 300, 317 (3d Cir. 2020) (finding no adequate remedy at law for First Amendment injury); *Nat'l People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) ("[I]njunctions are especially appropriate in the context of first amendment violations because of the inadequacy of money damages."). Likewise, "[m]oney damages are obviously not an adequate remedy" for the irreparable physical and emotional harms associated with delayed or denied abortion care. *See, e.g.*, *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 643 F. Supp. 1217, 1228 (D.N.J. 1986), *aff'd in part, modified in part*, 834 F.2d 326 (3d Cir. 1987); *see also Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1229 (11th Cir. 2017) ("[S]ince [plaintiff] suffered irreparable harm, his remedies at law were inadequate."). Accordingly, Plaintiffs are entitled to a permanent injunction.

## **CONCLUSION**

For the foregoing reasons, there is no genuine issue of material fact and the threatened application of the Alabama Criminal Laws against Plaintiffs for their speech and conduct aimed at

assisting pregnant Alabamians seeking to travel across state lines to access legal abortion care violates both the First Amendment and the constitutionally protected right to travel and is therefore unconstitutional. Accordingly, this Court should grant Plaintiffs' Motion for Summary Judgment, enter declaratory judgment in their favor, and issue the requested permanent injunctive relief.

Dated: June 17, 2024

<div style="margin-left: 50%;">

Respectfully submitted,

/s/ Alison Mollman
Alison Mollman
Alabama State Bar No. 8397-A33C
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(510) 909-8908
amollman@aclualabama.org

Meagan Burrows*
New York State Bar No. 5341904
Alexa Kolbi-Molinas*
New York State Bar No. 4477519
Lindsey Kaley*
New York State Bar No. 5324983
Scarlet Kim*
New York State Bar No. 5025952
Jessica Quinter*
New York State Bar No. 6124077
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
mburrows@aclu.org
akolbi-molinas@aclu.org
lkaley@aclu.org
scarletk@aclu.org
jquinter@aclu.org

Lorie Chaiten*
Illinois State Bar No. 6191424

</div>

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
1640 North Sedgwick
Chicago, IL 60614
(212) 549-2633
lchaiten@aclu.org

*Attorneys for Plaintiffs West Alabama Women's Center, Alabama Women's Center for Reproductive Alternatives, LLC, d/b/a Alabama Women's Center, and Yashica Robinson, M.D.*

*\*Admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was filed using the

Court's CM/ECF system on this 17th day of June 2024, which will serve all counsel of record.

<div align="right">

/s/ Alison Mollman
Alison Mollman

</div>