# EXHIBIT A

**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| YELLOWHAMMER FUND, on behalf of itself and its clients, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 2:23-cv-450-MHT |
| ATTORNEY GENERAL OF ALABAMA STEVE MARSHALL, in his official capacity, | ) ) ) ) ) | |
| Defendant. | ) ) | |
| WEST ALABAMA WOMEN'S CENTER, on behalf of themselves and their staff, et al., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 2:23-cv-451-MHT |
| STEVE MARSHALL, in his official capacity as Alabama Attorney General, | ) ) ) ) | |
| Defendant. | ) | |

**AFFIDAVIT OF ROBIN MARTY IN SUPPORT OF PLAINTIFFS WEST ALABAMA WOMEN'S CENTER, ALABAMA WOMEN'S CENTER FOR REPRODUCTIVE ALTERNATIVES, LLC, AND DR. YASHICA ROBINSON'S MOTION FOR SUMMARY JUDGMENT**

Robin Marty declares and states as follow:

1. I am the Executive Director of West Alabama Women's Center ("WAWC"), a nonprofit reproductive healthcare clinic in Tuscaloosa, Alabama and a plaintiff in the above-captioned case on behalf of itself and its staff.

2. I have been Executive Director of WAWC since August 2023. I have been with WAWC since August 2020, first as Director of Communications (from June 2020 until May 2021) and then as Director of Operations, from May 2021 until I assumed my current role as Executive Director. I am a Community Action Group member of the Alabama Maternal Health Task Force, a statewide effort to improve maternal health that is led by researchers at the University of Alabama at Birmingham School of Public Health and Alabama Perinatal Quality Collaborative and funded in part by the Alabama Department of Health and the U.S. Health Resources and Services Administration. I also recently completed a maternal health fellowship with Families USA's Health Equity Academy, which trains health care leaders to advocate for health systems transformation and equitable maternal health policies.

3. As Executive Director of WAWC, I oversee the clinic's daily operations, business matters, and compliance with all applicable laws and regulations. I am also responsible for supervising and managing all of our staff and for developing, reviewing, and/or approving WAWC's non-clinical policies and procedures. My duties as Director of Operations were the same; my role changed in title only.

4. I submit this affidavit in support of Plaintiffs WAWC, Alabama Women's Center for Reproductive Alternatives, LLC, d/b/a Alabama Women's Center, and Dr. Yashica Robinson's Motion for Summary Judgment. The facts I state here are based on my education, training, personal and professional experience, and information obtained through the course of my duties at WAWC.

**WAWC's Mission and Provision of Information and Support About Legal Abortion Prior to *Dobbs* and the Events Leading Up to This Lawsuit**

5. As mentioned above, WAWC is a nonprofit reproductive healthcare clinic located in Tuscaloosa, Alabama. WAWC's mission is to provide essential reproductive healthcare to every individual, without discrimination based on past or current medical history, socioeconomic status,

2

or any other non-clinical factors that might otherwise limit access to care. It is also our mission to offer information and support to anyone planning to stay pregnant, whether or not they decide to parent; considering or seeking an abortion; and/or considering or seeking adoption.

6. WAWC was established in 1993, and provided abortion, along with other forms of reproductive healthcare, to patients in Alabama for nearly three decades, until the Supreme Court's decision in *Dobbs v. Jackson Women's Health Org*. After *Dobbs*, Alabama's criminal ban on nearly all abortion care took effect. Ala. Code § 26-23H-1 *et seq.* (the "Ban"). As a result, WAWC no longer provides abortion care, but still provides a range of high-quality reproductive health services, including contraceptive counseling and care, testing and treatment for sexually transmitted infections, pregnancy testing and dating, counseling about options for patients continuing their pregnancies, including information about parenting and relinquishment, annual well-woman exams, prenatal care, and referrals for adoption services.

7. As far as I am aware, and as someone familiar with the limited community of abortion providers in Alabama prior to *Dobbs*, Alabama physicians are no longer providing abortion care in the state, except potentially where one of the Ban's limited exceptions or exclusions applies.

8. Prior to *Dobbs* and the events leading up to this lawsuit, WAWC frequently received inquiries from pregnant people in Alabama about their medical care options. Sometimes people asked about services that were legal and available within Alabama, but other times out-of-state care was more appropriate or necessary given an individual's medical and/or personal circumstances.

9. I and other staff at WAWC used to provide those people with information about and recommendations for specific, trusted out-of-state providers from whom they could obtain safe, high-quality care. We tailored such information and recommendations to each individual's particular circumstances based on things such as proximity to their home, their pregnancy duration, or any

3

other specific medical needs or considerations, in an effort to ensure that they would receive the care they needed as soon as possible, without unnecessary delay.

10. We also provided specific information about where pregnant Alabamians seeking to travel out of state for abortion care could obtain financial and practical support to access such care, including information about organizations that could assist with inter-state travel.

**The Impact of Attorney General Marshall's Threats On WAWC, Our Staff, and Pregnant Alabamians**

11. I and the other staff at WAWC are aware that Attorney General Steve Marshall has threatened to use existing Alabama criminal laws to prosecute anyone who helps facilitate pregnant Alabamians' leaving the state for legal abortion care. The other WAWC staff and I have discussed these threats. We understand that we could face severe penalties, i.e., imprisonment, for providing information and support to pregnant Alabamians seeking to travel outside the state to access abortion where it is legal.

