# EXHIBIT B

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| YELLOWHAMMER FUND, on behalf of itself and its clients, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 2:23-cv-450-MHT |
| ATTORNEY GENERAL OF ALABAMA STEVE MARSHALL, in his official capacity, | ) ) ) ) ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| WEST ALABAMA WOMEN'S CENTER, on behalf of themselves and their staff, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 2:23-cv-451-MHT |
| STEVE MARSHALL, in his official capacity as Alabama Attorney General, | ) ) ) ) | |
| Defendant. | ) | |

### AFFIDAVIT OF YASHICA ROBINSON, M.D., IN SUPPORT OF PLAINTIFFS WEST ALABAMA WOMEN'S CENTER, ALABAMA WOMEN'S CENTER FOR REPRODUCTIVE ALTERNATIVES, LLC, AND DR. YASHICA ROBINSON'S MOTION FOR SUMMARY JUDGMENT

Yashica Robinson, M.D., declares and states as follows:

1.      I am a Board-certified OB-GYN practicing in Huntsville, Alabama. I have provided

comprehensive reproductive health care in Alabama for twenty years. I currently provide a broad

range of health care in my private medical practice and as Medical Director of Alabama Women's Center for Reproductive Alternatives, LLC, d/b/a Alabama Women's Center ("AWC"). That care includes, but is not limited to, general OB-GYN care; major and minor gynecological surgeries; prenatal, delivery and post-partum care; management of infertility; and primary care. Prior to *Dobbs v. Jackson Women's Health Organization*, I also provided abortion care. However, in June of 2022, immediately following the Supreme Court's decision in *Dobbs*, Alabama's criminal ban on abortion, Ala. Code § 26-23H-1 *et seq*. (the "Abortion Ban" or the "Ban"), took effect. As a result of the Ban, I, and, to the best of my knowledge, other Alabama physicians, ceased providing abortion care in the state, except in very rare cases where one of the Ban's limited exceptions or exclusions applies.

2.      As noted above, in addition to my private medical practice, I am also the Medical Director of Plaintiff AWC, a role in which I have served for approximately ten years.  In that role, I personally provide medical care to AWC patients and oversee the provision of all other AWC medical services. In addition, along with AWC's Clinic Administrator, I oversee the organization's business matters, develop organizational policies, assure compliance with all applicable laws and regulations, and supervise AWC staff.

3.      AWC provided abortion and other forms of reproductive health care in Huntsville for more than twenty years until the Supreme Court's *Dobbs* decision. AWC no longer provides abortion care because of the Ban, and, as a result, has had to scale down its operations to some extent. However, AWC continues to provide a range of other high-quality reproductive health services, including contraceptive counseling and care; testing and treatment for sexually transmitted infections; pregnancy testing, dating and counseling; and referrals for prenatal care and adoption services. AWC provides this care in service of its long-standing mission of making available to the people of Alabama the reproductive health information and resources needed to plan and build a

healthy, active, prosperous life. This includes providing information and education about all legally available medical options and treatments, so people can make the right choices for themselves and their families

4.    I am a plaintiff in this action on behalf of myself, my staff, and my patients at both my private practice and AWC. AWC is a plaintiff in this action on behalf of itself, its staff, and its patients.

5.    I submit this affidavit on behalf of myself and AWC in support of Plaintiffs West Alabama Women's Center, Alabama Women's Center, and Dr. Yashica Robinson's Motion for Summary Judgment. The facts I state herein are based on my education, training, and experience, and information obtained in the context of my private medical practice and my role as the Medical Director of AWC.

**Provision of Information and Support Regarding Legal Abortion Prior to *Dobbs* and the Events Leading Up to this Lawsuit**

6.    Prior to *Dobbs* and the events leading up to this lawsuit, pregnant people in Alabama would frequently inquire at my private practice and at AWC about their medical options. Sometimes people asked about abortion care that, at the time, was legal and available in Alabama; other times a person's individual medical or personal circumstances meant that out-of-state care was more appropriate or necessary. In addition, I occasionally received inquiries from other health care providers seeking information for their patients about available treatment and medical options, including options for abortion care outside of Alabama.

