# IN THE DISTRICT COURT OF THE UNITED STATES FOR THE MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

YELLOWHAMMER FUND, on
behalf of itself and its clients.            )

                                             )      CASE NO. 2:23-cv-00450-MHT

                                             )

          Plaintiff,                         )      CIVIL ACTION

                                             )

v.                                           )

                                             )

ATTORNEY GENERAL OF                          )

ALABAMA STEVE MARSHALL,                      )

in his official capacity                     )

                                             )

          Defendant.                         )

WEST ALABAMA WOMEN'S                         )

CENTER, on behalf of themselves              )

and their staff; et al.,                     )

                                             )

          Plaintiffs,                        )

                                             )

v.                                           )

                                             )

STEVE MARSHALL, in his official              )

capacity as Alabama Attorney                 )

General,                                     )

                                             )

          Defendant.                         )

## PLAINTIFF YELLOWHAMMER FUND'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iv

INTRODUCTION ............................................................................... 1

STATEMENT OF FACTS ..................................................................... 2

    A.  Defendant Threatened to Prosecute Abortion Funds for Helping Pregnant People Travel to Obtain Lawful Abortions in Other States. ......................... 2

    B.  Plaintiff Is a Reproductive Justice Organization that Communicates a Message of Solidarity and Support to Pregnant Alabamians. ..................... 4

    C.  Plaintiff Wants to Resume Engaging in Constitutionally Protected Activities. ................................................................................... 5

    D.  Plaintiff's Constitutionally Protected Activities Would Offer Vital Resistance to Alabama's Abortion Ban. ...................................... 7

    E.  Plaintiff Filed this Lawsuit so it Can Resume Helping Pregnant People Travel to Obtain Lawful Abortion Care. ........................................ 9

STANDARD OF REVIEW ................................................................... 11

ARGUMENT ................................................................................... 11

    A.  Defendant's Threatened Prosecutions Violate the Right to Travel. .......... 13

        1.  The Predominant Purpose of Defendant's Threats of Prosecution Is to Prevent the Exercise of the Right to Interstate Travel and to Oppress Those Who Exercise That Right. ........................................... 15

        2.  The Right to Travel Is a Hollow Shell if Movement Among the States Does Not Allow Freedom of Action. ..................................... 21

        3.  Plaintiff Has Third-Party Standing to Vindicate the Right to Travel for Those it Serves. ................................................... 24

        4.  Plaintiff Can Bring a Right to Travel Claim Itself. ................................ 28

    B.  Defendant's Threatened Prosecutions Are First Amendment Violations ... 33

        1.  Defendant's Threats are Presumptively Unconstitutional Because They Are Content- and Viewpoint-Based Restrictions on Speech. ............... 34

            a.  Plaintiff Engages in Both Speech and Expressive Conduct to Support People in Need. ........................................... 35

            b.  Defendant's Threatened Prosecutions Are Content- and Viewpoint-Based Because They Exclusively Target Speech and Expressive Conduct About Lawful, Out-of-State Abortion Care. ........................................... 40

2.  Defendant's Threatened Prosecutions Violate Plaintiff's Right to Associate with Like-Minded Abortion Funds, Supporters, and Pregnant Alabamians............................................................................. 42

3.  Defendant's Threatened Enforcement Cannot Survive Strict Scrutiny. 45

C.  Applying the Alabama Abortion Ban to Criminalize Abortion in a State Where it Is Lawful Would Violate the Due Process Clause and Foundational Principles of Sovereignty and Comity. ................................. 48

1.  Due Process Does Not Allow Prosecutions of Lawful Conduct. .......... 49

2.  Defendant's Prosecution of Plaintiff Would Offend Principles of Comity and Sovereignty................................................................................. 51

D.  Plaintiff Yellowhammer Fund Meets the Standard for Declaratory Judgment and Permanent Injunction for Each Claim. ............................... 54

CONCLUSION............................................................................................... 56

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*303 Creative LLC v. Elenis,*
  143 S. Ct. 2298 (2023) ............................................................ 34, 35

*Aetna Life Ins. Co. v. Haworth,*
  300 U.S. 227 (1937) ...................................................................... 54

*Alabama v. U.S. Army Corps of Engineers,*
  424 F.3d 1117 (11th Cir. 2005) .................................................... 55

*Ams. for Prosperity Found. v. Bonta,*
  594 U.S. 595 (2021) ...................................................................... 44

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ...................................................................... 11

*Ashcroft v. American Civil Liberties Union,*
  535 U.S. 564 (2002) ...................................................................... 34

*Ashcroft v. Free Speech Coal.,*
  535 U.S. 234 (2002) ...................................................................... 34

*Attorney General of New York v. Soto-Lopez,*
  476 U.S. 898 (1986) ................................................ 13, 15, 18, 20

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963) ........................................................................ 33

*Barrows v. Jackson,*
  346 U.S. 249 (1953) ...................................................................... 26

*Bigelow v. Virginia,*
  421 U.S. 809 (1975) .......................................................... 47, 48, 53

*BMW of N. America, Inc. v. Gore,*
  517 U.S. 559 (1996) .............................................................. 50, 51

*Bolger v. Youngs Drug Products Corp.,*
  463 U.S. 60 (1983) ........................................................................ 34

*Boy Scouts of Am. v. Dale,*
  530 U.S. 640 (2000) ...................................................................... 43

*Brady v. Carnival Corp.,*
  33 F.4th 1278 (11th Cir. 2022) .................................................... 11

*Carey v. Pop. Servs. Int'l,*
  431 U.S. 678 (1977) ...................................................................... 25

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) ................................................................ 32

*Clark Const. Co., Inc. v. Pena*,
930 F. Supp. 1470 (M.D. Ala. 1996) ...................................... 55

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
6 F.4th 1247 (11th Cir. 2021) ................................................ 39

*Corfield v. Coryell*,
6 F. Cas. 546 (C.C.E.D. Pa. 1823) ......................................... 22

*Craig v. Boren*,
429 U.S. 190 (1976) ................................................. 25, 26, 27

*Crandall v. Nevada*,
73 U.S. 35 (1867) ............................................................ *passim*

*Dennis v. United States*,
341 U.S. 494 (U.S. 1951) ....................................................... 47

*DJR Assocs. LLC v. Hammonds*,
241 F. Supp. 3d 1208 (N.D. Ala. 2017) ................................ 52

*Dobbs v. Jackson Women's Health Organization*,
597 U.S. 215 (2022) ..................................................... 1, 2, 52

*Edelman v. Jordan*,
415 U.S. 651 (1974) ............................................................... 13

*Edwards v. California*,
314 U.S. 160 (1941) ........................................................ *passim*

*Elrod v. Burns*,
427 U.S. 347 (1976) ................................................. 43, 44, 55

*Fla. State Conf. of N.A.A.C.P. v. Browning*,
522 F.3d 1153 (11th Cir. 2008) ............................................. 54

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
901 F.3d 1235 (11th Cir. 2018) ........................................ *passim*

*Garvie v. City of Fort Walton Beach*,
366 F.3d 1186 (11th Cir. 2004) ............................................. 11

*Griswold v. Connecticut*,
381 U.S. 479 (1965) ............................................................... 25

*Grosjean v. Am. Press Co.*,
297 U.S. 233 (1936) ............................................................... 32

*Healy v. James*,
408 U.S. 169 (1972) ............................................................... 44

*Hodes & Nauser v. Schmidt,*
 440 P.3d 461 (Kan. 2019) ................................................................ 46

*Holder v. Humanitarian Law Project,*
 561 U.S. 1 (2010) ............................................................................ 45

*Holloman ex rel. Holloman v. Harland,*
 370 F.3d 1252 (11th Cir. 2004) ................................................ 36, 39

*Hope Clinic for Women, Ltd. v. Flores,*
 991 N.E.2d 745 (Ill. 2013) .............................................................. 46

*Hulbert v. State Farm Mut. Auto. Ins. Co.,*
 723 So.2d 22 (Ala. 1998) .......................................................... 29, 30

*June Med. Servs. L.L.C. v. Russo,*
 591 U.S. 299 (2020) ................................................................... 25, 27

*Kaplan v. California,*
 413 U.S. 115 (1973) ........................................................................ 35

*Kassel v. Consol. Freightways Corp. of Delaware,*
 450 U.S. 662 (1981) ........................................................................ 32

*Kent v. Dulles,*
 357 U.S. 116 (1958) ................................................................... 14, 24

*Kowalski v. Tesmer,*
 543 U.S. 125 (2004) ........................................................................ 26

*Matal v. Tam,*
 137 S. Ct. 1744 (2017) .................................................................... 40

*Matsumoto v. Labrador,*
 No. 1:23-cv-00323-DKG, 2023 WL 7386998 (D. Idaho Nov. 8, 2023) ................ 29

*McCutcheon v. Fed. Election Comm'n,*
 572 U.S. 185 (2014) ........................................................................ 39

*MedImmune, Inc. v. Genentech, Inc.,*
 549 U.S. 118 (2007) ........................................................................ 54

*Minn. Voters All. v. Mansky,*
 585 U.S. 1 (2018) ............................................................................ 45

*Moe v. Sec'y of Admin. & Fin.,*
 417 N.E.2d 387 (Mass. 1981) ......................................................... 46

*Myers v. United States,*
 377 F.2d 412 (5th Cir. 1967) .......................................................... 18

*NAACP v. Alabama ex rel. Patterson,*
 357 U.S. 449 (1958) ........................................................................ 44

*Nat'l Pork Producers Council v. Ross,*
  598 U.S. 356 (2023)................................................................... 51

*Nat'l Rifle Ass'n of Am. v. Vullo,*
  No. 22-842, 2024 WL 2751216 (U.S. May 30, 2024)....................................... 33, 50

*New York Life Ins. Co. v. Head,*
  234 U.S. 149 (1914)................................................................... 51

*Nielsen v. Oregon,*
  212 U.S. 315 (1909)............................................................. 45, 49, 52

*Otto v. City of Boca Raton,*
  981 F.3d 854 (11th Cir. 2020) ................................................ 41, 42, 45, 47

*Paul v. Virginia,*
  75 U.S. 168 (1868)................................................................... 22

*Pembina Consol. Silver Mining & Milling Co. v. Com. of Pennsylvania,*
  125 U.S. 181 (1888)................................................................... 32

*Planned Parenthood Greater N.W. v. Labrador,*
  No. 23-cv-001420, 2023 WL 4864962 (D. Idaho July 31, 2023) .......................... 42

*Planned Parenthood of Montana v. State,*
  515 P.3d 301 (Mont. 2022)............................................................. 46

*Planned Parenthood Se. v. Bentley,*
  951 F. Supp. 2d 1280 (M.D. Ala. 2013)................................................. 56

*Police Dep't of Chic. v. Mosley,*
  408 U.S. 92 (1972)................................................................... 34

*Powers v. Ohio,*
  499 U.S. 400 (1991)............................................................. 25, 26, 28

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015)............................................................. 40, 41, 47

*Right to Choose v. Byrne,*
  450 A.2d 925 (N.J. 1982) ............................................................. 46

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984)............................................................... 43, 45

*Robinson v. Marshall,*
  No. 2:19-cv-365-MHT, 2022 WL 2314402 (M.D. Ala. June 24, 2022).................. 2

*Rosenberger v. Rector and Visitors of Univ. of Va.,*
  515 U.S. 819 (1995)................................................................... 40

*Rutan v. Republican Party of Ill.,*
  497 U.S. 62 (1990)................................................................... 48

*Saenz v. Roe,*
    526 U.S. 489 (1999) ............................................................ 13

*Shapiro v. Thompson,*
    394 U.S. 618 (1969) ...................................................... 13, 15

*Singleton v. Wulff,*
    428 U.S. 106 (1976) .................................................. 26, 27, 28

*Speech First, Inc. v. Cartwright,*
    32 F.4th 1110 (11th Cir. 2022) ........................................ 40

*Spence v. State of Wash.,*
    418 U.S. 405 (1974) .................................................. 36, 37, 38

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ............................................................ 25

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
    538 U.S. 408 (2003) ............................................................ 52

*Steffel v. Thompson,*
    415 U.S. 452 (1974) ............................................................ 54

*Stewart v. Baldwin Cty. Bd. of Educ.,*
    908 F.2d 1499 (11th Cir. 1990) ........................................ 36

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ...................................................... 26, 54

*Texas v. Johnson,*
    491 U.S. 397 (1989) ...................................................... 35, 38

*Toomer v. Witsell,*
    334 U.S. 385 (1948) ............................................................ 22

*Turner Broad. Sys., Inc. v. F.C.C.,*
    512 U.S. 622 (1994) ............................................................ 34

*United States v. Goodwin,*
    457 U.S. 368 (1982) ............................................................ 49

*United States v. Guest,*
    383 U.S. 745 (1966) ....................................................*passim*

*United States v. Se. Underwriters Ass'n,*
    322 U.S. 533 (1944) ............................................................ 22

