# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| YELLOWHAMMER FUND, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 2:23-cv-00450-MHT-KFP |
| STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama, | ) ) ) | |
| | ) | |
| *Defendant*. | ) | |

| | | |
|---|---|---|
| WEST ALABAMA WOMEN'S CENTER, *et al.*, | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2:23-cv-00451-MHT-KFP |
| | ) | |
| STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama, | ) ) ) | |
| | ) | |
| *Defendant*. | ) | |

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendant Attorney General Steve Marshall moves for summary judgment on all remaining claims left in this consolidated action.

## STATUTORY BACKGROUND AND MATERIAL FACTS

**A.**    **Legislative Findings On "Unborn Children" And "Abortion"**

In Alabama, "[t]he dignity and value of life, especially the lives of children, born or unborn, has been and continues to be a public policy and often sacred concern of the highest order for the people of this state." ALA. CODE § 26-23F-2(a)(4). On November 6, 2018, the Alabama Constitution was amended to declare and affirm "the public policy of the state to recognize and support the sanctity of unborn life and the rights of unborn children." § 26-23H-2(b). Alabama law establishes that "medical science has increasingly recognized the humanity of the unborn child[,]" at all stages of development. *Id*. § 26-23H-2(e).

The Alabama Legislature has made specific findings on the effects of abortion on maternal health and safety. "The medical, emotional, and psychological consequences of an abortion are serious and can be lasting or life threatening." *Id*. § 26-23A-2(a)(3); "abortion or reproductive health centers have often failed to meet acceptable standards of medical care[,]" *id*. § 26-23E-2(8), and often treat patients "in a manner inconsistent with a traditional physician/patient relationship[,]" *id.* (2). "Abortion is . . . most often engaged in by stand-alone clinics without many of the safeguards found in a traditional physician/patient relationship or other medical care setting." *Id.* (6). "Most women do not return to the [abortion] facility for post-surgical care." *Id*. § 26-23A-2(a)(2).

**B.    The Alabama Human Life Protection Act**

In 2019, Alabama passed The Alabama Human Life Protection Act. ALA. CODE § 26–23H–1, *et seq*. The law makes it "unlawful for any person to intentionally perform or attempt to perform an abortion except" to address certain health risks to the mother or unborn child. ALA. CODE § 26-23H-4; *see also id.* § 26-23H-3(1). The statute exempts from liability women on whom abortions are performed. *Id.* § 26-23H-5. "An abortion performed in violation of this chapter is a Class A felony," and "[a]n attempted abortion performed in violation of this chapter is a Class C felony." *Id.* § 26-23H-6.

After the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), the Court found the Human Life Protection Act fully enforceable. *Robinson v. Marshall*, No. 2:19-cv-365-MHT, 2022 WL 2314402 (M.D. Ala. June 24, 2022).

**C.    Alabama Conspiracy Law**

Under Alabama law:

(a) A person is guilty of criminal conspiracy if, with the intent that conduct constituting an offense be performed, he or she agrees with one or more persons to engage in or cause the performance of the conduct, and any one or more of the persons does an overt act to effect an objective of the agreement.

(b) If a person knows or should know that one with whom he or she agrees has in turn agreed or will agree with another to effect the same criminal objective, he or she shall be deemed to have agreed with the other person, whether or not he or she knows the other's identity.

ALA. CODE § 13A-4-3. "A conspirator is not liable under this section if, had the criminal conduct contemplated by the conspiracy actually been performed, he or she would be immune from liability under the law defining the offense." *Id.* § 13A-4-3(e). But it is no "defense to a prosecution for criminal conspiracy" that "[t]he person, or persons, with whom defendant is alleged to have conspired has been acquitted, has not been prosecuted or convicted . . . or is immune from prosecution." *Id.* § 13A-4-3(d).

Finally, "[a] conspiracy formed in this state to do an act beyond the state, which, if done in this state, would be a criminal offense, is indictable and punishable in this state in all respects as if such conspiracy had been to do such act in this state." *Id.* § 13A-4-4.

### D.    Procedural Posture

On July 31, 2023, West Alabama Women's Center, Yashica Robinson, and Alabama Women's Center ("West Alabama Plaintiffs") and Yellowhammer Fund filed lawsuits in the Middle District of Alabama alleging that their constitutional rights to free speech, expression, association, travel, due process, and to be free from extraterritorial application of State law would be violated by the application of general Alabama criminal laws (namely Ala. Code §§ 13A-2-23, 13A-4-1, 13A-4-3, and 13A-4-4) to punish Plaintiffs for helping others obtain out-of-state abortions. *See* doc. 1 (Yellowhammer Fund Complaint); doc. 23 (West Alabama Plaintiffs'

Complaint). On August 28, 2023, Defendant moved to dismiss Plaintiffs' complaints arguing Plaintiffs lacked standing and had failed to state a claim. Doc. 28.

