# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| YELLOWHAMMER FUND, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 2:23-cv-00450-MHT-KFP |
| STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama, | ) ) ) | |
| | ) | |
| *Defendant*. | ) | |

| | | |
|---|---|---|
| WEST ALABAMA WOMEN'S CENTER, *et al.*, | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2:23-cv-00451-MHT-KFP |
| | ) | |
| STEVE MARSHALL, in his official capacity as Attorney General of the State of Alabama, | ) ) ) | |
| | ) | |
| *Defendant*. | ) | |

**CONSOLIDATED RESPONSE TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

Defendant Attorney General Steve Marshall responds as follows to Yellowhammer's (doc. 61) and the *West Alabama* Plaintiffs' (doc. 60) motions for summary judgment:

## RESPONSE TO PLAINTIFFS' STATEMENTS OF UNDISPUTED MATERIAL FACTS

As outlined in Defendants' motion for summary judgment, doc. 62 at 5–9, "there is no genuine dispute as to any *material* fact" in this case. FED. R. CIV. P. 56(a) (emphasis added). Defendants do not dispute that the *West Alabama* Plaintiffs "feel ethically obligated" to assist women in receiving "the abortion care that Plaintiffs can no longer provide." Doc. 60-1 at 15. Similarly, Defendants do not dispute that "Yellowhammer Fund believes that every person should be free to" receive an elective abortion "without shame or governmental interference." Doc. 61 at 16. Finally, Defendants do not dispute that Plaintiffs, organizations incorporated or persons residing in Alabama, ceased making abortion referrals, transporting women to abortion appointments, and funding abortions after Defendant's public statements.

Plaintiffs' statement of undisputed facts, however, include numerous assertions immaterial to the questions of law in this case. *See, e.g.*, doc. 60-1 at 16 (asserting "abortion is always safe, and far safer than childbirth"); doc. 61 at 20 ("Carrying a pregnancy to term is especially dangerous for certain populations."). To the extent Plaintiffs present "policy arguments" as undisputed facts, they do not affect "how abortion may be regulated in the States." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 259 (2022).

## ARGUMENT

### I. Plaintiffs have failed to carry their burden to show that they have standing to bring this action.

Standing is the "irreducible constitutional minimum" for a court to exercise jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). At the summary judgment stage a "plaintiff can no longer rest on such mere allegations" as they alleged in the complaint "but must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561 (cleaned up).[1] Courts cannot dispense standing in gross. *See Davis v. FEC*, 554 U.S. 724, 734 (2008) (citing *Lewis v. Casey*, 518 U.S. 343, 358, n.6 (1996)). "Rather, 'a plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought." *Id.* (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S 332, 352 (2006)).

Thus, the intricate web of claims and what parties bring those claims—whether on a first- or third-party basis—matters in terms of the scope of relief. As a general matter, Plaintiffs' claims are generally brought as as-applied challenges, *see* doc. 48 at 62 n.16; *accord* doc. 1 at 36–37; doc. 23 at 32, which limits the scope of

---

[1] Thus, while Defendant did not contest Plaintiffs' first-party standing at the motion-to-dismiss stage where the standard required this Court to accept the complaints' well-pleaded allegations as true, neither Plaintiffs nor this Court can rest on those allegations to satisfy Article III. *See, e.g.*, *MSP Recovery, LLC v. Allstate Ins. Co.*, 835 F.3d 1351, 1357 (11th Cir. 2016) ("Federal courts have an independent obligation to ensure that subject-matter jurisdiction exists to hear a case[.]" (citation omitted)).

relief. And for the right-to-travel claim specifically, if Plaintiffs lack third-party standing, this Court cannot grant any relief because Yellowhammer (a corporation)—the only party asserting its own right—lacks a standalone right to travel. *see infra* § III.C. Thus, because Plaintiffs cannot meet the close-relationship and hindrance requirements of traditional third-party standing as to their clients[2] or show that they fall within the narrow category of cases where "enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights," summary judgment in Defendant's favor is warranted on all non-first-party claims for lack of standing. *Kowalski*, 534 U.S. at 129–30.[3]

### A. Plaintiffs Yellowhammer, AWC, and Dr. Robinson cannot satisfy *Kowalski*'s undistorted articulation of the third-party standing requirements as to their clients.

