# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| YELLOWHAMMER FUND, on behalf of itself and its clients, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 2:23-cv-450-MHT |
| ATTORNEY GENERAL OF ALABAMA STEVE MARSHALL, in his official capacity, | ) ) ) ) ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| WEST ALABAMA WOMEN'S CENTER, on behalf of themselves and their staff, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 2:23-cv-451-MHT |
| STEVE MARSHALL, in his official capacity as Alabama Attorney General, | ) ) ) ) | |
| Defendant. | ) | |

## WEST ALABAMA WOMEN'S CENTER ET AL. PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS .......................................................... 1

STANDARD OF REVIEW ................................................................................................... 2

ARGUMENT ..................................................................................................................... 2

   I.  Plaintiffs Have Standing to Bring the First Amendment and Right to Travel
      Claims. ................................................................................................................ 5

      a.  Plaintiffs Have Third-Party Standing to Bring the First Amendment Claim. ............... 7

      b.  Plaintiffs Dr. Robinson and AWC Have Third-Party Standing to Bring the Right to
          Travel Claim. ................................................................................................. 10

   II.  Defendant Is Not Entitled to Summary Judgment on the First Amendment
       Claim. ................................................................................................................ 17

      a.  The Narrow Speech-Integral-to-Criminal-Conduct Exception Is Inapplicable
          Here. ................................................................................................................ 17

      b.  Defendant Has Not Shown and Could Not Show that His Content- and Viewpoint-
          Based Restriction on Plaintiffs' Protected Speech Survives Strict Scrutiny. .............. 22

  III. Defendant Is Not Entitled to Summary Judgment on the Constitutional Right to Travel
       Claim. ................................................................................................................ 22

      a.  The Right to Travel Protects Both the Ability to Physically Move Across State
          Lines and to Engage in Activities that Are Legal in the Destination State. ................ 23

      b.  Defendant's Threats Are Not Mere "Reasonable" Travel Regulations but
          Unconstitutional Restrictions on the Fundamental Right to Travel. .......................... 30

         i.  Defendant's Threats Are Not Mere "Reasonable" Regulations of Travel and the
            Precedent He Cites in Support of His Requested "Reasonableness" Test Is
            Inapposite. ................................................................................................. 31

         ii.  Defendant's Attempt to Distinguish the Supreme Court Precedent that Controls
            Here Fails. ................................................................................................. 35

CONCLUSION .................................................................................................................. 40

## TABLE OF AUTHORITIES

**Cases**

*Att'y Gen. of N.Y. v. Soto-Lopez*,
  476 U.S. 898 (1986) ............................................................................................... 24, 25

*Bigelow v. Virginia*,
  421 U.S. 809 (1975) ...................................................................................................... 30

*BMW of N. Am., Inc. v. Gore*,
  517 U.S. 559 (1996) ...................................................................................................... 21

*Bosco's Club, Inc. v. City of Okla. City*,
  598 F. Supp. 583 (W.D. Okla. 1984) .............................................................................. 7

*Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993) ...................................................................................................... 25

*Brown v. Plata*,
  563 U.S. 493 (2011) ...................................................................................................... 39

*Calderwood v. United States*,
  623 F. Supp. 3d 1260 (N.D. Ala. 2022) ........................................................................... 5

*Charles v. Carey*,
  627 F.2d 772 (7th Cir. 1980) ......................................................................................... 15

*Clarke v. Tannin, Inc.*,
  301 F. Supp. 3d 1150 (S.D. Ala. 2018) ..................................................................... 17, 22

*Council of Ins. Agents + Brokers v. Gallagher*,
  287 F. Supp. 2d 1302 (N.D. Fla. 2003) ..................................................................... 8, 10

*Craig v. Boren*,
  429 U.S. 190 (1976) ....................................................................................... 11, 13, 14, 15

*Crandall v. Nevada*,
  73 U.S. (6 Wall.) 35 (1867) .................................................................................... *passim*

*Cramer v. Skinner*,
  931 F.2d 1020 (5th Cir. 1991) .................................................................................. 32, 33

*DJR Assocs., LLC v. Hammonds*,
  241 F. Supp. 3d 1208 (N.D. Ala. 2017) .......................................................................... 21

*Dobbs v. Jackson Women's Health Org.*,
  597 U.S. 215 (2022) ...................................................................................................... 29

*Doe v. Bolton*,
    410 U.S. 179 (1973) ..................................................................................... 29

*Doe v. Moore*,
    410 F.3d 1337 (11th Cir. 2005) ............................................................ 31, 32

*Edwards v. California*,
    314 U.S. 160 (1941) ............................................................................. *passim*

*Ellis v. England*,
    432 F.3d 1321 (11th Cir. 2005) ................................................................... 2

*Florida v. Royer*,
    460 U.S. 491 (1983) ..................................................................................... 39

*Fleeton v. O'Malley*,
    2:23-cv-62, 2024 WL 235216 (M.D. Ala. Jan. 22, 2024) ........................... 13

*FPL Food, LLC v. U.S. Dep't of Agric.*,
    671 F. Supp. 2d 1339 (S.D. Ga. 2009) ......................................................... 9

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949) ............................................................................. 17, 19

*Gilmore v. Gonzales*,
    435 F.3d 1125 (9th Cir. 2006) .............................................................. 32, 33

*Howard v. Metro. Atl. Rapid Transit Auth.*,
    No. 1:14-cv-03667, 2016 WL 10988790 (N.D. Ga. July 14, 2016) ........... 14

*Johnson v. Austal, U.S.A., L.L.C.*,
    805 F. Supp. 2d 1299 (S.D. Ala. 2011) ...................................................... 14

*Jones v. Gov. of Fla.*,
    950 F.3d 795 (11th Cir. 2020) ...................................................................... 6

*Jones v. Helms*,
    452 U.S. 412 (1981) ............................................................................. 33, 34

*Katt v. Dykhouse*,
    983 F.2d 690 (6th Cir. 1992) ...................................................................... 20

*Kent v. Dulles*,
    357 U.S. 116 (1958) ..................................................................................... 26

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ........................................................................... 5, 7, 11

*Matsuo v. United States*,
   586 F.3d 1180 (9th Cir. 2009) ................................................................ 32

*Mem'l Hosp. v. Maricopa County*,
   415 U.S. 250 (1974) ............................................................................... 29

*Mitchell v. State*,
   27 So. 2d 36 (Ala. 1946) ........................................................................ 20

*N.Y.C.L. Union v. N.Y.C. Transit Auth.*,
   684 F.3d 286 (2d Cir. 2012) ..................................................................... 7

*Nielsen v. Oregon*,
   212 U.S. 315 (1909) ........................................................................... 20, 21

*Nw. Mem'l Hosp. v. Ashcroft*,
   362 F.3d 923 (7th Cir. 2004) .............................................................. 9, 11

*Okpalobi v. Foster*,
   190 F.3d 337 (5th Cir. 1999) ................................................................. 15

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
   280 F.3d 278 (3d Cir. 2002) ..................................................................... 8

*Paul v. Virginia*,
   75 U.S. (8 Wall.) 168 (1868) ................................................................. 29

*Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky., Inc. v. Comm'r, Ind. State Dep't of Health*,
   No. 1:17-CV-01636-SEB-MG, 2024 WL 1908110 (S.D. Ind. May 1, 2024) ......... 18

*Planned Parenthood of Cent. N.J. v. Farmer*,
   220 F.3d 127 (3d Cir. 2000) ................................................................... 14

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
   748 F.3d 583 (5th Cir. 2014) ................................................................. 14

*Planned Parenthood Se., Inc. v. Bentley*,
   951 F. Supp. 2d 1280 (M.D. Ala. 2013) ................................................. 15

*Planned Parenthood Se., Inc. v. Strange*,
   33 F. Supp. 3d 1330 (M.D. Ala. 2014) ..................................................... 8

*Powers v. Ohio*,
   499 U.S. 400 (1991) ................................................................. 8, 9, 11, 14

*Region 8 Forest Serv. Timber Purchasers Council v. Alcock*,
   993 F.2d 800 (11th Cir. 1993) ............................................................ 9, 10

*Reprod. Health Servs. v. Strange*,
204 F. Supp. 3d 1300 (M.D. Ala. 2016) .................................................................. 14

*Saenz v. Roe*,
526 U.S. 489 (1999) ....................................................................... 23, 30, 35

*Shapiro v. Thompson*,
394 U.S. 618 (1969) .................................................................................. 35

*Singleton v. Wulff*,
428 U.S. 106 (1976) ......................................................................... 9, 11, 14

*Slaughter-House Cases*,
83 U.S. (16 Wall.) 36 (1872) ...................................................................... 27, 28

*United Bldg. & Constr. Trades Council of Camden Cnty. & Vicinity v.
Mayor of City of Camden*, 465 U.S. 208 (1984) ............................................... 27, 28

*United States v. Ala. Dep't of Mental Health & Mental Retardation*,
No. 2:08-cv-1025, 2010 WL 454905 (M.D. Ala. Feb. 10, 2010) ............................... 13

*United States v. Guest*,
383 U.S. 745 (1966) ....................................................................... 27, 36

*United States v. Hansen*,
599 U.S. 762 (2023) ....................................................................... 18, 19

*United States v. Simington*,
No. EP-10-CR-2275-KC, 2011 WL 145326 (W.D. Tex. Jan. 14, 2011) ..................... 31, 33

*United States v. Williams*,
553 U.S. 285 (2008) ....................................................................... 17, 19

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ............................................................................ 6

*W. Ala. Women's Ctr. v. Williamson*,
120 F. Supp. 3d 1296 (M.D. Ala. 2015) .......................................................... 8

*Warth v. Seldin*,
422 U.S. 490 (1975) ....................................................................... 5, 11

## Constitutional Provisions

U.S. Const. art. IV, § 2, cl. 1 ................................................................. 28

## Statutes

18 U.S.C. § 371 .................................................................................. 20

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................ 2

**Treatises**

15A C.J.S. *Conspiracy* § 118 .................................................................................. 20

16 Am. Jur. 2d *Conspiracy* § 1 .............................................................................. 21

**Other Authorities**

Seth F. Kreimer, *Lines in the Sand: The Importance of Borders in American Federalism*,
  150 U. Pa. L. Rev. 973 (2002) .............................................................................. 24

Laurence H. Tribe, Saenz *Sans Prophecy: Does the Privileges or Immunities Revival
  Portend the Future—Or Reveal the Structure of the Present?*,
  113 Harv. L. Rev. 110 (1999) ............................................................................... 24

Eugene Volokh, *The "Speech Integral to Criminal Conduct" Exception*,
  101 Cornell L. Rev. 981 (2016) ............................................................................ 20

## INTRODUCTION[1]

Defendant's motion for summary judgment largely recycles the same legal arguments that this Court considered and rejected at the motion to dismiss stage. These arguments have become no more compelling with the brief passage of time. As detailed below, and for the reasons already set forth in the WAWC Plaintiffs' Brief in Support of their Motion for Summary Judgment ("WAWC SJ Br."), Doc. 60-1, incorporated by reference herein, each of Defendant's arguments fails as a matter of law.[2] Accordingly, this Court should deny Defendant's motion and enter judgment in the WAWC Plaintiffs' favor on their First Amendment and right to travel claims.[3]

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The WAWC Plaintiffs incorporate by reference the Statement of Undisputed Material Facts set forth in their Brief in Support of their Motion for Summary Judgment, and the affidavits attached thereto. *See* WAWC SJ Br. 2–7; Aff. Robin Marty Supp. WAWC et al. Pls.' Mot. Summ. J. ("Marty Aff."), Doc. 60-2; Aff. Yashica Robinson, M.D., Supp. WAWC et al. Pls.' Mot. Summ. J. ("Robinson Aff."), Doc. 60-3.

