# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| YELLOWHAMMER FUND, on behalf of itself and its clients, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 2:23-cv-450-MHT |
| ATTORNEY GENERAL OF ALABAMA STEVE MARSHALL, in his official capacity, | ) ) ) ) ) | |
| Defendant. | ) ) | |

| | | |
|---|---|---|
| WEST ALABAMA WOMEN'S CENTER, on behalf of themselves and their staff, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 2:23-cv-451-MHT |
| STEVE MARSHALL, in his official capacity as Alabama Attorney General, | ) ) ) ) | |
| Defendant. | ) ) | |

## WEST ALABAMA WOMEN'S CENTER ET AL. PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

I.   Plaintiffs Have Standing to Bring Both the First Amendment and Constitutional
     Right to Travel Claims. ............................................................................................. 2

     a.   Defendant's Attempt to Distinguish the *Craig v. Boren* Line of Cases Fails ............... 2

     b.   Plaintiffs AWC and Dr. Robinson Satisfy All Three Elements of the Traditional
          Third-Party Standing Test. ............................................................................... 5

          i.   Plaintiffs AWC and Dr. Robinson Have a Close Relationship with Their
               Patients and Other Pregnant Alabamians Seeking Their Assistance. .................... 6

          ii.  Plaintiffs AWC's and Dr. Robinson's Patients and the Other Pregnant
               Alabamians Seeking Their Assistance Face Genuine Obstacles to Asserting
               Their Own Rights. .......................................................................................... 9

II.  Plaintiffs Are Entitled to Judgment as a Matter of Law on the First Amendment
     Claim. ......................................................................................................................... 16

     a.   The Narrow Speech-Integral-to-Criminal-Conduct Exception Is Inapplicable
          Here. .......................................................................................................................... 16

     b.   Defendant Has Not Shown and Could Not Show that His Content- and Viewpoint-
          Based Restriction on Plaintiffs' Protected Speech Survives Strict Scrutiny. ............. 20

III. Plaintiffs Are Entitled to Judgment as a Matter of Law on the Constitutional Right
     to Travel Claim. ......................................................................................................... 20

     a.   The Right to Cross State Lines to Engage in Legal Activities in a Destination
          State Is Not Limited to a Particular Constitutional Provision. ..................................... 21

     b.   Defendant's Threats Are Not Mere "Reasonable" Travel Regulations but
          Unconstitutional Restrictions on the Fundamental Right to Travel. ............................ 27

          i.   Defendant's Threats Are Not Mere "Reasonable" Regulations of Travel and
               the Precedent He Cites in Support of His Requested Rational Basis Test Is
               Inapposite. ........................................................................................................ 27

          ii.  Defendant's Attempt to Evade His True Unconstitutional Purpose Fails. ............ 30

CONCLUSION ...................................................................................................................... 32

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abdi v. Wray*,
    942 F.3d 1019 (10th Cir. 2019) ............................................................................ 23

*Aid for Women v. Foulston*,
    441 F.3d 1101 (10th Cir. 2006) ............................................................................ 12

*Att'y Gen. of N.Y. v. Soto-Lopez*,
    476 U.S. 898 (1986) ............................................................................................. 24

*Barrows v. Jackson*,
    346 U.S. 249 (1953) ............................................................................................... 9

*Carey v. Population Servs. Int'l*,
    431 U.S. 678 (1977) ............................................................................................. 11

*Colon v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
    No. 8:23-CV-223-MSS-UAM, 2024 WL 309975 (M.D. Fla. Jan. 26, 2024) .......................... 12

*Craig v. Boren*,
    429 U.S. 190 (1976) ...................................................................................... *passim*

*Crandall v. Nevada*,
    73 U.S. (6 Wall.) 35 (1867) ............................................................................. 3, 23

*Dobbs v. Jackson Women's Health Org.*,
    597 U.S. 215 (2022) ............................................................................................. 25

*Doe v. Miller*,
    405 F.3d 700 (8th Cir. 2005) ............................................................................... 23

*E. Coast Test Prep LLC v. Allnurses.com, Inc.*,
    167 F. Supp. 3d 1018 (D. Minn. 2016) ................................................................ 10

*Edwards v. California*,
    314 U.S. 160 (1941) ...................................................................................... *passim*

*Eisenstadt v. Baird*,
    405 U.S. 438 (1972) .......................................................................................... 3, 9

*Fleeton v. O'Malley*,
    2:23-cv-62, 2024 WL 235216 (M.D. Ala. Jan. 22, 2024) ....................................... 3

*Jones v. Helms*,
    452 U.S. 412 (1981) ............................................................................................. 29

*June Med. Servs. L.L.C. v. Russo*,
   591 U.S. 299 (2020) ................................................................................. 10

*Katt v. Dykhouse*,
   983 F.2d 690 (6th Cir. 1992) .................................................................... 18

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) ................................................................. 2, 5, 7, 8

*Lee v. State*,
   869 F. Supp. 1491 (D. Or. 1994) .............................................................. 14

*Matsuo v. United States*,
   586 F.3d 1180 (9th Cir. 2009) .................................................................. 28

*Miller v. Albright*,
   523 U.S. 420 (1998) ................................................................................. 11

*Mitchell v. State*,
   27 So. 2d 36 (Ala. 1946) .......................................................................... 19

*NAACP v. Alabama ex rel. Patterson*,
   357 U.S. 449 (1958) ................................................................................. 11

*Nw. Mem'l Hosp. v. Ashcroft*,
   362 F.3d 923 (7th Cir. 2004) .............................................................. 11, 12

*Obergefell v. Wymyslo*,
   980 F. Supp. 2d 907 (S.D. Ohio 2013) ..................................................... 14

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
   280 F.3d 278 (3d Cir. 2002) ..................................................................... 12

*Paul v. Virginia*,
   75 U.S. (8 Wall.) 168 (1868) .................................................................... 26

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
   748 F.3d 583 (5th Cir. 2014) .................................................................... 15

*Planned Parenthood of Se. Pa. v. Casey*,
   505 U.S. 833 (1992) ................................................................................... 6

*Planned Parenthood Se., Inc. v. Strange*,
   33 F. Supp. 3d 1330 (M.D. Ala. 2014) ............................................... 12, 13

*Pollack v. Duff*,
   793 F.3d 34 (D.C. Cir. 2015) .................................................................... 24

*Powers v. Ohio*,
  499 U.S. 400 (1991) ................................................................................................ *passim*

*Quantum Commc'ns Corp. v. Tiger Commc'ns, Inc.*,
  No. 3:04-cv-190, 2005 WL 2146046 (M.D. Ala. Sept. 1, 2005) ................................................. 1

*Reprod. Health Servs. v. Strange*,
  204 F. Supp. 3d 1300 (M.D. Ala. 2016) ................................................................................. 13

*S. Poverty L. Ctr. v. DHS*,
  No. 18-760, 2020 WL 3265533 (D.D.C. June 17, 2020) ........................................................ 14

*Saenz v. Roe*,
  526 U.S. 489 (1999) ........................................................................................ 22, 23, 24

*Smith v. Comm'r, Ala. Dep't of Corr.*,
  No. 21-13298, 2021 WL 4817748 (11th Cir. Oct. 15, 2021) ................................................. 5

*Shapiro v. Thompson*,
  394 U.S. 618 (1969) .............................................................................................. 24

*Singleton v. Wulff*,
  428 U.S. 106 (1976) ................................................................................. 10, 11, 13

*SisterSong Women of Color Reprod. Just. Collective v. Gov. of Ga.*,
  40 F.4th 1320 (11th Cir. 2022) ................................................................................. 6

*Swain v. Junior*,
  958 F.3d 1081 (11th Cir. 2020) ............................................................................ 15

*Tallahassee Bail Fund v. Marshall*,
  No. 4:22cv297, 2024 WL 691365 (N.D. Fla. Feb. 20, 2024) ................................................. 14

*Terry v. Reno*,
  101 F.3d 1412 (D.C. Cir. 1996) .............................................................................. 12

*United States v. Guest*,
  383 U.S. 745 (1966) ..................................................................................... 23, 32

*United States v. Hansen*,
  599 U.S. 762 (2023) ...................................................................................... 16, 18

*United States v. Salerno*,
  481 U.S. 739 (1987) ............................................................................................. 6

*United States v. Williams*,
  553 U.S. 285 (2008) ...................................................................................... 16, 18

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ............................................................................................ 2

*W. Ala. Women's Ctr. v. Williamson*,
120 F. Supp. 3d 1296 (M.D. Ala. 2015) ........................................................ 12, 15

*Warth v. Seldin*,
422 U.S. 490 (1975) ............................................................................................ 8

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1 ................................................................................ 26

U.S. Const. art. IV, § 2, cl. 1 ................................................................................ 26

**Statutes**

Ala. Code § 26-23H-1 *et seq.* ............................................................................ 20

Ala. Code § 26-23H-2(i) ...................................................................................... 13

**Rules**

Fed. R. Civ. P. 56(e)(2) ........................................................................................ 1

**Treatises**

15A C.J.S. *Conspiracy* § 118 .............................................................................. 19

