IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| YELLOWHAMMER FUND, on behalf of itself and its clients, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | CIVIL ACTION NO. 2:23cv450-MHT (WO) |
| ATTORNEY GENERAL OF ALABAMA STEVE MARSHALL, in his official capacity, | ) ) ) ) | |
| Defendant. | ) | |
| | | |
| WEST ALABAMA WOMEN'S CENTER, on behalf of themselves and their staff; et al., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | CIVIL ACTION NO. 2:23cv451-MHT (WO) |
| STEVE MARSHALL, in his official capacity as Alabama Attorney General, | ) ) ) ) | |
| Defendant. | ) | |

OPINION

Previously, this court wrote in denying a motion to dismiss: "At its core, this case is simply about whether a State may prevent people within its borders from going to another State, and from assisting others in going to another State, to engage in lawful conduct there." *Yellowhammer Fund v. Att'y Gen. of Ala. Steve Marshall*, 733 F. Supp. 3d 1167, 1174 (M.D. Ala. 2024) (Thompson, J.). The court now answers no, a State cannot.

**\*\*\*\***

A little over two years ago, the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), overturned *Roe v. Wade*, 410 U.S. 113 (1973), and delegated abortion regulation to the States. As a result, it is now a felony in Alabama for anyone "to intentionally perform or attempt to perform an abortion" absent a "medical emergency." Ala. Code § 26-23H-4. *Dobbs* suggested that vertical federalism concerns--that is, the division of power between the federal government

and the States--warranted returning abortion regulation to the States.  *See* 597 U.S. at 302 ("The Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion.  *Roe* and *Casey* arrogated that authority.  We now overrule those decisions and return that authority to the people and their elected representatives.").

In the wake of *Dobbs*, the Attorney General of Alabama threatened to criminally prosecute those who assist women seeking to travel out-of-state to procure a legal abortion. Unlike *Dobbs* which implicated, as stated, vertical federalism concerns, the Alabama Attorney General's threatened enforcement contravenes horizontal federalism, an historical sovereign principle rooted in the Constitution's original design.  Plaintiffs Yellowhammer Fund, West Alabama Women's Center (WAWC), Alabama Women's Center (AWC), and Dr. Yashica Robinson then sued, naming the Attorney General as defendant. Plaintiffs all either helped coordinate legal abortions

3

in Alabama or provided such abortions themselves, and, most significantly here, they arranged or facilitated, and provided information for, legal abortions outside Alabama.

The plaintiffs seek a declaratory judgment that the Attorney General's threats of criminal prosecution are unconstitutional; they also seek permanent injunctive relief to prevent such prosecution. While the claims brought by each of the four plaintiffs vary slightly, this litigation tasks the court with resolving whether the Attorney General's threats violate three constitutional protections: the right to travel, the First Amendment, and the Due Process Clause.[1]

---

1. The court previously dismissed a "fair notice" claim brought under the Due Process Clause of the Fourteenth Amendment, as well as a First Amendment overbreadth claim. *See Yellowhammer Fund*, 733 F. Supp. 3d 1167, 1201. The remaining claims, though brought under the same amendments, are distinct from the dismissed claims.

4

Jurisdiction is proper pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

These two now consolidated cases are before the court on cross-motions for summary judgment. The court will grant in part and deny in part both plaintiffs' and defendant's motions.


I.   SUMMARY-JUDGMENT STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The court must view the admissible evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In this case, the parties agree that there are no disputed issues of material fact and that the only issues for resolution are ones of law.

## II.  FACTUAL BACKGROUND[2]

### A.    Yellowhammer Fund

Yellowhammer Fund is a Tuscaloosa-based nonprofit advocacy group committed to supporting families and "ensuring access to reproductive health care for all members of [its] community, regardless of race, income, location, age, gender, sexuality, disability, number of children, or status as a citizen." Fountain Decl. (Doc. 61-1) ¶ 6.  The Fund believes that, "[b]y providing material assistance, education, and mutual aid to pregnant and parenting Alabamians and their families, [it] send[s] an important message to [its] community about individual dignity and each person's innate ability

_____

2. Because the facts of this case are undisputed, all parties agreed at oral argument on March 5, 2025, that the court could rely on the facts of the complaints for background information.  Therefore, based on the allegations in the complaints, and in the uncontroverted declarations submitted in support of summary judgment, the facts are as set forth in the body of this opinion.

to make the decisions that are best for themselves and their families. [It] also seek[s] to communicate to funding recipients, volunteers, employees, supporters, other abortion advocacy groups, and the general public the belief that all people deserve access to the resources necessary to make the decisions that are right for them." *Id.* ¶ 11. To further its mission, the Fund distributes free diapers, school supplies, pregnancy tests, contraception, hygiene products, emergency contraception, sex-education materials, and referrals for a wide range of reproductive-healthcare providers. Before *Dobbs* and the Attorney General's threats, Yellowhammer Fund also operated an abortion fund, which provided financial assistance and logistical support, including help coordinating food, lodging, childcare, and travel logistics to people in Alabama seeking abortions. At that time, between 15 and 20 percent of the abortions

that the Fund's clients[3] received occurred outside of
Alabama.   The Fund arranged for its clients' travel
either by having its staff members transport them to
their out-of-state appointments or by helping its clients
book bus and plane tickets.   All of the Fund's clients
were low-income and the majority were on Medicaid or were
uninsured.   The Fund also provided technological support
and language assistance in response to the barriers their
clients faced in accessing abortion information.

B.   *Healthcare Providers WAWC, AWC, and Dr. Robinson*

    WAWC and AWC are reproductive-healthcare providers
that offer routine checkups, prenatal care, testing and
treatment for sexually transmitted infections, and

---

    3. The court uses the term 'clients' as shorthand
for the class of individuals whom the plaintiffs serve
and wish to serve, including WAWC, AWC, and Dr.
Robinson's patients; Yellowhammer Fund's would-be
funding and transportation recipients; and individuals
who approach the plaintiffs with requests for assistance
in obtaining out-of-state abortions that the plaintiffs
would fulfill but for the Attorney General's threats.

pregnancy testing, among other services.  Dr. Robinson,
who serves as the medical director of AWC and has her own
private practice, provides a broad range of reproductive
and women's healthcare services, including but not
limited to "general OB-GYN care; major and minor
gynecological surgeries; prenatal, delivery and
post-partum care; management of infertility; and primary
care."  Robinson Decl. (Doc. 60-3) ¶ 1.  Most of the
plaintiff healthcare providers' clients live in poverty
or have low incomes, and some are homeless.

Before *Dobbs*, as stated, WAWC, AWC, and Dr. Robinson
offered abortions themselves and, where appropriate,
would arrange for out-of-state abortions.  These three
healthcare providers helped their patients secure funding
for their abortions and, like Yellowhammer Fund, provided
logistical support for patients' efforts to obtain
abortions.

As with any medical care the healthcare providers
give, they tailored information to each patient based on

9

individual personal and medical circumstances. They provided pregnant women who wanted or needed to obtain an out-of-state abortion with recommendations for specific, trusted providers based on the woman's medical needs, pregnancy duration, geographic location, and other factors necessary for her to receive care without needless delay.

For medically complex cases, including cases where a patient's medical conditions resulted from or were exacerbated by pregnancy, Dr. Robinson would communicate directly with out-of-state physicians to relay pertinent medical information and forward relevant medical records. Just as Dr. Robinson would do for any patient needing a transfer of medical treatment, she also guided and assisted patients in figuring out how to pay for out-of-state medical care when they needed an abortion. These practices align with the three plaintiff healthcare providers' training and commitment to patient-centered care. Dr. Robinson is motivated by her belief that

10

"pregnant Alabamians, just like people seeking other types of medical treatment, should be able to seek and obtain information, counsel, and medical advice about all their medical options, including those that are legal outside of Alabama, such as abortion." *Id.* ¶ 29.

Similarly, the staff at WAWC "feel a deep sense of ethical obligation to present pregnant Alabamians who reach out to [WAWC] for help with all of their healthcare options, respond to their questions, and provide them with the best information [they] can, including specific, tailored information about where and how to safely access care that WAWC cannot provide." Marty Decl. (Doc. 60-2) ¶ 14.

### C. Attorney General's Statements

After *Dobbs* was decided, Alabama's abortion restrictions went into effect. Under Alabama law, it is now "unlawful for any person to intentionally perform or attempt to perform an abortion except ... in the case of a medical emergency." Ala. Code § 26-23H-4. The

restrictions exempt those who receive abortions from civil and criminal liability. *See id.* § 26-23H-5. But anyone who performs an abortion can be charged with a Class A felony, punishable by anywhere between 10 and 99 years in prison. *See id.* § 26-23H-6(a); *id.* § 13A-5-6(a)(1). Those who attempt to perform an abortion can be charged with a Class C felony, punishable by between a year and a day to 10 years in prison. *See id.* § 26-23H-6(b); *id.* § 13A-5-6(a)(3). The restrictions amount to a near-total ban on abortion.

On the day that *Dobbs* was decided, a representative in Alabama's legislature speculated that, with Alabama's abortion restrictions now in effect, anyone who helped someone else either get or plan an abortion in another State could be prosecuted for conspiracy. The representative cited Alabama's interjurisdictional conspiracy statute, which was passed in 1896 and provides that, "A conspiracy formed in this state to do an act beyond the state, which, if done in this state, would be

a criminal offense, is indictable and punishable in this state in all respects as if such conspiracy had been to do such act in this state." Ala. Code § 13A-4-4. Under Alabama's general conspiracy statute, "A person is guilty of criminal conspiracy if, with the intent that conduct constituting an offense be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one or more of such persons does an overt act to effect an objective of the agreement." *Id.* § 13A-4-3(a).

In response to the state representative's comment, the Alabama Attorney General announced that he was "reviewing the matter." WAWC's Compl. (Doc. 23) ¶ 28. A few weeks later, he stated that his office would exercise its authority to prosecute violations of the 2019 abortion ban and Alabama's conspiracy laws, which could include attempts to procure an out-of-state abortion.

The Attorney General reiterated his commitment to

prosecuting those who help coordinate out-of-state abortions during an appearance on an online radio program. The show's host asked him what he thought of "talk" that one could be an accomplice to a violation of the abortion ban by transporting someone else to another State for an abortion. *Id*. ¶ 32. In response, the Attorney General emphasized that, in Alabama, performing an abortion is "the most significant offense we have as far as punishment goes under our criminal statute absent a death penalty case, and so, uh, provisions relating to accessory liability--uh provisions relating to conspiracy--uh would have applicability involving [the abortion ban]." Suelzle Decl. (Doc. 61-3) ¶ 6. He elaborated:

> "[O]ne thing we will do in working with local law enforcement and prosecutors is making sure that we fully implement this law. ... [I]f any individual held themselves out ... as an entity or a group that is using funds, that they are able to raise, uh, to be able to facilitate ... those visits [to an out-of-state abortion provider] then that, uh, is something we are going to look at closely. ... To the

14

> extent that there [are] groups, and we've seen
> groups out of Tuscaloosa for example, that have
> one point in time have talked about it, some of
> them are doing it now, uh, but if they are
> promoting this as one of the services, uh, we
> clearly will be taking a look at that."

*Id.* A few months after his radio-show appearance, the

Attorney General again noted "that prosecution is also

possible to those who aid and abet abortions."

Yellowhammer Fund's Compl. (Doc. 1) ¶ 23. The Attorney

General's comments about liability as an accessory or for

aiding and abetting an offense seemingly refer to

Alabama's criminal complicity statute, under which anyone

who induces, aids and abets, or fails to prevent a crime

is criminally liable. *See* Ala. Code § 13A-2-23.

### D. Plaintiffs' Injury

The Attorney General's threats to prosecute people

for facilitating out-of-state abortions were reported

widely in the media, which is how the plaintiffs learned

of them. The four plaintiffs all wish to continue serving

people in Alabama who seek lawful out-of-state abortions

15

and would do so but for the Attorney General's threats. Collectively, they still receive as many as 95 weekly inquiries from clients about the availability of out-of-state abortions.[4]  The three healthcare providers no longer respond to questions from clients or physicians about medical procedures available in other States.  They also no longer coordinate with out-of-state medical providers, including forwarding medical records and other relevant patient information, for patients seeking an out-of-state abortion.  Yellowhammer Fund no longer operates its abortion fund and has eliminated a position on its staff dedicated to overseeing the organization's efforts to reduce obstacles to abortions.  The Fund also

_____

4. WAWC receives approximately 40 to 50 inquiries per week; Dr. Robinson has an estimated ten inquiries each week; AWC receives approximately 20 to 25 inquiries per week; and Yellowhammer Fund receives an estimated five to ten calls weekly from clients, plus additional calls from healthcare providers on behalf of their patients.

16

used to work with other advocacy groups and abortion funds but no longer does so for fear of prosecution. In June and July 2023, the Fund organized a bus tour throughout Alabama to share reproductive-healthcare information and resources with Alabamians. But for the Attorney General's threats of criminal prosecution, the Fund would have shared information about its abortion fund as well as the names of out-of-state abortion providers. The Executive Director of the Fund explained that "[t]he absence of this information, as a result of Defendant's threats of prosecution, diluted the value of our bus tour and hampered our ability to achieve our mission." Fountain Decl. (Doc. 61-1) ¶ 10.