12. As a recognized provider of reproductive healthcare in Alabama for decades, WAWC still frequently receives inquiries from pregnant Alabamians seeking information about where and how to access abortion services. While, as discussed above, we used to be able to respond to such requests with specific, personalized information, counseling, and support to help each pregnant person access abortion care, including care that is legal and available outside of Alabama, because of Attorney General Marshall's threats we are no longer able to provide people who are interested in obtaining a legal abortion out of state with information about where to go and how to access the resources they may need to support their out-of-state travel.

13. When we initially filed this lawsuit, I estimated that we received approximately 30 such calls or inquiries per week; however, I estimate that, starting towards the end of 2023, that number increased to approximately 40 to 50 calls or inquiries per week.

4

14. Just as we did before, I and other WAWC staff still feel a deep sense of ethical obligation to present pregnant Alabamians who reach out to us for help with all of their healthcare options, respond to their questions, and provide them with the best information we can, including specific, tailored information about where and how to safely access care that WAWC cannot provide. Indeed, but for the Attorney General's threats, WAWC would expect and require all of our staff who interact with callers and patients to provide such counseling and assistance.

15. As Executive Director, I know through ongoing conversations and discussions with WAWC staff that our inability to continue to provide this sort of information and counseling, owing to the threat of prosecution, is a source of immense distress, anger, and frustration for all of us at WAWC. By withholding information about and support for accessing legal abortion care outside of Alabama, we fear we may be exacerbating the confusion and distress that people who come to us for help are already experiencing, and contributing to potentially dangerous delays in patients accessing healthcare, putting their health and safety at risk. *See infra* ¶¶ 21–30. As just one example, last summer a staff member came to me distraught, in tears after a call with a pregnant individual who was seeking abortion information. When the staff member informed the caller that WAWC was unable to give her the specific information she was looking for, the caller threatened self-harm (crashing her car or getting someone to beat her up) and hung up.

16. In my opinion, our inability to continue to provide the specific, tailored information and support we provided before threatens WAWC's reputation and undermines our relationship with our patients. The health care provider/patient relationship is one built on trust and is one of the most important factors in addressing the racial and economic health disparities that are expanding in our nation. This is especially true in the South where, in my experience and based on conversations with WAWC staff and patients, mistrust of healthcare providers among populations of color is the

5

justifiable result of a long history of medical abuse. As Executive Director, I am aware that our patients find us almost entirely through word of mouth, patient to patient referrals. Trust is the centerpiece of our patient relationships and community building, and that trust relies on patients knowing we will be allowed to provide every piece of information they need to make their own best healthcare decisions.

17. Our inability to provide information and assistance also disrupts WAWC's ability to fulfill its mission. As mentioned above, an important part of WAWC's mission is to provide information and support to those seeking care beyond that which WAWC can provide. WAWC cannot accomplish this in the face of the possible prosecution of its staff, without whom WAWC cannot operate.

18. Unfortunately, however, I and the other WAWC staff feel we have had no choice but to stop providing the sort of information and assistance we provided before. The risk of prosecution and the attending severe penalties is not one that I or other staff at WAWC can afford to take.

19. In particular, as Executive Director, I am aware that the majority of WAWC's staff are the sole source of income for their households. Some of the staff are also single parents, raising children completely on their own. As such, if a WAWC staff member were to be arrested and prosecuted, they face not only the loss of their personal freedom, but also the potential loss of physical and financial security for their entire families.

20. Even if a prosecution were ultimately unsuccessful, an arrest, felony charge, and prosecution would take an enormous financial and reputational toll on me and other WAWC staff. The cost of defending such a prosecution could be financially devastating.

21. It is not only WAWC's staff who are harmed by the Attorney General's threats; these threats—and their impact on WAWC's ability to provide the requested information and support—

6

also seriously harm the pregnant Alabamians who come to us for help. I am concerned that many pregnant Alabamians who request WAWC's support in accessing legal out-of-state abortion care, but who are unable to receive that support owing to Attorney General Marshall's threats, will be delayed in obtaining care—and some may be prevented altogether.

22. Based on my experience, I know that even in the best circumstances, the process of navigating the often-complicated abortion landscape in the United States, finding reliable information, arranging travel, and securing resources to finance the whole endeavor in order to obtain safe and trusted abortion services outside of Alabama is often extremely time consuming and onerous. In my opinion, if pregnant Alabamians are left in the lurch and must manage this all on their own without WAWC's support, it will take them even longer, if they are able to get care at all.

23. For example, based on my conversations with patients, callers and other WAWC staff, I estimate that more than half of the individuals who request WAWC's help in identifying, connecting with, and accessing safe out-of-state legal abortion care have had limited formal education, which may make it difficult to research and to identify reliable information. Additionally, I am aware based on these conversations that a significant portion do not have reliable internet access and/or are not tech savvy, and so navigating the internet on their own to find information and resources about abortion care out of state is very difficult, if not impossible.