7.    In response, I and the staff, both in my private practice and at AWC, who interacted with those making such inquiries, would provide people who wanted or needed to obtain out-of-state abortion care with information about and recommendations for specific, trusted providers from whom the particular pregnant person could obtain such care. In so doing, we would take into account the

person's geographic location and individual personal and medical circumstances, such as proximity to their home, their pregnancy duration, and other medical factors, in an effort to ensure that they would receive the care they needed, without needless delay. In addition, we would provide specific information about where people could obtain financial and practical support to travel out of state to access abortion.

8.     AWC staff also provided direct assistance to many individuals who needed to travel out of Alabama for abortion care—including AWC patients and others who contacted AWC directly, as well as patients from my private practice. The AWC staff would communicate with specific out-of-state providers to ensure that they could provide the care a particular individual needed, make appointments for such individuals with those providers, coordinate funding for care and travel with local and national abortion assistance organizations, and help to make travel arrangements. For medically complex patients, my staff and I would personally help coordinate the patient's transfer to an out-of-state provider by, for example, talking directly to the other provider about the patient's medical circumstances and forwarding medical records and other relevant information to support the patient's care.

**Attorney General Marshall's Threats and Their Impact**

9.     I and the staff at my private practice and at AWC are aware that Attorney General Marshall has threatened to use existing Alabama criminal laws to prosecute people who assist pregnant Alabamians in traveling out of state for legal abortion care. We have discussed the Attorney General's threats as a staff, both at my private practice and AWC. We understand that his threats mean that we could face prosecution and severe penalties, including imprisonment, for providing information and assistance to pregnant Alabamians seeking to travel outside Alabama to access

abortion care where it is legal. In addition, those of us who are licensed professionals could face the loss of our medical licenses with career-ending consequences.

10.     AWC and my private practice are well-known in the Huntsville area and Alabama generally for the reproductive health care we provide. We frequently receive questions from patients and other pregnant people in Alabama who are considering abortion about how to access such care. Some of these are people dealing with medically complex circumstances, including patients who have medical conditions resulting from, or exacerbated or complicated by, a pregnancy. Some of our patients and others inquiring about abortion care understand that abortion is illegal in Alabama and are requesting information and assistance about where they can obtain abortion care in another state where it is legal and how they can get funding and travel assistance. Others do not even know about the Ban, and we have to tell them they cannot legally obtain the medical care they seek in their home state of Alabama, which most often leads to requests for information about where and how they can obtain such care in another state.

11.     At the time this lawsuit was filed, I estimated, based on consultation with the staff at my private practice and at AWC, that we received approximately 5 inquiries each week from pregnant Alabamians about out-of-state abortion options at my private practice and approximately 40-50 per week at AWC. My best estimate today, also based on consultation with staff, is that the number of inquiries at my private practice has increased to approximately 10 per week, but the number of such inquiries at AWC has decreased to approximately 20-25 per week.

12.     Because of the Attorney General's threats, I and the staff in my private practice and at AWC can no longer respond to these inquiries with the kind of specific, tailored information, counseling, and support for pregnant people seeking abortion care outside Alabama that we provided previously. We can no longer guide patients and other pregnant people to trusted providers in other

5

states that we know offer high-quality abortion care and are able to meet the specific needs of the person seeking care based on proximity to their home, their pregnancy duration and/or other specific medical needs. Nor can we offer those seeking it information about where and how they can obtain financial assistance and/or other practical support as they attempt to travel out of state for abortion care. Because of the Attorney General's threats, my staff and I no longer coordinate directly with out-of-state providers, as we did before, to facilitate abortion care for our medically complex patients, and AWC staff no longer provide direct assistance to people seeking abortion care by, e.g., communicating with out-of-state providers to make appointments, coordinating funding for care and/or travel, and/or helping to make travel arrangements.

13.     In addition to the inquiries described above, I continue to receive regular requests from other medical provider colleagues in Alabama seeking information about how their patients may access legal abortion care, but, because of the threat of prosecution, I can no longer assist these colleagues in their efforts to help their patients.

14.     But for the Attorney General's threats, I and the staff in my private practice and at AWC would continue to provide the kind of assistance described above to patients seeking to leave Alabama for a legal abortion. Just as we were in the past, we are deeply committed to our patients and their well-being. We feel ethically obligated to present them and the other pregnant Alabamians who seek our assistance with all of their health care options, to address their questions, and to provide them with the best information we can, including specific, tailored information about where and how to safely access medical care that we cannot provide, including abortion care in other states where it is legal.