*Valley Hosp. Ass'n, Inc. v. Mat-Su Coal. for Choice,*
    948 P.2d 963 (Alaska 1997) ............................................ 46

*Ward v. State,*
    79 U.S. 418 (1870) ............................................................ 22

*Williams v. Fears*,
179 U.S. 270 (1900) ................................................................. 24

*Wollschlaeger v. Governor of Fla.*,
848 F.3d 1293 (11th Cir. 2017) ................................................. 41

*Women of State of Minn. by Doe v. Gomez*,
542 N.W.2d 17 (Minn. 1995) ..................................................... 46

*Young Apartments, Inc. v. Town of Jupiter*,
529 F.3d 1027 (2008) ............................................................... 27

*Zobel v. Williams*,
457 U.S. 55 (1982) ................................................... 13, 23, 24, 31

## STATUTES

28 U.S.C. § 2201(a) ................................................................. 54, 56

42 U.S.C. § 1988 ............................................................................ 10

Ala. Code § 13A-2-23 ............................................ 10, 12, 13, 48, 53

Ala. Code § 13A-2-26 ..................................................................... 17

Ala. Code § 13A-4-3 .................................................. 10, 12, 48, 53

Ala. Code § 13A-4-4 .......................................................... 10, 53

Ala. Code § 13A-5-6 ......................................................................... 2

Ala. Code § 13A-5-11 ....................................................................... 2

Ala. Code § 26-23H-4 .................................................................. 2, 7

Ala. Code § 26-23H-6(a) ................................................................... 2

Ark. Code Ann. § 5-61-304 ............................................................... 7

Fla. Stat. Ann. § 390.0111 ....................................................... 8, 28

Ga. Code Ann. § 16-12-140 ...................................................... 8, 28

Ga. Code Ann. § 16-12-141 ...................................................... 8, 28

Idaho Code § 18-622 ........................................................................ 7

Ind. Code Ann. § 16-34-2-1 .............................................................. 7

Ky. Rev. Stat. Ann. § 311.772 .......................................................... 7

La. Stat. Ann. § 40:1061 ................................................................... 7

Miss. Code Ann. § 41-41-45 ......................................................... 7, 8

Mo. Rev. Stat. § 188.017 ................................................................... 7

N.D. Cent. Code Ann. § 12.1-19.1-02 ............................................... 7

Okla. Stat. Ann. tit. 21, § 861 .......................................................... 7

S.D. Codified Laws § 22-17-5.1 .................................................................. 7

Tenn. Code Ann. § 39-15-213 .............................................................. 7, 8

Tex. Health & Safety Code Ann. § 170A.002 ........................................ 7

W. Va. Code § 16-2R-3 ............................................................................ 7

**RULES**

Fed. R. Civ. P. 56(a) ............................................................................... 11

Rules of H.R., 118th Cong. (2023), Rule XI, cl. 2(m)(3)(D) ..................30

**CONSTITUTIONAL PROVISIONS**

Cal. Const. art. I, § 1.1 ......................................................................... 46

Cal. Const. art. I, § 18 (1849) ............................................................... 46

Ill. Const. art XIII, § 16 ......................................................................... 46

Ind. Const. art. XI, § 7 (1816) ............................................................... 46

Iowa Const. art. II, § 23 (1846) ............................................................. 46

Kan. Const. Bill of Rts. § 6 (1861) ........................................................ 46

Md. Const. Decl. of Rts., art. 24 (1864) ............................................... 46

Mich. Const. art. XI (1835) ................................................................... 46

Minn. Const. art. I, § 2 (1857) .............................................................. 46

Nev. Const. art. I, § 17 (1864) .............................................................. 46

Ohio Const. art. I, § 22 .......................................................................... 46

Ohio Const. art. VIII, § 2 (1802) .......................................................... 46

Or. Const. art. I, § 34 (1857) ................................................................. 46

U.S. Const. amend. I ........................................................................ *passim*

U.S. Const. art. I, § 8, cl. 3 .................................................................... 24

U.S. Const. art. IV, § 2, cl. 1 ................................................................. 23

U.S. Const. amend. V ............................................................................ 24

U.S. Const. amend. XIV, § 1 ................................................... 12, 23, 24

Vt. Const. ch. 1, art. 22 ......................................................................... 46

Vt. Const. ch. I, § 1 (1777) .................................................................... 46

Wis. Const. art. I, § 2 (1848) ................................................................. 46

OTHER AUTHORITIES

3 J. Story, *Commentaries on the Constitution of the United States*, 3:674–75, § 1800 (1833) .......................................................................................... 22

Bowerman, Ashley, *Alabama AG clarifies prosecution rules under abortion law,* WSFA 12 News (Jan. 11, 2023), https://www.wsfa.com/2023/01/12/alabama-ag-clarifies-prosecution-rules-under-abortion-law/ ...................................................................................... 3

Cooper Davis, Peggy, *The Persistence of the Confederate Narrative*, 84 Tenn. L. Rev. 301 (2017) ......................................................................... 19

*Induced Termination of Pregnancy Statistics, Alabama Center for Health Statistics,* Alabama Center for Health Statistics, Alabama Department of Public Health, 1 (2022) ........................................................................... 9

Jeff Poor Show FM Talk 1065, Transcript of Alabama Attorney General Steve Marshall, at 4:29:09 p.m., 8:00 min – 10:01 (August 11, 2022), https://fmtalk1065.com/podcast/alabama-attorney-general-steve-marshall-jeff-poor-show-thursday-8-11-22 .............................................................. 3

Kidd, Camille, et al., *State abortion bans threaten nearly 7 million Black women, exacerbate the existing Black maternal mortality crisis,* Nat'l P'ship for Women & Families (May 2024) ............................................... 7

Kreimer, Seth F., *Lines in the Sand; The Importance of Borders in American Federalism*, 150 U. Pa. L. Rev. 973 (2002) ................................... 14, 30, 49

Kreimer, Seth F., *The Law of Choice and Choice of Law: Abortion, the Right to Travel, and Extraterritorial Regulation in American Federalism*, 67 N.Y.U. L. Rev. 451 (1992) ........................................................... 51, 52

LaFrance, Mary, *Constitutional Implications of Acquisition-Value Real Property Taxation: Assessing the Burdens on Travel and Commerce*, 1994 Utah L. Rev. 1027 (1994) ......................................................................... 31

*Membership Has Its Privileges and Immunities: Congressional Power To Define and Enforce the Rights of National Citizenship*, 102 Harv. L. Rev. 1925, 1935 (1989) ............................................................................. 23, 24

Moderated by Manley F. Brown, The Honorable Marc T. Treadwell, *The United States Attorney's Office Middle District of Georgia: Gary B. Blasingame, Manley F. Brown, Joseph H. Davis, and Joseph W. Popper, Jr.*, 22 J.S. Legal Hist. 73, 109 n. 46 (2014) .......................................... 19

Sacks, Katherine, et al., *Maternal Mortality Among Vulnerable US Communities,* Milken Institute, 4 (2023) .................................................. 8

Sunstein, Cass R., *Democracy and the Problem of Free Speech*, The Free Press, 181 (1993) ...................................................................................... 35

Tribe, Laurence H., *Saenz Sans Prophecy: Does the Privileges or Immunities Revival Portend the Future-or Reveal the Structure of the Present?*, 113 Harv. L. Rev. 110, 152 (1999) .................................................. 21, 22

Weixel, Nathaniel, *Abortion advocates sue Alabama AG over prosecution threats for out-of-state travel*, The Hill (July 31, 2023), https://thehill.com/policy/healthcare/4128993-abortion-advocates-sue-alabama-ag-over-prosecution-threats-for-out-of-state-travel/ .................................. 3

## INTRODUCTION

Plaintiff Yellowhammer Fund asks this Court to find that, just as state actors may not prevent residents from traveling to another state to engage in lawful conduct, neither may they prevent helpers from assisting residents in doing so. Yellowhammer Fund is a non-profit helper founded in Tuscaloosa that operated an abortion fund for approximately five years before Alabama's abortion ban took effect. Following *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), and Alabama's abortion ban taking effect, Defendant Alabama Attorney General Steve Marshall threatened to prosecute organizations that help pregnant people leave the state for lawful abortion care.

Helpers are the people who aid others in accessing their rights. When helpers extend a hand, they do more than simply provide aid; they send a message. To those who are persecuted, they send a message of solidarity. To oppressors, helpers send a message of protest and defiance. This is true whether the aid furthers a politically popular viewpoint or one held by the minority. And it is especially true when a state disagrees with the message, values, or goals of the aid provided.

Yellowhammer Fund wants to help people, as it has done in the past, get lawful abortion care outside of Alabama. It wants to send a message of solidarity to those persecuted by the Alabama abortion ban, and a message of defiance to those who

enacted it and those who enforce it—a message inherently communicated by Yellowhammer Fund supporting the right to travel of those it serves. Yellowhammer Fund seeks summary judgment so that it may reopen its abortion fund and resume helping pregnant Alabamians seek lawful, out-of-state abortion care.

## STATEMENT OF FACTS

### A.   Defendant Threatened to Prosecute Abortion Funds for Helping Pregnant People Travel to Obtain Lawful Abortions in Other States.

Alabama's near-total abortion ban—Alabama Code § 26-23H-4 ("Abortion Ban")—took effect on June 24, 2022, the day the United States Supreme Court released its opinion in *Dobbs*, 597 U.S. 215. *See Robinson v. Marshall*, No. 2:19-cv-365-MHT, 2022 WL 2314402, at *1 (M.D. Ala. June 24, 2022). Violations of the Abortion Ban are punishable by up to life in prison and a fine of up to $60,000. Ala. Code §§ 13A-5-6, 13A-5-11, 26-23H-6(a).

On August 11, 2022, Defendant appeared on the Jeff Poor Show, a local talk radio program, and threatened to prosecute abortion helpers in Alabama. Among other things, Defendant stated, "if someone was promoting themselves . . . as a funder of abortion out of state . . . that is potentially criminally actionable for us," and that he would "look . . . closely" at anyone who uses funds to "facilitate" out-

of-state abortion care.[1] Declaration of Paige Suelzle ISO Mot. Summ. J. ¶¶ 3–7 ("Suelzle Decl."). In his remarks, Defendant specifically mentioned "groups out of Tuscaloosa" that provide support for out-of-state abortion. Suelzle Decl. ¶ 6.

Members of Plaintiff's staff learned about Defendant's statements after his appearance on the Jeff Poor Show. Declaration of Jenice Fountain ISO Mot. Summ. J. ¶ 22 ("Fountain Decl."); Declaration of Kelsea McClain ISO Mot. Summ. J. ¶ 23 ("McLain Decl."). Yellowhammer Fund believed that Defendant's threats specifically targeted them. *See* McLain Decl. ¶ 23; Fountain Decl. ¶¶ 6, 22–23. Following his radio appearance, Defendant has repeatedly touted his desire to prosecute abortion helpers when they assist with lawful, out-of-state abortion care.[2] *See* Fountain Decl. ¶¶ 24–27, 29–30; McLain Decl. ¶¶ 24–25, 33; *see also* Def.'s Answer to Yellowhammer Compl. ¶¶ 11–12, ECF No. 56; Def.'s Answer to WAWC Compl. ¶ 30, ECF No. 57 ("Admitted that Matt Clark reported statements made by

---

[1] The Suelzle Declaration contains a transcription of Alabama Attorney General Steve Marshall, Jeff Poor Show FM Talk 1065, August 11, 2022, at 4:29:09 p.m., 8:00 min – 10:01, available at https://fmtalk1065.com/podcast/alabama-attorney-general-steve-marshall-jeff-poor-show-thursday-8-11-22 (last visited June 10, 2024).

[2] *See, e.g.*, Ashley Bowerman, *Alabama AG clarifies prosecution rules under abortion law*, WSFA 12 News (Jan. 11, 2023), https://www.wsfa.com/2023/01/12/alabama-ag-clarifies-prosecution-rules-under-abortion-law/; Nathaniel Weixel, *Abortion advocates sue Alabama AG over prosecution threats for out-of-state travel*, The Hill (July 31, 2023), https://thehill.com/policy/healthcare/4128993-abortion-advocates-sue-alabama-ag-over-prosecution-threats-for-out-of-state-travel/ (explaining that the attorney general responded to the filing of this lawsuit by stating that he "will continue to vigorously enforce Alabama laws protecting unborn life which include the Human Life Protection Act. That includes abortion providers conspiring to violate the Act").

Defendant that . . . the conspiracy statute 'could apply to attempts to procure an abortion out of state.'"). He has further done so in this litigation.[3]

### B. Plaintiff Is a Reproductive Justice Organization that Communicates a Message of Solidarity and Support to Pregnant Alabamians.