On May 6, 2024, the Court granted Defendant's motion to dismiss as to Yellowhammer's overbreadth claim and as to the West Alabama Plaintiffs' "Fair Notice" due process claim. Doc. 48 at 98. The Court denied Defendant's motion to dismiss as to Plaintiffs' right-to-travel claim, freedom-of-speech claim, freedom-of-association claim, and extraterritoriality claim. *Id*. On May 20, 2024, Defendant answered the separate complaints. Doc. 56 (Answer to Yellowhammer Fund's Complaint); doc. 57 (Answer to West Alabama Plaintiffs' Complaint).

### E.      Statement of Undisputed Material Facts

#### i.      *Defendant's Public Statements*

On June 24, 2022, the U.S. Supreme Court issued the *Dobbs* decision. Doc. 1 ¶ 11. On August 11, 2022, Defendant publicly discussed the possibility of enforcing the Human Life Protection Act and other existing criminal statutes. Docs. 1 & 56 ¶ 20. Defendant stated that the Alabama Attorney General's Office would look into groups that potentially violated Alabama law, specifically referencing the conspiracy provisions of Alabama law and generally referencing groups in Alabama that had "talked about" facilitating abortions. Docs. 1 & 56 ¶¶ 20–21, 24.

In his public remarks, Defendant stated that he would "look at closely" whether those in Alabama who "facilitate" out-of-state abortions have conspired to

commit a crime. Docs. 1 & 56 ¶ 29. Defendant has not rescinded his intent to fully enforce Alabama law. Docs. 1 & 56 ¶ 27.

     *ii.   Plaintiffs' Activities*

1.    According to its complaint, "Plaintiff Yellowhammer Fund is a nonprofit abortion advocacy and reproductive justice organization" that serves residents in Alabama. Doc. 1 ¶ 7. It is registered as a 501(c)(3) in Tuscaloosa, Alabama. *Id.*

2.    "Speaking about abortion and providing funding to help people access abortion care are core parts of Yellowhammer Fund's mission." Doc. 1 ¶ 36. In furtherance of this mission, Yellowhammer Fund aims to remove barriers to abortion. Doc. 1 ¶ 38.

3.    "Before *Dobbs*, Yellowhammer Fund operated an abortion fund, which provided funding and practical support to Alabamians seeking abortion care both in and outside of Alabama." Doc. 1 ¶ 40. "Yellowhammer Fund worked directly with abortion clinics and other abortion care providers, who referred clients to the fund for financial and practical support." *Id.* "Yellowhammer Fund supported patients with other needs to help them access abortion care, including transportation, childcare arrangements, and lodging." *Id.*

4.    "The abortion fund's clients included residents of Alabama . . . as well as out-of-state residents who needed financial, transportation, and other assistance

to access abortion care within Alabama." *Id*. "The fund operated a helpline for patients to contact and ask for financial and logistical assistance." *Id*. "Most referrals came from abortion care providers in Alabama, who notified their patients about Yellowhammer Fund's services[.]" *Id*.

5.      "In the months leading up to Dobbs, . . . Yellowhammer fund began developing systems" to help pregnant women "travel out of Alabama" to obtain abortions. *Id*. ¶ 42. "[T]he organization anticipated that 100 percent of the Alabama residents it served would need support traveling to other states after *Dobbs*." *Id*.

6.      After the *Dobbs* decision was released and "a spokesperson in the Office of the Alabama Attorney General said the office was reviewing the [] conspiracy statute," Yellowhammer "stopped sharing information about lawful out-of-state abortion and stopped providing funds and logistical support" to help women obtain abortions. Doc. 1 ¶¶ 43–44.

7.      "If not for Defendant's" public statements, "Yellowhammer Fund would be operating the abortion fund and providing funding and practical support to pregnant Alabamians traveling to other states for abortion care where it remains legal. The organization would be sharing information and advertising the fund to make sure that Alabamians and clinics are aware of its services. Additionally, it would increase the capacity of its staff to provide transportation, including by directly transporting callers to their appointments in other states." *Id*. ¶ 46.

8.    Yellowhammer Fund "receives approximately five to ten calls a week from people who need abortion funding." *Id*. ¶ 47. "Funding abortions in other states and helping Alabamians access care remain central to Yellowhammer Fund's mission and core beliefs, and it would be acting on these beliefs if not for Defendant's" public statements. *Id*. ¶ 48.

9.    Plaintiff West Alabama Women's Center (WAWC) performed abortions "in Tuscaloosa, Alabama, for nearly three decades, until the Supreme Court's *Dobbs* decision." Doc. 23 ¶ 10.

10.    "WAWC estimates they receive calls or inquiries about out-of-state abortion options from approximately 30 individuals per week." *Id*. ¶ 77.

11.    Plaintiff Dr. Yashica Robinson is the Medical Director of Plaintiff Alabama Women's Center (AWC), which is located in Huntsville, Alabama. Both Dr. Robinson and AWC previously performed abortions in Huntsville, Alabama. *Id*. ¶¶ 12, 14.