As an initial matter, Plaintiffs continue to ignore how abortion cases misapplied "the Court's third-party standing doctrine." *Dobbs*, 597 U.S. at 286–87 (footnote omitted). They cite numerous abortion decisions in support of their

---

[2] The *West Alabama* Plaintiffs also bring claims on behalf of their staff. Though Defendant previously argued that Plaintiffs also fail to satisfy the third-party standing elements as to their staff, he recognizes this argument has no practical significance if the *West Alabama* Plaintiffs have satisfied Article III as to their own First Amendment claims.

[3] The *West Alabama* Plaintiffs argue that "recognizing third party standing in this context would also be consistent with the Supreme court's right to travel jurisprudence." Doc. 60-1 at 40 (citing *Crandall v. Nevada*, 73 U.S. 35 (1867); *Edwards v. California*, 314 U.S. 160 (1941)). Of course, these cases predate third-party standing jurisprudence and don't discuss standing at all. These "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925) (citations omitted).

arguments, *see* doc. 60-1 at 24–25; doc. 61 at 39–40, while failing to engage with what *Dobbs* cites for the proper articulation of third-party standing doctrine, *see Dobbs*, 597 U.S. 215, 287 n.61. This despite the Eleventh Circuit's instruction that "we can no longer engage in those abortion distortions in the light of a Supreme Court decision to cease doing so." *SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*, 40 F.4th 1320, 1328 (11th Cir. 2022). Such guidance from the Supreme Court and Eleventh Circuit should give this Court pause before proceeding to find third-party standing here. Under the proper standard, Plaintiffs have failed to adduce evidence to establish that they still have a close enough relationship with their clients or that those clients have meaningful barriers to asserting their own rights. *See Kowalski*, 534 U.S. at 129–30.

     1. *These Plaintiffs do not have sufficiently close relationships with their clients.*

     Yellowhammer has produced no evidence that they have a sufficiently close relationship with the clients whose rights they wish to assert. Instead, the evidence shows that the relevant "clients" Yellowhammer asserts a close relationship with were random callers to its telephone and text help line—most of which "had been referred by clinics or individual providers" (i.e., had no prior relationship with Yellowhammer). *See* doc. 61-2 ¶ 8. Because the help line existed to provide "financial and logistical assistance for" abortions, *id.*, it is no longer in operation, *id.* ¶ 27; *accord* doc. 61-1 ¶ 28. Regardless, communicating with random callers to

5

"try[] to figure out resources for their abortions" is a relationship entirely contingent on the caller's continued desire to obtain an abortion. Doc. 61-2 ¶ 26. To be sure, Yellowhammer provides other services, such as "free emergency contraception by mail," and "engages in abortion advocacy" (including a bus tour), doc. 61-1 ¶¶ 9, 10, but this evidence supports nothing more than a distant relationship between Yellowhammer and persons who utilize these services or agree with Yellowhammer's advocacy. Yellowhammer's relationship with "clients" is in reality not close at all and now largely hypothetical. *See Kowalski*, 543 U.S. at 131 ("This *existing* attorney-client relationship is, of course, quite distinct from the *hypothetical* attorney-client relationship posited here.").

Much the same reasoning applies to the *West Alabama* Plaintiffs' claims of a close relationship with hypothetical patients. The only evidence they cite supports a one-off congruity of interests: "pregnant Alabamians seek[ing] Plaintiffs' support" and "Plaintiffs['] desire to provide such support," doc. 60-1 at 41. WAWC refers to receiving "inquiries" from—not local existing patients—but pregnant women across the State, which WAWC answered by providing information and recommendations about where and how the inquirers could receive abortion care. Doc. 60-2 ¶¶ 9–10. AWC and Dr. Robinson talk of the same inquirers and "interactions with those making such inquiries," doc. 60-3 ¶¶ 6–7, but again, these Plaintiffs no longer provide such services.