Notably, Defendant Marshall does not contend that there are any material facts in dispute. Mot. Summ. J. ("Def.'s MSJ") 5–9, Doc. 62. Indeed, Defendant agrees: (1) that Defendant publicly stated an intention to prosecute those he believes have violated provisions of Alabama's conspiracy

---

[1] Unless otherwise noted, all emphasis is added and all internal quotation marks and citations are omitted.

[2] The terms "WAWC Plaintiffs" and "Plaintiffs" are used herein to refer collectively to Plaintiffs West Alabama Women's Center ("WAWC"), Alabama Women's Center for Reproductive Alternatives, LLC, d/b/a Alabama Women's Center ("AWC"), and Dr. Yashica Robinson.

[3] The WAWC Plaintiffs have cross-moved for summary judgment only on their two remaining claims, which arise under the First Amendment and the right to travel, *see* WAWC et al. Pls.' Mot. Summ. J., Declaratory Relief & Permanent Inj., Doc. 60, and respond only to arguments raised in Defendant's motion for summary judgment as to those two remaining claims—they do not address arguments made in Defendant's motion to the extent they pertain to claims brought only by the Yellowhammer Fund.

1

and other criminal laws by facilitating Alabamians' access to legal, out-of-state abortion care, *see id.* at 5–6; (2) that Defendant has "not rescinded his intent" in this respect, *id.* at 6; and (3) that Plaintiffs provided "information, counseling, and support" to pregnant Alabamians seeking to access legal, out-of-state abortion care prior to *Dobbs* and the events leading up to this lawsuit, *id.* at 8–9 ¶¶ 13–16; stopped doing so "[d]ue to Defendant's public statements," *id.* at 9 ¶ 15; continue to regularly receive inquiries from pregnant Alabamians regarding out-of-state abortion options, *id.* at 8 ¶¶ 10, 12; and would resume providing "information, counseling, and support" to these individuals "but for Defendant's public statements," *id.* at 9 ¶ 16.

## STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also* WAWC SJ Br. 7–8.[4] Defendant cannot meet his burden under Rule 56 here. To be sure, as noted above, Defendant does not assert that there are genuine disputes as to any material facts—nor *could* he, because "[f]or factual issues to be considered genuine, they must have a real basis in the record." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). However, as detailed below, all of Defendant's legal arguments fail as a matter of law and, as such, Defendant's motion for summary judgment should be denied.

## ARGUMENT

Defendant's motion for summary judgment is largely a reprise of legal arguments that this Court already rejected at a prior stage of these proceedings. For the reasons below, those arguments remain wrong on the law and must again be rejected.

---

[4] While Defendant also recites the standard for reviewing a motion for judgment on the pleadings in his brief, *see* Def.'s MSJ 10, his motion itself is solely for summary judgment, *see, e.g.*, *id.* at 1, 30, and Plaintiffs therefore treat it as such.

2

At the outset, Defendant's assertion that this Court lacks subject matter jurisdiction "because Plaintiffs cannot satisfy the third-party standing requirements," Def.'s MSJ 10, is meritless. Defendant now seemingly focuses this argument solely on the right-to-travel claim, *id.* at 11, but it gains no traction so narrowed: Third-party standing is prudential, not jurisdictional, and regardless, in addition to their undisputed Article III standing, the WAWC Plaintiffs clearly satisfy the prudential requirements for third-party standing to assert *both* their staffs' First Amendment rights *and* the right to travel of pregnant Alabamians seeking Plaintiffs' assistance in obtaining legal, out-of-state abortion care.

Defendant's arguments on the merits are similarly baseless and fail to establish entitlement to judgment as a matter of law. As to the First Amendment, Defendant claims he is entitled to judgment in his favor by reciting the same refrain, already considered and rejected by this Court: that Plaintiffs' speech is not protected because it is integral to criminal conduct. *See* Def.'s MSJ 25–26; *see also* Mot. Dismiss Op. & Order ("MTD Order") 75–86, Doc. 48. He is wrong. As explained in detail in Plaintiffs' summary judgment brief and *infra*, because Plaintiffs' speech pertains only to the provision and receipt of *legal*, out-of-state abortion care—"conduct" that is ***not*** criminal and cannot constitutionally be made so by Alabama—it is fully protected under the First Amendment. And Defendant's attempt to get around this by merely slapping the label of "criminal conspiracy" on any agreement formed to engage in indisputably legal conduct is foreclosed by both First Amendment doctrine and foundational principles of conspiracy liability. Once this is established, the rest easily follows—as Plaintiffs demonstrated in their cross-motion, Defendant's threats of prosecution amount to a content- and viewpoint-based restriction on Plaintiffs' protected speech and are therefore subject to strict scrutiny, a rigorous standard that Defendant makes no attempt to satisfy and could not satisfy if he tried.

As to the right to travel, Defendant recycles his claim that the right is not implicated here because it does not protect one's "travel to another State [to] do whatever is lawful there." Def.'s MSJ 17. This argument, too, is belied by binding law. As Plaintiffs have argued in their motion and as this Court has already concluded, history, logic, and Supreme Court precedent make clear that the constitutional right to travel unquestionably protects one's ability to move across state lines for the purposes of doing what is lawful in the destination state.

Defendant next contends that his threatened prosecution of anyone who helps a pregnant Alabamian exercise their right to leave the state is "a mere reasonable regulation on certain assistance for interstate travelling" that "do[es] not implicate the right," Def.'s MSJ 21, and—even if it did—is a constitutionally permissible, "reasonable" burden on travel, *id.* at 18–19, 21–22. But this is also not supported by law. Ignoring the Supreme Court precedent that actually applies, Defendant rests both of these arguments on cases that concern travel restrictions imposed on individuals who had previously committed a crime, or regulations that were in fact aimed at facilitating or improving the safety of travel and were found to have only incidental or negligible impacts on travel. As shown below, these cases are inapposite here, where Defendant's stated purpose and effect is to penalize pregnant Alabamians' legal interstate travel to obtain legal medical care by threatening to prosecute anyone who assists them in doing so. On this, Supreme Court precedent is clear: A state cannot (purposefully or otherwise) impose a direct penalty like the threatened criminal sanctions here on those who assist others in engaging in interstate travel for lawful purposes. This is so regardless of whether the state's actions actually prevent such travel, and even where the state contends that the restriction actually furthers a state legitimate interest— something that Defendant cannot credibly claim here, given his concession that pregnant Alabamians are entirely within their rights to leave the state to obtain a legal abortion elsewhere,

so long as they do so entirely on their own.

Accordingly, Defendant Marshall cannot demonstrate he is entitled to summary judgment on Plaintiffs' First Amendment and right to travel claims, and his motion should be denied.

## I.   Plaintiffs Have Standing to Bring the First Amendment and Right to Travel Claims.

Defendant "does not dispute" Plaintiffs' Article III standing. Def.'s MSJ 10; MTD Order 21 ("The court finds, and the Attorney General does not dispute, that all of the plaintiffs have satisfied the constitutional requirements for standing and thus have what is often referred to as 'Article III standing' to bring each claim.").[5] However, Defendant once again contends that Plaintiffs lack third-party standing to pursue either First Amendment or right to travel claims on behalf of their "staff and clients" and that this Court therefore lacks subject matter jurisdiction to hear such claims. Def.'s MSJ 10. This attack is fundamentally wrong and entirely unsupported in multiple respects.

As a threshold matter, third-party standing is an exception to the prudential—not jurisdictional—rule that a plaintiff "must assert his own legal rights and interests," and therefore this Court's subject matter jurisdiction is not implicated at all. *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *see also Kowalski v. Tesmer*, 543 U.S. 125, 128–29 (2004); *Calderwood v. United States*, 623 F. Supp. 3d 1260, 1280 (N.D. Ala. 2022). Moreover, because all parties and this Court agree that at least one of the WAWC Plaintiffs—Plaintiff Dr. Robinson—has Article III standing to assert her own First Amendment rights, *see, e.g.*, Def.'s MSJ 10; MTD Order 21, 28 n.4, this Court

---

[5] To wit, Dr. Robinson is plainly suffering an injury-in-fact to her own speech rights, and the clinic Plaintiffs have clearly demonstrated injuries to themselves—*inter alia*, the inability to fulfill their mission and ethical obligations as health care providers, *see, e.g.*, Marty Aff. ¶¶ 5, 14–17; Robinson Aff. ¶¶ 3, 14–16—caused directly by Defendant's threats of prosecution. These injuries are capable of redress by this Court through a declaratory judgment that Defendant's threatened enforcement of the Alabama criminal laws against Plaintiffs violates the U.S. Constitution and an injunction preventing such enforcement.

need not conduct a third-party standing analysis with respect to Plaintiffs' First Amendment claim. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977) (where "at least one individual plaintiff . . . has demonstrated standing . . . we need not consider whether the other . . . plaintiffs have standing to maintain the suit"); *Jones v. Gov. of Fla.*, 950 F.3d 795, 805–06 (11th Cir. 2020) (same); *see also, e.g.*, MTD Order 64–65. Defendant seems to recognize as much by focusing his third-party standing attack on the right to travel claim. *See* Def.'s MSJ 11.

Even so, as already set forth in Plaintiffs' summary judgment brief, all three WAWC Plaintiffs easily satisfy the prudential requirements for asserting the First Amendment rights of their staff, and Plaintiffs AWC and Dr. Robinson similarly satisfy these same requirements for asserting the right to travel of the pregnant Alabamians who seek their assistance. *See* WAWC SJ Br. 11–15, 28–32. Defendant does not meaningfully argue otherwise. Rather, Defendant states that he "stands by his standing briefing" from his motion to dismiss, Def.'s MSJ 11, and very briefly reasserts two arguments set forth in that briefing and already rejected by this Court. Because it is unclear whether Defendant actually means to rely on additional third-party standing arguments he raised at the motion to dismiss stage but did not expressly reassert in his motion for summary judgment, and to ensure Plaintiffs do not waive their response, Plaintiffs address those arguments below. As to the two arguments that Defendant *does* affirmatively reassert—(1) that *Craig v. Boren* is inapplicable to Plaintiffs' standing to bring the right to travel claim, and (2) that Plaintiffs' standing hinges on the application of some sort of lenient, "distorted" third-party standing test for cases concerning abortion that Defendant alleges was overruled by the Supreme Court in *Dobbs*, *see id.* at 11–12—both are wrong and do nothing to undercut Plaintiffs' standing here.