16 Am. Jur. 2d *Conspiracy* § 1 .......................................................................... 19

**Other Authorities**

Letter from Lynn Fitch, Att'y Gen., Miss., et al., to Xavier Becerra, Sec'y of Health &
Hum. Servs., U.S. Dep't of Health & Hum. Servs. (June 16, 2023),
https://www.mississippifreepress.org/wp-content/uploads/2023/07/657773029-
Mississippi-AG-opposes-reproductive-care-privacy-rule.pdf .................................. 13

Eugene Volokh, *The "Speech Integral to Criminal Conduct" Exception*,
101 Cornell L. Rev. 981 (2016) ........................................................................ 18, 19

# INTRODUCTION[1]

All parties agree that there is no genuine dispute as to any material fact in this case. *See, e.g.*, Consol. Resp. Pls.' Mot. Summ. J. ("Def.'s Opp.") 2, Doc. 66; WAWC et al. Pls.' Br. Supp. Mot. Summ. J., Declaratory Relief, & Perm. Inj. ("WAWC SJ Br.") 2–7, Doc. 60-1; Def.'s Mot. Summ. J. ("Def.'s MSJ") 5–9, Doc. 62; WAWC et al. Pls.' Br. Opp'n Def.'s Mot. Summ. J. ("WAWC Opp.") 1–2, Doc. 67.[2] Indeed, the only "disputes" that Defendant raises in his opposition to the WAWC Plaintiffs'[3] summary judgment motion are *legal* ones, the vast majority of which this Court has already considered and resolved in Plaintiffs' favor at the motion to dismiss stage. It should do the same again here. As set forth below and in Plaintiffs' opening brief, Plaintiffs have clearly demonstrated their entitlement to summary judgment on both the First Amendment and constitutional right to travel claims, and each of Defendant's arguments to the contrary fails as a matter of law. Accordingly, Plaintiffs respectfully request that this Court grant their motion and issue the requested declaratory and injunctive relief.

---

[1] Unless otherwise noted, all emphasis is added and all internal quotation marks and citations are omitted.

[2] While Defendant acknowledges that certain undisputed facts in Plaintiffs' Statement of Undisputed Material Facts are material to the merits of Plaintiffs' claims, he purports to question the relevance of others, ignoring the fact that they are relevant to, *inter alia*, Plaintiffs' standing and entitlement to permanent injunctive relief, *see* Def.'s Opp. 2; WAWC SJ Br. 42–43. Regardless, because he has not raised any genuine dispute as to *any* of those facts in his opposition, they should be deemed undisputed at this stage. *See* Fed. R. Civ. P. 56(e)(2) (providing that, if the nonmovant "fails to properly address another party's assertion of fact as required by Rule 56(c)," then the court may "consider the fact undisputed for purposes of the motion"); *Quantum Commc'ns Corp. v. Tiger Commc'ns, Inc.*, No. 3:04-cv-190, 2005 WL 2146046, at *1–2 (M.D. Ala. Sept. 1, 2005) (Non-movant must establish a genuine factual dispute "with evidence beyond the pleadings," and "must present 'affirmative evidence' of material factual conflicts").

[3] The terms "WAWC Plaintiffs" and "Plaintiffs" are used herein to refer collectively to Plaintiffs West Alabama Women's Center ("WAWC"), Alabama Women's Center for Reproductive Alternatives, LLC, d/b/a Alabama Women's Center ("AWC"), and Dr. Yashica Robinson.

I.      **Plaintiffs Have Standing to Bring Both the First Amendment and Constitutional Right to Travel Claims.**

As is amply laid out in Plaintiffs' opening brief, and the affidavits attached thereto, Plaintiffs have established both first- and third-party standing to raise the First Amendment claim. WAWC SJ Br. 11–15. In response, Defendant does not contest Dr. Robinson's first-party standing to bring a First Amendment claim, and concedes that, as a result, challenging Plaintiffs WAWC's and AWC's third-party standing to assert the First Amendment rights of their staff would have "no practical significance." Def.'s Opp. 4 n.2; *see also Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977) (where "at least one individual plaintiff . . . has demonstrated standing . . . we need not consider whether the other . . . plaintiffs have standing to maintain the suit"). Instead, Defendant argues that Plaintiffs AWC and Dr. Robinson lack third-party standing to assert the right to travel claim.[4] Def.'s Opp. 4–11. However, as set forth in Plaintiffs' opening summary judgment brief, and for the reasons outlined below, Plaintiffs AWC and Dr. Robinson have clearly demonstrated their third-party standing to bring this claim under two separate doctrinal tests, and Defendant's arguments to the contrary fail as a matter of law.

a.      **Defendant's Attempt to Distinguish the *Craig v. Boren* Line of Cases Fails.**

As already explained in Plaintiffs' opening brief, this case fits squarely into the class of cases where the Supreme Court has "allowed standing to litigate the rights of third parties" because "enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (emphasis in

---

[4] Defendant does not contest Plaintiffs' Article III standing. While Defendant asserts that Plaintiffs cannot rest on the allegations in their Complaint to establish Article III standing at this stage, Def.'s Opp. 3 n.1, the WAWC Plaintiffs clearly have done nothing of the sort. *See* WAWC SJ Br. 11–13, 28; WAWC Opp. 5 n.5. Notably, Defendant's only standing arguments relate to the right to travel claim and Plaintiffs AWC's and Dr. Robinson's satisfaction of the *prudential* factors for third-party standing to assert the rights of their patients and other pregnant people requesting their assistance. As shown, these arguments fail.

original); *see also* WAWC SJ Br. 28–30; Order & Op. ("MTD Order") 23–26, Doc. 48.[5] Defendant

acknowledges the existence of this class of cases yet contends that "this is not one such case"

because it is factually distinguishable from two decisions—*Craig v. Boren*, 429 U.S. 190 (1976),

and *Eisenstadt v. Baird*, 405 U.S. 438 (1972). Def.'s Opp. 10–11. To begin, these cases are merely

"*example[s]* of the broader principle" from which Plaintiffs' standing emanates: "that litigants

threatened with enforcement are well positioned, if not entitled, to assert the rights of third parties

that are intertwined with the conduct the litigants seek to pursue." MTD Order 27; *see also id.* at

23 n.2 (collecting cases). But even setting that aside, Defendant's attempts to distinguish the case

at bar from this line of cases cannot carry the day.

      First, Defendant cannot distinguish this case on the basis that the relevant criminal laws

here do not directly impose corporate criminal liability on clinic Plaintiff AWC. *See* Def.'s Opp.

10. As this Court has already recognized, the Plaintiff clinics can operate only by and through their

staff; therefore, "[a]s far as the *Craig* rationale is concerned, enforcement against the plaintiffs'

staff *is* the functional equivalent of enforcement against the organizations themselves." MTD

Order 28. Defendant purports to dispute this argument but offers no reasoning or case law to

support his position. This is plainly insufficient at this stage of the proceedings. *See, e.g.*, *Fleeton

v. O'Malley*, 2:23-cv-62, 2024 WL 235216, at *6 (M.D. Ala. Jan. 22, 2024) ("[C]onclusory and

unsupported arguments" for which a party "cites no specific authority or evidence" are insufficient

on a motion for summary judgment).

---

[5] That *Crandall v. Nevada*, 73 U.S. (6 Wall.) 35 (1867) and *Edwards v. California*, 314 U.S. 160 (1941) "predate" *Craig* and modern third-party standing jurisprudence, and therefore do not consider third-party standing as such, *see* Def.'s Opp. 4 n.3, does nothing to undermine Plaintiffs' argument that permitting them to assert the right to travel of the third parties they seek to assist would be *consistent with* those two cases, where the plaintiffs were similarly permitted to assert the right to travel of those they were seeking to assist. WAWC SJ Br. 30.

Second, Defendant cannot evade that he has directly threatened to use the general criminal laws at issue here to prosecute "providing direct assistance to people seeking to travel out of state for abortion[s]," Def.'s Opp. 20 (alteration in original), *see also* Def.'s MSJ 5–6, 24, 26, and that it is this threatened application *to Plaintiffs' conduct* that is challenged here. As such, contrary to Defendant's suggestion, Def.'s Opp. 10 n.7, this case is squarely on all fours with *Craig* and *Eisenstadt* where the Supreme Court found the plaintiffs had third-party standing to challenge statutory provisions that directly addressed their conduct.[6]

Third, Defendant attempts to argue that third-party standing is inappropriate here because the pregnant Alabamians who Defendant has *disclaimed any authority to prosecute* would somehow be "less awkward challenger[s]" than those he *is* claiming the authority to prosecute. Def.'s Opp. 10–11. This is not only illogical, but it has no basis in the law. If anything, Defendant's position is belied by *Craig*, which confirms that the Supreme Court found the plaintiffs in both *Craig* and *Eisenstadt* to be the "least awkward challenger[s]" and the "obvious claimant[s]" *because* they were the ones *"subject to th[e] proscription," Craig*, 429 U.S. at 196–97, that indirectly resulted in the violation of third parties' constitutional rights. The same is patently true here.