The plaintiffs find that the Attorney General's threats injure their relationships with their clients. As healthcare providers, they attest, they have an ethical obligation to help each patient evaluate all of their healthcare options in light of their personal circumstances. Impeding their ability to deliver

tailored care undermines their relationship with their
patients--a relationship dependent on trust that the
provider will give specific advice based on the patient's
particular needs.  Moreover, a WAWC healthcare provider
explained: "By withholding information about and support
for accessing legal abortion care outside of Alabama, we
fear we may be exacerbating the confusion and distress
that people who come to us for help are already
experiencing, and contributing to potentially dangerous
delays in patients accessing healthcare, putting their
health and safety at risk. ... As just one example, last
summer a staff member came to me distraught, in tears
after a call with a pregnant individual who was seeking
abortion information.  When the staff member informed the
caller that WAWC was unable to give her the specific
information she was looking for, the caller threatened
self-harm ... and hung up."  Marty Decl. (Doc. 60-2)
¶ 15.

       Being prosecuted for assisting a client in obtaining

an out-of-state abortion would impose significant financial, emotional, and reputational costs on the plaintiffs and their staff, even if the prosecution were ultimately unsuccessful.

### E.  *Client Circumstances*

Those seeking out-of-state abortions must arrange for them as quickly as possible.  States have varying deadlines for legal abortions, and even a brief delay may make abortion legally unavailable.  Moreover, according to Dr. Robinson, "While abortion is very safe, and far safer than childbirth,[5] the risks associated with it increase as pregnancy progresses, as do its costs." Robinson Decl. (Doc. 60-3) ¶ 41.  "As a result," she continues, "the longer it takes for someone to find an appropriate out-of-state abortion provider, and make the necessary arrangements to attend an appointment ... the

_____

5. Alabama has the third highest maternal mortality rate in the United States.  *See id.* ¶ 28.

19

greater the risk to their health and safety from prolonged pregnancy and the abortion itself." *Id.* ¶ 42.

Arranging out-of-state medical care requires finding a provider that can treat an individual given her gestational stage and medical conditions; planning travel; managing time away from home and work (*e.g.*, arranging childcare and getting time off); and securing the necessary resources to pay for care and travel. According to an estimate by the Executive Director of WAWC, who also serves as a member of the Alabama Maternal Health Task Force, "more than half of the individuals who request WAWC's help in identifying, connecting with, and accessing safe out-of-state legal abortion care have had limited formal education, which may make it difficult to research and to identify reliable information," and "a significant portion do not have reliable internet access and/or are not tech savvy, and so navigating the internet on their own to find information and resources about abortion care out of state is very difficult, if not

impossible."    Marty    Decl.    (Doc.    60-2)    ¶ 23.
Additionally, as discussed above, most of the plaintiffs'
clients live in poverty or have low income.[6]  For these
low-income women, financial assistance and practical
support is likely necessary to travel out-of-state and
pay for an abortion.

Without    assistance    from    the    plaintiffs,    the
plaintiffs'    clients    will    face    significant,    and
potentially insurmountable, barriers to arranging legal
out-of-state abortions.  Unlike most individuals seeking
abortions, the plaintiffs have the resources and
connections to navigate the changing legal landscape
across states.  Dr. Robinson notes that "[AWC and her
private practice] make every effort to stay abreast of
the legal changes, which is no easy task."    Robinson

---

6. Alabama has the sixth highest percentage of
residents living in poverty in the country, with "more
than 800,000 people, including 250,000 children, living
below the poverty line."  White Decl. (Doc. 61-4) ¶ 24.

21

Decl. (Doc. 60-3) ¶ 32. Through "personal and
professional relationships with out-of-state providers
who offer high-quality, lawful abortion care," the
healthcare providers can "readily contact these
colleagues to verify gestational limits, wait times, and
other aspects of the current state of abortion care in
their states to ensure that people seeking to travel
there could get the abortion care they need." *Id.*
"[E]ven those who are ultimately able to identify and
travel to an out-of-state abortion provider without
[WAWC's] assistance will likely experience delays in
accessing time-sensitive abortion care that may cause
them physical, emotional, and/or financial harm." *Id.*
¶ 31.

### III. DISCUSSION[7]

As stated, the court must determine whether the Attorney General's threatened enforcement of Alabama law would violate three constitutional guarantees: the right to travel, the First Amendment, and the Due Process Clause. Not every plaintiff makes each of these constitutional claims, and the plaintiffs bring some claims on behalf of their clients and staff.

#### A. Standing

The court will first address the threshold issue of standing. In general, to establish standing, a plaintiff must possess "'such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the

_____

7. While the court parrots many of its earlier conclusions of law when resolving the Attorney General's dismissal motion, *see Yellowhammer Fund*, 733 F. Supp. 3d 1167, it substantially and importantly expands on some as well.

23

court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  "'[A] plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

The "irreducible constitutional minimum of standing" has three elements. *Defenders of Wildlife*, 504 U.S. at 560 (1992).  A plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  If a plaintiff cannot meet these requirements, the court does not have jurisdiction over the case. *See Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008).

All of the plaintiffs have satisfied the constitutional requirements for standing and thus have what is often referred to as 'Article III standing' to bring each claim. Due to the Attorney General's threats, Yellowhammer Fund has been unable to fulfill its organizational mission by providing abortion information, funding, and transportation to its clients, including advertising these resources on its bus tour across Alabama. The Fund also eliminated a staff position dedicated to overseeing the organization's efforts to reduce obstacles to abortions. *See, e.g., Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (finding an organization suffered injury and had standing when its mission was thwarted and it had to divert resources); *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165-66 (11th Cir. 2008) (same). The three healthcare-provider plaintiffs suffer injury by being unable to meet their ethical obligations to provide care and recommendations appropriate for each patient's unique

25

circumstances. *See, e.g., Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1304 (11th Cir. 2017) (determining physicians and physician interest groups were harmed by and had standing to challenge a law censoring doctors from asking about particular safety concerns). These injuries could be redressed by a ruling for the plaintiffs granting the requested prospective relief. Thus, all of the requirements for Article III standing have been met. Notably, the Attorney General does not make any argument to the contrary.

Instead, the Attorney General focuses his attack on the issue of third-party standing, arguing that Yellowhammer, AWC, and Dr. Robinson lack standing to bring claims asserting a violation of their clients' right to travel.[8]

_____

8. The Attorney General's motion for summary judgment disputes the plaintiffs' standing to assert both their clients' and their staff's right to travel; however, none of the plaintiffs assert a right-to-travel claim on behalf of their staff.

26

Generally, a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (internal citation omitted). This principle reflects the assumption that "the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation." *Id.* Unlike Article III standing, which is a constitutional and jurisdictional requirement, the limitations on asserting the rights of third parties are prudential, meaning they are "flexible and not jurisdictional in nature." *Am. Iron & Steel Inst. v. OSHA*, 182 F.3d 1261, 1274 n.10 (11th Cir. 1999). Prudential requirements are "judicially self-imposed limits on the exercise of federal jurisdiction." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (internal citation omitted).

That said, the Supreme Court has consistently recognized a "class of cases where [it] 'allowed standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights.'"  *Kowalski*, 543 U.S. at 131 (emphasis in original) (quoting *Warth*, 422 U.S. at 510).[9]  One such case, *Craig v. Boren*, 429 U.S. 190 (1976), is particularly illustrative.  In *Craig*, a beer vendor sued

---

9. *See also, e.g.*, *U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720 (1990) (permitting an attorney disciplined for accepting a fee prohibited by the Black Lung Benefits Act of 1972 to invoke claimants' due process rights to challenge the fee restriction that resulted in his punishment); *Doe v. Bolton*, 410 U.S. 179, 188 (1973) (permitting criminally liable physicians to raise the rights of patients seeking abortions), *abrogated in part on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965) (permitting a criminally liable physician to assert the rights of a married couple seeking contraception); *Barrows v. Jackson*, 346 U.S. 249, 257-59 (1953) (permitting a white tenant sued for conveying property to African-American individuals to raise the rights of prospective African-American purchasers).

to prevent the enforcement of a statute that prohibited the sale of beer to men under the age of 21 and to women under the age of 18. The vendor argued that the statute unconstitutionally discriminated against men between the ages of 18 and 20. The Supreme Court held that the vendor, because she had Article III standing, was "entitled to assert those concomitant rights of third parties that would be 'diluted or adversely affected' should her constitutional challenge fail and the statutes remain in force." *Id.* at 195 (quoting *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965)). The Court further explained that, because the statute prohibited vendors from distributing beer to young men rather than directly prohibiting young men from drinking beer, the vendor was the "obvious claimant" and "least awkward challenger." *Craig*, 429 U.S. at 197.

The same reasoning holds true here. Just as the statute in *Craig* was directed at the vendor, the Attorney General has addressed his threats of enforcement to the

29

plaintiffs and their staff.  He has declared his intent to prosecute any "entity" or "group" that facilitates out-of-state abortions.  Suelzle Decl. (Doc. 61-3) ¶ 6. He specifically mentioned "groups out of Tuscaloosa" as organizations of interest, apparently referring to Yellowhammer Fund.  *Id.*  The plaintiffs contend that targeting them for helping their clients leave Alabama to obtain medical services that are lawful in other States infringes on their clients' right to travel.  As in *Craig*, the plaintiffs, by virtue of being the target of the Attorney General's enforcement, are the "obvious claimants" and "least awkward challengers."  *Craig*, 429 U.S. at 197.

The Attorney General attempts to distinguish *Craig* on various fronts,[10] but he forgets that *Craig* is just

---

10. The Attorney General asserts that, in *Craig*, the State had not objected in the lower courts to the vendor's assertion of the rights of third parties, leaving the Court reluctant to "await the initiation of a new (continued...)

one example of the broader principle that litigants threatened with enforcement are well positioned, if not entitled, to assert the rights of third parties that are intertwined with the conduct the litigants seek to pursue. For instance, in *Griswold v. Connecticut*, the Court found that the healthcare providers who wished to provide contraception to patients had standing to assert the constitutional rights of the married people they aided in obtaining contraception, reasoning that a person "[c]ertainly ... should have standing to assert that the offense which he is charged with assisting is not, or cannot constitutionally be a crime."  381 U.S. 479, 481 (1965).

---

challenge to the statute by injured third parties" before reaching the constitutional claims.  429 U.S. at 194. But the Court in *Craig* emphasized that, regardless of these circumstances, the vendor "ha[d] established independently her claim to assert jus tertii standing." *Id.*

These cases stand for the principle that litigants threatened with enforcement are well positioned to assert the rights of third parties that are intertwined with the conduct the litigants seek to advance. The Attorney General contends that this principle is inapplicable to the plaintiff organizations because Alabama law does not provide for criminal liability for conspiracy for corporations--only for individuals. However, he has threatened to prosecute the plaintiff organizations' staff with the express purpose of frustrating the work of the "entit[ies]" and "group[s]" for whom they work. Suelzle Decl. (Doc. 61-3) ¶ 6. The organizational plaintiffs, of course, cannot function without their staff members. As far as the *Craig* rationale is concerned, enforcement against the plaintiffs' staff is the functional equivalent of enforcement against the organizations themselves, considering that the Attorney General's stated objective is to target the organizations. Moreover, courts have found third-party

standing under *Craig* when an organization sues on its own behalf.  *See Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 216 (4th Cir. 2020) (concluding that Atlantic Guns, a gun-dealing organization, had third-party standing to assert its potential customers' Second Amendment rights).

Consistent with the logic of *Craig*, the Supreme Court has long allowed parties facing the prospect of enforcement to bring right-to-travel claims on behalf of third parties whose travel they wish to facilitate. *See, e.g.*, *Crandall v. Nevada*, 73 U.S. 35, 39 (1867) (upholding a stage-company agent's challenge to a tax on crossing the state border on the passengers' behalf); *Edwards v. California*, 314 U.S. 160, 170-71 (1941) (permitting a man who helped his brother-in-law enter California to challenge a statute forbidding individuals from helping indigent persons enter the State).

In fact, in *Crandall*, the Court held that a tax imposed on common carriers for each passenger was a violation of the passengers' right to travel;

33

nonetheless, because the liability fell on the common-carrier companies and not the passengers, the court permitted an agent of the stagecoach company to assert the passengers' right to travel despite the fact that he did not travel. *See Crandall*, 73 U.S. at 39; *Ex parte Crandall*, 1 Nev. 294, 300 (1865).[11]

The travel restrictions in this matter are analogous. Just as the tax per passenger on common carriers was a violation of the passengers' right to travel, the Attorney General's threatened enforcement of Alabama's inchoate criminal statutes is similarly an unconstitutional burden on the plaintiffs' clients' right to travel. Moreover, the Attorney General has threatened to prosecute groups promoting the facilitation of out-of-state abortions. *See* Suelzle Decl. (Doc. 61-3) ¶ 6. Thus, as the target of criminal liability, the

---

[11] The court acknowledges that *Crandall* did not address standing; however, the case is still instructive.

34

plaintiffs, like the agent in *Crandall*, can invoke their clients' right to travel regardless of whether they have physically traveled.