24. Further, based on my conversations with patients, callers and staff, I estimate that a small number of the people who seek our assistance have limited English language proficiency. This, too, makes it difficult to find information—there is a dearth of reliable online resources available in other languages, including Spanish.

25. From my conversations with other WAWC staff and our patients and callers, I understand that another complicating factor for those seeking information about safe abortion care

7

outside of Alabama is the shifting legal landscape, and related availability of services, in nearby states. Rapidly changing laws and lawsuits since *Dobbs* have led to clinics opening and closing and gestational limits changing multiple times over the past few years in states like Georgia, Florida, North Carolina, and South Carolina. As an entity with a mission to provide information to patients about how to access the reproductive care they need, WAWC regularly monitors these changes and, as a former abortion clinic, has relationships with many abortion providers in nearby states. Given these relationships, we are well-positioned to give people the most accurate and timely information, as we could very easily obtain real time, up-to-date information on out-of-state clinics' status and available services, including information as to whether they remain open, to what point in pregnancy they provide abortion care, and their approximate wait times for an appointment. But as we are unable to provide the information directly to patients and callers in the face of the Attorney General's threats, I worry pregnant Alabamians will have difficulty parsing a confusing and fluctuating legal framework and navigating related changes to out-of-state clinics' services. While it is WAWC's job as a reproductive healthcare provider to be up to date on this type of information, in my opinion it is a lot to expect that a person suddenly facing an unintended pregnancy will have all this information ready at their fingertips.

26. Additionally, from my own conversations with patients, callers and with WAWC staff members, I know that without WAWC's expertise to guide pregnant people to an appropriate, trusted provider and assistance in accessing the resources they need, some people unknowingly seek information via entities or websites that are set up to impede access to abortion care. We have seen patients that, though they were seeking information about abortion care, initially went to an entity that has the express mission of preventing abortions because it was the first search result when they looked for a nearby place to get a pregnancy test or ultrasound. Such entities are often staffed by

non-medical personnel who lie to patients about their pregnancies and options and use other tactics to purposefully delay patients who want and are seeking abortion from obtaining abortion information and care. Additionally, some patients end up at wholly non-medical businesses offering "novelty" ultrasounds, such as for a "gender reveal." These entities are completely unable to give patients the medical information they require.

27. Based on my experience and conversations with other staff at WAWC, I know these delays can be extremely harmful for our patients, who come to WAWC seeking assistance in accessing legal abortion care out of state for complex reasons. The decision whether to continue a pregnancy is a deeply personal one, and individuals reaching out to WAWC for support are often navigating a complicated web of considerations relating to their health status and reproductive history, values and beliefs, culture and religion, familial situation, and resources and economic stability.

28. Through my own conversations with patients, as well as with WAWC's medical and clinical staff, I am aware that continuing a pregnancy poses a risk to the physical, mental, and/or emotional health of every pregnant Alabamian seeking WAWC's help. Continuing a pregnancy may also threaten the stability and well-being of their families, including existing children: Indeed, most of WAWC's patients are already parents.

29. Through my conversations with patients, callers and with other staff, I am also aware that some of the pregnant Alabamians who come to WAWC for assistance have suffered trauma like sexual assault or intimate partner violence and fear that being pregnant and/or having another child will exacerbate their already extremely difficult personal circumstances. It may also endanger their physical safety, or even their life.

30. Moreover, based on my conversations with patients and with other staff, I am aware that the majority of WAWC's patients live in poverty or with low incomes; some are unhoused. Based on my experience, I know that, even with our help, these Alabamians face greater risk of delay owing to their need to secure the requisite funds for inter-state travel and for the abortion procedure itself, as well as practical support such as affordable childcare and/or lodging. This delay is only exacerbated by our inability to assist them in locating the support they need.

***

31. In sum, it is my opinion—based on my experience—that for some pregnant Alabamians, direct assistance in finding a safe and trusted provider, and/or an entity or organization that can help arrange funding and handle the logistics, may be what makes the difference between them being able to obtain the legal abortion that they want or being forced to continue a pregnancy against their will, with potentially dire consequences: Alabama has the one of the highest maternal mortality rates in the country,[1] and Black women make up a disproportionate share of these deaths.[2] Moreover, it is also my opinion, based on my experience, that even those who are ultimately able to identify and travel to an out-of-state abortion provider without our assistance will likely experience delays in accessing time-sensitive abortion care that may cause them physical, emotional, and/or financial harm.

32. But for the threat of prosecution, WAWC would resume providing this type of information about and recommendations for specific, trusted abortion providers in other states, tailored to pregnant Alabamians' individual needs, and specific information about how those

---

[1] Bur. of Family Health Servs., Ala. Dep't of Pub. Health, 2020 Maternal Mortality Review 6 (2022), https://www.alabamapublichealth.gov/perinatal/assets/2020_annual_mmr.pdf.

[2] *Id.* at 17.

10

traveling out of state to access abortion care could obtain the financial and other practical support they need.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that this affidavit was executed this 10th day of June, 2024 in Birmingham, AL.

_____

Robin Marty
Executive Director, West Alabama Women's Center