15.     My staff and I are frustrated and, indeed, outraged by our inability to continue to provide this sort of information and assistance because of the threat of prosecution. Our distress is

a topic of frequent conversation as our patients and other pregnant Alabamians continue to request information and assistance, and we are forced to withhold what they need. In my view, based on my decades of experience providing comprehensive reproductive health care in this community, our patients and the other pregnant people who reach out to us for information and assistance expect to be able to trust us, their health care providers, to provide counseling and information about all risks, benefits and alternatives of contemplated medical care, as well as specific information about where and how they can safely access the care they need when they need it. It is devastating to me, and I know from conversations with my staff in my private practice and at AWC, that it is equally devastating for them, to have to withhold vital information and support, knowing that doing so can put our patients' health and safety at risk, exacerbate the confusion and distress our patients may already be experiencing, and contribute to potentially dangerous delays in their accessing the health care they need.

16.     My patients carrying wanted pregnancies often ask me what would happen and where they could go if something went wrong with the pregnancy and they were considering terminating it. I am heartbroken each time this happens, because, faced with Attorney General Marshall's threats, I cannot provide the sort of information and counseling about their options that they need and deserve in that situation. All I can do is tell them that I am no longer able to offer this type of information and counseling and that they will have to look online or find it elsewhere. Depriving patients of this information and assistance is agonizing for me and goes against all of my training and commitment to patient-centered care, and, in my professional view, significantly undermines my relationship with my patients.

17.     However, as much as I and the staff in my private practice and at AWC wish we could provide information and support to pregnant Alabamians seeking abortion care in other states, we

simply cannot afford to put ourselves and our families at risk in the face of Attorney General Marshall's threats.

18.    Based on my supervisory responsibilities, I know that most of the staff in my private practice and at AWC have children and families they support, as do I.   As a result, we not only face the risk of our own imprisonment if prosecuted and convicted, we fear the loss of physical security and financial stability for our entire families.

19.    Even if a prosecution were ultimately unsuccessful, an arrest, felony charge, and prosecution would take an enormous financial, emotional, and reputational toll. The cost of defending such a prosecution alone could be financially devastating for each of us and our families.

20.    These fears are not hypothetical. I have had personal experience with the enormous toll that defending against an unjustified and ultimately unsuccessful prosecution can take on a person's life and family, and the staff in my private practice and at AWC are well aware of the emotional and financial devastation that I and my family endured as a result of a wrongful prosecution.

21.    In 2014, I was criminally indicted on federal fraud charges, as a result of unknowingly purchasing misbranded intra-uterine devices (a form of long-acting, reversible contraception). My attorneys moved to dismiss the indictment on the grounds that I had been subject to selective prosecution because of my connection with abortion services. Def. Y. Robinson White M.D.'s Mem. of Law in Supp. Mot. to Dismiss, *United States v. Robinson White*, No. 3:14-CR-00126-MHT, (M.D. Ala. Jan. 20, 2015), ECF No. 30. Indeed, as of January 2015, when the motion to dismiss was filed, I was the only person—in Alabama or the nation—to have been prosecuted for any federal offense related to these devices, despite the fact that *hundreds* of other health care

providers—including multiple providers in Alabama alone—had also purchased misbranded devices in the same manner. *Id.* at 7–8.

22.    After the motion was filed, the federal government also moved to dismiss, and the court granted that motion, dismissing the indictment with prejudice. Judgment, *United States v. Robinson White*, No. 3:14-CR-00126-MHT (M.D. Ala. Mar. 4, 2015), ECF No. 46.

23.    Despite the dismissal, the process inflicted significant harm on my professional and personal life. My indictment was used in unrelated legal proceedings to malign the safety and competence not only of the care I provided, but also of the care of other physicians who provided abortions in Alabama. I even had to obtain a letter from my lawyer to submit to the hospital where I work to retain my admitting privileges.

24.    Further, the legal fees for my ultimately successful defense were financially devastating, and the entire experience also took a deeply personal toll on me. Before the indictment was dismissed, I was often unable to sleep and frequently reduced to uncontrollable tears, fearful that in addition to my family's financial well-being, my freedom was being threatened at every turn. I struggled to explain to my children what was happening and to protect them from being asked about it at school.