Yellowhammer Fund is a reproductive justice organization founded in 2017. Fountain Decl. ¶¶ 6–7; McLain Decl. ¶ 17. Reproductive justice organizations are typically Black-led organizations that believe all people have the right to decide whether to have children, when to have children, and how to parent the children they have in safe and healthy environments. Fountain Decl. ¶ 6; McLain Decl. ¶ 17. Yellowhammer Fund believes that every person should be free to make decisions about their bodies, families, and futures without shame or governmental interference. Fountain Decl. ¶¶ 1, 6–7, 9–13, 16–19; McLain Decl. ¶¶ 17, 32. Plaintiff provides support to pregnant Alabamians and their families to help eliminate barriers to abortion care, with a specific focus on addressing racial inequity in reproductive healthcare. *See, e.g.*, Fountain Decl. ¶¶ 8–16, 19–20; McLain Decl.

---

[3] *See, e.g.*, Def.'s Mot. Dismiss at 16–17, ECF No. 28 ("[I]t is plainly illegal pursuant to Ala. Code § 13A-4-4 for Plaintiffs to conspire with others to procure abortions that would be illegal in Alabama. The criminal conduct is the agreement (the conspiracy) itself, which is conduct that occurs *in Alabama* that Alabama has every right to prosecute."); *id.* at 18 ("Alabama can criminalize Alabama-based conspiracies to commit abortions elsewhere, even if the State lacked jurisdiction to prosecute out-of-state crimes."); *id.* at 23 ("Plaintiffs undeniably would violate the statute as written."); Def.'s Reply ISO Mot. Dismiss at 11, ECF No. 36 ("Alabama seeks to punish an unlawful conspiracy formed in this State—not potentially lawful conduct in another State.").

¶¶ 6–8, 14–16. As a helper, Plaintiff communicates a message of solidarity and support to people in need. *See* Fountain Decl. ¶¶ 10–13, 18–20; McLain Decl. ¶¶ 11–14; 29–30, 32.

### C.  Plaintiff Wants to Resume Engaging in Constitutionally Protected Activities.

From 2017 to June 24, 2022, Yellowhammer Fund operated an abortion fund that provided financial and logistical support to pregnant people seeking abortion care. Fountain Decl. ¶¶ 7, 14–18; McLain Decl. ¶¶ 6–13. The fund provided support to pregnant Alabamians and residents of other states who needed help accessing abortions within and outside of Alabama. McLain Decl. ¶¶ 3, 6, 18; Fountain Decl. ¶ 7. In addition to paying for the cost of abortion care, the fund helped callers with transportation, childcare, and lodging, and it provided guidance, moral support, and information about reproductive healthcare. McLain Decl. ¶¶ 6–13; Fountain Decl. ¶¶ 7, 18. Members of Plaintiff's staff also drove patients to abortion appointments both within and outside of Alabama. Fountain Decl. ¶ 16.

Plaintiff's abortion fund was a core part of the organization's mission. *See* Fountain Decl. ¶¶ 10, 14–19. The fund met a critical gap for pregnant Alabamians, with a particular focus on helping people of color and people with low incomes. McLain Decl. ¶¶ 11–16; Fountain Decl. ¶¶ 19–20. Well before *Dobbs*, Plaintiff began to plan for a future in which abortion care would be banned in Alabama.

McLain Decl. ¶¶ 18–21. Plaintiff anticipated the abortion fund would play a critical role in helping pregnant Alabamians travel to states where abortion care remained legal. *Id.* It began developing plans to expand the fund to meet community needs. *Id.*

After *Dobbs*, Plaintiff paused the operation of the abortion fund. McLain Decl. ¶ 22; Fountain Decl. ¶ 21. Plaintiff has not resumed providing support to pregnant Alabamians seeking abortion care outside the state because it fears criminal prosecution because of Defendant's threats. McLain Decl. ¶¶ 23–25; Fountain Decl. ¶¶ 24–26, 29–30. Its resources have been diverted to supporting more educational initiatives and providing free emergency contraception, pregnancy tests, Plan B, and basic necessities like diapers, food supplies, school supplies, period products, and other items to meet community needs. Fountain Decl. ¶¶ 8–9. Also, because Defendant's threats have caused Yellowhammer Fund to divert resources, it now informs clients that it cannot help them obtain an abortion but that it can provide other support during their pregnancy and after giving birth. McLain Decl. ¶ 29. In addition to no longer associating with pregnant Alabamians seeking abortion care in the way they both would like, Plaintiff also has stopped collaborating with abortion funds, advocacy groups, and out-of-state clinics out of fear that its associations will be criminalized. Fountain Decl. ¶¶ 17, 25; McLain Decl. ¶¶ 7, 27.

Since *Dobbs*, pregnant Alabamians continue to contact Yellowhammer Fund seeking support for accessing abortion care in states where abortion is legal. McLain Decl. ¶ 26. Plaintiff's helpline receives between five and ten calls per week from people seeking support from the fund. *Id.* Because Plaintiff no longer operates the fund, it notifies callers that it cannot provide them with help. *Id.* at ¶ 27. Plaintiff would resume providing support to callers and advertising the services of the fund if it could be assured that criminal prosecution would not result from it doing so. *Id.* at ¶¶ 32–33; Fountain Decl. ¶¶ 28–30. Plaintiff also would resume providing information to callers about out-of-state abortion care. McLain Decl. at ¶¶ 32–33; Fountain Decl. ¶¶ 28–30.

### D. Plaintiff's Constitutionally Protected Activities Would Offer Vital Resistance to Alabama's Abortion Ban.

Today, fourteen states, including Alabama, have near-total abortion bans.[4] Of the four states that border Alabama, Mississippi and Tennessee currently have near-

---

[4] Ala. Code § 26-23H-4; Ark. Code Ann. § 5-61-304; Idaho Code § 18-622; Ind. Code Ann. § 16-34-2-1; Ky. Rev. Stat. Ann. § 311.772; La. Stat. Ann. § 40:1061; Miss. Code Ann. § 41-41-45; Mo. Rev. Stat. § 188.017; N.D. Cent. Code Ann. § 12.1-19.1-02; Okla. Stat. Ann. tit. 21, § 861; S.D. Codified Laws § 22-17-5.1; Tenn. Code Ann. § 39-15-213; Tex. Health & Safety Code Ann. § 170A.002; W. Va. Code § 16-2R-3. Notably, 57 percent of Black women of reproductive age live in states where abortion is banned, where there have been significant legislative attempts to ban abortion, where there are legal challenges to a ban pending, or where there are gestational limits between six and twenty weeks. Camille Kidd et al., *State abortion bans threaten nearly 7 million Black women, exacerbate the existing Black maternal mortality crisis*, Nat'l P'ship for Women & Families (May 2024), https://nationalpartnership.org/report/state-abortion-bans-threaten-black-women (considering Alabama, Arizona, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Carolina,

total bans on abortion, Miss. Code Ann. § 41-41-45; Tenn. Code Ann. § 39-15-213, and Georgia and Florida have 6-week bans, Ga. Code Ann. §§ 16-12-140, 16-12-141; Fla. Stat. Ann. § 390.0111. Pregnant Alabamians who seek abortion care must travel long distances to access care in states where abortion is legal. *See* Declaration of Kari White ISO Mot. Summ. J. ¶ 21 ("White Decl."); McLain Decl. ¶¶ 28, 31.

People who are unable to obtain abortion care face significant medical, social, and economic consequences. White Decl. ¶¶ 22, 27. The United States has a higher rate of maternal mortality than any other developed nation, and that rate has increased in recent years. *Id.* at ¶ 28. Alabama has the third highest maternal mortality rate in the country. *Id.*[5] Carrying a pregnancy to term is especially dangerous for certain populations. Pregnancy-related deaths disparately impact communities of color. *Id.* at ¶ 29. According to a 2021 report, the maternal mortality rate for Black women is 2.6 times higher than the rate for non-Hispanic white women. *Id.* Specifically, the maternal mortality rate for non-Hispanic white women

---

North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, West Virginia, Wisconsin, and Wyoming).

[5] Since the signing of the White Declaration, the location of the Maternal Mortality report has changed to https://www.alabamapublichealth.gov/perinatal/assets/2020_annual_mmr.pdf. Notably, other sources now report Alabama as having the highest rate of mothers dying from pregnancy-related issues. Katherine Sacks et al., *Maternal Mortality Among Vulnerable US Communities*, Milken Institute, 4 (2023), https://milkeninstitute.org/sites/default/files/2023-07/MaternalMortalityamongVulnerableUSCommunities.pdf.

in 2021 was 26.6 deaths per 100,000 live births, while the maternal mortality rate for Black women was 69.9 deaths per 100,000 live births. *Id.*

Those who seek abortion care in Alabama are disproportionately people of color and have low incomes. *Id.* at ¶ 23.[6] Along with Kentucky, Alabama is the sixth-poorest state in the country. *Id.* at ¶ 24. Since *Dobbs*, abortion has become increasingly inaccessible for pregnant Alabamians. *Id.* at ¶¶ 16, 26. Without financial and logistical support from abortion funds and practical support organizations, many Alabamians struggle to access abortion care today. *Id.* at ¶¶ 24–25.

### E.   Plaintiff Filed this Lawsuit so it Can Resume Helping Pregnant People Travel to Obtain Lawful Abortion Care.

Yellowhammer Fund filed this lawsuit on July 31, 2023. Yellowhammer Compl., ECF No. 1. It alleged that Defendant's threats to prosecute Yellowhammer and other abortion funds for helping pregnant people obtain lawful, out-of-state abortion care violate (1) the federal constitutional right to travel (*id.* at ¶¶ 87–97); (2) the First Amendment right to free speech and expression (*id.* at ¶¶ 70–78); (3) the First Amendment right to association (*id.* 1 at ¶¶ 79–86); and (4) the Due Process Clause and principles of sovereignty and comity within the U.S. Constitution (*id.* at

---

[6] In 2022, Black Alabamians comprised 67 percent of the state's abortion patients while only comprising around 27 percent of the Alabama population. *Induced Termination of Pregnancy Statistics*, Alabama Center for Health Statistics, Alabama Department of Public Health, 1 (2022), https://www.alabamapublichealth.gov/healthstats/assets/itop-2022.pdf.

¶¶ 98–106). On August 21, 2023, this Court consolidated *West Alabama Women's Center et al. v. Marshall*—a case brought by medical providers concerned about how Defendant's threats limit their ability to support their patients in obtaining out-of-state care—with this case. Order Granting Mot. Dismiss, ECF No. 22 (formerly Civil Action No. 2:23cv451-MHT).

On August 28, 2023, Yellowhammer Fund moved for summary judgment. Mot. Summ. J., ECF No. 27. Defendant filed a motion to dismiss later that day. Def.'s Mot. Dismiss, ECF No. 28. On May 6, 2024, the Court ruled on the motion to dismiss. Order Mot. Dismiss, ECF No. 48. At a status conference, the Court and parties agreed that rather than supplement the motion for summary judgment Yellowhammer Fund filed on August 28, 2023, the Court would deny it without prejudice, so that Yellowhammer Fund could refile by June 17, 2024. Order Den. Mot. Summ. J., ECF No. 54; Scheduling Order, ECF No. 55.

Yellowhammer Fund's complaint and this motion ask this Court to declare unconstitutional and permanently enjoin enforcement of Alabama Code §§ 13A-2-23, 13A-4-3, and 13A-4-4, for speech and actions to assist Alabama residents leaving the state to obtain lawful abortion care. Plaintiff also asks for an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other relief the Court deems just, proper, and equitable.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] 'genuine' dispute exists if 'a jury applying [the applicable] evidentiary standard could reasonably find for either the plaintiff or the defendant' as to the material fact." *Brady v. Carnival Corp.*, 33 F.4th 1278, 1281 (11th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, "the mere existence of *some* alleged factual dispute between the parties" will not defeat a summary judgment motion unless the dispute is genuine and the fact is material to the outcome of the case. *Anderson*, 477 U.S. at 247–48.

Summary judgment is appropriate if "the pertinent facts are obvious and indisputable from the record," and "the only remaining truly debatable matters are legal questions that a court is competent to address." *Garvie v. City of Fort Walton Beach*, 366 F.3d 1186, 1190 (11th Cir. 2004).

## ARGUMENT

This Court should grant Yellowhammer Fund's motion for summary judgment because no factual disputes preclude the resolution of its claims. Defendant's threatened prosecutions blatantly infringe on Plaintiff's and pregnant Alabamians' right to travel by penalizing those who would assist people seeking to

travel across state lines for lawful abortion care. Defendant can no more punish helpers assisting travel than it could punish the pregnant person for traveling.

Plaintiff necessarily engages in speech, expressive conduct, and expressive association to pursue the organization's mission and values. Defendant's threats to prosecute abortion helpers for speaking about lawful, out-of-state activities violate the First Amendment because he seeks to chill and restrict speech based on its content and viewpoint.

The Due Process Clause and principles of sovereignty and comity strictly forbid Defendant from applying Alabama laws outside the state's borders. Certainly, that would be the result of his threatened prosecutions. This case is only about lawful out-of-state abortions. To prosecute Plaintiff for conspiracy or aiding and abetting there must be an Alabama crime. Ala. Code § 13A-4-3(a); Ala. Code § 13A-2-23. Since the assistance and agreements would only support lawful, out-of-state conduct, Defendant is essentially arguing that he can extend Alabama's laws outside the state to make unlawful the abortion care that another state deems lawful, and in some cases constitutionally protects.