12.    "Dr. Robinson estimates she receives approximately 5 inquiries about out-of-state abortion options each week at her private practice, and AWC estimates that it receives approximately 40-50 such inquiries per week." *Id*. ¶ 78.

13.    All West Alabama Plaintiffs previously "provided those who wanted or needed to obtain out-of-state abortion care with information about and recommendations for specific, trusted providers from whom they could obtain that

care, tailored to their geographic location and particular personal and medical circumstances, as well as specific information about where they could obtain financial and practical support to access such care and for assistance with inter-state travel." *Id.* ¶¶ 11, 13, 15.

14.    Dr. Robinson "would also direct patients to the staff at AWC who would work with patients further to facilitate their travel" to receive "abortion care." *Id.* ¶ 13. "AWC staff also directly assisted many individuals who needed to travel out of state for abortion care by communicating with specific out-of-state providers to ensure that they could provide the care needed, making appointments for patients with out-of-state providers, coordinating funding for care and travel with local and national abortion assistance organizations, and helping to make travel arrangements." *Id.* ¶ 15.

15.    Due to Defendant's public statements, neither Dr. Robinson nor AWC staff engage in these activities. *Id.* ¶¶ 13, 15.

16.    The West Alabama Plaintiffs previously "provided . . . information, counseling, and support in order to assist those individuals interested in accessing out-of-state abortion care in doing so." *Id.* ¶ 65. "[T]hey would do the same today" but for Defendant's public statements. *Id.*

## LEGAL STANDARD

Summary judgment is appropriate when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "When the only question a court must decide is a question of law, summary judgment may be granted." *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011).

Additionally, "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). As under Rule 56, "[j]udgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Cannon v. City of West Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001). A judgment on the pleadings is limited to consideration of "the substance of the pleadings and any judicially noticed facts." *Bankers Ins. Co. v. Fla. Residential Prop. & Cas. Joint Underwriting Ass'n*, 137 F.3d 1293, 1295 (11th Cir. 1998).

## ARGUMENT

### I. This Court lacks subject-matter jurisdiction to consider some of Plaintiffs' claims.

This Court lacks jurisdiction over Plaintiffs' claims on behalf of their staff and clients because Plaintiffs cannot satisfy the third-party standing requirements. While Defendant does not dispute that the Court has jurisdiction over Plaintiffs' claims asserting their own rights, the general rule remains that a party "must assert his own

legal rights and interests[.]" *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). This limitation exists because "[t]he Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Where the rubber meets the road is with the right-to-travel claim. Yellowhammer, which does not possess a right to travel, doc. 28 at 31–33; doc. 38 at 38–40, is the only Plaintiff asserting a first-party right-to-travel claim, *id.* at 38 n.30. Thus, because "a plaintiff must demonstrate standing for each claim he seeks to press," doc. 48 at 20 (cleaned up), this Court must determine whether the Plaintiffs asserting third-party right-to-travel claims have met their burden to prove standing, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

The Court found that Plaintiffs can proceed on behalf of their clients and staff, doc. 48 at 40, 71, and Defendant stands by his standing briefing without repeating it in full. Nonetheless, Plaintiffs' ability to assert claims on behalf of their clients and staff must be decided in accordance with the current state of third-party standing doctrine. Even if what *Dobbs* said about how abortion how distorted third-party standing doctrine is dicta, "there is dicta and then there is dicta, and then there is Supreme Court dicta." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006). The Supreme Court didn't leave room for doubt that *June Medical* and *Whole Women's Health* "ignored the Court's third-party stranding doctrine" while the dissents in

those cases map onto *Warth* and *Elk Grove*. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 286–87 & n.61 (2022).

What isn't dicta is the Eleventh Circuit's instruction to "take the Supreme Court at its word" and "treat parties in cases concerning abortion the same as parties in any other context." *SisterSong Women of Color Reprod. Just. Collective v. Governor of Georgia*, 40 F.4th 1320, 1328 (11th Cir. 2022). The undistorted third-party standing jurisprudence casts significant doubt on Plaintiffs' ability to prove that it satisfies the close-relationship and hindrance elements for third-party standing. The Supreme Court has been "quite forgiving with these criteria in certain circumstances," but those criteria supply the governing rule to be applied "to the facts" of this case. *Kowalski*, 543 U.S. at 130. Defendant stands by his three arguments that *Craig* is distinguishable *as to all Plaintiffs*,[1] *see* doc. 36 at 6–7 & n.3. Given that Plaintiffs will be submitting evidence with their motions for summary judgment, Defendant will otherwise hold off.