These "relationships" are one-off "incidental congruit[ies] of interest," *Warth v. Seldin*, 422 U.S. 490, 510 (1975), rather than "existing" relationships like those between parents and children where the "the plaintiff's interests are so aligned with those of a particular right-holder that the litigation will proceed in much the same way as if the right-holder herself were present." *June Med. Srvs. L. L. C. v. Russo*, 591 U.S. 299, 414 (Gorsuch, J., dissenting) (cited by *Dobbs*, 597 U.S. at 287 n.61). Plaintiffs thus fail to satisfy the close-relationship element of third-party standing, as articulated in *Kowalski*.

> 2. *There is no meaningful barrier that prevents women seeking abortions from asserting their own legal rights.*

In *Kowalski*, the Supreme Court held "that the lack of an attorney is the type of hindrance necessary to allow another to assert the indigent defendants' rights." 543 U.S. at 133. It's thus clear that the hindrance element requires something more than thinking up *some* obstacle to pregnant women vindicating their own rights, which Plaintiffs fail to engage with. They instead rely on the abortion-distorted plurality opinion from *Singleton v. Wulff*, 482 U.S. 106—a basis for the dissent in *Kowalski*, *see* 543 U.S. at 138 (Ginsburg, J., dissenting). But *Singleton* is "thoroughly unconvincing" when "judged on its own merits," *June Med.*, 591 U.S. at 368 (Alito, J. dissenting) (cited by *Dobbs*, 597 U.S. at 287 n.61), which is unsurprising because the Court's "treatment of third-party standing ha[s] changed since *Singleton*," *id.* at 408 (Gorsuch, J., dissenting) (cited by *Dobbs*, 597 U.S. at

287 n.61). *See also id.* at 268 (Thomas, J. dissenting) (stating that *Singleton* "perfunctorily appl[ied] this Court's requirements for third-party standing"). And "whatever the supposition of a 1976 plurality, in the years since interested women have challenged abortion regulations on their own behalf in case after case." *Id.* at 414–15 (Gorsuch, J., dissenting) (cited by *Dobbs*, 597 U.S. at 287 n.61).

With these principles in mind, Plaintiffs' evidence does not establish that women seeking abortions are *more* hindered in their ability to vindicate their right to travel than in the *pro se* criminal defendants' ability to assert their rights on appeal from *Kowalski*. The only evidence that the *West Alabama* Plaintiffs cite is a paragraph in Dr. Robinson's declaration saying that most of AWC's patients are low income and thus need financial assistance to travel for an abortion. *See* doc. 60-1 at 42 (citing doc. 60-3 ¶ 13); *accord* doc. 61-4 (citing doc. 61-1 ¶ 20). Ignoring that "there is little reason to think that a woman who challenges an abortion restriction will have to pay for counsel," *June Med.*, 591 U.S. at 405 (cited by *Dobbs*, 597 U.S. at 287 n.61), such a rule that the "economic burdens of litigation" satisfy the hindrance inquiry proves too much. *Powers* discusses this language in the context of "the small financial stake involved" of a juror excluded from hearing a criminal case compared to the criminal defendant's. *Powers v. Ohio*, 499 U.S. 400, 415 (1991). By contrast, woman seeking abortion obviously have a financial stake in a potential pregnancy while Plaintiffs' motives are "purely mission-driven" and have no

financial incentive—according to the complaints.[4] Doc. 48 at 35 n.8. Even the "hard to defend" *Singleton* did not rest on such a rule-swallowing argument. *June Med.*, 591 U.S. at 4-5 (Alito, J., dissenting) (cited by *Dobbs*, 597 U.S. at 287 n.61).