**a. Plaintiffs Have Third-Party Standing to Bring the First Amendment Claim.**

The WAWC Plaintiffs satisfy all three elements of the traditional third-party standing test for asserting the First Amendment rights of their staff. *See Kowalski*, 543 U.S. at 130 (explaining that third-party standing requires "two additional showings" of "'close' relationship" and "hindrance" on top of Article III injury requirements). It is undisputed that Plaintiffs are suffering the requisite injury-in-fact, as the threatened prosecution of Plaintiffs' staff—by and through whom Plaintiffs operate—chills their speech and, in so doing, inflicts significant harm on Plaintiffs' ability to fulfill their mission and ethical obligations. *See, e.g.*, Marty Aff. ¶¶ 11–18, 32; Robinson Aff. ¶¶ 9–12, 14–15, 17, 25, 46; *Bosco's Club, Inc. v. City of Okla. City*, 598 F. Supp. 583, 588–89 (W.D. Okla. 1984) ("[A] corporation[] can act only by and through its employees. Thus, if [a law] infringes the constitutional rights of the employees as they work, it is obvious that the Plaintiff has suffered the harm as well."); *N.Y.C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 295 (2d Cir. 2012) (concluding that plaintiff non-profit entity had shown that, through its agents, it had suffered a concrete injury where its ability to carry out responsibilities to its clients was frustrated by challenged policy); *see also* WAWC SJ Br. 11–13.

As to closeness, it is also undisputed both that Plaintiffs have a mission of providing information, counseling, and support to pregnant Alabamians to help them access the full range of reproductive health care options, including options that are legal in other states, *see* Marty Aff. ¶¶ 5, 9–10, 17; Robinson Aff. ¶¶ 3, 14–16, 27–29; *cf.* Def.'s MSJ 8–9, and that Plaintiffs' staff members are trained and feel ethically obligated to help fulfill that mission by providing on-the-job information and support to pregnant Alabamians, *see* Marty Aff. ¶¶ 14–15; Robinson Aff. ¶¶ 14–15. Thus, the interests of Plaintiffs and their staff, who are imperiled by the threatened prosecutions challenged here, are substantively identical, creating the requisite close relationship

for third-party standing. *See, e.g.*, *Powers v. Ohio*, 499 U.S. 400, 413 (1991) (permitting defendants to assert the third-party rights of jurors because of their "common interest in eliminating racial discrimination from the courtroom"); *see also* MTD Order 66–67.

Likewise, the hindrance requirement is clearly met here, where there exists a well-established climate of stigma, harassment, and violence relating to abortion in Alabama. *See, e.g.*, *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1333–34 (M.D. Ala. 2014) (describing a "history of violence [against] abortion providers and women seeking abortions in Alabama"); *W. Ala. Women's Ctr. v. Williamson*, 120 F. Supp. 3d 1296, 1308, 1321–22 (M.D. Ala. 2015) (same). Indeed, the undisputed facts underscore that being publicly associated with the provision of abortion care in Alabama can lead to targeting and harassment, which in turn can jeopardize an individual's, as well as their family's, financial, social, and physical security. *See, e.g.*, Robinson Aff. ¶¶ 18, 20–25; Marty Aff. ¶ 19. This is more than sufficient to establish a hindrance under the law. *See, e.g.*, *Council of Ins. Agents + Brokers v. Gallagher*, 287 F. Supp. 2d 1302, 1309 (N.D. Fla. 2003) (employer had standing to assert employees' rights where there existed "some obstacle," including fear of reprisal); *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 290 (3d Cir. 2002) (recognizing that "fear of stigmatization . . . operates as a powerful deterrent to bringing suit"); *see also* MTD Order 69–71.

Defendant does not contest any of this in his motion. Instead, he seemingly concedes Plaintiffs' third-party standing to bring the First Amendment claim in focusing his argument on the right to travel claim. Def.'s MSJ 11 ("Where the rubber meets the road is *with the right-to-travel claim*."). Nevertheless, to the extent Defendant means to dispute Plaintiffs' standing to assert the speech rights of their staff by using the same arguments he offered at the motion to dismiss stage, *see id.*, he remains doomed to failure.

To start, the fact that an individual employee of Plaintiff AWC—Dr. Robinson—is a named plaintiff in this case, *see* Def.'s Mot. Dismiss ("MTD") 15, Doc. 28; Def.'s Reply in Supp. Mot. Dismiss ("MTD Reply") 11, Doc. 36, does nothing to undermine Plaintiffs' standing, as the applicable test does not require Plaintiffs to categorically prove there are *no* circumstances in which any of their staff members would be willing to act as a plaintiff in their own right, only that there be "some hindrance," *Powers*, 499 U.S. at 411, or "some genuine obstacle" to doing so, *Singleton v. Wulff*, 428 U.S. 106, 116 (1976), as there is here. *See* MTD Order 70–71. Nor does the potential for concerned staff to sue under pseudonyms, MTD Reply 10–11, defeat any showing of hindrance. A pseudonym generally does not protect one's identity from litigation counterparties, nor does it prevent family, friends, and/or others in one's community from deducing one's identity from facts revealed through litigation. *Cf. Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 929 (7th Cir. 2004) (when de-identified patient records "are made a part of the trial record . . . persons of their acquaintance, or skillful 'Googlers,' sifting the information contained in the medical records concerning each patient's medical and sex history, will put two and two together, 'out' [abortion patients], and thereby expose them to threats, humiliation, and obloquy"). Moreover, as this Court has already explained, the pseudonym "argument was considered in *Singleton* and was made in the *June Medical* dissents, but it has yet to carry the day." MTD Order 36–37, 71.

Finally, Defendant's prior argument that the Eleventh Circuit's decision in *Region 8 Forest Service Timber Purchasers Council v. Alcock*, 993 F.2d 800, 810 (11th Cir. 1993), forecloses employers from asserting their employees' rights "[a]s a matter of law," *see* MTD 15, ignores that courts in the Eleventh Circuit have declined to read *Region 8* to categorically preclude third-party standing in the employer-employee context. *See, e.g.*, *FPL Food, LLC v. U.S. Dep't of Agric.*, 671 F. Supp. 2d 1339, 1361–62 (S.D. Ga. 2009) (rejecting contention that *Region 8* created a rule "that

an employer-employee relationship is never close enough to confer third-party standing," noting that "[o]ther circuits have . . . upheld third-party standing in the employer-employee context, and [the 11th Circuit] . . . upheld standing in the landlord-tenant context, which arguably is not as close as the employer-employee relationship"); *Gallagher*, 287 F. Supp. 2d at 1309–10 (applying *Region 8* test and finding employers had third-party standing to assert their employees' rights). Further, as this Court recognized, *Region 8* itself limits its ruling to the facts of that case,[6] *see* MTD Order 67–69, and rightly so: The timber company employers there were attempting to gain third-party standing by asserting their employees' generalized interest in "the outdoors," which was not only unrelated to the employees' work but also was not necessarily congruent with the employer's primary asserted economic interest. 993 F.2d at 809–10. By contrast, here, "the plaintiff healthcare providers and their staff have materially identical interests that the threatened prosecutions would equally imperil." MTD Order 68. *Region 8* thus "poses no bar" to Plaintiffs' standing to raise the speech rights of their staff, *id.* at 69, which they have amply demonstrated.

**b. Plaintiffs Dr. Robinson and AWC Have Third-Party Standing to Bring the Right to Travel Claim.**

Plaintiffs Dr. Robinson and AWC's[7] third-party standing to assert the right to travel claim is equally strong—and Defendant's arguments to the contrary, equally without merit. As set forth in Plaintiffs' summary judgment brief, Plaintiffs have standing to bring the right to travel claim under two separate doctrinal tests for third-party standing. WAWC SJ Br. 28–32. First, this case fits squarely into the class of cases where the Supreme Court has "allowed standing to litigate the rights of third parties" because "enforcement of the challenged restriction *against the litigant*

---

[6] *Region 8*, 993 F.2d at 810 (holding that "*in this case* the employee/employer relationship is not such that the employer would be nearly as effective a proponent as the employees").

[7] Plaintiff WAWC does not raise any right to travel claim.

would result indirectly in the violation of third parties' rights." *Kowalski*, 543 U.S. at 131 (emphasis in original); *see also Craig v. Boren*, 429 U.S. 190, 192–97 (1976); WAWC SJ Br. 28–30; MTD Order 23–26.[8] Second, Plaintiffs AWC and Dr. Robinson also readily satisfy each element of the traditional tri-part third-party standing test: (1) they have the requisite Article III injury, as detailed above; (2) their interest in assisting pregnant Alabamians in traveling across state lines to access desired legal out-of-state abortion care, *see* Robinson Aff. ¶¶ 10–11, 13, is identical to, and necessarily "inextricably bound up with," *Singleton*, 428 U.S. at 114–18, those persons' interests in engaging in interstate travel to obtain the health care they desire, thereby providing the requisite closeness, *id.*; *see also Powers*, 499 U.S. at 413–14; MTD Order 30–35; and (3) as numerous courts have long recognized, "genuine obstacle[s]"—including concerns for privacy, financial vulnerability, and the time-sensitive nature of pregnancy—hinder pregnant peoples' ability to assert their own rights in the abortion context, *see, e.g.*, *Singleton*, 428 U.S. at 116–17; *see also* WAWC SJ Br. 31–32; MTD Order 35–38; *cf. Nw. Mem'l Hosp.*, 362 F.3d at 929.

Rather than meaningfully contend with the wealth of precedent supporting these conclusions, Defendant's motion only attacks the first doctrinal basis for Plaintiffs' standing by singling out one illustrative case—*Craig v. Boren*, 429 U.S. 190 (1976)—and asserting that it is "distinguishable *as to all Plaintiffs*." Def.'s MSJ 12 (emphasis in original). At the threshold, as this Court has already noted, Defendant "forgets that *Craig* is just one example of the broader

---

[8] As set forth in Plaintiffs' summary judgment brief, WAWC SJ Br. 30, and as this Court already concluded, MTD Order 26, recognizing third-party standing in this context is also consistent with the Supreme Court's right to travel jurisprudence, under which individuals facing penalties for facilitating travel have long been permitted to assert the right to travel of the persons they desire to assist. *See generally Crandall v. Nevada*, 73 U.S. (6 Wall.) 35 (1867) (permitting stagecoach company agent carrying passengers out of Nevada to assert passengers' right to interstate travel in challenging $1 tax imposed on company for each passenger); *Edwards v. California*, 314 U.S. 160 (1941) (permitting defendant who drove brother-in-law into California to assert brother-in-law's right to travel in challenging law criminalizing bringing or assisting in bringing non-resident indigent persons into the state).

principle that litigants threatened with enforcement are well positioned, if not entitled, to assert the rights of third parties that are intertwined with the conduct the litigants seek to pursue." MTD Order 27; *see also id.* at 23 n.2 (collecting cases). But even if *Craig* were the be-all and end-all here, the three arguments Defendant sets forth in an attempt to distinguish it would not carry the day.

Defendant first contends that, unlike in *Craig*, the general criminal laws here broadly describe the type of conduct that is criminalized rather than targeting one specific issue or group of people (i.e., those selling "near beer"). Def.'s MSJ 12 & n.1 (citing MTD Reply 6–7 & n.3); MTD Reply 5. But as this Court explained, the Supreme Court in *Craig* highlighted the plaintiff-vendor's duties—and liability—under the statute only to illustrate that she had *Article III* standing, which the Attorney General "does not dispute" here. MTD Order 27 n.3. Regardless, it is also undisputed that Defendant Marshall has threatened to use the general criminal statutes at issue to prosecute Plaintiffs' specific conduct—namely, providing travel-related assistance to Alabamians seeking legal abortions out-of-state. *See* Def.'s MSJ 5–9. Thus, the threatened *application* of the relevant statutes—which is what is challenged here—*is* in fact specifically addressed to Plaintiffs.