Defendant's final point—that, unlike the defendant state officials in *Craig*, he has not failed to challenge third-party standing at an early stage of the case, and (relatedly) there are thus no similar efficiency concerns compelling resolution on the merits here, Def.'s Opp. 11—makes far too much of the *Craig* Court's observation that denying third-party standing at such a late stage in that case would "serve no functional purpose." 429 U.S. at 193–94. Irrespective of *when* third-

---

[6] Indeed, the passages from *Craig* that Defendant cites addressed whether the *Craig* and *Eisenstadt* plaintiffs had *Article III* standing. Def.'s Opp. 10 n.7 (citing *Craig*, 429 U.S. at 194, 196). As explained above and in Plaintiffs' opening brief, here it is undisputed that the threatened prosecutions directly cause Plaintiffs AWC and Dr. Robinson injury that would be redressed by the relief sought. WAWC SJ Br. 11–13, 30.

party standing was contested in *Craig*, the Court clearly held that the plaintiff "established independently her claim to assert jus tertii standing." *Id.* at 194. Put simply, nothing in *Craig*, or in the application of that case by the Supreme Court and lower courts over the past half-century, suggests, let alone dictates, that its holding was purely the result of waiver and not a reasoned analysis by the Court.[7]

In sum, Defendant has offered nothing to distinguish this case from *Craig*, *Eisenstadt*, or any of the Supreme Court cases finding third-party standing where "enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights," *Kowalski*, 543 U.S. at 131, and nothing to defeat Plaintiffs' clear standing to assert the right to travel of their patients and other pregnant Alabamians under this precedent.

**b.      Plaintiffs AWC and Dr. Robinson Satisfy All Three Elements of the Traditional Third-Party Standing Test.**

Even setting aside the controlling precedent above would not change the outcome, however, as Plaintiffs AWC and Dr. Robinson also readily satisfy each element of the traditional three-part prudential standing test. *See* WAWC SJ Br. 30–32; MTD Order 30–38. Here too, Defendant fails to overcome Plaintiffs' showing. Defendant seemingly concedes that Plaintiffs have the requisite injury-in-fact. And his attempt to contest Plaintiffs' satisfaction of the other two prudential factors—closeness and hindrance—hinges largely on the idea that *Dobbs* articulated a new test for third-party standing that somehow weakens prior Supreme Court third-party standing cases, if not overrules them altogether. *See* Def.'s Opp. 4–5. However, as this Court has already recognized, "*Dobbs* was not a case about standing, and it did not overrule any precedent except

---

[7] Defendant's passing contention that this case is also distinguishable because enforcement of the Alabama criminal laws against Plaintiffs would not "indirectly result in the violation of the pregnant woman's right to travel," Def.'s Opp. 11, inappropriately conflates standing with the merits, *see Smith v. Comm'r, Ala. Dep't of Corr.*, No. 21-13298, 2021 WL 4817748, at *2 (11th Cir. Oct. 15, 2021), and, regardless, as explained *infra* Section III, is wrong as a matter of law.

5

where the Court explicitly said so." MTD Order 39. Thus, "[w]hile the Attorney General may wish that a great bulk of the Court's cases governing standing to assert third-party rights were overruled and that dissenting opinions were instead binding authority, this court must abide by precedent." *Id.*

*SisterSong Women of Color Reproductive Justice Collective v. Governor of Georgia*, 40 F.4th 1320, 1328 (11th Cir. 2022), Def.'s Opp. 5, does not counsel otherwise. Defendant quotes language out of context in an attempt to imply that the Eleventh Circuit would be reticent to permit third-party standing here because this case is related to abortion. But the *SisterSong* Court indicated nothing of the sort. Rather, while discussing not *standing*, but whether to apply the standard from *United States v. Salerno*, 481 U.S. 739 (1987) or the large-fraction test from *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992) to determine the plaintiffs' entitlement to facial relief, the Court merely noted generally that "*to the extent* that [it] has distorted legal standards because of abortion," it could no longer do so considering the Supreme Court's decision in *Dobbs*. 40 F.4th at 1327–28. The court's decision not to apply the large-fraction test there has no bearing on Plaintiffs' third-party standing here, which, as set forth in Plaintiffs' opening brief, and detailed further below, Plaintiffs have clearly demonstrated under the controlling traditional test. Defendant's attempts to suggest otherwise both distort the facts and misstate the law and must be rejected.

> **i.   Plaintiffs AWC and Dr. Robinson Have a Close Relationship with Their Patients and Other Pregnant Alabamians Seeking Their Assistance.**

With respect to closeness, Defendant's arguments are neither factually supported nor persuasive. For example, to the extent Defendant suggests Plaintiffs AWC and Dr. Robinson do not receive requests for information and assistance from any individuals with whom they have an

existing patient relationship—or from individuals who could become patients given the non-abortion medical "services" Plaintiffs still provide, Def.'s Opp. 6—that is incorrect. *See, e.g.*, Aff. Yashica Robinson, M.D., Supp. WAWC et al. Pls.' Mot. Summ. J. ("Robinson Aff.") ¶¶ 8, 10, 12, 14, 16, 30, Doc. 60-3 (discussing receipt of inquiries from and support provided to "patients" as well as other pregnant people requesting assistance); *id.* at ¶ 44 (discussing provision of "ongoing prenatal care" to patients who initially asked for information about accessing abortion that Plaintiffs were unable to provide due to Defendant's threats).[8]

Moreover, the test for "closeness" does not, as Defendant implies, Def.'s Opp. 6–7, require a particular duration of contact or pre-existing relationship between the plaintiff and the third party. Indeed, Defendant cites nothing to support such a notion and any reliance on *Kowalski v. Tesmer*, *id.* at 6, is misplaced. There, the Supreme Court's rejection of the plaintiff-attorneys' attempt to demonstrate closeness by invoking their attorney-client relationship with the putative defendant third parties was premised on two conclusions: (1) that the attorneys were "rely[ing] on a future attorney-client relationship with as yet unascertained Michigan criminal defendants who will request, but be denied, the appointment of appellate counsel, based on the operation of the [challenged] statute," 543 U.S. at 130–31—in other words, *entirely hypothetical* future clients with whom the attorneys had "*no* relationship at all," *id.* at 131, and who would only *become* their clients, and have their asserted rights implicated, *if* a series of hypothetical, future events occurred; and (2) that the case did not fit into the *Craig* class of cases discussed above, wherein enforcement of the challenged restriction against the litigant would result in a violation of the third parties'

---

[8] Defendant also suggests that Plaintiff WAWC does not receive inquiries from any existing patients. Def.'s Opp. 6. While this is completely irrelevant, as Plaintiff WAWC does not assert the right to travel claim, it is also factually inaccurate. *See, e.g.*, Aff. Robin Marty Supp. WAWC et al. Pls.' Mot. Summ. J. ("Marty Aff.") ¶¶ 14–16, Doc. 60-2 (discussing importance of providing requested information to, *inter alia*, "patients"); *id.* at ¶¶ 23–30 (explaining difficulties and harms faced by those unable to receive requested information, based on, *inter alia*, her "conversations with patients").

rights, *id.* That is a far cry from the situation here, where—as already explained—the *Craig* rationale *does* apply, and the undisputed facts make abundantly clear that Plaintiffs are receiving requests for assistance from *actual* patients and pregnant people whose right to travel is *currently* being infringed because of their inability to receive the requested help. *See* Robinson Aff. ¶¶ 8, 10, 12, 14, 16, 30. For much the same reason, trying to compare the attenuated relationship between the first and third parties in *Warth v. Seldin*, 422 U.S. 490, 510 (1975), Def.'s Opp. 7, does not get Defendant anywhere either.[9]

Moreover, any argument that *Kowalski* established a hard rule that a putative plaintiff must always have an existing, documented relationship with the third party whose rights he asserts is belied by the decision itself, which does not purport to do anything of the sort. It is also contrary to other controlling precedent, wherein the Supreme Court has permitted plaintiffs to assert the rights of third parties with whom they had no current or pre-existing relationship, and reinforced that what matters for "closeness" is not a temporally long relationship, but a showing of identity of interests that will ensure that the plaintiff "will be a motivated, effective advocate for the [third party's] rights." *Powers v. Ohio*, 499 U.S. 400, 413–14 (1991) (finding that a close relationship exists between criminal defendant and excluded jurors where they "have a common interest in eliminating racial discrimination from the courtroom" and there is "no doubt that [defendant] will be a motivated, effective advocate for the excluded venirepersons' rights"); *Craig*, 429 U.S. at 195

---

[9] In *Warth*, the taxpayer-plaintiffs attempted to assert the rights of low- and moderate-income persons excluded from a particular suburb by the challenged zoning practices. But the plaintiffs were "not themselves subject to [the] zoning practices," they merely disliked them because they allegedly increased their taxes. 422 U.S. at 510. And they had no relationship with the third parties actually excluded by the challenged practices other than this "incidental congruity of interest." *Id.* That is also a far cry from the situation here, where the undisputed facts show that (1) Plaintiffs themselves are in fact "subject to" the challenged threat of prosecution, WAWC SJ Br. 11–13, 30; and (2) Plaintiffs not only have relationships with their patients and the other pregnant people who seek them out and affirmatively request their assistance, but a congruence of interests that is far from "incidental," *id.* at 31.

(near-beer vendor plaintiff permitted to assert the rights of potential customers where her interest in "resist[ing] efforts at restricting [her] operations," was aligned with third parties' interest in obtaining "access to [her] market or function"); *Eisenstadt*, 405 U.S. at 445 (distributor of contraceptive foam permitted to assert the rights of unmarried persons seeking to obtain contraceptives where interest in distributing contraceptives provided "an adequate incentive" to protect the third parties' interest in obtaining them by asserting the third parties' rights).