Admittedly, the Supreme Court has used a two-factor test to determine whether plaintiffs have standing to assert third-party rights: first, whether the plaintiffs have a 'close relationship' to the third parties; and, second, whether the third parties are 'hindered' from asserting their own rights. *See Powers v. Ohio*, 499 U.S. 400, 411 (1991). While, as demonstrated in the cases discussed above, the Supreme Court has "been quite forgiving with these criteria," *Kowalski*, 543 U.S. at 130, in the "class of cases where [The Supreme Court has] 'allowed standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights,'" *Kowalski*, 543 U.S. at 131 (emphasis in original) (quoting *Warth*, 422 U.S. at 510), the plaintiffs here each still satisfy the standard

35

prudential requirements to assert their clients' right to travel.[12]

Turning to the first of those two factors, plaintiffs must ordinarily establish that their relationship with the third party whose rights they wish to assert is sufficiently close such that the plaintiffs are "fully, or very nearly, as effective a proponent of the right" as the third party would be. *Singleton v. Wulff*, 428 U.S. 106, 115 (1976) (plurality opinion). A close relationship exists where the plaintiffs and the third

---

12. The court takes up the parties' arguments about these prudential factors as an alternative ground for its ruling on standing. However, it bears emphasis that the *Craig* rationale is sufficient to establish standing to assert third-party rights. When that rationale applies, courts need not also consider whether a plaintiff has sufficiently alleged a close relationship with the third parties and a hindrance in the third parties' ability to assert their rights. *See, e.g.*, *Craig*, 429 U.S. at 195; *June Med. Servs. L.L.C. v. Russo*, 591 U.S. 299, 318-19 (2020), *abrogated on other grounds by Dobbs*, 597 U.S. 215; *Triplett*, 494 U.S. at 720; *Carey v. Population Servs., Int'l*, 431 U.S. 678, 683 (1977).

parties have "a strong identity of interests." *Region 8*, 993 F.2d at 810; *see also Powers*, 499 U.S. 400 at 413 (emphasizing that defendants could assert the third-party rights of jurors because of their "common interest in eliminating racial discrimination from the courtroom"). The close-relationship standard is generally satisfied if the third parties' rights are "inextricably bound up with the activity the litigant[s] wish[] to pursue." *Singleton*, 428 U.S. at 114.

The Attorney General contends that the plaintiffs do not have a close relationship with their clients because they are "random callers." AG's Resp. (Doc. 66) at 5. In his telling, only such intimate relationships as those between parents and children, and guardians and wards, are sufficiently 'close' to satisfy the prudential factor. As an initial matter, the evidence reflects that at least two of the plaintiffs who bring the right-to-travel claim on behalf of their clients--Dr. Robinson and AWC--provide gynecological care and prenatal

care to patients, and that they want to be able to further assist their patients with obtaining out-of-state legal abortions. It is not accurate to call these patients "random callers." Moreover, as is true as to the healthcare providers, Yellowhammer Fund currently provides services to clients and would like to resume its services to include the assistance of out-of-state legal abortions, which it previously provided. And as to any so-called "random callers," they are actual callers the Fund would serve absent the Attorney General's threats. It is those threats that keep them from becoming actual clients. In any case, the Attorney General's argument is controverted by the many cases in which the Supreme Court recognized a litigant's standing to assert third-party rights despite the relationship between the litigant and the third party being quite unlike a

parent-child relationship. *See, e.g.*, *Powers*, 499 U.S. at 413.[13]

The Attorney General misinterprets what "close" entails for the close-relationship factor of the third-party standing test. Supreme Court jurisprudence makes clear that a close relationship is not dependent on the duration of a relationship. In fact, in *Powers*--the totemic case enumerating the two-factor, third-party standing test--the litigant (the criminal defendant) and the third parties (the jurors) had not spent any time with one another, but the Court still found the defendant had standing to complain about racial discrimination in the jury-selection process. The

_____

13. Indeed, the Supreme Court has even refused to let a parent assert a child's rights where "[i]n marked contrast to our case law on *jus tertii*, the interests of this parent and this child are not parallel and, indeed, are potentially in conflict." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 (2004) (internal citation omitted), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

close-relationship factor was justified based on their
"common interest in eliminating racial discrimination
from the courtroom." *Id.* at 413. A doctor-patient or a
helper-client relationship with intertwined pursuits is
just as close, if not closer than, many of the close
relationships where the Court has upheld third-party
standing. Unlike the hypothetical clients in *Kowalski*,
a case where attorneys lacked third-party standing to
bring action on behalf of a conglomerate of theoretical
future defendants who could not be identified, the
plaintiffs here have not only turned away real callers,
some first-time and others seasoned clients, seeking
their advice and assistance due to the Attorney General's
threat of prosecution, but they have also denied
additional help to existing clients for that reason. The
plaintiffs share a common interest in assisting each
client in finding reproductive healthcare for their

40

needs, regardless of whether the client has contacted
them once or is existing.[14]

Here, the clients' right to travel is inextricably
bound up with the plaintiffs' desire to assist them in
that travel. The plaintiffs' and their clients'
interests are essentially identical, as the plaintiffs
wish to provide services that their clients seek. The
plaintiffs wish to carry out their mission to provide
information, counseling, and logistical support to
individuals seeking out-of-state abortions. And, because
the plaintiffs face the threat of enforcement should they
resume facilitating legal out-of-state abortions, they
have every incentive to litigate their claim vigorously.

---

14. Furthermore, the Attorney General bases much of
his theory of standing on dissenting Supreme Court
opinions, which are at odds with the binding precedent
that *stare decisis* obligates this court to apply. *See,
e.g.*, AG's Resp. (Doc. 66) at 5-7 (drawing on a dissenting
opinion in *June Medical*).

The plaintiffs also satisfy the second of the two factors for standing to assert third-party rights: that the third parties be hindered in their ability to assert their own rights. When third parties do not assert their own rights, it might suggest that their "right[s] [are] not truly at stake, or truly important to [them]." *Singleton*, 428 U.S. at 116. However, if "some genuine obstacle" hinders the third parties from asserting their rights, "the third party's absence from court loses its tendency to suggest that his right is not truly at stake, or truly important to him, and the party who is in court becomes by default the right's best available proponent." *Id.*

The plaintiffs' clients face multiple obstacles to asserting their rights. Even a meritorious lawsuit is unlikely to reach a merits determination until after the window to obtain an abortion has passed. The sheer unlikelihood of obtaining personal relief before the end of pregnancy will inevitably deter clients from filing

42

their own suits.  Clients who are unlikely to succeed in obtaining an abortion through litigation have "little incentive to set in motion the arduous process needed to vindicate [their] own rights." *Powers*, 499 U.S. at 415.

Couple the unlikelihood of obtaining personal relief before the end of pregnancy with the added hurdle of needing to promptly find safe, credible, out-of-state abortion care in the absence of trusted sources, and clients are even more unlikely to be in a position to assert their rights in court, let alone "with the necessary zeal and appropriate presentation." *Kowalski*, 543 U.S. at 129.

The women who need the plaintiffs' assistance live in poverty or with low incomes, many are uninsured, and some lack housing.  Moreover, a significant portion of the plaintiffs' clients have had limited formal education.  Many do not have reliable internet access and/or are not technologically savvy, so navigating the internet on their own to find information and resources

43

Case 2:23-cv-00450-MHT-KFP    Document 84    Filed 03/31/25    Page 44 of 131

about abortion care out of state is very difficult, if
not impossible.  Some have limited English proficiency
and few reliable abortion resources are available in
other languages.  Meanwhile, abortion has strict time
limits.  Without plaintiffs' assistance, these women need
to find a safe, reliable out-of-state abortion provider
on their own, make travel arrangements, get time off from
work, find childcare and the money to cover their
expenses, all while the clock is ticking.  They do not
have time to sit down with lawyers in preparation for
litigation.  Not to mention that many of the same
obstacles (a lack of formal education, internet access,
and technological skills) make it even more difficult for
these women to find an attorney in Alabama to represent
them.  The time and expense of litigation is likely to
be too much for these clients to bear.  *See Powers*, 499
U.S. at 414-15.

Other obstacles abound.  For one, the plaintiffs'
clients may be deterred from bringing their own suits by

44

a desire to protect their privacy. *See Colon v. Bureau of Alcohol*, No. 8:23-CV-223-MSS-UAM, 2024 WL 309975 (M.D. Fla. Jan. 26, 2024) (finding that a gun vendor's customers' privacy concerns regarding their status as firearms owners was a sufficient hindrance for third-party standing, and noting that "[c]ourts have regularly found privacy to be a legitimate hindrance sufficient to confer *jus tertii* standing in cases involving citizenship concerns, medical procedures, and contraceptives"), *appeal docketed*, No. 24-10897 (11th Cir. Mar. 26, 2024). Alabama has a well-established climate of stigma, harassment, and violence relating to abortion. *See Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1333-34 (M.D. Ala. 2014); *W. Ala. Women's Ctr. v. Williamson*, 120 F. Supp. 3d, 1296, 1308, 1321-22 (M.D. Ala. 2015). Pregnant Alabamians seeking a legal abortion out of state are likely to face hostility in their community if they draw attention to their desire to obtain an abortion. These privacy concerns make the

45

plaintiffs' clients "reluctant to raise [legal] claims for fear of provoking additional policing measures" or other threats. *Young Apartments, Inc. v. Town of Jupiter, Fla.*, 529 F.3d 1027, 1044 (11th Cir. 2008). Although the Attorney General emphasizes that litigants who wish to maintain their anonymity can sue under a pseudonym, such an argument was considered in *Singleton* and was made in the *June Medical* dissents, but it has yet to carry the day.

The Attorney General argues that the plaintiffs' clients cannot be hindered from filing suit because other pregnant plaintiffs in other legal actions have been willing to assert similar rights regardless of these obstacles. But the existence of a hindrance turns on whether "some genuine obstacle" to the third-parties' assertion of their own rights exists, not whether that obstacle can theoretically be or has been overcome. *Singleton*, 428 U.S. at 116. A few individuals may be willing to brave the risks, costs, and inconveniences of

litigation, but that does not negate the magnitude of those risks, costs, and inconveniences or the likelihood that they will significantly deter others. In light of the time-sensitive nature of pregnancy, the hurdle of devoting time to researching and securing reliable information on abortion providers and resources for travel in the absence of trusted sources, as well as the clients' privacy concerns and financial vulnerability, the plaintiffs have sufficiently alleged a hindrance in their clients' ability to assert their own rights.

The Attorney General offers one final objection to the plaintiffs' standing to assert their clients' rights that warrants discussion. He misreads *Dobbs* insofar as he suggests that the Supreme Court, in eight words, upended the law of standing. *Dobbs* was not a case about standing, and it did not overrule any precedent except where the Court explicitly said so. Accordingly, this court has applied the traditional prudential standards governing when litigants may assert third-party rights,

47

as *stare decisis* requires, and it has determined that the plaintiffs have met those standards.

In sum, the court finds that Yellowhammer Fund has standing to assert the right to travel on its own behalf, and Yellowhammer, AWC, and Dr. Robinson also have standing to bring right-to-travel claims on their clients' behalf.

The plaintiffs also all have standing to bring their First Amendment claims.    The Fund brings a First Amendment challenge on its own behalf, while the plaintiff healthcare providers--WAWC, AWC, and Dr. Robinson--bring their claim on behalf of themselves and their staff.    Though the Attorney General previously challenged the plaintiff healthcare providers' standing to assert the rights of their staff, he concedes that this challenge is moot if the plaintiffs have Article III standing for their own First Amendment claims.    *See* AG's Resp. (Doc. 66) at 4 n.2; *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263-64 (1977)

48

(finding the Court did not need to determine whether a real-estate company could bring claims on behalf of its prospective tenants because one of those tenants was a party to the suit with Article III standing).  Because the plaintiff healthcare providers have Article III standing to assert their First Amendment claims, and because one of their staff members, Dr. Robinson, is a party to the suit and is asserting those same rights herself, under *Arlington Heights*, her presence in this suit relieves the court from having to determine whether the three plaintiff healthcare providers have standing to assert their staff members' rights.

Finally, the court finds that Yellowhammer Fund has standing to bring its due-process claim on its own behalf for the same reason it has Article III standing for its other claims: the Fund has been unable to fulfill its organizational mission and has had to divert its resources because of the Attorney General's threatened prosecutions.  Once again, the Attorney General does not

dispute the Fund's standing to bring this claim.

### B.    *The Right to Travel*

Yellowhammer Fund and two of the healthcare providers, AWC and Dr. Robinson, assert a right-to-travel claim on behalf of their clients. The Fund also brings a right-to-travel claim on its own behalf. These plaintiffs argue that the right to travel forbids the Attorney General from using Alabama law to prosecute someone for facilitating out-of-state abortions in States where they are lawful. The Attorney General responds that Alabama can prohibit their abortion-related assistance without violating their clients' constitutional rights. Regarding the Fund's claim on its own behalf, the Attorney General contends that only natural persons, and not organizations, enjoy a right to travel, and that, even if an organizational right to travel existed, it would not protect travel that furthers criminal conduct.

50

The court concludes that the Attorney General's threatened enforcement amounts to a violation of the plaintiffs' clients' right to travel. The court will, however, abstain from deciding whether Yellowhammer Fund enjoys a right to travel since full relief can be granted without resolving that novel constitutional question.