25.    As noted above, my immense fear of arrest and criminal prosecution is based on my own personal experience. And my staff, who, as noted, are very much aware of what my family and I had to live through, have expressed fear about something similar happening to them if they were to be targeted for prosecution for helping our patients and other pregnant Alabamians in the way that we wish we could.

26.     Moreover, the Attorney General's threats are not only having an impact on us; they are also imposing serious harm on our patients and the other pregnant people we are unable to help as they seek to travel out of state for abortion care where it is legal.

27.     Based on my medical training and experience, I know that when a patient needs care that may not be available within their home state, consultation with a local medical provider regarding the availability of out-of-state options for medical care is often the first step in providing access to these critical treatments. For example, there are cancer clinics that draw their patients from across the country for clinical trials or treatments only available in those locations. Alabama patients might only learn of the opportunity to obtain care at such a facility because of the knowledge and expertise of their local oncologist.

28.     Many patients also rely on their home-state medical providers to guide and assist them in figuring out payment for out-of-state care, and (particularly for medically complex patients) to communicate directly with any out-of-state specialist they are being referred to about their medical condition and history.

29.     In my professional opinion, pregnant Alabamians, just like people seeking other types of medical treatment, should be able to seek and obtain information, counsel, and medical advice about all their medical options, including those that are legal outside of Alabama, such as abortion. They should not be required to search the internet on their own to find the information they need, but unfortunately, that's what Attorney General Marshall's threats have meant.

30.     The patients and others who inquire at AWC and my private practice about abortion options but are unable to get the assistance they seek are left to their own devices to try to find the information and resources they need to obtain abortion care outside of Alabama and are faced with risky delays in obtaining such care as a result.

31.     I have been providing reproductive health care in Alabama for decades and have witnessed the challenges involved in accessing abortion care in this country, challenges that have only increased, and—for many—become insurmountable, since *Dobbs*.  Even under the best of circumstances, pregnant Alabamians seeking abortion care today face a complex web of obstacles as they attempt to find high-quality care that meets their personal circumstances, plan travel out of state, manage time away from home and work, and secure the necessary resources to pay for their care and travel associated with obtaining it.

32.     This process is extremely complicated in light of the fluctuating availability of abortion in nearby states.  As a result of new laws coming into effect and the impact of numerous lawsuits, gestational limits have changed and clinics have opened and closed or dramatically changed services multiple times in recent years in states in this region, including, for example, Georgia, Florida, North Carolina, and South Carolina. In my private practice and at AWC, we make every effort to stay abreast of the legal changes, which is no easy task. We also have personal and professional relationships with out-of-state providers who offer high-quality, lawful abortion care and could readily contact these colleagues to verify gestational limits, wait times, and other aspects of the current state of abortion care in their states to ensure that people seeking to travel there could get the abortion care they need. But, because of the Attorney General's threats, we cannot assist in this way. Without our guidance, our patients and the other pregnant Alabamians who seek our help are left to flounder as they attempt to navigate this complex terrain on their own.

33.     In addition, without our expertise to guide them to appropriate, trusted providers, some people go to websites that are not set up to provide reliable information to facilitate access to abortion care but are instead designed to derail such access. My patients who are seeking out and desire abortion care often express frustration and anger as they tell me about their experiences with

such websites and organizations. Moreover, these experiences inevitably lead to patients being delayed in accessing the care they want and need, if not prevented altogether.

34.     On top of all this, some people seeking our assistance have limited English language proficiency, which can make searching online for reliable information and resources relating to out-of-state abortion providers particularly daunting, given that so few online resources are available in other languages.

35.     Similarly, based on my conversations with patients and AWC staff about the inquiries we receive, I know that many AWC patients and others who seek our assistance do not have reliable access to internet at home or work and often lack basic computer literacy which can make navigating the internet to find the reliable information and resources they need on their own difficult, if not impossible.

36.     Further, the majority of AWC's patients live with low incomes, and many have never traveled outside Alabama in their lives. Without our assistance in securing funds, transportation, or logistical support that can enable them to travel out of state, these patients must try to raise the necessary funds and orchestrate the necessary logistical arrangements alone and therefore face an even greater risk of delay.