The consequences of threatening prosecution or initiating prosecution against Yellowhammer Fund's employees for doing the essential duties of employment are

significant. This is true even if, ultimately, the prosecution would be unsuccessful.[7]

Plaintiff seeks an order that would allow it to reopen its abortion fund without fear

of prosecution so that it can assist pregnant people who no longer want to be pregnant

to leave Alabama for lawful abortion care.

## A. Defendant's Threatened Prosecutions Violate the Right to Travel.

The U.S. Supreme Court has firmly established and repeatedly recognized a

right to travel. *Zobel v. Williams*, 457 U.S. 55, 67 (1982) (Brennan, J., concurring);

*Shapiro v. Thompson*, 394 U.S. 618, 630 (1969), *overruled on other grounds by*

*Edelman v. Jordan*, 415 U.S. 651 (1974). It is a right that ensures people can enter

and leave any state. *Saenz v. Roe*, 526 U.S. 489, 500 (1999). The right to travel is

"so elementary" that it inherently accompanies the Union that the Constitution

established. *United States v. Guest*, 383 U.S. 745, 758 (1966). How else could a loose

confederation of states be transformed into one nation? *See Zobel*, 457 U.S. at 67

(Brennan, J., concurring); *Attorney General of New York v. Soto-Lopez*, 476 U.S.

---

[7] This Court need not construe the Alabama criminal statutes to decide whether they apply to Plaintiffs' speech and conduct, because the highest law enforcement officeholder in the state asserts he can and will prosecute the subject speech, association, expressive conduct, and travel under these statutes. The threats in themselves are sufficient to justify a need to enjoin such prosecutions and declare that such prosecution would violate federal law. Plaintiff Yellowhammer Fund—while deeply offended by the extreme misreading of Alabama law—has no claim in this litigation that requires this Court to interpret Alabama Code §§ 13A-2-23, 13A-4-3, and 13A-4-4. To the extent Yellowhammer Fund talks about how one cannot be prosecuted for conspiring to do a lawful act, or that clearly there is no extraterritorial effect of state law, it is only to show Defendant's animosity toward concepts of sovereignty and comity and illustrate how the Due Process Clause is implicated.

898, 902 (1986) (noting "the important role [the right to travel] has played in transforming many States into a single Nation"); *Crandall v. Nevada*, 73 U.S. 35, 43 (1867) ("[T]he people of these United States constitute one nation.").

As this court noted in its May 6, 2024, order and opinion, the right to travel's origins date back at least as far as the Magna Carta. Order Mot. Dismiss at 43, ECF No. 48 (citing Magna Carta (1215) cl. 41; *Kent v. Dulles*, 357 U.S. 116, 125–26 (1958)). It is clear that "damage and havoc . . . would ensue if the States had the power to prevent the free movement of citizens from one State to another." *Edwards v. California*, 314 U.S. 160, 178 (1941) (Douglas, J., concurring). Considering the importance of the right to travel, its broad interpretation is necessary because "[i]f our bodies can move among states, but our freedom of action is tied to our place of origin, then the 'right to travel' becomes a hollow shell." Seth F. Kreimer, *Lines in the Sand; The Importance of Borders in American Federalism*, 150 U. Pa. L. Rev. 973, 1007 (2002).

Defendant's threats convey to Plaintiff, and the pregnant people in Alabama that it serves, that Plaintiff's employees and volunteers could be prosecuted and face up to a life sentence in prison if Plaintiff helps pregnant people travel to a state where abortion is legal. When California made it illegal for helpers to bring indigent people into the state, the U.S. Supreme Court invalidated the law. *Edwards*, 314 U.S. at 166. When a Nevada law taxed people leaving the state, the U.S. Supreme Court

14

overturned it. *Crandall*, 73 U.S. at 49. And when the Ku Klux Klan inflicted violence in Georgia meant to stop Black people from using highways to travel between states, the U.S. Supreme Court declared this violence a violation of the right to travel. *Guest*, 383 U.S. at 760. Plaintiff's right to travel claim can be resolved by applying well-established constitutional principles. No factual issues prevent this Court from entering summary judgment in Plaintiff's favor.

> **1. The Predominant Purpose of Defendant's Threats of Prosecution Is to Prevent the Exercise of the Right to Interstate Travel and to Oppress Those Who Exercise That Right.**

State action implicates the right to travel when impeding travel is its primary objective. *Soto-Lopez*, 476 U.S. at 903; *see also Guest*, 383 U.S. at 760. When the government infringes upon the right to travel, the government's actions will be unlawful. *Shapiro*, 394 U.S. at 634. Three cases—*Edwards, Crandall,* and *Guest*—make abundantly clear that the right to travel is implicated here.

*Edwards* shows why Plaintiff—a helper seeking to assist in the exercise of the right to travel—has suffered a constitutional violation. Fred Edwards traveled from Texas to California with his brother-in-law to help him start a new life. *Edwards*, 314 U.S. at 170–71. His brother-in-law had $20 to his name and, because of his indigency, he believed California could offer him and his family new opportunities. *Id.* at 171. At the time, California law criminalized helpers like Mr. Edwards, specifically making it unlawful to transport indigent people into the state. *Id.* The

trial court sentenced Mr. Edwards to six months in the county jail for coming to the aid of his brother-in-law. *Id.* The U.S. Supreme Court found that no single state could "isolate itself" by prohibiting indigent people from entering and held that fundamental constitutional rights were at play—rights we now call "the right to travel." *Id.* at 173. Though sympathetic to the "grave and perplexing social and economic dislocation" that led California to use its police power to restrict travel, the Court held that this interest could not overcome the countervailing importance of preserving the free movement of people across state lines. *Id.*

The similarities between *Edwards* and this case are striking. Like Mr. Edwards, Plaintiff is a helper seeking to transport people who do not have the funds to travel to another state. *See, e.g.*, Fountain Decl. ¶ 14. Like Mr. Edwards, Plaintiff will be criminalized if it aids in another's travel. *See, e.g.*, Fountain Decl. ¶ 24; McLain Decl. ¶¶ 23–24. And like Mr. Edwards, Yellowhammer Fund is being deprived of the fundamental right to move freely between states while being faced with a state's efforts to isolate itself and its residents from other states in the Union. *See* Fountain Decl. ¶¶ 16, 26.

*Crandall* also establishes that Plaintiff is a proper party, and that Defendant's threats violate the constitutional right to travel. In 1865, Nevada enacted a law that levied a tax of one dollar upon any person leaving the state by railroad, stagecoach, or other vehicle for hire. *Crandall*, 73 U.S. at 35–39. The Court found Nevada's

actions in conflict with the Constitution, discussing the havoc that would befall the nation if the government could place burdens on the right to leave a state. *Id.* at 49. "The people of these United States constitute one nation. They have a government in which all of them are deeply interested." *Id.* at 43. Rejecting Nevada's argument that this was "not a tax upon the passenger, but upon the business of the carrier who transports him," *id.* at 39, the Court explained that it is against the principles of our nation to erect barriers to leaving a state, which would interfere with the activities of national citizenship, *id.* at 43–44. "[N]o power can exist in a State to obstruct this right that would not enable it to defeat the purposes for which the government was established." *Id.* at 44.

*Crandall* guides this case for two additional reasons. First, Mr. Crandall was not a passenger but the agent for a stagecoach. *Id.* at 36. Like Mr. Edwards, he was able to get judicial relief even though the law at issue violated the right to travel of the stagecoach passengers traveling out of Nevada. Second, the infringement on that right was merely a one-dollar fee. Here, Defendant threatens a sentence of up to life in prison. *See* Suelzle Decl. ¶ 6. Even if unsuccessful, a criminal prosecution would deeply impact Yellowhammer Fund's mission and work, and its employees and leadership would be embroiled in criminal legal proceedings, and potentially charged for criminal activity undertaken by the organization. *See* Ala. Code § 13A-2-26 ("A person is criminally liable for conduct constituting an offense which he

performs or causes to be performed in the name of or in behalf of a corporation to the same extent as if such conduct were performed in his own name or behalf.").

Finally, *Guest* demonstrates that the right to travel is infringed if the predominant purpose of the challenged act is to "impede or prevent the exercise of the right of interstate travel, or to oppress a person because of his exercise of that right."[8] *Guest*, 383 U.S. at 760. *Guest* arises from the Ku Klux Klan shooting of Lt. Col. Lemuel Penn in Athens, Georgia, and the rash of racially motivated terror inflicted on Athens around the time of the shooting. *See Myers v. United States*, 377 F.2d 412, 416 (5th Cir. 1967) (describing facts of the murder that were the basis of *Guest*).[9] Lt. Col. Lemuel Penn was shot while driving back to Washington after

---

[8] Plaintiff moves for summary judgment here on a theory that the primary objective of the Defendant's threats is to impede or prevent the right to interstate travel or to oppress a person because of his exercise of that right. *Attorney General of New York v. Soto-Lopez* also allows Plaintiff to establish a violation through additional theories. 476 U.S. 898, 903 (1986). Plaintiff recognizes that proceeding on those alternative theories may require reliance upon issues of fact, and therefore, this summary judgment motion only proceeds on "primary objective grounds." By doing so, Plaintiff does not waive its right to present evidence in support of the additional theories if summary judgment is not granted.

[9] During the Spring and Summer of 1964, Athens, Georgia, had been plagued with violence arising from a group of Ku Klux Klansmen and the complicity of law enforcement in their violence. *Myers v. United States*, 377 F.2d 412, 414–16 (1967) (discussing law enforcement's frequent presence when the Ku Klux Klan acted). In the backdrop, young Black residents were picketing The Varsity drive-in restaurant in Athens because the business refused to serve Black residents. *Id*. at 414–15. A group of Klansmen, often with the same few actors, traversed the town with weapons, beat Black men, shot into homes in Black residential neighborhoods costing a man his eye and a 13-year-old girl her lip, and sought to scare Black people with out-of-state license plates off the interstate highways through a rash of violence. *Id*. at 414–16. Around 5 a.m. on July 11, 1964, Lt. Col. Lemuel Penn and two other Black army officers were driving to Washington D.C. from Fort Benning, Georgia, after completing summer training duties. *Id*. at 416. They stopped in Athens, Georgia, where Lt. Col. Penn took the wheel. *Id.* About 20 miles

completion of reserve military duty at Fort Benning, Georgia. *Id*. After a local jury failed to convict the suspects of murder, the federal government sought to prosecute the men for conspiring to deprive Black people of their constitutional rights, including the right to travel. *Guest*, 383 U.S. at 747 n.1. Initially, the district court dismissed the indictment. *Id.* at 748.

On appeal, the U.S. Supreme Court had to determine whether the Department of Justice could indict under 18 U.S.C. § 241. *Id.* at 746–47, 750–51. *Guest*, one of the first cases argued by Thurgood Marshall as Solicitor General, is primarily about the Court's decision to extend the protection of the Fourteenth Amendment to people who suffer a deprivation of their constitutional rights at the hands of private actors. Peggy Cooper Davis et. al., *The Persistence of the Confederate Narrative*, 84 Tenn. L. Rev. 301, 342 (2017). But the case is rooted in, and explores deeply, the constitutional right to travel. *Guest*, 383 U.S. at 757. The Supreme Court stated that "[t]he constitutional right to travel from one State to another, and necessarily to use the highways and other instrumentalities of interstate commerce in doing so,

---

outside of town, a light-colored car approached the three men's vehicle. *Id*. Two shotgun blasts were fired, one of these going through a rear window and missing the occupants. *Id*. The other blast smashed a hole in the window near Lt. Col. Penn—a decorated veteran of World War II, an assistant superintendent of schools in Washinton D.C., a husband, and a father of three—striking his head and killing him instantly. *Id*.; *see also* Moderated by Manley F. Brown, The Honorable Marc T. Treadwell, *The United States Attorney's Office Middle District of Georgia: Gary B. Blasingame, Manley F. Brown, Joseph H. Davis, and Joseph W. Popper, Jr.*, 22 J.S. Legal Hist. 73, 109 n. 46 (2014). None of these facts are described in the text of *Guest* but provide the context of the case.

occupies a position fundamental to the concept of our Federal Union." *Id.* It continued:

> Although the Articles of Confederation provided that 'the people of each State shall have free ingress and regress to and from any other State,' that right finds no explicit mention in the Constitution. The reason, it has been suggested, is that a right so elementary was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created. In any event, freedom to travel throughout the United States has long been recognized as a basic right under the Constitution. . . . Although there have been recurring differences in emphasis within the Court as to the source of the constitutional right of interstate travel, there is no need here to canvass those differences further. All have agreed that the right exists.