---

[1] Defendant's failure to directly reference Dr. Robinson in his discussion of *Craig* in his reply brief was an unintentional omission. *See* doc. 36 at 6, 7 (twice referencing "the organizational Plaintiffs"). Indeed, his heading states: "Plaintiffs Lack Third-Party Standing[,]" *id.* at 5, would not be true if *Dr. Robinson* could proceed under *Craig*. *See also id.* at 7 (". . . not addressed directly to Plaintiffs"). The distinction arose because of an additional reason that *Craig* does not apply: that the organizational Plaintiffs cannot be prosecuted under § 13A-4-4 as a general matter, *see* doc. 28 n.4. Defendant also disputes the Court's practical argument that because the organizational Plaintiffs cannot function without their staff "enforcement against the plaintiffs' staff is the functional equivalent of enforcement against the organizations themselves[,]" doc. 48 at 28. *Craig* hinged on the legal duties ("sanctions and perhaps loss of license") being "addressed directly to vendors[.]" *Craig v. Boren*, 429 U.S. 190, 194 (1976). In *Boren*, Carolyn Whitener was the plaintiff, not the Honk n' Holler gas station that she owned.

**II.     Yellowhammer's extraterritoriality claim fails as a matter of law.**

Yellowhammer alleges that Alabama's conspiracy law, as applied to them for actions they take in Alabama, violates their "right to be from extraterritorial application of state law." Doc. 1 at 34. In the context of federal law, the Supreme Court has explained that a law applies extraterritorially when it is applied "to events occurring and injuries suffered *outside* the United States." *RJR Nabisco v. European Community*, 579 U.S. 325, 329 (2016) (emphasis added). "By definition, an extraterritorial application of a statute involves the regulation of conduct beyond U.S. borders." *Env't Def. Fund, Inc. v. Massey*, 986 F.2d 528, 530 (D.C. Cir. 1993). "Even where the significant effects of the regulated conduct are felt outside U.S. borders, the statute itself does not present a problem of *extraterritoriality*, so long as the conduct which Congress seeks to regulate occurs largely within the United States." *Id*.

Thus, for a state law to have extraterritorial application, it must apply to events occurring and injuries suffered primarily outside the state's borders. The undisputed facts reveal Alabama's conspiracy statutes do not and would not operate extraterritorially. All Plaintiffs are Alabama-based entities or persons providing services in Alabama. Doc. 1 ¶ 7; doc. 23 ¶¶ 10, 12. As an organization, Yellowhammer wants to coordinate with citizens in Alabama and transport women within Alabama to procure elective abortions somewhere. Doc. 1 ¶ 46. The West

Alabama Plaintiffs' conduct similarly occurs in Alabama. Doc. 23 ¶¶ 13, 15. For ALA. CODE §13A-4-4 to have extraterritorial application it must criminalize some activity—verbal coordination, funding, or transportation—occurring outside of Alabama, but §13A-4-4 is only applicable to activity *inside* Alabama. Instead of criminalizing the act of abortion *outside of Alabama*, ALA. CODE §13A-4-4 criminalizes "conspirac[ies] formed in this State" to procure abortions, generally.

Even if the Fourteenth Amendment "prohibits a state from applying its laws extraterritorially to criminalize out-of-state activity which is lawful where it occurs," Doc. 1 ¶ 98, there is no credible threat that the laws in this case will be applied in such a manner. "The parties agree that the Attorney General does not intend to prosecute [i.e., criminalize] conduct occurring in another State." Doc. 48 at 89. That resolves Yellowhammer's claim. Defendant stands on his motion-to-dismiss briefing that Ala. Code § 13A-4-4—a law that criminalizes only a "conspiracy formed in this state"—does not implicate any right to be free from extraterritorial application of State law. *See* doc. 28 at 36–38.

That prosecution of Alabama-based conspiracies might "deter or prevent" out-of-state conduct—lawful or unlawful—does not render the *application* of the law extraterritorial, much less unconstitutional. The cases underlying Yellowhammer's claim show this. A "basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its

14

borders[.]" *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003). Even if one assumes that the conspiracy statutes were unreasonable burdens on travel or speech, those burdens still apply only within Alabama's borders. By prosecuting activity occurring wholly in Alabama, Defendant does not "punish a man for doing within the territorial limits of [another state] an act which that state had specially authorized him to do[,]" *Nielsen v. Oregon*, 212 U.S. 315, 321 (1909). Prosecuting a doctor for performing, in Georgia, an abortion on an Alabama citizen would be an extraterritorial application of state law. As would prosecuting Alabama women for undergoing an abortion in another state. No Alabama law purports to do this.

Creating effects in other States by regulating within one's own borders is not tantamount to regulating extraterritorially. "[M]any (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior." *National Pork Producers Council v. Ross*, 598 U.S. 356, 374 (2023). Such statutes are often challenged under the Dormant Commerce Clause—a claim Yellowhammer chose not to bring. Doc. 33 at 41. Even in that context, there is no per se constitutional rule restricting "the ability of a State to project its power extraterritorially." *Id.* at 374–76. That rule would eviscerate "the usual 'legislative power of a State to act upon persons and property within the limits of its own territory[.]'" *Id.* at 375 (quoting *Hoyt v. Sprague,* 103 U.S. 613, 630 (1881)). Again, "the constitutional limitations on the extraterritorial application of state law" do not cast doubt on the validity of a

state statute that regulates conduct occurring wholly within the State's borders. Defendant is entitled to judgment as a matter of law on Yellowhammer's extraterritoriality claim. The Court should thus enter judgment in Defendant's favor on this claim.