Yellowhammer cites evidence that it "has observed *its clients' fear* of being wrongfully criminalized for obtaining an abortion out of state and their desire for privacy." Doc. 61 at 40 (emphasis added). But the paragraph in the declaration that it cites discusses Yellowhammer's own fears as to Defendant's threats, not the fear women seeking abortion might have as to litigating their rights.[5] And of course, pregnant women in Alabama cannot be prosecuted under the Human Life Protection Act. *See* ALA. CODE § 26-23H-5. Another declaration references callers being "fearful of retaliation [(presumably from the domestic abusers mentioned in the previous paragraph)] for accessing abortion care" and seeking "private support." Doc. 61-1 ¶ 20. Again, normal third-party standing doctrine recognizes that

---

[4] Despite commissioning an expert to opine on the risks of pregnancy and childbirth, *see* doc. 61-4 ¶¶ 28–31, Yellowhammer implies that women who want to terminate their pregnancies have "little incentive" to litigate their own rights. *See* doc. 61 at 40.

[5] "These threats made me worried that I could be prosecuted for providing support through Yellowhammer Fund's abortion fund. I am also worried that my staff members and volunteers could be prosecuted if we provide funding and logistical support to help pregnant Alabamians access abortion care in states where it is lawful. We have also feared that these threats would expose our clients to additional surveillance or that their abortions would be implicated in any legal case brought against Yellowhammer Fund. These threats concerned us because we are always heavily focused on protecting our clients' privacy. Doc. 61-2 ¶ 24 (emphasis added).

pseudonyms and "[o]ther precautions" assuage privacy concerns.[6] Lastly, this Court's suggested most significant obstacle—"the sheer unlikelihood of obtaining personal relief before the end of pregnancy"—can be addressed with preliminary relief. Doc. 48 at 36. In sum, Plaintiffs' limited evidence does not establish that women seeking abortions face a greater hindrance than *Kowalski*'s *pro se* criminal defendants on appeal did.

### B. The *Craig v. Boren* line of cases does not apply.

True, in several cases, the Supreme Court "has allowed standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Kowalski*, 543 U.S. at 130 (citations omitted). But this is not one such case for multiple reasons. First, except for Dr. Robinson, Alabama's conspiracy statutes would not be enforced against the organizational Plaintiffs because Ala. Code § 13A-4-4 does not provide for corporate liability. *See State v. St. Paul Fire and Marine Ins. Co.*, 835 So. 2d 230, 234 (Ala. Crim. App. 2000).[7] Plaintiffs are not the "least awkward challenger[s]" or "the obvious claimant[s]." *Contra* doc. 60-1 at 39; doc. 61 at 38

---

[6] Yellowhammer also generally cites to the Declaration of Kari White (doc. 61-4), but this declaration is about the burdens women face in obtaining abortion care ("the availability and incidence of abortion care," doc. 61-4 ¶ 2).

[7] Relatedly, "[t]he legal duties created by the statutory sections under challenge are [*not*] addressed *directly* to [Plaintiffs]." *Craig v. Boren*, 429 U.S. 190, 194 (1976) (emphasis added); *cf. id.* at 196 ("Since the statute was directed at Baird" (discussing *Eisenstadt v. Baird*, 405 U.S. 438, 443 (1972)).

(citing *Craig*, 429 U.S. at 197). Unlike in *Craig* or *Einsendtadt* where the restrictions at issue only regulated the seller because they prohibited distribution—not possession or use, *id.* at 196–97, the conspiracy prohibition would apply to both woman seeking abortions and their assistors. To be sure, women are not subject to prosecution under the Human Life Protection Act (and thereby Ala. Code § 13A-4-4), but their inability to be prosecuted seems like a reason that would make them a less awkward challenger.

In the alternative, as to all Plaintiffs, enforcement against them would not indirectly result in the violation of the pregnant woman's right to travel for the reasons discussed *infra* Part III. Lastly, the initial prudential concerns that *Craig* relied on are inapplicable here. Defendant has contested Plaintiffs' ability to rely on third-party rights from the get-go, *contra id.* at 193 (noting that "appellees never raised" third-party standing before the district court), and this case is not on appeal with a "lower court already ha[ving] entertained the relevant constitutional challenge" where the parties "sought" or "at least ha[d] never resisted an authoritative constitutional determination, *contra id.* For these reasons, this Court should not extend the limited category of cases where the Supreme Court "ha[s] been quite forgiving" with the *Kowalski* criteria. 543 U.S. at 130.