Defendant's second point—that the relevant criminal laws do not directly impose corporate criminal liability on clinic Plaintiff AWC, *see id.* at 12 n.1; MTD Reply 5—is similarly flawed. As this Court has also already recognized, given that the Plaintiff clinics can operate only by and through their staff, "[a]s far as the *Craig* rationale is concerned, enforcement against the plaintiffs' staff *is* the functional equivalent of enforcement against the organizations themselves." MTD Order 28.[9] Defendant states that he "disputes" this concededly "practical argument," but offers no

---

[9] While Defendant seemingly contends that Dr. Robinson cannot proceed under the rule from *Craig* based on his other two arguments, *see* Def.'s MSJ 12 n.1, he (rightly) does not assert that *she* could not be prosecuted directly for violation of the relevant criminal statutes.

reasoning or case law to support his position. Def.'s MSJ 12 n.1. Such conclusory statements fall far short of satisfying Defendant's burden as the movant here. *See, e.g.*, *United States v. Ala. Dep't of Mental Health & Mental Retardation*, No. 2:08-cv-1025, 2010 WL 454905, at *6 (M.D. Ala. Feb. 10, 2010) (defendant was "not entitled to have its motion for summary judgment granted" on the basis of an argument for which "it ha[d] failed to point to the legal or factual predicate"); *Fleeton v. O'Malley*, 2:23-cv-62, 2024 WL 235216, at *6 (M.D. Ala. Jan. 22, 2024) ("[C]onclusory and unsupported arguments" for which a party "cites no specific authority or evidence" are insufficient on a motion for summary judgment).

Finally, Defendant's third point—that, unlike the defendant state officials in *Craig*, he has not failed to challenge third-party standing at this stage of the case, and thus, there are no similar efficiency concerns compelling resolution on the merits here, MTD Reply 5 n.3—makes far too much of the *Craig* Court's reasoning that the "denial of jus tertii standing" and refusal to address the merits there, where "the applicable constitutional questions have been and continue to be presented vigorously and cogently[,]. . . serve[s] no functional purpose." 429 U.S. at 193–94. Irrespective of the fact that the state in *Craig* did not contest third-party standing earlier in the case, the *Craig* Court clearly held that the plaintiff "established independently her claim to assert jus tertii standing." *Id.* at 194. In short, nothing in *Craig*, or in the application of that case by the Supreme Court and lower courts over the past half-century, suggests that its recognition of third-party standing was purely the result of waiver and not a reasoned analysis by the Court.

This puts to bed Defendant's *Craig* arguments.[10] But even if the principle from *Craig* were inapplicable here, that would not matter because—as noted above—Plaintiffs also satisfy the

---

[10] Defendant claims he will "hold off" making his full argument until he reads Plaintiffs' cross-motion. Def.'s MSJ 12. It is unclear whether by this he means to "hold off" on further arguing for the inapplicability of *Craig*, or on further contesting Plaintiffs' third-party standing more generally. Either way, a summary

traditional prudential requirements for asserting their clients' right to travel, and to the extent Defendant means to incorporate his prior attempts to contest this, *see* Def.'s MSJ 11, they remain unsuccessful. To start, the "closeness" of the relationship between Plaintiffs and the pregnant Alabamians who seek their assistance does not turn on the duration of the contact between them, *contra* MTD Reply 7–8, nor does any binding legal authority support such a notion. Rather, numerous courts have effectively rejected the contention that a continuous, long-standing relationship is necessary in concluding that abortion providers have a sufficiently close relationship with their patients to assert their constitutional rights.[11] *See, e.g.*, *Singleton*, 428 U.S. at 117 ("The closeness of the relationship [between an abortion provider and her patients] is patent" given that "[a] woman cannot safely secure an abortion without the aid of a physician"); *Reprod. Health Servs. v. Strange*, 204 F. Supp. 3d 1300, 1322–24 (M.D. Ala. 2016) (abortion providers had a close relationship with their patients for third-party standing purposes); *Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 147 (3d Cir. 2000) (same); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 589 (5th Cir. 2014) (same).

---

judgment movant cannot simply hold his arguments in reserve until reply. *See, e.g.*, *Howard v. Metro. Atl. Rapid Transit Auth.*, No. 1:14-cv-03667, 2016 WL 10988790, at *7 (N.D. Ga. July 14, 2016) (holding that because the summary judgment movant did not make a certain argument in her opening brief, she "has not carried her summary-judgment burden and may not now raise the issue in her reply brief" and noting that the refusal to consider an "argument raised for the first time in reply is a matter of fairness—[the opposing party] has not gotten a chance to respond to the arguments first raised" in reply) (collecting cases); *Johnson v. Austal, U.S.A., L.L.C.*, 805 F. Supp. 2d 1299, 1310 (S.D. Ala. 2011) ("In order to avoid a scenario in which endless sur-reply briefs are filed, or the Court is forced to perform a litigant's research for it on a key legal issue because that party has not had an opportunity to be heard, or a movant is incentivized to save his best arguments for his reply brief so as to secure a tactical advantage based on the nonmovant's lack of opportunity to rebut them, this Court does not consider arguments raised for the first time in a reply brief.").

[11] Relatedly, any contention that only intimate relationships, like that of a parent and their child, are sufficiently "close" for third-party standing purposes, MTD Reply 7, is flatly belied by a wealth of Supreme Court precedent wherein the Court recognized a litigant's standing to assert a third party's rights in situations where the relationship between the two was far from that of a parent and their child. *See, e.g.*, *Powers*, 499 U.S. at 413 (defendants had third-party standing to raise rights of excluded jurors); *Craig*, 429 U.S. at 194–97 ("near beer" seller had third-party standing to raise rights of potential customers).

Likewise, Defendant cannot undermine closeness by claiming that Plaintiffs are somehow seeking to promote their own financial and reputational interests at the expense of pregnant Alabamians' safety. *See, e.g.*, MTD 11–12; MTD Reply 6–7. His attempt to manufacture a non-existent conflict of interest rests on (1) dissenting opinions from Supreme Court cases; (2) wholly unsupported speculation that Plaintiffs receive monetary or reputational remuneration for assisting pregnant people in accessing legal, out-of-state abortion care; and (3) wholly unsupported speculation that, if they did, Plaintiffs would prioritize personal profit above their professional and ethical obligations. As to (1), these opinions are not only not binding, but also from inapposite cases wherein the state was defending challenged restrictions on the basis that they improved the safety of abortion or defending "compliance measures" imposed on plaintiffs' provision of abortion care that providers "might be incentivized to avoid," MTD Order 34. As to (2) and (3), there is nothing in the record to support either, and, regardless, (2) is not legally relevant, *see, e.g.*, *Craig*, 429 U.S. at 195–97, and (3) has been correctly rejected by other courts, as this Court should do here, *see, e.g.*, *Planned Parenthood Se., Inc. v. Bentley*, 951 F. Supp. 2d 1280, 1285 n.3 (M.D. Ala. 2013) (rejecting that the "economic and liberty interests of the plaintiffs conflict with . . . patients' interests"); *Okpalobi v. Foster*, 190 F.3d 337, 352 (5th Cir. 1999) (same), *rev'd on reh'g en banc on other grounds*, 244 F.3d 405 (5th Cir. 2001); *Charles v. Carey*, 627 F.2d 772, 779 n.10 (7th Cir. 1980) (same).

Finally, as to hindrance, as already explained, the ability to sue under a pseudonym, *see* MTD 14, is not a panacea, and the fact that some pregnant people have been willing and able to assert their own rights in other cases, *id.*; MTD Reply 9–10, is irrelevant, given that a prospective proponent of a third party's rights need not show that there are *no* circumstances under which the third party could assert their rights on their own, only that a genuine obstacle to doing so exists.

*Supra* 9; *see also* MTD Order 37. As such, none of Defendant's arguments can defeat Plaintiffs AWC and Dr. Robinson's clear standing to assert the right to travel of the pregnant Alabamians they seek to assist.

\* \* \*

With that, all that remains of Defendant's third-party standing argument is his baseless assertion that Plaintiffs' "ability to assert claims on behalf of their clients and staff" centers on the application of some sort of "distorted" abortion exception to the traditional third-party standing criteria that was allegedly eliminated by the Supreme Court in *Dobbs*. Def.'s MSJ 11–12. But Plaintiffs' third-party standing has nothing to do with the fact that the speech and conduct Plaintiffs wish to engage in relates to legal abortion. To the contrary, as detailed above, and entirely ignored by Defendant, Plaintiffs have amply demonstrated that they satisfy each of the *traditional factors* set forth in "[t]he undistorted third-party standing jurisprudence," *id.* at 12, for both the First Amendment and right to travel claims. And any argument that *Dobbs* overruled *sub silentio* all prior abortion cases where third-party standing was recognized, and that the dissents in those cases now control all third-party standing analysis in all cases that touch on abortion, *id.* at 11–12; MTD Reply 3–4, has already been flatly rejected by this Court, and rightly so. As this Court explained, "*Dobbs* was not a case about standing, and it did not overrule any precedent except where the Court explicitly said so." MTD Order 39. Thus, "[w]hile the Attorney General may wish that a great bulk of the Court's cases governing standing to assert third-party rights were overruled and that dissenting opinions were instead binding authority, this court must abide by precedent." *Id.* Under that precedent, and the prudential requirements for third-party standing that flow from it, Plaintiffs have standing to assert the speech rights of their staff and the fundamental right to travel

of the pregnant Alabamians' seeking their assistance. Accordingly, Defendant's request for judgment on the basis that Plaintiffs lack third-party standing must be denied.

## II.      Defendant Is Not Entitled to Summary Judgment on the First Amendment Claim.

Defendant rests his motion as to Plaintiffs' First Amendment claim entirely on the assertion that Plaintiffs' speech is unprotected because it is "integral or in furtherance of criminal conduct." Def.'s MSJ 25. This Court has rejected this argument once, MTD Order 74–86, and should do so again. As Plaintiffs have set out in their summary judgment brief, WAWC SJ Br. 15–27, not only does Plaintiffs' speech fall within the heart of the First Amendment's protections, but Defendant's threats of prosecution are both viewpoint-based and—as he has already conceded, *see* MTD Order 74–75; MTD 26—content-based. Defendant makes no attempt to argue that those threats pass constitutional muster under *any* tier of scrutiny, let alone the strict scrutiny that applies, and any last-ditch effort to argue as much on reply will be too little too late. *See, e.g.*, *supra* n.10; *Clarke v. Tannin, Inc.*, 301 F. Supp. 3d 1150, 1173 (S.D. Ala. 2018) ("District courts, including this one, ordinarily do not consider arguments raised for the first time on reply."). Accordingly, Defendant cannot meet his burden of proving entitlement to judgment on the First Amendment claim.