This same precedent also flatly belies any contention that only intimate relationships, like that of a parent and their child, Def.'s Opp. 7, are sufficiently "close" for third-party standing purposes. *See, e.g.*, *Powers*, 499 U.S. at 413 (criminal defendant had standing to raise rights of excluded jurors); *Craig*, 429 U.S. at 194–97 ("near beer" seller had standing to raise rights of potential customers); *Eisenstadt*, (distributor of contraceptive had standing to raise rights of potential unmarried distributees); *Barrows v. Jackson*, 346 U.S. 249, 255–59 (1953) (seller of land had standing to raise rights of prospective Black purchasers).

Thus, Defendant has failed to negate that Plaintiffs' interests in assisting their patients and other pregnant Alabamians in traveling across state lines to obtain legal abortion care outside Alabama—and their patients' and others' interests in *receiving* that assistance—are sufficiently close and congruent to satisfy this factor of the prudential third-party standing test. *See* WAWC SJ Br. 31; WAWC Opp. 13–15.

### ii.   Plaintiffs AWC's and Dr. Robinson's Patients and the Other Pregnant Alabamians Seeking Their Assistance Face Genuine Obstacles to Asserting Their Own Rights.

Defendant's attack on Plaintiffs' satisfaction of the hindrance requirement is equally unfounded. His complaints here center largely around his contention that *Singleton v. Wulff*, 428 U.S. 106 (1976), is an "abortion-distorted" decision that should be dismissed as "thoroughly

Case 2:23-cv-00450-MHT-KFP   Document 70   Filed 07/22/24   Page 16 of 40

unconvincing." Def.'s Opp. 7–8 (citing various dissenting opinions from *June Med. Servs. L.L.C. v. Russo*, 591 U.S. 299 (2020)). But Defendant cannot replace *Singleton*'s standing analysis— which remains good law—with "*dissenting* Supreme Court opinions, which are not binding authority and are at odds with the precedent that *stare decisis* obligates this court to apply." MTD Order 33 n.6. Nor can he disregard that—whether binding or not—*Singleton*'s factual assessment of the reasons that patients seeking sensitive and often stigmatized medical care may be chilled from asserting their own rights remains self-evidently correct, and well-supported by other precedent identifying the same "several obstacles" as hindrances sufficient for third-party standing. *Singleton*, 428 U.S. at 116–17.

Indeed, Defendant's attempts to discount the real-world factors that may hinder abortion patients from litigating this case directly are entirely unpersuasive. For example, he contends that the fact that the majority of Plaintiff AWC's patients are low-income is irrelevant because it is likely they could obtain pro-bono counsel. Def.'s Opp. 8. But even if Defendant could point to undisputed facts in the record to support that sweeping claim, it is absurd to claim the cost of hiring a lawyer is the only burden that bringing litigation—particularly against a powerful and motivated opponent like a state official—puts on one's finances and resources. *See, e.g.*, *Powers*, 499 U.S. at 414–15; MTD Order 37; *see also E. Coast Test Prep LLC v. Allnurses.com, Inc.*, 167 F. Supp. 3d 1018, 1022–23 (D. Minn. 2016) (finding that litigation expense was a hindrance to third parties' ability to assert claims on their own behalf, noting that litigation is not only "expensive," but also "time consuming, often embarrassing, and something that almost all reasonable people seek to avoid").

Nor can Defendant seriously contend that pseudonyms and other unidentified "precautions" necessarily eliminate any privacy concerns. Def.'s Opp. 9–10. As Plaintiffs have

already explained, WAWC SJ Br. 32, patients' "desire to protect the very privacy of [their] decision[s] [to terminate pregnancies] from the publicity of a court suit" because of stigma around abortion and the intimate nature of reproductive decision-making can prevent them from suing on their own behalf. *Singleton*, 428 U.S. at 117. And even proceeding pseudonymously generally does protect one's identity from litigation counterparties, nor does it prevent family, friends, and/or others in the person's community from deducing their identity from facts revealed through litigation. *Cf. Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 929 (7th Cir. 2004) (when de-identified patient records "are made a part of the trial record . . . persons of their acquaintance, or skillful 'Googlers,' sifting the information contained in the medical records concerning each patient's medical and sex history, will put two and two together, 'out' [abortion patients], and thereby expose them to threats, humiliation, and obloquy").

Moreover, contrary to what Defendant suggests, the idea that privacy concerns and fear of stigmatization can be a hindrance to participating in litigation is hardly limited to the Supreme Court's decision in *Singleton* or the abortion context. Numerous cases have recognized in numerous contexts that "[p]rivacy concerns may . . . provide a compelling explanation for a third party's absence from the litigation." *Miller v. Albright*, 523 U.S. 420, 449 (1998) (O'Connor, J., concurring); *see also, e.g.*, *Carey v. Population Servs. Int'l*, 431 U.S. 678, 684, n.4 (1977) (concluding vendor could challenge law prohibiting distribution of contraceptives to minors in part because desire to avoid publicity would deter potential purchasers from defending their own rights); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459 (1958) (holding that organization could raise the privacy rights of its members because litigation initiated by those members would disclose their identity and destroy the very privacy they sought to protect); *Aid for Women v. Foulston*, 441 F.3d 1101, 1113–14 (10th Cir. 2006) (finding third-party minor patients seeking

sensitive health care may be hindered from asserting their own rights given concerns surrounding privacy and stigmatization); *Colon v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, No. 8:23-CV-223-MSS-UAM, 2024 WL 309975, at *10 (M.D. Fla. Jan. 26, 2024) (holding that gun vendor's customers' privacy concerns surrounding their individual status as firearms owners was a sufficient hindrance, and noting that "[c]ourts have regularly found privacy to be a legitimate hindrance sufficient to confer *jus tertii* standing in cases involving citizenship concerns, medical procedures, and contraceptives"); *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 290 (3d Cir. 2002) (recognizing that "fear of stigmatization . . . operates as a powerful deterrent to bringing suit"). If anything, the privacy concerns identified in these cases are even more powerful in the digital age. *See generally Nw. Mem'l Hosp.*, 362 F.3d at 929.

Such privacy concerns and fear of stigmatization are also compelling given that there exists a well-established climate of stigma, harassment, and violence relating to abortion in Alabama. *See, e.g.*, *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1333–34 (M.D. Ala. 2014) (describing a "history of violence [against] abortion providers and women seeking abortions in Alabama"); *W. Ala. Women's Ctr. v. Williamson*, 120 F. Supp. 3d 1296, 1308, 1321–22 (M.D. Ala. 2015) (same); *see also, e.g.*, *Terry v. Reno*, 101 F.3d 1412, 1414 (D.C. Cir. 1996) (noting "a *nationwide* pattern of blockades, vandalism, and violence aimed at abortion clinics and their patients and employees"). This climate indisputably endures today. "On a day-to-day basis," an abortion patient "sees this hostility when she opens the newspaper" to read about the Attorney General's threats, WAWC Compl. ¶ 34; Answer ¶ 34, or his latest policy position attacking the privacy of those seeking reproductive health care out of state,[10] or hears of those associated with

---

[10] *See* Letter from Lynn Fitch, Att'y Gen., Miss., et al., to Xavier Becerra, Sec'y of Health & Hum. Servs., U.S. Dep't of Health & Hum. Servs. at 5 (June 16, 2023), https://www.mississippifreepress.org/wp-content/uploads/2023/07/657773029-Mississippi-AG-opposes-reproductive-care-privacy-rule.pdf   (letter

abortion facing retaliatory prosecutions, Robinson Aff. ¶¶ 20–25. *Strange*, 33 F. Supp. 3d at 1334. Indeed, the legislative findings in the 2019 Abortion Ban—the very ban currently forcing pregnant Alabamians to travel out of state for abortion care—explicitly compare abortion to "German death camps, Chinese purges, Stalin's gulags, Cambodian killing fields, and the Rwandan genocide." Ala. Code § 26-23H-2(i). While the use of such rhetoric is certainly within the Legislature's prerogative, it is difficult to dispute that when the State compares abortion to some of the 20th Century's worst crimes against humanity, that chills pregnant Alabamians from jeopardizing the privacy of their decision to seek such care. Particularly when considered as a whole, these circumstances—which Defendant ignores entirely—are more than enough to establish a "hindrance sufficient to support an exception to the prudential limitation on third party standing" in this case. *Reprod. Health Servs. v. Strange*, 204 F. Supp. 3d 1300, 1325–26 (M.D. Ala. 2016); *see Singleton*, 428 U.S. at 116–17; WAWC SJ Br. 31–32.[11]

Finally, Defendant is wrong to claim that any hindrance presented by the inherently time-limited nature of pregnancy and time-sensitive nature of abortion care can be resolved by seeking preliminary relief. Def.'s Opp. 10. To start, the notion that imminent mootness, or the inability to effectuate one's own rights through the contemplated litigation, may present an obstacle to suit is well-established in the case law, and (again) hardly limited to the abortion context. *See, e.g.*, *Craig*,

---

signed by Defendant Marshall opposing proposed HIPAA rule barring, *inter alia*, certain disclosure of medical records relating to legal abortion care in one state when sought in connection with an investigation or proceeding in a different state).