### 1. The Clients' Right to Travel

Because Yellowhammer Fund and healthcare providers AWC and Dr. Robinson all have standing to assert a right-to-travel claim on behalf of their clients, the court now turns to whether the claim has merit. The court finds that the claim is meritorious because (a) the right to travel includes the right both to move physically between States and to do what is lawful in those States, and (b) prosecuting those who facilitate lawful out-of-state abortions, as the Attorney General threatens to do, would violate that right.

51

a.  The Right to Travel Includes the Right to Do What
Is Lawful Where One Travels

The central disagreement between the plaintiffs and
the Attorney General concerns the scope of the right to
travel.  The plaintiffs assert that the right to travel
includes both the right to physically move across state
borders and the right to engage in legal conduct in the
destination State.  The Attorney General insists that
"the relevant statutes do not even implicate the right
to travel, and even if they do, the statutes withstand
scrutiny."  AG's Mot. for Summ. J. (Doc. 62) at 16.  The
history and jurisprudence of the right to travel
overwhelmingly support the plaintiffs.

The right to interstate travel is one of our most
fundamental constitutional rights.  It cultivates
national citizenship and curbs state provincialism, and
thus was key to fusing a league of States into a true
federal union.  *See United States v. Guest*, 383 U.S. 745,
757-58 (1966); *id.* at 767 (Harlan, J., concurring).

Indeed, while the right to travel is not enumerated in the Constitution, it is so essential to the structure and character of our nation that the Court has found the right manifested in several constitutional provisions. *See id.* at 757-59 (1966) (noting that the Court has identified several sources of the right).[15] "The right has also been inferred from the federal structure of government adopted by our Constitution." *Att'y Gen. of New York v. Soto-Lopez*, 476 U.S. 898, 902 (1986) (plurality opinion, Brennan, J.).

The right to travel has deep historical roots, and it has long encompassed more than the mere movement of persons across borders. Indeed, as the court will

---

15. The Supreme Court has derived the right to travel from the Privileges and Immunities Clause of Article IV, the Commerce Clause, the Privileges or Immunities Clause of the Fourteenth Amendment, and the Due Process Clauses of the Fifth and Fourteenth Amendments. *See Shapiro v. Thompson*, 394 U.S. 618, 666 (1969) (Harlan, J., dissenting), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974); *Guest*, 383 U.S. at 763-70 (Harlan, J., concurring).

explain, travel has consistently been protected precisely so that people would be free to engage in lawful conduct while traveling.  The right can be traced back at least as far as the Magna Carta, which ensured that merchants could travel for the purpose of engaging in commerce. *See* Magna Carta (1215) cl. 41; *see also Kent v. Dulles*, 357 U.S. 116, 125-26 (1958); *Kerry v. Din*, 576 U.S. 86, 92 (2015) (plurality opinion, Scalia, *J.*) (explaining that Blackstone's articulation of the "personal liberty of individuals" protected by the Magna Carta and incorporated into the Constitution includes "the power of locomotion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint.").  In the United States, the right was explicitly included in Article IV of the Articles of Confederation, and it similarly guaranteed that citizens "shall have free ingress and regress to and from any other state, and shall enjoy therein all the privileges of trade and

commerce, subject to the same duties, impositions and restrictions as the inhabitants thereof." Articles of Confederation of 1781, art. IV, para. 1. Thus, in addition to protecting travel for the purpose of commerce, it provided that those traveling would not be subject to restrictions in other States beyond those which are imposed on those States' residents.

While Article IV of the Constitution omitted the express reference to "free ingress and regress," "Charles Pinckney, who drafted the current version of Article IV, told the Convention that this Article was 'formed exactly upon the principles of the 4th article of the present Confederation.'" *Zobel v. Williams*, 457 U.S. 55, 79 (1982) (O'Connor J., concurring) (quoting 3 M. Farrand, Records of the Federal Convention of 1787, p. 112 (1934)). Considering Pinckney's statement and that Article IV of the Constitution incorporated its predecessor's broad guaranty that "the citizens of each state shall be entitled to all privileges and immunities

of citizens in the several states," U.S. Const. art. IV, § 2, cl. 1, "[c]ommentators ... have assumed that the Framers omitted the express guaranty [of the right to travel] merely because it was redundant." *Zobel*, 457 U.S. at 79-80. In fact, the Supreme Court has repeatedly observed that the Constitution did not include the right-to-travel language because the right was "so elementary [that it] was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created." *Guest*, 383 U.S. at 758.

Because the right to travel has been assumed from our nation's founding, the Supreme Court has persistently refused to delineate precisely from where in the Constitution the right derives. *See Soto-Lopez*, 476 U.S. at 903 ("Whatever its origin, the right to migrate is firmly established and has been repeatedly recognized by our cases."); *Shapiro v. Thompson*, 394 U.S. 618, 630 (1969), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974) ("We have no occasion to ascribe the

56

source of this right to travel interstate to a particular
constitutional provision."); *Guest*, 383 U.S. at 759
("Although there have been recurring differences in
emphasis within the Court as to the source of the
constitutional right of interstate travel, there is no
need here to canvass those differences further. All have
agreed that the right exists."). In *Saenz v. Roe*, the
Court explained that the right to travel "embraces *at
least* three different components,"[16] but did not limit
the scope of the right to those three. 526 U.S. 489, 500
(1999) (emphasis added). And once again, the Court

---

16. *Saenz* cited three examples protected by the right
to travel, including "the right of a citizen of one State
to enter and to leave another State, the right to be
treated as a welcome visitor rather than an unfriendly
alien when temporarily present in the second State, and,
for those travelers who elect to become permanent
residents, the right to be treated like other citizens
of that State." 526 U.S. at 500.

emphasized that it "need not identify the source" of the right to travel. *Id.* at 501.[17]

The right to travel includes both the right to move physically between two States and to do what is legal in the destination State. The Supreme Court has held that States cannot punish their residents for traveling to another State and engaging in conduct that is lawful

---

17. Despite the Supreme Court's repeated refusal to demand a party identify a particular source in the Constitution for the right to travel, the Attorney General relies on a D.C. Circuit case with unrelated facts to insist such identification is "essential." AG's Reply (Doc. 68) at 5 (citing *Pollack v. Duff*, 793 F.3d 34, 40 (D.C. Cir. 2015)). In *Pollack*, the court analyzed the source of the right to travel invoked by the plaintiff because that case involved "challenges [to] the action of an agency of the federal government, not that of a state," and "[n]either the Supreme Court nor this court ha[d] previously considered whether the right to travel is implicated when a federal agency" acts. *Pollack*, 793 F.3d at 40-41. Thus, the court conducted an extensive analysis to determine whether a right-to-travel claim could be brought against the federal government. *Id.* at 40-48. This 'essential' step in *Pollack* is unnecessary in this case where the Attorney General's threatened prosecutions are state action governed by binding Supreme Court right-to-travel precedent.

there.  *Cf. Nielsen v. Oregon*, 212 U.S. 315, 321 (1909)
(finding Oregon could not "punish a man for doing within
the territorial limits of Washington an act which that
state had specially authorized him to do"); *State Farm
Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 421 (2003) ("A
State cannot punish a defendant for conduct that may have
been lawful where it occurred."); *Bigelow v. Virginia*,
421 U.S. 809, 824 (1975) ("A State does not acquire power
or supervision over the internal affairs of another State
merely because the welfare and health of its own citizens
may be affected when they travel to that State."); *N.Y.
Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914) ("[I]t
would be impossible to permit the statutes of [a State]
to    operate    beyond    the    jurisdiction    of    that
State ... without    throwing    down    the    constitutional
barriers by which all the States are restricted ... and
upon the preservation of which the Government under the
Constitution depends.").

59

This principle extends to people who enter a State to procure medical services, including abortions. See *Doe v. Bolton*, 410 U.S. 179, 200 (1973) (noting that the right to travel "protect[s] persons who enter Georgia seeking the medical services that are available there"), *abrogated in part on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)[18]; *Bigelow*, 421 U.S. at 822-24 (1975) (emphasizing that "[t]he Virginia Legislature could not ... prevent its residents from traveling to New York to obtain [abortion] services or ... prosecute them for going there."); *accord Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974) (holding that a durational residency requirement for state-funded medical care generally violated the right to travel).

Perhaps most noteworthy is that Justice Kavanaugh, while voting in *Dobbs* to overturn *Roe v. Wade*, reaffirmed

---

18. Because this holding did not depend on the constitutionally protected status of abortion, the *Dobbs* decision did not undermine it.

this principle with confidence when he explained that the question whether a State may "bar a resident of that State from traveling to another State to obtain an abortion" was "not especially difficult as a constitutional matter" because "the constitutional right to interstate travel" would prohibit such state action. *Dobbs*, 597 U.S. at 346 (Kavanaugh, J., concurring). Alabama's criminal jurisdiction does not reach beyond its borders, and it cannot punish what its residents do lawfully in another State. "Nor may Alabama impose sanctions ... in order to deter conduct that is lawful in other jurisdictions." *BMW of N. America, Inc. v. Gore*, 517 U.S. 559, 573 (1996) (finding that lawful out-of-state conduct could not be considered when awarding punitive damages in a state that prohibited that same conduct).

As the Supreme Court has recognized, Article IV's Privileges and Immunities Clause confirms that the right to travel includes both the right to physically go

between the States and to engage in lawful conduct in other States. *See Saenz*, 526 U.S. at 501. The Clause was meant to create a "general citizenship," 3 J. Story, *Commentaries on the Constitution of the United States*, 3:674-75, § 1800 (1833), and "place the citizens of each State upon the same footing with citizens of other States." *Paul v. Virginia*, 75 U.S. 168, 180 (1868), *overruled in part on other grounds by United States v. Se. Underwriters Ass'n*, 322 U.S. 533 (1944). When individuals do travel into another State, the Clause ensures that they lose both "the peculiar privileges conferred by their [home State's] laws" as well as "the disabilities of alienage." *Id.* The Clause "insures to [citizens] in other States the same freedom possessed by the citizens of those States in the acquisition and enjoyment of property and in the pursuit of happiness." *Id.* at 180-81. These goals are incompatible with a right to travel that would allow one's home State to inhibit a

traveler's liberty to enjoy the opportunities lawfully available in another State.

Accordingly, one of the first notable judicial recognitions of the right to travel included in its list of privileges and immunities the "right of a citizen of one state to pass through, or to reside in any other state, for *purposes of trade, agriculture, professional pursuits, or otherwise*." *Corfield v. Coryell*, 6 F. Cas. 546, 552 (C.C.E.D. Pa. 1823) (Washington, J., on circuit) (emphasis added). Similarly, the Supreme Court has explained that the Privileges and Immunities Clause "plainly and unmistakably secures and protects the right of a citizen of one State to pass into any other State of the Union for the purpose of engaging in lawful commerce, trade, or business without molestation." *Ward v. State*, 79 U.S. 418, 430 (1870); *accord Toomer v. Witsell*, 334 U.S. 385 (1948); *Saenz*, 526 U.S. at 502 (noting that the right to travel inherent in the Privileges and Immunities clause "provides important

63

protections for nonresidents who enter a State whether to obtain employment, ... to procure medical services, ... or even to engage in commercial fishing" (citations omitted)).

The Attorney General suggests that the Privileges and Immunities Clause of Article IV is cabined to concerns with States treating visitors differently from residents. He argues the Clause does not implicate burdens on travel imposed by the State of origin. The Attorney General extrapolates this assertion from *United Bldg. & Const. Trades Council of Camden Cnty. & Vicinity v. Mayor & Council of City of Camden*, 465 U.S. 208, 217 (1984). AG's Mot. for Summ. J. (Doc. 62) at 17-18; AG's Resp. (Doc. 66) at 15; AG's Reply (Doc. 68) at 7-8. But *Camden* does not stand for that proposition.

*Camden* involved a challenge to a municipal ordinance in Camden, New Jersey, which required "at least 40 % of the employees ... working on city construction projects be Camden residents." 465 U.S. at 210. The lower court

64

concluded that the statute "did not violate the Privileges and Immunities Clause because it was not aimed primarily at out-of-state residents," but was instead intended to favor a certain city's residents. However, the Supreme Court disagreed. It found that, even though the ordinance "almost certainly affects more New Jersey residents not living in Camden than it does out-of-state residents," *id.* at 213, and though "the disadvantaged New Jersey residents have no claim under the Privileges and Immunities Clause," *id.* at 217, the ordinance violated the primary purpose of the Clause and thus was subject to scrutiny. The primary purpose of the Privileges and Immunities Clause of Article IV, the Court wrote, is "to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy." *Id.* at 216 (quoting *Toomer,* 334 U.S. at 395 (1948)).

*Camden* stands for the principle that discrimination by a State between different classes of its own residents is not subject to review under the Privileges and

Immunities Clause.  But the Attorney General's threatened prosecutions do not constitute intra-state discrimination between different groups of Alabamians. The Attorney General's threatened prosecutions are violations of the exact right the Clause was intended to protect: the right of "a citizen of State A" (Alabama) "who ventures into State B" (another State where abortion is legal) to enjoy "the same privileges which the citizens of State B enjoy."  *Id.*

While it is true that previous right-to-travel cases have generally concerned States that discriminated against visitors from other States, this merely reflects the nature of the lawsuits that came before the courts and the extraordinary nature of the Attorney General's actions in seeking to prevent residents of his own State from engaging in lawful conduct in other States.  Neither the text nor the purpose of the Privileges and Immunities Clause suggests that its protections depend upon whether the State imposing interstate travel restrictions is the

State of one's origin or destination. The Clause provides broadly that, "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1, and it serves to ensure that residents may travel to other States "on the same footing with citizens of [those] States." *Paul*, 75 U.S. at 180. It follows that the Privileges and Immunities Clause and the right to travel are implicated when *any* State prohibits residents of one State from enjoying the benefits lawfully available in another State.