37.     Delays in accessing abortion care harm our patients and the other pregnant Alabamians who seek our assistance. Pregnancy carries serious medical risks and can have long-term medical consequences, even for someone who is otherwise healthy and has an uncomplicated pregnancy. Whether to take on these risks and/or the responsibilities of parenting, or whether to have an abortion, is an extremely personal and individualized decision and one that many of our patients wish to make in consultation with us, their health care providers.

38.     Based on my decades of experience providing reproductive health care in Alabama, I know that pregnant Alabamians seeking our assistance in accessing abortion care do so for myriad complex and often interrelated reasons that are intimately bound up with the individual's health status and reproductive history, values and beliefs, culture and religion, familial situation, and resources and economic stability. This is just as true for people who are seeking our assistance in leaving Alabama to access abortion care today as it was for those who were able to have abortions in Alabama before the Ban took effect.

39.     In my experience, some people who request our assistance in obtaining abortion care have suffered trauma, such as sexual assault or domestic violence, and are concerned that pregnancy, childbirth, and/or an additional child may exacerbate already extremely difficult and dangerous situations for them and put them at greater risk of sexual or other physical violence, or worse.

40.     For many people who seek our assistance, their medical or other personal circumstances mean that continuing a pregnancy poses an increased risk to their physical, mental, and emotional health, and at times even their life.  For some, continuing a pregnancy may also threaten the stability and well-being of their families, including the children they already have. Indeed, most of my patients in private practice as well as AWC's patients are already parents.

41.     While abortion is very safe, and far safer than childbirth, the risks associated with it increase as pregnancy progresses, as do its costs. Pregnancy places stresses on a person's body and can give rise to or complicate existing health risks. Based on my experience, I know that the physical stresses of pregnancy can also make it difficult if not impossible for some people to continue to go to work or school or care and provide for existing children. And, for those experiencing intimate partner violence, forced pregnancy may also exacerbate the risk of new or increased violence and may—often permanently—tether the victim and the victim's family to their abuser.

42.    As a result, the longer it takes for someone to find an appropriate out-of-state abortion provider, and make the necessary arrangements to attend an appointment, the greater the cost, especially if they are required to make multiple trips and/or engage in extensive inter-state travel, and the greater the risk to their health and safety from prolonged pregnancy and the abortion itself.

43.    Based on my decades of experience with pregnant patients in Alabama, and my conversations with patients and staff since *Dobbs* and the events leading up to this lawsuit, I believe that receiving assistance in finding a clinic, arranging funding, and managing logistics can make the difference between a pregnant person being able to obtain a safe abortion or being forced to continue a pregnancy and give birth against their will.

44.    Indeed, I have provided ongoing prenatal care to patients who initially asked for information about access to abortion care—information that I was unable to provide as a result of Attorney General Marshall's threats—and who then continued, throughout their pregnancies, to express ambivalence and distress about remaining pregnant and carrying the pregnancy to term and giving birth.

45.    Particularly for Black women, who comprise the majority of AWC's patients, the ability to travel out of state for care may be what makes the difference between obtaining a safe abortion and dying as a result of pregnancy or childbirth in Alabama—a state that, according to the Alabama Department of Public Health, as of 2020, had the third highest maternal mortality rate in the country, with Black women comprising a disproportionate share of these deaths.

46.    In sum, if not for the threat of prosecution, I and the staff in my private practice, as well as AWC and AWC staff, would resume providing information about and recommendations for specific, trusted abortion providers in other states, based on an individual's personal and medical circumstances, as well as information about where and how people traveling out of state for abortion

care can obtain financial assistance and/or other the practical support they need to do so. In addition, my staff and I would resume coordinating the transfer of patient care for our medically complex patients traveling from Alabama to out-of-state abortion providers; I would return to talking directly to out-of-state abortion providers to facilitate such care and my staff and I would be able to forward medical records and other relevant information directly to those providers to better support our patients. Likewise, AWC would resume directly assisting some patients with practical and logistical needs by, for example, helping patients with phone calls and scheduling appointments; helping patients make travel arrangements; and/or coordinating travel, lodging, and financial assistance with organizations that provide financial and practical support.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that this affidavit was executed this  14  day of June, 2024 in _____Alabama_____.

_Yashica Robinson, MD_

Yashica Robinson, M.D.