*Id.* at 758–59 (internal citations and footnotes omitted). The Court allowed the indictment, explaining:

> [I]f the predominant purpose of the conspiracy is to impede or prevent the exercise of the right to interstate travel, or to oppress a person because of his exercise of that right, then, whether or not motivated by racial discrimination, the conspiracy becomes a proper object of the federal law under which the indictment in this case was brought.

*Id.* at 760. Since then, the "predominant purpose" or "primary objective" test has been one way a party can show infringement of the right to travel. *See Soto-Lopez*, 476 U.S. at 903.

Here, the predominant purpose of Defendant's threats of prosecution are to "impede or prevent the exercise of the right to interstate travel" and to "oppress a person because of his exercise of that right." One need only look to Defendant's statements for proof of their purpose. He specifically acknowledged his inability to

prosecute the pregnant person for exercising the right. Suelzle Decl. ¶ 6 ("You know there is nothing about that law that restricts any individual from driving across state lines and, uh, seeking an abortion, uh, in another place . . ."). But he went on to explain how he would stop that travel by prosecuting abortion funds. *Id.* ("[H]owever, I would say that if any individual held themselves out, uh, as a, as an entity or a group that is using funds, that they are able to raise, uh, to be able to facilitate those [sic] those visits then that, uh, is something we are going to look at closely."). Defendant is threatening enforcement specifically to prevent organizations and individuals like Plaintiff from transporting people to other states, just as in *Edwards* and *Crandall*. And, like in *Guest*, his purpose in making this threat is to impede travel. Further, *Guest* makes clear that "actions" (i.e., the unspeakable violence Black Georgians' faced), not just laws, can violate the right to travel. Here, like the actions in *Guest*, Defendant's threats, if carried out, are life-destroying, as Defendant is threatening a sentence of life in prison without the possibility of parole to any helper. A non-profit organization cannot carry out its mission in the face of the criminalization of its primary activities and its primary speech.

> **2.   The Right to Travel Is a Hollow Shell if Movement Among the States Does Not Allow Freedom of Action.**

> *The conclusion that a state's legal system must not hobble a citizen as she travels from state to state follows from a conception of interstate mobility that entails something more than just a change of scenery. If each state could decide for itself, possibly with some measure of congressional authorization, how much of its legal system*

*its citizens would have to carry around on their backs while seeking to take advantage of the legal environments of other states, then the right to choose which state to enter for any purpose lawful in that state would amount to nothing more than the right to have the physical environment of the states of one's choosing pass before one's eyes in a kind of virtual reality arcade while one remained strapped at all times in a legally fixed and closed environment. Surely, however, more than that is involved in the right of interstate mobility that follows from the basic structure of our federal Union.*

- Professor Lawrence Tribe[10]

In its order and opinion denying Defendant's motion to dismiss, this Court engaged in a significant discussion on the origins of the right to travel, looking predominantly to Article IV's Privileges and Immunities Clause. Plaintiff agrees that the Privileges and Immunities Clause is *one* origin of the right to travel and helps establish that the right includes both the right to move physically between the States and to do what is legal in the destination State. *See* Order Mot. Dismiss at 45–47, ECF No. 48 (citing 3 J. Story, *Commentaries on the Constitution of the United States*, 3:674–75, § 1800 (1833); *Paul v. Virginia*, 75 U.S. 168, 180 (1868), *overruled in part on other grounds by United States v. Se. Underwriters Ass'n*, 322 U.S. 533 (1944); *Corfield v. Coryell*, 6 F. Cas. 546, 552 (C.C.E.D. Pa. 1823) (Washington, J., on circuit); *Ward v. State*, 79 U.S. 418, 430 (1870); *Toomer v. Witsell*, 334 U.S. 385 (1948)).

---

[10] Laurence Tribe, *Saenz Sans Prophecy: Does the Privileges or Immunities Revival Portend the Future-or Reveal the Structure of the Present?*, 113 Harv. L. Rev. 110, 152 (1999).

But courts have declined to cabin the origin of the right to travel to one particular constitutional source. *See, e.g.*, *Zobel*, 457 U.S. at 66–67 (Brennan, J., concurring). In the *Zobel* concurrence, Justice Brennan explained:

> I note that the frequent attempts to assign the right to travel some textual source in the Constitution seem to me to have proved both inconclusive and unnecessary. Justice O'CONNOR plausibly argues, post, at 2322–2323, that the right predates the Constitution and was carried forward in the Privileges and Immunities Clause of Art. IV. But equally plausible, I think, is the argument that the right resides in the Commerce Clause, *see Edwards v. California*, 314 U.S. 160, 173, 62 S.Ct. 164, 166, 86 L.Ed. 119 (1941), or in the Privileges and Immunities Clause of the Fourteenth Amendment, *see id.*, at 177–178, 62 S.Ct., at 168–169 (Douglas, J., concurring). In any event, in light of the unquestioned historic recognition of the principle of free interstate migration, and of its role in the development of the Nation, we need not feel impelled to "ascribe the source of this right to travel interstate to a particular constitutional provision." *Shapiro v. Thompson*, 394 U.S. 618, 630, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600 (1969).

*Id.* In fact, over the last two centuries, justices have suggested at least seven different sources. For some, it has been the Article IV Privileges and Immunities Clause. U.S. Const. art. IV, § 2, cl. 1.; *see, e.g., Zobel*, 457 U.S. at 73–74 (O'Connor, J., concurring in the judgment). For others, it has been the Fourteenth Amendment Privileges and Immunities Clause. U.S. Const. amend. XIV, § 1; *see Edwards*, 314 U.S. at 178 (Douglas, J., concurring). It has been rooted in a conception of national citizenship implicit in "the structural logic of the Constitution itself." *Membership*

*Has Its Privileges and Immunities: Congressional Power To Define and Enforce the Rights of National Citizenship*, 102 Harv. L. Rev. 1925, 1935 (1989); *see Crandall*, 73 U.S. at 43. In *Edwards*, sourcing within the Commerce Clause featured prominently. U.S. Const. art. I, § 8, cl. 3; *see Edwards*, 314 U.S. at 172–73. The Equal Protection Clause has been mentioned, U.S. Const. amend. XIV, § 1; *see, e.g.*, *Zobel*, 457 U.S. at 60 n. 6, as have each of the Due Process Clauses, U.S. Const. amend. V; U.S. Const. amend. XIV, § 1; *Kent v. Dulles*, 357 U.S. 116, 125 (1958) (Fifth Amendment Due Process Clause); *Williams v. Fears*, 179 U.S. 270, 274 (1900) (Fourteenth Amendment Due Process Clause). While Plaintiff agrees with the Court's analysis on the motion to dismiss, it submits that each basis supports the proposition that the right to travel protects not just the movement among states but the right to engage in lawful conduct on arrival. Regardless of its source, the right to travel is hollow if unaccompanied by the freedom to engage in lawful conduct in the states to which one travels.

### 3. Plaintiff Has Third-Party Standing to Vindicate the Right to Travel for Those it Serves.

While *Edwards* and *Crandall* make clear that Plaintiff can bring this claim on its own behalf,[11]  Plaintiff also has third-party standing to vindicate the right to travel

---

[11] This Court found, and Defendant has not disputed, that Plaintiff has also satisfied Article III standing requirements. Order Mot. Dismiss at 21, ECF No. 48. Plaintiff has amply demonstrated through its complaint and declarations that it has suffered an injury-in-fact, its injuries are fairly

on behalf of those it serves. Third-party standing is a prudential doctrine, not a constitutional requirement under Article III, and the rule disfavoring it "is hardly absolute." *June Med. Servs. L.L.C. v. Russo*, 591 U.S. 299, 317–18 (2020) (plurality opinion); *accord id.* at 354 n.4 (Roberts, C.J., concurring). The Supreme Court has, for example, permitted third-party standing in cases where a litigant has Article III standing to challenge the constitutionality of a law, policy, or action, and the "rights of third parties . . . would be 'diluted or adversely affected' should [its] constitutional challenge fail." *Carey v. Pop. Servs. Int'l*, 431 U.S. 678, 684 (1977) (quoting *Craig v. Boren*, 429 U.S. 190, 195 (1976)). Such cases have entailed a variety of fact patterns and interests. *See, e.g.*, *Powers v. Ohio*, 499 U.S. 400, 415 (1991) (holding that a criminal defendant had third-party standing to assert the rights of potential jurors excluded from jury service); *Carey*, 431 U.S. at 683–84 (holding that a company selling non-medical contraceptives had third-party standing to assert the rights of potential customers, including minors); *Craig*, 429 U.S. at 194 (holding that a beer vendor had third-party standing to assert the rights of potential customers); *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965) (holding that healthcare providers had third-party standing to assert the rights of patients seeking

---

traceable to Defendant's threatened prosecutions, and its injuries would be redressed by a decision from this Court enjoining Defendant from prosecuting Plaintiff and declaring such prosecutions unconstitutional. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). All facts in the complaint are supported by the declarations attached to this motion and evince Article III standing.

to use contraception); *Barrows v. Jackson*, 346 U.S. 249, 258–59 (1953) (holding that white property owners had third-party standing to assert the rights of potential Black purchasers). Plaintiff is the "obvious claimant" and the "least awkward challenger" because Plaintiff is the target of Defendant's threats. *See Craig*, 429 U.S. at 197.

Plaintiff also satisfies third-party standing because it has suffered an injury-in-fact, there is a sufficiently close relationship between Yellowhammer Fund and the pregnant people it supports, and pregnant Alabamians are hindered from protecting their own rights. *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004).

First, Yellowhammer Fund is suffering an injury-in-fact that is caused by Defendant's credible threat of prosecution, and Plaintiff's injury would be redressed by a judgment declaring that Defendant's threatened prosecution infringes upon its right to travel. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014) (explaining that, when a plaintiff seeks to engage in conduct that is proscribed by statute, a credible threat of enforcement gives rise to injury-in-fact).

Second, Yellowhammer Fund has a close relationship with pregnant Alabamians seeking to travel out of state for lawful abortion care such that Plaintiff is "fully, or very nearly, as effective a proponent of the right" as its clients would be. *Singleton v. Wulff*, 428 U.S. 106, 115 (1976) (plurality opinion); *Powers*, 499 U.S. at 413. Before pregnancy, Plaintiff serves its clients through education, mutual aid,

and other programmatic initiatives. Fountain Decl. ¶¶ 8–11. Once a client becomes pregnant and seeks an abortion, Plaintiff used to play a crucial role in enabling its clients to travel. McLain Decl. ¶ 18. There are clients presently in need of Plaintiff's services, and it regularly receives requests from clients who cannot travel without Plaintiff's financial and logistical assistance. *Id.*, ¶¶ 26, 29. Additionally, Plaintiff's interests are aligned with those of the pregnant people they serve: Plaintiff's mission is to provide abortion funding and travel support to those who wish to obtain a lawful abortion, which gives Plaintiff a direct interest in protecting pregnant people's right to travel. Fountain Decl. ¶ 30. And Defendant is effectively targeting pregnant people by threatening criminal prosecution against helpers such that the clients' rights are "inextricably bound up with the activity the litigant wishes to pursue." *Singleton*, 428 U.S. at 114; *see also June Med. Servs. L.L.C.*, 591 U.S. at 319 ("[T]he 'threatened imposition of governmental sanctions' . . . eliminates any risk that [Plaintiff's] claims are abstract or hypothetical." (quoting *Craig*, 429 U.S. at 195)).

Third, pregnant people in Alabama face significant hindrances to asserting the right to travel on their own behalf. Pregnant people seeking lawful abortion are likely to face hostility from some if they draw attention to their desire to obtain an abortion and are "reluctant to raise such claims for fear of provoking additional policing measures" or other legal risks. *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1044 (2008). Plaintiff has observed its clients' fear of being wrongfully

criminalized for obtaining an abortion out of state and their desire for privacy. *See* McLain Decl. ¶ 24. A pregnant person may be chilled from asserting their own right to travel by the publicity of a court suit, *Singleton*, 428 U.S. at 117, and someone seeking to travel also faces the imminent mootness of their claim, *id.* ("Only a few months, at the most, after the maturing of the decision . . . her right thereto will have been irrevocably lost.").[12] Plaintiff's clients predominantly have low-incomes, lack the means to travel out of state, and would face significant "economic burdens of litigation." *Powers*, 499 U.S. at 415; *see* Fountain Decl. ¶ 20. Thus, someone who is unable to obtain an abortion through litigation has "little incentive to set in motion the arduous process needed to vindicate [their] own rights." *Powers*, 499 U.S. at 415. Plaintiff's clients face several hindrances to asserting their own rights in Alabama's climate of abortion hostility. *See, e.g.*, White Decl. ¶¶ 20–22, 26.

Accordingly, Plaintiff may assert pregnant Alabamians' constitutional right to travel.