### III.   Plaintiffs' right-to-travel claims fail as a matter of law.

The Constitution does not confer an unfettered right to receive or provide traveling assistance for any purpose whatsoever. Without such a right, Plaintiffs' claim fails. Even if such a right exists, the burden must be weighed against the State's interest.

### A.   A State may regulate the facilitation of conduct that is illegal in the home State.

According to Plaintiffs, Alabama law violates the right to travel of them, their staff, and their clients. *See* doc. 1 ¶¶ 87–97; doc. 23 ¶¶ 128–31. But the relevant statutes do not even implicate the right to travel, and even if they do, the statutes withstand scrutiny.

The right to interstate travel contains three distinct components: (1) "the right of a citizen of one State to enter and to leave another State," (2) "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State," and, (3) "for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz v. Roe,* 526 U.S. 489, 500 (1999). The second and third components are not relevant here

16

because they are only implicated when a State treats out-of-state residents differently than it does its own residents. *See id.* at 501–03.

The right to cross state lines concerns "the right of 'free ingress and regress to and from' neighboring states.'" *Id*. (quoting *United States v. Guest*, 383 U.S. 745, 758 (1966)). The constitutional right to interstate travel protects travelers from "the erection of actual barriers to interstate movement." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 277 (1993). So States generally may not impose taxes, fines, or penalties on a citizen merely for going from one State to another. *See, e.g.*, *Crandall v. Nevada*, 73 U.S. 35 (1867). The Supreme Court has never stretched this unenumerated right to point of granting an absolute entitlement to travel to another State and do whatever is lawful there.

The Court nonetheless found strong "support" for Plaintiffs' reading of the right to travel that protects the right not only to "free ingress and regress" between the States but also the right to do "*whatever* is legal" while traveling. Doc. 48 at 41. In large part, the Court relied on the Privileges and Immunities Clause to reach this result. *See id.* at 45. In the Court's view, nothing about that Clause "suggests that its protections depend upon whether the State imposing the State imposing travel restrictions is the … origin or destination" State. *Id.* at 48 n.12. But that Clause is concerned with how States treat non-residents. *See Slaughter-House Cases*, 83 U.S. 36, 77 (1872); *accord United Bldg. & Const. Trades Council of Camden Cnty. &*

*Vicinity v. Mayor & Council of City of Camden*, 465 U.S. 208, 216–17 (1984). Treating a state law's application to residents differently from its application to non-residents makes sense. If a resident dislikes state law, she can seek a "remedy at the polls." *Id.* at 217. A non-resident has "no similar opportunity," and without the Clause would be forced to hope for relief through the "diplomatic processes and official retaliation." *Id.* Those "uncertain remedies" for non-residents are insufficient to create a Nation with one citizenship; solving that problem is the Clause's primary goal. *Id.* at 216.

Nor is the Clause's requirement that States treat residents and non-residents the same "absolute." *Saenz*, 526 U.S. at 502. There must be "a substantial reason" for different treatment "beyond the mere fact that they are citizens of other States." *Id.* Thus, a State would not necessarily be compelled to provide abortions to residents and non-residents on equal terms. *Doe v. Bolton* is not to the contrary. 410 U.S. 179 (1973). That case simply held that Georgia had insufficient reasons to withhold medical care from out of state residents, *id.* at 200, not that no interest would be sufficient or that the home States cannot limit the ability to travel for that purpose.

Even if the right to travel generally includes the right to do what is lawful in another State, it does not follow that interference of any kind violates the right. Not all "burdens" on interstate travel are "necessarily a violation" of the right. *Doe v.*

*Moore*, 410 F.3d 1337, 1348 (11th Cir. 2005); *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991) ("Minor restrictions on travel simply do not amount to the denial of a fundamental right that can be upheld only if the Government has a compelling justification." (citation omitted)). Rather, reasonable burdens are permissible. *See Saenz*, 526 U.S. at 499.

In *Doe v. Moore*, for example, the Eleventh Circuit rejected an argument from sex offenders that the Florida Sex Offender Act "unreasonably burdened" their right to travel by requiring them to notify Florida law enforcement in person when they change permanent or temporary residences. 410 F.3d at 1348–49. Despite recognizing that the requirement burdened the right to travel, the Eleventh Circuit did not find that burden unreasonable given the State's legitimate, "strong interest in preventing future sexual offenses[.]" *Id.*; *see also United States v. Simington*, No. EP-10-CR-2275-KC, 2011 WL 145326, at *9 (W.D. Tex. 2011) ("[W]here a statute imposes a reasonable burden or mere inconvenience on a person's right to travel, the statute does not violate any constitutional right." (emphasis omitted) (citing *Doe*, 410 F.3d at 1349)). Similarly, even total bars on travel can pass constitutional muster, like when a State imposes an increased penalty on leaving the State after committing a crime, instead of imposing "a simple penalty for leaving." *Jones v. Helms*, 452 U.S. 412, 422 (1981).