**II.    Yellowhammer's extraterritoriality claim fails as a matter of law.**

Yellowhammer does not engage with the remaining extraterritoriality inquiry into "whether and to what extent the constitutional limitations on the extraterritorial application of state law are implicated when a state seeks to use its criminal law to deter or prevent specific out-of-state conduct," doc. 48 at 89–90. Yellowhammer's Motion instead presses how to best interpret Alabama's conspiracy statutes, doc. 61 at 49, which was addressed (exhaustively) at the motion-to-dismiss stage.

Yellowhammer also ignores this Court's conclusion that "[t]he parties agree that the Attorney General does not intend to prosecute [i.e., criminalize] conduct occurring in another State." Doc. 48 at 89. Given this stipulation, Yellowhammer's contingent assertion that "[i]f Defendant punishes abortions that are provided out-of-state under Alabama's Abortion Ban . . . this would constitute an unconstitutional extraterritorial application of Alabama's laws" misses what remains to be decided. Doc. 61 at 62. Yellowhammer cannot advance a claim based on a hypothetical scenario that indisputably does not exist.

The *West Alabama* Plaintiffs—who don't bring such a claim—are closer to the mark when they note that "Alabama has not passed any law . . . purporting to proscribe individuals from providing or obtaining a lawful abortion *outside* its borders." Doc. 60-1 at 29 (citing Defendant's answer). Without even purporting to punish conduct *outside* Alabama, Defendant's threatened prosecutions do not

implicate the constitutional limits on the *extra*territorial application of state law. Doc. 61 at 13–16. Defendant thus stands on his prior briefing that Ala. Code § 13A-4-4—a law that criminalizes only a "conspiracy formed in this state"—does not implicate any right to be free from extraterritorial application of State law. *See, e.g.*, doc. 28 at 36–38. He also stands on his summary-judgment briefing (doc. 61 at 13–16) that a State's enforcement of its criminal law within its borders does not implicate a right to be free from extraterritorial application of State law, even if there are extraterritorial effects.

Instead, permitting Plaintiffs to invoke the laws of another state to justify obtaining an exemption from an Alabama law, applied to Alabama citizens, punishing conduct that occurs exclusively in Alabama, is its own kind of impermissible extraterritoriality. *See State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) (a "basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders[.]"). Because the undisputed facts show Defendant has not threatened an extraterritorial application of State law, Yellowhammer's motion for summary judgment on its extraterritoriality claim is due to be denied.

## III. Plaintiffs' right-to-travel claims fail as a matter of law.

Although the Constitution protects "the right of a citizen of one State to enter and to leave another State," *Saenz v. Roe*, 526 U.S. 489, 500 (1999), Plaintiffs assert

13

a right much broader. They claim the right to leave Alabama to engage in conduct in other States that will directly harm Alabama and the right to receive organized assistance in Alabama to facilitate that harm. But the Constitution protects no such right. The right to travel is made up of multiple different Constitutional provisions, but Plaintiffs cannot identify their asserted right in any of them. The right to travel does not apply, and even if it does, the relevant Alabama laws withstand scrutiny.

### A. The right to travel does not extend to taking steps in one State to do whatever is lawful in another State.

The right to travel does not entitle a resident to leave their home State and do any and everything that is lawful in another State. Instead, the right to travel generally consists of three components: (1) "the right of a citizen of one State to enter and to leave another State," (2) "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State," and, (3) "for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz,* 526 U.S. at 500. Even though together these components comprise the right to travel, they are "different" and come from different Constitutional provisions. *Id.* Identifying the source is "essential"— "different doctrines" exist "to analyze the constitutionality of governmental action under each of the various provisions of the Constitution that protect the right to travel." *Pollack v. Duff*, 793 F.3d 34, 39–40 (D.C. Cir. 2015).