### a.  The Narrow Speech-Integral-to-Criminal-Conduct Exception Is Inapplicable Here.

The narrow speech-integral-to-criminal-conduct exception to First Amendment protection that Defendant seeks to invoke has no bearing here. *See* WAWC SJ Br. 15–20. Certainly, as the Supreme Court explained in *Giboney v. Empire Storage & Ice Co.*, the "constitutional freedom for speech" protected by the First Amendment does not "extend[] its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." 336 U.S. 490, 498 (1949). However, the *sine qua non* of the "speech integral to criminal conduct" exception is that the speech must be "intended to induce or commence *illegal activities*." *United States v. Williams*,

553 U.S. 285, 298 (2008); *see also United States v. Hansen*, 599 U.S. 762, 783 (2023) (recognizing that "[s]peech intended to bring about a particular *unlawful act*" is not protected by the First Amendment).

As such, Defendant's argument that this exception applies to Plaintiffs' speech "ignores the issue at the heart of this case: that the plaintiffs and their staff wish to help their clients access abortions in States where abortions are *lawful*." MTD Order 76 (emphasis in original). Defendant has not shown and cannot show that the relevant speech—speech about abortion care provided and obtained *in another state*, where it is *legal* under the laws of *that state*—is intended to induce or commence any activities or acts that are unlawful or criminal in any respect. *See, e.g.*, *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, No. 1:17-CV-01636-SEB-MG, 2024 WL 1908110, at *5 (S.D. Ind. May 1, 2024) (providing pregnant minors "truthful information regarding out-of-state options for legally obtaining an abortion and providing medical referrals and/or contacting out-of-state providers on behalf of such minors seeking to obtain abortion services that are legal in those states is . . . *not* inducing criminal activity" (emphasis in original)). Thus, in effect, Defendant's argument amounts to an ask that this Court "extend *Giboney*'s immunity into new terrain: [speech related to] efforts to perform acts that would be unlawful in the State where they are planned but lawful (and potentially even constitutionally protected) in the State where they would occur." MTD Order 77–78. This request finds no support in the law and should again be rejected. Indeed, to sanction such a view would sever the requisite connection between unprotected speech and a particular crime, rendering the speech-integral-to-criminal-conduct exception virtually boundless, with dangerous consequences.

For example, such an expansive construction of a narrow exception would effectively give a state the power to exempt speech about *any* activity it disfavors from First Amendment

protection, even where the speech has absolutely no connection to conduct that is actually "in violation of a valid criminal statute." *Giboney*, 336 U.S. at 498. Following this logic, a state (State A) that has chosen to restrict or limit certain activities it disfavors within its borders (e.g., recreational gambling or certain hunting practices) could claim that simply because those activities are unlawful in State A, *any* speech related to engaging in those activities *in State B* (where those same activities are *legal*)—such as recommendations for casinos or hunting locations—may be criminalized. The constitutional problem that arises, of course, is the same as the one presented here—the speech in question is not "integral" to any independently illegal course of conduct since the conduct at issue (i.e., gambling or hunting *in State B*) is not criminal.

Defendant attempts to get around this with sleight of hand, contending that the exception nevertheless applies because "abortion is generally illegal under Alabama law, and the Legislature has prohibited Alabama-based conspiracies (agreements) to perform them because such agreements are inherently dangerous." Def.'s MSJ 26. Plaintiffs do not dispute that, as a general matter, conspiracy is a stand-alone criminal offense because the crime is the "act of agreement itself." *Id*. But even assuming that the Alabama Legislature had purported to criminalize as "conspiracies" agreements formed in Alabama to engage in out-of-state conduct that is perfectly *legal* where it occurs,[12] that would not matter: The First Amendment forbids a state from so easily nullifying its protections by slapping the label of "conspiratorial agreement" on speech about conduct that it may disfavor but is indisputably *legal*. *See, e.g.*, *Hansen*, 599 U.S. at 783 (emphasizing that for speech to fall into *Giboney*'s exception, and be unprotected, it must be "intended to bring about a particular *unlawful act*"); *Williams*, 553 U.S. at 297–98 (same); Eugene

---

[12] Such an assumption also rests entirely on Defendant's interpretation of a nearly 130-year-old criminal law that has *never* been enforced, let alone enforced in this manner, or even construed by the Alabama Supreme Court since its enactment. *See generally* MTD Order 91, 94–95.

Volokh, *The "Speech Integral to Criminal Conduct" Exception*, 101 Cornell L. Rev. 981, 987–88 (2016) ("[T]he *Giboney* doctrine can't justify treating speech as 'integral to illegal conduct' simply because the speech is illegal under the law that is being challenged."); *id.* at 1000 (explaining that the speech being proscribed must be "causally linked to a particular crime, a crime that does not itself consist of otherwise protected speech"); *Katt v. Dykhouse*, 983 F.2d 690, 695 (6th Cir. 1992) ("We must decide, then, whether the First Amendment protects speech that proposes a transaction lawful in the place where the transaction is to occur when both the underlying transaction and the offer are unlawful in the place where the offer is made. We conclude that the First Amendment does provide such protection.").

Indeed, this circular logic is belied not just by First Amendment doctrine, but also by fundamental principles of conspiracy liability, which make clear that for conspiracy laws to pass muster, the purportedly illegal "agreement" must be in furtherance of a *separate, independent criminal objective*.[13] *See generally Mitchell v. State*, 27 So. 2d 36, 38–39 (Ala. 1946) (noting "the word 'conspire' does not within itself necessarily connote an evil intention," and holding that in an indictment for criminal conspiracy, "the fact that the conspiracy is characterized as unlawful is not enough," and the government must allege that the "supposed offense that was the object of the conspiracy" is unlawful); 15A C.J.S. *Conspiracy* § 118 ("To constitute a criminal conspiracy, either the object of the conspiracy or the means of accomplishing it must be illegal. . . . No one

---

[13] Any attempt to resort to cases involving Section 1 of the Sherman Act, *see* MTD Reply 12, and the "defraud" clause of 18 U.S.C. § 371, *see* MTD 17–18, n.6, to argue to the contrary "misses a critical point," as "[d]efrauding the United States and restraining trade, which *no* State affirmatively permits, are fundamentally unlike abortions and the patchwork of legal protections nationwide surrounding them." MTD Order 82–83 (emphasis in original). Moreover, those two federal laws concern acts "that Congress has the constitutional authority to criminalize" throughout the United States, *id.* at 83, whereas here, the Constitution forbids Alabama from prohibiting people from engaging in lawful, out-of-state conduct through threats of criminal sanction, *see Nielsen v. Oregon*, 212 U.S. 315, 321 (1909), and Alabama cannot achieve the same unconstitutional end indirectly by prosecuting instead all those who would provide any assistance in doing so. *Id.* at 83–84.

can be held criminally liable for conspiracy to do acts that are perfectly lawful and to which there is no criminal objective."); 16 Am. Jur. 2d *Conspiracy* § 1 ("The crime of conspiracy can only be defined in conjunction with a second crime, that is, the substantive crime involved in the conspiracy.").

In short, as this Court has already explained, for the narrow speech-integral-to-criminal-conduct exception "to have tractable limits, the speech at issue *must* bear some relation to an independently unlawful course of conduct." MTD Order 79. Here, the independent "course of conduct" that any speech or agreement bears relation to—legal, out-of-state abortion—is not unlawful or criminal and could not constitutionally be made such by Alabama. *See* Answer ¶¶ 60, 121, Doc. 57; WAWC et al. Verified Compl. Declaratory & Inj. Relief ¶ 60, Doc. 23; *see also Nielsen*, 212 U.S. at 321 ("[F]or an act done within the territorial limits of [one state], under authority and license from that state, one cannot be prosecuted and punished by . . . [a different] state."); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572–73 (1996) (holding that while Alabama could punish BMW for engaging in unlawful behavior in Alabama, it would violate due process to punish BMW for engaging in out-of-state conduct that was lawful where it transpired); *DJR Assocs., LLC v. Hammonds*, 241 F. Supp. 3d 1208, 1233 (N.D. Ala. 2017) ("[I]n a federal system, Alabama does not have the right to insist that its view of proper . . . policy be enforced . . . with respect to conduct occurring entirely in another state, particularly where Alabama's policy choices conflict with those of the other state."). Accordingly, Plaintiffs' speech does not fall within the narrow speech-integral-to-criminal-conduct exception and is fully protected under the First Amendment.

**b. Defendant Has Not Shown and Could Not Show that His Content- and Viewpoint-Based Restriction on Plaintiffs' Protected Speech Survives Strict Scrutiny.**

As detailed in Plaintiffs' summary judgment brief, once it is established that their speech does not fall into the speech-integral-to-criminal-conduct exception, the resolution of this claim is straightforward: The Attorney General's threatened prosecution of Plaintiffs for their protected speech about legal, out-of-state abortion care is a content- and viewpoint-based restriction, subject to strict scrutiny, which it cannot survive. *See* WAWC SJ Br. 20–22. Defendant does not contest this. To the contrary, he has already conceded that the restriction here is content-based, *see* MTD Order 74–75; MTD 26, and he makes no attempt to argue that such a restriction survives any level of constitutional review, let alone strict scrutiny. And, even if it were appropriate to make such an argument for the first time on reply—which it is not, *see supra* n.10; *Clarke*, 301 F. Supp. 3d at 1173—it would fail, *see* WAWC SJ Br. 22–27. As such, Defendant's request for summary judgment on the First Amendment claim should be denied.

**III.    Defendant Is Not Entitled to Summary Judgment on the Constitutional Right to Travel Claim.**

Defendant is not entitled to summary judgment on Plaintiffs AWC and Dr. Robinson's right to travel claim either. *See* Def.'s MSJ 16–25. As already explained above, Plaintiffs AWC and Dr. Robinson have standing to assert the right to travel of the pregnant Alabamians who request their assistance. *See supra* 10–17. Defendant's remaining arguments boil down to the following: (1) the right to travel does not protect travel for purposes of doing what is lawful in the destination state, Def.'s MSJ 17, and, regardless, (2) Defendant's threats amount to a mere *regulation* of assistance for travel that does not implicate the right, *id.* at 21, and, even if it did, it is a "reasonable" restriction supported by legitimate state interests, and therefore is constitutional, *id.* at 20–22. As explained below, these arguments fail, and the binding Supreme Court precedent

that applies instructs that state laws or actions—like Defendant's threats—that have the purpose and effect of penalizing interstate travel violate the constitutional right to travel. Accordingly, Defendant's motion for judgment as to this claim must also be denied.

### a. The Right to Travel Protects Both the Ability to Physically Move Across State Lines and to Engage in Activities that Are Legal in the Destination State.

Defendant seemingly agrees that the right to interstate travel is a fundamental, constitutional right and that one component of this right is the right of a resident of one state to enter and leave another state. *See* Def.'s MSJ 16.[14] Nevertheless, Defendant would render the right effectively meaningless by asking this Court to hold that it does not protect an interstate traveler's ability to travel for purposes of engaging in legal activities in the destination state. *Id.* at 17. Under Defendant's logic, the right to travel would be limited to mere entry into and exit from a state, would apply only so long as the traveler does not intend to actually *do* anything in the destination state, and would dissipate in the event the purpose of said travel was to engage in legal activities within the destination state. As this Court has already recognized, such a position runs contrary to history, precedent, and logic, and must be rejected. *See* MTD Order 41–51.