[11] It also bears reiterating that a prospective proponent of a third party's rights need not show that there are *no* circumstances under which the third party could assert their rights on their own; they simply must show that there exists "*some* hindrance," *Powers*, 499 U.S. at 411, or "*some* genuine obstacle," *Singleton*, 428 U.S. at 116, to the third parties' assertion of their interests. Thus, the fact that some pregnant litigants may not be concerned about maintaining the privacy of their decision, or may be comfortable proceeding pseudonymously, does nothing to upend Plaintiffs' showing of the genuine obstacles that exist here, and their concomitant entitlement to assert the right to travel claim.

429 U.S. at 194 (finding third-party standing where prospective beer customers between 18 to 20

years old may age out before litigation is complete); *Lee v. State*, 869 F. Supp. 1491, 1494–95 (D.

Or. 1994) (holding that physicians had third-party standing to assert the rights of their terminally-

ill patients seeking assistance in dying due to "the possibility of claims becoming moot due to

death prior to a final resolution"); *Obergefell v. Wymyslo*, 980 F. Supp. 2d 907, 915 (S.D. Ohio

2013) (allowing funeral director to assert claims on behalf of third-party clients whose claims may

be "imminently moot" owing to the deaths of their loved ones); *S. Poverty L. Ctr. v. DHS*, No. 18-

760, 2020 WL 3265533, at *14 (D.D.C. June 17, 2020) (allowing non-profit to assert claims on

behalf of third-party clients detained at ICE facilities where "[i]mminent mootness" existed

because before "detained individuals could litigate their suits, their removal cases may have

already concluded"); *Tallahassee Bail Fund v. Marshall*, No. 4:22cv297, 2024 WL 691365, at *8

(N.D. Fla. Feb. 20, 2024) (allowing bail fund to assert claims of future third-party clients who

"would have a limited window to bring an excessive bail claim of their own while also focusing

on defending against the criminal charges levied against them"), *appeal docketed sub nom.*

*Tallahassee Bail Fund, Inc. v. Clerk of Cir. Ct. & Comptroller for Leon Cnty.*, No. 24-10827 (11th

Cir. Mar. 20, 2024).

Here, Defendant does not actually dispute that, as this Court has already recognized, "even

a meritorious lawsuit is unlikely to reach a merits determination until after the window to obtain

an abortion has passed." MTD Order 36. Under the foregoing precedent, that is enough to satisfy

the prudential standing test. And, as a practical matter, the option of seeking preliminary relief

does not always guarantee that a pregnant litigant will obtain relief in time to *personally* benefit

from a favorable decision given, *inter alia*, the time it takes to put together and file a lawsuit,

potential delays that may be beyond the plaintiff's control, and the possibility the State may obtain

14

an emergency stay. *See, e.g.*, *Williamson*, 120 F. Supp. 3d at 1319 (recognizing "good faith efforts [by counsel] to investigate the facts and the law" for purposes of a TRO can sometimes take over a month); *Swain v. Junior*, 958 F.3d 1081, 1085 (11th Cir. 2020) (granting emergency stay of preliminary injunction order six days after entry); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 588 (5th Cir. 2014) (noting that appeals court granted emergency stay of district court order within forty-eight hours). This is not to suggest that such delays negate meaningful preliminary relief in *every* case, but that the mere existence of this procedural option does not guarantee that imminent mootness is not an obstacle to suit.

That is particularly true here, where any immediate relief granted pertains solely to the ability to receive assistance in traveling out of state to obtain abortion care. Thus, even if an individual litigant were able to obtain preliminary relief, this would only be the first step in a lengthy process towards actually obtaining the *time-sensitive* health care she needs: once she can access assistance from her health care provider, she would still need to find an out-of-state clinic, make an appointment, arrange time off of work, and/or childcare, and actually travel to obtain that care. *See, e.g.*, Robinson Aff. ¶¶ 30–43. At a minimum, this highlights that the option of preliminary relief does not necessarily provide pregnant litigants with the "incentive to set in motion the arduous process needed to vindicate [their] own rights." *Powers*, 499 U.S. at 415.[12]

In sum, as with the closeness requirement, Defendant can point to nothing to undermine the significant and genuine obstacles that the third parties here face to asserting their own rights. Accordingly, none of Defendant's arguments can defeat Plaintiffs AWC and Dr. Robinson's clear

---

[12] As above, *supra* note 11, that some individual litigants may not be deterred and may be able to obtain a judgment in time to personally benefit from it does nothing to defeat Plaintiffs' standing, as—under the law—Plaintiffs do not need to show that no third party ever would be able to assert their own rights, only that "*some* hindrance," *Powers*, 499 U.S. at 411, exists that could prevent them from doing so.

standing to assert the right to travel of their patients and the other pregnant Alabamians they seek to assist.

## II.     Plaintiffs Are Entitled to Judgment as a Matter of Law on the First Amendment Claim.

As to the merits of the First Amendment claim, Defendant once again asserts that Plaintiffs' provision of information about and referrals for legal, out-of-state abortion is not protected speech because it is integral to criminal conduct. *See* Def.'s Opp. 19–21. This entire argument flows from a false premise: that Alabama's abortion ban does not merely criminalize specific abortions within Alabama, but somehow renders abortions that are legal—and even legally protected—in the states where they are provided criminal as well. Therefore, according to Defendant, *any* speech intended to assist someone in obtaining an entirely legal abortion in another state is unprotected by the First Amendment and punishable in Alabama. *See, e.g.*, *id.* at 19. As already extensively detailed in Plaintiffs' opening brief and opposition to Defendant's motion for summary judgment,[13] and re-explained briefly here, Defendant is wrong.

### a.     The Narrow Speech-Integral-to-Criminal-Conduct Exception Is Inapplicable Here.

The *sine qua non* of the "speech integral to criminal conduct" exception that Defendant seeks to invoke is that the speech must be "intended to induce or commence *illegal activities*." *United States v. Williams*, 553 U.S. 285, 298 (2008); *see also United States v. Hansen*, 599 U.S. 762, 783 (2023) (recognizing that "[s]peech intended to bring about a particular *unlawful act*" is not protected by the First Amendment). As such, Defendant's argument that this exception applies to Plaintiffs' speech "ignores the issue at the heart of this case: that the plaintiffs and their staff wish to help their clients access abortions in States where abortions are *lawful*." MTD Order 76

---

[13] Plaintiffs incorporate by reference the arguments made in these briefs here. *See* WAWC SJ Br. 15–20; WAWC Opp. 17–21.

(emphasis in original). Put another way, the only "activity" that Plaintiffs' speech could arguably be in furtherance of here is *legal*, *out-of-state* abortion—which, as already explained, is certainly *not* criminal and *cannot* constitutionally be made criminal by Alabama. *See* WAWC SJ Br. 19–20. Thus, in effect, Defendant's argument amounts to asking this Court to "extend *Giboney*'s immunity into new terrain: [speech related to] efforts to perform acts that would be unlawful in the State where they are planned but lawful (and potentially even constitutionally protected) in the State where they would occur." MTD Order 77–78. As this Court has already held, such a request finds no support in the law, *id.* at 78–85, and accepting it "would have dangerous consequences for the freedom of expression," *id.* at 78. It must therefore again be rejected.

Defendant tries to get around this with sleight of hand, contending that his position is in fact much more limited, as he is not purporting to criminalize "pure speech" about abortion—such as "providing information" about or "advocating for" abortion—but only what he considers to be "speech integral to the conspiracy." Def.'s Opp. 19–20. This elides both facts and law.

First, on the facts, Defendant ignores that Plaintiffs are not seeking to provide only the sort of general "information about medical options" that Defendant now admits is "pure" protected speech. They also desire to and, but for Defendant's threats, would provide specific information that offers the sort of "direct assistance" to people seeking to travel out of state for abortion that Defendant maintains "could constitute a conspiracy" under his distorted view of the law. *Id.* at 20. For example, but for Defendant's threats, the WAWC Plaintiffs would provide recommendations for trusted providers tailored to an individual patient's geographic location and particular personal and medical circumstances, Marty Aff. ¶¶ 9, 12, 14, 32; Robinson Aff. ¶¶ 7, 12, 14, 46, and would communicate directly with out-of-state providers to facilitate care for patients with certain medical complications, Robinson Aff. ¶¶ 8, 12–14, 46. Thus, to the extent Defendant's belated attempt to

limit the scope of his threats is aimed at undermining the factual basis for Plaintiffs' First Amendment claim, it does no such thing.