As the historical roots of the right to travel demonstrate, the Constitution protects the right to cross state lines and to take advantage of lawful opportunities available in other States. The Attorney General's characterization of the right to travel as merely a right to move physically between the States contravenes history, precedent, and common sense. Travel is valuable precisely because it allows us to pursue opportunities

67

available elsewhere. "If our bodies can move among states, but our freedom of action is tied to our place of origin, then the 'right to travel' becomes a hollow shell." Seth F. Kreimer, *Lines in the Sand: The Importance of Borders in American Federalism*, 150 U. Pa. L. Rev. 973, 1007 (2002). The Attorney General's theory of the right to travel, which would allow each State to force its residents to carry its laws on their backs as they travel, "amount[s] to nothing more than the right to have the physical environment of the states of one's choosing pass before one's eyes." Laurence H. Tribe, Saenz *Sans Prophecy: Does the Privileges or Immunities Revival Portend the Future—or Reveal the Structure of the Present?*, 113 Harv. L. Rev. 110, 152 (1999). Such a constrained conception of the right to travel would erode the privileges of national citizenship and is inconsistent with the Constitution.

b.  The Right to Travel Includes the Right to Obtain
    Necessary Assistance to Travel

Having established that the right to travel protects both entering other States *and* engaging in conduct that is lawful there, this court easily resolves the question whether the Attorney General's threatened prosecutions would violate that right. If a State cannot outright prohibit the plaintiffs' clients from traveling to receive lawful out-of-state abortions, it cannot accomplish the same end indirectly by prosecuting those who assist them.

"A state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right." *Soto-Lopez*, 476 U.S. at 903 (internal citations omitted). The Attorney General's threatened prosecutions are intended to deter and prevent people from traveling out-of-state to receive lawful abortions. He insists that the intent behind his prosecutorial threats is to "prohibit[] elective abortions and conspiracies to

procure them" even when those abortions are lawfully obtained in "out-of-state destinations." AG's Mot. for Summ. J. (Doc. 62) at 22. State restrictions with the primary objective of preventing specific lawful out-of-state conduct are just as constitutionally impermissible as restrictions aimed at preventing travel generally. Moreover, not only are the Attorney General's threats intended to deter travel, but they have actually deterred travel. The plaintiffs have halted providing information and material support to their clients who rely on them to be able to travel outside of Alabama to obtain an abortion. Perhaps because under Alabama law he cannot prosecute Alabamians who travel out of state for legal abortions, the Attorney General seeks to target those who would provide necessary assistance to Alabamians to make that travel possible. However, such backdoor circumvention is unconstitutional. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) ("[A] government official cannot do indirectly what []he

is barred from doing directly."). Supreme Court precedent rejects travel restrictions directed toward those who facilitate travel for others. *Crandall v. Nevada*, 73 U.S. 35 (1867), and *Edwards v. California*, 314 U.S. 160 (1941), exemplify this point.

At issue in *Crandall* was a Nevada statute that imposed on common carriers a one-dollar tax for each passenger leaving the State; a related statute required people engaged in the common-carrier business to submit monthly reports under oath regarding the number of passengers transported. An agent of a stagecoach company who was arrested for refusing to submit the required report of the number of passengers on the company's coaches challenged the constitutionality of the law. *See* 73 U.S. at 36. The Court held that the tax was an unconstitutional burden on the right of American citizens to pass from one State to another.

Likewise, in *Edwards v. California*, the Supreme Court struck down a California law that made it a crime to

bring or assist in bringing into the State any indigent person who was not a California resident. 314 U.S. 160 (1941). Thus, the California law subjected only those who *assisted* others in travel to criminal liability. The Court nonetheless determined that the law violated indigent people's right to travel. It did so even despite recognizing that the State had passed the law to address "grave and perplexing social and economic" issues. *Id.* at 173. The Court held that regardless of "'the wisdom, need, or appropriateness' of the legislative efforts of the States to solve such difficulties," the Constitution prohibited such a burden on facilitating travel. *Id.* (quoting *Olsen v. Nebraska ex rel. W. Reference & Bond Ass'n*, 313 U.S. 236, 246 (1941)).

A straightforward application of *Crandall* and *Edwards* resolves the right-to-travel claim brought on behalf of the plaintiffs' clients. Just as California could not prosecute Edwards for assisting his indigent brother-in-law with travel, and the State of Nevada could

not tax common carriers who transport people out of the state, the Attorney General cannot prosecute those who assist people in Alabama to travel out of state to obtain a lawful abortion. Denying--through threats of criminal prosecution--assistance to the plaintiffs' clients, many of whom are financially vulnerable, in their effort to avail themselves of the advantages available in another State, is a greater burden on travel than the one-dollar tax per passenger in *Crandall*, and it is precisely what was held unconstitutional in *Edwards*.

The Attorney General's acknowledgement that Alabama law does not prohibit individuals from traveling out of state on their own to obtain an abortion--and the concomitant fact that some pregnant Alabamians may leave the State to procure an abortion without assistance--is immaterial. The same was true in *Crandall*, where passengers were not taxed if they chose to leave Nevada using a form of transportation other than common carriers, and in *Edwards*, where the statute did not

subject indigent people to criminal liability if they
traveled to California on their own.  The fact that the
burdened individuals theoretically could have left Nevada
or entered California on their own was irrelevant to the
Supreme Court's constitutional analysis: the Court still
held that a penalty on those who assisted the travel of
others was unconstitutional.  If individuals could be
punished for assisting others in exercising their right
to travel, "[t]he right to travel is a phantom."  Joseph
W. Singer, *Conflict of Abortion Laws*, 16 Ne. U. L. Rev.
313, 421 (2024).  "We do not, in general, walk from state
to state, and not all of us have cars or the ability to
drive ourselves to another state.  For that reason, it
is unconstitutional to punish someone for helping another
person to exercise their right to travel to another state
to take advantage of its laws."  *Id.*

The Attorney General argues that *Crandall* and *Edwards*
are distinguishable because the travel restrictions at
issue in those cases operated categorically, regardless

of the reasons for which people were traveling.  Again,
however, the right to travel includes the right to do
what is lawful in another State while traveling, so
restrictions that prohibit travel for specific
out-of-state conduct are unconstitutional just as those
that impede travel generally are.  There is no end-run
around the right to travel that would allow States to
burden travel selectively and in a patchwork fashion
based on whether they approve or disapprove of lawful
conduct that their residents wish to engage in outside
their borders.[19]

_____

19. The Attorney General also tries to distinguish
*Edwards* and *Crandall* based on dicta in *Crandall*
mentioning the interaction between the right to travel
and "the correlative right to approach the great
departments of the government, the ports of entry through
which commerce is conducted, and the various Federal
offices in the States."  73 U.S. at 36.  However, "there
is not a shred of evidence in the record of the *Crandall*
case that the persons there involved were en route on any
such mission [to petition their government];" instead,
that dicta "was merely an illustration of the damage and
havoc which would ensue if the States had the power to
(continued...)

75

The Attorney General's attempt to distinguish *Edwards* and *Crandall* is even less persuasive when considering the cases that he believes should govern the court's analysis. He relies mostly on cases that bear little resemblance to the facts of this case to argue that using Alabama criminal law to prevent people seeking out-of-state abortions from receiving assistance is a "mere inconvenience" or "mere reasonable regulation" that does not warrant serious constitutional scrutiny. AG's Mot. for Summ. J. (Doc. 62) at 19, 21. These cases concerned challenges to notification and registration

---

prevent the free movement of citizens from one State to another." *Edwards*, 314 U.S. at 179 (Douglas, J., concurring). The Attorney General also points to *United States v. Wheeler*, 254 U.S. 281, 299 (1920), to support his assertion regarding *Crandall*, see AG's Reply (Doc. 68) at 6, but the relevant part of *Wheeler* was explicitly rejected in *Guest*, 383 U.S. at 759 n.16 ("Whatever continuing validity *Wheeler* may have as restricted to its own facts, the dicta in the *Wheeler* opinion relied on by the District Court in the present case have been discredited in subsequent decisions. *Cf. Edwards*, 314 U.S. at 180 (1941) (Douglas, J., concurring); *United States v. Williams*, 341 U.S. 70, 80 (1951).").

requirements for sex offenders, *see Doe v. Moore*, 410 F.3d 1337, 1348-49 (11th Cir. 2005); *United States v. Simington*, No. EP-10-cr-2275-KC, 2011 WL 145326, at *9-10 (W.D. Tex. 2011) (Cardone, *J.*) (unpublished opinion); a requirement to present identification at an airport or be subjected to a more extensive search, *Gilmore v. Gonzales*, 435 F.3d 1125, 1136-37 (9th Cir. 2006); and federal restrictions placed on an airport that required that those seeking to fly to certain other States either use a connecting flight or use another airport twelve miles away for direct flights, *Cramer v. Skinner*, 931 F.2d 1020, 1031-33 (5th Cir. 1991).

Citing *Jones v. Helms*, 452 U.S. 412 (1981), *Saenz v. Roe*, 526 U.S. 489 (1999), and *Doe v. Moore*, 410 F.3d 1337 (11th Cir. 2005), the Attorney General asserts that a State may impose "reasonable burdens" to one's right to travel if the State has a legitimate purpose. AG's Mot. for Summ. J. (Doc. 62) at 19. In essence, the Attorney General lowers the standard of scrutiny for

77

violating one's right to travel to a rational-basis test. Not only is the Attorney General misguided in his approach to the right-to-travel analysis, but his citation to *Saenz* for a supposed reasonableness standard is completely at odds with the Court's findings in that case. 526 U.S. at 500, 504. There, California contended it should be subject to a rational-basis test, and the United States, participating as *amicus curiae*, advocated for intermediate scrutiny. *See id.* at 500. The Court denied both requests for a laxer standard, reiterating that "a penalty on the exercise of the right to travel violated the Equal Protection Clause unless shown to be necessary to promote a *compelling* governmental interest" (emphasis in original) (citation omitted). *Id.* at 499.[20]

---

20. Because the right-to-travel is a substantive right "deeply rooted in the Nation's history and tradition, and implicit in the concept of ordered liberty," the court finds that infringing on the right here is categorically unconstitutional. *Dobbs*, 597 U.S. at 231 (citing *Washington v. Glucksberg*, 521 U.S. 702, (continued...)

The Attorney General attempts to analogize his action to the Supreme Court's holding in *Jones*, which permitted Georgia to aggravate a misdemeanor to a felony offense when a person charged or convicted with voluntary child abandonment left the State. 452 U.S. at 422. However, in *Jones*, the Court explicitly distinguished *Crandall* and *Edwards*. The Court noted that, unlike the citizens in *Crandall* and *Edwards* "whose right to travel had not been qualified in any way," "nothing in our prior cases or in the language of the Federal Constitution ... suggests that a person who has committed an offense punishable by imprisonment has an unqualified federal right to leave the jurisdiction prior to arrest or conviction." *Jones*, 452 U.S. at 420-21. In other words,

---

721 (1997) (internal citations omitted)); *see N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 19 (2022). However, if strict scrutiny applies, the Attorney General's threats are still unconstitutional for the reasons explained in the strict-scrutiny analysis in the freedom-of-speech section of this opinion.

the Court found that a State could reasonably restrict someone's right to travel if that person were charged with or convicted of a crime and the restriction relates to the criminal offense. *Id.* The finding in *Doe* was similar. 410 F.3d at 1348 (finding registration requirements for sex offenders were reasonable restrictions on their right to travel because of their prior criminal convictions). Here, the plaintiffs' clients' have not been charged with or convicted of a crime; nor could they under Alabama's abortion ban. Therefore, the Attorney General's reliance on *Doe* and *Jones* is inapposite.

In sum, the cases the Attorney General cites are quite unlike the one before the court. In contrast, the Attorney General is attempting to prohibit, in effect, all abortion-related travel that would require assistance from others. This is no 'mere inconvenience' or 'mere reasonable regulation,' especially considering that most of the plaintiffs' clients lack the financial

resources to travel on their own. Considering the
complexity associated with finding, evaluating, and
arranging medical care in another State, especially
amidst an ever-changing legal landscape and varying
deadlines for abortions under other States' laws, it
would be difficult for anyone to arrange for an
out-of-state abortion without at least some assistance.

Accordingly, the plaintiffs have sufficiently
alleged that the Attorney General's threatened
enforcement would violate their clients' right to travel.
The court will therefore enter summary judgment in favor
of the plaintiffs with respect to the right-to-travel
claim asserted on the plaintiffs' clients' behalf.


2.  Yellowhammer Fund's Right to Travel

Finally, Yellowhammer Fund brings a right-to-travel
claim on its own behalf.  The Fund represents that
previously it "provided direct transportation for
pregnant people who needed assistance traveling to their

81

abortion appointments," including "dr[iving] pregnant
people across state lines for abortion care." Fountain
Decl. (Doc. 61-1) ¶ 16. But for the Attorney General's
threats, the Fund would continue assisting people seeking
lawful abortions. *Id.* ¶ 30. The Attorney General argues
that the right to travel belongs only to "a flesh and
blood, physical citizen," and not to organizations such
as the Fund. AG's Mot. for Summ. J. (Doc. 62) at 20.
The Fund, of course, disagrees.