### 4.  Plaintiff Can Bring a Right to Travel Claim Itself.

The Court need not decide whether a nonprofit company with employees seeking to travel between states may assert a right to travel claim for Yellowhammer

---

[12] A client may have even less time to obtain an abortion than the Court contemplated in *Singleton v. Wulff* due to the gestational age bans in neighboring states. *See, e.g.*, Ga. Code Ann. §§ 16-12-140, 16-12-141 (Georgia's 6-week ban); Fla. Stat. Ann. § 390.0111 (Florida's 6-week ban).

Fund to receive the full relief it seeks because the relief Yellowhammer Fund seeks is co-extensive with the relief it seeks on behalf of its clients. And while no appellate court has decided the issue, a district court in Idaho recently found an abortion fund and a helper nonprofit working within indigenous communities could bring a right to travel claim. *Matsumoto v. Labrador*, No. 1:23-cv-00323-DKG, 2023 WL 7386998, at *5 (D. Idaho Nov. 8, 2023). Moreover, there is good reason to rule that Yellowhammer Fund can bring a right to travel claim.

The primary cases relating to the right to travel in instances where a regulation prevents entry to and exit from a state have been brought by helpers, but have not discussed third-party standing. *See supra* § A.1 (discussing *Crandall* and *Edwards*); Order Mot. Dismiss at 54, ECF No. 48 ("[T]ravel restrictions directed toward those who facilitate travel for others can offend the Constitution.").

Nonprofits certainly serve as travel facilitators, as demonstrated here. Here, Yellowhammer Fund traditionally assigned their employees to accompany certain pregnant people who needed lawful care out-of-state and had needs along the way that must be met by a travel companion. *See* Fountain Decl. ¶ 16. Yellowhammer Fund also paid for that travel, which happened on company time and furthered Yellowhammer Fund's mission. *Id.* ¶¶ 15–16, 18. If there were a traffic accident while an employee was traveling with a pregnant person, *respondeat superior* suggests Yellowhammer Fund could be liable. *See Hulbert v. State Farm Mut. Auto.*

29

*Ins. Co.*, 723 So.2d 22, 23 (Ala. 1998). And prohibiting Yellowhammer Fund from sending its employees to travel with those who cannot travel for out-of-state care alone frustrates its organizational mission: it may be unable to assist some of the populations it seeks to aid. *See* Fountain Decl. ¶¶ 24–30. Presumably, on these excursions, accompanying pregnant people in their travel, its employees and volunteers would return with information about how pregnant people are treated during travel for lawful out-of-state abortion care. In a post-*Dobbs* world, accompanying clients would allow it to fulfill its mission more effectively, but also would allow it to better engage in intercourse between states on reproductive autonomy and justice. *See* Seth F. Kreimer, *Lines in the Sand: The Importance of Borders in American Federalism*, 150 U. Pa. L. Rev. 973, 1007 (2002)_("It is by intercourse as equals that the country is knit together across parochial boundaries, and it is by sharing the experience of others that our personal horizons are broadened and our liberty reaffirmed."). Lastly, Yellowhammer Fund can be summoned to testify before Congress just as an individual can. Rules of H.R., 118th Cong. (2023), Rule XI, cl. 2(m)(3)(D) ("Subpoenas for documents or testimony may be issued to any person or entity, whether governmental, public, or private, within the United States . . . ."); *see Crandall*, 73 U.S. at 43 ("Th[e] government has a right to call to this point any or all of its citizens to aid in its service, . . . and this right cannot be made to depend upon the pleasure of a State over whose territory they must pass to

reach the point where these services must be rendered."); *see also id.* at 44 ("[I]f the government has these rights on her own account, the citizen also has correlative rights. He has the right to . . . seek its protection, . . . a right to free access . . ., and this right is in its nature independent of the will of any State over whose soil he must pass in the exercise of it."); *see also Edwards*, 314 U.S. at 179 (Douglas, J., concurring) (there was "not a shred of evidence in the record of the *Crandall* case that the persons there involved were en route on any such mission [to petition their government]," arguing that it "was merely an illustration of the damage and havoc which would ensue if the States had the power to prevent the free movement of citizens from one State to another.").

This Court understandably struggled with the limited guidance on the *Bellotti* footnote and when constitutional rights are withheld from nonprofits. Order Mot. Dismiss at 60–61, ECF No. 48. However, the right to travel is unique among constitutional rights in that it has so many sources for its existence within the Constitution. *See supra* § A.2. Not all the sources have allowed corporations to assert the rights, but this should not "bar [a corporate] plaintiff from premising a right-to-travel challenge on another constitutional provision, such as the Commerce or Equal Protection Clauses." Mary Lafrance, *Constitutional Implications of Acquisition-Value Real Property Taxation: Assessing the Burdens on Travel and Commerce*, 1994 Utah L. Rev. 1027, 1046 n. 104 (1994) (citing *Zobel*, 457 U.S. at 73–74 & n.3).

But the U.S. Supreme Court has never said that the right to travel belongs only to individuals. And corporations, including nonprofit organizations like Yellowhammer Fund, have long been able to vindicate their rights under the other constitutional sources from which the right to travel originates. *See Pembina Consol. Silver Mining & Milling Co. v. Com. of Pennsylvania*, 125 U.S. 181, 189 (1888) ("[T]here is no doubt that a private corporation is included" under the designation of "person" in the Equal Protection Clause); *Grosjean v. Am. Press Co.*, 297 U.S. 233, 244 (1936) ("[A] corporation is a 'person' within the meaning of the equal protection and due process of law clauses" of the Fourteenth Amendment.); *Kassel v. Consol. Freightways Corp. of Delaware*, 450 U.S. 662, 669 (1981) (entertaining a trucking company's Commerce Clause challenge to a state law that burdened interstate commerce).

Additionally, entities enjoy numerous other constitutional rights. For example, the Constitution protects corporate speech, even though corporations themselves cannot physically speak in the way that individuals can. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 346 (2010) ("[T]he Government cannot restrict political speech based on the speaker's corporate identity."). The same is true for Yellowhammer Fund's right to travel—its desired travel and travel

assistance is protected, even though the nonprofit entity cannot physically travel itself.[13]

In sum, this Court does not need to decide on this issue because the relief is co-extensive with Yellowhammer Fund's third-party standing relief, but there are strong arguments that Yellowhammer Fund may also bring this claim on its own behalf.

### B.    Defendant's Threatened Prosecutions Are First Amendment Violations.

Defendant's threatened prosecution of Plaintiff violates the First Amendment. "[T]he First Amendment prohibits government officials from relying on the 'threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression' of disfavored speech." *Nat'l Rifle Ass'n of Am. v. Vullo*, No. 22-842, 2024 WL 2751216, at *7 (2024) (U.S. May 30, 2024) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas,

---

[13] In rejecting Defendant's argument on corporate criminal liability, this Court stated: "[E]nforcement against the plaintiffs' staff is the functional equivalent of enforcement against the organizations themselves, considering that the Attorney General's stated objective is to target the organizations." Order Mot. Dismiss at 28, ECF No. 48. The same rationale can apply to Yellowhammer Fund's right to travel. The Attorney General's stated objective is to target organizations with the unconstitutional purpose of impeding lawful travel, and enforcement against Plaintiff's staff is the functional equivalent of enforcement against Yellowhammer Fund itself.

its subject matter, or its content." *Police Dep't of Chic. v. Mosley*, 408 U.S. 92, 95 (1972) (addressing an ordinance that determined which picketing was permissible based on subject matter); *see also Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002) (same) (quoting *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 65 (1983)). On their face, Defendant's threats blatantly target expression and association because of the messages they convey and the perspectives they embrace. As further explained below, Plaintiff is entitled to summary judgment on its First Amendment claims because Defendant impermissibly seeks to criminalize speech, conduct, and association based on content and viewpoint, and Defendant cannot satisfy strict scrutiny.

### 1. Defendant's Threats are Presumptively Unconstitutional Because They Are Content- and Viewpoint-Based Restrictions on Speech.

The First Amendment "bars the government from dictating what we see or read or speak or hear." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002). It protects the right of all people to make their own decisions about "the ideas and beliefs deserving of expression, consideration, and adherence," *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994), even when those ideas and beliefs are unpopular. *See, e.g.*, *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312 (2023).

### a.   Plaintiff Engages in Both Speech and Expressive Conduct to Support People in Need.

Although the First Amendment uses the term "speech," constitutional protection "does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). In addition to speech, the First Amendment also protects conduct of an "expressive nature." *Id.*; *see also Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (hereinafter "*FLFNB*") ("The constitutional protection is afforded to 'speech,' and acts that qualify as signs with expressive meaning qualify as speech within the meaning of the Constitution.") (quoting Cass R. Sunstein, *Democracy and the Problem of Free Speech* 181 (1993).

As a matter of law, Defendant's threats are infringing on Plaintiff's right to engage in pure speech related to lawful out-of-state abortion care. There can be no genuine dispute that Plaintiff's abortion fund wishes to provide information to pregnant Alabamians about lawful out-of-state abortion care, including referrals, guidance, and moral support. *See, e.g.*, Fountain Decl. ¶ 15; McLain Decl. ¶¶ 7, 29. This type of communication clearly constitutes "pure speech" that receives First Amendment protection. *See 303 Creative LLC*, 143 S. Ct. at 2312 ("All manner of speech—from 'pictures, films, paintings, drawings, and engravings,' to 'oral utterance and the printed word'—qualify for the First Amendment's protections." (quoting *Kaplan v. California*, 413 U.S. 115, 119–20 (1973)).

Defendant's threats also prevent Plaintiff from engaging in protected expressive conduct. The Supreme Court has announced a two-part test to determine whether conduct is protected by the First Amendment: (1) whether the speaker has "[a]n intent to convey a particularized message," and (2) whether "in the surrounding circumstances the likelihood [i]s great that the message would be understood by those who viewed it." *Spence v. State of Wash.*, 418 U.S. 405, 410–11 (1974). But "in determining whether conduct is expressive, [courts] ask whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (emphasis in original); *see also Stewart v. Baldwin Cty. Bd. of Educ.*, 908 F.2d 1499, 1501, 1505 (11th Cir. 1990) (a school employee's "quiet and nondisruptive" early departure from a mandatory meeting was expressive).

First, as a helper supporting people seeking healthcare, Plaintiff is engaged in expressive conduct. *See, e.g.*, *FLFNB*, 901 F.3d at 1240–41 (explaining that providing access to a necessary human right is a form of expressive conduct). Plaintiff intends to convey a message of solidarity, love, and support when it helps pregnant Alabamians access lawful out-of-state abortion care. *See, e.g.*, Fountain Decl. ¶¶ 10–13, 18–20; McLain Decl. ¶¶ 11–14, 29–30, 32. Plaintiff is a mission-driven organization that envisions a world where all people can access reproductive

healthcare, regardless of their income level or place of residence. *See* Fountain Decl. ¶ 6. There can be no dispute that Plaintiff's abortion fund seeks to advance the organization's mission and message by helping community members afford abortion care and reducing barriers that limit access to care. *See* Fountain Decl. ¶ 11–12.

Second, the context and circumstances surrounding abortion care in Alabama demonstrate that Plaintiff's desired activities constitute expressive conduct. *See, e.g.*, White Decl. ¶¶ 16–20, 25–26. *FLFNB* is particularly instructive. In that case, the Eleventh Circuit held that an organization that hosted food-sharing events in a public space was engaged in expressive conduct. 901 F.3d at 1240–41. The court's decision emphasized that "the context in which a symbol is used for purposes of expression is important, for the context may give meaning to the symbol." *Id.* at 1241 (quoting *Spence*, 418 U.S. at 410). By distributing food in a public park, sharing information and literature, and hosting public events, FLFNB intentionally communicated a message "that all persons are equal, regardless of socio-economic status, and that everyone should have access to food as a human right." *Id.* at 1240–41. The court observed that "the treatment of the City's homeless population is an issue of concern in the community," *id.* at 1242, which added essential context for a reasonable observer to understand that "FLFNB's food sharing sought to convey some message." *Id.* at 1243.

Like FLFNB, Plaintiff's abortion fund helps members of the community access a critical human need: healthcare. Just as food and lodging for the homeless population was an issue of public concern in *FLFNB*, access to reproductive healthcare in Alabama is unquestionably a topic of rapid change and significance to the community. *See, e.g.*, White Decl. ¶¶ 16, 20, 25–27. The context illustrates that abortion care is inaccessible for many pregnant Alabamians due to financial limitations, political restrictions, and geography. *See id.* ¶¶ 20–27. One can reasonably conclude that navigating this landscape without assistance (information, logistic assistance, money, transportation, etc.) would be incredibly difficult and for some, impossible. *See supra* at 28 n. 12.