Permitting States to regulate in this manner fits naturally within our Constitutional structure. Because state criminal law may punish acts—like aborting Alabama citizens—that intentionally have "sufficient direct repercussions within the state," *Heath v. Jones*, 941 F.2d 1126, 1139 (11th Cir. 1991), it follows that they may regulate types of travel that will result in such direct detrimental effects, *see Jones*, 452 U.S. at 422–23.

Whether considering the right to travel of either Plaintiffs' clients or of Plaintiffs and their staff, Alabama law does not infringe upon it.

### B.    Alabama law does not violate the right to travel.

Plaintiffs lack standing to invoke their clients' or potential clients' right to travel in this case. *See infra* Part I. And Defendant maintains his argument that Yellowhammer—a corporation—does not possess a right to travel as "a flesh and blood, physical citizen" would. *See* doc. 28 at 32. Even if Plaintiffs could pursue these claims, they fail either because either (1) the right to travel is not implicated by the reasonable restrictions here or (2) to the extent that those restrictions are cognizable, they are supported by legitimate State interests.

As the State has explained, Ala. Code § 13A-4-4 does not forbid a woman from leaving the state to obtain an abortion. *Contra* doc. 48 at 49 (implying that this case is the same as Justice Kavanaugh's concurring dictum that the right to travel prevents a State from "bar[ring] a resident of that State from traveling to another

20

State to obtain an abortion"). Plaintiffs instead rest their case on two faulty theories. One, that without their "information, counseling, and support" in finding available out-of-state abortions, a pregnant woman's right to travel would be unconstitutionally burdened. *E.g.*, doc. 23 ¶ 66. Two, that the "primary objective" or the "predominant purpose" of enforcing the relevant statutes is "to impede travel." Doc. 33 at 64; doc. 34 at 54.

*First*, the relevant statutes do not burden the right to travel. The supposed "burden" from Ala. Code § 13A-4-4 is different in kind from those that implicate the right to travel. It is a mere reasonable regulation on certain assistance for interstate travelling. Regulations on travel agents or hotels do not implicate the right to travel. *See, e.g.*, *Matsuo v. United States*, 586 F.3d 1180, 1183 (9th Cir. 2009) ("[N]ot everything that deters travel burdens the fundamental right to travel. States and the federal government would otherwise find it quite hard to tax airports, hotels, moving companies or anything else involved in interstate movement"); *Cramer*, 931 F.2d at 1030 ("If every infringement on interstate travel violates the traveler's fundamental constitutional rights, any governmental act that limits the ability to travel interstate, such as placing a traffic light before an interstate bridge, would raise a constitutional issue." (footnote omitted)). Nor does a regulation on how one may travel implicate the right: "the Constitution does not guarantee the right to travel by

any particular form," not even "the most convenient." *See, e.g.*, *Gilmore v. Gonzales*, 435 F.3d 1125, 1136–37 (9th Cir. 2006).

Even if the alleged restrictions here were cognizable, they are still constitutional. The test, as applied in *Doe v. Moore*, for burdens on interstate travel is reasonableness. *See* 410 F.3d at 1348–49. Alabama law easily passes muster as applied to Plaintiffs because it is supported by a wide array of strong, legitimate interests, such as "respect for and preservation of prenatal life," "maternal health and safety," and "the integrity of the medical profession." *Dobbs*, 597 U.S at 301. The State's legitimate objectives of prohibiting elective abortions and conspiracies to procure them cannot be achieved if conspirators may "legally subvert the purpose[s]" of Alabama law so long as they target out-of-state destinations. *Doe*, 410 F.3d at 1348.

*Edwards v. California* is inapposite. 314 U.S. 160 (1941). The California law in *Edwards* barred assisting the in-migration of indigent non-residents for the purpose of excluding impoverished newcomers. *Id.* at 166. California's law was an attempt to "isolate itself" from national problems by placing an "intended and immediate" burden on "interstate commerce," and it left "the real victims of the statute" without "opportunity" to convince California to change its ways. *Id.* at 173–174 (citing *S.C. State Highway Dep't v. Barnwell Bros.*, 303 U.S. 177, 185 n.2 (1938)).