14

Plaintiffs nonetheless pull from cases applying the right to travel stemming from several different Constitutional sources. They cite, for example, cases finding parts of the right to travel in the Privileges and Immunities Clause, the Privileges or Immunities Clause, the Commerce Clause, the Due Process Clause, and the Equal Protection Clause. *See, e.g.*, Doc. 60-1 at 43 n.16; doc. 61 at 35. But they never quite identify which constitutional provision carries the day for them, nor do they explain why they win under the doctrine applicable to any constitutional provision.

Perhaps that's because each provision is a poor fit. The Privileges and Immunities Clause of Article IV, § 2 of the Constitution would not make much sense because that right is concerned with how States treat non-residents within their borders, *United Bldg. & Const. Trades Council of Camden Cnty. & Vicinity v. Mayor & Council of City of Camden*, 465 U.S. 208, 217 (1984), but Plaintiffs are asserting a right against the home State. The Privileges or Immunities Clause of the Fourteenth Amendment is equally ill-suited because it protects "the right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens *of the same State*." *Saenz*, 526 U.S. at 502 (emphasis added); *see id*. at 503–04.

Even if the Commerce Clause might entitle a citizen to take actions in their home State in service of engaging in lawful conduct in another State under some circumstances, preventing abortion conspiracies (and not out-of-state abortions) has nothing to do with commerce. *See Nat'l Pork Producers Council v. Ross*, 598 U.S.

356, 369 (2023); Doc. 62 at 23. Similarly, even if substantive due process protects a right to travel to engage in "deeply rooted" conduct, *Dobbs*, 597 U.S. at 237, abortion doesn't fall into that category, *see id.* at 250; *Williams v. Att'y Gen. of Ala.*, 378 F.3d 1232, 1239 (11th Cir. 2004) ("extension" of the substantive due process right requires "a careful description" of the right asserted and asking whether the right is deeply rooted). And as for the Equal Protection Clause, abortion regulations don't trigger heightened scrutiny, and Alabama's law has a rational basis. *See Dobbs*, 597 U.S. at 301.

At bottom, the right to travel still requires identifying the source of the right asserted and prevailing under that provision's test. *See Pollack*, 793 F.3d at 39–40. Instead of doing that, Plaintiffs extrapolate from right-to-travel cases advancing principles found within some independent Constitutional source to find a right to travel to another State and do whatever is lawful there. But unlike the rights the Supreme Court has protected under the right to travel, that principle finds no home in any Constitutional provision or its structure.

**B. Even if the right to travel applies, Alabama law withstands scrutiny.**

The relevant statutes do not impose a cognizable burden on travel because they are reasonable regulations on travel assistance. *See* Doc. 62 at 21–23. Even if the burdens are cognizable, the relevant laws are constitutional because they are rationally related to Alabama's strong and legitimate interest in protecting its

unborn, among other interests. *See id.* at 22. Defendant stands on his prior briefing on this score.

Plaintiffs' theory that the Attorney General's statements have a primary purpose of impeding interstate travel still does not help them. *See* Doc. 60-1 at 47–48; Doc. 61 at 30. The primary purpose here is not to prevent travel-*qua*-travel, which is the primary purpose that the Supreme Court has questioned. The primary purpose, as explained, is to protect unborn children and maternal health. Doc. 62 at 25.

### C. Yellowhammer—a corporate entity and the only Plaintiff asserting a first-party right—does not possess a right to travel.

Conceptually, several strands of the right to travel are strange fits for Yellowhammer because it is a corporate entity. Corporations are premised on a "legal fiction that" it "is present" in a State separate and apart from its officers and employees. *Rush v. Savchuk*, 444 U.S. 320, 328 (1980). That legal fiction makes it impossible for a corporation to move between States. *See id.*

But even if a corporation could move in the sense the right to travel uses that word, it would not help Yellowhammer. Certain constitutional rights are "personal … applying only to natural individuals." *United States v. White*, 322 U.S. 694, 698 (1944). Those rights tend to focus on "dignity, humanity and impartiality." *Id.* These personal rights "cannot be utilized by or on behalf of any organization, such as a corporation." *Id.* at 699. The Supreme Court has held that the right against self-

incrimination and the right to privacy are both personal rights that a corporation could not assert. *Id.* (self-incrimination); *Wilson v. United States*, 221 U.S. 361, 380 (1911) (similar); *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 65 (1974) ("[N]either incorporated nor unincorporated associations can plead an unqualified right to conduct their affairs in secret."); *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) (same).