The conclusion that the right to travel protects the right to do what is legal in the destination state is well-supported. Free interstate movement is central to our system of federalism and to "national unity," because it plays an essential role in binding the residents of the several states together and preserving the core principle that "[t]he people of these United States constitute one nation." *Crandall*, 73 U.S. at 43. It is in pursuit of this end that the fundamental right to travel necessarily protects not just the ability to physically move one's body across state lines for the

---

[14] Defendant concedes that the other two components of the right to travel—"the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in [a] second State," and, "for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State," Def.'s MSJ 16–17 (quoting *Saenz v. Roe*, 526 U.S. 489, 500 (1999))—"are not relevant here." *Id.*

sake of it, but the ability to do so for purposes of "seeking new horizons in other States" and experiencing what other jurisdictions have to offer. *Edwards*, 314 U.S. at 181 (Douglas, J., concurring); *see also Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 902 (1986) (noting "the important role [the right to travel] has played in transforming many States into a single Nation"). Indeed, as detailed in Plaintiffs' summary judgment brief, the legal foundations of this nation— from the Magna Carta, to the Articles of Confederation, to the Constitution, to early Supreme Court precedent recognizing the fundamental right to travel—all reinforce the underlying principle that the right to travel must necessarily protect travel into a sister state for the purpose of engaging in lawful activities in that state. *See* WAWC SJ Br. 33–36; *see also* MTD Order 43–46.

This is for good reason. Were this not the case—were "our bodies [able to] move among states, but our freedom of action . . . tied to our place of origin"—then the right to travel would become "a hollow shell." Seth F. Kreimer, *Lines in the Sand: The Importance of Borders in American Federalism*, 150 U. Pa. L. Rev. 973, 1007 (2002); Laurence H. Tribe, Saenz *Sans Prophecy: Does the Privileges or Immunities Revival Portend the Future—Or Reveal the Structure of the Present?*, 113 Harv. L. Rev. 110, 152 (1999) ("If each state could decide for itself . . . how much of its legal system its citizens would have to carry around on their backs while seeking to take advantage of the legal environments of other states, then the right to choose which state to enter for any purpose lawful in that state would amount to nothing more than the right to have the physical environment of the states of one's choosing pass before one's eyes . . . ."). Indeed, accepting Defendant's argument here would enable every state in the nation to effectively deprive its residents of the ability to travel across state lines for purposes of engaging in any and all intellectual, cultural, scientific, social, and political pursuits in other states. This would undermine the federal system and the foundation and purpose of our nation and cannot be the case.

Nevertheless, Defendant attempts to muster some support for his cramped view of this fundamental right by suggesting both that the right to travel only protects travelers from "the erection of actual barriers," Def.'s MSJ 17, and that the right derives solely from the Privileges and Immunities Clause and, as a result, only applies to a *destination state's* treatment of non-residents, *id.* at 17–18. Both contentions are incorrect.

**First**, Defendant's "actual barriers" argument—based solely on out-of-context language from *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993)—is belied by *multiple* Supreme Court cases confirming that Plaintiffs may prove a violation of the right to travel without showing actual deterrence, let alone outright prevention. *See, e.g.*, *Soto-Lopez*, 476 U.S. at 903 (state action can violate the right to travel in multiple ways, including "when impeding travel is its primary objective"); *Edwards*, 314 U.S. at 177 (holding that statute criminalizing bringing or assisting in bringing a non-resident indigent person into California violated the right to travel, notwithstanding the absence of any evidence that the statute was actually preventing indigent people from entering the state); *Crandall*, 73 U.S. at 46 (holding tax of $1 imposed on common carriers for each person transported out of Nevada violated the right to travel even while recognizing that such a minimal tax would likely not actually deprive people of the ability to travel).[15]

**Second**, to the extent Defendant suggests that Plaintiffs' construction of the right to travel rests solely on Privileges and Immunities Clause precedent, and is therefore inapplicable here because that Clause does not apply to efforts by an *origin* state to restrict what its residents can do in traveling to a *destination* state, Def.'s MSJ 17–18, he misreads both the Supreme Court's

---

[15] In any event, the undisputed facts show the existence of "actual barriers" here, as Defendant's threats *are* actually depriving pregnant Alabamians of assistance needed to cross state lines in order to access time-sensitive health care. Marty Aff. ¶¶ 21–31; Robinson Aff. ¶¶ 26–45.

broader right to travel precedent and the Privileges and Immunities Clause itself. To be sure, the Privileges and Immunities Clause—and Supreme Court cases interpreting it—provide one robust pillar of support for construing the right to travel to protect travel for the purpose of *doing things*. *See* WAWC SJ Br. 34–36; *see also* MTD Order 43–49. But Defendant is wrong to imply that the right—and this construction of it—rests on the Privileges and Immunities Clause alone. To the contrary, as explained in Plaintiffs' summary judgment brief and acknowledged by this Court, the Supreme Court has never found it necessary to locate the fundamental right to travel in any one, specific constitutional provision; it has attributed the protections afforded the right to travel not only to the Privileges and Immunities Clauses of Article IV and the Fourteenth Amendment, but also the Commerce Clause, the Due Process Clause of the Fifth and Fourteenth Amendments, and even to the general federal structure of government adopted by the Constitution. *See* WAWC SJ Br. 33 n.16; *see also* MTD Order 42 n.10. As such, it is no surprise that the wealth of Supreme Court precedent supporting the conclusion that the right to travel protects the right to move across state lines for purposes of *doing things* in the destination state includes cases outside of the Privileges and Immunities context. *See, e.g.*, *Crandall*, 73 U.S. at 36 (reasoning that the federal structure of the nation as a whole protects the right to travel for purposes of "approach[ing] the great departments of the government, the ports of entry through which commerce is conducted, and the various Federal offices in the States"); *Edwards*, 314 U.S. at 177 (holding that law criminalizing those who bring or assist in bringing indigents into California, presumably for the purposes of making a better life for themselves, violates right to travel under the Commerce Clause); *Kent v. Dulles*, 357 U.S. 116, 125–26 (1958) (holding that "[t]he right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment" and recognizing that interstate travel "may be necessary for a livelihood" and

that the nation "has thrived on the principle that, outside of areas of plainly harmful conduct, every American is left to shape his own life as he thinks best, do what he pleases, go where he pleases"); *United States v. Guest*, 383 U.S. 745, 757–60 (1966) (acknowledging "recurring differences in emphasis within the Court as to the source of the constitutional right of interstate travel" but finding "no need here to canvass those differences further" or locate the right in a particular provision, given agreement that "the right exists," and overturning dismissal of an indictment against defendants alleged to have conspired to "injure, oppress, threaten, and intimidate" Black Americans' right to travel freely to and from the State of Georgia, presumably for the purpose of doing things inside and outside of the state); *see also id.* at 772 (Harlan, J., concurring) (surveying the various constitutional bases for the right to travel, including the Commerce Clause, Privileges and Immunities Clause, and the Due Process Clause, and explaining that "[a] basic reason for the formation of this Nation was to facilitate commercial intercourse; intellectual, cultural, scientific, social, and political interests are likewise served by free movement. . . . If the State obstructs free intercourse of goods, people, or ideas, the bonds of the union are threatened . . . .").

Regardless, Defendant's attempt to distinguish the relevant Privileges and Immunities precedent on the basis that it only bears on "how States treat non-residents," Def.'s MSJ 17–18, is unavailing. To start, the *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1872), and *United Building & Construction Trades Council of Camden County & Vicinity v. Mayor of City of Camden*, 465 U.S. 208 (1984), *see* Def.'s MSJ 17–18, do nothing to support Defendant. Both cases merely stand for the unremarkable proposition that a resident of a state has no claim under the Privileges and Immunities Clause against her home state for any alleged differential treatment or disadvantage imposed upon her as compared to other in-state residents within that state. In other words, these cases only confirm that the Privileges and Immunities Clause protects rights associated with being

part of a greater federal union of states—like the right to interstate travel—and not rights associated with only state citizenship. As such, a putative plaintiff could not bring a claim under the Privileges and Immunities Clause against her home state for, *inter alia*, privileging one group of in-state residents over another group of in-state residents. *Slaughter-House Cases*, 83 U.S. at 73–80 (holding that New Orleans butchers did not have a claim under the Privileges and Immunities Clause against Louisiana statute granting New Orleans corporation effective monopoly over the slaughterhouse industry); *id.* at 79–80 (contrasting state occupational privileges sought by the New Orleans butchers with privileges protected by the Clause, including the right to interstate travel); *United Bldg.*, 465 U.S. at 216–17 (holding that out-of-state plaintiffs had Privileges and Immunities Clause claim against municipal ordinance providing hiring preference for residents of Camden, New Jersey over other New Jersey residents and residents of other states, even though the similarly disadvantaged New Jersey residents (i.e., those not residing in Camden) did not have such a claim themselves).

But that is not what is at issue here. Here, Defendant is penalizing the right of Alabama residents to interstate travel—a right unquestionably protected by the Privileges and Immunities Clause, *see Slaughter-House Cases*, 83 U.S. at 79–80—because of the specific *out-of-state* legal conduct they intend to engage in. And as this Court has already explained, "[n]either the text nor purpose of the Privileges and Immunities Clause suggests that its protections depend upon whether the State imposing travel restrictions is the State of one's origin or destination." MTD Order 48 n.12. Rather, the Clause provides broadly that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1, and it serves to ensure that residents of State A are able to travel to States B, C, and D and engage in legal activities in those states "on the same footing with citizens of [those] States" and without

28

facing "the disabilities of alienage." *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 180 (1868), *overruled in part on other grounds by United States v. Se. Underwriters Ass'n*, 322 U.S. 533 (1944). Thus, "[i]t follows that the Privileges and Immunities Clause and the right to travel are implicated when *any* State prohibits residents of one State from enjoying the benefits lawfully available in another State." MTD Order 48 n.12 (emphasis in original). The fact that previous right-to-travel cases may have largely arisen in the context of destination states discriminating against travelers from other states "merely reflects the unprecedented nature of the Attorney General's actions in seeking to prevent residents of his own State from engaging in lawful conduct in other States." *Id.*[16]

    In sum, the Supreme Court precedent cited above, and others of the Court's precedents referenced in Plaintiffs' summary judgment brief, WAWC SJ Br. 32–37, make clear that interstate travel is protected for myriad purposes, including, as relevant here, for purposes of accessing "the medical services that are available [in the destination State]." *Doe v. Bolton*, 410 U.S. 179, 200 (1973) (holding that interstate travel to seek and obtain legal abortion is protected); *see also Mem'l Hosp. v. Maricopa County*, 415 U.S. 250, 269 (1974) (holding that one-year durational residency requirement for receipt of state-funded nonemergency hospitalization or medical care creates an invidious classification that impinges on the right to interstate travel); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 345 (2022) (Kavanaugh, J., concurring) ("[B]ased on the constitutional right to interstate travel," a state may not "bar a resident of that State from traveling to another

---

[16] That the protections afforded by the Privileges and Immunities Clause are not "absolute," such that state laws treating residents differently from non-residents could theoretically be justified by substantial state interests in certain contexts, Def.'s MSJ 18, is irrelevant. This case is not about "a State treat[ing] out-of-state residents differently than it does its own residents"; that would implicate the second and third components of the right to travel which, as noted above, Defendant concedes "are not relevant here." *Id.* at 16–17. Rather, as all parties agree, at issue here is the first component of the right to travel—the right of a resident of one state to enter and leave another state—and, as discussed below, the controlling Supreme Court precedent on *that* component of the right forecloses Defendant from justifying his penalization of travel based on purported state interests in restricting such travel for legal purposes.