Second, even limited to speech that provides "direct assistance to people seeking to travel out of state for abortions," Def.'s Opp. 20, Defendant's position fails as a matter of law. To be sure, Plaintiffs do not dispute that, as a general matter, conspiracy is a stand-alone criminal offense because the crime is "the act of agreement" itself, plus—as Defendant now for the first time contends—"an overt act to further the unlawful objective." *Id*. But even assuming that the Alabama Legislature had purported to criminalize as "conspiracies" agreements formed in Alabama to engage in out-of-state conduct that is perfectly *legal* where it occurs,[14] that would not matter: The First Amendment forbids a state from so easily nullifying its protections by slapping the label of "conspiratorial agreement" on speech about conduct that it may disfavor but is indisputably *legal*. *See, e.g.*, *Hansen*, 599 U.S. at 783 (emphasizing that for speech to fall into *Giboney*'s exception and be unprotected, it must be "intended to bring about a particular *unlawful act*"); *Williams*, 553 U.S. at 297–98 (same); *see also Katt v. Dykhouse*, 983 F.2d 690, 695 (6th Cir. 1992) ("We must decide, then, whether the First Amendment protects speech that proposes a transaction lawful in the place where the transaction is to occur when both the underlying transaction and the offer are unlawful in the place where the offer is made. We conclude that the First Amendment does provide such protection."). Put another way, a state cannot exempt disfavored speech from First Amendment protection by circuitously contending that the disfavored speech is integral to the "criminal conduct" of *engaging in that very speech*. *See* Eugene Volokh, *The "Speech Integral to Criminal Conduct" Exception*, 101 Cornell L. Rev. 981, 987–88 (2016) ("[T]he *Giboney* doctrine

---

[14] Such an assumption also rests entirely on Defendant's interpretation of a nearly 130-year-old criminal law that has *never* been enforced, let alone enforced in this manner, or even construed by the Alabama Supreme Court since its enactment. *See generally* MTD Order 91, 94–95.

can't justify treating speech as 'integral to illegal conduct' simply because the speech is illegal under the law that is being challenged."); *id.* at 1000 (explaining that the speech being proscribed must be "causally linked to a particular crime, a crime that does not itself consist of otherwise protected speech"). But that is exactly what Defendant is attempting to do here, in arguing that the speech he seeks to criminalize is unprotected as "speech integral to *the conspiracy*," Def.'s Opp. 19, or speech integral to *providing* "*direct abortion assistance*," *id.* at 20.

To sanction Defendant's position here would thus sever the requisite connection between unprotected speech and a particular crime, rendering the speech-integral-to-criminal-conduct exception virtually boundless. The Supreme Court's First Amendment precedents do not allow this, and (unsurprisingly) Defendant cites nothing to support it. Indeed, this circular logic is belied not just by First Amendment doctrine, but also by fundamental principles of conspiracy liability, which make clear that for conspiracy laws to pass muster, the purportedly illegal "agreement" must be in furtherance of a *separate, independent criminal objective*. *See generally Mitchell v. State*, 27 So. 2d 36, 38–39 (Ala. 1946) (noting "the word 'conspire' does not within itself necessarily connote an evil intention," and holding that in an indictment for criminal conspiracy, "the fact that the conspiracy is characterized as unlawful is not enough," and the government must allege that the "supposed offense that was the object of the conspiracy" is unlawful); 15A C.J.S. *Conspiracy* § 118 ("To constitute a criminal conspiracy, either the object of the conspiracy or the means of accomplishing it must be illegal. . . . No one can be held criminally liable for conspiracy to do acts that are perfectly lawful and to which there is no criminal objective."); 16 Am. Jur. 2d *Conspiracy* § 1 ("The crime of conspiracy can only be defined in conjunction with a second crime, that is, the substantive crime involved in the conspiracy.").

In short, as this Court has already explained, for the narrow speech-integral-to-criminal-conduct exception "to have tractable limits, the speech at issue *must* bear some relation to an independently unlawful course of conduct." MTD Order 79. Here, the independent "course of conduct" that any speech or agreement bears relation to—legal, out-of-state abortion—is not unlawful or criminal at all, and Defendant cannot render it such by appealing to Alabama's ban, which—by its own terms, and in accordance with constitutional limits on Alabama's criminal jurisdiction—only applies within Alabama's borders. *See* Ala. Code § 26-23H-1 *et seq.*; WAWC SJ Br. 19–20. Accordingly, Plaintiffs' speech does not fall within the narrow speech-integral-to-criminal-conduct exception and is fully protected under the First Amendment.

> **b.     Defendant Has Not Shown and Could Not Show that His Content- and Viewpoint-Based Restriction on Plaintiffs' Protected Speech Survives Strict Scrutiny.**

Once the above is established, the resolution of the WAWC Plaintiffs' First Amendment claim is straightforward: As detailed in Plaintiffs' opening brief, the Attorney General's threatened prosecution of Plaintiffs for their protected speech about legal, out-of-state abortion care is a content- and viewpoint-based restriction, subject to strict scrutiny, which it cannot survive. *See* WAWC SJ Br. 20–27. Defendant does not contest this. To the contrary, he has already conceded that the restriction here is content-based, *see* MTD Order 74–75; Mot. Dismiss 26, Doc. 28, and he makes no attempt to argue that such a restriction survives any level of constitutional review, let alone strict scrutiny. As such, for the reasons already outlined in Plaintiffs' opening brief, Plaintiffs are entitled to judgment as a matter of law on the First Amendment claim.

## III.    Plaintiffs Are Entitled to Judgment as a Matter of Law on the Constitutional Right to Travel Claim.

Defendant similarly fails to overcome Plaintiffs' entitlement to summary judgment on the right to travel claim. To start, Defendant wrongly suggests that there is no constitutional basis for

Plaintiffs' right to travel claim. *See* Def.'s Opp. 14–16. He then does no more than reprise the same misguided arguments made in prior briefing in this case: (1) that Defendant's threats are mere reasonable regulations of travel that do not implicate or violate the right to travel, *id*. at 16–17; *see also, e.g.*, Def.'s MSJ 18–22; Reply Supp. Mot. Dismiss ("MTD Reply") 43–44, Doc. 36, and (2) that Defendant's primary purpose is not to prevent travel, Def.'s Opp. 17; *see also, e.g.*, Def.'s MSJ 24–25; MTD Reply 39, 42–43. Each of these arguments fails as a matter of law.

### a. The Right to Cross State Lines to Engage in Legal Activities in a Destination State Is Not Limited to a Particular Constitutional Provision.

As Plaintiffs already outlined in prior briefing, WAWC SJ Br. 32–37; WAWC Opp. 23–30, the right to travel plainly protects travel for the purposes of doing lawful things in another state. Defendant's attempt to undermine this logical and well-supported legal conclusion is unavailing. At the threshold, Defendant cannot simply assert that policy differences between Alabama and other states "harm Alabama," Def.'s Opp. 13–14, and then restrict travel on that basis. Such an alleged "harm" is not legally relevant to the right to travel analysis, and for good reason—if it were, there would effectively be ***no*** right to travel between the several states, as every state could easily prevent such movement by merely claiming "harm" from the fact that other states regulate certain activities within their borders differently. Setting this aside, Defendant's only other argument is that Plaintiffs have not identified a particular constitutional "source of the right [to travel] asserted." *Id*. at 14, 16. As explained below, this argument fails on multiple fronts.

At a fundamental level, Defendant's argument conflates the import of identifying which *component* of the constitutional right to travel is at issue with a need to identify a single constitutional provision on which the right itself rests. *Id*. at 14–15. As Defendant acknowledges, the Supreme Court has characterized the right to travel as "embrac[ing] at least three different components": (1) "the right of a citizen of one State to enter and to leave another State,"; (2) "the

right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State," and, (3) "for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz v. Roe*, 526 U.S. 489, 500 (1999); Def.'s Opp. 14. There can be no argument that Plaintiffs have sufficiently identified the relevant component of the right to travel at issue here: indeed, all parties agree that this case concerns the first component, the right to enter and leave another state. *See* WAWC SJ Br. 32–41; WAWC Opp. 29 n.16; Def.'s MSJ 16–17.

To the extent Defendant argues, however, that Plaintiffs' right to travel claim fails if they cannot locate the *single* constitutional provision from which the first component of the right travel emanates, he is wrong as a matter of law. In fact, the sole Supreme Court case Defendant cites in support of this contention—*Saenz*—actually *undermines* any such claim. As Defendant acknowledges, in *Saenz* the Supreme Court explicitly outlined the three components of the right to travel, before briefly discussing the first and second, and then determining that the case before it concerned the third. 526 U.S. at 500–02. While it is true that, throughout the course of this discussion, the Court found the occasion to conclude both that the *second* component of the right to travel is "expressly protected" by the Privileges and Immunities Clause of Article IV, *id.* at 501–02, and that the *third* component of the right to travel is protected also by the Privileges or Immunities Clause of the Fourteenth Amendment, *id.* at 502–04, the Court explicitly *refused* to ascribe the first component to a specific constitutional provision, *id.* at 500–01. Indeed, as to the first component, the Court explained that it "need not identify the source of that particular right in the text of the Constitution," noting that "[t]he right of 'free ingress and regress to and from' neighboring States, which was expressly mentioned in the text of the Articles of Confederation, may simply have been 'conceived from the beginning to be a necessary concomitant of the stronger

Union the Constitution created.'" *Id.* at 501 (quoting *United States v. Guest*, 383 U.S. 745, 758 (1966)); *see also Doe v. Miller*, 405 F.3d 700, 711 (8th Cir. 2005) (citing *Saenz* in acknowledging that "the Supreme Court has not identified the textual source of [the first] component" of the right to interstate travel); *Abdi v. Wray*, 942 F.3d 1019, 1029 (10th Cir. 2019) (similar).