Because the court has very limited legal authority
to guide its analysis of this cliam and because the court
can resolve this case and grant full relief without
reaching this claim, the court will follow the principle
of constitutional avoidance and decline to resolve this
claim.[21]

--------

21. "A fundamental and longstanding principle of
judicial restraint requires that courts avoid reaching
constitutional questions in advance of the necessity of
deciding them." *Lyng v. Nw. Indian Cemetery Protective*
(continued...)

### C. First Amendment

All four plaintiffs contend that the Attorney General's reading of Alabama's criminal laws, including those punishing inchoate offenses and codifying accomplice liability, violates the freedom of speech under the First Amendment. They all raise an as-applied challenge, contending that the Attorney General cannot constitutionally prosecute people for providing information, counseling, and material support to their clients.[22] Yellowhammer Fund brings its First Amendment

---

*Ass'n*, 485 U.S. 439, 445 (1988). This principle applies even when a court addresses one constitutional issue but can avoid others. *See Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1291 n.4 (11th Cir. 2021) ("*Food Not Bombs II*") (refusing to reach a freedom-of-association claim though addressing an expressive-conduct claim).

22. This is an as-applied challenge because with it, the plaintiffs do not ask the court to declare the various general criminal statutes that the Attorney General seeks to enforce to be unconstitutional in whole. Rather, the (continued...)

83

challenge on its own behalf, while the healthcare providers--WAWC, AWC, and Dr. Robinson--bring their claim on behalf of themselves and their staff.

The Fund makes two other First Amendment arguments: first, that its abortion-related services involve constitutionally protected expressive conduct and, second, that the Attorney General's threatened enforcement also violates the freedom of association.

Though the Attorney General previously challenged the healthcare providers' standing to assert the rights of their staff, he acknowledges in his summary-judgment response that this challenge is moot since the plaintiffs have Article III standing for their own First-Amendment claims. *See* AG's Resp. (Doc. 66) at 4 n.2. Nonetheless, he reiterates his argument that the plaintiffs' speech

---

plaintiffs argue that the statutes are unconstitutional only insofar as they would prohibit people from providing assistance to others seeking abortions in a State where abortion is lawful.

can be constitutionally regulated because it furthers conduct that Alabama has deemed criminal. The court concludes that the Attorney General's threatened enforcement violates the plaintiffs' and their staff's freedom of speech.

## 1. The Free-Speech Challenge

### a. Content- and Viewpoint-Based Restriction

Relying on the First Amendment, the plaintiffs contend that the Attorney General cannot prosecute or threaten to prosecute those who help others obtain lawful out-of-state abortions for inchoate crimes, such as conspiracy, as accomplices, or otherwise.[23] They submit that Alabama's criminal laws cannot authorize the Attorney General to act on his threats without creating an unconstitutional content--and viewpoint--based

---

23. The Attorney General's briefs focus almost exclusively on conspiracy laws.

restriction on speech, at least as applied to the speech they and their staff wish to engage in:[24] informing their clients about the laws of other States, offering counseling services about treatment options outside Alabama, and coordinating with out-of-state abortion providers on their clients' behalf.

"[A]s a general matter, 'the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002) (alteration in original) (quoting *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 65 (1983)). Content-based restrictions on speech are ordinarily subject to strict scrutiny. *See Reed v. Town*

---

24. The court refers to 'the plaintiffs and their staff' for readability, but the reader is reminded that only the three healthcare providers--West Alabama, Alabama Women's Center, and Dr. Robinson--assert a First Amendment claim on their staff's behalf. Yellowhammer Fund brings its First Amendment challenge on its own behalf only.

*of Gilbert*, 576 U.S. 155, 163-64 (2015). A law is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 163.

Viewpoint-based regulations are "an egregious form of content discrimination." *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995) (citation omitted). The Eleventh Circuit Court of Appeals has interpreted Supreme Court caselaw to say that viewpoint-based restrictions are prohibited "seemingly as a *per se* matter." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1126 (11th Cir. 2022); *see also Otto v. City of Boca Raton*, *Fla.*, 981 F.3d 854, 864 (11th Cir. 2020) (suggesting viewpoint-based discrimination is unconstitutional per se); *see also Minn. Voters All. V. Mansky*, 585 U.S. 1, 11 (2018) ("[R]estrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited.").

The Attorney General's threatened enforcement of Alabama's criminal laws imposes a content- and viewpoint-based restriction on speech. It restricts information and discussion about a specific subject--abortion--to forbid encouraging a specific viewpoint--access to a legal out-of-state abortion.

It is unclear whether a content- and viewpoint-based restriction is categorically unconstitutional or subject to strict scrutiny. If restrictions based on viewpoint are unconstitutional "seemingly as a *per se* matter," the court need not proceed further. *Speech First, Inc.* 32 F.4th at 1126. However, even if strict scrutiny is the appropriate level of scrutiny, the Attorney General's restriction on speech cannot meet such a demanding standard.

b.  Exceptions to First-Amendment Strict Scrutiny

There are a few "narrowly limited classes of speech" that the government may regulate without having to

satisfy strict scrutiny. *United States v. Stevens*, 559 U.S. 460, 468-69 (2010) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)). These categories include obscenity, defamation, fraud, incitement, and speech integral to unlawful conduct. *See Stevens*, 315 U.S. at 469. The Supreme Court has described these categories as "historic and traditional" because regulations of the speech they encompass "have never been thought to raise any Constitutional problem." *Id.* at 468-49 (quoting *Chaplinsky*, 559 U.S. at 571-72). The Attorney General contends that insofar as the Alabama statutes at issue regulate speech, they reach only speech integral to unlawful conduct and need not satisfy strict scrutiny. He does not dispute that providing abortion-related services would require the plaintiffs and their staff to engage in speech or that his threats have chilled that speech. Nonetheless, in his view, the Alabama statutes are exempt from strict scrutiny because "speech integral or in furtherance of criminal conduct

is not protected by the First Amendment."  AG's Mot. for
Summ. J. (Doc. 62) at 25.

The exception to strict scrutiny for speech integral
to unlawful conduct comes from *Giboney v. Empire Storage
& Ice Co.*, 336 U.S. 490 (1949).  There, the Supreme Court
observed "that the constitutional freedom for
speech ... [does not] extend[] its immunity to speech or
writing used as an integral part of conduct in violation
of a valid criminal statute."  *Id.* at 498.  The Attorney
General casts his motion for summary judgment as a
straightforward application of *Giboney*: Alabama law
prohibits almost all abortions within its borders, and
so any agreement, encouragement, or assistance to do what
Alabama has outlawed is criminally actionable, even if
the agreement, encouragement, or assistance occurs
through speech.

Simple as this argument seems, it ignores the issue
at the heart of this case: that the plaintiffs and their
staff wish to help their clients access abortions in

90

States where abortions are *lawful*.  The Attorney General
has not identified any instance of *Giboney* being held to
authorize a prosecution for steps taken inside one State
toward an act that would be permitted, or even legally
protected, in another.  The question the court must
confront is whether *Giboney*'s exception to strict
scrutiny for content-based restrictions on speech can
accommodate these novel circumstances.

It bears repeating that *Giboney* represents a
"narrowly limited" exception to the general rule that
content-based restrictions on speech must satisfy strict
scrutiny.  *Stevens*, 559 U.S. at 468-69 (quoting
*Chaplinsky*, 315 U.S. at 571-72); *see also United States
v. Alvarez*, 567 U.S. 709, 717-18 (2012); *United States
v. Williams*, 553 U.S. 285, 288 (2008).  The categories
of regulation exempt from strict scrutiny are narrow
largely because even speech related to unlawful conduct
can have constitutional value, including the potential
to inform, critique, entertain, and otherwise enrich the

91

"interchange of ideas." *Dennis v. United States*, 341
U.S. 494, 549 (1951) (Frankfurter, J., concurring in the
judgment); *see also* Eugene Volokh, *Crime-Facilitating
Speech*, 57 Stan. L. Rev. 1095, 1111 (2005).

Against this backdrop, the Attorney General urges
the court to extend *Giboney*'s immunity into new terrain:
efforts to perform acts that would be unlawful in the
State where they are planned but lawful (and potentially
even constitutionally protected) in the State where they
would occur.  The court cannot accept the Attorney
General's expansive interpretation of *Giboney*, which
would have dangerous consequences for the freedom of
expression.

The Attorney General's reading of *Giboney* would
enable him to regulate conduct that he lacks the
authority to prosecute directly by burdening speech.  *See
Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190
(2024) ("[A] government official cannot do indirectly
what []he is barred from doing directly.").   Alabama's

criminal jurisdiction does not reach beyond its borders, and it cannot pass a statute explicitly punishing what its residents do in another State: "[A]n act done within the territorial limits of [one state], under authority and license from that state, ... cannot be prosecuted and punished by [another state]." *Nielsen v. Oregon*, 212 U.S. 315, 321 (1909). Unable to proscribe out-of-state abortions, the Attorney General interprets state law as punishing the speech necessary to obtain them. *Giboney*, however, is intended only to recognize a narrow and well-established class of speech that governments have historically regulated, not as a tool to reach regulatory ends that the Constitution otherwise prohibits governments from realizing. *See Stevens*, 559 U.S. at 468-69.

For the *Giboney* exception to have tractable limits, the speech at issue must bear some relation to an independently unlawful course of conduct. *Giboney* "can't justify treating speech as 'integral to illegal conduct'

simply because the speech is illegal under the law that is being challenged." Eugene Volokh, *The "Speech Integral to Criminal Conduct" Exception*, 101 Cornell L. Rev. 981, 987–88 (2016). In other words, the speech being proscribed must be "substantially enough connected to some other crime for the speech to be potentially punishable." *Id.* at 1011 (emphasis in original); *see also Katt v. Dykhouse*, 983 F.2d 690, 695 (6th Cir. 1992) ("We must decide, then, whether the First Amendment protects speech that proposes a transaction lawful in the place where the transaction is to occur when both the underlying transaction and the offer are unlawful in the place where the offer is made. We conclude that the First Amendment does provide such protection.").

For conspiracy, this means the State cannot "punish conspiracy to advocate something, the doing of which it may not punish." *Dennis*, 341 U.S. at 575 (Jackson, J., concurring in the judgment). In order for speech to be integral to criminal conduct, the underlying nonspeech

conduct must be criminal.  *See* Eugene Volokh, *The "Speech Integral to Criminal Conduct" Exception*, 101 Cornell L. Rev. at 1051.  It follows then that for a conspiracy charge, the nonspeech conduct underlying an agreement must be unlawful.  *See* 15A C.J.S. *Conspiracy* § 118 ("To constitute a criminal conspiracy, either the object of the conspiracy or the means of accomplishing it must be illegal ... No one can be held criminally liable for conspiracy to do acts that are perfectly lawful and to which there is no criminal objective."); 16 Am. Jur. 2d *Conspiracy* § 1 ("The crime of conspiracy can only be defined in conjunction with a second crime, that is, the substantive crime involved in the conspiracy.").  Here, the nonspeech conduct--obtaining an abortion in a State where abortion is legal--is not unlawful, so any speech connected to obtaining such care is not integral to, nor in furtherance of, criminal conduct and is therefore not an exception to First Amendment protection.  *See, e.g., Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky.,*

*Inc. v. Comm'r, Ind. State Dep't of Health*, No. 1:17-CV-01636-SEB-MG, 2024 WL 1908110, at *5 (S.D. Ind. May 1, 2024) (sharing "truthful information to clients regarding out-of-state options and medical referrals to out-of-state providers for abortion services that are legal in those states ... [is] *not* inducing criminal activity" (emphasis in original)). Were the doctrine otherwise, any criminally prohibited speech would be integral to unlawful conduct, and any statute punishing criminally prohibited speech would be immune from strict scrutiny simply because the legislature had criminalized it. Indeed, that is the very logic the Attorney General advances here. He contends that the Alabama statutes can withstand the plaintiffs' as-applied challenge because the speech they and their staff wish to engage in would be integral to unlawful conduct, but their speech would be integral to unlawful conduct only because the Alabama statutes, as interpreted by the Attorney General, make

their speech unlawful.  Such circular reasoning quickly spins out of control.

Put another way, the Attorney General's reading of *Giboney* would render meaningless the requirement that the speech being regulated be integral to unlawful conduct. Without a separate course of unlawful conduct that the plaintiffs' and their staff's speech would further, the only 'conduct' that could be the basis of the Attorney General's threatened prosecutions would be speech that the State regards as politically unpopular and morally disfavored.  The First Amendment does not tolerate that result, as the freedom of speech is meant to prevent governments from "suppress[ing] unpopular ideas or information." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994).  *Giboney* therefore cannot exempt the Attorney General's threatened enforcement of the Alabama statutes from strict scrutiny.

c.  Strict Scrutiny Analysis

Having established that the Attorney General's attempt to invoke *Giboney* is unavailing, the court turns to whether the plaintiffs are entitled to summary judgment on their freedom-of-speech claim.  The plaintiffs argue that the State plans to initiate a prosecution under Alabama's statutes punishing conspiracy, complicity, and other possibly other inchoate offenses based on the content and the viewpoint of the speech they and their staff wish to engage in about out-of-state abortions.