Against this backdrop, Plaintiff necessarily communicates an important message about the injustice of barriers to reproductive healthcare. *See, e.g.*, Fountain Decl. ¶ 18. Plaintiff seeks to provide funding and logistical support for lawful out-of-state abortions during a critical moment in the struggle for reproductive justice. *See, e.g.*, *Johnson*, 491 U.S. at 406 (holding that timing of flag burning, which "coincided with the convening of the Republican Party," contributed to conclusion that it was expressive conduct); *Spence*, 418 U.S. at 410 (concluding that displaying an American flag with peace symbols affixed to it was expressive when it was "roughly simultaneous with and concededly triggered by the Cambodian incursion and the Kent State tragedy, also issues of great public moment"); White Decl. ¶¶ 16,

20–24. Further, as a previous funder of abortion, Plaintiff seeks to contribute financially to pregnant Alabamians' out-of-state abortions and provide logistical support for travel, childcare, lodging, and other related needs. *See* McLain Decl. ¶¶ 32–33. Courts have repeatedly recognized that donating money to a political, charitable, or social cause qualifies as expressive conduct. *See, e.g.*, *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 191 (2014) ("[T]he right to participate in democracy through political contributions is protected by the First Amendment."); *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1254-55 (11th Cir. 2021) ("[W]e have no problem finding that Amazon engages in expressive conduct when it decides which charities to support through the AmazonSmile program."). The expressive nature of Plaintiff's conduct does not depend on the resolution of facts—it is self-evident from the context surrounding abortion access in Alabama and the historical role of helpers in the struggle for civil rights. *See, e.g.*, White Decl. ¶¶ 16, 20–24; *see also FLFNB*, 901 F.3d at 1240–42; *Holloman*, 370 F.3d at 1270 (Conduct is expressive if a "reasonable person would interpret it as *some* sort of message").

For these reasons, Plaintiff's activities constitute pure speech and expressive conduct and are therefore protected by the First Amendment.

### b. Defendant's Threatened Prosecutions Are Content- and Viewpoint-Based Because They Exclusively Target Speech and Expressive Conduct About Lawful, Out-of-State Abortion Care.

By threatening to prosecute Plaintiff for supporting lawful abortion care, Defendant targets Plaintiff's speech based on its content and viewpoint. Content-based laws "target speech based on its communicative content," while viewpoint-based laws prohibit speech based on the "particular views taken by speakers on a subject." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1125–26 (11th Cir. 2022). "Content-based laws . . . are presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

"Viewpoint discrimination is . . . an egregious form of content discrimination." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). "The Supreme Court has reiterated time and again—and increasingly of late—the 'bedrock First Amendment principle' that '[s]peech may not be banned on the ground that it expresses ideas that offend." *Speech First, Inc.*, 32 F.4th at 1126 (quoting *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017)).[14]

---

[14] This Court's order on Defendant's motion to dismiss did not address whether the Attorney General's threatened enforcement of Alabama law would constitute viewpoint discrimination because the Attorney General conceded that the statutes at issue discriminate against speech based on content. Order Mot. Dismiss at 72 n.18, ECF No. 48. The Court stated that, "The question the court must confront is whether *Giboney*'s exception to strict scrutiny for content-based restrictions on speech can accommodate these novel circumstances." *Id.* at 76. Because *Giboney*'s exception for speech integral to criminal conduct does not apply here, strict scrutiny

Here, there can be no dispute that Defendant's threats prohibit speech based on the message it communicates and the goals it advances: Defendant concedes that his threatened enforcement discriminates on the basis of content and viewpoint. Def.'s Mot. Dismiss at 26, ECF No. 28. Defendant's threats specifically target abortion helpers that "promot[e] themselves" as funders of out-of-state abortions and use funds to "facilitate" out-of-state abortions. *See* Suelzle Decl. ¶ 6. To determine if a speaker violated these restrictions, Defendant would have to examine the content of Plaintiff's message to pregnant Alabamians, abortion supporters, volunteers, and members of the public to decide whether it was promoting and facilitating out-of-state abortions. *See Reed*, 576 U.S. at 164 (explaining that a restriction is content-based if its enforcement depends "entirely on the communicative content" of the speech); *see also Otto v. City of Boca Raton*, 981 F.3d 854, 863 (11th Cir. 2020) (holding that a ban on conversion therapy was content-based because it prohibited certain therapy based on "the content of the words used in that therapy"); *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1307–08 (11th Cir. 2017) (holding that law was content-based because it restricted doctors from asking patients about

---

must apply. As such, Plaintiff focuses its argument on content-based discrimination but maintains that Defendant's threatened enforcement also discriminates on the basis of viewpoint.

firearm ownership but did not apply to other types of doctor-patient communications).[15]

On their face, Defendant's threats prevent Plaintiff and other abortion helpers from speaking about a specific issue—lawful abortion care in other states—without disturbing their ability to speak about a host of other issues and viewpoints. As a result, Defendant's threats are both viewpoint- and content-based.

### 2. Defendant's Threatened Prosecutions Violate Plaintiff's Right to Associate with Like-Minded Abortion Funds, Supporters, and Pregnant Alabamians.

Defendant's threatened prosecutions also violate Plaintiff's First Amendment right to expressive association. The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding

---

[15] Again, Plaintiff maintains that Defendant's threats also prohibit speech based on the viewpoint it advances. By threatening to prosecute people who support and fund lawful out-of-state abortions, Defendant targets speech that expresses the view that abortion care should be accessible. Like the restriction on conversion therapy in *Otto*, Defendant's threats seek to "codify a particular viewpoint"—that abortion care should be inaccessible to pregnant Alabamians—and punish abortion helpers like Plaintiff for "advancing any other perspective." 981 F.3d at 864 (holding that restriction on conversion therapy for out-of-state abortion care were content- and viewpoint-based). Further, Defendant's threats silence Plaintiff and other abortion helpers *only* when they speak in support of lawful out-of-state abortion. *See Planned Parenthood Greater N.W. v. Labrador*, No. 23-cv-001420, 2023 WL 4864962, at *22 (D. Idaho July 31, 2023) (holding that threats to prosecute healthcare providers for referring people for out-of-state abortion care were content- and viewpoint-based restrictions because they silence healthcare providers "on a single topic—abortion," while permitting them to "provide information and referrals about out-of-state resources like anti-abortion counseling centers or prenatal care"). But as the Court indicated in its order and opinion on the motion to dismiss, it need only find that the threatened enforcement is a content-based restriction on speech and expression to apply strict scrutiny.

right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Indeed, "[t]he Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties." *Id.* at 618. Restrictions on the right to associate can be sustained only if they satisfy strict scrutiny. *Id.* at 623 (Infringements on expressive association must "serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

Laws unconstitutionally restrict the right to associate when they punish individuals based on the company they keep or the goals and values they share. In *Elrod v. Burns*, the Supreme Court held that it was unconstitutional for a sheriff's office to deny or grant public benefits, including public employment, on the basis of an individual's affiliation with a political party. 427 U.S. 347, 357–59 (1976). The Court explained that threatening dismissal for an individual's failure to support a specific political party "unquestionably inhibits protected belief and association," penalizing people for choosing to associate with a different political party or support another party's goals. *Id.* at 359. In striking down the political patronage system in *Elrod*, the Court recognized that the right to associate forbids the government from forcing people to associate *and* requires the government to permit individuals to

choose their own associations and advance favored goals together. *Id.* at 357; *see also NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958) ("Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association.").

On their face, Defendant's threats prevent Plaintiff and other abortion helpers from associating with pregnant Alabamians for the purpose of helping them travel to other states for lawful abortion care. *See* Suelzle Decl. ¶ 6. Like all helpers, Plaintiff associates with others to help them access their rights. *See, e.g.*, McLain Decl. ¶¶ 7, 24, 29; Fountain Decl. ¶¶ 18, 26. By threatening to prosecute helpers like Plaintiff for holding themselves out as funders of out-of-state abortion, Defendant's threats impede Plaintiff's ability to advance its goals in collaboration with others— including pregnant Alabamians, other abortion funds, and abortion advocacy groups. *See, e.g.*, *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 600-01, 616 (2021) (State-required "disclosure [of charitable organizations' donors] can chill association 'even if there is no disclosure to the general public.") (internal quotation omitted); *see also Healy v. James*, 408 U.S. 169, 181 (1972) (holding that a college's refusal to officially recognize a student political organization created an "impediment to free association" that limited "the organization's ability to participate in the intellectual give and take of campus debate").

There can be no dispute that Defendant's threatened prosecutions chill expressive association by forbidding collaboration and support in favor of lawful out-of-state abortion care. Thus, Defendant's threatened prosecutions violate Plaintiff's right to associate under the First Amendment.

### 3.  Defendant's Threatened Enforcement Cannot Survive Strict Scrutiny.

Because Defendant's threats restrict Plaintiff's speech, expressive conduct, and association based on their message and viewpoint, they can be justified only by "compelling state interests, unrelated to the suppression of ideas." *Roberts*, 468 U.S. at 623; *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (holding that state action targeting expressive conduct because of its message is subject to strict scrutiny). In *Otto*, the Eleventh Circuit suggested, but did not conclusively determine, that viewpoint-based speech restrictions are per se unconstitutional. 981 F.3d at 864; *see also Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) ("[R]estrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited."). There is no justification for Defendant's threatened prosecutions that can meet this demanding standard.

First, as a matter of law, the State has no interest—much less a compelling one—in punishing a person for supporting or associating to advance *lawful* out-of-state conduct. *See, e.g.*, *Nielsen*, 212 U.S. at 321 (holding that a state cannot

prosecute someone "for doing within the territorial limits of [another state] an act which that [separate] state had specifically authorized him to do"); *see also supra* at 12–14. Not only is abortion lawful in most states, "[s]ome States regard the freedom to terminate a pregnancy as so sacred that the liberty interest is protected in their constitutions."[16] Order Mot. Dismiss at 83, ECF No. 48. Although courts have

---

[16] *See also* Cal. Const. Art. I, § 1.1 ("The state shall not deny or interfere with an individual's reproductive freedom in their most intimate decisions, which includes their fundamental right to choose to have an abortion and their fundamental right to choose or refuse contraceptives"); Ohio Const. Art. I, § 22 (""Every individual has a right to make and carry out one's own reproductive decisions, including but not limited to decisions on: contraception; fertility treatment; continuing one's own pregnancy; miscarriage care; and abortion."); Vt. Const. Ch. 1, Art. 22 ("Personal reproductive liberty. That an individual's right to personal reproductive autonomy is central to the liberty and dignity to determine one's own life course and shall not be denied or infringed unless justified by a compelling State interest achieved by the least restrictive means."); *Valley Hosp. Ass'n, Inc. v. Mat-Su Coal. for Choice*, 948 P.2d 963, 969 (Alaska 1997) ("[R]eproductive rights are fundamental, and . . . they are encompassed within the right to privacy expressed in article I, section 22 of the Alaska Constitution."); *Hope Clinic for Women, Ltd. v. Flores*, 991 N.E.2d 745, 760 (Ill. 2013) (recognizing a right to abortion under state due process clause); *Hodes & Nauser v. Schmidt*, 440 P.3d 461, 466 (Kan. 2019) (holding that Section 1 of the Kansas Constitution Bill of Rights includes "a woman's right to make decisions about her body, including the decision whether the continue her pregnancy"); *Moe v. Sec'y of Admin.* & Fin., 417 N.E.2d 387, 399 (Mass. 1981) (discussing how the "constitutional guarantee of due process has sometimes impelled" the court to go further than the United States Supreme Court regarding abortion); *Women of State of Minn. by Doe v. Gomez*, 542 N.W.2d 17, 27 (Minn. 1995) ("[T]he right of privacy under the Minnesota Constitution encompasses a woman's right to decide to terminate her pregnancy."); *Planned Parenthood of Montana v. State*, 515 P.3d 301, 307–08 (Mont. 2022) (reaffirming that Montana's constitutional right to privacy guarantees the right of each individual to make medical judgments free from government interference and the right to procreative autonomy); *Right to Choose v. Byrne*, 450 A.2d 925, 934 (N.J. 1982) ("The right to choose whether to have an abortion, however, is a fundamental right of all pregnant women . . . ."). There are few examples of a country more divided over an issue. Prior to the Civil War, abortion provisions were engrained in the constitutions of at least fourteen states and yet a portion of the country went to war to uphold slavery. Cal. Const. art. I, § 18 (1849); Ill. Const. art. XIII, § 16 (1848); Ind. Const. art. XI, § 7 (1816); Iowa Const. art. II, § 23 (1846); Kan. Const. Bill of Rts. § 6 (1861); Md. Const. Decl. of Rts., art. 24 (1864); Mich. Const. art. XI (1835); Minn. Const. art. I, § 2 (1857); Nev. Const. art. I, § 17 (1864); Ohio Const. art. VIII, § 2 (1802); Or. Const. art. I, § 34 (1857); Vt. Const. ch. I, § 1 (1777); Wis. Const. art. I, § 2 (1848);

acknowledged that the crime of conspiracy inherently targets speech, the justifications for the constitutional exception permitting states to prosecute conspiracy evaporate when the speech does not further conduct that is criminal. *See Dennis v. United States*, 341 U.S. 494, 575 (U.S. 1951) (Jackson, J., concurring) (explaining that the State may not "punish conspiracy to advocate something, the doing of which it may not punish").