None of that is true here. First, regulations limiting travel for the purpose of preventing migration, like the law in *Edwards*, strike at the core of the Constitution's goal of creating a single citizenship through ingress and egress, but liability here is triggered by participating in an unlawful scheme to procure an elective abortion— regardless of movement across State lines. Second, interstate transportation of indigent persons may only be regulated "by a single authority," *id.* at 176, whereas "[t]he Constitution does not prohibit the citizens of each State from … prohibiting abortion," *Dobbs*, 597 U.S. at 302. Third, unlike the non-residents blocked from entering California in *Edwards*, Plaintiffs, their staff, and their clients can avail themselves of Alabama's democratic processes.

*Crandall v. Nevada* is similarly inapplicable. 73 U.S. 35 (1867). There, around 150 years ago, Nevada levied a one-dollar tax on each person leaving the State by railroad or stagecoach. *Id.* at 39. The Court reasoned that if a State could impose a "tax of one dollar," it could impose a tax of "one thousand dollars," and "[i]f one State can do this, so can every other State." *Id.* at 47. Thus, upholding the tax would empower a few States to prevent "*all* transportation of passengers from one part of the country to the other." *Id.* at 46. Such a power would interfere with rights of citizens that correlate to the federal government's required "services of its citizens," like traveling "to the seat of government," seeking its "protection," and accessing its

"offices" and "sea-ports," which exist "independent[ly] of the will of any State over whose soil he must pass." *Id.* at 44.

Alabama law does nothing of the sort. It does not impose any sort of tax or penalty on mere movement across State lines. It instead limits travel assistance only to the extent it is intended to further a criminal conspiracy, whether to procure an elective abortion, traffic illegal drugs, or engage in any other criminal conduct. And obtaining an abortion has little if anything to do with a citizen's duties to the country. In sum, the purported burdens on the right to travel of Plaintiffs and their clients are not cognizable, and even if so, any burden is reasonable and thus constitutional.

*Second*, the relevant statutes do not automatically flunk the constitutional test just because, at some level of abstraction, their "primary objective" could be described as inhibiting travel. For one, the law in *Jones* was upheld because it was *reasonable* even though it punished certain people for leaving the State. *See* 452 U.S. at 422–23. If the primary objective here is to prevent travel, the same was true in *Jones.*

For another, while some statutes draw suspicion if their primary purpose is to prevent travel-*qua*-travel, the Supreme Court has never extended that principle to apply where the purpose is to curtail certain conduct no matter the location. Yet that is the situation here. The Human Life Protection Act recognizes and protects "[t]he dignity and value of life, especially the lives of children, born and unborn[.]" ALA.

24

CODE § 26-23F-2(a)(4). Its primary objective is thus to advance Alabama's "legitimate interests" in respecting and preserving "prenatal life at all stages of development." *Dobbs*, 597 U.S. at 301. Enforcing Alabama law also shields women from "[t]he medical, emotional, and psychological consequences of an abortion." ALA. CODE § 26-23A-2(a)(3). Similarly, Alabama's conspiracy laws aim to prohibit the "unlawful combination, the corrupt and corrupting agreement[,]" *Thompson*, 17 So. at 516, formed by those who would help procure an elective abortion. These laws were not "enacted for the impermissible purpose of inhibiting migration[,]" *Saenz*, 526 U.S. at 499, any more than other criminal laws of general applicability are.

***

Alabama's conspiracy law violates no one's right to travel. Defendant entitled to judgment as a matter of law on Plaintiffs' right-to-travel claims.

## IV.   Plaintiffs First Amendment claims fail as a matter of law.

Speech integral or in furtherance of criminal conduct is not protected by the First Amendment. *United States v. Williams*, 553 U.S. 285, 298 (2008); *United States v. Fleury*, 20 F.4th 1353, 1365 (11th Cir. 2021). Similarly, "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage*

*& Ice Co.*, 336 U.S. 490, 502 (1949) (citations omitted). Plaintiffs are thus not free to conspire in Alabama to procure elective abortions for women, even if the conspiracies involve speech. Doc. 28 at 25–27; doc. 36 at 28–34.

"In a criminal context, the purpose of conspiracy charges is to punish *the act of agreement* itself." *Beck v. Prupis*, 162 F.3d 1090, 1011 n.18 (11th Cir. 1998) (emphasis added) (citing Wayne R. LaFave & Austin W. Scott, Jr., Criminal Law § 6.4(d) (2d ed. 1986)). To this end, a "[c]onspiracy is a 'distinct, substantive offense and is complete when the unlawful combination is entered into.'" Doc. 1 ¶ 31 (quoting *Connelly v. State*, 1 So. 2d 606, 607 (Ala. Ct. App. 1990)). Here, abortion is generally illegal under Alabama law, and the Legislature has prohibited Alabama-based conspiracies (agreements) to perform them because such agreements are inherently dangerous.

Defendants have adequately presented these arguments in their motion to dismiss and are aware of the Court's determination that the criminal-conduct exception to the First Amendment, articulated in *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949), does not "extend to speech in furtherance of lawful conduct." Doc. 48 at 86. Defendant stands by his argument that the facilitation of out-of-state elective abortions is a "course of conduct" that may be constitutionally criminalized, even if the facilitation is "in part carried out by means of language." *Giboney*, 336 U.S. at 502.