At least some components of the right to travel are the type of personal rights that a corporation cannot assert. When the right was first adopted in the Articles of Confederation, it was framed in purely personal terms: "the people of each state shall have free ingress and regress to and from any other state." ARTICLES OF CONFED., art. IV. And when Justice Washington first examined the various privileges and immunities that Americans have, he too framed the right to travel in purely personal terms: "The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise." *Corfield v. Coryell*, 6 F. Cas. 546, 552 (C.C.E.D. Pa. 1823) (Washington, J., on circuit) (emphasis added).

And that makes sense. As noted above, corporations are legal fictions that cannot travel or be in a specific place.

Though Yellowhammer also asserts a right to travel derived from the Commerce, Equal Protection, and Due Process Clauses to avoid this problem, Doc.

61 at 36, 43, it has not demonstrated how its novel conception of the right to travel fits within any of those constitutional provisions.

## IV.   Plaintiffs First Amendment claims fail as a matter of law.

An agreement between specific people in Alabama formed with the specific "intent" to "cause the performance of" a specific elective abortion, followed by an "overt act" by one of those persons to effect an objective of the agreement, ALA. CODE § 13A-4-3(a), "constitute[s] a single and integrated course of conduct . . . in violation of [Alabama]'s" Human Life Protection Act and Ala. Code § 13A-4-4, *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 498 (1949). Thus, any "speech integral" to that "criminal conduct" is unprotected. *United States v. Fleury,* 20 F.4th 1353, 1365 (11th Cir. 2021).

Plaintiffs argue that this concerted action criminalizes "*any* speech" or "pure speech related to" performing elective abortions. Doc. 60-1 at 27; doc. 61 at 47. This argument proves too much. The specific intent, meeting of the minds, and overt act elements distinguish speech integral to the conspiracy from "the abstract advocacy of" abortion. *United States v. Williams*, 553 U.S. 285, 299 (2008). The statute targets only an unlawful combination without criminalizing speech, conduct, or association that the First Amendment protects.

### A. Enforcement of Alabama's conspiracy statutes is consistent with Plaintiffs' freedom of speech.

Simply providing "information" about "medical care options . . . such as abortion," is pure speech and not criminalized under the relevant statutes. *See, e.g.*, Doc. 60-1 at 14. The challenged statutes would only "punish the act of agreement" to procure a *specific* elective abortion and only when followed by an overt act to further the unlawful objective. *Beck v. Prupis*, 162 F.3d 1090, 1011 n.18 (11th Cir. 1998). Plaintiff medical providers are free to speak "frankly and openly to patients," including "ask[ing] about" and "express[ing] views" advocating for elective abortion. *Wollschlaeger v. Governor of Florida*, 848 F.3d 1293, 1313 (11th Cir. 2017). Unlike doctors disallowed from being "hostile to[] firearm ownership," *id.*, or a website designer compelled to promote same-sex marriage, Plaintiffs do not "face sanctions for expressing [their] own beliefs" about abortion, *303 Creative LLC v. Elenis*, 600 U.S. 570, 589 (2023).

Depending on whether a specific agreement is formed, "making referrals to abortion providers," which will involve speech, could constitute a conspiracy to procure an elective abortion. Doc. 61-2 ¶ 7. This course of conduct—providing "direct assistance to people seeking to travel out of state for abortion[s]"—is the crux of the *West Alabama* Plaintiffs' free speech claim. Doc. 60-1 at 14 (citing doc. 60-3 ¶ 7). Defendant stands by his arguments that direct abortion assistance is legitimately

criminalized within Alabama, and the First Amendment affords such conspiracies no protection.

### B. Enforcement of Alabama's conspiracy statutes is consistent with Yellowhammer's First Amendment rights to engage in expressive conduct and association.