State to obtain an abortion[.]"); *cf. Bigelow v. Virginia*, 421 U.S. 809, 822–24 (1975) ("The Virginia Legislature could not have . . . prevent[ed] its residents from traveling to New York to obtain [legal abortion] services, or . . . prosecute[d] them for going there.") (collecting "right to travel" cases). Accordingly, Defendant's attempt to limit such a fundamental, constitutional right so as to effectively eviscerate the protections it affords cannot stand.

### b. Defendant's Threats Are Not Mere "Reasonable" Travel Regulations but Unconstitutional Restrictions on the Fundamental Right to Travel.

The law is clear that a state law or action that has the purpose or effect of penalizing interstate travel, like the Attorney General's threats of prosecution here, is unconstitutional as a matter of law. *See Saenz*, 526 U.S. at 499 n.11 ("If a law has no other purpose . . . than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it [is] patently unconstitutional."); *Crandall*, 73 U.S. at 42–45, 49 (striking down Nevada law that imposed $1 tax on common carriers for each passenger carried out of the state as violative of the right to travel, notwithstanding minimal amount of tax); *Edwards*, 314 U.S. at 173–74 (striking down California law that criminalized "bring[ing] or assist[ing] in bringing" a non-resident indigent person into the state as violative of the right to travel, notwithstanding recognition of weighty state interest in limiting migration during Great Depression); *see* WAWC SJ Br. 37–42. This Court has already rejected Defendant's attempt to evade constitutional review under this clear precedent by invoking inapposite cases to recast his threats of criminal prosecution as a mere "regulation" that either does not implicate the right or passes muster under some sort of "reasonableness" test. *See* Def.'s MSJ 18–19, 21–22; MTD Order 57–58. It should do so again for the same reasons. Once these arguments are rejected, all that is left is Defendant's futile attempt to distinguish the binding Supreme Court precedent that *does* control here. *See* Def.'s MSJ 22–25.

Accordingly, Defendant cannot satisfy his burden of proving his entitlement to judgment on the right to travel claim.

      **i.** **Defendant's Threats Are Not Mere "Reasonable" Regulations of Travel and the Precedent He Cites in Support of His Requested "Reasonableness" Test Is Inapposite.**

In an effort to evade controlling Supreme Court precedent, Defendant resorts to defending his threats on the basis of their purported "reasonableness." First, trying to escape from under the weighty constitutional protections afforded the right to travel entirely, he contends that his threats to impose criminal penalties on those who facilitate others' out-of-state travel for legal abortion are merely "reasonable regulation[s]" that do not even implicate the right.[17] *Id.* at 21–22. Second, he argues that even if the right is implicated, his restriction on travel passes constitutional muster because the applicable test is only one of "reasonableness," and his threats are reasonable considering the allegedly "legitimate" state interests they aim to serve. *Id.* at 18–20, 22. He is wrong on both fronts.

To begin, Defendant's request for the application of some sort of "reasonableness" standard—both to determine whether the right to travel is implicated and to assess the constitutionality of any infringement—relies on inapposite cases under which often minor, incidental burdens on one's ability to travel are subject only to rationality review because they do not meaningfully implicate the right. *See* MTD Order 57–58. These cases include challenges to, for example, notification and registration requirements for sex offenders, like those at issue in *Doe v. Moore*, 410 F.3d 1337, 1348 (11th Cir. 2005), and *United States v. Simington*, No. EP-10-CR-

---

[17] Defendant creates a straw man in contending that the "relevant statutes" impose no burden on travel. As is clear from Plaintiffs' complaint and briefing, they are not challenging the relevant criminal statutes on their face; the challenge here is to the Attorney General's threats to use those statutes to prosecute Plaintiffs for assisting pregnant people in accessing legal, out-of-state abortion care. Because it is the threatened *application* of the relevant statutes that is actually at issue here, Plaintiffs construe and respond to Defendant's reasonableness argument accordingly.

2275-KC, 2011 WL 145326, at *9 (W.D. Tex. Jan. 14, 2011), *see* Def.'s MSJ 19, 22; laws that impose security screening requirements at airports, *see, e.g.*, *id.* at 22 (citing *Gilmore v. Gonzales*, 435 F.3d 1125, 1136 (9th Cir. 2006)); restrictions placed on the use of certain airports that have the effect of making a preferred method of airline travel "less convenient" for certain passengers, *id.* at 19, 21 (citing *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991)); and conventional traffic regulations like traffic lights, speed limits, license and registration requirements, and toll roads that affect travel by car, *see id.* at 21 (quoting *Cramer*, 931 F.2d at 1030). Central to the courts' reasoning in these cases was the determination that any impact on travel amounted to no more than routine delays and inconveniences or affected only a single mode or preferred method of travel, leaving alternative routes open. This is a far cry from the draconian criminal penalties Plaintiffs are threatened with here for assisting with *any* and *all* forms of interstate travel for abortion. *See Edwards*, 314 U.S. at 173 (criminal penalties on travel-related assistance impermissibly "restrain[]" right to travel).[18]

In addition, Defendant's cases do not apply because, unlike the threatened prosecutions here, the impact on travel was ancillary to the non-travel-related purposes that the policies at issue were designed to serve. Laws like sex offender security protocols and rules regarding air travel *regulate* travel but are not primarily aimed at impeding travel itself.[19] By contrast, Defendant here

---

[18] *Matsuo v. United States*, 586 F.3d 1180, 1183 (9th Cir. 2009), Def.'s MSJ 21, is even further afield, as it did not even involve a *state* restriction on interstate travel. The Ninth Circuit's decision there was not, as Defendant implies, premised on a conclusion that the law in question did not implicate the right to travel, but rather on the basis that "states [weren't] involved," and that the Supreme Court's precedent on right to travel invoked by the plaintiffs there—namely, *Saenz*—does not provide any right to "be[] provided with the same *federal* benefits after moving." *Matsuo*, 586 F.3d at 1184. Moreover, any incidental burden on travel that flows from the loss of a financial employment benefit obtained by virtue of residing in certain states, as was at issue in *Matsuo*, is a far cry from the direct criminal penalties at issue here.

[19] *See, e.g.*, *Doe*, 410 F.3d at 1348 (noting primary purpose to prevent sex offenders from legally subverting the objective of the Sex Offender Act by temporarily traveling to other jurisdictions for long periods, where

has threatened to impose criminal penalties on anyone who would assist residents in travelling across state lines precisely *because* they have assisted in that travel, for the *purpose* of inhibiting that travel. And the Supreme Court in *Edwards*—one of the cases that controls here—certainly did not impose a test of "reasonableness." Def.'s MSJ 22. Rather, the *Edwards* Court looked at whether the California law criminalizing the provision of assistance to indigent persons in entering the state utilized the impermissible mechanism of penalizing interstate travel, and found that, because it did, it violated the fundamental right, regardless of whether the law also accomplished otherwise-legitimate objectives. 314 U.S. at 173 (restraining cross-border transportation exceeded the "boundaries [of] permissible . . . State legislative activity," despite other interests served).

*Jones v. Helms, see* Def.'s MSJ 19–20, 24, does nothing to undercut this important distinction. In that case, the Supreme Court held that there was no right-to-travel violation in a Georgia law that "enhance[d] the misdemeanor of child abandonment to a felony if a resident offender leaves the State after committing the offense." 452 U.S. 412, 422 (1981). The Court concluded that the appellee—who had already pleaded guilty to the misdemeanor of child abandonment *before* leaving Georgia for Alabama—had already engaged in criminal conduct (i.e., the commission of the crime of child abandonment under the laws of Georgia) that "had qualified his right to travel interstate before he sought to exercise that right." *Id.* at 420. Thus, *Jones* merely holds that "a person who has committed an offense punishable by imprisonment" does not have an "unqualified federal right to leave the jurisdiction prior to arrest or conviction," *id.*, especially where their "departure aggravates the consequences of [criminal] conduct that is otherwise

---

they might commit sex offenses, without having to notify law enforcement); *Simington*, 2011 WL 145326, at *10 (noting purpose of law to "prevent[] future sex crimes"); *Cramer*, 931 F.2d at 1031 ("[T]he statute's history shows that its purpose was not to impede travel but to carry out an agreement thought necessary to benefit the region's travelers by consolidating service."); *Gilmore*, 435 F.3d at 1131 n.4 (noting airline passenger identification requirement intended to "protect transportation security").

punishable," *id.* at 422–23—in that case, child abandonment. It does not, as Defendant seems to contend, give states carte blanche to *purposefully* prevent the interstate travel of individuals who have committed *no* crime—and are in fact only attempting to do something (i.e., leave the state for abortion) that Defendant admits is itself entirely legal. Def.'s MSJ 20. Nor does it create some sort of generally applicable rational basis or reasonableness test for restrictions on the right to travel, under which any state-imposed penalty on travel can survive constitutional review so long as the state asserts the travel will have some sort of "detrimental effects." *Id.* at 19–20.

Given that the standard here is not one of "reasonableness," Alabama's asserted interests in penalizing lawful travel are of no moment. Def.'s MSJ 22. If California's interest in preventing what the Court characterized as "grave and perplexing" problems of health, morals, and finance allegedly created by an influx of migrants into the state during the Great Depression could not save the criminal statue at issue in *Edwards*, 314 U.S. at 173, Alabama's interests cannot save the near-identical threats to travel assistance here. Moreover, Defendant cannot claim that his threats serve "[t]he State's legitimate objectives of prohibiting elective abortions and conspiracies to procure them," Def.'s MSJ 22, when prohibiting elective abortions in other states is not a legitimate exercise of Alabama's authority. Thus, the question in this case is not, as Defendant would have it, whether a state has the power to prohibit criminal conspirators from traveling in pursuit of the illegal objects of their conspiracies. It is instead whether Alabama can apply its general criminal laws to make it more difficult for a pregnant Alabamian to cross state lines when they (1) indisputably have a right to interstate travel; (2) indisputably have not committed any crime in Alabama; and (3) indisputably are not committing any crime by engaging in the intended conduct in the destination state. In accordance with decades of Supreme Court precedent and logic, the answer to that question must be no.

**ii. Defendant's Attempt to Distinguish the Supreme Court Precedent that Controls Here Fails.**

Once Defendant's "reasonableness" arguments are cast aside, the result here is clear: As set forth in Plaintiffs' summary judgment brief, controlling Supreme Court precedent dictates that the Attorney General's unjustified threats violate the fundamental right to travel in at least two ways. *See* WAWC SJ Br. 37–42. First, Defendant's threats were issued with the unconstitutional purpose of penalizing interstate travel. *See Saenz*, 526 U.S. at 499 n.11 ("If a law has no other purpose . . . than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it [is] patently unconstitutional." (alteration in original)); *Shapiro v. Thompson*, 394 U.S. 618, 631 (1969), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974) (same); *Edwards*, 314 U.S. at 174 (striking down California law that had the "express purpose" of prohibiting indigent people from entering the state). And second, Defendant's threats have an unconstitutional effect on interstate travel by penalizing those who would assist pregnant Alabamians in exercising their right to move across state lines. *See Crandall*, 73 U.S. at 48–49; *Edwards*, 314 U.S. at 173–74. Defendant attempts to get around this by mischaracterizing his primary purpose and distinguishing the binding precedent that applies. Both efforts fail.