That the first component of the right to travel is not—and need not be—specifically located in any one constitutional provision is further supported by the direct precedent that controls this case. *See* WAWC SJ Br. 37–41. In these cases, multiple opinions by multiple justices affirm that the first component of the right can be drawn from a variety of constitutional provisions and principles—including the federal framework as a whole—and certainly none of these cases held that a plaintiff bringing a claim under the first component ***must*** locate the right in one particular provision. *See, e.g.*, *Crandall*, 73 U.S. 35 (not ascribing the right to travel to a particular constitutional provision, but rather to the national character of the federal government, in concluding the right was violated by a Nevada law imposing a $1 tax on common carriers for every passenger carried out of the state); *Edwards*, 314 U.S. 160 (holding California law that imposed criminal penalties on those who bring or assist in bringing a non-resident indigent into the state violated the right to travel on Commerce Clause grounds). *But see id.* at 181 (Douglas, J., concurring) (concurring that the California law violated the right to travel, but on the basis that it instead ran afoul of the Privileges or Immunities Clause of the Fourteenth Amendment); *id.* at 183 (Jackson, J., concurring) (same). *See also Guest*, 383 U.S. at 758 ("Although the Articles of Confederation provided that 'the people of each State shall have free ingress and regress to and from any other State,' that right finds no explicit mention in the Constitution. The reason, it has been suggested, is that a right so elementary was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created. In any event, freedom to travel

throughout the United States has long been recognized as a basic right under the Constitution."). This also aligns with other Supreme Court cases, wherein the Court has more generally refused to "locate th[e] right [to travel] definitively in any particular constitutional provision" given "the unquestioned historic acceptance of the principle of free interstate migration, and of the important role that principle has played in transforming many States into a single Nation." *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 902–03 (1986); *Shapiro v. Thompson*, 394 U.S. 618, 630 (1969) ("We have no occasion to ascribe the source of this right to travel interstate to a particular constitutional provision."), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974).

Defendant cites no binding precedent to the contrary. Even the one non-binding case he does cite—*Pollack v. Duff*, 793 F.3d 34, 39–40 (D.C. Cir. 2015), Def.'s Opp. 14, 16—does not support his position. Rather, the D.C. Circuit in *Pollack* was merely acknowledging what Plaintiffs already explained above—that the Supreme Court in *Saenz* "observed that '[t]he "right to travel" discussed in [its] cases embraces at least three different components' located in different provisions of the Constitution," 793 F.3d at 39 (alterations in original) (quoting *Saenz*, 526 U.S. at 500), and that it is therefore important to identify the relevant component at hand in each particular case, because, depending on which component is at issue, "different doctrines" arising under "the various provisions of the Constitution that protect the right to travel" may be applicable. *Id.* at 39–40. That is exactly what Plaintiffs have done here. They have identified the component of the right to travel that is implicated—the right to enter and leave a state—and have proven their entitlement to judgment in their favor under the applicable doctrine concerning that aspect of the right, which, as explained above, emanates from *multiple* constitutional provisions.

Because the Supreme Court has clearly held that the first component of the right to travel may be based on multiple constitutional provisions and has refused to limit this component to one

particular source, Defendant's attempt to cast a series of constitutional provisions as a "poor fit[s]" for this case when each is viewed in isolation, *see* Def.'s Opp. 15–16, is simply beside the point. In any case, Defendant's arguments on this front are also flawed. For example, Defendant falls back on his argument that he is merely "preventing abortion conspiracies (and not out-of-state abortions)[, which] has nothing to do with commerce." *Id.* at 15. But, as already explained, such "abortion conspiracies" do not even legally *exist* here, where the underlying abortion in question is *legal*, *supra* p. 19, and thus what Defendant is in fact doing, as he has admitted elsewhere, is penalizing travel so as to subvert pregnant Alabamians' cross-state movement to "prevent elective abortions." *See, e.g.*, MTD Reply 39 (stating that the "the primary purpose of enforcing the relevant statutes is to *prevent elective abortions* and corrupt agreements to procure them").

Likewise, Defendant's suggestion that there is no right to travel to engage in lawful conduct unless that conduct is subject to heightened constitutional protection under substantive due process or the Equal Protection Clause, Def.'s Opp. 16, is obviously wrong. *See, e.g.*, *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 345 (2022) (Kavanaugh, J., concurring) (recognizing that removal of heightened protection for abortion under the Fourteenth Amendment does not change that, "based on the constitutional right to interstate travel," a state may not "bar a resident of that State from traveling to another State to obtain an abortion"); *see also generally Edwards*, 314 U.S. at 178–79 (Douglas, J., concurring) (explaining that "there is not a shred of evidence in the record of the *Crandall* case that the persons there involved were en route on any such mission [to the seat of national government or its offices throughout the country] . . . . The point . . . was merely in illustration of the damage and havoc which would ensue if the States had the power to prevent the free movement of citizens from one State to another").

25

Finally, Defendant's attempt to distinguish the Privileges and Immunities Clauses on the basis that they only bear on how *destination* states treat non-residents as compared to residents, or newer residents as compared to older residents, respectively, Def.'s Opp. 15, is, as already explained elsewhere, WAWC Opp. 27–29, meritless. Neither the "text nor purpose" of these two clauses suggests that their protections "depend upon whether the State imposing travel restrictions is the State of one's origin or destination." MTD Order 48 n.12. For example, the Privileges and Immunities Clause of Article IV provides broadly that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1. Moreover, the Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States." U.S. Const. amend. XIV, § 1. Together, these clauses ensure that residents of State A can travel to States B, C, and D and—if they so choose, become new permanent residents of States B, C, and D—and, in doing so, are able to engage in legal activities in those states "upon the same footing with citizens of [those] States" and without facing "the disabilities of alienage." *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 180 (1868), *overruled in part on other grounds by United States v. Se. Underwriters Ass'n*, 322 U.S. 533 (1944). Thus, "[i]t follows that the Privileges and Immunities Clause[s] and the right to travel are implicated when *any* State prohibits residents of one State from enjoying the benefits lawfully available in another State." MTD Order 48 n.12 (emphasis in original).[15] In sum, Defendant's assertion that Plaintiffs lack a constitutional basis for their right to travel claim fails as a matter of law and must be rejected.

---

[15] As this Court explained, the fact that previous right to travel cases may have largely arisen in the context of destination states discriminating against temporary travelers or new destination-state residents originally hailing from other states "merely reflects the unprecedented nature of the Attorney General's actions in seeking to prevent *residents of his own State* from engaging in lawful conduct in other States." MTD Order 48 n.12.

b.     **Defendant's Threats Are Not Mere "Reasonable" Travel Regulations but Unconstitutional Restrictions on the Fundamental Right to Travel.**

Defendant's remaining arguments are likewise easily dismissed. As set forth in Plaintiffs' opening brief, the law is clear that a state law or action that has the purpose or effect of penalizing interstate travel, like the Attorney General's threats of prosecution here, is unconstitutional as a matter of law. *See* WAWC SJ Br. 37–42. Defendant does not meaningfully argue otherwise. Rather, Defendant briefly reasserts two arguments already considered and rejected by this Court: (1) that his threatened prosecutions are a mere "regulation" on travel assistance that either does not implicate or violate the right,[16] Def.'s Opp. 16–17; MTD Order 57–58, and (2) that his primary purpose here is not to prevent travel, but to "protect unborn children and maternal health," Def.'s Opp. 17; MTD Order 53. As detailed below, those arguments remain factually and legally wrong.

i.     **Defendant's Threats Are Not Mere "Reasonable" Regulations of Travel and the Precedent He Cites in Support of His Requested Rational Basis Test Is Inapposite.**

Defendant cannot defend his actions against the weight of Supreme Court precedent, WAWC SJ Br. 37–41, by characterizing his threats as mere "reasonable regulations" that do not even implicate the right to travel. Def.'s Opp. 16 (citing Def.'s MSJ 21–23). Nor can he claim to survive constitutional review because his threats are rationally related to legitimate state interests. Def.'s Opp. 16–17 (citing Def.'s MSJ 22).

Indeed, in arguing for some sort of "reasonableness" standard Defendant "stands on his prior briefing," Def.'s Opp. 16–17, which relies on inapposite cases under which often minor,

---

[16] Defendant makes this argument in all of two sentences, citing to his motion for summary judgment, and otherwise stating that he "stands on his prior briefing on this score." Def.'s Opp. 16–17. Because it is unclear whether Defendant actually means to rely on the specific arguments he made in his motion for summary judgment, and to ensure Plaintiffs do not waive their response, Plaintiffs address those arguments below, and otherwise incorporate by reference their Opposition to Defendant's Motion for Summary Judgment here.

incidental burdens on one's ability to travel are subject only to rationality review because they do not meaningfully implicate the right. *See* MTD Order 57–58. These cases include challenges to, for example, sex offender notification and registration requirements, *see* Def.'s MSJ 18–19, 22; security screening requirements at airports, *see, e.g.*, *id.* at 22; restrictions on the use of certain airports that make airline travel less "convenient" for certain passengers than other methods of travel, *id.* at 19, 21; and conventional traffic regulations like traffic lights, speed limits, license and registration requirements, and toll roads that affect travel by car, *see id.* at 21. As Plaintiffs have explained elsewhere, WAWC Opp. 31–32, central to the courts' reasoning in these cases was the determination that any impact on travel amounted to no more than routine delays and inconveniences or affected only a single mode or preferred method of travel, leaving alternative routes open. This is a far cry from the draconian criminal penalties Plaintiffs are threatened with here for assisting with *any* and *all* forms of interstate travel for abortion. *See Edwards*, 314 U.S. at 173 (holding that criminal penalties on travel-related assistance impermissibly "restrain[]" right to travel).[17]