"Content-based regulations are presumptively invalid," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992), and are permissible only if they survive strict scrutiny.  *See Reed*, 576 U.S. at 159.  The Eleventh Circuit has suggested, without deciding, that viewpoint-based regulation is prohibited per se.  *See Speech First, Inc.*, 32 F.4th at 1126; *Otto*, 981 F.3d at 864.  If so, the threatened prosecutions are per se unconstitutional.

In any case, as discussed below, even if viewpoint-based restrictions are subject to strict scrutiny, the Attorney General's threats still fail to pass constitutional muster.

To survive strict scrutiny, the State bears the burden to "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171. Thus, the Attorney General must prove that prosecuting people who share information with others about lawful out-of-state abortion care "furthers a compelling interest and is narrowly tailored to that end." *Id.* A regulation or enforcement is not narrowly tailored "[i]f a less restrictive alternative would serve the Government's purpose." *U.S. v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000).

The Attorney General cannot satisfy this heavy burden. He has presented no other reason to deny the plaintiffs' First Amendment claim besides his attempt to

invoke the *Giboney* exception, which, as stated, does not extend to speech in furtherance of lawful out-of-state conduct.  He has advanced no governmental interest, let alone a compelling one, in regulating medical care beyond Alabama's borders.  Assuming for the sake of argument that the State interests he identifies in the right-to-travel section--"respect for and preservation of prenatal life," "maternal health and safety," and "the integrity of the medical profession," (quoting *Dobbs*, 597 U.S. at 301)--apply here, they cannot meet the strict-scrutiny standard.  AG Mot. for Summ. J. (Doc. 62) at 22.

First, these interests were considered legitimate enough to meet the lower rational-basis threshold in *Dobbs*, but they are not compelling interests that justify the suppression of speech and criminal prosecution in these circumstances.  Because the Attorney General concedes that pregnant women themselves can leave Alabama for a legal abortion, the interests in "maternal health

and safety" and "the integrity of the medical profession"
are not at odds with what the plaintiffs seek to do.  To
the contrary, these interests support allowing those who
seek to obtain a legal abortion out of state to receive
information and counseling from trusted medical providers
about the safest, reliable places to obtain such care.
As for the integrity of the medical profession, the
Attorney General's threats force the plaintiff medical
providers to violate their oath to provide individualized
medical care and advice to their patients, thus
undermining the profession's integrity.  In addition, the
State's interest here arguably is the same as that
"entitled to little, if any, weight under the
circumstances" in *Bigelow*: "Here, [the State] is really
asserting an interest in regulating what [its citizens]
may *hear* or *read* about [out-of-state] services.  It is,
in effect, advancing an interest in shielding its
citizens from information about activities outside [the
State]'s borders, activities that [the State]'s police

101

powers do not reach." 421 U.S. at 827-28. The State has no compelling interest in obstructing its citizens from receiving truthful information about medical care they can legally access out of state.

The Attorney General's argument in his reply and response briefs that he does not intend to prosecute the lawful provision of information and advocacy for elective abortions is a hollow assurance. "Mid-litigation assurances are all too easy to make and all too hard to enforce, which probably explains why the Supreme Court has refused to accept them." *W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1328 (11th Cir. 2018), abrogated in part on other grounds by *Dobbs*, 597 U.S. 215. The Attorney General's response and reply briefs contend that providing information about medical care options, including abortion, and advocating for elective abortions are lawful in Alabama, but he also states that "[d]epending on whether a specific agreement is formed, making referrals to abortion providers, which will

102

involve speech, could constitute a conspiracy to procure an elective abortion." AG Resp. (Doc. 66) at 20 (internal citations omitted); *see also* AG Reply (Doc. 68) at 10. The plaintiffs are left with no idea what the Attorney General conceptualizes as a "specific agreement," nor a subsequent overt act, required to trigger enforcement. This distinction is at least as vague and therefore as likely to inhibit speech as the statute at issue in *Wollschlaeger.* 848 F.3d 1293 (11th Cir. 2017).

In that case, the Eleventh Circuit found that a statute proscribing a medical professional from "unnecessarily harassing a patient about firearm ownership" was unconstitutional as a content-based restriction because of inadequate state interests and poor tailoring, and was also void for vagueness. *Id.* at 1303, 1307, 1319. While the Attorney General's threatened enforcement is based on an interpretation not grounded in the wording of a statute, this case presents a similar threat to physician speech. How is a provider

to know when the line is crossed between acceptable individualized care that involves patient-specific advice and criminally-prosecutable speech based on the Attorney General's conception of Alabama conspiracy law? If a provider offers a patient information about legal out-of-state abortion providers and, unbeknownst to the provider, the patient travels there to obtain an abortion, can the Alabama provider be liable? Does it matter if the provider knows that the patient plans to heed the advice and travel out of state? As in *Wollschlaeger*, "wrong guesses will yield severe consequences." *Id.* at 1319. There, healthcare providers risked civil penalties, including possible suspension or revocation of their medical licenses. *Id.* Here, a wrong guess could yield criminal prosecution and up to 99 years in prison. Even an unsubstantiated prosecution could devastate a medical provider's career and reputation. *See* Robinson Decl. (Doc. 60-3) ¶¶ 19-20, 23-24. The indefiniteness of the Attorney General's threatened

enforcement "forces doctors to choose between adequately performing their professional obligation to counsel patients on health and safety on the one hand and the threat of serious [criminal] sanctions on the other." *Wollschlaeger*, 848 F.3d at 1323.

The Attorney General's attempts to clarify his threats result in the same effect: they still chill plaintiffs' speech. The Supreme Court recognized that "[t]he vagueness of [content-based regulations of speech] ... raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871-72 (1997). Thus, the Attorney General's new assertions in his reply and response that "it is lawful in Alabama to share information about or advocate for abortions," not only contradict his prior statements, but the vagueness about what he is threatening to enforce violates the plaintiffs' First Amendment rights by chilling their speech.

Second, even if assuming for the sake of argument these are compelling interests, they are certainly not narrowly tailored. Threats of prosecution cannot serve a State's legitimate interest when the State does not have legitimate authority to punish lawful behavior conducted in other States. In other words, because the Attorney General's threatened enforcement is illegitimate/extraterritorial, no interest could justify it.[25]

Since the Attorney General's threatened enforcement cannot meet strict scrutiny, the court will enter summary judgment in favor of the plaintiffs for this freedom-of-speech claim.

---

25. Additionally, the Attorney General had less restrictive alternatives at his disposal, including counter speech, such as a public information campaign or other methods of disseminating information regarding the State's views on prenatal life, maternal health, and the integrity of the medical profession.

106

### 2. Yellowhammer Fund's Expressive-Conduct and Freedom-of-Association Claims

#### a. Expressive Conduct

Yellowhammer Fund asserts that its provision of funds and logistical support to pregnant Alabamians for abortion is protected as expressive conduct.  At oral argument, the Fund specifically homed in on two categories of conduct that it avers do not require speech and are protected expressive conduct: providing funds for a pregnant woman to obtain an abortion and transporting and accompanying pregnant people to their abortion appointments.  The court will address each category in turn.

First Amendment protection "does not end at the spoken or written word;" rather it extends to expressive conduct as well.  *Texas v. Johnson*, 491 U.S. 397, 404 (1989).  In *Spence v. Washington*, 418 U.S. 405, 409 (1974) (per curiam), the Supreme Court set forth a two-part test to determine if conduct should receive

First Amendment protection.  The first question inquired whether the speaker "inten[ded] to convey a particularized message," and the second question analyzed whether "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it."  *Id.* at 410-11.  *Spence* also emphasized the importance of context.  *See id.* at 409-410.  A little over two decades later, the Court eliminated the requirement that an individual's message be "particularized."  *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995).  In the Eleventh Circuit, instead of asking whether an act conveys a *particularized* message, courts "ask whether the reasonable person would interpret it as *some* sort of message."  *Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (emphasis in original).  "If ... the conduct in question is expressive, any law regulating that conduct is subject to the First Amendment."  *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247,

1254 (11th Cir. 2021) (citing *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) ("*Food Not Bombs I*")). *See also Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006) ("*FAIR*") (explaining that conduct must be "inherently expressive" to warrant First Amendment protection).

Yellowhammer Fund contends that the act of providing funds for women to travel out-of-state to obtain a legal abortion is expressive conduct. The Attorney General disagrees; he believes the conduct does not convey its own message without speech. The critical question is "whether the reasonable person would interpret [Yellowhammer Fund's provision of abortion funds] as *some* sort of message." *Holloman*, 370 F.3d at 1270.

To answer this question, "context matters." *Food Not Bombs I*, 901 F.3d at 1237. "[T]he context in which a symbol is used for purposes of expression is important, for the context may give meaning to the symbol." *Spence*,

418 U.S. at 410 (citing *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)).  Context can transform ordinary actions into expressive conduct.  For example, "[c]ontext separates the physical activity of walking from the expressive conduct associated with a picket line or a parade." *Food Not Bombs I*, 901 F.3d at 1241 (citing *United States v. Grace*, 461 U.S. 171, 176 (1983)).

The Attorney General supposes that only political donations constitute expressive conduct, but the Eleventh Circuit has recognized the communicative connotations of funding for other purposes, including social causes.  *See Coral Ridge*, 6 F.4th at 1254.  Funding particular causes is a sort of symbolism that constitutes "a primitive but effective way of communicating ideas." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943).  Funding a certain cause, especially an issue of public concern in a public manner, communicates one's support for certain ideas.  *See Food Not Bombs I*, 901 F.3d at 1242-43.

In *Coral Ridge*, the Eleventh Circuit recognized that Amazon engages in expressive conduct when it determines which charities to donate to and when it donates funds through its AmazonSmile program. 6 F.4th at 1254-56. At issue was whether Amazon could be required to donate funds to a religious organization it did not wish to promote on the theory that the AmazonSmile program was a public accommodation under Title II of the Civil Rights Act, 42 U.S.C. § 2000a et seq., and that Amazon's exclusion of the organization was religious discrimination. In rejecting the organization's argument, the court reasoned that applying Title II to require Amazon to fund the organization "would 'modify the content of [Amazon's] expression'--and thus modify Amazon's 'speech itself'--by forcing it to donate to an organization it does not wish to promote." *Id.* at 1255-56 (quoting *Hurley*, 515 U.S. at 578, 573).

Notably, in *Coral Ridge*, the court relied heavily on *Food Not Bombs I*. In that case, the court found conduct

was expressive by analyzing whether the conduct related
to an issue of public concern, and whether the conduct
was public and symbolic. *Food Not Bombs I*, 901 F.3d at
1242-43. And, applying these factors, the court went on
to conclude that a non-profit's weekly outdoor
food-sharing event was expressive conduct because it
conveyed a message that food is a human right. *Id.* at
1238. In *Coral Ridge*, the court found that AmazonSmile's
funding of nonprofits was expressive conduct without
delineating the specific factors the court used in *Food
Not Bombs I*. *See Coral Ridge*, 6 F.4th at 1254-55. As
demonstrated by the Eleventh Circuit's analysis in *Coral
Ridge*, while the factors from *Food Not Bombs I* are useful
considerations, the main consideration is that the
conduct at issue is examined in context. *See id.* at
1254; *Food Not Bombs I*, 901 F.3d at 1237. Taken together,
the factors that the *Food Not Bombs I* court considered,
and the context in which Yellowhammer Fund's abortion
fund operates, lead this court to conclude that

112

Yellowhammer Fund's provision of financial assistance to or on behalf of its clients, if not outright expressive conduct, must be viewed as expressive conduct when taken in context.

Yellowhammer Fund's abortion fund addresses an issue of public concern. When Yellowhammer Fund was founded in 2017, its purpose was to meet what it saw as a critical need in Alabama: the inaccessibility of reproductive options, including abortion, for many pregnant Alabamians. *See* Fountain Decl. (Doc. 61-1) ¶ 14.[26]  At its founding, the abortion fund was Yellowhammer Fund's sole program. *See id.*  The abortion fund was the expression that gave life to Yellowhammer Fund's mission

---

26. Abortion has become increasingly inaccessible for many pregnant Alabamians since *Dobbs*. *See* White Decl. (Doc. 61-4) ¶ 16. "Even before *Dobbs*, abortion clinics were few and difficult for patients to access. In 2021, there were five abortion clinics in Alabama. By June 2022, that number had been reduced to three clinics." *Id.* ¶ 17.

to "ensur[e] access to reproductive health care for all members of [its] community, regardless of race, income, location, age, gender, sexuality, disability, number of children, or status as a citizen." *Id.* ¶ 6. The abortion fund was symbolic of Yellowhammer Fund's support of pregnant Alabamians "individual dignity and each person's innate ability to make the decisions that are best for themselves and their families." *Id.* ¶ 11. The context of the abortion fund matters. In Alabama, where maternity care has lagged behind that in other States,[27]

---

27. "Many Alabama counties are considered maternity care deserts, meaning that people who reside in those counties do not have access to birthing facilities or maternity care providers. 28% of women in Alabama have no birthing hospital within 30 minutes of their residence, compared with just 10% of women nationally. In some Alabama counties, especially those in the Black Belt of Alabama, the distance to the nearest birthing hospital or maternity care provider can be up to 70 minutes each way. As the March of Dimes has explained 'the farther a woman travels to receive maternity care, the greater the risk of maternal morbidity and adverse infant outcomes, such as stillbirth and NICU [Neonatal Intensive Care Unit] admission." *Id.* ¶ 31.