Second, Defendant has no "interest in regulating" what its residents "may hear or read about" lawful, out-of-state abortion. *See Bigelow*, 421 U.S. at 827-28. Alabama has no interest in "shielding its citizens from information about activities outside [its] borders." *Id.*. The First Amendment does not permit the government to "calibrate the propriety and utility of speech on certain topics." *Otto*, 981 F.3d at 868. Moreover, even if Defendant identifies a compelling interest, he must prove that his threats "further[] a compelling governmental interest and [are] narrowly tailored to that end." *Reed*, 576 U.S. at 171. Defendant's disagreement with other state's abortion laws does not justify his threats to prosecute all speech and association related to funding and supporting out-of-state abortions. Even if these

---

see also *Massachusetts Constitution and the Abolition of Slavery*, Mass.gov (last visited June 11, 2024), https://www.mass.gov/guides/massachusetts-constitution-and-the-abolition-of-slavery#-the-quock-walker-case- (discussing a series of court cases, known collectively as the Quock Walker case, from 1781 to 1783 that determined slavery was incompatible with the Massachusetts Constitution prior to statehood).

were compelling interests, Defendant's threatened prosecutions go far beyond expressing disagreement with Plaintiff's activities: instead, they attempt to "shield[]" Alabamians "from information about activities outside [Alabama's] borders, activities that [Alabama's] police powers do not reach." *Bigelow*, 421 U.S. at 827–28; *see also Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 (1990) (explaining that the First Amendment prohibits the government from forcing people to "conform their beliefs and associations to some state-selected orthodoxy").

For these reasons, Defendant's threatened prosecutions cannot survive strict scrutiny, and Plaintiff is entitled to summary judgment on its free expression and association claims.

### C.   Applying the Alabama Abortion Ban to Criminalize Abortion in a State Where it Is Lawful Would Violate the Due Process Clause and Foundational Principles of Sovereignty and Comity.

Alabama's general conspiracy statute requires an intent to violate an Alabama *criminal offense*. Ala. Code § 13A-4-3(a). Accessory liability involves holding a person accountable for an Alabama *criminal offense*, if that person assists in the commission of that offense. Ala. Code § 13A-2-23. Therefore, it is proper to ask one additional question: can Alabama apply its own abortion ban to criminalize out-of-state abortions for its residents? If Alabama cannot, then Defendant lacks authority to prosecute Plaintiff for agreeing with others to facilitate travel for out-of-state abortions that are legal under the laws of the states where they occur. Similarly,

Defendant would lack the authority to prosecute people for paying for out-of-state, lawful abortion care and for aiding and abetting in such lawful acts. Because, as detailed below, the law is clear that Alabama has no power to project its Abortion Ban outside its borders and into other states, it necessarily follows that Alabama also lacks the power to use its existing criminal statutes (on conspiracy and aiding and abetting), to prosecute Plaintiff for agreeing to assist someone in doing something entirely legal in another jurisdiction.

### 1.   Due Process Does Not Allow Prosecutions of Lawful Conduct.

"To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *United States v. Goodwin*, 457 U.S. 368, 372 (1982) (internal citation omitted). "Within a decade after the Fourteenth Amendment's adoption in 1868, the Supreme Court began to read the territorial restrictions on state sovereignty into the definition of due process." Seth F. Kreimer, *Lines in the Sand: The Importance of Borders in American Federalism*, 150 U. Pa. L. Rev. 973, 979 (2002). Courts have long upheld the rule that a state cannot prosecute a person "for doing within the territorial limits of [another state] an act which that state had specially authorized him to do." *Nielsen v. Oregon*, 212 U.S. 315, 321 (1909). Acts that are "done within the territorial limits of [one state], under authority and license from that state . . . cannot be prosecuted and punished by [a different state]." *Id.* If Defendant cannot prosecute an Ohio-based provider for

providing a pregnant person from Alabama with lawful abortion care in Ohio, he should not be able to prosecute those who provide that pregnant person information or emotional, physical, or practical support to help them obtain that care. *Nat'l Rifle Ass'n of Am.*, 2024 WL 2751216, at *8 ("[A] government official cannot do indirectly what she is barred from doing directly."). Alabama cannot punish lawful out-of-state conduct occurring beyond the bounds of its jurisdiction, nor can it impose penalties "in order to deter conduct that is lawful in other jurisdictions." *BMW of N. America, Inc. v. Gore*, 517 U.S. 559, 573 (1996) (holding that lawful out-of-state conduct could not be considered by the court when awarding punitive damages in a state that prohibited that same conduct).

There are no facts that must be resolved to decide whether Alabama can apply its Abortion Ban extraterritorially—this is a purely legal inquiry. Here, Defendant cannot punish helpers for aiding or abetting or conspiring to do something that does not violate Alabama's Abortion Ban. If Defendant punishes abortions that are provided out-of-state under Alabama's Abortion Ban, including in jurisdictions where abortion is not only lawful but in some cases statutorily or constitutionally protected, this would constitute an unconstitutional extraterritorial application of Alabama's laws.

### 2. Defendant's Prosecution of Plaintiff Would Offend Principles of Comity and Sovereignty.

While at its heart, Plaintiff's claim is a Due Process Clause claim, it is also a claim about respecting the sovereignty of other states. The "original and historical understandings of the Constitution's structure and the principles of 'sovereignty and comity' it embraces" similarly cannot allow for such an outcome. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 (2023) (citing *BMW of North America, Inc.*, 517 U.S. at 572). In *National Pork Producers Council v. Ross*, the Court found that a state can require those who sell pork within California to follow certain production requirements. *Id.* at 364–66. In its holding, the Court reinforced the principles of "sovereignty and comity" within the Constitution. *Id.* at 376. Relatedly,

> [I]t would be impossible to permit the statutes of [a State] to operate beyond the jurisdiction of that State . . . without throwing down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends.

*New York Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914). It is an essential feature of American federalism that people can travel among the states and avail themselves of the laws of the state they are visiting. "The tradition of American federalism stands squarely against efforts by states to punish their citizens for conduct that is protected in the sister state where it occurs." Seth F. Kreimer, *The Law of Choice*

*and Choice of Law: Abortion, the Right to Travel, and Extraterritorial Regulation in American Federalism*, 67 N.Y.U. L. Rev. 451, 462 (1992). This is what makes the country a cohesive nation of states while respecting the sovereignty of each state.

Another "basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003). The majority in *Dobbs* reinforced this principle when returning the issue of the abortion to the states: "[T]he people of the various States may evaluate those interests differently." *Dobbs*, 142 S. Ct. at 2257. Indeed, "the federal system, as it has been understood since the founding of our republic, demands that the moral commitments of each state be tempered by a regard for the commitments of its neighbors; the moral sovereignty of each state ends at its borders." Kreimer, *The Law of Choice*, 67 N.Y.U. L. Rev. at 519.

Thus, Alabama may not impose its policy preferences on other states that have chosen to allow abortion within their borders. "Alabama does not have the right to insist that its view of" abortion be enforced "with respect to conduct occurring entirely in another state, particularly where Alabama's policy choices conflict with those of the other state." *DJR Assocs. LLC v. Hammonds*, 241 F. Supp. 3d 1208, 1233 (N.D. Ala. 2017); *see also Nielsen*, 212 U.S. at 321 ("[O]ne state cannot

enforce its opinion against that of the other; at least, as to an act done within the limits of that other state.").

It is axiomatic that each state's right to set policy preferences and exercise its police powers extends only as far as its own jurisdiction. A "State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State." *Bigelow*, 421 U.S. at 824. A state cannot bar the dissemination of information about an activity that is legal in another state, even "under the guise of exercising internal police powers." *Id.*. The same is true here: Plaintiff is only seeking to support legal abortions taking place in another state, which are obviously "activities that [Alabama's] police powers do not reach." *Id.* at 828.

In sum, the only way that Defendant could use Alabama Code §§ 13A-4-3, 13A-4-4, and 13A-2-23, or any other Alabama criminal law, to prosecute helpers supporting lawful, out-of-state abortions is if he were to apply Alabama's Abortion Ban to lawful extraterritorial conduct. The Due Process Clause will not tolerate such an egregious overreach of sovereign power. Accordingly, to the extent the Attorney General's position rests on such a construction or application of the Alabama Ban, Plaintiff is entitled to summary judgment of its due process claim.

### D.  Plaintiff Yellowhammer Fund Meets the Standard for Declaratory Judgment and Permanent Injunction for Each Claim.

Plaintiff has met the requirements for the relief it seeks. The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Disputes must be "definite and concrete, touching the legal relations of parties having adverse legal interests"; "real and substantial"; and seek "relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007); *see also Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239–40 (1937) (explaining that "cases of actual controversy" in the Act means the type of "cases" and "controversies" that are justiciable under Article III).

An actual arrest, prosecution, or other enforcement action is not a prerequisite for a case or controversy under Article III when a plaintiff is subject to a threat of enforcement, so it similarly follows that it is not a pre-requisite for a declaratory judgment. *See Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1164 (11th Cir. 2008) (allowing nonprofits to bring pre-enforcement challenge to voter registration restrictions); *Susan B. Anthony List*, 573 U.S. at 161 (holding that nonprofits faced a credible threat of

enforcement from a statute that criminalized making false statements in the course of political campaigns). The Court should issue a declaratory judgment in Plaintiff's favor.

Plaintiff is also entitled to a permanent injunction because it has shown that: (1) it has established the violation of the rights asserted in its complaint; (2) there is no adequate remedy at law for the violation of these rights; and (3) irreparable harm will result if the court does not order injunctive relief. *See Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1128 (11th Cir. 2005). The inadequate remedy element is "inextricably intertwined with the irreparable injury element," because an inadequate remedy causes irreparable harm. *Clark Const. Co., Inc. v. Pena*, 930 F. Supp. 1470, 1490 (M.D. Ala. 1996).

Here, Plaintiff is experiencing an ongoing infringement of its First Amendment rights to speech, expressive conduct, and association. Plaintiff has established that it would resume providing funding and logistical support to pregnant Alabamians seeking out-of-state abortion care if it could be assured that it would not face prosecution for doing so. *See, e.g.*, McLain Decl. ¶ 33; Fountain Decl. ¶¶ 24, 29–30. It cannot be assured of this because of Defendant's threats of prosecution. *See, e.g.*, Suelzle Decl. ¶ 6. Every moment that Plaintiff is prohibited from speaking in accordance with its values, beliefs, and goals constitutes ongoing irreparable injury. *See Elrod v. Burns*, 427 U.S. at 373 ("The loss of First Amendment freedoms,

for even minimal periods of time, unquestionably constitutes irreparable injury."). Further, as the threats of enforcement of the Abortion Ban through conspiracy and aiding and abetting laws remain, Plaintiff's right to travel and due process rights are impacted, and its clients' rights to travel are impacted in the myriad ways shown above. *See supra* at § A. Moreover, for those clients, it is well-established that delays in abortion care are an irreparable harm. *See, e.g.*, *Planned Parenthood Se. v. Bentley*, 951 F. Supp. 2d 1280, 1289 (M.D. Ala. 2013). Plaintiff has therefore shown  that it has an actual controversy under 28 U.S.C. § 2201(a) and that Defendant's threats of prosecution are a violation of constitutional law, for which Plaintiff will suffer irreparable harm because there is no adequate remedy at law.

## CONCLUSION

For the reasons set forth above, this Court should grant Plaintiff's motion for summary judgment in its entirety.

Dated: June 17, 2024                              Respectfully submitted,

                                                  */s/ Jamila Johnson*
                                                  Jamila Johnson*
                                                  Allison Zimmer*
                                                  THE LAWYERING PROJECT
                                                  3157 Gentilly Blvd. #2231
                                                  New Orleans, LA 70122
                                                  (347) 706-4981 (JJ)
                                                  (347) 515-6074 (AZ)
                                                  jjohnson@lawyeringproject.org
                                                  azimmer@lawyeringproject.org

Paige Suelzle*
THE LAWYERING PROJECT
158 SW 148th Street #1198
Burien (Seattle), WA 98166
(347) 515-6073
psuelzle@lawyeringproject.org

Juanluis Rodriguez*
The Lawyering Project
41 Schermerhorn St., No. 1056
Brooklyn, NY 11201
(646) 490-1080
prodriguez@lawyeringproject.org

Latasha McCrary, ASB-935-L75M
Southern Poverty Law Center
400 Washington Ave.
Montgomery, AL 36104
(334) 604-5018
latasha.mccrary@splcenter.org
Krista Dolan*
SOUTHERN POVERTY LAW CENTER
PO Box 10788
Tallahassee, FL 32302
(850) 521-3000
Krista.dolan@splcenter.org

*Admitted *pro hac vice*

## **CERTIFICATE OF SERVICE**

I, Jamila Johnson, do hereby Certify that a true and correct copy of the foregoing has been furnished by ECF electronic service, on this 17th day of June 2024, to counsel of record for Defendant Steve Marshall.

Date: June 17, 2024                    */s/ Jamila Johnson*
                                       Jamila Johnson