26

And Plaintiffs' overt acts to procure elective abortions are unprotected non-expressive conduct. Plaintiffs admittedly want to "assist" Alabama residents "in accessing out-of-state abortion care." Doc. 23 ¶ 65; doc. 1 at 8 (describing Plaintiff Yellowhammer as an "abortion helper[]"). This assistance may involve the spoken or written word. *See, e.g.*, Doc. 1 ¶ 46 ("sharing information and advertising the fund"); doc. 23 ¶ 67 (providing "information about and recommendations for specific, trusted abortion providers"). However, Yellowhammer's assistance in Alabama indisputably takes the form of conduct as well. Doc. 1 ¶¶ 41, 44, 89.[2] This conduct is not the "abstract advocacy of illegality" but concrete facilitation of it. *United States v. Williams*, 553 U.S. 285, 298–99 (2008).

Plaintiff Yellowhammer wishes to "directly transport[] callers to abortion appointments." Doc. 1 ¶ 41. Additionally, "Yellowhammer Fund previously traveled, and desires to once again travel, between states with passengers in its vehicles who need transportation to other states to obtain lawful abortion care." *Id.* ¶ 89.[3] The transportation of women to abortion clinics does not "comprehensively

---

[2] Because Yellowhammer plead with specificity the conduct involved in the "practical support" its abortion "helpers" wish to provide, *e.g.*, Doc. 1 ¶ 3, Defendant addresses his arguments to Yellowhammer's complaint. West Alabama Plaintiffs' complaint alludes to "coordinating . . . travel" and providing "assistance" in "transportation" for patients in Alabama. Doc. 23 ¶¶ 105, 107. This coordination or assistance could take the form of speech or conduct. To the extent it is the latter, Defendant's arguments apply with equal force to West Alabama Plaintiffs.

[3] This factual allegation is in the context of Yellowhammer's right-to-travel claim, but it illustrates that Plaintiffs intend through conduct, not just speech, to violate Alabama law by "caus[ing] the

communicate its own message without additional speech." *Tagami v. City of Chicago*, 875 F.3d 375, 378 (7th Cir. 2017); *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006) ("*FAIR*") ("If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it."). Because this conduct is not "inherently expressive," *FAIR*, 547 U.S. at 66, the First Amendment does not independently protect it.

"Providing funds . . . to abortion seekers," like providing transportation, is not an activity protected by the First Amendment either. Doc. 1 ¶ 44. To be sure, "restrictions on the amount of money a person or group can spend on political communication" implicate First Amendment interests. *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 741 (2011). Thus, bans on funding petition circulators indirectly burden free speech by cutting off the flow of money that produces it. *Meyer v. Grant*, 486 U.S. 414, 424 (1988). But under the First Amendment, one does not communicate a political message by financing another person's abortion any more than one does so by performing or obtaining an abortion. For it to be otherwise, abortion itself would have to be constitutionally protected expression, which of course it is not. *See Dobbs v. Jackson Women's*

---

performance of," ALA. CODE § 13A-4-3(a), elective abortions on Alabama citizens, *id*. § 13-4-4; *id*. § 26-23H-4.

*Health Organization*, 597 U.S. 215, 231 (2022). Plaintiffs' completion of overt acts in Alabama to procure elective abortions is not expressive conduct under the First Amendment.

Lastly, Yellowhammer's freedom-of-association claim falls with its freedom-of-speech claim. The Supreme Court has interpreted the First Amendment to protect the "right of expressive association" because the rights enumerated by the First Amendment would mean little if citizens could not exercise those rights together. *See FAIR*, 547 U.S. at 68; *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). Thus, the right is all about permitting people to choose *with whom* they exercise First Amendments rights, s*ee O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1054 (11th Cir. 2022); *McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir. 1994), but it does not entitle anyone to engage in *unprotected* activity with others, *see City of Dallas v. Stanglin*, 490 U.S. 19, 24–25 (1989).

Alabama law does not tell Plaintiffs with whom they may exercise their First Amendment rights. Rather, it instructs Plaintiffs that, while they are associating with others of their choice, they may not engage in certain forms of unprotected activity. Consequently, Alabama law does not violate their freedom of association. *See Stanglin*, 490 U.S. at 24–25; *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 933 (1982).

**CONCLUSION**

Summary judgment should be granted in Defendant's favor on all counts.

Respectfully submitted,

Steve Marshall
  *Attorney General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Dylan Mauldin (ASB-3281-Z11M)
  *Assistant Solicitor General*

/s/ Benjamin M. Seiss
Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Jim.Davis@AlabamaAG.gov
Dylan.Mauldin@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

## CERTIFICATE OF SERVICE

I certify that I electronically filed this document using the Court's CM/ECF system on June 17, 2024, which will serve all counsel of record.

/s/ Benjamin M. Seiss