The bulk of Yellowhammer's First Amendment argument is focused on how its "desired activities constitute expressive conduct." Doc. 61 at 49; *see generally id*. at 48–54.[8] The specific conduct claimed to be expressive falls into two categories: funding and transportation. Defendant stands by his briefing explaining that neither is protected by the First Amendment, Doc. 62 at 25–29, and will specifically respond to the declarations.

The First Amendment's guarantee of "an uninhibited marketplace of ideas in which truth will ultimately prevail," *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 767 (2018), does not entail an uninhibited marketplace of abortion funding in every State until all fifty "recognize and support the sanctity of unborn life." ALA. CODE § 26-23H-2(b). As the Deputy Director of Yellowhammer explains, the organization makes "financial pledges directly to clinics to help cover the cost of" specific abortions. Doc. 61-2 ¶ 9. Yellowhammer "purchas[es] bus and plane tickets" for the procurement of abortions. *E.g.*, *id*. ¶ 13.

---

[8] The *West Alabama* Plaintiffs do not argue that the funding of elective abortions or interstate abortion transportation constitutes constitutionally protected expression under the First Amendment.

To the extent Plaintiffs "contribute financially" within Alabama to the performance of elective abortions on "pregnant Alabamians[]," doc. 61 at 51, the First Amendment protects this funding only if it funds speech. *See Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 741 (2011). Abortions, however, are not protected "by any constitutional provision," *see Dobbs*, 597 U.S. at 231, and funding abortions, even with the intent "to convey a message of solidarity, love, and support," is therefore not protected expression. Doc. 61 at 48.

Second, "personally" driving pregnant women "to their abortion appointments in order to ensure that they [are] able to access" abortion care is not expressive conduct. Doc. 61-1 ¶ 16. There is no indication this transportation involves expressive "banners," is "open to everyone" (rather than only pregnant women considering an abortion), or takes place in a "traditional public forum." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1242 (11th Cir. 2018) (*FLFNB*). Aside from the factors in *FLFNB*, interstate abortion transportation is not "inherently expressive" conduct. *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006). Only by "talking about it," *id.*, can Yellowhammer "transform" transportation to an abortion clinic into a message about "destigmatizing abortion" or "liberty and autonomy." Doc. 61-1 ¶ 30.

Moreover, even if Plaintiffs' funding and transportation were expressive, Alabama may constitutionally regulate it. Under the *O'Brien* test, the prosecutions

would "further" numerous "substantial governmental interest[s]." *U.S. v. O'Brien*, 391 U.S. 367, 377 (1968). Alabama has substantial interests in protecting "the sanctity of unborn life and the rights of unborn children," ALA. CODE § 26-23H-2(b), and protecting women from the "serious … lasting or life threatening" consequences of abortion, *id*. § 26-23F-2(a)(4). The State's interests are legitimate objectives unrelated to the suppression of ideas. *O'Brien*, 391 U.S. at 377.

Finally, Yellowhammer argues that it has a First Amendment right to "associate[] with others to help them access their rights." Doc. 61 at 56 (citing declarations). The right to expressive association protects the ability of people to choose with whom they exercise their First Amendment rights, but it does not protect activities, like abortion funding, just because the funding involves association. Doc. 62 at 29.

## CONCLUSION

Plaintiffs' motions for summary judgment should be denied on all counts.

23

Respectfully submitted,

Steve Marshall
  *Attorney General*

James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*

Dylan Mauldin (ASB-3281-Z11M)
  *Assistant Solicitor General*

/s/ Benjamin M. Seiss
Benjamin M. Seiss (ASB-2110-O00W)
Charles A. McKay (ASB-7256-K18K)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Jim.Davis@AlabamaAG.gov
Dylan.Mauldin@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov
Charles.McKay@AlabamaAG.gov

## CERTIFICATE OF SERVICE

I certify that I electronically filed this document using the Court's CM/ECF system on July 15, 2024, which will serve all counsel of record.

/s/ Benjamin M. Seiss