***First***, Defendant contends that his primary purpose is not to impede travel but to "curtail certain conduct no matter the location." Def.'s MSJ 24. This argument is unavailing. As this Court has already held, a restriction on travel "with the primary objective of preventing specific lawful out-of-state conduct"—as the Attorney General has conceded is his objective here, *see, e.g., id.*; MTD Reply 36—is "just as constitutionally impermissible as restrictions aimed at preventing travel generally," MTD Order 53. Similarly unavailing is any argument that Defendant's purpose here is instead to further state interests in protecting fetal life or maternal health. Def.'s MSJ 24–25. Alabama has already advanced any purported interest in fetal life within its own borders by

banning abortion in the state.[20] And—importantly—Defendant here is not simply seeking to ensure that Alabama's ban is fully enforced by punishing alleged conspiracies to provide abortions *in* Alabama that would *violate the ban*. Indeed, if that were what Defendant was threatening to do, this would be a very different case. Rather, Defendant is seeking to further his purported state interests *beyond* the state's borders by preventing Alabamians from *lawfully* leaving the state to obtain abortion care in other states where it is legal. Having conceded that pregnant people are free to leave the state for abortion care on their own, Def.'s MSJ 20, and making no argument that Alabama has the power to prohibit the provision or receipt of abortion in another state, *id.* at 14–15, it follows that the only way Defendant can achieve his aim is by inhibiting the ability of state residents to leave Alabama and enter another state to obtain that care. Accordingly, the *immediate* and *primary* purpose of Defendant's threats can only be to "impede or prevent the exercise of the right of interstate travel." *Guest*, 383 U.S. at 760; *see also Edwards*, 314 U.S. at 174 (concluding that the "express purpose" of California law criminalizing bringing an indigent person into California was "to prohibit the transportation of indigent persons across the California border," even where the state claimed the law combatted problems of health, morals, and finance).

**Second**, Defendant cannot meaningfully distinguish *Edwards* and *Crandall*, Def.'s MSJ 22–24, both of which are directly applicable here and instruct that a state law or action that penalizes those who assist others in traveling across state lines has an unconstitutional *effect* on interstate travel, regardless of whether it imposes an insurmountable barrier to that travel, and regardless of the legitimacy of purported state interests at play. *See Crandall*, 73 U.S. at 48–49;

---

[20] And if Defendant is genuinely concerned with protecting maternal health outside Alabama, *see, e.g.*, Def.'s MSJ 22, then one would think that he would want to ensure that the pregnant Alabamians he concedes are free to leave the state for abortion, *id.* at 20, receive information, guidance, and support from trusted medical experts and health professionals about the safest, highest-quality places to obtain such care. It is telling that he does not.

*Edwards*, 314 U.S. at 174. In *Crandall*, the Court struck down Nevada's $1 tax imposed on common carriers for each passenger brought out of the state as violative of the right to travel, even though the tax was merely $1, was imposed on the carrier assisting with travel rather than directly on travelers themselves, and applied only when someone leaving the state relied on a carrier for transportation. 73 U.S. 35. Likewise, in *Edwards*, the Court held that the California law making it a crime to bring or assist in bringing into the state any indigent person who was not a California resident violated the right to travel, even though the criminal penalty was imposed on the assistor (not the indigent traveler themselves), and even while recognizing the state's asserted interests in addressing health, moral, and financial concerns related to migration into the state during the Great Depression as "grave." 314 U.S. at 173. These cases are discussed in greater detail in Plaintiffs' summary judgment brief, *see* WAWC SJ Br. 37–41, but it bears repeating here that if even the small monetary tax at issue in *Crandall*, let alone the criminal law targeting travel assistors in *Edwards*, violated the fundamental right to travel, Defendant Marshall's attempt to "isolate" Alabamians by criminalizing those who would assist them in exercising their right to cross state lines necessarily must also fail. *Edwards*, 314 U.S. at 173; *id.* at 181 (Douglas, J., concurring) ("If a state tax on that movement, as in the *Crandall* case, is invalid, a fortiori a state statute which obstructs or in substance prevents that movement must fall.").

The Attorney General's arguments to the contrary amount to nothing more than smoke and mirrors. He first claims that *Edwards* is somehow inapposite because this case is not about restricting interstate migration for the sake of it but is instead about punishing those who "participat[e] in an unlawful scheme to procure an elective abortion—regardless of movement across State lines." Def.'s MSJ 23. But, as already explained, there can be no "unlawful scheme" here, because any "elective abortion" that Plaintiffs assist someone in obtaining is perfectly legal.

Thus, unlike if Defendant's threats were limited to conspiratorial agreements to provide illegal abortions *in* Alabama, the threats of criminal sanction here are not, as Defendant implies, in accord with the State's proper exercise of its police powers and criminal jurisdiction. Rather, Defendant has threatened to impose criminal penalties directly on those who "assist[] in bringing," *Edwards*, 314 U.S. at 171, people across state lines for purposes of obtaining a *legal, out-of-state abortion*— conduct that the Attorney General may disfavor, but effectively concedes Alabama does not and could not directly prohibit. *See* Def.'s MSJ 14–15, 20. Put another way, Defendant is attempting to do indirectly what Alabama has not done and could not constitutionally do directly—prohibit Alabamians from obtaining a legal abortion in another state—by penalizing those who assist them in traveling across state lines for care in the hopes that such penalties prevent that travel (and thus receipt of care) altogether. This "strike[s] at the core of the Constitution's goal of creating a single citizenship through ingress and egress," *Id.* at 23, in the exact same manner as California's law in *Edwards*.

Defendant's second attempt at a distinction fares no better. He seemingly contends that *Edwards* is of no moment because the Court there concluded that regulation of the transport of indigent persons across state lines "does not admit of diverse treatment by the several States," 314 U.S. at 176, whereas the federal constitution does not forbid states from regulating abortion in different manners. *See* Def.'s MSJ 23. But this case has nothing to do with Alabama's ability to regulate abortion within its borders, which it has already done. The question here is whether Defendant can impose penalties on those who assist others in traveling to engage in certain conduct for the purpose and with the effect of inhibiting the putative travelers' exercise of their right to travel. *Edwards* makes clear he cannot.

Finally, the *Edwards* Court's recognition that indigent non-residents affected by California's statute could not—by virtue of being effectively prevented from entering the state—avail themselves of the democratic processes to try to change the policy, *Id.* at 22–23, does nothing to render it inapposite. Indeed, the actual plaintiff in *Edwards*—against whom the California statute's criminal penalties ran—*was* a resident of California, 314 U.S. at 170, and thus presumably had the ability (as Defendant contends Plaintiffs do here) to resort to the democratic process to try to change the law. And, in any event, a putative plaintiff is under no obligation to exhort their elected representatives to cease an unconstitutional action or repeal an unconstitutional statute before appealing to the courts to remedy ongoing violations of federal constitutional rights. *Brown v. Plata*, 563 U.S. 493, 511 (2011) ("Courts nevertheless must not shrink from their obligation to enforce the constitutional rights of all 'persons,' . . . ."); *Florida v. Royer*, 460 U.S. 491, 512 (1983) (Brennan, J., concurring) (recognizing courts' "unflagging duty to strike down official activity that exceeds the confines of the Constitution").

Defendant also revives his claim that *Crandall* is inapposite because the penalty there was categorical in that it applied to all assistance in traveling across state lines, regardless of the purpose—lawful or otherwise—of that travel, whereas here any limitation on travel assistance is only "to the extent it is intended to further a criminal conspiracy." Def.'s MSJ 24. However, again, any agreement to help a pregnant person travel to obtain an abortion outside of Alabama cannot be conspiratorial, because the underlying out-of-state conduct—providing and obtaining a legal abortion—is not criminal. And, as this Court has already explained, because "the right to travel includes the right to do what is *lawful* in another State while traveling, . . . restrictions that prohibit travel for specific out-of-state conduct are unconstitutional just as those that impede travel generally are." MTD Order 56. In other words, because "[t]here is no end-run around the right to

travel that would allow States to burden travel selectively and in a patchwork fashion based on whether they approve or disapprove of lawful conduct that their residents wish to engage in outside their borders," *id.* at 56, Defendant's effort to undercut *Crandall*'s direct applicability fails.[21]

* * *

In sum, contrary to Defendant's claims, there exists no general "reasonableness" test for penalties imposed on the right to interstate travel. Rather, binding Supreme Court precedent makes clear that a state law or action that has the purpose or effect of penalizing interstate travel, like the Attorney General's threatened prosecutions, is unconstitutional as a matter of law. Try as he might, Defendant cannot get around the applicability of this precedent, which controls the outcome here and, as a matter of law, precludes him from proving his entitlement to judgment on the right to travel claim. Accordingly, his motion as to that claim should be denied.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendant's Motion for Summary Judgment and, as set forth in Plaintiffs' Motion for Summary Judgment, enter judgment as a matter of law in Plaintiffs' favor.

---

[21] Defendant also cursorily asserts that "obtaining an abortion has little if anything to do with a citizen's duties to the country." Def.'s MSJ 24. To the extent this is an attempt to distinguish *Crandall* because the pregnant people here are traveling for purposes of obtaining an abortion, as opposed to approaching offices of government or performing certain citizenship duties, it fails. As Justice Douglas explained in his concurrence in *Edwards*, "there is not a shred of evidence in the record of the *Crandall* case that the persons there involved were en route on any such mission [to the seat of national government or its offices throughout the country] . . . . The point which Mr. Justice Miller made was merely an illustration of the damage and havoc which would ensue if the States had the power to prevent free movement of citizens from one State to another." *Edwards*, 314 U.S. at 178–79 (Douglas, J., concurring). It is that exact power that the Attorney General is attempting to wield here.

Dated: July 15, 2024

Respectfully submitted,

/s/ Meagan Burrows
Meagan Burrows*
New York State Bar No. 5341904
Alexa Kolbi-Molinas*
New York State Bar No. 4477519
Lindsey Kaley*
New York State Bar No. 5324983
Scarlet Kim*
New York State Bar No. 5025952
Jessica Quinter*
New York State Bar No. 6124077
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
mburrows@aclu.org
akolbi-molinas@aclu.org
lkaley@aclu.org
scarletk@aclu.org
jquinter@aclu.org

Lorie Chaiten*
Illinois State Bar No. 6191424
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
1640 North Sedgwick
Chicago, IL 60614
(212) 549-2633
lchaiten@aclu.org

Alison Mollman
Alabama State Bar No. 8397-A33C
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(510) 909-8908
amollman@aclualabama.org

*Attorneys for Plaintiffs West Alabama
Women's Center, Alabama Women's Center
for Reproductive Alternatives, LLC, d/b/a*

41

*Alabama Women's Center, and Yashica Robinson, M.D.*

*\*Admitted pro hac vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was filed using the

Court's CM/ECF system on this 15th day of July, which will serve all counsel of record.

/s/ Meagan Burrows
Meagan Burrows