These cases are also inapposite because, unlike the threatened prosecutions here, the impact on travel was ancillary to the non-travel-related purposes that the policies at issue were designed to serve. *See* WAWC Opp. 32 n.19. By contrast, Defendant here has threatened to impose criminal penalties on anyone who would assist residents in travelling across state lines precisely *because* they have assisted in the very travel that Defendant expressly seeks to prohibit. Thus, where the

---

[17] *Matsuo v. United States*, 586 F.3d 1180, 1183 (9th Cir. 2009), Def.'s MSJ 21, is even further afield, as it did not even involve a *state* restriction on interstate travel. The Ninth Circuit's decision there was not, as Defendant implies, premised on a conclusion that the law in question did not implicate the right to travel, but rather on the basis that "states [weren't] involved," and that the Supreme Court's precedent on the right to travel invoked by the plaintiffs there—namely, *Saenz*—does not create any right to "be[] provided with the same *federal* benefits after moving." *Matsuo*, 586 F.3d at 1184. Moreover, any incidental burden on travel that flows from the loss of a financial employment benefit obtained by virtue of residing in certain states, as was at issue in *Matsuo*, bears no resemblance to the direct criminal penalties at issue here.

purpose is, in Defendant's own words, to criminalize "direct abortion assistance" for people seeking to travel across state lines to access that care, Def.'s Opp. 20, the abovementioned cases do not control. Rather, as Plaintiffs explain in their opening brief and as this Court already recognized, WAWC SJ Br. 37–41; MTD Order 51–58, this case is controlled by *Crandall* and *Edwards*, neither of which imposed a test of "reasonableness" or rationality. Rather, in both cases, the Supreme Court recognized that because the laws at issue necessarily penalized interstate travel—as Defendant's threats do here—they exceeded "the boundaries to the permissible area of State legislative activity." *Edwards*, 314 U.S. at 173.

*Jones v. Helms,* another case relied on by Defendant, *see* Def.'s MSJ 19–20, 24, does nothing to undercut this important distinction. In *Jones*, the Supreme Court held a Georgia law that "enhance[d] the misdemeanor of child abandonment to a felony if a resident offender leaves the State after committing the offense" did not violate the right to travel. 452 U.S. 412, 422 (1981). The Court concluded that the appellee—who had pled guilty to the misdemeanor of child abandonment *before* leaving Georgia for Alabama—had already engaged in criminal conduct (i.e., the commission of the crime of child abandonment under the laws of Georgia) that "had qualified his right to travel interstate before he sought to exercise that right." *Id.* at 420. Thus, *Jones* merely holds that "a person who has committed an offense punishable by imprisonment" does not have an "unqualified federal right to leave the jurisdiction prior to arrest or conviction," *id.*, especially where their "departure aggravates the consequences of [criminal] conduct that is otherwise punishable," *id.* at 422–23—in that case, child abandonment. It does not, as Defendant seems to contend, Def.'s MSJ 19–20, 24, give states carte blanche to *purposefully* prevent the interstate travel of individuals who have committed *no* crime—and are in fact only attempting to do something (*i.e.*, leave the state for abortion) that Defendant admits is itself entirely legal, *id.* at 20.

Nor does it create some sort of generally applicable rational basis or reasonableness test for restrictions on the right to travel, under which any state-imposed penalty on travel can survive constitutional review so long as the state asserts the travel will have some sort of "detrimental effects." *Id.* at 19–20.[18]

Given that the standard here is not one of "reasonableness," Alabama's asserted interests in penalizing lawful travel are of no moment. *Id.* at 22. If California's interest in preventing what the *Edwards* Court characterized as "grave and perplexing" problems of health, morals, and finance allegedly created by an influx of migrants into the state during the Great Depression could not save the criminal statue at issue, 314 U.S. at 173, Alabama's interests cannot save the near-identical threats to travel assistance here. Moreover, even if this was the standard, Defendant cannot claim that his threats serve any "legitimate objectives," Def.'s MSJ 22, when prohibiting elective abortions *in other states* is not a legitimate exercise of Alabama's authority. WAWC SJ Br. 19–20; WAWC Opp. 20 n.13, 34–36.

> ## ii.    Defendant's Attempt to Evade His True Unconstitutional Purpose Fails.

As set forth in Plaintiffs' opening brief, controlling Supreme Court precedent dictates that the Attorney General's threats violate the fundamental right to travel in at least two independent ways: (1) they were issued with the unconstitutional purpose of preventing travel; and (2) they have the unconstitutional effect of penalizing pregnant Alabamians' movement across state lines. *See* WAWC SJ Br. 37–42. Notably, Defendant makes no attempt to contest the applicability of the second basis for Plaintiffs' right-to-travel claim, and any attempt to do so would be futile for reasons already described in Plaintiffs' opening motion and opposition to Defendant's cross-

---

[18] Indeed, despite seemingly arguing as much now, Defendant previously contended that he has "never suggested that *Jones v. Helms* prescribed a 'rational basis' standard for assessing all laws that burden the right to travel." MTD Reply 44 n.36.

motion. WAWC SJ Br. 37–41; WAWC Opp. 36–40. Rather, Defendant addresses only the first, contending that his primary purpose is "not to prevent travel-*qua*-travel," but instead "to protect unborn children and maternal health," presumably by preventing out-of-state abortions from taking place. Def.'s Opp. 17. This argument is unavailing. To begin, as this Court has already held, a restriction on travel "with the primary objective of preventing specific lawful out-of-state conduct"—as the Attorney General has effectively conceded is his objective here, *see, e.g.*, *id.*; Def.'s MSJ 24; MTD Reply 36—is "just as constitutionally impermissible as restrictions aimed at preventing travel generally," MTD Order 53.

Moreover, even assuming, *arguendo*, that preventing abortion actually furthers interests in fetal life and maternal health,[19] Alabama has already sought to advance those interests within its own borders by banning abortion in the state. And Defendant here is not simply seeking to ensure that Alabama's ban is fully enforced by punishing alleged conspiracies to provide abortions *in* Alabama that would *violate the ban*. Rather, Defendant is seeking to further his purported state interests *beyond* the state's borders by preventing Alabamians from *lawfully* leaving the state to obtain abortion care in other states where it is legal. That is where his argument falls apart. Having conceded that pregnant people are free to leave the state for abortion care on their own, Def.'s MSJ 20, and making no argument that Alabama has the power to criminalize the provision or receipt of abortion in another state, *id.* at 14–15, it follows that the only purpose Defendant's threats serve is to inhibit lawful travel to obtain lawful medical care. In other words, the *immediate* and *primary*

---

[19] Contrary to Defendant's assertion that his threats advance maternal health, the undisputed facts demonstrate that pregnant people's health is harmed—not improved—when they are delayed or prevented from accessing abortion care. Marty Aff. ¶¶ 28–29; Robinson Aff. ¶¶ 41–45. Moreover, if Defendant was genuinely concerned with protecting maternal health outside Alabama, then one would think that he would want to ensure that the pregnant Alabamians he concedes are free to leave the state for abortion, Def.'s MSJ 20, receive information, guidance, and support from trusted medical experts and health professionals about the safest, highest-quality places to obtain such care. It is telling that he does not.

purpose of Defendant's threats can only be to "impede or prevent the exercise of the right of interstate travel" for abortion care. *Guest*, 383 U.S. at 760; *see also Edwards*, 314 U.S. at 174 (concluding that the "express purpose" of the California law criminalizing provision of travel assistance to indigents was "to prohibit the transportation of indigent persons across the California border" ). Under binding Supreme Court precedent, this in and of itself condemns Defendant's efforts to challenge Plaintiffs' clear entitlement to judgment on the right to travel claim. *See* MTD Order 52–53.

## **CONCLUSION**

For the foregoing reasons, and for those already set forth in Plaintiffs' Motion for Summary Judgment, this Court should grant Plaintiffs' motion, enter judgment as a matter of law in Plaintiffs' favor, and issue the requested permanent injunctive relief.


Dated: July 22, 2024

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ Meagan Burrows
Meagan Burrows*
New York State Bar No. 5341904
Alexa Kolbi-Molinas*
New York State Bar No. 4477519
Lindsey Kaley*
New York State Bar No. 5324983
Scarlet Kim*
New York State Bar No. 5025952
Jessica Quinter*
New York State Bar No. 6124077
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2633
mburrows@aclu.org
akolbi-molinas@aclu.org

</div>

lkaley@aclu.org
scarletk@aclu.org
jquinter@aclu.org

Lorie Chaiten*
Illinois State Bar No. 6191424
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
1640 North Sedgwick
Chicago, IL 60614
(212) 549-2633
lchaiten@aclu.org

Alison Mollman
Alabama State Bar No. 8397-A33C
ACLU OF ALABAMA
P.O. Box 6179
Montgomery, AL 36106-0179
(510) 909-8908
amollman@aclualabama.org

*Attorneys for Plaintiffs West Alabama Women's Center, Alabama Women's Center for Reproductive Alternatives, LLC, d/b/a Alabama Women's Center, and Yashica Robinson, M.D.*

*\*Admitted pro hac vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was filed using the

Court's CM/ECF system on this 22nd day of July, which will serve all counsel of record.


/s/ Meagan Burrows
Meagan Burrows