114

Yellowhammer Fund was founded on, and remains committed to, the principle that reproductive healthcare should be accessible to all. Moreover, there is no dispute that reproductive healthcare remains an issue of public concern today, particularly in States such as Alabama that have banned abortion.

In addition to addressing an issue of public concern, Yellowhammer Fund made its provision of funds for abortion public. The Fund advertised its abortion fund through social media, on its website, by contacting healthcare providers, and through word of mouth. But for the Attorney General's threats of criminal prosecution, the Fund would have shared information about its abortion fund and names of out-of-state abortion providers on the bus tour it organized throughout Alabama in June and July 2023, where it advertised its mission and passed out literature with reproductive-healthcare information.

In fact, counsel for the Attorney General conceded that the Attorney General is interested in prosecuting

Yellowhammer Fund because it is 'publicly' advertising that it funds abortions.  When asked whether, under his interpretation of the law, a husband in Alabama who drove his wife to another State to get an abortion could be prosecuted under Alabama's criminal laws, counsel stated that the Attorney General was interested in prosecuting "organizations that are holding themselves out publicly as ... funding the abortions."  Oral Argument Tr. (Doc. ___) at __ (official transcript is unavailable).  He then conceded that "that's the whole purpose of the organization [Yellowhammer Fund] ... not just to assist [clients] with traveling, but also to pay for the travel, pay for the abortion."  *Id.* at __.  The Attorney General's admission that he is targeting Yellowhammer Fund instead of individuals because the Fund's message reaches a broader audience demonstrates that the Yellowhammer Fund's provision of funding for legal abortions is expressive conduct when taken in context.

116

Considering the surrounding circumstances, a reasonable person would interpret Yellowhammer Fund's provision of funds to women seeking a legal abortion outside of Alabama as conveying "*some* sort of message" about the mission and viewpoint it supports. *Coral Ridge*, 6 F.4th at 1254. Accordingly, the court finds that Yellowhammer Fund's act of pledging and providing funds on behalf of pregnant Alabamians who seek a legal abortion outside Alabama is expressive conduct, and, therefore, subject to First Amendment protection.

In contrast with the Yellowhammer Fund's abortion-funding program, the record contains no evidence that the Fund has publicized its willingness to have its staff drive and accompany pregnant women to their medical appointments. It is unlikely that a reasonable observer witnessing a Fund employee driving a woman to an out-of-state abortion appointment would perceive a message that the Fund supports access to reproductive healthcare. Explanatory speech would be required to

understand the Fund's message.  The reasoning of *Coral Ridge* simply does not fit here.  Therefore, on the factual record before the court, Yellowhammer Fund's physically transporting pregnant women out of state to abortion appointments does not constitute expressive conduct under the First Amendment.

The Attorney General asserts that, even if Yellowhammer Fund's funding is expressive, Alabama can constitutionally regulate the conduct because criminally prosecuting such conduct would further "'substantial governmental interest[s]' ... in protecting 'the sanctity of unborn life and the rights of unborn children,' Ala. Code § 26-23H-2(b), and protecting women from the 'serious ...lasting or life threatening' consequences of abortion, *id.* § 26-23F-2(a)(4)."  AG's Resp. (Doc. 66) at 22-23 (citing *United States v. O'Brien*, 391 U.S. 367, 377 (1968)).  In *O'Brien*, the Supreme Court explained that in expressive-conduct cases, "a government regulation is sufficiently justified if it

is within the constitutional power of the Government; if it furthers an important and substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 377.

A governmental regulation must meet all four criteria to pass constitutional muster. The Attorney General's threats do not meet the *O'Brien* threshold. First, as discussed above, impeding Alabamians' right to travel and criminalizing conduct that legally occurs out of state is not within the Attorney General's constitutional power. Second, *O'Brien* intermediate scrutiny applies only when a State regulates expressive conduct for reasons unrelated to its content. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010). As explained in the court's freedom-of-speech analysis and evidenced by counsel for the Attorney General's comments

at oral argument, the Attorney General is targeting Yellowhammer Fund because of the content of its speech and its ability to reach a broader audience. Finally, even if *O'Brien*'s lower level of scrutiny applies, the Attorney General does not have a legitimate interest--let alone a substantial interest--in regulating expressive conduct about abortions that occur lawfully in other States.

Because Yellowhammer Fund's abortion-funding program is expressive conduct, the court's First Amendment analysis regarding the plaintiffs' freedom of speech also applies to this conduct. Accordingly, the court finds that the Attorney General's threats violate Yellowhammer Fund's right to expressive conduct and cannot withstand strict scrutiny.

b. Freedom of Association

Yellowhammer Fund asserts that the Attorney General's threatened enforcement violates its right to

associate by "imped[ing] Plaintiff's ability to advance its goals in collaboration with others--including pregnant Alabamians, other abortion funds, and abortion advocacy groups." Yellowhammer Fund's Mot. for Summ. J. (Doc. 61) at 56. For the same reasons that the court declined to address the Fund's right-to-travel claim, the court declines to address its freedom-of-association claim.

### D. *Due Process, Sovereignty, and Comity*

Yellowhammer Fund next argues that the Attorney General's threatened prosecutions would violate the Due Process Clause and the constitutional principles of sovereignty and comity by punishing individuals for engaging in or agreeing to engage in lawful conduct. The Fund asserts this claim on its own behalf only. For the same reasons that the court declined to address the Fund's right-to-travel claims, the court declines to address its claim based on the Due Process Clause and the constitutional principles of sovereignty and comity.

## IV. RELIEF

Here plaintiffs seek relief from the threat of criminal prosecution by Alabama.  They seek a declaratory judgment that the Attorney General's use of the provisions of Alabama's criminal code to prosecute those who assist individuals seeking to leave Alabama to obtain abortion care in a State where abortion is legal would violate both the First Amendment and the right to travel.  Additionally, they seek to have this court permanently enjoin the Attorney General, his staff, his agents, and his successors from prosecuting individuals who assist others, in word or in action, to obtain a lawful abortion outside of Alabama.  In view of how the treatment by the Supreme Court of these distinct forms of relief has evolved in the context presented here, the court must address them separately.

The question whether this court may grant the plaintiffs' request for declaratory relief against

criminal prosecution is quickly resolved by reference to the Supreme Court's decision in *Steffel v. Thompson*, 415 U.S. 452 (1974). That case concerned a federal lawsuit challenging the threatened enforcement of a state criminal statute that had been initiated prior to the commencement of any state proceedings against the plaintiff. Observing that the principles of comity, equity, and federalism underlying *Younger v. Harris*, 401 U.S. 37 (1971), and its progeny had little force in such a context, and expressly reserving for another day the question of whether federal injunctive relief may be granted, the Court held that federal declaratory relief was available. *Steffel*, 415 U.S. at 460–475. To be eligible for declaratory relief, the Court held, a plaintiff must face a genuine threat of enforcement of the challenged state criminal statute. *Id*. at 475. Here, while no criminal or civil proceedings in state court have been initiated against the plaintiffs on the basis of the Attorney General's threats, the plaintiffs have

established that they face a genuine threat of enforcement. The court, therefore, concludes that it may grant declaratory relief in view of *Steffel*.

Whether the court should also award injunctive relief presents a substantially less straightforward question. Because, as noted, *Steffel* left this question unanswered, its resolution requires an examination of subsequent Supreme Court decisions. The former Fifth Circuit Court of Appeals undertook just such an examination in *Ealy v. Littlejohn*, 569 F.2d 219 (5th Cir. 1978).[28] Specifically, the court reviewed two post-*Steffel* decisions of the Supreme Court: *Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975), which addressed whether the issuance of a preliminary injunction is barred by the equitable

---

28. In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

124

considerations underlying *Younger*, and *Wooley v. Maynard*, 430 U.S. 705 (1977), which addressed the same question regarding a permanent injunction.  The former Fifth Circuit concluded on the basis of these decisions that *Younger* does not preclude the granting of federal injunctive relief provided the plaintiff can clear the following hurdles: (1) satisfaction of the requirements of federal jurisdiction; (2) demonstration of the existence of "exceptional circumstances"; and (3) demonstration that an injunction is necessary for the adequate protection of the plaintiff's constitutional rights.  CITE?  The Supreme Court in *Wooley* explained the need for these additional barriers as follows: "although [o]rdinarily ... the practical effect of injunctive and declaratory relief will be virtually identical, a district court can generally protect the interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be

unnecessary." 430 U.S. at 711 (internal citations omitted).

It is apparent here that only the second and third showings described in *Ealy* remain at issue. While the intended meaning of "exceptional circumstances," as employed in the second requirement, is far from crystal clear, it does appear to erect a rather high barrier to the issuance of federal injunctive relief. For instance, in *Wooley*, the Court found that three successive prosecutions of the plaintiff in five weeks, with the threat of repeated prosecutions in the future against both him and his wife, satisfied this requirement and justified federal injunctive relief. 430 U.S. at 712. The Court then intimated that a single threatened prosecution, absent earlier proceedings brought against the plaintiffs under the same disputed statute, will not constitute "exceptional circumstances," stating that the scenario presented "is quite different from a claim for federal equitable relief when a prosecution is threatened

for the first time." *Id.*; *see Spencer v. Honorable Justices of Supreme Court of Pa.*, 579 F. Supp. 880, 892-93 (E.D. Pa. 1984) (finding no exceptional circumstances because plaintiff faced only his first threat of prosecution under the challenged provision of the Pennsylvania Code of Professional Responsibility), aff'd, 760 F.2d 261 (3d Cir. 1985) (table).

Because there is no record of prosecutions brought against any of the plaintiffs based on the Attorney General's threats, and because there appears to be no need to question here the soundness of the Supreme Court's observation that, in the context of a challenge to criminal prosecution, "a district court can generally protect the interests of a federal plaintiff by entering a declaratory judgment," this court concludes that the requisite "exceptional circumstances" are not present. Additionally, because the court now declares the Attorney General's threatened prosecution invalid, there is no apparent threat of future prosecution. The Attorney

127

General represented in oral argument that he will not
enforce Alabama criminal laws to prosecute assisting
individuals procuring an abortion in another state where
it is legal should this court hold such enforcement to
be unconstitutional. Moreover, he affirmed his authority
to supervise district attorneys so that they, too, comply
with this court's judgment. The court will, therefore,
refrain from entering injunctive relief, and will enter
only a declaratory judgment.[29]

------------------------

29. At oral argument, when counsel for the Attorney
General was asked whether he threatened prosecution under
criminal statutes beyond Ala. Code 13A-4-4 Conspiracy
Formed in This State to Commit Crime Elsewhere Indictable
Here, counsel would not provide a definitive answer. He
stated: "[W]e proceeded under 4-4. We haven't taken a
position on whether the other three [inchoate statutes],
as a matter of state law, the State would be able to
prosecute the conduct that the plaintiffs seek to engage
in. The statements that were made in this case were very
preliminary. I don't know that there has been full
thought on these other three statutes about whether as a
matter of state law we can prosecute. So I don't think
that I can answer for sure whether it would be necessary
to speak to the other three statutes." Oral Argument Tr.
(Doc. __) at __. Therefore, because of the ambiguity of
(continued...)

## V. CONCLUSION

The court has found that the Attorney General's threatened prosecutions violate the right to travel and the First Amendment. But the broader, practical implications of the Attorney General's threats should not be overlooked. If Alabama held the power its Attorney General asserts here, it is hard to envision a limiting principle besides what the Attorney General personally sees as permissible and impermissible. It is one thing for Alabama to outlaw by statute what happens in its own backyard. It is another thing for the State to enforce its values and laws, as chosen by the Attorney General, outside its boundaries by punishing its citizens and others who help individuals travel to another State to

---

the statutes the Attorney General contemplates enforcing, the declaratory judgment does not specify a particular criminal statute.

129

engage in conduct that is lawful there but the Attorney General finds to be contrary to Alabama's values and laws. For example, the Alabama Attorney General would have within his reach the authority to prosecute Alabamians planning a Las Vegas bachelor party, complete with casinos and gambling, since casino-style gambling is outlawed in Alabama. *See* Ala. Code §§ 13A-12-20 through 13A-12-22. As the adage goes, be careful what you pray for.

****

A judgment will be entered as follows: (1) Plaintiffs' motions for summary judgment will be granted as to all the right-to-travel claims except as to the one brought by plaintiff Yellowhammer Fund on its own behalf. The motions will also be granted as to the freedom-of-speech claims and the expressive-conduct claim as to 'funding.' They will be denied as to the expressive-conduct claim as to 'transportation.' Plaintiffs' motions for summary judgment will be denied

130

as to the claims the court declined to resolve, and those claims will be dismissed without prejudice. And defendant's motion for summary judgment will be granted as to plaintiffs' expressive-conduct claim as to 'transportation' and will be denied in all other respects. (2) The court will grant only a declaration that the Attorney General's threatened prosecutions are unlawful.

DONE, this the 31st day of March, 2025.

  /s/ Myron H. Thompson  
UNITED STATES DISTRICT JUDGE